DOWNEY BRAND LLP
WILLIAM R. WARNE (Bar No. 141280)
MICHAEL J. THOMAS (Bar No. 172326)
ANNIE S. AMARAL (Bar No. 238189)
621 Capitol Mall, 18th Floor
Sacramento, CA  95814-4731
Telephone:     (916) 444-1000
Facsimile:     (916) 444-2100
bwarne@downeybrand.com
mWarne@downeybrand.com
aamaral@downeybrand.com

Attorneys for Defendant/Cross-Defendant
SIERRA PACIFIC INDUSTRIES

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SIERRA PACIFIC INDUSTRIES, ET AL.<br><br>Defendants.<br><br><br>AND RELATED CROSS-ACTIONS | Case No.  2:09-CV-02445-JAM-EFB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO AMEND STATUS (PRE-TRIAL SCHEDULING) ORDER**<br><br>**[Fed. R. Civ. P. 16(b)(4)]**<br><br>Date:          September 1, 2010<br>Time:          9:30 a.m.<br>Judge:        Hon. John A. Mendez<br>Courtroom:  6<br>Trial Date:   October 24, 2011 |

1092123.9

1

# TABLE OF CONTENTS

2

**Page**

3   I.      INTRODUCTION ...................................................................................................1

4   II.     BACKGROUND ...................................................................................................3

        A.     Brief Factual Overview ..............................................................................3

5       B.     The State Actions: Procedural History and Discovery Efforts.............................4

6       C.     The Federal Action: Procedural Background and Discovery Efforts ....................5

7       D.     Testing of the Metal Bulldozer Fragments.............................................................8

    III.    LEGAL STANDARD ...........................................................................................9

8   IV.     LEGAL ARGUMENT...........................................................................................9

9       A.     Defendants Diligently Assisted the Court in Creating a Workable
               Scheduling Order ...................................................................................10

10      B.     Defendants Have Been Working Diligently on Written Discovery,
               Document Production and Review, Expert Disclosures and Depositions ...........10

11      C.     Unforeseen Circumstances Have Arisen that Were Not and Could Not
               Have Been Reasonably Anticipated at the Time the Parties Submitted the
12             Joint Status Report. .............................................................................12

13             1.     After the Parties Submitted Their Joint Status Report, Plaintiff Filed
                      a Second Amended Complaint that Alleges a Brand New Cause of
14                    Action and Includes New Factual Allegations........................................12

15             2.     Discovery Has Revealed Number of Complicated and Fact-
                      Intensive Issues that Were Not Fully Known to Defendants at the
16                    Time the Parties Submitted the Joint Status Report. ................................12

17             3.     Defendants Only Learned of the Complexity of Plaintiff's Damages
                      After the Parties Submitted the Joint Status Report ................................13

18             4.     Defendants' Metallurgy Experts Will Not Be Prepared to Issue
                      Expert Reports by October 15, 2010 .......................................................15

19             5.     There is Not Enough Time Before the Non-Expert Discovery Cut-
                      off to Complete All the Depositions That Need to Be Taken...................15

20      D.     Defendants Have Been Diligent in Seeking Amendment of the Scheduling
               Order Once it Became Apparent that Noncompliance Would be Likely..............18

21      E.     Defendants Request that Six Months Be Added to the Dates in the
               Scheduling Order ...................................................................................18

22  V.      CONCLUSION .....................................................................................................19

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Jackson v. Laureate*, Inc.,
 186 F.R.D. 605, 607 (E.D.Cal., 1999)..................................................................................9

*Johnson v. Mammoth Recreations*,
 975 F.2d 604, 609 (9th Cir.1992)......................................................................................9

## RULES

Fed. R. Civ. P. 16(b)(4)..........................................................................................................9

Fed. R. Civ. P. 26(a)(2)(B)....................................................................................................15

1092123.9

ii

## I.   **INTRODUCTION**

Defendants Sierra Pacific Industries ("Sierra Pacific"), Howell's Forest Harvesting Company ("Howell"), a group of twenty-eight landowners ("Landowners"), and W.M. Beaty & Associates, *et al.* ("Beaty") (collectively, "Defendants") do not bring this Motion lightly. Defendants fully understand that this Court's busy caseload requires a rigorous adherence to its orders. Every now and again, however, a case progresses to a point where it becomes clear that initial assumptions regarding the timing of expert disclosures, discovery, dispositive motions and trial are no longer viable and an adjustment becomes necessary. Such is the case here. Discovery and other aspects of this litigation have revealed that the contemplated deadlines have become unworkable, and unless modified by this Court, Defendants will be unable to adequately defend themselves at trial. Consequently, and for the reasons set forth in this memorandum, Defendants respectfully request that the Court modify its Status (Pre-trial Scheduling) Order (hereinafter the "Scheduling Order") and extend the remaining deadlines by approximately six months.[1]

A brief overview of the complicated facts and legal theories underlying this litigation is necessary to put this request in context. At the most basic level, the United States of America ("Plaintiff" or "United States") is seeking to obtain nearly eight hundred million dollars in connection with the Moonlight Fire, a wildfire that burned 65,000 acres in Plumas and Lassen counties approximately three years ago. As it turns out, and contrary to what Plaintiff apparently assumed at the start of this matter, this wildfire case is not like many, where the cause and origin of the fire is rather obvious, where the defendants spend little time questioning the government's investigative report, and where the parties instead focus mostly on damages. Not so here. The first several months of discovery have capsized the norm, demonstrating that the cause and origin of the Moonlight Fire is anything but settled. Today, the central question of this case has been identified: "Who actually caused the Moonlight Fire?"

---

[1]   While Defendants are asking for six months, they are not doing so with hopes of receiving half of that; indeed, they seek six months after seriously reflecting on what would be the shortest extension necessary to properly prepare this case for trial. If after reading this brief, the Court believes that a six-month extension may be insufficient, Defendants would be grateful for whatever additional time this court believes is appropriate.

MP&A ISO MOTION TO AMEND STATUS (PRE-TRIAL SCHEDULING) ORDER

In an effort to answer this question, the United States clings a "Origin and Cause Investigation Report" jointly authored by the California Department of Forestry and Fire Protection ("Cal Fire") and the United States Forest Service ("USFS").  Although Cal Fire and USFS immediately concluded (the day after the fire) that the Moonlight Fire was caused by bulldozer grousers striking rocks, it is now perfectly clear that the authors of this report reached their premature conclusion before eliminating other possibilities, and that they accepted as true the false statements from untrustworthy witnesses, while but ignoring statements from witnesses who challenged their conclusions.  They also simply failed to identify and interview numerous witnesses who possess important information about what really happened the day the fire ignited.

As a result of these ineptitudes, the United States in this action, and Cal Fire in one of four state court actions, have had no choice but to focus their discovery efforts on deposing witness after witness in a futile effort to shore up the conclusions in the Investigative Report.  Meanwhile, Defendants have conducted their own lengthy and thorough investigation, and are now deposing or are set to depose numerous witnesses who will contest the government's version of who and what started the fire, and who will also testify that they were never even contacted by Cal Fire or USFS during the investigation of the fire's cause.  Although the bulk of the depositions to date have been conducted in the state actions, any effort to suggest that these discovery efforts are not relevant to this action would be completely disingenuous.  Indeed, the United States itself recognizes the importance of these depositions because it spends taxpayer dollars to station an attorney at the state action depositions, taking notes and collecting copies of all exhibits.

Adding another layer of complexity to this case, Sierra Pacific noticed and took the deposition of one of the government's star witnesses, who is quoted in the Investigation Report in a way that is highly supportive of its conclusions, but who in his deposition contradicted numerous aspects of what he told the investigators.  This same witness ultimately took the Fifth Amendment when asked a series of critical questions, including, "Did you start the fire?"  His testimony, as well as that of various other witnesses, has exponentially multiplied the list of percipient witnesses who must be deposed.

/ / /

In light of these and other issues discussed herein, the present deadlines in the Scheduling Order must be revised to reflect the present posture of this case.  In fact, even the newly proposed deadlines are ambitious, but Defendants are hopeful that an additional six months, when coupled with their continuing diligent efforts, will bring this action to resolution as quickly as possible.

## II.      BACKGROUND

### A.      Brief Factual Overview.

As noted above, this action involves the Moonlight Fire, a wildfire that burned approximately 65,000 acres in Plumas and Lassen counties about three years ago.  The fire broke out on Monday, September 3, 2007, near Moonlight Peak and burned for several days without being contained by Cal Fire or USFS.  Approximately 45,000 of the acres that burned are purportedly owned by Plaintiff.

Immediately after being dispatched to the Moonlight Fire, Cal Fire and the USFS focused their cause and origin investigation on a logging operation occurring in the surrounding area, to the exclusion of other possible ignition sources.  Specifically, Cal Fire and the USFS looked to the operations conducted by Defendant Howell, who had been hired by Defendant Sierra Pacific as an independent contractor to harvest timber owed by Defendant Landowners.  Cal Fire and the USFS concluded that a bulldozer operated by a Howell employee allegedly struck a rock, created a spark, and two hours later ignited the blaze now known as the Moonlight Fire.  (*See* Docket Entry No. 53 (Plaintiff's Second Amended Complaint) at ¶¶ 14, 24.)

Cal Fire and the USFS collected small metal fragments off the ground in the area of the alleged point of origin of the fire by dragging a magnet through the soil.  Cal Fire and the USFS issued a joint investigation report, the Origin and Cause Investigation Report ("Investigative Report"), which surmises that these metal fragments are from the subject bulldozer.  (*Declaration of William R. Warne In Support of Motion to Amend Scheduling Order* ("Warne Decl.") at ¶ 6, Ex. B (at US000023-24).)  Neither Cal Fire nor the USFS have tested the fragments they collected to determine whether those specimens match the bulldozer.  (*Id.* at ¶ 7.)

Defendants dispute the conclusions reached by Cal Fire and the USFS, and will vigorously contest their causation theory through the use of (among other things) percipient and

1    expert witness testimony.  Defendants intend to show that Plaintiff bases its claims on a faulty

2    investigation report, which turns on the following dubious evidence:  (1) metal fragments that

3    were collected by a fire investigator when he swept the ground for metal, but which have never

4    been tested to determine whether they ever caused a spark, or whether they came from the

5    bulldozer that is alleged to have run over the rock; (2) testimony of former Howell employee who

6    claims to have received confessions from a Howell bulldozer operator, but who later invoked the

7    Fifth Amendment in response to a variety of critical questions about the cause of the Moonlight

8    Fire; and (3) a signed witness statement by a Howell employee, who later testified under oath that

9    he never made the statements contained therein, that he cannot read, and that he did not even

10   know what the statement contained at the time he signed it.  (Warne Decl. at ¶ 6, Ex. B at

11   US000148-149, ¶ 12, Ex. D, ¶ 13, Ex. E.)

                B.    **The State Actions: Procedural History and Discovery Efforts.**

13          Five lawsuits have been filed to date in connection with the Moonlight Fire.  In addition to

14   this federal action (hereinafter the "Federal Action"), four cases are pending in Plumas County

15   Superior Court (hereinafter the "State Actions").  (Warne Decl. at ¶ 2.)  One of the state actions

16   has been brought by Cal Fire to recoup fire suppression costs, and the others are brought by

17   private parties or insurers for fire damage to land.  (*Ibid.*)  The State Actions have been

18   consolidated for discovery purposes only.  (*Ibid.*)

19          In the State Actions, extensive written discovery has been propounded, voluminous

20   documents have been produced, and numerous depositions have been and are being conducted.

21   (*Id.* ¶ 5.)  As a brief overview of just the State Actions, Defendants have propounded

22   approximately 117 requests for production and 274 specially prepared interrogatories.  (*Ibid.*)

23   Defendants also have propounded nine subpoenas on third parties such as the Plumas and Lassen

24   County Sheriff Offices, Plumas and Lassen County Offices of Emergency Services and various

25   telephone companies.  (*Ibid.*)  Defendants also have responded to multiple sets of written

26   discovery, including approximately 129 requests for production, 552 specially prepared

27   interrogatories, and 42 requests for admission.  (*Ibid.*)

28   / / /

1092123.9                                                 4

MP&A ISO MOTION TO AMEND STATUS (PRE-TRIAL SCHEDULING) ORDER

1    Numerous documents have been exchanged by the parties in the State Actions.  (*Ibid.*)

2    For example, Defendant Sierra Pacific has reviewed and produced approximately 1,640 pages of

3    documents, while Defendant Howell has produced 5,395 pages of documents.  (*Ibid.*)  Defendants

4    have received over 23,853 pages of documents from Cal Fire, with the most recent document

5    production occurring on July 26, 2010.  (*Ibid.*)  Defendants are still in the labor-intensive process

6    of reviewing these documents for relevant information, and are informed by Cal Fire that more

7    documents may be forthcoming, production date unknown.  (*Ibid.*)

8    Even though the document review process has not been completed, numerous depositions

9    have been conducted in the State Actions, with more depositions scheduled for the upcoming

10   months.  (*Ibid.*)  Between March 29, 2010 and August 3, 2010, 22 days of deposition have taken

11   place.  (*Ibid.*)  Additionally, another 35 days of deposition have been scheduled between August

12   9, 2010, and December 17, 2010.  (*Ibid.*)  All of these depositions have been conducted, or are

13   scheduled  to be conducted, in locations that require significant travel by counsel (including

14   Susanville, Anderson, Chico and Redding).  (*Ibid.*)

15   Although these depositions have been conducted in connection with the State Actions,

16   counsel for Plaintiff has attended almost all of these depositions, taken notes and copied exhibits.

17   (*Ibid.*)  Originally, the United States appeared to take the position that it could unilaterally use

18   any and all of these deposition transcripts in the Federal Action, but Defendants could not.  (*Id.*

19   Ex. F, *see* Response to Request for Admission No. 44.)  However, as meet-and-confer discussions

20   progressed, Plaintiff changed course and now contends, as of Monday of this week, that the State

21   Action deposition transcripts can be used by Defendants in the Federal Action, but only if the

22   United States was present at the depositions as an observer.[2]  (*Id.* Ex. J.)

23   **C.    The Federal Action: Procedural Background and Discovery Efforts.**

24   Plaintiff filed the Federal Action on August 31, 2009.  (*See* Docket Entry No. 1.)  It has

25   amended its Complaint twice, most recently on May 26, 2010.  (*See* Docket Entry Nos. 5, 53.)  Its

26

27   _____

     [2] Sierra Pacific disagrees with this position because it is fundamentally unfair.  It would enable the government to pick and choose which depositions to attend, and to leave a deposition while in progress, as the government already

28   has done several times, so that it could shut down the use of testimony if it was becoming unhelpful.  The government should not have unilateral control over which transcripts can be used and which ones cannot.

1   Second Amended Complaint includes new facts and legal theories that Plaintiff did not include in

2   its earlier pleadings.  (*Compare* Docket Entry No. 1, *with* Docket Entry No. 53.)

3          The parties filed their Joint Status Report with the Court on February 8, 2010.  (*See*

4   Docket Entry No. 34.)  The Joint Status Report evidenced strong disagreement among the parties

5   about the manner in which this case should be scheduled.  Plaintiff aggressively pushed for a

6   timeline that would have set trial in approximately one year.  (*See id.* at p. 10.)  Defendants

7   argued that trial in July 2012 was more realistic in light of the complex nature of the case, the

8   large number of percipient witnesses, and the liability and damages issues that would require

9   expert analysis and testimony.  (*See id.* at 10:24-11:16.)

10         In February 2010, the Court issued its Scheduling Order, which set (in relevant part) the

11  following timelines:

| 12 | **Event** | **Deadline** |
| --- | --- | --- |
| 13 | Rule 26 Disclosures | April 15, 2010 |
| 14 | Non-damages Expert Disclosures | October 15, 2010 |
| 15 | Damages Expert Disclosures | December 15, 2010 |
| 16 | Non-Expert Discovery Cut-off | February 15, 2011 |
| 17 | Expert Discovery Cut-off | April 15, 2011 |
| 18 | Dispositive Motions Filed | June 15, 2011 |
| 19 | Dispositive Motions Heard | July 20, 2011 |
| 20 | Final Pretrial Conference | September 16, 2011 |
| 21 | Trial | October 24, 2011 |

22  (*See* Docket Entry No. 39.)

23         After the Court issued this Order, the parties promptly began propounding discovery.  For

24  example, in March 2010, before Initial Disclosures had even been exchanged, Sierra Pacific

25  served a deposition subpoena on Josh White, a co-author of the Investigative Report.  (*See* Warne

26  Decl. at ¶ 3.)  Sierra Pacific also served a Request to Inspect Tangible Things on April 12, 2010,

27  which demanded, among other things, inspection of the metal fragments collected by fire

28  investigators.  (*Ibid.*)  Caterpillar has propounded written discovery on Howell and Beaty.  (*See*

1   *ibid.*)  And, Beaty and the Landowner Defendants requested a number of documents from the

2   government under the Freedom of Information Act.  (*See* Underwood Decl. Exs. A-B.)  In total,

3   Defendants have propounded approximately 280 requests for production, 52 interrogatories and

4   53 requests for admission.  (Warne Decl. ¶ 20.)

5          Plaintiff has served Sierra Pacific with 203 requests for production of documents, 190

6   requests for admission, and more than 25 interrogatories.  (*Id.* ¶ 3.)  Plaintiff propounded similar

7   requests on Eunice Howell, the individual, on Howell (her business), and on Beaty and the

8   Landowners.  (*See ibid.*)  Sierra Pacific also served Howell with a request for inspection of the

9   bulldozer, which was completed on May 14, 2010.  (*See ibid.*)   In total, Plaintiff has propounded,

10  and Defendants have responded to, a collective 324 requests for production, 99 interrogatories,

11  and 380 requests for admission.  (*Id.* ¶ 20.)  Drafting responses to this discovery has been labor

12  intensive and time consuming.  (*Ibid.*)

13         Also, in accordance with the Scheduling Order, the parties served their Initial Disclosures

14  on April 15, 2010.  In these disclosures, Plaintiff revealed for the first time the amount and types

15  of damages it seeks.  (*See* Warne Decl. at ¶ 4, Ex. A.)  Significantly, when Plaintiff served the

16  disclosures, its counsel represented that she would produce the documents identified therein

17  within approximately thirty days.  (*See ibid.*)  In light of this representation, Defendants did not

18  immediately propound a formal request for production.  (*Ibid.*)

19         On May 26, 2010, after Sierra Pacific had reached out to Plaintiff regarding its document

20  production format, Plaintiff revealed that it would not be complying with its earlier promise and

21  would not produce the documents identified in its disclosures.  (*Ibid.*)  Plaintiff took the illogical

22  position that an arrangement reached between its counsel and Sierra Pacific on March 24, 2010 –

23  a date that occurred <u>before</u> Plaintiff had promised to produce the documents – somehow excused

24  compliance with its later representation.  (*Id.* at ¶ 4, Ex. G.)

25         Once Plaintiff made clear its new position, Defendants acted immediately to acquire the

26  documents identified in the Initial Disclosures and other relevant records.  On June 1, 2010, less

27  than one week after Plaintiff revealed it would not be producing the documents as promised,

28  Defendant Sierra Pacific served requests for production on Plaintiff.  (*See id.* at ¶ 3.)  Shortly

1  thereafter, Sierra Pacific followed up with interrogatories and requests for admission.  (*Ibid.*)  In

2  total, Sierra Pacific propounded 225 requests for production, two interrogatories, and 53 requests

3  for admission.  (*Ibid.*)

4       As a result of these and other written discovery requests, numerous documents have been

5  exchanged by the parties.  (*Id.* ¶ 20.)  For example, Sierra Pacific has produced approximately

6  973 pages of documents, and Defendants have received over 62,076 pages of documents from the

7  United States, with its most recent production occurring on July 6, 2010.  (*Ibid.*)  Defendants are

8  still in the process of reviewing these voluminous documents, and are informed by Plaintiff that

9  additional documents will be produced during the week of August 2nd.  (*Ibid.*)

10      The parties have begun to schedule depositions in the Federal Action, but this process has

11  been complicated by the fact that almost every available date between now and mid-December

12  has been noticed or reserved for depositions in the State Actions, and by the fact that the United

13  States and Cal Fire have not completed their document production.  (*Id.* ¶ 21.)  Despite this

14  problem, as well as the difficulty of coordinating calendars for five different sets of attorneys, the

15  federal parties deposed one witness in July, have scheduled five additional depositions for the

16  month of August, and set one deposition for September.  (*Id.*)  However, numerous percipient

17  witness depositions remain, and of course, no expert depositions have been conducted yet.

18      **D.      Testing of the Metal Bulldozer Fragments.**

19      The metal fragments collected by Cal Fire and the USFS at the alleged point of origin

20  appear to be at most only ¼ inch in size.  (*See* Warne Decl. at ¶ 6, Ex. B at US000232.)  A visual

21  inspection of these metal fragments is scheduled to occur on August 5, 2010, which all parties

22  (state and federal) and their experts are expected to attend.  (*Id.* at ¶ 8.)  Significantly, this visual

23  inspection is occurring pursuant to a request for inspection that Sierra Pacific served in both the

24  State Actions and Federal Action in early April 2010.  (*Ibid.*)

25      Because the metal fragments are so small, they may be destroyed while being tested to

26  determine whether they match the bulldozer tracks, as theorized by Cal Fire and the USFS in their

27  Investigative Report.  (*Id.* at ¶ 8.)  To ensure that all parties are afforded the opportunity to

28  participate in the testing of these fragments, counsel for Cal Fire proposed a "Joint Protocol"

1   testing mechanism, whereby the metallurgy experts for the parties in the State Actions and the

2   Federal Action could consult with each other and agree on a joint testing method.   (*Ibid.*)

3   Although the first three steps of the Joint Protocol testing will occur on August 5th, the dates for

4   the remaining six steps have not yet been determined.   (*Ibid.*)

5                               III.   **LEGAL STANDARD**

6           A pretrial scheduling order may be modified by the court upon a showing of good cause.

7   Fed. R. Civ. P. 16(b)(4).   The good cause standard primarily involves the diligence of the party

8   seeking the modification.   *Johnson v. Mammoth Recreations*, 975 F.2d 604, 609 (9th Cir.1992).

9           "Central to this required showing of diligence is whether the movant discharged her

10   obligation under Rule 16 to collaborate with the district court in managing the case."   *Jackson v.*

11   *Laureate*, Inc., 186 F.R.D. 605, 607 (E.D.Cal., 1999).   To this end, "not only must parties

12   participate from the outset in creating a workable Rule 16 scheduling order but they must also

13   diligently attempt to adhere to that schedule throughout the subsequent course of the litigation."

14   *Id*. (internal citation omitted).   In determining whether a party has been diligent, the court may

15   require the party seeking a modification to show the following:

16           (1) that she was diligent in assisting the Court in creating a
             workable Rule 16 order[;] (2) that her noncompliance with a Rule
17           16 deadline occurred or will occur, notwithstanding her diligent
             efforts to comply, because of the development of matters which
18           could not have been reasonably foreseen or anticipated at the time
             of the Rule 16 scheduling conference[;] and (3) that she was
19           diligent in seeking amendment of the Rule 16 order, once it became
             apparent that she could not comply with the order . . . .
20

21   *Id*. at 608 (internal citations omitted).

22                               IV.   **LEGAL ARGUMENT**

23           An abundance of good cause exists to amend the Scheduling Order.   As detailed below,

24   Defendants diligently assisted the Court in creating a workable schedule by proposing dates that

25   appeared to be (at least at that time) feasible for discovery, motion practice and trial.   Despite

26   their best efforts, Defendants will be unable to comply with the current deadlines because of

27   unforeseen matters that were not, and could not, have been anticipated at the time the parties

28   submitted their Joint Status Report.   As soon as these and other issues became apparent,

1   Defendants began preparing this Motion.  Accordingly, for the reasons set forth below, the Court

2   should grant their Motion and extend the current deadlines by six months, and a bit longer for

3   damages expert disclosures.

4       A.      **Defendants Diligently Assisted the Court in Creating a Workable Scheduling**

5               **Order.**

6       Defendants participated in a lengthy meet-and-confer process with opposing counsel to

7   propose a joint schedule to the Court.  (Warne Decl. ¶ 22.)  Counsel were not able to agree on a

8   timeline, and all parties set forth their respective positions in the Joint Status Report, which they

9   timely submitted to the Court.  (*See* Docket Entry No. 34.)  Defendants took their responsibility

10  of assisting the Court so seriously that they explicitly requested a conference be held so they

11  could explain various issues and complexities with scheduling this action.  (*See id*.)

12      B.      **Defendants Have Been Working Diligently on Written Discovery, Document**

13              **Production and Review, Expert Disclosures and Depositions.**

14      Although the Scheduling Order set a shorter timeline than what Defendants requested,

15  they have been working diligently to comply with the deadlines set by the Court.  For example,

16  after the Scheduling Order issued, Defendants promptly prepared and exchanged Initial

17  Disclosures, propounded or responded to approximately 1,188 written discovery requests, served

18  six subpoenas on non-parties, reviewed and produced approximately 973 pages of documents,

19  began their analysis of 62,076 pages of government documents, and attended and/or calendared

20  seven depositions.  (Warne Decl. ¶ 20.)  Of note, Defendants moved forward with propounding

21  their written discovery without the benefit of the documents originally promised by Plaintiff in an

22  effort to avoid wasting the limited amount of time allotted for discovery.  (*Id.* ¶ 4.)  Defendants

23  also have been working diligently to identify and retain numerous experts, and have been

24  cooperatively working with the government to ensure that the metal tractor fragments are tested

25  as soon as possible.  (*Id.* ¶ 20.)

26      Also, the extensive discovery efforts in the State Action cannot be overlooked.  In those

27  actions, Defendants have propounded and responded to approximately 1,114 written discovery

28  requests, produced approximately 7,547 pages of documents, begun their analysis of 23,853

1   pages of government documents, served nine subpoenas on non-parties, attended 22 days of

2   depositions, and scheduled 35 more days of depositions to commence during the next four

3   months.  (*Id.* ¶ 5.)

4        Defendants anticipate that Plaintiffs may attempt to characterize the extensive discovery

5   conducted in the State Actions as irrelevant to the instant Motion.  And at first blush, this Court

6   might be tempted – at least initially – to view that discovery as separate and unrelated to its

7   assessment of this Motion.  But Defendants believe that even the most cursory understanding of

8   the interplay between the discovery in the State Actions and discovery in this Federal Action will

9   lead this Court to conclude that what has happened to date there is absolutely relevant to the

10   court's determination here.

11        First, the relationship between discovery in the State Actions and this action is borne out

12   by the fact that most of the depositions in the State Actions have been attended by an attorney for

13   the United States, which belies any attempt to suggest that the state discovery is unrelated to or

14   isolated from the Federal Action.[3]  (Warne Decl. ¶ 4.)  Each of these actions turn on the question

15   of who actually caused the Moonlight Fire, and what damages, if any, should be recovered.

16        Second, Defendants and their attorneys have been forced to devote significant time,

17   energy and effort to their defense of the State Actions, while simultaneously defending this

18   parallel Federal Action.  As but one example of the time the State Actions require, over the past

19   five months defense counsel have been traveling back and forth to Westwood for site inspections,

20   to Susanville for depositions in a detention facility wherein a critical witness was incarcerated,

21   and to Anderson, Chico and Redding, where numerous and lengthy depositions have been

22   conducted.  (Warne Decl. ¶ 5.)  Simply stated, the attorneys on this matter have been working

23   hard, and the Moonlight Fire cases and their depositions are all but monopolizing the time of

24   numerous lawyers from a variety of firms.

---

25   [3]  Indeed, at the outset, there were multiple scheduling conference calls which included counsel for Cal Fire and
Plaintiff, as well as at least one defense counsel, wherein counsel discussed consolidating all depositions so that any
26   party in both the Federal Action and the State Actions could ask questions for use in either case.  (Warne Decl. ¶ 11.)
These discussions were unsuccessful because the United States was unwilling to stipulate to using California's Code
27   of Civil Procedure for these depositions, a stipulation which Defendants thought was reasonable in light of the
number of depositions being noticed by the State, and because they would certainly go more than seven hours in
28   length in view of the number of parties involved and the complexity of the issues at hand.  (*Ibid.*)

In sum, Defendants have diligently litigated this and the State Actions, but due to unforeseen circumstances and developments discussed below, they cannot reasonably complete discovery, prepare their experts, and defend themselves at trial within the current deadlines.

**C.**   **Unforeseen Circumstances Have Arisen that Were Not and Could Not Have Been Reasonably Anticipated at the Time the Parties Submitted the Joint Status Report.**

Although Defendants have attempted to comply with the Scheduling Order deadlines, circumstances have arisen that were not and could not have been foreseen by Defendants at the time the parties submitted their Joint Status Report to the Court.

**1.**   **After the Parties Submitted Their Joint Status Report, Plaintiff Filed a Second Amended Complaint that Alleges a Brand New Cause of Action and Includes New Factual Allegations.**

On May 26, 2010, months after the parties submitted their Joint Status Report, Plaintiff filed a Second Amended Complaint.  (*See* Docket Entry No. 53.)  The amended pleading contains an entirely new theory of liability for negligent hiring, and also includes new factual allegations. (*See* Docket Entry No. 53 at ¶¶ 11-12, 55-59.)  Defendants did not know and could not have anticipated that these allegations would be made at the time they filed the Joint Status Report because Plaintiff represented at that time that no further amendments to the pleadings were anticipated.  (*See* Docket Entry No. 34 at 7:3-4.)

**2.**   **Discovery Has Revealed Number of Complicated and Fact-Intensive Issues that Were Not Fully Known to Defendants at the Time the Parties Submitted the Joint Status Report.**

Perhaps more importantly, discovery has revealed a blizzard of issues which were not fully known to Defendants at the time they submitted the Joint Status Report.  For example, when the parties submitted this Report, Defendants did not know about the failure of fire investigators to identify and speak to a number of newly identified critical witnesses regarding the cause and origin of the Moonlight Fire.  (Warne Decl. ¶ 22.)  Recent discovery efforts have raised additional doubts about the integrity of the Investigative Report, and it is now clear that each page and witness in this 294 page report must be vetted from start to finish.

Ryan Bauer, a third party and former Howell employee, is an example.  He is quoted in the Investigative Report as stating that he was told by the bulldozer drivers that one of their

1    vehicles caused a spark that started the fire.  (*Id.* at ¶ 6, Ex. B at US000148-149.)  When Mr.

2    Bauer was deposed in the State Actions, he contradicted his interview and then invoked the Fifth

3    Amendment in response to numerous critical questions, which caused his deposition to be

4    subsequently suspended.  (*Id.* at ¶ 12, Ex. D.)  In addition, there is a signed witness statement in

5    the Investigative Report from one of the bulldozer drivers that says he believes one of bulldozers

6    scraped a rock, which allegedly caused the fire, but when questioned about this statement in his

7    deposition, he revealed he could not read and testified that he never made that statement to the

8    fire investigators who questioned him.  (*Id.* at ¶ 13, Ex. E.)

9         Also, at the time that the parties submitted the Joint Status Report, Defendants did not

10   understand that the USFS failed to implement the mandates of the Herger Feinstein Quincy

11   Library Group Forest Recovery Act, which required the government to take measures to create a

12   fire-resilient forest in the area affected by the Moonlight Fire.  (*Id.* ¶ 22.)  Defendants also

13   recently unearthed issues associated with gross misconduct by federal employees on the day of

14   the fire at the Red Rock Look-Out Tower, which raises questions about damages and whether the

15   government could and should have spotted the Moonlight Fire sooner.  (*Ibid.*)

16        Discovery on all of these fronts is continuing, but these factual issues have dramatically

17   increased the workload in this matter, requiring additional time for discovery, experts, motions

18   and trial preparation.  Plaintiff spent two years building its case, finding its experts, and

19   calculating its damages before filing suit.  But their work was incomplete and misguided.  Now

20   Defendants are playing catch-up to learn the true facts and find experts in a case that Plaintiff

21   mistakenly assumed it had ready for trial.  All of the parties are now paying dearly for that faulty

22   assumption.

23              **3.       Defendants Only Learned of the Complexity of Plaintiff's Damages
                           After the Parties Submitted the Joint Status Report.**
24

25        Plaintiff's damage claims are incredibly complex, a fact not known to Defendants at the

26   time the parties filed the Joint Status Report.  While Defendants initially anticipated that this case

27   was complicated and that a large sum would be sought by Plaintiff, they were not privy to the

28   numerous categories and sheer amount of damages sought by Plaintiff until it unveiled its

1092123.9                                          13

1 calculations in its Initial Disclosures.  (Warne Decl. ¶ 22.)  As revealed in these Disclosures,

2 Plaintiff seeks in excess of $791,367,246.76, which includes several unique categories of

3 damages, including: (1) HEA resource-based damages of $469,950,633.84l;[4] (2) timber loss

4 damages of $6,441,296.00; and (3) reforestation damages of $68,098,193.00.  (*Id.* Ex. A.)

5      Moreover, the delayed document production by the United States has frustrated efforts by

6 Defendants to analyze its astronomical damage claim.  Defendants are just beginning the tedious

7 process of attempting to determine if *any* of the 62,076 pages of documents Plaintiff recently

8 produced will be of any assistance in terms of evaluating its damages.  (Warne Decl. ¶ 20.)  And,

9 Plaintiff has represented that additional damages documents will be produced in the next week or

10 so.  (*Id.* Ex. J.)  Consequently, at this point in time, Defendants do not have all of the documents

11 necessary to begin their damages analysis, and if critical documents are withheld, Defendants will

12 have to conduct their analysis from scratch.  This will require experts to engage in complicated

13 tree counts and laborious calculations based on numerous studies and measurements.

14      The current Scheduling Order specifies that all damages expert reports must be completed

15 by December 15, 2010.  However, with the magnitude of damages being claimed, the lack of

16 documentation provided by the government to date, and the damages analysis that must be done

17 by Defendants, there is simply not enough time to meet this deadline.  The lack of time is further

18 complicated by weather, which will likely bury the fire site in snow by November and prevent

19 access.  In view of the fact that the damages claim by the United States may approach $1 billion,

20 the exposure to Defendants is virtually unprecedented.[5]  If Defendants are not provided a

21 [4] Habitat Equivalency Analysis (HEA) is a methodology initially developed to quantify injury to natural resources

22 resulting from discharges of oil, releases of hazardous substances or physical injury such as vessel groundings  *See generally*, "Habitat Equivalency Analysis: An Overview *Damage Assessment and Restoration Program," National Oceanic and Atmospheric Administration, Department of Commerce March 21, 1995.*

23 [5]  As the Court is undoubtedly aware, wildland fires affecting federally owned land in California have occurred for

24 many, many years.  Over the past several years, however, the federal government has deployed new theories and methodologies for asserting damages; the rapid progression of the magnitude of federal damages claims in wildland fire cases is nothing short of astonishing.  For example, in 2006, the United States Attorney for the Eastern District

25 announced a $14 million settlement in the Big Creek Fire case.  The fire reportedly cost $7.7 million to extinguish and the balance of the settlement was compensation for lost commercial timber and HEA-based resource damages.

26 The settlement reportedly represents the first time the United States claimed HEA-based resource damages in a wildland fire case.  In July of 2008, the United States Attorney for the Eastern District issued a press release

27 announcing a $102 million dollar settlement in the Storrie Forest Fire case, which the government boasted was the "largest settlement ever in a forest fire case."  In that case, the fire burned more that 52,000 acres and killed trees on

28 21,000 acres.  The total damages claimed by the government, including lost timber ($121 million) and HEA damages

14

1    meaningful opportunity to prepare a defense to these historic claims, the constitutional

2    implications are clear.  There is just too much at stake; Defendants have a right to both procedural

3    and substantive due process in a scenario where the federal government is attempting to "take" a

4    vast amount of property under the guise of "damages" to a National Forest in a species of

5    litigation that did not effectively exist until recently.

6         **4.    Defendants' Metallurgy Experts Will Not Be Prepared to Issue Expert
             Reports by October 15, 2010.**

7

8        Although Defendant Sierra Pacific requested to inspect the metal fragments in early April,

9    this inspection will not occur until early August.  (Warne Decl. ¶ 8.)  Moreover, the testing to be

10   conducted pursuant to the Joint Protocol has not yet been completed.  (*Ibid.*)  Although the first

11   three steps of this testing will be conducted on August 5th, these preliminary steps will only

12   consist of weighing, measuring and photographing the fragments.  (*Ibid.*)  There is no scheduled

13   completion date for the remaining six steps, which is when the metal fragments will be

14   quantitatively analyzed for the purpose of determining whether they match the bulldozer's track.

15   (*Ibid.*)  Defendants need time for their metallurgists to review and analyze this testing data, and

16   prepare a report that meets the requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil

17   Procedure.  Additionally, their cause and origin experts need this information, as it may inform

18   their analyses of whether the Moonlight Fire is likely to have started at the alleged point of origin,

19   as the government claims, or whether it more likely started elsewhere.

20        **5.    There is Not Enough Time Before the Non-Expert Discovery Cut-off to
             Complete All the Depositions That Need to Be Taken.**

21

22       Despite the immense amount of discovery conducted to date, far more remains to be

23   completed before Defendants are adequately prepared for trial.  Numerous percipient depositions

24   must be completed, many of which cannot be scheduled until Plaintiff and Cal Fire have

25   produced their documents and Defendants have had the opportunity to review these records and

26   discern which witnesses should be deposed.  In addition, almost every available date between

27   ($13 million) were reportedly in excess of $200 million.  In comparison, for the Moonlight Fire, the United States is
claiming damages in excess of $791,367,246.76, almost four times the amount sought in the Storrie Fire case.

28

now and mid-December has been noticed or reserved for depositions in the State Actions.

(Warne Decl. ¶ 21.)  Specifically, the parties in the State Actions agreed to reserve 35 days total

for 29 depositions, all of which are set to occur between August 9, 2010, and December 16,

2010.[6]   (Warne Decl. ¶ 19.)  Eighteen of these depositions will be noticed by Cal Fire or one of

the other plaintiffs in the State Actions, and as such, Defendants are not at liberty to postpone

them.  (*Ibid.*)  The twelve depositions that Sierra Pacific noticed during this timeframe are for key

eyewitnesses who have foundational information regarding events on the day of the Moonlight

Fire, and Defendants need their testimony to inform further discovery efforts in both the State

Actions and Federal Action.  (*Id.* at ¶ 10.)  Defendants had no way of knowing at the time they

filed the Joint Status Report that plaintiffs in the State Actions would notice so many depositions

to occur immediately before the non-expert discovery cut-off in the Federal Action.

The heavy deposition schedule will not be confined to the State Actions.  Having

conducted both formal and informal discovery, Defendants believe that this is a case where the

parties should be entitled to take well more than the ten depositions afforded by the Federal

Rules.  For instance, Plaintiff's Initial Disclosures list 36 people as witnesses who it may use to

support its claims or defenses to the Federal Action.  (*See* Warne Decl. at ¶ 4, Ex. A.)  The first

22 of these witnesses are listed as Cal Fire or USFS employees, making depositions the only

available mechanism for Defendants to obtain information from them.  (*See id.*)  In light of the

need to take these individual's testimony and the testimony of numerous non-parties who were

overlooked by the government in preparing the investigative report, Defendants have requested

that Plaintiff stipulate to fifty depositions per side, but Plaintiff refused.  (*Id.* at ¶ 18.)  For these

reasons, Defendants are being forced to file a motion with Magistrate Judge Brennan to increase

the limits of the Federal Rules.  (*Id.* at ¶ 11.)

Further, it is becoming increasingly clear that Plaintiff is engaged in a concerted effort

with Cal Fire to take advantage of the ongoing separate actions in a way that benefits its

prosecution and is detrimental to Defendants in both the Federal and State Actions.   For instance,

---

[6] This does not include days that the parties agreed to "hold" for depositions in those cases, nor does it reflect the days that counsel for Cal Fire indicated will be taken by additional depositions she intends to notice in January 2011. (Warne Decl. at ¶ 9.)

16

1   during a June 24, 2010, meet-and-confer conference call, representatives for the parties in the

2   State Actions agreed that the deposition of Kelly Crismon (a Howell employee allegedly working

3   on September 3, 2007) would proceed on July 29, 2010.  (*Id.* at ¶ 9.)  Thereafter, on July 13,

4   2010, Cal Fire served its amended deposition notice for the deposition of Mr. Crismon, setting the

5   deposition for July 29th.[7]  (*Id.* at ¶ 16.)  Cal Fire served the deposition notice on all parties via

6   federal express.  (*Id.*)  On the same day, Plaintiff, who did not participate in the June 24th

7   conference call and who did not meet and confer with Defendants about the setting of Mr.

8   Crismon's deposition, hand served a notice for Mr. Crismon's deposition.  The notice was for the

9   same individual, on the same date, at the same time, and at the same place as the corresponding

10  deposition notice in the State Actions.  (*Id.* at ¶¶ 9, 16.)  Thereafter, on July 28, 2010, Cal Fire

11  stated that it intended to allow the United States to lead the deposition.  Sierra Pacific objected,

12  and the United States then took the untenable position that because its deposition notice was

13  served by hand on July 13th, its notice took priority over Cal Fire's Amended Notice served by

14  federal express on the same day.  (*Id.* at ¶ 17, Ex. I.)  The United States only relented on the

15  morning of the deposition when Sierra Pacific's counsel again objected.

16          This gamesmanship continued at the deposition of Kelly Crismon, where the United

17  States, for the first time, on the day of the deposition and after counsel and the witness were

18  assembled, offered to stipulate to the federal and state depositions of Mr. Crismon running

19  concurrently.  For efficiency's sake, Defendants agreed to the proposal and requested the

20  arrangement be applied to additional depositions in the Federal Action.  (Warne Decl. at ¶ 18.)

21  The United States refused, stating it would analyze the issue on a case-by-case basis.  (*Id.*)

22  Apparently, the reason the United States believes that the Scheduling Order does not require

23  modification is because it has already laid the groundwork that will allow it to piggyback on the

24  depositions occurring in the State Actions, and stipulate at the last minute when it suits it to do so.

25          If Defendants are successful on their request for additional depositions, which they expect

26  to be, they need the bulk of these percipient depositions to be taken before the first phase of

27  ───────────────
    [7] Cal Fire had previously served a Notice of Deposition for Mr. Crismon on March 5, 2010, setting his deposition for

28  April 14, 2010.  That deposition date was subsequently vacated due to scheduling concerns, making it necessary for
    Cal Fire to serve an Amended Deposition Notice after the June 24th meet-and-confer conference.

1   expert disclosures occurs.  This is because the liability experts need the percipient witnesses'

2   testimony (including what those witnesses saw on the day of the Moonlight Fire, where they saw

3   it, and when they saw it) to inform their expert opinions regarding whether the fire started in the

4   manner claimed by Plaintiff.  Taking into consideration only the number of Plaintiff-affiliated

5   witnesses listed in Plaintiff's Initial Disclosures, there is no way this could occur before October

6   15, 2010, or for that matter, February 15, 2011, the non-expert discovery cut-off date.

7        **D.**     **Defendants Have Been Diligent in Seeking Amendment of the Scheduling**

8             **Order Once it Became Apparent that Noncompliance Would be Likely.**

9        Knowing that the expert disclosure deadlines would approach quickly, Defendants have

10  been working diligently to retain all the experts who will be necessary to defeat Plaintiff's

11  causation and damages theories.  But upon learning from Cal Fire's counsel of the timeline

12  affiliated with the Joint Protocol, Defendants realized that even if they retained all the experts

13  they needed, it is still unlikely that they would be able to comply with the Court's October 15,

14  2010, deadline because the metal fragments will not have been fully tested by then.  This started

15  to become clear on June 24, 2010, when Cal Fire's counsel proposed October 22, 2010, as the

16  date to test the metal fragments.  (*See id.* at ¶ 8.)  This date is clearly not workable in terms of the

17  Federal Action timeline, and so Defendants, together with Caterpillar, worked with the other

18  parties in the State Actions to move the date and start the testing on August 5th.  (*Ibid.*)  Although

19  measurements and photographs will be taken on this date, qualitative testing will not be

20  conducted until later, on a date unknown.  In light of how long it has taken to schedule just the

21  visual inspection, Defendants anticipate that noncompliance is likely – and even imminent – and

22  as such, after a failed lengthy meet-and-confer process, have been forced to file the instant

23  Motion.  Defendants did this as promptly as they could after realizing the Scheduling Order had

24  become unworkable and that Plaintiff would not stipulate to a meaningful modification.[8]

25  / / /

26

---

27  [8]  Plaintiff would only agree to a limited extension of the expert disclosure deadline.  Specifically, Plaintiff would only stipulate to moving the liability expert disclosure deadline to November 15, 2010 (a one month extension) and

28  the damages expert disclosure deadline to February 15, 2010 (a two month extension).  (Warne Decl. Ex. J.)  In light of the foregoing, clearly this is not enough time for Defendants to adequately prepare their case.

E.     **Defendants Request that Six Months Be Added to the Dates in the Scheduling Order.**

In light of the foregoing, Defendants respectfully request that the Court continue the dates in the Scheduling Order by approximately six months.  Defendants respectfully suggest that the Court amend its Scheduling Order as follows:

| Event | Current Date | Proposed Date |
|---|---|---|
| Non-damages Expert Disclosures | October 15, 2010 | April 22, 2011 |
| Damages Expert Disclosures | December 15, 2010 | July 30, 2011[9] |
| Non-Expert Discovery Cut-off | February 15, 2011 | August 15, 2011 |
| Expert Discovery Cut-off | April 15, 2011 | October 17, 2011 |
| Dispositive Motions Filed | June 15, 2011 | December 16, 2011 |
| Dispositive Motions Heard | July 20, 2011 | January 20, 2012 |
| Final Pretrial Conference | September 16, 2011 | March 12, 2012 |
| Trial | October 24, 2011 | April 16, 2012 |

## V.     CONCLUSION

This is a huge case.  There is nearly $800 million dollars at issue.  There are numerous parties and attorneys involved, all working overtime in an effort to chase down a variety of complicated legal and factual issues.  Before filing its Complaint, Plaintiff had the benefit of almost two years to investigate the Moonlight Fire, interview witnesses, review documents, retain experts, vet its legal claims and theories, and devise its damages claims.  It did so, and now wants to rush Defendants to trial so that they have the least amount of time to discover and analyze the true facts.  In a case where so much is at stake, the ultimate decisions which will be made on causation and damages should not be the product of rushed discovery and analysis.  Moreover, discovery here has already revealed that the government's case is a tangle of unanswered questions and premature conclusions.  Fairness dictates that Defendants should be provided with an opportunity to fully investigate and prepare for trial, especially since the circumstances have

---

[9]  Defendants request a seven and a half month extension of the damages expert disclosure deadline due to the unpredictability of the weather and their inability to visit the fire site while snow is on the ground.

1092123.9

19

changed dramatically since the parties submitted their Joint Status Report.  For all the reasons set forth in this brief, and in the interest of simple fairness, Defendants respectfully request that the Court modify the Scheduling Order and extend the remaining deadlines by approximately six months.

DATED:  August 4, 2010                    DOWNEY BRAND LLP


                                          By: /s/ William R. Warne
                                              WILLIAM R. WARNE
                                          Attorneys for Defendant/Cross-Defendant
                                              SIERRA PACIFIC INDUSTRIES

DATED:    August 4, 2010                  RUSHFORD & BONOTTO, LLP


                                          By: /s/ Phillip R. Bonotto (as authorized on 8/4/2010)
                                              PHILLIP R. BONOTTO
                                          Attorneys for Defendants/Cross-Defendants
                                          EUNICE HOWELL, individually and DBA
                                              Howell's Forest Harvesting Company

DATED:    August 4, 2010                  MATHENY SEARS LINKERT & JAIME, LLP


                                          By: /s/ Richard S. Linkert (as authorized on 8/4/2010)
                                              RICHARD S. LINKERT
                                          Attorneys for Defendants/Cross-Claimants
                                          W.M. BEATY & ASSOCIATES and
                                              LANDOWNER DEFENDANTS
                                              (Brooks Walker *et al.*)

MP&A ISO MOTION TO AMEND STATUS (PRE-TRIAL SCHEDULING) ORDER