IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,                                      No. CIV S-09-2445 KJM EFB

    vs.

SIERRA PACIFIC INDUSTRIES, et al.,

    Defendants.                             <u>ORDER</u>

/

        Defendant Sierra Pacific Industries, W.M. Beaty/ Landowner defendants, and Howells defendants move to compel the United States to produce testimony and documents relating to communications between two of the United States' designated expert witnesses, Joshua White and Dave Reynolds, and attorneys for the United States and the California Department of Forestry and Fire Protection ("CDF"). The parties appeared at a hearing before the undersigned on April 28, 2011, and the matter was submitted.[1] For the reasons given below, the motion to

---

[1] At the hearing, the parties also discussed the United States' April 22, 2011 request for a discovery conference and request for a stay of responding to defendants' written discovery. As memorialized in the court's May 5, 2011 order, the United States was granted additional time to respond to some of defendants' discovery. The parties agreed to further meet and confer regarding their discovery disputes, and to contact the undersigned's courtroom deputy if it became necessary to schedule a discovery conference. The United States' request for a stay of discovery was denied.

1

compel is granted.

## I. BACKGROUND

This lawsuit concerns damages caused by the Moonlight Fire in September 2007. At the time of the fire, White was a CDF employee and Reynolds was an employee of the United States Forest Service. Dckt. No. 178-1 at 1. They investigated the fire and prepared an Origin and Cause Report documenting their findings. *Id.* at 2. In 2010, the United States disclosed them as testifying expert witnesses. *Id.* White and Reynolds were not retained experts, and they did not prepare expert reports for this litigation for the purposes of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). *Id.*

The United States claims that communications between White and Reynolds and the United States Attorneys' Office ("USAO") and the California Attorney General's Office ("AGO") are work product and protected by the attorney-client privilege.[2] Therefore, the United States instructed White and Reynolds not to answer deposition questions regarding conversations that they had with attorneys from the USAO or the AGO, and refused to produce documents reflecting communications between the experts and counsel.

Defendants do not dispute that the communications and documents in question were initially privileged. Rather, they argue that by designating White and Reynolds as testifying expert witnesses, the United States waived otherwise applicable privilege and work-product protection for those communications and documents.

## II. ANALYSIS

### A. The Applicable Federal Rule Was Recently Amended

The Federal Rule governing expert witness disclosures was amended on December 1, 2010. The relevant changes here pertain to whether certain communications by counsel to an

---

[2] The USAO and the AGO have entered into a joint prosecution agreement. Defendants do not argue that otherwise applicable privileges are waived because of the disclosure of the documents and communications at issue to CDF. Defs' Mot. to Compel at 9.

expert witness who has been designated to testify at trial results in a waiver of any privilege or work product protections as to the information communicated. Although perhaps an oversimplification of the matter, and as explained in greater detail below, the rule amendments effected a change as to the protection of communications with counsel and retained expert witnesses. Under the old rule, there was little or no protection for what counsel said or provided to a designated expert and such communications were generally discoverable. Under the new rule, some communications can occur without waiving work product protection, but the rule differentiates between experts who are required to provide reports and experts who are not. As seen below, that distinction has relevance here.

The former version of the rule required an expert witness who was "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony" to provide a written report, containing, *inter alia*, the "data or other information" considered by the witness in forming his or her opinion. *See* Fed. R. Civ. P. 26(a)(2)(B) (effective until December 1, 2010). It did not discuss expert witnesses who did not fall into these categories.

The new rule explicitly sets out different requirements for reporting experts and non-reporting experts. Reporting experts (i.e., experts who are retained, specially employed, or whose duties as a party employee include regularly giving testimony) must now reveal in their reports only the "facts or data" they considered in forming their opinion, rather than "data or other information." *See* Fed. R. Civ. P. 26(a)(2)(B) (effective December 1, 2010). Non-reporting experts must disclose the subject matter of their testimony and a summary of the facts and opinions they will testify to. Fed. R. Civ. P. 26(a)(2)(C). The new rule provides that draft reports and disclosures for both reporting and non-reporting experts are protected and not discoverable, and, significantly, it explicitly protects communications between a party's attorney and reporting experts. Fed. R. Civ. P. 26(b)(4)(B), (C).

////

**B.    The New Rule Governs this Dispute**

Defendants contend that the old rule applies to this dispute, whereas the United States contends that the new rule applies.[3]  The rule was amended on December 1, 2010.

The scheduling order in this case required the parties to disclose their experts by April 22, 2011.  Dckt. No. 38.  The United States disclosed White and Reynolds as expert witnesses early on August 30, 2010, and amended their disclosures on September 14, 2010.  Dckt. No. 171, Ex. B, C.  White and Reynolds' depositions were taken in March 2011.  *Id.* at 4, Ex. F-H.  Thus, the United States disclosed its experts before the amended rule took effect, but the depositions of the experts did not take place until after the amended rule took effect.

In its April 28, 2010 order adopting the amendments to the Federal Rules, the United States Supreme Court ordered that the changes "shall take effect on December 1, 2010, and shall govern all proceedings thereafter commenced, and, insofar as just and practicable, all proceedings then pending."  This proceeding was already pending on December 1, 2010; therefore, the new rule applies to this dispute *unless* the result would be either unjust or impracticable.

Defendants argue that the "just and practicable" language has been interpreted by the Seventh Circuit to mean that a newly amended rule does not change the consequences of actions taken prior to the effective date.  *See Diaz v. Shallbetter*, 984 F.2d 850, 853 (7th Cir. 1993) ("Amendments may or may not govern 'further proceedings' in pending cases.  Neither the statute nor the Court's implementing language implies using an amendment to change the *consequences* of actions completed before [the effective date of the amended rule] . . . only . . . new acts in cases already on the docket ordinarily should conform to the new rules.") (emphasis in original).  Defendants argue that the United States chose to disclose their expert witnesses before the effective date of the amended rule, and that the amended rule should not be

---

[3] Both parties argue that the motion to compel should be resolved in their favor regardless of whether the old or new rule applies.

4

applied to change the consequences of this action–that is, that privileges have been waived.

First, *Diaz* is not controlling authority. *See G.F. Co. v. Pan Ocean Shipping Co.*, 23 F.3d 1498, 1502 (9th Cir. 1994) (reaching a different conclusion regarding the applicability of an amended rule in a factual context similar to the one in *Diaz*). Moreover, as discussed below, applying the new rule does not change the outcome of this dispute. Whether the new rule or the old rule is applied, by disclosing White and Reynolds as testifying expert witnesses, the United States waived the otherwise applicable privilege. Under the facts of this case, the consequences of the United States' expert witness designations are not changed by applying the amended rule.

Finally, even if applying the new rule changed the outcome of this dispute, the parties have had ample notice of the provisions that would take effect under the new rules and should have been able to prepare accordingly. As application of the new rule does not create unjust or impracticable results here, it applies to this dispute.

### C. White and Reynolds are Non-Reporting Experts

Both parties have argued that White and Reynolds should be considered non-reporting expert witnesses, as the Federal Rules do not require them to prepare a written expert report. *See* Fed. R. Civ. P. 26(a)(2)(B) ("*Witnesses who must provide a written report . . .* [include those who are] retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."). Although White and Reynolds authored an investigative report on the cause and origin of the Moonlight Fire, the United States has not provided Rule 26 expert reports for them.

White and Reynolds' testimony in this case will be limited to the knowledge and opinions that they had formed at the time of their report. Pl.'s Br. at 2. Neither White nor Reynolds has been retained by the United States. *Id.* The United States writes, "While their opinions are contained in the Report of Investigation (which was attached to the expert disclosure), these experts did not and were not required to produce a separate report under Rule 26(a)(2)(b) . . . . Therefore, these witnesses are properly considered non-reporting witnesses

5

. . ." *Id.* at 3.  Later in its brief, the United States declares that if the court grants this motion to compel, it intends to "of course retain White and Reynolds for a nominal fee, thus making them reporting experts." *Id.* at 15.  Defendants argue that the United States has repeatedly asserted that White and Reynolds are non-reporting experts, and that they should be estopped from adopting a contrary position.  Defs' Reply at 14.[4]

As noted above, White, a CDF employee, and Reynolds, a former USFS employee, jointly investigated the cause and origin of the Moonlight Fire.  They were present at the fire scene on the day that the fire began and on multiple days thereafter.  They are percipient witnesses as well as expert witnesses who will testify both as to their percipient observations as well as their opinions.

After the parties completed their briefing, and after the hearing on this motion, the Ninth Circuit issued a decision in *Goodman v. Staples the Office Superstore*.  The Ninth Circuit held that when a treating physician is hired to render expert opinions that go beyond the usual scope of a treating doctor's testimony, he "morphs" into the type of expert witness for whom an expert report must be provided.  2011 WL 1651246, *1 (9th Cir. May 03, 2011).  In *Goodman*, the plaintiff disclosed her treating physicians as experts, but originally did not provide expert reports for them.  *Id.* at *2-3.  Plaintiff had "specifically retained" the treating physicians to provide expert testimony beyond the scope of the treatment rendered.  *Id.* at *8.  Plaintiff's counsel had given the treating physicians information that they had not reviewed during the course of treatment to aid them in forming their expert opinions.  *Id.*  The trial court limited the treating physicians' testimony to opinions actually developed during the course of the doctors' treatment of the plaintiff.  *Id.* at *3.  The Ninth Circuit affirmed, holding that a treating physician is only a non-reporting witness to the extent that his expert opinions were formed during the course of

---

[4] The court will not address the United States' stated intention to retain the witnesses or whether such a change in designation would be permissible at this point, as it would be speculative to do and the parties have not fully briefed the ramifications of such a change in designation.

6

1 treatment. *Id.* at *8. Thus, as to those opinions an expert report was not required as a
2 prerequisite to the physician's opinion testimony at trial.  However, plaintiff was required to
3 provide expert reports for the treating physicians' opinions that were outside of this scope. *Id*.
4 For opinions formed on the basis of information obtained by the physician other than in the
5 course of the treatment, the same rule applies as for any other expert and a report is required
6 setting forth the expert's opinions and the basis for those opinions.  The distinguishing
7 characteristic between expert opinions that require a report and those that do not is whether the
8 opinion is based on information the expert witness acquired through percipient observations or
9 whether, as in the case of retained experts, the opinion is based on information provided by
10 others or in a manner other than by being a percipient witness to the events in issue.

11 Because the law regarding the "hybrid expert situation" was not settled in the Ninth
12 Circuit, the court applied the newly clarified rule prospectively, and allowed plaintiff a chance to
13 disclose expert reports for the treating physicians. *Id.*

14 Like the treating physicians in *Goodman*, White and Reynolds are hybrid percipient and
15 expert witnesses.  But the physicians reviewed documents after they treated plaintiff for the
16 purpose of testifying regarding the causation of her injuries, and formed some of their expert
17 opinions after they had concluded their treatment of plaintiff.  According to the United States,
18 White and Reynolds' testimony will be limited to the knowledge and opinions that they formed
19 at the time they drafted their report on the cause and origin of the Moonlight Fire.  They will not
20 render any expert opinions save those that they had already formed at the time that they wrote
21 their investigative report.  Moreover, the treating physicians in *Goodman* were retained as expert
22 witnesses, although they were apparently not paid until after the initial deadline for disclosing
23 expert witnesses, when they were retained to write reports for settlement purposes and for
24 rebuttal expert disclosures. Pl.'-Appellant's Opening Br., 2010 WL 3390207 *34-35.  White and
25 Reynolds have not been paid at any time for their expert opinions.
26 ////

Both parties have consistently agreed, both in their briefing and at the pre-motion informal phone conference held with the undersigned, that White and Reynolds are non-reporting experts. White and Reynolds will not offer any opinions that were formed after they drafted their report summarizing their percipient investigation of the Moonlight Fire. The United States has not paid White and Reynolds for their role as expert witnesses at any time. Therefore, the recent holding in *Goodman* does not change White and Reynolds' categorization as non-reporting expert witnesses. As White and Reynolds are properly categorized as non-reporting expert witnesses, *Goodman*, which was published days after the parties had completed briefing and the hearing was held, does not alter the analysis applicable here.

### D. The Amended Rule Does Not Change the Common Law Regarding Waiver of Privilege for Non-Reporting Expert Witnesses

As noted above, the newly amended Rule 26 explicitly protects communications between a party's attorney and reporting experts. *See* Fed. R. Civ. P. 26(b)(4)(C) ("Rules 26(b)(3)(A) and (B) protect communications between the party's attorney and any witness required to provide a report under 26(a)(2)(B), regardless of the form of the communication," with certain exceptions). But the rule is silent as to communications between a party's attorney and non-reporting experts.

However, the advisory committee notes state:

> The protection is limited to communications between an expert witness required to provide a report under Rule 26(a)(2)(B) and the attorney for the party on whose behalf the witness will be testifying, including any "preliminary" expert opinions . . . . The rule does not itself protect communications between counsel and other expert witnesses, such as those for whom disclosure is required under Rule 26(a)(2)(C). The rule does not exclude protection under other doctrines, such as privilege or independent development of the work-product doctrine.

2010 Advisory Committee Note to Fed. R. Civ. P. 26. Thus, the advisory committee notes explain that the new rule does not provide protection for communications between non-reporting experts and counsel, but does not disturb any existing protections.

The United States and defendants agree that the amended rule did not change the existing law regarding non-reporting experts. However, both sides argue that the previously existing

8

common law has always supported their position.  Defendants contend that there has long been a bright-line rule in the Ninth Circuit that disclosing any witness as a testifying expert waives all privileges; however, none of the cases that they cite actually involved non-reporting experts.  In contrast, United States contends that the waiver rule never applied to non-reporting experts, because such experts were never required to disclose the "data or other information" they considered in forming their opinions.  The United States cites no cases holding that the waiver rule does not apply to non-reporting experts.

The minutes of the Civil Rules Advisory Committee meeting show that the committee did not intend that communications between a party's counsel and non-reporting experts generally be protected.  The committee discussed and rejected the idea of protecting communications with all non-reporting experts, and more specifically, with non-reporting party employee experts.  The committee found reasons to protect communications with some types of non-reporting experts, but not others.  The committee decided that it had not yet received sufficient input regarding the advisability of protecting communications with any of the types of non-reporting experts to risk codifying such protection.

At the committee's February meeting, it was suggested that the protection should be extended to communications with all non-reporting experts, or alternatively, to experts who are employed by a party but whose duties do not involve regularly giving expert testimony.  Minutes, Civil Rules Advisory Committee Meeting (February 2-3, 2009) p. 7.  On the one hand, it was argued that lawyers should be free to communicate with employee experts who do not regularly give testimony as they are to communicate with those who are retained or specially employed to give testimony.  *Id.*  On the other hand, employee experts often have fact knowledge apart from their expert opinions.  *Id.*  Also, it was suggested that if communications with all employee experts were protected, lawyers might abuse the rule by designating a former employee as an expert witness.  *Id.* at 8.  It was further observed that the project was launched to address a different concern–that is, the problems created by the 1993 amended rules allowing

discovery into reporting experts' communications with counsel. *Id.* at 8. All of the pre-publication comments focused on these problems with outside experts. *Id.* at 7. The committee concluded that this issue should be considered by a subcommittee. *Id.* at 8.

At the committee's April meeting, the issue was discussed further. Minutes, Civil Rules Advisory Committee Meeting (April 20-21, 2009) p. 14-20. The subcommittee had decided not to protect attorney communications with all non-reporting experts. *Id.* at 14. The subcommittee also decided not to protect communications with employee experts, for fear of unintended consequences. *Id.* at 20. Regarding the employee expert witnesses, the subcommittee was concerned about line-drawing problems, and whether communications with in-house counsel, former employees, and contract employees should be protected. *Id.* at 19. Moreover, a party's employee might be an important fact witness as well as an expert witness, leading to "obvious opportunities for mischief." *Id.* at 20. For example, if an employee engineer designed a product that was the subject of a product liability case, it would be difficult to separate the engineer's sense impressions leading up to the design of the product with his expert opinions at trial, and to distinguish between attorney communications regarding the former from those regarding the latter. *Id.* The committee did not want to protect communications of one party's lawyer with "treating physicians, accident investigators, and the like." *Id.* at 14. (The committee also noted that there were good arguments on both sides of the issue of protecting communications between a plaintiff's attorney and a treating physician. *Id.* at 19.)

The minutes of the committee's May 2009 meeting reflect its final decision not to codify protections for communications with employee experts:

> . . . Both the Subcommittee and the Committee concluded that *the time has not yet come to extend the protection for attorney expert communications beyond experts required to give an (a)(2)(B) report*. The potential need for such protection was not raised in the extensive discussions and meetings held before the invitation for public comment on this question. There are reasonable grounds to believe that broad discovery may be appropriate as to some "no-report" experts, such as treating physicians who are readily available to one side but not the other. Drafting an extension that applies only to expert employees of a party might be tricky, and might seem to favor parties large enough to have on the regular

10

> payroll experts qualified to give testimony.  Still more troubling, employee experts often will also be "fact" witnesses by virtue of involvement in the events giving rise to the litigation.  An employee expert, for example, may have participated in designing the product now claimed to embody a design defect.  Discovery limited to attorney-expert communications falling within the enumerated exceptions might not be adequate to show the ways in which the expert's fact testimony may have been influenced.

Report of the Civil Rules Advisory Committee (May 8, 2009, amended June 15, 2009), pp. 4-5 (emphasis added).

Thus, finding that there were certain circumstances under which broad discovery should be allowed into a party attorney's communications with a non-reporting employee expert witness, the committee refused to protect such communications in all cases.  But the committee did not intend that such communications with non-reporting expert witnesses be discoverable in all cases.

It is clear that the amended rule neither created a protection for communications between counsel and non-reporting experts witnesses, nor abrogated any existing protections for such communications.  As noted previously, there is no contention here that White and Reynolds are reporting experts for purposes of the protections under the new rule.

### E. Designating White and Reynolds as Expert Witnesses Waived Privileges and Protections

As explained in the previous section, the 2010 amendments to rule 26 did not change the law as to non-reporting experts.  Accordingly, the law prior to the date of the amendment determines whether the United States waived applicable protections by disclosing White and Reynolds as expert witnesses.

Defendants argue that before the 2010 amendments courts in the Ninth Circuit followed a bright-line rule that designating an individual as a "testifying expert" waives all otherwise applicable privileges and protections of communications with and information provided to that expert by counsel retaining the expert.  *See* Def.'s Mot. to Compel at 7 (citing *In South Yuba River Citizens League v. National Marine Fisheries Service*, 257 F.R.D. 607, 610 (E.D. Cal.

11

1  2009) (explaining that "the work product rule does not protect materials, including attorney
2  opinion, considered by a testifying expert in formation of his opinions"); *Ass'n of Irritated*
3  *Residents v. Dairy*, 2008 WL 2509735, *1 (E.D. Cal. 2008) ("The majority view, and the better
4  view...is that all things communicated to the expert and considered by the expert in forming an
5  opinion must be disclosed even if it constitutes opinion otherwise protected as work product.");
6  *S.E.C. v. Reyes*, 2007 WL 963422, at *1, n.1 (N.D. Cal. 2007) (explaining that "courts have
7  overwhelmingly...imposed a 'bright-line rule' that all materials considered by a testifying expert,
8  including attorney work product, must be disclosed" and holding the same)).[5]  Although several
9  of these cases use the term "testifying expert," which logically encompasses both reporting and
10 non-reporting experts, none of the cases defendants cite actually involved non-reporting experts
11 like White and Reynolds.

12      The United States agrees that there was a bright-line waiver rule within the Ninth Circuit
13 with respect to reporting testifying experts, but contends that rule never applied to non-reporting
14 testifying experts.  The United States argues that the rationale for the waiver rule simply does not
15 apply to non-reporting experts, because the waiver of privilege stems from the 1993 amendments
16 to Rule 26.  The 1993 amendments required parties to disclose the "data and other information"
17 that reporting experts considered in forming their opinions.  Fed. R. Civ. P. 26(a)(2)(B)
18 (effective until December 1, 2010).  The "data and other information" language was intended to
19 put a stop to arguments that materials given to testifying expert witnesses were privileged or
20 protected.  *See* 1993 Advisory Committee Note to Fed. R. Civ. P. 26, sub. (B), par. (2).  Thus,
21 argues the government, as the 1993 rule amendment only applied to reporting experts, there was
22 never any waiver of privilege with respect to non-reporting experts.

23      There is some support for the United States' position in the advisory committee's
24 meeting minutes for the 2010 revisions, which, as explained above, undid the effects of the 1993

---

[5] The Ninth Circuit itself has never addressed this issue.

12

amendments as to reporting expert witnesses. The 2010 committee minutes state:

> If we do not say anything about communications with employee witnesses, there may be a negative implication that they are not protected by work-product doctrine. This observation was met with the suggestion that before 1993, it would have been assumed that work-product protection applies to all attorney-expert communications. The 1993 Committee Note never purported to change that as to experts not required to make a Rule 26(a)(2)(B) report.

Minutes, Civil Rules Advisory Committee Meeting (April 20-21, 2009) p. 8. Apparently, at least some members of the committee assumed that before the 1993 amendments all attorney-expert communications were protected. While this may have been the case in some jurisdictions, there is no support for that premise in the caselaw from courts within this circuit. Indeed, the pre-1993 caselaw is to the contrary. Prior to the 1993 amendments, courts within the Ninth Circuit had already found that communications with expert witnesses were discoverable. For example, a Northern District of California case found that communications from counsel to a testifying expert are discoverable to the extent that they relate to matters about which the expert will testify. *Intermedics, Inc. v. Ventritex, Inc.*, 139 F.R.D. 384, 397 (N.D. Cal 1991). The court reasoned that the trier of fact should be able to discover whether a testifying expert was actually merely parroting the opinions of the party's lawyer. *Id.* ("We hope that the rule we adopt here will enhance the reliability of the fact finding process and will promote public confidence in our adjudicatory system"). *See also Mushroom Associates v. Monterey Mushrooms, Inc.*, 1992 WL 442898, *5 (N.D. Cal. 1992) (citing *Intermedics* and holding that documents an employee expert had considered in forming his expert opinion were discoverable).

Before and after both the 1993 and 2010 rule amendments, courts within the Ninth Circuit held that privileges and protections were waived for communications between a party's attorney and a testifying expert. The United States cites no case from any time period within the Ninth Circuit finding that the privilege was not waived in the case of a non-reporting yet testifying expert. The United States does cite a recent New Jersey district court decision that found that communications between a party's counsel and employee witnesses who had not yet

13

been designated as experts were not discoverable. *See Graco, Inc. v. PMC Global*, 2011 WL 666056 (D.N.J. February 14, 2011). In *Graco*, the plaintiff submitted employee affidavits containing expert opinions in support of its motion for preliminary injunction and in opposition to a motion for summary judgment. *Id.* at *1. Defendant brought a motion to compel discovery of, among other things, communications between these employee witnesses and plaintiff's counsel, arguing that plaintiff had waived protection by submitting these employees' expert testimony to the court. *Id.* Even though plaintiff had not yet disclosed the employees as experts, the court found that they were testifying experts given the reliance on the testimony in their declarations. *Id.* at *13. Applying the 2010 amended rule, the court ordered disclosure of facts and data relied on by the witnesses, including "communications with anyone other than Graco's counsel about the opinions expressed . . . ." *Id.* at *12, *14. While the court did not order the disclosure of communications between counsel and the testifying experts, the analytical basis for that result is not explained. *Graco* discussed at length the text of the 2010 amended Rule 26 and the advisory committee notes, but it engaged in little analysis in support of its conclusion. Rather, after quoting the committee notes and stating general principles of attorney-client and work product privilege law, *Graco* summarily concluded that the "Employee Opinion Witnesses" were not required under Rule 26(a)(2) to submit written reports, and further that Graco's counsel's communications with those witnesses were protected by attorney-client privilege and were not discoverable. *Id. Graco* does not analyze the state of the caselaw prior to the 2010 amendments as to whether communications by counsel with non-reporting or so-called hybrid expert witnesses waived the privilege. Nor does *Graco* provide any persuasive reason for rejecting the several district court opinions from within the Ninth Circuit that had clearly held at the time that such communications were not protected and must be disclosed upon the designation of the witness as a testifying expert. Thus, *Graco* (which is not controlling here) provides little assistance to address the issue presented on this motion.

////

As explained in detail above, the advisory committee notes to the 2010 amendments to Rule 26 show that the committee did not intend to either generally protect or generally not protect communications between a party's counsel and non-reporting experts. Although the committee considered protecting communications with non-reporting party employee experts, it ultimately decided not to do so. The committee recognized that the term "non-reporting" encompasses a varied class of experts who present unique policy considerations. For example, party employees and former employees, in-house counsel, independent contractors, treating physicians, and accident investigators might all be non-reporting expert witnesses.

Some of these non-reporting witnesses should not be treated differently than reporting expert witnesses. For example, there is no immediately apparent policy reason to treat an employee expert whose duties regularly involve giving expert testimony any differently than an employee expert whose duties involve only intermittently giving expert testimony.

However, some non-reporting witnesses, such as treating physicians and accident investigators, should be treated differently than reporting witnesses with respect to the discoverability of their communications with counsel. *See* Minutes, Civil Rules Advisory Committee Meeting (April 20-21, 2009) p. 14 ("The Committee did not want to protect communications by one party's lawyer with treating physicians, accident investigators, and the like. An employee expert, moreover, may be an important fact witness."). These type of witnesses are hybrid fact and expert opinion witnesses. While it is desirable that any testifying expert's opinion be untainted by attorneys' opinions and theories, it is even more important that a witness who is testifying regarding his own personal knowledge of facts be unbiased. Therefore, at least in some cases, discovery should be permitted into such witnesses' communications with attorneys, in order to prevent, or at any rate expose, attorney-caused bias.

Given the facts of this particular dispute, counsel's communications with White and Reynolds should not be protected. White and Reynolds are hybrid fact and expert witnesses. In addition to being current and former employees, White and Reynolds have percipient knowledge

15

of the facts at issue in this litigation. As two of the three primary investigators of the Moonlight Fire, they have first-hand factual knowledge regarding the causes of the Moonlight Fire. If their communications with counsel were protected, any potential biases in their testimony regarding the causes of the fire would be shielded from the fact-finder.

The court declines to hold that designating an individual as a non-reporting expert witness waives otherwise applicable privileges and protections in all cases, or even for all cases involving non-reporting employee expert witnesses. But in this particular factual scenario, the United States waived its privilege and work-product protection by disclosing White and Reynolds as expert witnesses.

The United States argues that the foreseeable consequence of this ruling is that parties will be forced into retaining their own employees as expert witnesses in order to prevent discovery into their communications with these experts. If the analysis turns on whether the expert is being paid, the United States argues, parties will buy privilege by retaining all of their experts. But the analysis does not turn solely on whether an expert is being paid. As explained above, some types of non-reporting experts should be treated the same as reporting experts for the purpose of determining whether a party's communications with them are privileged. In addition, the amended Rule 26 provides that communications between retained experts and counsel are protected. The rule clearly does not itself provide protection for communications between non-reporting experts and counsel. Although the United States may disagree with the soundness of the policy behind the amended rule, the issue it raises is one caused by the rule itself.

As for the United States' contention that it will protect its communications with White and Reynolds by retaining them for a nominal fee, thus transforming them into reporting experts, the court makes no ruling at this time on the permissibility or effect of such an action given the history of this discovery dispute.

////

### F. The Discovery At Issue

The remaining question is specifically what documents and communications must be produced. Defendants seek all documents and communications that White and Reynolds drafted, prepared, saw, read, reviewed, reflected upon, considered and/or received any time after this litigation was instituted. Def.'s Mot. to Compel at 4. More specifically, defendants claim that they are entitled to question White and Reynolds regarding the substance of conversations they had with attorneys for the United States and CDF, and that they are entitled to specific documents listed on CDF's privilege log in a state court case over damages caused by the Moonlight Fire. *Id.* at 5-6.

The United States admits that well after Reynolds and White completed their investigation, the USAO communicated with Reynolds about his investigation. Pl.'s Br. at 3. The United States also admits that the USAO communicated with White in the presence of attorneys from the AGO in preparation for litigation. *Id.* at 3-4.

As for documents, the United States admits that documents reflecting communications between Reynolds and the USAO were created before and after litigation commenced. *Id.* at 4. The documents created before the litigation commenced are listed on the United States' privilege log. *Id.* The documents created after litigation commenced are not, as "those documents are assumed to be privileged." *Id.* One former Assistant U.S. Attorney may also have had written communications with White. *Id.* The United States asserts that most if not all of these written communications with Reynolds and White are "logistical in nature." *Id.* The United States further asserts that it does not have possession of "the majority" of the documents listed on CDF's privilege log, including communications between White and CDF attorneys or employees. *Id.*

The United States must produce all documents and communications that White and Reynolds considered–that is, generated, saw, read, reviewed, and/or reflected upon–in connection with their analysis of the Moonlight Fire, regardless of whether the documents ultimately affected their analysis. *See* Defs.' Mot. at 18-19 (citing *Western Resources Inc. v. Union Pacific Railroad*,

17

2002 WL 181494, *9 (D. Kan. January 31, 2002) (an expert considers materials if he "read or reviewed the privileged materials before or in connection with formulating his or her opinion"); *Synthes Spine Co., L.P. v. Walden*, 232 F.R.D. 460, 464 (E.D. Pa. 2005) (party must produce documents that expert "generated, reviewed, reflected upon, read, and/or used in formulating his conclusions, even if these materials were ultimately rejected by [the] expert in reaching his opinions")). To the extent that logistical communications fall within these categories, the United States must produce them.

Of course, the United States need only produce documents within its possession, custody or control. Fed. R. Civ. P. 34 (a). As noted above, the United States represents that it does not have possession, custody or control over a number of the documents listed on CDF's privilege log in a state court case. It does not have copies of these documents, and despite the United States' joint prosecution agreement with CDF, CDF has refused to turn over copies of the documents. It appears that defendants may have to subpoena the documents.

The United States argues that documents created and communications with White and Reynolds after they had finished preparing their report are not discoverable. But such documents and communications are indeed discoverable, even if they did not ultimately affect White and Reynolds' analysis of the Moonlight Fire. *See*, *e.g.*, *Colindres v. Quietflex Mfg.*, 228 F.R.D. 567 (S.D. Tex. 2005) ("information considered, but not relied upon, can be of great importance in understanding and testing the validity of an expert's opinion"). Such documents and communications may reveal that White and Reynolds did not alter their report even after being given reason to do so, and therefore be of use in testing the validity of their opinions.

As discussed at the hearing, White and Reynolds may be re-deposed regarding their communications with attorneys from the USAO and the AGO and the newly produced documents. The depositions shall be limited to four hours each.

////

////

### III. CONCLUSION

The court finds that by designating White and Reynolds as non-reporting expert witnesses, the United States waived otherwise applicable privilege and work-product protections.

Accordingly, it is hereby ORDERED that:

1. Defendants' motion to compel is granted.

2. Within 5 days of the date of this order, if the United States has not already done so pursuant to the undersigned's oral ruling at the hearing, it shall produce all documents and communications that White and Reynolds considered, generated, saw, read, reviewed, and/or reflected upon in connection with their analysis of the Moonlight Fire.

3. White and Reynolds may be re-deposed regarding their communications with attorneys from the USAO and the AGO and the newly produced documents for four hours each.

DATED: May 26, 2011.

_____
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE