IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

      Plaintiff,                                         No. CIV S-09-2445 KJM EFB

     vs.

SIERRA PACIFIC INDUSTRIES, et al.,

      Defendants.                         <u>ORDER</u>
_____/

       On July 19, 2011, the United States filed a motion to find counsel for Sierra Pacific Industries in contempt. Dckt. No. 242. The motion is predicated on alleged intentional violations of the court's earlier orders prohibiting unauthorized, ex parte contacts with a represented party. The undersigned held a hearing on the motion on September 7, 2011. For the reasons explained below, the court denies the motion to find counsel in contempt, but finds that the conduct of Sierra Pacific's counsel, which is addressed herein, violated California Rule of Professional Conduct 2-100.

I.    <u>Background</u>

    A.    <u>This Court's Previous Order</u>

       On November 16, 2010, this court found that one of Sierra Pacific's attorneys had violated Rule 2-100 (the no-contact rule) by communicating directly with employees of the

1

1  United States Forest Service about the subject matter of this litigation without the consent of
2  attorneys for the United States.  Dckt. No. 92 at 8-12.  The court ordered Sierra Pacific to
3  "identify all federal employees contacted without the knowledge of counsel for the United States
4  in this matter to date."  *Id.* at 12.  The court's order also contained the following language: "the
5  court accepts SPI counsel's representation that counsel will identify [their] relationship to Sierra
6  Pacific and involvement in this litigation before seeking out and interviewing particular
7  government employees about issues related to the Moonlight Fire.  [And] . . . to notice the
8  deposition of control group federal employees if and when [counsel] wish to ask them
9  questions."  *Id.* at 12-13.

10  Sierra Pacific moved for reconsideration of this order.  Dckt. No. 107.  The then-assigned
11 district judge denied that motion and affirmed the undersigned's ruling that Sierra Pacific's
12 counsel had violated Rule 2-100, and further found that counsel's conduct in failing to reveal to
13 the United States Forest Service employees that he represented Sierra Pacific was an ethical
14 lapse.  *See* Order, Dckt. No. 124, at 5-7.  Judge Mendez admonished, "[f]inally, this Court
15 believes it is important to make clear that it is troubled by SPI's counsel's behavior and
16 decisions with respect to this particular incident.  Such conduct is out of the ordinary and the
17 Court takes SPI's counsel at its word that it will not occur again."  *Id.* at 6.[1]

18     B.    Carman

19  Sierra Pacific has retained Steven Carman, a retired Special Agent with the Bureau of
20 Alcohol, Tobacco, Firearms and Explosives, as an expert in this case.  Carman Decl., Dckt. No.
21 280-1 at 3, 1.  On June 6, 2011, Carman met with counsel for Sierra Pacific, Downey Brand
22 attorneys Meghan Baker, Thomas Marrs, and William Warne.  *Id.* at 4.  They discussed a former
23 forest service employee, Michael McNeil, who is suspected of setting a series of arson fires and

---

[1] Judge Mendez found that Sierra Pacific's counsel had committed additional ethical violations beyond the violations discussed in this court's order.  To the extent that the United States seeks relief for violations of Judge Mendez's order, it must seek relief before the district judge assigned to this case.

2

who may have been in the area of the Moonlight Fire at the time it started. *Id.* at 3-4. The attorneys told Carman that McNeil had been arrested by two ATF agents, Karl Anglin and Michael Hidalgo, in October 2007, "on charges related to terrorist threats and possibly an arson in Southern California." *Id.* at 4.

Carman told the attorneys that Anglin and Hidalgo had been his friends and associates for many years, and suggested that he contact them to find out whether they had been involved in investigating McNeil as a serial arsonist. *Id.* at 5. The attorneys agreed that he could contact Anglin and/or Hidalgo. *Id.* The attorneys told Carman that "they also wanted be to be clear in any conversations that [Carman] was working for the defense of Sierra Pacific Industries on a case brought against the company by the U.S. Attorney's office." *Id.* at 5-6.

Carman called Anglin on the same day. *Id.* at 6. Carman declares that he told Anglin:

> . . . instead of working on the side of the federal government, I was working opposite them. I said I had actually been hired by a law firm that was representing the largest logging company (and I may have mentioned that I thought it was the largest private land owner) in California. I told Karl that the Civil Division of the U.S. Attorney's office in Sacramento had filed a $1 billion lawsuit against this company. . . . I explained that it was related to a large wildland fire in Northern California that occurred on Labor Day, 2007. I do not think I mentioned the names "Moonlight fire" or "Sierra Pacific Industries" because with Karl being in Los Angeles and not working directly in Northern California, I did not think either name would mean a thing to him. I am sure however that I did state I was opposite the U.S. government because I explained to Karl that it felt really strange working against the U.S. Attorney's office after having worked with them for twenty years on fire cases.

*Id.* at 6-7. Carman declares that he asked Anglin for "public information" regarding McNeil. *Id.* at 7.

In contrast, Anglin declares that Carman told him during this phone call "that he had been retained as an expert by a law firm representing a 'large client' involved in a civil lawsuit involving a wild-land fire in Northern California." Anglin Decl., Dckt. No. 242-8 at 2. He declares: "Based on Mr. Carman's statements to me, I never understood that the lawsuit in which he was working was brought by the United States and was being civilly prosecuted by the United States Attorney's Office . . . it was my understanding based on the comments made by

3

1  Mr. Carman that the lawsuit involved private parties and not the United States.  Had I known

2  that Mr. Carman was working for a party against the United States, I would not have provided

3  him information . . . ."  Anglin Supp. Decl., Dckt. No. 287-4 at 2.

4        Carman then wrote an email to Hidalgo.  Carman Decl., Dckt. No. 280-1 at 8.  The email

5  stated that Carman was "across from the Civil side of the US Attys office in Sacramento" but did

6  not mention the name of the client he was working for or the name of the fire.  *Id.*  Carman sent

7  the email to the wrong address, so it was not received by Hidalgo.  *Id.* at 8-9.

8        Carman declares that on June 9, 2011, Hidalgo called Carman, and Carman told Hidalgo

9  that he "was across from the U.S. Attorney in Sacramento in a civil case involving a big

10 wildland fire and that I was working for a company that was being sued by the government for

11 $1 billion . . . .  Like my discussion with Karl Anglin, I do not specifically recall mentioning the

12 names 'Sierra Pacific Industries,' 'Downey Brand' or the 'Moonlight fire' because again I did

13 not think any of those names would mean anything to Mike [Hidalgo]."  *Id.*

14       In contrast, Hidalgo declares that Carman told him "that he has been retained as an expert

15 by a law firm representing a client involved in a civil lawsuit involving a wild land fire in

16 Northern California."  Hidalgo Decl., Dckt. No. 242-9 at 2.  Hidalgo further declares:  "At no

17 point did Mr. Carman ever tell me that the case in which he was retained was brought by the

18 United States, or that the client was Sierra Pacific Industries."  *Id.*  He declares that:  "Mr.

19 Carman never 'expressly mentioned that [he] was working on a civil defense case 'across from

20 the Civil side of the US Attys office in Sacramento'. . . .  [He] certainly never explained that the

21 lawsuit was brought by the United States and was being civilly prosecuted by the United States

22 Attorney's Office, and I never understood that to be the case . . . .  Had I known that Mr. Carman

23 was working for a party against the United States, I would not have provided him information."

24 Dckt. No. 287-5 at 2.

25       Carman asked Hidalgo questions about McNeil.  Carman Decl., Dckt. No. 280-1 at 9-10.

26 ////

4

1  Hidalgo gave Carman information about his investigation of McNeil. *Id.* at 10.  He stated that he
2  had not investigated McNeil for arson. *Id.*  According to Carman, Hidalgo "told me that if I
3  would like to come to Los Angeles, he would accompany me to the jail to interview McNeil."
4  *Id.*  Carman declares that Hidalgo "indicated that . . . I could ask questions regarding McNeil
5  related to the case I was working and that any evidence of criminal activity would be something
6  [Hidalgo] could follow up on or pass off to other agents." *Id.* at 11.  Carman told him that he
7  would have to get permission from the attorneys he was working with. *Id.*

8        Carman declares that Hidalgo later told him that Hidalgo had contacted Diane Welton at
9  the United States Forest Service to get information about McNeil. *Id.*  Welton told Hidalgo that
10 she had been instructed not to talk about the Moonlight Fire because it was the subject of an
11 active case. *Id.*

12       Carman further declares that the joint interview with McNeil did not happen because the
13 Downey Brand attorneys told Carman that "the U.S. Attorney's office in Sacramento had alleged
14 that I may somehow have violated a protective order when I spoke with Karl Anglin and Mike
15 Hidalgo." *Id.* at 12.

16       Carman declares that "I learned nothing from either man that related directly to the
17 Moonlight fire or my investigation of it . . . .  All of the information about McNeil that I
18 addressed in my report came either from deposition testimony or the 2008 newspaper report
19 discussing McNeil in light of the Euler prosecution in Southern California.  In my conversations
20 with [Anglin] and [Hidalgo], I discovered that ATF had investigated McNeil for impersonating
21 an ATF official, not for setting numerous fires in Southern California." *Id.* at 13.

22       C.      <u>Bundy</u>

23       Scott Biddle, a current Bureau of Land Management employee and a former seasonal
24 Forest Service employee, posted a slideshow of photographs of the Moonlight Fire on YouTube
25 in 2008. Biddle Decl, Dckt. No. 287-2 at 2.  Biddle was not a federal government employee at
26 the time of the contact. Opp'n to Mot. For Contempt, Dckt. No. 297 at 5.

Dean Bundy, an expert witness retained by Sierra Pacific, emailed Biddle on March 9, 2011, asking for photographs and video of the fire. Biddle Decl., Dckt. No. 287-2 at 2. Bundy told Biddle that he was investigating the Moonlight Fire, but did not say that the investigation was for a lawsuit or that he was working for Sierra Pacific. *Id.* Biddle asked Bundy "what kind of investigation are you doing? Is this a private lawsuit, or a federal investigation?" *Id.* Bundy responded, stating "this is a private lawsuit involving a number of parties related to that fire." *Id.* Bundy did not tell Biddle that he was working for Sierra Pacific, or that the lawsuit was brought by the United States. Dckt. No. 287-2 at 2. Nor did Bundy ask whether Biddle was a federal employee. *Id.* Biddle did not respond to the email. Baker Decl., Dckt. No. 297-1 at 5.

Meghan Baker, counsel for Sierra Pacific, declares that Bundy contacted Biddle without her consent or knowledge. *Id.* at 4-5. After Bundy contacted Biddle, Bundy told Baker about the contact. *Id.* at 5. She "did not perceive any issue with the communications . . . since Mr. Biddle was a seasonal employee who no longer worked for the U.S. Forest Service"[2] but reminded Bundy "not to contact any current U.S. Forest Service or government employees without first obtaining permission from Downey Brand." *Id.*

D. Novak

On August 18, 2011, while this motion was pending before this court, Grant Novak, an analyst at ICF International, a consulting firm retained by Sierra Pacific in this case, emailed Ryan Tompkins, a current Forest Service employee. Dckt. No. 287-3 at 2. Novak asked for information regarding damages caused by the Moonlight Fire. *Id.* at 3. Tompkins did not provide him with information. *Id.* Counsel for Sierra Pacific did not work directly with Novak and did not know of or approve the contact with Tompkins. Dckt. No. 297-1 at 5-6.

////

---

[2] Baker declares that "I did not understand Mr. Biddle to be employed by the U.S. Forest Service (or any other government agency) at the time that Mr. Bundy e-mailed him." Dckt. No. 297-1 at 7.

II. Analysis

The United States argues that Carman's contacts with the two ATF agents, Bundy's contact with a former Forest Service Employee, and Novak's contact with a current Forest Service Employee, violate this court's November 2010 order and also independently violate ethical rules. Dckt. No. 287 at 7.

Sierra Pacific argues that its attorneys' and experts' conduct does not violate this court's order because the order "presupposes that counsel for Sierra Pacific can and will contact non-party federal employees during this litigation" and that the conduct at issue does not violate Rule 2-100 because Carman did not contact a represented party about the subject of the representation; Biddle was not a government employee at the time he was contacted by Bundy; and Novak's contact with Tompkins was not at the direction of or with the knowledge of counsel. *See* Dckt. No. 280 at 11-20; Dckt. No. 297 at 5-8.

A. Violation of Rule 2-100

Sierra Pacific violated Rule 2-100 by allowing Carman to contact Anglin and Hidalgo. As this court already explained to Sierra Pacific in its November 16, 2010 order, Rule 2-100 of the California rules states: "[w]hile representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer."

Sierra Pacific argues that Carman's contacts with Anglin and Hidalgo did not violate Rule 2-100 because the agents are not a "party" under the rule, and the communications were not about the "subject of the representation." Dckt. No. 280 at 16.[3] For the purposes of Rule 2-100,

---

[3] The United States points out that Sierra Pacific did not raise these arguments in prior briefs regarding Michael Schaps' communications with the United States Forest Service employees. *See* Dckt. No. 287 at 14. The United States argues that these arguments are barred by the law of the case doctrine. *Id.* at 11. Because the arguments fail in any event, the court does not address whether they are barred by the law of the case doctrine.

a "party" is defined as "(1) An officer, director, or managing agent of a corporation or association, and a partner or managing agent of a partnership; or (2) An association member or an employee of an association, corporation, or partnership, if the subject of the communication is any act or omission of such person in connection with the matter which may be binding upon or imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization." Rule 2-100(B). Here, Anglin and Hidalgo fall under 2-100(B)(2)–they are United States employees, and their statements might constitute admissions on the part of the United States.

Fed. R. Evid. 801(d)(2) defines a party admission as "a statement made by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Carman attempted to elicit statements from Anglin and Hidalgo about McNeil's arrest and their investigation of him. He spoke to them while they were United States employees about their investigation of McNeil. To the extent that they performed such an investigation regarding McNeil, they did so in their official capacities. In addition, any information that the agents had about McNeil, and relayed to Carman, was obtained in the scope of their employment.

Sierra Pacific argues that Anglin and Hidalgo's statements do not constitute admissions on the part of the United States because the agents are not of the requisite level of authority to speak on behalf of the United States. Sierra Pacific relies on a California Court of Appeal case, *Snider v. Superior Court*, 113 Cal. App. 4th 1187 (2003), which found that Rule 2-100 had not been violated where the employees who had been contacted were not officers, directors and managing agents of the organization; had not been interviewed about their own actions and omissions, but merely their percipient knowledge; and were not "high-ranking executives and spokespersons" with the authority to make an admission on behalf of the organization. But *Snider* is not persuasive here because that case applied California evidence law, whereas federal evidence law applies here. *See id.* at *129 (citing California evidence law for the proposition

8

that "'Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: (a) The statement was made by a person authorized to make a statement...concerning the subject matter of the statement.' This has been interpreted in California as only applying to high-ranking organizational agents who have actual authority to speak on behalf of the organization.").

Sierra Pacific also argues that Rule 2-100 does not apply because Carman did not communicate with the agents "about the subject of the representation." Dckt. No. 280 at 19. But, indeed, the very purpose of the contact was to do just that. The United States' position in this litigation is that McNeil had nothing to do with the Moonlight Fire and Sierra Pacific was seeking through the ex parte contacts with ATF agents to establish the opposite. Sierra Pacific also argues that because the government claims that McNeil was not involved in the cause and origin of the Moonlight fire Carman's contact with the ATF agents was therefore not about the subject of the U.S. Attorney's office's representation. According to Sierra Pacific, the agents "were just two government employees who happened to have information interesting to Sierra Pacific." *Id.* But obviously, Carman attempted to elicit information from the agents for the purpose of using it in this litigation. Sierra Pacific sought information regarding McNeil in order to gather evidence to bolster its theory that McNeil set the Moonlight Fire.

Finally, Sierra Pacific rehashes the argument it previously presented to this court and to Judge Mendez in the context of Schaps' contact with the United States Forest Service employees--that the contact did not violate 2-100 because the "public officer" exception to the rule applies. For the reasons laid out in this court's November 2010 order and Judge Mendez's order, this argument is again rejected here.

The contacts made by Sierra Pacific's other retained experts–Bundy and Novak–did not violate Rule 2-100. At the time Bundy contacted Biddle, Biddle was not a United States employee. Dckt. No. 297 at 5. *See Lott v. United States*, 2008 WL 2923437, *1 (N.D. Cal. 2008) (Rule 2-100 is not violated if an attorney contacts a former employee of the opposing

9

party). Because Rule 2-100 applies only to attorneys' direct or indirect communications with parties, and Sierra Pacific's counsel did not approve or know of Novak's contacts with Tompkins, the Novak contact does not violate Rule 2-100.[4] *Cf. Midwest Motor Sports v. Arctic Sales, Inc.*, 347 F.3d 693, 699 (8th Cir. 2002) (holding that the no-contact rule was violated where there was evidence in the record that an expert's contacts were not only ratified, but were directed by counsel).

B.  Violation of this Court's Order

The United States asks that this court hold counsel for Sierra Pacific in contempt for violating the court's November 16, 2010 order. Dckt. No. 242-1 at 1. As noted above, the court found that one of Sierra Pacific's attorneys had violated Rule 2-100 by communicating directly with employees of the United States Forest Service without the consent of the United States' attorneys. Dckt. No. 92 at 8-12. The court found that Sierra Pacific's attorney's purpose in communicating with the Forest Service employees was to "obtain information and evidence to use in this litigation against the government." In addition, the court found that the "public officer" exception to Rule 2-100 did not apply because the attorney did not seek redress of a grievance, but to obtain evidence for this litigation. Dckt. No. 92 at 8, 10. The order stated, "under either Cal. Rule 2-100, or the rule that its language tracks, Rule 4.2, the communications with the employees here were prohibited." Dckt. No. 92 at 12.

The court ordered Sierra Pacific to "identify all federal employees contacted without the knowledge of counsel for the United States in this matter to date" and barred SPI from "using information obtained through such contacts in this litigation." *Id.* at 12. The court's order also contained the following language: "the court accepts SPI counsel's representation that counsel will 'identify [their] relationship to Sierra Pacific and involvement in this litigation before

---

[4] Sierra Pacific's attorneys had told all of their experts and consultants "that they were not to have any contact with any government employee or agency regarding the Moonlight Fire without first obtaining permission from counsel." Dckt. No. 297 at 4.

10

seeking out and interviewing particular government employees about issue related to the Moonlight Fire. [And] . . . to notice the deposition of control group federal employees if and when [counsel] wish to ask them questions.'" *Id.* at 12-13.

Sierra Pacific argues that the contacts by Carman, Bundy and Novak do not violate the order because the order did not explicitly prohibit Sierra Pacific from contacting government employees to obtain information about the Moonlight Fire. Dckt. 280 at 13. Sierra Pacific argues that its attorneys complied with the portion of the order that required counsel to identify their relationship to Sierra Pacific and their involvement in this litigation before seeking out and interviewing government employees about issues related to the Moonlight Fire, because Sierra Pacific's attorneys told their experts to do so. *Id.*

It is true that this court's order, while finding that Sierra Pacific's attorney had violated Rule 2-100 by the prior ex parte contacts, did not contain language explicitly prohibiting counsel from violating the rule again in the future. Such a directive should hardly be necessary. The undersigned trusted that counsel would conform their conduct to the analysis set out in the opinion and the opinion issued by Judge Mendez. It appears, regrettably, that such trust may have been misplaced.

The order stated:

> Likewise, the court accepts SPI counsel's representation that counsel will 'identify [their] relationship to Sierra Pacific and involvement in this litigation before seeking out and interviewing particular government employees about issues related to the Moonlight Fire. [And]. . . to notice the deposition of control group federal employees if and when [counsel] wish to ask them questions." Jt. Stmt. at 33, 42 (quoting August 27, 2010 Warne letter). Counsel must hold themselves to that representation and must not engage in such contact in the future.

Dckt. No. 92 at 12-13. This language was copied from Sierra Pacific's brief. Sierra Pacific argues that the court's quotation of this language gave tacit approval for Sierra Pacific's counsel to engage in unconsented contacts with government employees. Unfortunately, the language does not include an explicit assurance that Sierra Pacific's counsel would obtain the consent of

11

the United States' counsel before making the contacts described. Obviously, the manifest intent of the order was that Sierra Pacific's counsel would do so in order to comply with Rule 2-100.

Now, the court amends its previous order to clearly and unmistakably include the following directive: Sierra Pacific's counsel shall comply with all applicable ethical rules, including, but not limited to, Rule 2-100; and shall ensure that their experts or anyone else acting on behalf of Sierra Pacific's counsel do not engage in conduct that, if done by an attorney, would violate Rule 2-100.

The United States contends that Sierra Pacific violated this court's November 16, 2010 order because Carman did not properly identify himself to the two agents. This issue is problematic. The contrast between Carman's declaration and the agents' declarations is striking. *Cf.* Hidalgo's Supp. Decl., Dckt. No. 287-5, at p. 2, para. 3 (declaring that "Carman never expressly mentioned that [he] was working on a civil defense case 'across from the Civil side of the US Attys office in Sacramento'. . ."; "never explained that the lawsuit was brought by the United States and was being civilly prosecuted by the United States Attorneys' office"; and that he would not have given Carman information if he had known that Carman was working for a party against the United States); and Anglin's Supp. Decl., Dckt. No. 287-4 at 2 ("it was my understanding based on the comments made by Mr. Carman that the lawsuit involved private parties and not the United States") with Carman's Decl., Dckt. No. 280-1 at 6-7, 9 (declaring that he told Anglin "instead of working on the side of the federal government, I was working opposite them. I said I had actually been hired by a law firm that was representing the largest logging company . . . in California. I told [Anglin] that the Civil Division of the U.S. Attorney's Office in Sacramento had filed a $1 billion lawsuit" and that he told Hidalgo that he was "was across from the U.S. Attorney in Sacramento in a civil case involving a big wildland fire and that I was working for a company that was being sued by the government for $1 billion").

It is very difficult to reconcile these conflicting accounts. If both accounts are to be taken as true it would appear that Carman attempted to identify himself, but the communication was an

1 abject failure.  Based on their declarations, the agents who were contacted certainly did not
2 understand that Carman was working for a company that was being sued by the United States.
3 Although Carman admits that he did not specifically state that he worked for Sierra Pacific, he
4 attempted to communicate that he was adverse to the United States in the litigation.  If both
5 accounts are true, Carman's statements to Anglin and Hidalgo substantially complied with the
6 November 16 order.  *See Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885,
7 891 (9th Cir. 1982) (substantial compliance is a defense to a finding of civil contempt).

8      Neither did Bundy or Novak's conduct violate the November 16 order.[5]  As noted above,
9 Biddle was not a United States employee at the time Bundy contacted him, and Novak's contact
10 with Tompkins was undertaken without the knowledge or consent of counsel for Sierra Pacific.
11 Thus, the language in the order prohibiting "counsel" from contacting "employees" does not bar
12 these contacts.  Thus, counsel for Sierra Pacific did not violate the explicit language of the
13 November 16 order, and the undersigned does not find them in contempt of that order.

14      C.      <u>Remedy for Sierra Pacific's Second Violation of Rule 2-100 to Date</u>

15      As explained above, the court finds that Sierra Pacific's counsel did not directly violate
16 the expressed language of this court's earlier order, but did violate Rule 2-100 for the second
17 time in the course of this litigation.

18      The proper remedy for violating Rule 2-100 stems from its purpose.  Rule 2-100 was
19 intended to "preserve the attorney-client relationship from an opposing attorney's intrusion and
20 interference."  *HTC Corp. v. Technology Properties Ltd.*, 715 F. Supp.2d 968, 974 (N.D. Cal.
21 2010), citing *Jackson v. Ingersoll-Rand Co.*, 42 Cal. App. 4th 1163, 1167 (1996).  A remedy for
22 violating Rule 2-100 should not be punitive, because "punishment for violation of the Rules of
23 Professional Conduct is a matter within the purview of the State Bar, not of a court presiding

---

25 [5] The undersigned does not rule on whether Bundy's statements, including that he wanted information for "a private lawsuit involving a number of parties related to that fire" violated
26 Judge Mendez's order in this case.

over the affected case." *Id.* (citing *McMillan v. Shadow Ridge at Oak Park Homeowner's Ass'n*, 165 Cal. App. 4th 960, 968 (Cal. Ct. App. 2008)). The proper remedy must rectify "whatever improper effect the attorney's misconduct may have had in the case before it." *McMillan*, 165 Cal. App. 4th at 968.

Thus, the proper remedy here is to exclude all evidence or information obtained through the improper contacts. However, Carman declares that he "learned nothing . . . that related directly to the Moonlight fire or my investigation of it." Dckt. No. 280-1 at 12-13. To the extent that Carman learned anything through the improper contacts, or that he or anyone else used information that he obtained through these contacts to gain any other evidence, such evidence must be excluded.

As this is Sierra Pacific's second violation of Rule 2-100, it is unclear whether Sierra Pacific has engaged in additional improper contacts. Sierra Pacific is ordered to disclose its contacts, as set forth below.

III. <u>Conclusion</u>

Accordingly, it is hereby ORDERED that:

1. The United States' motion to hold counsel for Sierra Pacific in contempt is denied.

2. The court finds that counsel for Sierra Pacific have again violated Cal. Rule Prof. Conduct 2-100.

3. Within seven days of the date of this order, Sierra Pacific shall identify to counsel for the United States all communications its counsel or any of its agents, including expert witnesses, have had with persons who may have been employed by United States at the time of the communication without the knowledge of counsel for the United States relating to the Moonlight Fire or any of the issues presented by this litigation.

4. Any evidence that Carman obtained through his contacts with Anglin and Hidalgo, or any evidence otherwise stemming from the contacts, shall be excluded at trial.

////

14

5. This court's November 16, 2010 order is amended as follows. Counsel in this case are ordered to comply with all applicable ethical rules, including, but not limited to, Rule 2-100, and to ensure that their experts do not engage in conduct that, if done by an attorney, would violate Rule 2-100.

DATED: November 18, 2011.

*/s/ Edmund F. Brennan*
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

15