BENJAMIN B. WAGNER
United States Attorney
KELLI L. TAYLOR
RICHARD M. ELIAS
Assistant United States Attorneys
2500 Tulare Street, Suite 4401
Telephone: (559) 497-4000
Facsimile: (559) 497-4099
Kelli.L.Taylor@usdoj.gov
Richard.Elias@usdoj.gov
Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:09-cv-02445-JAM-EFB |
| Plaintiff, | **DECLARATION OF JOSHUA WHITE** |
| v. | |
| SIERRA PACIFIC INDUSTRIES, et al., | |
| Defendants. | |
| AND RELATED ACTIONS. | |

I, Joshua White, declare as follows:

1. I am over eighteen years of age and competent to testify. The following facts are based on my personal knowledge and I can attest to them if called as a witness.

2. I am currently a Deputy Chief for the California Department of Forestry and Fire Protection (CAL FIRE). Prior to that I was a Battalion Chief and my primary duties included investigating fires.

3. I have extensive experience and training as a wildland fire origin and cause investigator. My experience in investigating fires began as a Fire Apparatus Engineer for CAL FIRE in 1996. Over the course of my career, I estimate that I have investigated in excess of 200 fires. I hold the following

certificates: CAL FIRE Type II Fire Investigator, Firefighter I – California Board of Fire Services 1999, Firefighter II - California Board of Fire Services 2000, Fire Officer I - California Board of Fire Services 2001, Fire Investigator I - California Board of Fire Services 2005, Fire Investigator II - California Board of Fire Services 2005, Emergency Medical Technician – Northern California EMS 2004, Basic – Commission on Peace Office Standards and Training 2005, Intermediate - Commission on Peace Office Standards and Training 2006, Advanced - Commission on Peace Office Standards and Training 2009, Supervisory - Commission on Peace Office Standards and Training 2009.  I successfully completed the following courses that relate to fire investigation: NWCG Fire Investigation FI-210, NWCG Wildland Fire Case Management FI-310, Interview and Interrogation Techniques, Fire Investigation 1A, Fire Investigation 1B, Fire Investigation 2A, Fire Investigation 2B, CDF Surveillance, Intermediate Fire Behavior, CDF Basic Fire Academy, NFPA 921 Training Course, Fire Death Investigation, California Conference of Fire Investigators – 2006, California Conference of Fire Investigators – 2007, California Conference of Fire Investigators – 2008.  I have taught the following fire investigation related courses: NWCG FI-110 (Wildland Fire Observations and Origin Scene Protection), NWCG Fire Investigation FI-210 (Wildland Fire Investigation), NWCG Wildland Fire Case Management FI-310 (Wildland Fire Case Management).  I have testified as a fire investigation expert in four criminal cases.

4. I was one of the lead investigators of the Moonlight Fire.  The team of investigators conducted an on-scene investigation of the Moonlight Fire that lasted several days and interviewed witnesses for approximately two weeks.  My investigation, included, among other things, a detailed and labor-intensive reading of burn indicators, collecting and documenting evidence, taking over six hundred photographs, and interviewing multiple witnesses.

5. Based on this investigation,  it is my opinion that the Moonlight Fire was caused by a rock strike or strikes from the grouser tracks and/or blade of a Caterpillar 527 operated by Kelly Crismon (Crismon).  The contact caused friction which resulted in superheated metal fragments and sparks which

ignited the surrounding fine ground fuels.  I reached this conclusion by employing the scientific methodology described in NFPA 921, FI-210, and the Wildfire Origin & Cause Determination Handbook published by the National Wildfire Coordinating Group ("NWCG Handbook").

6. As the result of my investigation I co-authored an Origin and Cause Investigation Report ("Investigation Report") detailing my conclusions and the basis for those conclusions.  A copy of the Investigation Report is attached hereto as **Exhibit A.**

7. The Moonlight Fire ignited on September 3, 2007, which was the Labor Day holiday.  On September 3, 2007, I was dispatched to the Moonlight Fire at approximately 7:00 p.m.  I was assigned as the incident origin and cause investigator on behalf of the California Department of Forestry and Fire Protection ("CAL FIRE"), and co-investigated the fire with Dave Reynolds from the USDA Forest Service ("Forest Service"), until he was relieved by Diane Welton from the Forest Service.

8. After a general briefing as to the condition of the fire, I met investigator Reynolds near Road 3000 at approximately 10:00 p.m.  Mr. Reynolds informed me that upon arriving at the fire scene he interviewed an individual named J.W. Bush (Bush), who worked for Howell's Forest Harvesting Company ("Howell's").

9. Due to the fire intensity, low light conditions and hazards in the area, Reynolds and I agreed to meet back in the area in the morning to begin our origin and cause investigation.

10. I arrived back on the scene at approximately 6:30 a.m. the next morning (September 4, 2007).  As part of my investigation, I identified some logging equipment at a landing on Road 3130 and photographed it.  Later, I learned that this same equipment was operated by Howell's employees Bush and Crismon to build water bars on September 3, 2007.

11. I drove up Road 3131 and began reading burn indicators.  Burn indicators are widely-recognized visible marks left by wildland fires that allow investigators to trace the fire's vectors (i.e., direction of travel) and intensity.  Burn indicators allow the investigator to interpret whether in a given area the fire was moving in an advancing, lateral, or backing fashion.  Burn indicators allow a fire

investigator to trace a fire's progression back to a specific origin area, and, sometimes, to a precise point of origin.

12. There are fourteen burn indicators recognized by the scientific literature, including NFPA 921, FI-210, and the NWCG Handbook. An investigator generally reads burn indicators from areas of more intensive burning to the areas of less intensive burning. The burn indicators will typically lead the investigator to a general origin area, and then, based on a further reading of the micro indicators, the investigator will identify a specific origin area. Once a specific origin area is identified, an investigator will attempt to determine, if possible, a point of origin. This methodology of reading burn indicators to a specific origin area is an accepted methodology in wildland fire investigations, recognized by NFPA 921, the NWCG Handbook, and FI-210.

13. I was requested via radio to meet with a representative of the logging company. After responding to that request, I returned to Road 3131 and continued reading indicators. I observed lateral indicators indicating a change in the fire's vector along the left flank of the fire. In the area of the advancing fire, I observed trees completely void of all branch vegetation and completely charred, indicative of an advancing crown fire. Along the lateral transition line I observed trees with foliage freeze consistent with a south wind.

14. Upon Reynolds's arrival I returned to Road 3131. At that point, together with Reynolds, I re-traced my original route, sharing with Reynolds my observations. We then continued through an area of the advancing fire and worked our way uphill, to the west, to the lateral transition line. As we continued south from road 3131 through the transition area I observed ground indicators such as die out, damage differential, protection and staining, consistent with that of a lateral fire. Inside the burn, I observed fresh grouser marks and water bars, consistent with the recent work of a bulldozer. Progressing through the tree line to the fire's perimeter I observed backing indicators such as foliage drooping, an indicator consistent with foliage freeze, but having less heat resulting in a drooped appearance of the foliage.

15. Reynolds and I continued south in a zig zag fashion through the transition zone. There were numerous skid roads inside the burn that had fresh grouser marks consistent with tracked equipment and water bars. As we continued to the south, the lateral transition line curved downhill, parallel to the fire's perimeter edge. In the area of the apex of the curve, we continued east down a skid road through the burn. To the south of that skid road, we observed an area where the fire appeared to have burned with less intensity. We walked down approximately 423 feet from the beginning of the turn to the east and observed backing indicators such as foliage droop, protection, staining, and damage differential.

16. Based on the fire indicator patterns in the area, and accounting for the topography and weather behavior, it appeared the fire had traveled from this general origin area uphill, backing into the wind and had advanced downhill with the wind.

17. Based on our reading of the burn indicators, Reynolds and I identified a general origin area that was approximately seventy-five by fifty feet in size. The general origin area was located in a heavily wooded area. It was over 600 feet from the nearest road (which was a single lane dirt road). The area was remote. There were no traffic signals, houses, stores, or other developments in the area.

18. Inside the general origin area was a skid trail with what appeared to be recent grouser marks and a water bar. Also inside the general origin area we observed and interpreted micro scale indicators and identified a specific origin area of about ten by ten feet in size. The specific origin was about 119 feet inside the burn from the fire line perimeter.

19. Inside the specific origin area, we observed numerous rock strikes. The rock strikes were consistent with heavy equipment usage, such as a bulldozer. The rock strikes were in the proximity of where the left track of a bulldozer would be if the bulldozer was constructing the water bar as it progressed backward uphill. There were no other signs of any other equipment or foot traffic in the area.

20. Based on the identification of the origin, and the existence of bulldozer tracks and rock strikes in the origin, we decided to interview Crismon before processing the scene. We decided not to

tape off the general origin area prior to the interview so as not to alert Crismon that this was an area of interest when attempting to obtain unbiased information from him.

21. Before interviewing Crismon, Reynolds and I met with Bush. Bush told me that he and Crismon had been operating bulldozers in the area on September 3, 2007, beginning at 6:30 a.m. He described where he had been working and where Crismon had been working. He described where he had been working as the back side. From this information we were able to identify on a map where he had been working and where Crismon had been working. He told me that they had stopped operating their bulldozers at about 1:00 due to fire risk concerns, and had met at a landing where the fuel tender for their bulldozers was stored. Bush said Crismon had driven his personal truck to the worksite, although Bush and Crismon usually drive together. Bush said that he believed that Crismon had somewhere to go after work that day. Bush confirmed that he and Crismon left the fuel tender landing after fueling and servicing their Caterpillars, and that Bush drove to the logging encampment so that he could get his cell phone and something to drink.

22. I then contacted Crismon by cellular phone and asked him to meet Reynolds and me at the fire scene. We met Crismon at about 4:00 p.m. at the intersection of Moonlight Road and Road 3100. Crismon left his vehicle there and I drove him to the area where the bulldozers that he and Bush had been operating on September 3, 2007 were parked to get his hard hat. From there we traveled to a landing on Road 3130 below the general origin area and I supplied him with an extra set of Nomex safety gear.

23. We then hiked up to the origin from road 3130 with Crismon. Crismon stated that he had been operating his bulldozer on the hillside on September 3, 2007, constructing water bars and yarding logs. It is my understanding from my interview with Crismon that as he was working building water bars, when he saw missed logs, he would grapple them with his bulldozer and drag them to an area uphill of where he was working with the intent to later yard them to the landing on a different skid trail. We

walked near the area that Reynolds and I had identified as the general origin area.  Crismon said that he had operated his bulldozer in that specific area on September 3, 2007.  We were able to learn from Crismon that after operating his bulldozer in the general origin area at about 12:15 p.m. he worked one additional trail, then, at about 12:45 p.m., he grappled the logs that he had placed on the top of the hill and yarded them down to the landing on a different skid trail than the ones he water barred.  Crismon started heading back to the landing area at about 12:45 p.m. for a 1:00 p.m. shutdown.  Crismon stated that he shut down at that time due to the hazardous fire conditions, including high winds.

24.     A photo of the logs that Crismon yarded on September 3, 2007, is attached to the Investigation Report at p. 233.  Photos DA, DB, and DC are attached to this declaration and included in Exhibit B.  It is my understanding based on my interview of Crismon that he yarded these logs down a skid trail that was different from the one that he built water bars on just prior to shut down and where the Moonlight Fire originated.  These photos demonstrate that three of these logs are blocking the ingress and egress from the landing area to the skid trail on the left in photo DB.  It is my understanding that Crismon used the skid trail on the left in photo DB to yard the logs out at the end of the day and that skid trail did not have water bars on it on September 3, 2007.  These photos support my understanding, based on what Crismon told me in 2007, that he yarded these three logs out at approximately 12:45.

25.     Crismon stated that after yarding the final logs, he met Bush at the landing at about 1:00 p.m. and that they both drove away shortly after shutdown.  Crismon did not return and had no intention of returning that day.  He said that he believed Bush would be returning sometime later in his personal truck so that he could get a load of firewood.  Crismon said that his supervisor, Damon Baker, normally performed the fire watch duties, but that because it was a holiday, Bush and Crismon were operating alone.

26.     Crismon stated that he did not see anyone in the area where he was working during the approximately seven hours he worked on September 3, 2007.

27. I then drove Crismon back to his vehicle at the intersection of Moonlight Road and Road 3100.

28. Upon my return, Reynolds had flagged the general origin area off and began processing the scene. Reynolds flagged individual burn indicators with flags indicating advancing fire (red), lateral fire (yellow), and backing fire (blue).

29. We returned to the scene on the morning of September 5, 2007, and Reynolds and I then conducted a visual examination of the specific origin area. We worked side by side on our hands and knees for over thirty minutes carefully examining specific origin area (which was approximately ten by ten feet). Inside the specific origin area we observed six rocks with damage consistent with sustaining heavy damage from heavy equipment such as a bulldozer. Fresh grouser tracks were in line with four of the rock strikes and two of the strikes appeared to be between the tracks of the dozer, indicating a strike with the front blade of the dozer.

30. We placed number placards to correspond to some of the indicators we identified. We marked 15 different indicators in or near the specific origin area, showing indicators such as die out, foliage freeze, damage differential, staining, protection, and ash.

31. We examined the fuels outside the fire perimeter and noted heavy ground fuel loading. We compared that to the amount of white ash in the general origin area, and concluded that there was a similar heavy fuel loading in the general origin area. Based on the fuel load we concluded that there was long-term fire residency in the general origin area.

32. In addition to a visual inspection, we also swept a handheld magnet in the specific origin area. The magnet search yielded numerous small metal fragments near two of the rocks that we identified as having been struck by heavy equipment. We collected the metal fragments as evidence. As recommended by FI 210, I requested the assistance of a subject matter expert, specifically, a qualified

metallurgist. It is my understanding that Les Hendrickson was dispatched to the fire at my request and that he and other experts have conducted analysis of the metal fragments and are offering opinions in this matter.

33. During a complete search of the specific origin area, no other sources of ignition were found. We found no evidence of a match or book of matches, no evidence of an ignition device, no evidence of fireworks, handgun use, smoking, campfires, chain saw cutting, power line or utility activity, lightning, railroad activity, blasting, or any other competent ignition source other than the bulldozer operated by Crismon.

34. After collecting all the data and analyzing it, I developed several hypotheses and tested those hypotheses against the data collected. I was able to exclude lightning as a cause, because there was no visual evidence of lightning, and local weather data revealed no lightning strikes in the vicinity at any point during the previous two weeks.

35. I was able to exclude spontaneous heating, as there were no forms of material necessary for spontaneous heating in the general origin area.

36. I was able to exclude a campfire as a cause, because there was no evidence of campfire activity in or around the general origin area.

37. I excluded smoking because there was no evidence of smoking in the general origin area, Crismon said he did not smoke, and the area is not prone to cigarette litter due to its distance from any roadways.

38. I excluded debris burning because there was no evidence of any such burning in or near the general origin area, and Crismon stated that he saw no one in the area while he was working.

39. I excluded sunlight and glass refraction, as there were no bottles, cans, or other refractive objects in the general origin area.

40. I excluded an incendiary cause because there was no evidence of an ignition device, and there were no footprints, tire markings, or other markings to indicate human travel in the area (except for the markings left by Crismon's bulldozer). Our investigation and search revealed no physical evidence of arson. Crismon stated that he did not see anyone in the area, and the area of origin, which was located over 600 feet from the nearest road in a heavily wooded area, is an uncommon location for an arsonist to strike, particularly because of the difficulty of ingress and egress.

41. I excluded railroads because there were no rail lines in the area, and the nearest railroad was 8.45 miles to the south.

42. I excluded juveniles because there was no evidence of juveniles in the area, and the remote wooded area was not prone to juvenile activity.

43. I excluded fireworks because there was no evidence of fireworks in the area, and no reports of firework use in the area.

44. I excluded utilities as a cause because there were no utilities located in or around the area. There was no evidence of any overhead or underground power lines in the area.

45. Based on my investigation, I developed and was unable to exclude the hypothesis that the fire was caused by equipment use – namely, that Crismon's bulldozer tracks and/or blade struck a rock, causing friction, which caused hot metal fragments and sparks that contacted and ignited the ground fuels surrounding the bulldozer. Rock strikes are a known and accepted cause of wildland fires, recognized in FI-210, the NWCG Handbook, Kirk's Fire Investigation, and by wildland fire investigators throughout the world. In FI-210 we regularly teach students to look for evidence of tracked equipment slipping on rocks as a source of wildland fire. The NWCG Handbook recognizes the same. Kirk's Fire Investigation teaches that a "common cause" of forest fires is "sparks from any source, such as impacts of metal with rocks."

46. Kirk's also teaches that the mechanics of creating sparks through friction is quite simple. A highly localized frictional contact rips a fragment of the ferrous alloy out with sufficient energy to heat it beyond its ignition temperature (on the order of 1,475 degrees Fahrenheit). The particle ignites in the air and burns at temperatures that can exceed 2,000 degrees Fahrenheit, leaving a sometimes incandescent flake of carbon and iron oxide as an ash.

47. The only hypothesis that withstood testing was that the fire was caused by sparks and/or superheated metal resulting from strikes between Crismon's bulldozer and rocks. Because this was the only viable cause that I was unable to exclude, it is my opinion as a trained and experienced wildland fire investigator that the probable cause of the Moonlight Fire was Kelly Crismon's bulldozer striking a rock, creating sparks and hot metal fragments, which ignited the surrounding ground fuels. It is my opinion that the fire ignited at about 12:15 p.m. as an incipient, smoldering fire. It is my opinion that the fire spread initially in a creeping fashion as a smoldering fire with intermittent flaming combustion for approximately one-and-one-half to two hours before entering its free burning stage. This phenomenon of incipient smoldering and intermittent-flaming combustion is well recognized. Fires can smolder for long periods of time before reaching flaming ignition, and/or burn as a low intensity, creeping fire. It is my opinion that the fire did just this until it entered a fuel package with consistent fuels and the appropriate surface to mass ratio. Once it entered this fuel package, it picked up enough intensity to enter into a free-burning stage, continue to burn, and produce enough smoke to be identified by the Red Rock Lookout.

48. As part of my investigation, I also gathered published weather data and fuel conditions pertinent to the area where the Moonlight Fire ignited. According to the Pierce Remote Automated Weather Station (RAWS), the temperature at the time of the Moonlight Fire was eighty-seven degrees, with a relative humidity of nine percent, and winds at four miles per hour, with gusts at twenty miles per hour. The Pierce RAWS station is located approximately seven miles east of the ignition area at an elevation of 5811 feet, and in my opinion is a reliable approximation for the conditions in the origin area.

49.    As part of my investigation, I consulted with the Fire Behavior Analyst assigned to the incident management team for the Moonlight Fire, to analyze the available data related to fuels in the area of ignition.  Based on this analysis, it was determined that with the recorded humidity at the time of ignition and fine dead fuel moisture of 2%, the Probability of Ignition (PI) was 100%.  This means that 100 out of 100 firebrands landing in a receptive fuel bed would be expected to ignite a spot fire.  The PI speaks to the ease with which a fire can ignite.

50.    The origin area of the Moonlight Fire had been recently logged and was covered with untreated logging slash.  Fuel moistures were near or at historic lows with thousand hour fuels measured at five percent, and one hour fuels were often at one to two percent.

51.    Fire behavior at the time of ignition is best described as extreme, with spot fires out to one mile and a consistent crown fire.  The day was what is known as a "red flag warning" day, a condition called by the National Weather Service signaling elevated fire risks, generally driven by low relative humidity and high winds.

52.    As part of my investigation, I identified a fire trailer kept by the logging company, which included several pieces of fire suppression equipment, including a water tank, hose, fire suppression tools, and fire extinguishers.  This trailer was not on the landing where Crismon was operating his bulldozer, but was located over a half mile away.  The position of the fire trailer, as well as the fuel tender, in relation to the area where Crismon was working is depicted in several maps on pages 201-202 of the Investigation Report.

53.    Attached as **Exhibit B** are true and accurate copies of photographs that I took during my investigation of the Moonlight Fire.

54.    Attached to the Investigation Report at page 133, is a statement signed by Bush stating that he believed that Crismon was operating closest to the fire area and that he believes that Kelly's bulldozer scraped a rock, which caused the fire.

55. In an interview on September 10, 2007, Bush told me that the drive from the worksite to Howell's logging encampment was about twenty to thirty minutes. Bush told me that after leaving the worksite on September 3, 2007, he spent about five to ten minutes at base camp. Bush told me that he then drove back to the worksite area when he encountered heavy black smoke in the area where Crismon had been working.

56. In that same interview, I asked Bush about a fire that had occurred a few months earlier, in June 2007 on the Moonville timber sale. That fire is now known to me as the Greens Fire. I asked Bush if he had a rock strike in June that caused a fire and he said yes. I asked Bush if he was operating the bulldozer that caused the fire in June and he said yes. Bush also said he wished that he could make them better so they would not do that.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 23, 2012, in Sacramento County, California.

*/s/ Joshua White*
JOSHUA WHITE