# EXHIBIT A

# United States Forest Service
## and
# California Department of Forestry and Fire Protection




Origin and Cause Investigation Report

Moonlight Fire

CAPNF000670

September 3, 2007

Diane Welton
Special Agent
Tahoe National Forest
United States Forest Service

Joshua White
Battalion Chief
Lassen Modoc Unit
California Department of Forestry
and Fire Protection

## I.       Violations

**California Code of Regulations**

Title 14

938.8        Inspection for Fire

The timber operator or his/her agent shall conduct a diligent aerial or ground inspection within the first 2 hours after cessation of felling, yarding, or loading operations each day during the dry period when fire is likely to spread.  The person conducting the inspection shall have adequate communication available for prompt reporting of any fire that may be detected.

**California Public Resource Code**

4435

If any fire originates from the operation or use of any engine, machine, barbecue, incinerator, railroad rolling stock, chimney, or any other device which may kindle a fire, the occurrence of the fire is prima facie evidence of negligence in the maintenance, operation, or use of such engine, machine, barbecue, incinerator, railroad rolling stock, chimney, or other device.  If such fire escapes from the place where it originated and it can be determined which person's negligence caused such fire, such person is guilty of a misdemeanor.

## II.        Summary

On Monday, September 3, 2007, two bulldozer operators, JW BUSH (S-1) and Kelly
CRISMON (S-2) were working in the Cooks Creek drainage in Plumas County.  S-1
BUSH and S-2 CRISMON, employees for Howell's Forest Harvesting Company,
were installing water bars on the skid trails of a recent timber harvest area.  Based on
the weather conditions in the area, specifically a strong south wind, both operators
ceased operations at approximately 1:00 p.m. and left the area.

The Plumas National Forest dispatch center received a fire report from Red Rock
Lookout via two-way radio at 2:24 p.m.  The report placed the fire in the Cook's
Creek Drainage.  The dispatch center initiated a standard fire response and United
States Forest Service (USFS) Patrol Officer Dave REYNOLDS (I-1) was dispatched
as the fire investigator.

At approximately 2:30 p.m., S-1 BUSH returned to the area to perform a "fire watch"
function, consisting of a visual inspection of the area they had just worked to identify
any possible fire ignitions.  As S-1 BUSH was driving into the area on the 3100 road,
he observed the fire and drove back to the north to reach a cellular phone site and
report the fire.  S-1 BUSH waited on Moonlight Road and waited for responding fire
equipment to arrive to direct them in.

The first unit to arrive on scene was Air Attack 06 over the fire at 3:02 p.m. who
reported the fire to be 20 to 25 acres in size, fast rate of spread, and a southwest wind
on it.  One of the first ground units to arrive was Cal Fire Engine 2261 at 3:18 p.m.,
and reported the fire was crowning and spotting[1], 80 percent slope, and strong winds.

---

[1] Behavior of a fire producing sparks or embers that are carried by the wind and which start new
fires beyond the zone of direct ignition by the main fire. National Wildfire Coordinating Group,
Glossary of Wildland Fire Terminology (October 2006) 158.

By 4:00 p.m., the fire was reported to be 100 acres, spotting, and had crossed the main road splitting resources on either side.  Upon Investigator Reynolds' arrival, he observed a wind driven crown fire[2] advancing in a south to north direction.  The fire, named the Moonlight Fire, was spotting ahead of the main fire and crossed the Cooks Creek drainage, continuing to burn to the north.

The investigation into the origin and cause of the fire revealed the origin area to be where S-2 CRISMON had been working approximately 20 to 30 minutes prior to stopping work for the day.  In the specific origin area, rocks with marks consistent with a strike from a hard object were found, in-line with fresh grouser marks from a bulldozer.  In the immediate proximity to these rocks, metal fragments were found.  These metal fragments were shiny in appearance, with two of the larger metal fragments having a "blued" appearance.

No other sources of ignition were found.  Other than the grouser and blade marks in the soil, there were no other tracks, footprints or other indications of human travel.  S-2 CRISMON reported not seeing anyone in the area as he worked.  The origin area is in a remote portion of Plumas County and is approximately 650 feet uphill from road 3130 on an average 23% grade.

Based on the investigation, the cause is determined to be a rock strike with the grouser or front blade from S-2 CRISMON's bulldozer.  This rock strike resulted in superheated metal fragments (Competent Ignition Source[3]) separating from the blade or grouser and landing in the cured fuel bed.

---

[2] A fire that advances from top to top of trees or shrubs more or less independent of a surface fire.  Crown fires are sometimes classed as running or dependent to distinguish the degree of independence from the surface fire. National Wildfire Coordinating Group, Glossary of Wildland Fire Terminology (October 2006) 53.

[3] A source of heat that is capable of kindling a wildfire. It may be in the form of a mechanical or electrical spark, glowing ember, open flame, chemical reaction or friction.   National Wildfire Coordinating Group, Glossary of Wildland Fire Terminology (October 2006) 47.

**III.      Subjects**

**S-1 JW BUSH**



**S-2 Kelly CRISMON**

**Howell's Forest Harvesting Company**
P.O. Box 47
8798 Lenwood Way
Shingletown, CA 96088

Owner:     Eunice Howell

**Sierra Pacific Industries**
19794 Riverside Ave
Anderson, CA 96007

**W.M. Beaty and Associates**
845 Butte St.
Redding, CA 96001

## IV.    Investigators and Witnesses

I-1        Dave REYNOLDS
           Fire Prevention Technician
           Plumas National Forest
           159 Lawrence Street
           Quincy, CA  95971
           ███████████

I-2        Joshua WHITE
           Battalion Chief
           Cal Fire
           697-345 Highway 36
           Susanville, CA 96130
           ███████████

I-3        George GONZALEZ
           Fire Captain Specialist
           Cal Fire
           1199 Big Tree Rd.
           St. Helena, CA  94574
           ███████████

I-4        Dieter SCHMITT
           Fire Captain Specialist
           Cal Fire
           118 Fortuna Blvd.
           Fortuna, CA  95540
           ███████████

I-5        Diane WELTON
           Special Agent
           Tahoe National Forest
           631 Coyote St.
           Nevada City, CA  95959
           ███████████

W-1        Larry CRAGGS
           Division Chief
           Plumas National Forest
           159 Lawrence Street
           Quincy, CA  95971
           ███████████

W-2     Joe WATERMAN
        Division Chief
        California Department of Forestry and Fire Protection
        697-345 Highway 36
        Susanville, CA 96130
        ████████████

W-3     Leo WHITLOCK
        COOP Patrolman
             

W-4     Billy Lee DIETRICH
        Manager
        Howell's Forest Harvesting
        PO Box 423
        8798 Lenwood Way                    
        Shingletown, CA 96088
        ████████████

W-5     Damon Daniel BAKER
        Siderod
        Howell's Forest Harvesting
        8085 Starlitepines Rd.              
        Shingletown, CA 96088
        

W-6     John FORNO
        Forester
        Sierra Pacific Industries
        P.O. Box 750
        Quincy, CA 95971
        ████████████

W-7     Mike MITZER
        Forester
        Sierra Pacific Industries
        P.O. Box 750
        Quincy, CA 95971
        



W-8       Ryan BAUER
               Knotbumper

W-9       George Arthur BULLARD

W-10     Edwin Robert BAUER

W-11     Stephen Dale GOODWIN
               Owner - Quickmart
               475-900 Cramer Lane
               Susanville, CA 96130

               (530) 256-3668 Store

W-12     Daniel Logan HANNA
               Fire Apparatus Engineer
               Cal Fire
               697-345 Hwy 36
               Susanville, CA 96130

W-13     Danny Ray RACKLEY II
               Firefighter I
               Cal Fire
               697-345 Hwy 36
               Susanville, CA 96130

W-14     Scott HENRY
               Fire Captain
               Cal Fire
               697-345 Hwy 36
               Susanville, CA 96130

W-15        Steve SMITH
            Heavy Equipment Mechanic
            Cal Fire
            697-345 Highway 36
            Susanville, CA 96130
            ████████████

W-16        Lester E. HENDRICKSON, Ph.D.
            Forensic Engineering Consultant
            5025 South 33rd Street
            Phoenix, Arizona  85040
            ████████████

W-17        Karen JUSKA
            Fire Prevention Technician
            Plumas National Forest
            128 Hot Springs Road
            Greenville, CA  95947
            ████████████

W-18        Caleb B. LIEF
            Lookout
            Plumas National Forest
            135 Round Valley Rd.
            Greenville, CA 95947
            ████████████

W-19        Les CURTIS
            Forest Aviation Officer
            Lassen National Forest
            900 E. Highway 36
            Chester, CA 96020
            ████████████

W-20        John MOORE
            Owner – Sugarpine Aviators
            70 Spanish Creek Road                    ████████████
            Quincy, CA  95971
            ████████████

W-21     Hershel BEAIL
         Pilot – Sugarpine Aviators
         108 5th Street
         PO Box 372
         Quincy, CA  95971

## V.      Evidence

Evidence gathered within the specific area of origin included multiple metal fragments.  The metal fragments when collected had a shiny appearance with the larger shavings having a "blued" color.  The evidence was gathered by "sweeping" the area with a magnet and excluding the natural occurring ferrous material.

The two subject rocks with the greatest strike indicators and metal fragments in their specific vicinity were recovered and maintained as evidence.

A photographic flash card was received from Firefighter I Daniel RACKLEY (W-13). W-13 RACKLEY, assigned to Engine 2261 of the Westwood Cal Fire Station, was one of the first fire suppression personnel to arrive at the fire.  Using his personal camera, W-13 RACKLEY took photographs as he responded to the scene.  I downloaded the pictures from W-13 RACKLEY's flash card and returned the blank flash card to him.

On September 10, 2007, W-15 HENDRICKSON and I collected samples of metal from the subject bulldozer.  One sample was taken from the striker blade on the front blade of the bulldozer and one sample from the left track, or grouser plate.  I retained the hacksaw blade and the two samples as evidence for a comparison analysis.

The Chester Air Attack Base supplied a compact disk (CD) to me with 8 video files with fire footage.  The CD was marked "Moonlight Fire, MPEG-2, 8 Files, IA-Air Attack 06, Earl Johnson."

## VI.    Conditions

Conditions at the time of the ignition of the Moonlight Fire as recorded at the Pierce Remote Automated Weather Station (RAWS), where temperature 88 degrees, relative humidity of 9 percent, and winds from the South Southeast at 6 miles per hour (mph) with a gust record at 7mph. The Pierce RAWS is located approximately seven miles east of the ignition area at an elevation of 5811 feet.  The Piece RAWS records weather conditions on ten-minute averages and updates conditions once an hour.  With its close proximity to the fire, the Pierce RAWS best represents conditions at the fire site during the time of ignition.

Fuels in the area affected by the Moonlight Incident are primarily mixed conifer, Fire Behavior Prediction System (FBPS Fuel Model 10).  Some areas of the fire were treated but these treated areas had little effect on slowing fire spread.  Fuel moistures were near or at historic lows with thousand hour fuels measured at 5%, one hour fuels were often at 1-2%, live fuels in the conifers were between 90-110%.  With the recorded humidity at the time of ignition and fine dead fuel moisture of 2%, the Probability of Ignition (PI) was 100%.  This means that 100 out of 100 firebrands landing in a receptive fuel bed would be expected to ignite a spot fire.  The PI speaks to the ease with which a fire can ignite.

Topography is typical of the northern Sierra with the crest running north to south bisected by west to east aligned drainages with steep slopes and narrow canyons.

Fire behavior at the time of ignition is best described as extreme, with spot fires out to one mile, crown fire and plume dominated fire runs.  Plume domination is the condition where the energy of the fire overpowers the normal local factors that contribute to fire spread.  The fuel conditions in the fire area are consistent with a fire transitioning to plume dominated fire behavior.

**VII.   Equipment / Vehicles**

Type:              Bulldozer with grappler attachment
Model:             527
Serial Number:     4NS000150
Sticker Number:    CTS-021113

This is the bulldozer operated by K. CRISMON on September 3, 2007.  The bulldozer appeared to be in good working order and CRISMON did not report any mechanical defects with the equipment.  The bulldozer is powered by a diesel motor and equipped with a turbo-charger.  One grouser located on the track on the left side of the bulldozer was stamped with the number 44612   1162 (see Photograph CW). Welded to the backside of the blade was a plate with a stamped number of 8_E 9495. The digit following the 8 and before the E was illegible due to damage (see Photograph CZ).

The subject bulldozer was located in a landing at latitude N 40º 12.5919', longitude W 120º 52.0440'.  Based on the statement by CRISMON, he parked the dozer at this location at approximately 1:00 p.m. on September 3, 2007.

On September 5, 2007 at approximately 4:00 p.m., the subject dozer was relocated to latitude N 40º 13.5534', longitude W 120º 53.0364' to prevent damage by an advancing fire front.  On September 6, 2007, I flagged the dozer and left my business card and a note mandating I be notified if the dozer was to be moved again.

## VIII.   Property

The property located at the origin of the fire is on an east-facing slope in the Cooks Creek drainage in Plumas County, southeast of the town of Westwood and northeast of the town of Greenville.  The area of origin is located 2.25 miles from Moonlight Peak at a bearing of 213.8º and 2.67 miles from Evans Peak at a bearing of 341.5º. The specific area of origin is located at latitude N 40º 12.7964', longitude W 120º 51.8571º.

This east-facing slope has a grade of approximately 17% with a grade of 16% at the specific area of origin.  The elevation for this area is 5,346.7 feet above mean sea level (MSL).  A recent timber harvest in the area resulted in a large accumulation of ground fuels based on an evaluation of the ground fuels in the proximal areas outside of the burn (see Photograph EG).

Walker Brooks of Redding, California owns the property at the origin of the fire and W.M. Beaty and Associates Inc. manage the property.  On October 17, 2005 W.M. Beaty and Associates Inc. filed a timber harvest plan (THP) prepared by John Van Duyn, a Registered Professional Forester,  for this property with the California Department of Forestry and Fire Protection (Cal Fire) (see Attachment 5)  Upon review and approval by Cal Fire of the THP, W.M. Beaty and Associates Inc. opened the timber project to bid.  Sierra Pacific Industries won the bid and subsequently hired Howell's Forest Harvesting to manage the harvesting of the timber.

### IX.     Narrative

On Monday, September 3, 2007, at 2:24 p.m., the Plumas Emergency
Communications Center (ECC) for the Plumas National Forest (PNF) received an
emergency report of a vegetation fire from Red Rock Lookout.  The United States
Forest Service employee staffing the lookout, Caleb LIEF (W-18), reported a building
column of smoke at 232º and 6 miles.  The ECC for the PNF initiated a standard
vegetation fire response and USFS employee, Dave REYNOLDS (I-1), was
dispatched as the fire investigator.  The fire was named the Moonlight Fire.


I-1 REYNOLDS arrived at the intersection of Moonlight Road and Road 3000 at
approximately 3:30 p.m. and met with an individual he identified as S-1 JW BUSH.
S-1 BUSH reported to be an employee of Howell's Forest Harvesting and had been
working in the area earlier in the day.  S-1 BUSH identified a co-worker, S-2 Kelly
CRISMON, as a bulldozer operator that had been working in the area of the fire.  S-1
BUSH told I-1 REYNOLDS he and S-2 CRISMON had been operating bulldozers to
install water bars in the skid trails.  S-1 BUSH said they had completed work by 1:00
p.m., stopping early due to the south winds he observed.  S-1 BUSH said he
associated the winds as a potential fire danger.  S-1 BUSH said he and S-2
CRISMON parked their respective bulldozers in a landing and left in separate
vehicles. S-1 BUSH said he had left the area because he had forgotten his cellular
phone and returned to his encampment, approximately 18 minutes away, to retrieve
the phone and get something to drink.  S-1 BUSH said he was returning to perform a
"firewatch" inspection of the area when he observed the fire.  S-1 BUSH said he
returned to the meadow to the north to reach cellular phone reception and report the
fire.  S-1 BUSH said that as he was leaving the area he observed a person riding an
off-road vehicle driving toward him.  S-1 BUSH said he stopped the rider and told
them to report the fire.

I-1 REYNOLDS began driving to the heel of the fire and observed a crown fire in the Cooks Creek drainage traveling to the north, driven by a south wind.   I-1 REYNOLDS drove to an area that he identified as the heel of the fire based upon the fire's burn pattern[4].  Due to the fire's intensity, I-1 REYNOLDS did not begin an examination of the area to determine the general area of origin.  I-1 REYNOLDS assisted in the suppression of the fire.

At approximately 7:00 p.m. I received a telephone call from Division Chief Joe WATERMAN.  W-2 WATERMAN was at the Moonlight Fire and requested I respond to the incident to begin a unified investigation of the origin and cause with I-1 REYNOLDS.  I responded to the incident from the Ravendale area in Lassen County.

As I was responding to the incident, I met with W-3 Leo WHITLOCK.  I know W-3 WHITLOCK to be a Patrol Officer for the private forest companies in the area.  W-3 WHITLOCK told me there was a logging operation occurring in the general area of the fire.  W-3 WHITLOCK identified John FORNO as a forester for the Sierra Pacific Industries who would be able to provide me additional information.

Upon my arrival at the Incident Command Post (ICP), I met with the Incident Commander, Larry CRAGGS (W-1) a USFS Division Chief and CalFire Battalion Chief Scott Packwood.  W-1 CRAGGS notified the Operations Chief, W-2 WATERMAN, of my arrival on the tactical frequency.  I met with W-2 WATERMAN and he gave me a briefing of the fire's activity and provided me with directions and contact information to I-1 REYNOLDS.

From the ICP I drove south on Road 3100 into the burn.  I observed fire indicators, specifically the full consumption of tree limb vegetation, consistent with a crown fire

---

[4] Apparent and obvious design of burned material and the burning path from the area of origin. National Wildfire Coordinating Group, <u>Glossary of Wildland Fire Terminology</u> (October 2006) 39.

down the west side of Cooks Creek drainage and continuing up the east side of the drainage.  Due to the topography and smoke, I could not see the head of the fire[5].

I met with I-1 REYNOLDS at approximately 10:00 p.m. and we drove to the area he had identified as the heel of the fire.  This area was later identified as Road 3131.  I-1 REYNOLDS told me of the logging operations in the area and he did not know exactly where the equipment was or if the fire had damaged it.  Due to the fire intensity, low light conditions and hazards in the area, we agreed to meet back in the area in the morning to begin the origin and cause investigation.

On Tuesday, September 4, 2007, I returned to the fire at approximately 6:30 a.m.  I met with Scott PACKWOOD and he advised me of the location of the bulldozers, rubber tired skidder and fuel truck.  I drove south on road 3130 through the fire and found two bulldozers and a fuel tender parked in an area away from the fire.  I photographed the equipment and logged the location as latitude N 40º 12.5915', latitude W 120º 52.0436'.

I then drove back on road 3130 to a spur road that continued uphill.  The road was marked as road 3131 and this road continued through the burn to the area I-1 REYNOLDS had identified as the heel.  I observed lateral indicators indicating a change in the fire's vector[6] along the left flank of the fire.  In the area of the advancing fire I observed trees completely void of all branch vegetation and completely charred, indicative of an advancing crown fire.  Along the lateral transition line I observed trees with foliage freeze[7] consistent with a south wind.

---

[5] The most rapidly spreading portion of a fire's perimeter, usually to the leeward or up slope. National Wildfire Coordinating Group, <u>Glossary of Wildland Fire Terminology</u> (October 2006) 94.

[6] Directions of fire spread as related to rate of spread calculations (in degrees from upslope). National Wildfire Coordinating Group, <u>Glossary of Wildland Fire Terminology</u> (October 2006) 174.

[7] Small branches, needles, and leaves on green vegetation that take on a windswept appearance and "freeze" in that position. National Wildfire Coordinating Group, <u>Glossary of Wildland Fire Terminology</u> (October 2006) 84.

Progressing through the tree line to the fire's perimeter I observed backing indicators such as foliage drooping, an indicator consistent with foliage freeze, but having less heat resulting in a drooped appearance of the foliage.  As I walked south from road 3131 I observed ground indicators such as die out[8], damage differential[9], protection[10] and staining[11] consistent with that of a lateral fire.

I was notified via radio that there were representatives from the logging company at the ICP.  I drove to the intersection of Moonlight Road and road 3100 and met with W-4 Bill DIETRICH, W-5 Damon BAKER both from Howell's Forest Harvesting and W-7 Mike MITZER a forester with Sierra Pacific Industries (SPI).  I advised them that the fire had not damaged their logging equipment, but it was not safe to remove any of the equipment due to the fire.  W-4 DIETRICH identified the two employees of Howell's Forest Harvesting who had been working in the area the day before as S-1 BUSH and S-2 CRISMON.  W-4 DIETRICH also provided me with their contact information.  I advised them the investigation was still ongoing and I had not determined the cause.

I returned to road 3131 and continued examination of the fire indicators.  Inside the burn I observed fresh grouser marks and water bars, consistent with the recent work of a bulldozer.  I continued following the fire indicators to the south along the east

---

[8] Fingers or islands of less intensely burned areas or areas where the fire has self extinguished. National Wildfire Coordinating Group, <u>Glossary of Wildland Fire Terminology</u> (October 2006) 57.

[9] The amount of fire related destruction to combustible objects determined by comparing opposing sides of an object. National Wildfire Coordinating Group, <u>Glossary of Wildland Fire Terminology</u> (October 2006) 54.

[10] Fuels that are unburned or exhibit a less damaged appearance on the non-origin side of the fuel
itself or other objects. National Wildfire Coordinating Group, <u>Glossary of Wildland Fire Terminology</u> (October 2006) 139.

[11] Glossy, varnish-like stain, usually light yellow to orange to dark brown in color, which is deposited on the origin side of objects. National Wildfire Coordinating Group, <u>Glossary of Wildland Fire Terminology</u> (October 2006) 159.

side of the mountain when I-1 REYNOLDS contacted me via radio.  I returned to road 3131 and met with I-1 REYNOLDS.  I briefed him about locating the logging equipment, meeting with W-4 DIETRICH, W-5 BAKER and W-7 MITZER and the indicators I had observed.

From road 3131 we continued to the south through the burn examining the burn indicators.  We continued through the area of the advancing fire and worked our way uphill, to the west, to the lateral transition line.  We continued south along a skid road that appeared to have fresh grouser marks and water bars.  As we continued to the south, the lateral transition line curved downhill, parallel to the fire's perimeter edge.  On the fire's perimeter, a fire line was constructed and a hose lay was in place.  Approximately 423 feet from the beginning of the turn to the east, we observed backing indicators such as foliage droop, protection, staining, and damage differential.

Based on the fire indicator patterns in the area, and accounting for the topography and weather behavior, it appeared the fire had traveled from this general origin[12] area uphill, backing into the wind and had advanced downhill with the wind.  Inside the general origin area was a skid road with recent grouser marks and water bars.  Inside the general origin area, we examined the micro scale[13] fire indicators and identified the specific origin area[14].  Inside the specific origin area, we observed numerous rock strikes.  The rock strikes were consistent with heavy equipment usage, such as a

---

[12] The larger area where the fire started that is readily identifiable based on macro scale indicators and witness statements.  National Wildfire Coordinating Group, Glossary of Wildland Fire Terminology (October 2006) 89.

[13] Small individual indicators and patterns that are not easily observable without close observation or magnification.  National Wildfire Coordinating Group, Glossary of Wildland Fire Terminology (October 2006) 117.

[14] The smaller area, within the general origin, that first shows the influence of wind, fuel and/or slope.  National Wildfire Coordinating Group, Glossary of Wildland Fire Terminology (October 2006) 157.

bulldozer.  The rock strikes were in the proximity of where the left track of a
bulldozer would be, provided the bulldozer was constructing the water bars as it
progressed uphill.  There were no other tracks or indications of any other equipment
or foot traffic in this area.

The specific origin area was approximately 119 feet inside the burn from the fire line
perimeter.  Based on the identification of the origin, the proximity to the bulldozer
tracks and the rock strikes in the origin, we determined to interview S-2 CRISMON
before processing the scene.

We drove to the Howell's Forest Harvesting encampment and made contact with S-1
BUSH.  S-1 BUSH told us that S-2 CRISMON lived in Chester.  S-1 BUSH told me
he had been working in a different section than S-2 CRISMON.  Using a map
provided by I-1 REYNOLDS, S-1 BUSH identified the area he was working in as
further to the south and out of the fire's area.  S-1 BUSH identified the bulldozer he
used as the bulldozer with doors.  I asked S-1 BUSH if that was the bulldozer parked
closest to the road.  S-1 BUSH identified the bulldozer he was using as the bulldozer
closest to the road.  S-1 BUSH said he had just returned to the landing before S-2
CRISMON arrived.  S-1 BUSH said S-2 CRISMON drove his personal truck to the
worksite, although they usually drive together.  S-1 BUSH said he thought S-2
CRISMON had somewhere to go after work that day.

S-1 BUSH said he drove the service truck out in the morning and pointed at a white
service truck parked behind him.  S-1 BUSH then reiterated the same sequence of
events as he had told I-1 REYNOLDS.

I was able to make contact with S-2 CRISMON via cellular phone.  S-2 CRISMON
agreed to meet with us at the fire.  At approximately 4:00 p.m., I-1 REYNOLDS and I
met S-2 CRISMON at the intersection and he drove with me into the area of origin.
Recognizing the need for personal safety gear, we drove to the bulldozers for S-2
CRISMON to get his hard hat.  S-2 CRISMON went to the bulldozer parked furthest

from the road and retrieved his helmet from inside the cab.  We returned to the fire line and lent him an extra set of Nomex safety gear.  Before we hiked up to the origin from road 3130, I turned on my voice recorder and confirmed with S-2 CRISMON that he knew I would be recording the interview.  S-2 CRISMON said he started working from the area of road 3131 to the south on the east slope of the hill putting in water bars on the skid trails.  S-2 CRISMON said he would first check the area to determine if there were any logs left that needed to be skidded out.  S-2 CRISMON said he would go down the skid trail and put the water bars in as he progressed up the hill.  When completed with one skid trail he would do the same thing for each subsequent skid trail, working his way to the south.  S-2 CRISMON said the amount of time to put in water bars on a skid trail would vary, depending on the grade of the slope, the soil conditions and length of the skid trail.

S-2 CRISMON said he observed the south wind and determined they would be stopping work at 1:00 p.m. due to the fire hazard.  S-2 CRISMON said as he worked to the landing we were standing at, he observed some logs that had not been yarded, so he hooked the logs and yarded them out and then drove south on road 3130 to the landing where he met S-1 BUSH.  S-2 CRISMON pointed at three logs at the base of a skid trail and identified them as the logs he yarded out (see photograph CT).  S-2 CRISMON said S-1 BUSH was going to do the fire watch.  S-1 CRISMON said he believed S-1 BUSH was going to come back in his personal truck so he could get a load of firewood.  S-2 CRISMON said W-5 BAKER usually performs the fire watch task when they are all working, but due to Monday being a holiday, it was only him and S-1 BUSH.  S-2 CRISMON said he parked at the landing by 1:00p.m., and they both drove out at the same time.  S-2 CRISMON said he was driving first and S-1 BUSH was behind him.

S-2 CRISMON said there was no communication between him and S-1 BUSH. When asked how he knew to leave at 1:00 p.m., he said he just knew because of the wind.  S-2 CRISMON said they would work until 4:30 p.m. on days when the fire danger was not elevated.

We hiked up the fire line to the area we had identified as the specific origin area.  S-2 CRISMON said he had worked the skid trail, putting in the water bars.  I asked S-2 CRISMON how long it would take him to complete water bar improvements on a skid line such as the one we were standing on.  S-2 CRISMON said it would take about 20 minutes.  S-2 CRISMON said he did one additional trail and then yarded the logs out and drove the bulldozer back to the landing.  S-2 CRISMON said from the time he was at this location to the time he finished would have been under 30 minutes.

We hiked down to road 3130 and I drove S-2 CRISMON back to his vehicle.  I returned to the origin and I-1 REYNOLDS had flagged the general origin area off and was beginning to process the scene.  I-1 REYNOLDS was flagging the individual indicators.  Blue flags indicate a backing fire, yellow flags indicate a lateral fire, red flags indicate an advancing fire and white flags indicate the point of origin or evidence.

On September 5, 2007 we returned to the origin area and placed number plates to correspond to the indicators within the specific origin area.  The indicators were individually photographed.  The following numbers identify the indicator category observed.  Due to the limited number of identification plates, only the 15 indicators closest to the specific origin area were photographed and individually marked.

1. Die Out
2. Foliage Freeze[15]
3. Damage Differential
4. Staining

---

[15] Vegetation within the backing areas will usually appear much less windswept when compared to the advancing areas.  Appearance may be drooped due to the fact that gravity overcomes the wind influence.  National Wildfire Coordinating Group, Fire Investigation 210 Course Curriculum. Unit 2 Chapter VII Paragraph A.

5.   Protection

6.   Protection

7.   Staining and Damage Differential

8.   Staining

9.   Damage Differential

10. Damage Differential

11. Protection

12. Protection

13. Protection

14. Damage Differential

15. Ash[16]

Examination of the representative fuels located outside of the fire perimeter indicated heavy ground fuel loading (See Photo EG).  Based on the amount of white ash left in the general origin area, it was determined there was heavy fuel loading in the general origin area.  These indicated a long-term fire residence time[17] in the general origin area.

I-1 REYNOLDS and I conducted a visual examination of the specific origin area.  During this examination no competent ignition sources were found.  Inside the specific origin area there were six rocks with damage consistent with sustaining damage from heavy equipment such as a bulldozer.  The grouser tracks were in line with four of the rock strikes and two of the strikes appeared to be between the tracks of the dozer, indicating a strike with the front blade of the dozer.  A handheld magnet was utilized to "sweep" the area in an effort to identify any ferrous material.  Within close proximity of two of the

---

[16] White ash deposited on the origin side of objects.  National Wildfire Coordinating Group, Glossary of Wildland Fire Terminology (October 2006) 30.

[17] The time, in seconds, required for the flaming front of a fire to pass a stationary point at the surface of the fuel. The total length of time that the flaming front of the fire occupies one point. National Wildfire Coordinating Group, Glossary of Wildland Fire Terminology (October 2006) 143.

rocks, identified in Photo BA and BH, a ferrous material, consistent with that of metal shavings, were recovered.  These metal shavings were collected as Evidence #1.  These metal shavings are consistent with friction spark ignition sources resulting from contact between a metal object such as the grouser or blade of the dozer and a rock.  During a complete search of the specific origin area no other sources of ignition were identified.

Upon return to the landing on road 3130, I photographed the three logs S-2 CRISMON had identified that he yarded prior to ceasing operations for the day.  I-1 REYNOLDS and I drove .7 mile to the location S-1 CRISMON parked his bulldozer.  I photographed the identification plate on the bulldozer S-2 CRISMON was operating (Photo CV) as well as identification markings on the left track (Photo CW) and front blade (Photo CZ).  The identification plate on the bulldozer identified the sticker number as CTS-021113; Model number 527; Serial number 4NS00150; Manufacturer – Caterpillar.  The number stamped into a grouser on the left track was 44612 1162.  The front blade had a plate welded onto the back of it 8_E 9495.  The digit between the 8 and the E was not identifiable due to damage and wear.

On September 6, 2007, I returned to the origin area and photographed the macro scale lateral vector indicators (Photo DX) as well as backing indicators and fuels located on the south side of the fire perimeter (Photo EG).  These representative ground fuels consisted of normal forest duff material as well as slash consistent with that of residual logging slash.

I met with Scott HENRY (W- 14) a Fire Captain with Cal Fire, assigned to the Moonlight Fire as a Division Supervisor for Division B.  W-14 HENRY told me that representatives from Howell's Forest Harvesting had moved the equipment located at the end of road 3130 due to the advancing fire front.  W-14 HENRY said the equipment had been moved to the Stroing Ranch.  I then drove to the Stroing Ranch and found the bulldozers.  I placed a note, my business card with contact information and flagging on S-2 CRISMON's bulldozer.  The note instructed anyone who moved the equipment to notify me of who moved it, where it was moved to and when it was moved.

I later made contact with W-4 DIETRICH and advised him the bulldozer S-2 CRISMON was operating was evidence and I did not want it moved for any reason other than protection from the advancing fire.  W-4 DIETRICH acknowledged he understood.  W-4 DIETRICH asked when the bulldozer was going to be available and I advised him I would release it as soon as possible.  W-4 DIETRICH told me SPI was assigning his company to a new logging operation.

On September 6, 2007, at 1:35 p.m., I met with John FORNO (W-6) and Mike MITZER (W-7), at the Westwood Cal Fire Station.  Also present was Ivan HOUSER, a Forester with Cal Fire.  W-6 FORNO and W-7 MITZER are both Registered Professional Foresters employed by Sierra Pacific Industries (SPI).  I advised both W-6 FORNO and W-7 MITZER that I would be recording the conversation.

W-6 FORNO explained to me that W.M. Beaty and Associates manages the land where the fire started.  W-7 MITZER explained that Brooks WALKER owns the specific parcel where Howell's Forest Harvesting was working.  W-6 FORNO said that when the landowners or W.M. Beaty and Associates decides to have a timber harvest, W. M. Beaty and Associates prepares the Timber Harvest Plan (THP).  Once the THP for this operation was approved, the contract was placed out to bid and SPI won the contract.  SPI then contracted Howell's Forest Harvesting to harvest the timber.  Howell's was responsible for the whole harvesting operation including the cutting, yarding, loading and hauling.

W-6 FORNO explained a pre-operational meeting with representatives from Howell's Forest Harvesting, W.M.  Beaty and Associates and SPI occurred prior to the start of the operation.  W-6 FORNO said that W-4 DIETRICH was at the meeting representing Howell's Forest Harvesting.  W-6 FORNO explained the pre-op meeting was to have discussion regarding the contract, the requirements and the fire plan.  W-6 FORNO said W.M. Beaty and Associates supplied the fire plan paperwork, Howell's completed it and

submitted it.  W-6 FORNO said the fire plan would incorporate the number of people who would be working on the project, although that may vary from day to day.

W-6 FORNO explained that Eunice HOWELL would be monitoring the Remote Activated Weather Sites (RAWS) via computer and when the fire conditions warranted, she would place a call to W-4 DIETRICH to advise him to shut down operations.  W-6 FORNO explained that W-4 DIETRICH would have to drive to the meadow to check his voice mail messages.

W-7 MITZER explained that SPI has a different requirement for their lands in regard to monitoring the weather.  W-7 MITZER said SPI has mobile Remote Activated Weather Sites (RAWS) that they take to a specific logging site so they can receive specific weather for that site.  W-7 MITZER explained they would access the information from the RAWS via radio and the RAWS will report whether there are any restrictions in place.  W-7 MITZER explained the Stage 1 restriction would shut down the "hot saw" operations and the Stage 2 restriction would cease all equipment usage.

W-6 FORNO said he was home when he heard on the scanner that there was a fire.  W-6 FORNO said he heard it was Section 16 at approximately 2:30 p.m.

W-7 MITZER said the local land cooperators all pay to have an air patrol fly their lands. W-7 MITZER said the air patrol has to have visual observation of every piece of equipment in a logging operation and if there is a "hot saw" they have to observe that equipment twice in one day.  W-7 MITZER identified Johnny MOORE as the pilot for Sugarpine Aviation out of Quincy as having the local air patrol contract.  W-7 MITZER said the local cooperators decided to have the air patrol fly on Labor Day due to the hunters and perhaps any lightning.  W-7 MITZER said the air patrol flies Monday through Friday, or whatever days they require.  W-7 MITZER said he has checkpoints that he called into the Susanville Interagency Fire Center.

W-6 FORNO said he did not know who estimated the latitude or longitude for the fire. W-6 FORNO said he thought the first dispatch came from SIFC.

W-7 MITZER explained that SPI required a fire watch to occur on their logging operations within 2 hours of equipment shutting down.  W-6 FORNO said he believed the operators did a fire watch prior to leaving and that one of the operators, who he identified as S-1 BUSH, was driving back out to complete a second watch.  W-6 FORNO said he also saw S-2 CRISMON who looked as though he had taken a shower and was clean.  W-6 FORNO said S-1 BUSH was already out near the fire, prior to his arrival.

W-6 FORNO explained that Eunice Howell was the owner of Howell's Forest Harvesting.  W-6 FORNO provided me with contact information for Howell's Forest Harvesting.  W-6 FORNO also provided me information he had heard on the neighborhood regarding the cause of the fire.  W-6 FORNO said he had heard from Stephen GOODWIN (W-11) that the fire was caused by arson.  I explained to W-6 FORNO that we would be following all leads concerning the cause of the fire.

On the night of September 6, 2007, George GONZALEZ (I-3) and Dieter SCHMITT (I-4) were assigned to assist in the investigation.  I briefed both investigators of the status of the investigation and assigned them to witness interviewing.

On the morning of September 7, 2007, I-3 GONZALEZ  and I-4 SCHMITT interviewed Clarence Leo WHITLOCK (W-3).  W-3 WHITLOCK was identified by his California driver's license.

W-3 WHITLOCK said he was returning from a fire in the Lake Almanor area at about 2:30 pm when he heard Plumas National Forest Dispatch Center dispatching a fire in the 3000 Road area.  W-3 WHITLOCK said he drove to the Westwood Cal Fire station to advise the crew of the fire.  W-3 WHITLOCK said he continued toward the fire and he heard Red Rock Lookout put the fire one mile south of Moonlight Peak.

W-3 WHITLOCK drove through Goodrich Meadow and he saw an old Silver Dodge Pick-up regular cab, with a single driver coming out.  W-3 WHITLOCK said he stopped to talk to the driver of the pick-up and asked him where the fire was.  The driver of the pick-up identified himself as George (later identified as W-9 George BULLARD). W-3 WHITLOCK said W-9 BULLARD was unaware of the fire.  W-3 WHITLOCK said he pointed to the column of smoke.  W-3 WHITLOCK said he and W-9 BULLARD tried to determine the access to the fire based on the location of the smoke.

W-3 WHITLOCK said while driving the 3000 road, he could see the fire below the road in the vegetation.  W-3 WHITLOCK estimated the fire size to be about five (5) acres and spotting.  W-3 WHITLOCK advised the Plumas National Forest Dispatch Center the best access was off the 3100 road.

On September 7, 2007, at about 11:15 am, I-3 GONZALEZ and I-4 SCHMITT interviewed Cal Fire Fire Apparatus Engineer (FAE) Daniel Logan HANNA (W-12) at the Westwood Cal Fire Station.  W-12 HANNA was the operator of Engine 2261 on September 3, 2007, and responded to the Moonlight Fire from the Westwood Station along with Firefighters Dan RACKLEY (W-13) and Mark WARD.  W-12 HANNA said that CO-OP Forest Patrolman Leo WHITLOCK (W-3) came into the Westwood station and advised him that the Plumas National Forest was dispatching equipment to a fire near their station.  W-12 HANNA said W-3 WHITLOCK told him he was going to continue on to the fire.  W-12 HANNA said he made a phone call to Susanville Emergency Command Center, but before they answered, E2261 was dispatched to the fire.  W-12 HANNA said they were traveling on Moonlight Pass Road on the way in to the fire area when they came upon a pickup truck heading out.  W-12 HANNA told his Firefighter W-13 RACKLEY to get the license number on the truck.  W-12 HANNA said W-13 RACKLEY noted California License "5AY6215".  W-12 HANNA described the truck as a later model Dodge Pickup, light in color-possibly silver.

W-12 HANNA said he noticed only one male occupant in the truck.  W-12 HANNA

described the occupant as being excited and having a cell phone in his hand.  W-12 HANNA said the man told him he knew where the fire was, and said it was off the 3100 Road.  W-12 HANNA followed the truck in.  W-12 HANNA said while they were following, the Dodge truck almost collided with an ATV heading out.  W-12 HANNA said he noticed what he believed to be the same ATV while he was assigned to structure protection at the Stroing Ranch.  W-12 HANNA said he met a man at the ranch who told him that he was the one on the ATV who almost collided with the truck.

On September 7, 2007, at 2:12 p.m., Investigator George GONZALEZ (I-3) and I-4 SCHMITT interviewed Ryan BAUER (W-8) at the Westwood Cal Fire Station.  I-4 SCHMITT asked W-8 Ryan BAUER if he could record the interview and W-8 Ryan BAUER said yes.  W-8 Ryan BAUER said Howell's Forest Harvesting employed him. W-8 Ryan BAUER said he was not working on September 3, 2007, the day of the Moonlight fire.  W-8 Ryan BAUER said S-1 BUSH and S-2 CRISMON were operating bulldozers and constructing water bars that day.  W-8 Ryan BAUER said he called Eunice HOWELL, the owner of the company, to let her know about the fire but she already knew about it.

W-8 Ryan BAUER said he noticed the fire about 3:00 pm from his girlfriend's house in Westwood.  W-8 Ryan BAUER said he went to the fire to see if he could assist in getting equipment out of the fire area.  W-8 Ryan BAUER said that upon his arrival to the fire, fire suppression resources had already arrived.

W-8 Ryan BAUER said  an employee of Medici logging Company,  S-1 BUSH, S-2 CRISMON, the Forest Service and the Forest Patrolman were in the fire area.  W-8 Ryan BAUER said he had been working at the job for about three weeks.  W-8 Ryan BAUER said that as a faller, they use their own chainsaws at work.

I-3 GONZALEZ asked W-8 Ryan BAUER if someone had told him that a bulldozer started the fire.  W-8 Ryan BAUER said S-1 BUSH and S-2 CRISMON told him.  W-8 Ryan BAUER said he did not want it repeated because he did not want to lose his job.

W-8 Ryan BAUER asked me to turn off the recorder.  I-4 SCHMITT turned off the recorder at approximately 2:30 p.m.  W-8 Ryan BAUER said S-1 BUSH and S-2 CRISMON were both operating bulldozers.  W-8 Ryan BAUER said he didn't know who was in which section.  W-8 Ryan BAUER said S-1 BUSH and S-2 CRISMON told him they must have kicked up a spark and started the fire.  BAUER said that S-1 BUSH was blaming S-2 CRISMON and S-2 CRISMON was blaming S-1 BUSH.  I-4 SCHMITT turned the recorder back on at 2:32 p.m. and concluded the interview.

On the afternoon of September 7, 2007, I met with W-4 DIETRICH at the Incident Command Post in Westwood.  W-4 DIETRICH explained Eunice Howell owned Howell's Forest Harvesting.  W-4 DIETRICH said the company employees approximately 24 employees, 12 equipment operators and 12 fallers.  W-4 DIETRICH said W-5 BAKER was a side rod for the company, explaining he was responsible for the equipment operations and W-4 DIETRICH was responsible for the falling operations. W-4 DIETRICH said he was responsible for the operation and described himself as the manager.

W-4 DIETRICH said Howell's Forest Harvesting negotiated a contract with SPI for the logging operation.  W-4 DIETRICH explained that SPI bought the contract from W.M. Beaty and Associates and hired Howell's Forest Harvesting to harvest the wood and supply the SPI mills with the wood.  W-4 DIETRICH described SPI as a reputable company and enjoyed working with them.  W-4 DIETRICH said W-6 FORNO was the SPI Forester that was overseeing the contract and would act as a mediator in the event there were any disputes with representatives from W.M. Beaty and Associates or the employees at the mill.

W-4 DIETRICH explained there was a pre-operational meeting where the requirements for the job were specified including fire safety.  W-4 DIETRICH said they required a firebox, a cache of fire suppression tools, to be available at the job-site.  W-4 DIETRICH told me there had been a fire earlier in the year on a job-site he referred to as the

Moonville job[18].  W-4 DIETRICH said the fire was contained to approximately ¼ of an acre and was caused by a bulldozer striking a rock.  W-4 DIETRICH said he saw where the bulldozer had turned on some rocks, causing the grouser to scrape against the rocks, causing the fire.  W-4 DIETRICH said he had W-5 BAKER check the tracks on the bulldozer that started the fire to ensure it was not an ongoing problem.  W-4 DIETRICH said the bulldozer that caused the fire was the one operated by S-1 BUSH on September 3, 2007.

W-4 DIETRICH said Safeco insured Howell's Forest Harvesting.  W-4 DIETRICH said the Safeco office was in Redding and the agent's name was Fred Robison.  W-4 DIETRICH said the policy was for $3 million liability insurance, as required by SPI.  W-4 DIETRICH said he would fax me a copy of their insurance policy.

On September 7, 2007, at 3:40 p.m., I-3 GONZALEZ and I-4 SCHMITT interviewed Stephen Dale GOODWIN (W-11) at the Westwood Quik Mart at Highway 36 and County Road A-21.  W-11 GOODWIN said that there have been some rumors circulating around the Quik Mart concerning how the Moonlight fire started.  W-11 GOODWIN said a man named Roger ROPER thinks the fire cause is arson.

W-11 GOODWIN said other stories about kids on four wheelers and a U.S. Forest Service Bulldozer starting the fire have been heard in the mini mart.  W-11 GOODWIN said he didn't know who made the statements.  W-11 GOODWIN said he has not heard of anybody who has any firsthand knowledge of the fire cause.

On Saturday, September 8, 2007, I met with Special Agents Diane WELTON (I-5) and Marion MATTHEWS from the United States Forest Service (USFS).  I-5 WELTON had been assigned to the case and was taking the role of lead investigator for the USFS.  I briefed both Agents to the status of the case and we re-visited the fire scene.  Both agents evaluated the indicators and agreed with the specific origin area.

---

[18] CAPNF000305; Origin and Cause Investigation Report by B. FOSTER; June 21, 2007

On Sunday, September 8, 2007, I met with Steve SMITH (W-15) a Heavy Equipment Mechanic for Cal Fire.  W-15 SMITH has 22 years of experience working as a mechanic on diesel powered heavy equipment.  I met with W-15 SMITH at the Stroing Ranch and requested he perform a mechanical inspection of the subject bulldozer in an effort to exclude or include any possible ignition sources emanating from the equipment.  I confirmed the bulldozer was the same bulldozer as operated by S-2 CRISMON by identifying the serial number as 4NS00150.  I also observed the note, business card and flagging was in the same location as when I left it.

W-15 SMITH began an examination of the grousers on the bulldozer.  On the right inside track, W-15 SMITH observed a wear pattern on the grouser plate resulting in a bluing of the metal.  Based on the location of the wear pattern and the proximity to the rock guard, W-15 SMITH determined the grouser plates were likely coming in contact with the rock guard as the bulldozer was operated in uneven terrain.  W-15 SMITH observed the left rear inside rock guard was loose, but determined it would not have created any spark or source of heat.  W-15 SMITH reported the rollers appeared to be in good shape with no signs of heat buildup.

W-15 SMITH began a visual inspection of the engine compartment.  W-15 SMITH noted the fan belts were loose but did not see anything that related to the belts that would indicate a possible ignition source.  W-15 SMITH noted no physical deformities with the exhaust and turbo system.  W-15 SMITH saw the air filter was clogged and explained that the engine would actually be running cooler with a clogged air filter.  W-15 told me that less air would result in less fuel entering the system, which in turn would result in lower performance and a cooler engine.  W-15 SMITH saw a small accumulation of vegetation in close proximity to the exhaust manifold.  W-15 SMITH said the vegetation could become superheated from the exhaust temperatures and then be expelled through the front of the radiator.  W-15 SMITH explained the fan on a bulldozer was opposite than that of a car, in that the fan blows the air out the front and away from the driver.  W-15 SMITH said if the vegetation on the exhaust manifold were to reach ignition

temperature and forced out the front, embers could be expelled.  A visual examination revealed no excessive ash other than residual ash from the Moonlight Fire.

W-15 SMITH checked the coolant level and oil capacity of the bulldozer.  W-15 SMITH started the bulldozer and listened to the operating sound of the engine and exhaust system.  W-15 SMITH said the system did not seem to have as much power as he would have expected, but based the reason for the clogged air filter.  W-15 SMITH identified the only possible sources of ignition as the friction resulting in deformation of the grouser plates and the vegetation in the engine compartment.

On September 10, 2007, I met with S-1 BUSH at the Shell Gas Station in Westwood at approximately 8:30 a.m.  I told S-1 BUSH that I was going to record the conversation.  S-1 BUSH said he understood.  S-1 BUSH reiterated the same information he had provided to I-1 REYNOLDS.  S-1 BUSH said that after discovering the fire he was driving out to call on his cellular phone when he came across a 4-wheeler.  S-1 BUSH said he remembered the operator saying something about coming from a ranch.  S-1 BUSH said the operator was driving toward him as he was driving away from the fire.  S-1 BUSH was unable to provide any other details.

S-1 BUSH confirmed the fire was on the uphill side of road 3130.  S-1 BUSH said the smoke was thick and blowing over road 3130 as he was driving in and he knew it would be too dangerous to drive through and attempt to save the equipment.  S-1 BUSH said if the fire had been smaller, he could have used a bulldozer to cut a firebreak around it.  S-1 BUSH said this fire was too big and burning too fast to attempt any suppression.

I told S-1 BUSH that I was concerned with the sequence of events.  I explained to S-1 BUSH that based on his timeline he should have been able to get back out to the meadow and call 911 from his cellular phone before the Red Rock Lookout report.  S-1 BUSH said he could be off on his estimation of times.  S-1 BUSH also mentioned he stopped at one point to extinguish a spot fire on the downhill side of road 3130.

On  September 10, 2007, at approximately 8:35 a.m., I-4 SCHMITT interviewed Damon Daniel BAKER (W-5 ) at the Westwood Quik Mart  on Hwy 36 and County Road A-21. W-5 BAKER said he works as a Siderod for Howell's Forest Harvesting.  W-5 BAKER said his duties as a Siderod include briefing the employees on the work to be performed, safety briefings and making sure the employees have the equipment they need.  W-5 BAKER said once everyone is working, he would also operate equipment and move the fire trailer around as needed.

W-5 BAKER said on September 3, 2007, the day of the Moonlight Fire, S-1 BUSH and S-2 CRISMON were the only employees working.  W-5 BAKER said S-1 BUSH and S-2 CRISMON were catching up on water bar installations and cleaning up landings that day. W-5 BAKER said that the employee assigned fire watch stays approximately 2 hours after shutdown and patrols roads and work areas that were traveled during the workday to make sure there are no fires.  W-5 BAKER said that on the day of the fire, S-1 BUSH and S-2 CRISMON would have shut down operations at 1:00 p.m.  W-5 BAKER said S-1 BUSH was assigned to stay until 3:00 p.m. for fire watch.  W-5 BAKER said he received a phone call at home from Eunice HOWELL advising him of the fire at approximately 3:30 p.m.  W-5 BAKER said he drove up from Shingletown, but he didn't arrive at the camp area until 5:30 or 6:00 p.m. because he had to take a detour due to the fire.

On September 10, 2007, at 10:00 a.m., I met with Dr. Les HENDRICKSON, Ph.D. (W-16) at the Cal Fire Headquarters in Susanville.  I requested W-16 HENDRICKSON as a Forensic Engineering Consultant in metallurgy to assist in the examination of the bulldozer operated by S-2 CRISMON.  W-16 HENDRICKSON and I drove to the Stroing Ranch and found the bulldozer as I had left it on September 9, 2007.  W-16 HENDRICKSON and I photographed the bulldozer and the specific areas he decided to take samples.  W-16 HENDRICKSON chose the front left striker blade as well as a sample from the left track, grouser plate.

Using a hacksaw, I cut a small piece from the left striker plate, photographed the sample piece and secured the sample in a plastic bag.  W-16 HENDRICKSON and I

photographed the grouser plate he selected and using a hacksaw I cut another sample piece. We photographed the sample and secured it and some of the shavings from the cut in a plastic bag.

I removed the hacksaw blade, W-16 HENDRICKSON placed his initials on the blade and we photographed it. I retained the samples and hacksaw blade as evidence.

On September 12, 2007, I-5 WELTON interviewed W-18 LIEF at the Greenville USFS Fire Station. W-18 LIEF said he was assigned to the Red Rock Lookout on September 3, 2007. W-18 LIEF said that at approximately 2:23 p.m. Karen JUSKA (W-17) arrived at the lookout to take garbage out and retrieve paperwork. W-18 LIEF said that while in the driveway for the lookout, at approximately 2:23 p.m. he observed smoke to the southwest. W-18 LIEF described the smoke as a white column, blowing from the southwest to the northeast. W-18 LIEF said he returned to the lookout while W-17 JUSKA reported the smoke to the PNF ECC. W-18 LIEF said he used the azimuth in the lookout to report the fire to the PNF ECC at a bearing of 232° and a distance of 6 miles.

W-18 LIEF said he could not see the base of the smoke, but continued to watch the fire build rapidly. W-18 LIEF estimated the winds at the lookout at 20 to 30 mph. W-18 LIEF reported September 3, 2007, as a clear day, no clouds or lightning.

At 1:10 p.m., I-5 WELTON interviewed W-17 Karen JUSKA at the Greenville USFS Fire Station. W-17 JUSKA said she was at the Red Rock Lookout at approximately 2:10 p.m. on September 3, 2007. W-17 JUSKA said she did a visual 360-degree perimeter scan from the lookout. W-17 JUSKA said she did not observe any smoke at that time. W-17 JUSKA said she took garbage to her pickup with W-18 LIEF and observed a light wisp of top-smoke behind W-18 LIEF's shoulder. W-17 JUSKA advised W-18 LIEF of the smoke and then reported the smoke to the PNF ECC via the two-way radio in her vehicle. W-17 JUSKA said she responded to the fire from the lookout and estimated the fire size upon her arrival as 2 acres with spot fires.

On September 14, 2007, at 10:10 a.m., I-5 WELTON and I met with Les CURTIS (W-19) at the Chester Air Attack Base.  W-19 CURTIS said he was the Forest Aviation Officer and responded on Air Attack 06 out of Chester to the Moonlight Fire.  W-19 CURTIS said the fire was approximately 1 acre in size upon his arrival and the fire was already spotting.  W-19 CURTIS said he had the tankers drop retardant on the left and right flanks and was trying to hold the fire to the west of road 3130.  W-19 CURTIS said he had boxed in the origin area.  W-19 CURTIS produced a map and drew an x where he believed the fire was when he first arrived (see attachment 26).  W-19 CURTIS explained the fire was not backing very fast and stopped backing once he dropped retardant on the heel.

I showed W-19 CURTIS a detailed map on my laptop computer screen.  W-19 CURTIS pointed at an area near the top of the ridge and confirmed that was where he first observed the fire.  His location on the map is consistent with the origin determination.  I then showed W-19 CURTIS an aerial photograph of the fire I took from a helicopter and he again confirmed the fire was in the area consistent with the origin determination.

On September 16, 2007, I-5 WELTON interviewed W-1 CRAGGS, the first Incident Commander for the Moonlight Fire.  W-1 CRAGGS said he was augmenting the original dispatch while responding to the fire.

W-1 CRAGGS estimated the fire at 50 acres when he arrived at scene with long-range spot fires occurring.  W-1 CRAGGS estimated one spot fire occurring one-half to three-quarters of a mile from the main fire.  W-1 CRAGGS said the main fire had a rapid rate of spread.

I-5 WELTON later interviewed John MOORE (W-20), owner of Sugarpine Aviators.  W-20 MOORE said Sugarpine Aviators has the contract with W.M. Beaty and Associates to provide aerial patrol over the land managed by W.M. BEATY and Associates.  W-20 MOORE said the company has been flying the patrol for W.M. Beaty and Associates since 1980.

W-20 MOORE identified Hershel BEAIL (W-21) as the pilot who was flying for Sugarpine Aviators on Monday, September 3, 2007.  W-20 MOORE said W-21 BEAIL is the pilot who flies the air patrol as well as other charter flights.  W-20 MOORE said Sugarpine Aviators is contracted to fly Monday through Friday.

On September 17, 2007, I-5 WELTON met with W-21 Hershel BEAIL at the office for Sugarpine Aviators.  W-21 BEAIL explained to I-5 WELTON that he flew the patrol on September 3, 2007, and he provides the Forest Service a radio call when he flies by specific landmarks.  W-21 BEAIL said he contacts the Lassen National Forest in Susanville and his call sign is Almanor Air Patrol.  W-21 BEAIL said his first check-in was when he flew over Round Valley Lake.

W-21 BEAIL said he normally flies by all of the logging operations to check for any logging concerns.  W-21 BEAIL said he was unaware of anyone working on Monday, September 3, 2007, due to Labor Day Holiday.  W-21 BEAIL said his normal flight times are from 2:30 p.m. to 7:00 p.m. and the airplane he flies is a Cessna 172.

W-21 BEAIL said he flew over Dyer Mountain and observed a haze in the Moonlight Peak area.  W-21 BEAIL said he turned to check the area, which he estimated as 25 air miles away.  W-21 BEAIL said that within 2 to 3 minutes he heard Red Rock Lookout report the fire to the Plumas National Forest.  W-21 BEAIL continued to watch the smoke and could not see the base and described the smoke as being "laid down."  W-21 BEAIL said he did not see the smoke until he flew over Kettle Ridge and he estimated his altitude at 9500 feet.

W-21 BEAIL said he was flying by himself on September 3, 2007, and noted the winds were blowing from the south "real hard."  W-21 BEAIL said he did not know anyone was working on the Moonlight Timber Sale.  W-21 BEAIL said that W.M. Beaty and Associates wanted him to fly on the holiday due to the recreation use and high fire conditions.

Exclusions

Based on an evaluation of the evidence at the origin scene, witness accounts and supporting information, the following exclusions are made:

Lightning:  *Excluded*

"Lightning is a well-recognized cause of wildfires, particularly in forested areas, striking trees, power lines and rock outcrops.  The action of the lightning strike in the tree can not only splinter the trunk, but can form glassy clumps, called fulgarites, by melting sand  in the soil in the root area.  Lightning may simply strike the ground, igniting nearby fuels."[19]

A systematic search of the origin area did not reveal any indication of a lightning strike.  There were no trees damaged by lightning in the area and there were no blowholes or fulgarites found.  A lightning activity detection search was conducted by utilizing the website maintained by the Bureau of Land Management (BLM) at www.nifc.blm.gov.  The search revealed the nearest strike within the previous two weeks as a negative strike located at latitude N 40º 22.985' and longitude W 120º 39.8767' on August 30, 2007.  This coordinate places the lightning strike 15.76 miles from the origin.

Spontaneous Heating:  *Excluded*

"Special types of fuel will ignite spontaneously from internal heating caused by biological and chemical action.  This action is most likely to occur on warm, humid days in decomposing piles of organic material such as hay, grains, feeds, manure, sawdust, wood chips piles, and harvested, piled peat moss."[20]

---

[19] National Fire Protection Association, Guide for Fire and Explosion Investigations  (2004) 921-209.

[20] National Fire Protection Association, Guide for Fire and Explosion Investigations  (2004) 921-209.

There were no forms of material necessary for the spontaneous heating in the area of origin, relative humidity was recorded at the Westwood RAWS station at 13% and the 1-hour fuel moisture was recorded at 2.

Campsite:  *Excluded*

"Circle of rocks, or pits with a large amount of ash, or a pile of wood are good indicators of a campfire.  Even camp areas that have burned completely leave evidence of their prior existence."[21]

There was no indication of a campfire in or near the area of origin.  This area is not prone to camping and an active logging operation was in place.  No footprints, debris, campfire rings, hiking trails or any other indicator of camping was present.  Subsequent to fire suppression, a campfire ring was constructed by suppression personnel inside the fire perimeter to the west of the origin.  This campfire ring was constructed after the fire's ignition and was not present on the first or second day.

Smoking:  *Excluded*

"Discarded ignited smoking materials, such as cigarettes, cigars, pipe tobacco, and matches, can start wildfires.  However, any of these heat sources require several conditions in order to ignite vegetation.  The fuel source must be dry, and fine or powdery, such as litter or punky wood.  Fuel moisture needs to be below about 25 percent.  The ash and filter (if present) of a cigarette butt or burned match may be identifiable at the point of origin."[22]

---

[21] National Fire Protection Association, Guide for Fire and Explosion Investigations  (2004) 921-209.

[22] National Fire Protection Association, Guide for Fire and Explosion Investigations  (2004) 921-209.

There was no evidence of smoking in the area.  S-2 CRISMON stated he does not smoke.  The area is not prone to cigarette litter due to its distance from any roadways. A search of the specific origin area did not reveal a cigarette filter, ash or match.

Debris burning:  *Excluded*
"Fires occur at dumpsites as well as at residences from garbage and other debris set on fire.  Often these operations spread to the neighboring vegetation."[23]

There was no evidence of any debris burning in or near the origin.  S-2 CRISMON stated he did not observe anyone in the area while he was working.  The area is not conducive to debris burning.

Sunlight and glass refraction: *Excluded*
"The sun's rays can be focused to a point of intense heat if concentrated by certain glass or shiny objects.  This refraction process bends light rays, similar to that which occurs through a magnifying glass.  The shiny, concave end of a metal can may focus sunlight but its short focal distance makes the potential as a possible cause unlikely."[24]

There were no cans, bottles, or other refractive objects found in the origin.

Incendiary:  *Excluded*
"These fires are sometimes set in more than one location, and in areas that are frequently traveled.  Matches, fusees, and other ignition devices may be found in the area of origin.  The firesetter may decide to use a time-delay ignition device.  Items to look for include cigarettes, rope, rubber bands, tape, candles, and wire."

---

[23] National Fire Protection Association, <u>Guide for Fire and Explosion Investigations</u>  (2004) 921-209.

[24] National Fire Protection Association, <u>Guide for Fire and Explosion Investigations</u>  (2004) 921-209.

There was no evidence of any incendiary devices found in the origin.  There were no footprints, tire impressions or other markings to indicate human travel in the area.  S-2 CRISMON stated he did not see anyone in the area.  There was no evidence of any aerial ignition device being launched from the roadway.

Machinery and vehicles: *Included*

"Vehicles and machinery can cause wildfires in countless ways, from operating failures, overheated equipment, burning carbon, fuel leaks, and spills and friction. Any power or motorized equipment that uses electricity or flammable products in its operation or that creates ignition temperatures in its operation is capable of starting a fire when being operated in or adjacent to combustible vegetation.  This includes vehicles, powered portable and mobile machinery, harvesting and construction equipment, chain saws, grinding tools, and cutting torches.  Defective or failed parts add to the fire potential through friction heating of bearing-worn brakes, "frozen" shafts, and abrasion."[25]

Investigation in the origin area revealed a set of tracks consistent with that of a bulldozer.  The bulldozer tracks continued through the origin and were in a direct path with multiple rocks that had recent damage consistent with coming in contact with a hard object.  Metal particles (See Photograph CS) were recovered in close proximity with two of these damaged rocks.  Based on the statement by S-2 CRISMON, he had been operating a model 527 Caterpillar bulldozer in the area, constructing water bars.  S-2 CRISMON said he had been in the origin area approximately 20 minutes prior to leaving the area.  Metal samples were taken from the subject bulldozer to compare to the evidence found at the origin.

---

[25] National Fire Protection Association, Guide for Fire and Explosion Investigations  (2004) 921-209.

Railroad: *Excluded*

"Wildfires are sometimes started along railroads.  Occasionally, fire intended to clear a right-of-way will escape.  Diesel and diesel-electric powered locomotives can cause track-side fires from exhaust carbon, external buildups of lubrication oil, and exhaust and fuel line failure, while rolling stock can start fires hot brake metal, and overheated wheel bearings (hot boxes).  Fires can also result from derailments, cutting or grinding on rails, or warning flares."[26]

There are no rail lines in the area.  The nearest operating railroad is 5.85 miles to the south.

Juveniles: Excluded

"The carelessness of a child, coupled with the curiosity about fire, may lead to wildfires around residences, schools, playgrounds, campsites and wooded areas.  Matches, lighters, or other ignition devices may be found in the area of origin."[27]

There was no evidence of any juvenile activity in the area.  The area is not prone to juvenile activity.

Fireworks: Excluded

"Fireworks provide means of ignition through sparks and flaming debris.  Sparklers are a smaller hazard, but may ignite dry grass or other fuels."[28]

---

[26] National Fire Protection Association, Guide for Fire and Explosion Investigations (2004) 921-210.

[27] National Fire Protection Association, Guide for Fire and Explosion Investigations (2004) 921-210.

[28] National Fire Protection Association, Guide for Fire and Explosion Investigations (2004) 921-210.

There was no evidence of any fireworks in the vicinity.  There were no reports of any fireworks used in the area.

Utilities:  Excluded

"Public and private utilities often are present through wildfire areas and therefore provide a potential ignition source."[29]

There were no utilities located in the origin area.

Electricity: Excluded

"Overhead power lines may cause wildfires when trees contact a conductor and ignite the branch or foliage involved.  This contact usually leaves a brand on the portion of the tree that made contact and creates a pit or flash mark on the power conductor. After ignition, burning portions of the tree may fall to the ground and ignite ground litter.  In addition to tree contact, conductors may be blown against each other (phase to phase) during a windstorm creating a hot metal globule that falls to the ground. Conductors and transformers may fail, starting the pole or other equipment on fire, and may drop flaming or hot material onto the ground.  Underground conductors can be damaged by heavy equipment or digging operations, resulting in fire.  Electric fences are likewise a source of energy resulting in ignition of combustible materials."[30]

There were no overhead electrical conductors in the origin area.  There was no evidence of any underground electrical conductors in the area.

---

[29] National Fire Protection Association, <u>Guide for Fire and Explosion Investigations</u>  (2004) 921-210.

[30] National Fire Protection Association, <u>Guide for Fire and Explosion Investigations</u>  (2004) 921-210.

Conclusion

Based on a thorough examination of the area, coupled with data research and witness interviewing, it is my opinion the fire was caused by the grouser plate or front striker plate of the bulldozer operated by S-2 CRISMON, contacting the rocks within the origin area.  This contact resulted in superheated particles of the ferrous alloy from the bulldozer coming in contact with the dry fuels.

"Iron, steel, and some other ferrous metals will spark when struck by a suitable object.  This occurs most during grinding operations or when a portion of a vehicle strikes a stone-surfaced roadway.  The actual mechanism is quite simple.  A highly localized frictional contact rips a fragment of the ferrous alloy out with sufficient energy to heat it beyond it's ignition temperature [on the order of 700º to 800ºC (1,300º to 1,475ºF)].  The particle ignites in the air and burns (at >1600ºC, 2900ºF), leaving a sometimes incandescent flake of carbon and iron oxide as an ash."[31]

It is my opinion the fire smoldered and maintained heat generation in the incipient stage[32] until sufficient oxygen, heat and fuel accumulations allowed the fire to enter into the free-burning stage[33].

Based on the time lag from S-2 CRISMON's departure to the time or report by Red Rock Lookout, I believe the fire maintained in the incipient stage, smoldering in the

---

[31] John D. DeHaan, Kirk's Fire Investigation 6th edition (2007) 170.

[32] This is the first stage of fire development after the moment of ignition.  John D. DeHaan, Kirk's Fire Investigation 6th edition (2007) 46.

[33] The fire grows in intensity as more fuel is being involved.  Convection and radiation spread the flames upward and outward from the initial fuel package until nearby fuels reach their ignition temperatures and begin to burn.  John D. DeHaan, Kirk's Fire Investigation 6th edition (2007) 46.

dry fuel bed for approximately 1 ½ hours until it entered into the free-burning stage and producing enough smoke to be identified by Red Rock Lookout.

It is my opinion that had an inspection for fire occurred, as defined by California Code of Regulations, the fire could have been identified and contained by initial attack resources.  I believe S-1 BUSH and S-2 CRISMON recognized the fire danger and that was the reason they ceased operations at 1:00 p.m.

### X.    Attachments

1.  WildCAD Incident Card
2.  Incident Report   FS5300-1
3.  Origin and Cause Investigation Report
4.  Parcel Information for Origin Area
5.  Timber Operator's Fire Protection Plan
6.  Timber Harvest Plan Submitted by W.M. Beaty and Associates
7.  Statement from S-1 JW BUSH
8.  Statement from S-2 Kelly CRISMON
9.  Interview Report for S-1 BUSH
10. Interview Report for S-2 CRISMON
11. Interview Report for W-1 CRAGGS
12. Interview Report for W-2 WATERMAN
13. Interview Report for W-3 WHITLOCK
14. Interview Report for W-4 DIETRICH
15. Interview Report for W-5 BAKER
16. Interview Report for W-6 FORNO and W-7 MITZER
17. Interview Report for W-8 Ryan BAUER
18. Interview Report for W-9 BULLARD
19. Interview Report for W-10 Edwin BAUER
20. Interview Report for W-11 GOODWIN
21. Interview Report for W-12 HANNA
22. Interview Report for W-13 RACKLEY
23. W-14 HENRY's ICS 204
24. Interview Report for W-15 SMITH
25. Statement from W-17 Karen JUSKA
26. Statement from W-18 Caleb LIEF
27. Statement from W-19 Les CURTIS
28. Statement from W-20 MOORE
29. Statement from W-21 Hershel BEAIL
30. Interview Report for Roger ROPER
31. Westwood RAWS data for 9/03/07
32. Pierce RAWS data for 9/03/07
33. Maps
34. Fire Progression Map
35. Photographs
36. Evidence Log
37. Lightning Activity Detection Maps
38. Wildland Fire Report for "Greens Fire" June 21, 2007
39. Origin and Cause Report for "Greens Fire" June 21, 2007
40. Origin and Cause Report for "Lyman Fire" August 17, 2007
41. Origin and Cause Report for "Howell Fire" September 18, 2007
42. Red Rock Lookout Log Entry for 8/31/07 to 9/4/07

**WildCAD Incident Card - Plumas Emergency Communications Center: PNF 2007-670**
*"Moonlight" Vegetation Fire 09/03/2007 14:24:00 Order Number: CA-PNF-0000670*
Area 2

**Reporting Party:** Red Rock Lookout

**Initial Report On Conditions:**
have smoke @ 232 deg., 6 mi.

**Initial Location:** 1 mi. south of Moonlight Valley
         Lat: 40°,11',58.2", Lon: 120°,51',41.41", T27N, R10E, Sec 16
**Actual Location (09/03/2007 15:12):**
         Lat: 40°,12',54.71", Lon: 120°,51',7.19", T27N, R10E, Sec 10

**Incident Notes:**
P5DZC7 0511

**Dispatcher:** Laurie Bartel   **Status:** Open
**Job Codes:** P5DZC7 0511
**Web Comment:**
P5DZC7 0511
**Timer:** Closed Timer for Resource AA 06
**Timer:** Closed Timer for Resource A/A 06
**Timer:** Closed Timer for Resource 55LT
**Timer:** Closed Timer for Resource 9AC
**Timer:** Closed Timer for Resource B3
**Timer:** Closed Timer for Resource T-100
**Timer:** Closed Timer for Resource B3
**Timer:** Closed Timer for Resource B3
**Timer:** Closed Timer for Resource 55TL
**Timer:** Closed Timer for Resource LB3
**Timer:** Closed Timer for Resource H-901
**Timer:** Closed Timer for Resource H-202
**Timer:** Closed Timer for Resource A/A 06
**Timer:** Closed Timer for Resource H-901
**Timer:** Closed Timer for Resource AA-06
**Timer:** Closed Timer for Resource 3B
**Timer:** Closed Timer for Resource B3
**Timer:** Closed Timer for Resource A/A
**Timer:** Closed Timer for Resource 6MV
**Timer:** Closed Timer for Resource B3
**Timer:** Closed Timer for Resource A/A
**Timer:** Closed Timer for Resource 6MV
**Timer:** Closed Timer for Resource 28M
**Timer:** Closed Timer for Resource B56
**Timer:** Closed Timer for Resource 26MV
**Timer:** Closed Timer for Resource H-726
**Timer:** Closed Timer for Resource B56
**Timer:** Closed Timer for Resource B3
**Timer:** Closed Timer for Resource T-48
**Timer:** Closed Timer for Resource B56
**Timer:** Closed Timer for Resource 9CH
**Timer:** Closed Timer for Resource AA-17
**Incident Commander(s):**
09/04/2007 0859 Rick Case Effective 0900 Field units notified per IC Shafer

| Resource | Commit | Respond | On Scene | Avail Inc | Returning | Off Incident |
|----------|--------|---------|----------|-----------|-----------|--------------|
| E-9902 | 09/03 15:54 | | 09/03 15:54 | | | 09/06 08:37 |
| E-9903 | 09/03 14:33 | 09/03 15:55 | 09/03 15:53 | | | 09/04 08:39 |
| ENG 13 | 09/06 08:30 | | 09/06 08:28 | | | |
| ENG 15 | 09/06 08:30 | | 09/06 08:28 | | | |
| ENG 20 | 09/06 01:14 | | 09/06 01:14 | | 09/06 01:14 | 09/06 01:20 |
| ENG 22 | | 09/03 14:28 | 09/03 17:12 | | | 09/04 10:55 |
| ENG 25 | 09/03 14:28 | | 09/03 17:12 | | | 09/05 11:06 |
| ENG-W25 | | 09/03 14:27 | 09/03 15:50 | | | 09/05 11:36 |

| | | | | | |
|---|---|---|---|---|---|
| CREW 13 | 09/10 09:29 | | 09/10 09:29 | | |
| CREW 3 | 09/06 09:07 | | 09/06 09:07 | | |
| DOZ 1 | 09/03 16:13 | | 09/04 01:09 | | |
| DOZ 2 | 09/03 16:13 | | 09/04 01:09 | | |
| DOZ 3 | 09/10 09:29 | 09/03 14:36 | 09/04 01:09 | | |
| DOZ 81 | 09/04 19:04 | | 09/04 19:04 | | |
| PT-13 | 09/04 13:14 | | 09/04 19:04 | | |
| PT-21 | 09/03 15:17 | | 09/03 15:33 | 09/03 23:30 | 09/03 23:56 |
| PT-22 | | 09/03 14:27 | 09/03 15:17 | 09/03 21:04 | 09/03 23:29 |
| PT-23 | | 09/03 14:28 | 09/03 15:20 | | 09/04 00:01 |
| BC-21 | 09/06 01:13 | 09/03 14:28 | 09/03 15:17 | 09/06 01:14 | 09/06 01:30 |
| BC-22 | 09/03 16:25 | | 09/03 16:25 | 09/04 00:04 | 09/04 01:01 |
| DV-2 | | 09/03 15:17 | 09/03 15:52 | | 09/04 03:30 |
| DV-5 | 09/03 17:54 | | 09/04 08:18 | 09/04 09:06 | 09/04 13:14 |
| CH-3 | 09/04 01:08 | | 09/04 01:08 | | 09/10 09:28 |

| Entry Date/Time | From | To | Details |
|---|---|---|---|
| 09/03/2007 14:31:58 | Red R. | Lau | 1 mi. south of Moonlight, smoke building |
| 09/03/2007 14:33:40 | DV 2 | Lau | would like T 1 Helo, 2 handcrews |
| 09/03/2007 14:39:59 | lb | DV 2 | advised 4 air tankers ordered at this time |
| 09/03/2007 14:40:52 | DV 2 | Lau | per BC 21 column is building, would like 6 crews ordered |
| 09/03/2007 14:46:15 | 9902 | Lau | would like to hold in Taylorsville per DV 2 |
| 09/03/2007 14:49:05 | DV 2 | Lau | wants 2 WT's as well, & DZ 2 when back on forest |
| 09/03/2007 14:49:35 | E-2261 | Lau | responding from westwood |
| 09/03/2007 14:53:32 | Red Rock | Lau | still building |
| 09/03/2007 14:53:50 | AA | Lau | 7 min. ETA, have smoke in site |
| 09/03/2007 15:02:01 | AA | Lau | on scene, 20 - 25 acres, fast rate of spread, sw wind on it |
| 09/03/2007 15:05:21 | boat patro | Lau | in area, access will be off of Moonlight Pass, 3,000 rd., has structures at Storing Ranch, & logging equipment in the area//Prev. 21 will be enroute as well |
| 09/03/2007 15:18:08 | DV 2 | Lau | would like all units responding to stage at Moonlight Pass//announced on radio |
| 09/03/2007 15:18:50 | E-2261 | Lau | is crowning & spotting, 80 percent slope with strong winds |
| 09/03/2007 15:28:41 | DV 2 | Lau | assuming IC, trying to get access at this time for ground resources, still have all units stage at Moonlight Valley |
| 09/03/2007 15:30:39 | DV 2 | Lau | request per air attack for 3 additional air tankers |
| 09/03/2007 15:34:49 | IC | Lau | 50+ acres, burning paralell to structures |
| 09/03/2007 15:43:58 | IC | Lau | 60+ acres, hvy timber, torching and crowning, would like to consider T2 team, originated on private & is moving towards staging area at Moonlight Pass |
| 09/03/2007 15:50:25 | ant c-2 | Lau | on scene |
| 09/03/2007 15:53:06 | woods 25 | Lau | on scene |
| 09/03/2007 15:59:18 | ic | Lau | 100 acres & spotting, crossed the main moonlight road |
| 09/03/2007 15:59:51 | ic | jh | we will need to order a team |
| 09/03/2007 16:12:03 | IC | AH | Crossed Moonlight Rd. Burning to Moonlight Pk. Resources are split by fire. |
| 09/03/2007 16:13:54 | doz 2 | jh | dz1 & 2 are on A-21 do you want us to go to the fire |
| 09/03/2007 16:14:26 | jh | dz 2 | IC says go to the fire from westwood side |
| 09/03/2007 16:42:44 | ic | jh | all resources coming in from north, go to pinetown and come in from,moonlight staging north contact is lasseb Pt 12. resources from the south go to moonlight south staging at moonlight valley road contact is PT21 |
| 09/03/2007 16:42:45 | PT-23 | AH | Requesting a state investigator, order placed in ROSS. |
| 09/03/2007 17:16:31 | e 2571 | jh | on scene |
| 09/03/2007 17:45:35 | ic | jh | I have a verbal agreement with beatty logging (Jeff Toddlick?) to use their land at Pine town for fire camp |
| 09/03/2007 17:58:34 | ic | jh | working with cdf Joe Waterman on ordering thru sifc for cdf resources, want to know if we are talking with sifc to avoid double ordering |
| 09/03/2007 18:20:48 | ic | jh | update 300+ acres and still spotting |
| 09/03/2007 18:58:37 | jh | ic | all ordering will go thru Plumas ECC, Sifc is denying all orders coming from Joe Waterman |
| 09/03/2007 19:35:16 | e-15 | jh | on scene |
| 09/03/2007 21:04:41 | PT-22 | Wg | Released returning to Greenville |
| 09/03/2007 23:17:07 | IC | Wg | Request IC type 3 for tomorrow. |

| Entry Date/Time | From | To | Details |
|---|---|---|---|
| 09/03/2007 23:17:46 | BC-22 | Wg | Released return to Qtrs.  Back on regular duty tomorrow 0800 |
| 09/03/2007 23:18:24 | IC | Wg | Phil Schaffer to be IC tonight. |
| 09/03/2007 23:19:25 | WG | IC | Filled IC-3 request with Rick Case.  Report to Moonlight Pass 0700 |
| 09/03/2007 23:29:37 | PT-21 | Wg | Released returning to Qtrs |
| 09/03/2007 23:33:32 | IC | OPS | Heard there was an injury.  OPS verified minor burn to ankle of Crew Capts. |
| 09/03/2007 23:56:49 | PT-21 | Wg | In Qtrs Greenville out of service |
| 09/04/2007 01:01:26 | IC | Wg | Change of command.  Phil Schafer IC.  Briefing at 0700 at George Young Park in Pine Town |
| 09/04/2007 01:01:41 | BC-22 | Wg | Out of service |
| 09/04/2007 01:15:25 | DV-2 | Wg | Leaving incident going to Westwood CDF Station to work on Plan.  Heading home from there. |
| 09/04/2007 02:28:05 | DV-2 | Wg | 0158 hrs.  Arrived at Westwood CDF Station.  Request Spot Forecast for AM and PM.  Also, request an order for 4 Division Supervisors. |
| 09/04/2007 02:28:42 | DV-2 | Wg | Left CDF Station in route to Greenville. |
| 09/04/2007 03:30:50 | DV-2 | Wg | 0251 hrs. In Qtrs |
| 09/04/2007 06:16:55 | IC | Wg | 0555hrs. Request to FAX to Westwood CDF Station for 4 Type C fallers from camp for Division A. |
| 09/04/2007 06:24:13 | IC | Wg | Report upon request of IO's.  Not much acerage increase.  Making progress on line construction on Div. A, B,  50-60% humidity.  Waiting for fire to back down to Div. Z.  Open line on Div. U and D. |
| 09/04/2007 06:25:38 | IC | Wg | ... Report continued Structures still threatened outside fire perimeter.  About 15% contained. |
| 09/04/2007 07:46:21 | AH | IC | Notified of new A/G frequency. |
| 09/04/2007 09:47:34 | AH | IC | Relayed reported spots well ahead of fire. |
| 09/04/2007 09:48:58 | AH | AH | Lat and Long of possible Spots 40,18.1 x 120,47.1 |
| 09/04/2007 16:56:09 | IC | Lau | made announcement to IC of thundercells building to the northwest, with potential for high outflow of wind & downdrafts// advised to make sure resources are aware & that they are prepared |
| 09/04/2007 17:34:54 | AH | IC | Relayed weather information of possible hig winds:  from the W NW with gusts of 30 with possible 40-50 within 15 to 20 miles of incoming storm. |
| 09/04/2007 21:38:41 | DV-3 | Wg | Ops and IC have been turned over to the Team.  Fire has slowed down a little. |
| 09/05/2007 00:15:34 | SIFC | Wg | Brian called. "3 Beatty and Assoc. employees were burned over earlier today but are OK.  They are uncomfortable coming out on their own."  John (257-7191) called SIFC.  See paper notes for names. |
| 09/05/2007 00:16:54 | wg | OPS | John (OPS) relayed info.  They are located at 28N, 11E, sec33, SW1/4 |
| 09/05/2007 00:37:50 | Padia | Wg | Padia and Rosel returning to Mt. Hough from Road Block duty. |
| 09/05/2007 01:00:38 | DV-3 | Wg | 0050 hrs. They tried to get to the Beaty folks but road was block by trees.  Will try alternate routes.  He suggested contacting them and have them try to work out toward Antelope. |
| 09/05/2007 01:25:13 | DV-3 | Wg | Request notify PCSO evacuation of China Gulch, Ingles mine area. |
| 09/05/2007 01:48:11 | DV-3 | Wg | Have Indian Valley Fire meet him at Lights Cr. and 46 road. |
| 09/05/2007 02:26:03 | wg | PCSO | 0125 hr.  contacted PCSO request evacuation for China Gulch, Engle Mine Area |
| 09/05/2007 02:27:07 | DV-3 | Wg | 0133 Request 3 Strike Teams of Type 1 structure protecton engines |
| 09/05/2007 02:29:42 | Wg | PCSO | Request Indian Valley Fire for structure protection upper Lights Cr. Area |
| 09/05/2007 02:30:28 | Wg | OES | Contacted Andy Anderson to request the 3 OES Strike Teams of Engines |
| 09/05/2007 04:52:49 | DV 3 | Lau | fire is on both sides of China Gulch, near China Gulch, made an approx. 5 mil. run overnight |
| 09/05/2007 04:56:29 | DV 3 | Lau | Volunteer engines were released around 0400 hrs.//PCSO still in area of Engel Mine trying to do evacuations |

| Entry Date/Time | From | To | Details |
|---|---|---|---|
| 09/05/2007 19:08:34 | A/A | AH | Mix up with tankers.  T-21 departed to Chester ETA 1908, T-23 still over the fire.  Will release T-23 to Chico soon. |
| 09/06/2007 01:20:25 | 911 | Wg | Report of a fire between Duncan Trailer Park and Greenville N. of North Valley Rd.  (Refer to paper log for details.) |
| 09/06/2007 01:20:40 | E-20 | Wg | In Qtrs out of service |
| 09/06/2007 01:30:26 | BC-21 | Wg | In Qtrs out of service |
| 09/06/2007 01:53:20 | BC-22 | Wg | In Qtrs out of service |
| 09/08/2007 15:06:59 | Fuels 21 | Lau | leaving Lucky S Mine area, have Eng strike team in place & have done alot of work to protect structures// enroute to Pierce Crk area |
| 09/09/2007 12:12:17 | E-20 | Lau | older couple came in to station asking about road closures and evacuations for the area, & did they need to leave//located off the 03 road, Janesville grade area//passed into on to PCSO & they advised that they would handle it |

| VOR | ATB | Helibase |
|---|---|---|
| 32m 247° AHC: AMEDEE (HER | 18m 086° O05: CHESTER AIR | 15m 001° QCY: QUINCY HELI |
| 52m 043° CIC: CHICO | 53m 043° CIC: CHICO AIR T | 18m 085° CHR: CHESTER HEL |
| 64m 066° RBL: RED BLUFF | 56m 288° 4SD: STEAD AIR T | 25m 138° BOG: BOGARD HELI |
| 68m 087° RDD: REDDING | 60m 350° O17: GRASS VALLE | 40m 198° RAV: RAVENDALE H |
| 68m 319° SWR: SQUAW VALLE | 66m 294° RNO: RENO AIRPOR | 56m 053° VNA: VINA HELIBA |

**Initial Report On Conditions**
Fuels:     Acres:     W Speed:     Dir:     Slope:     Aspect:
Spread:     Complexity:     Jurisdiction:
Structures:
Access:
Hazards:

**Fire Report Information**
Fire #: 98   SubUnit #: 52   SubUnit #: 48
Acres: 28000   Size Class:  G   Elevation: 0   Land Status:
Contain:     Control:     Out:

## Incident Report (cont.)

| 1. Forest Dispatch No. | | 2. Incident Name |
|---|---|---|
| Yr. | Seq. No. | MOONLIGHT |
| 07 | 670 | |

| 3. Keyword | 4. Keyword |
|---|---|

### Associated Report(s)

| 5. Agency | 6. Report Type | 7. Report No. |
|---|---|---|
| 8. Agency | 9. Report Type | 10. Report No. |

### Assisting Officer(s)

| 11. Agency | 12. Officer (Name) | 13. Officer No. |
|---|---|---|
| 14. Agency | 15. Officer (Name) | 16. Officer No. |

17. Property/Resource (State Dollar Amount (\$) Checkbox In Synopsis)

Damaged   Stolen   Recovered

Property:
Resource:

18. Impounded/Seized Property (Property)  Yes  No

19. Weapon Present  Seized  Seized  Handgun  Rifle/Shotgun  Other

20. Subject Behavior  Cooperative  Assaultive  Verbally Abusive
Passive Resisted  Assaultive Weapon  Verbally Threatening
Active Resisted  Assault w/ Present

27. Synopsis (Other Information)

---

**INCIDENT REPORT**

USDA FOREST SERVICE

| 1. Case (G.U.O.) | 2. Incident No. | | 3. Date of Report |
|---|---|---|---|
| | | | Mo / Day / Yr |
| | 8384192 | | 09 05 07 |

4. Officer Name (Print)   5. Officer I.D. No.

DAVID W. REYNOLDS   381050

| 6. Date of Incident | 7. Time (24 Hour Format) | 8. Day of Week | 9. Other Report Info |
|---|---|---|---|
| Mo / Day / Yr | | | SOUTH OF MOONLIGHT; |
| 09 03 07 | 14.24 | 2 | PASS |

10. Incident Type   11. Incident Description

FIR   CAUSING TREES, TIMBER, BRUSH, OAK
SLASH TO BURN EXCEPT AS AUTHORIZE

12. Remarks
1" MOONLIGHT" FIRE CAUSED BY
DOZER GROUSERS STRIKING ROCKS.

13. Unit Identification

| Region | Forest | District | State | County | 14. Land Status |
|---|---|---|---|---|---|
| 0 5 | 1 1 | 5 2 | C A | 6 3 | PVT INSIDE |

15. Incident Location Coordinate (Latitude/Longitude) (ddd:mm:ss / ddd:mm:ss)
4 0 : 1 2 : 4 8 / - 1 2 0 : 5 1 : 5 1

| 16. IRC | 17. IRC | 18. ISFPA No. And Type | | Feature | Land Unit |
|---|---|---|---|---|---|
| 5 6 | | | | | Route |

19. Warning Issued  Yes  No
20. Incident Status  Solved  Defensed  Unsolved
21. Violation Severity  Infraction  Felony  Administrative  Misdemeanor  Civil  Non-Criminal

| 22. Offense Code | ( Title / Section ) | 23. Offense Code | ( Title / Section ) |
|---|---|---|---|
| Fed | | | |
| St. | | | |
| Other  CA PRC | 4435 | Other  36 CFR | 261.5 (c |

### SUBJECT

24. Subject Type  Suspect  Arrested  Operating  Reporting  Witness  Complainant  Victim

25. Last Name   26. First Name   27. Mdl. Init.
SIERRA PACIFIC INDUSTRIES

28. Residence Street Address

| 29. City | 30. State | 31. Zip Code | 32. Residence Phone (Area) |
|---|---|---|---|
| | | | ( ) |

33. Work Street Address
P.O. BOX 496028

| 34. City | 35. State | 36. Zip Code | 37. Work Phone (Area) |
|---|---|---|---|
| REDDING | CA | 96049 | 530 378-8000 |

| 38. Birth Date | 39. Sex | 40. Race | 41. Height | 42. Weight | 43. Hair | 44. Eyes |
|---|---|---|---|---|---|---|
| Mo / Day / Yr | | | | | | |

| 45. I.D. Type | 46. I.D. Number | | 47. Date |
|---|---|---|---|

### VEHICLE DESCRIPTION

| 48. State | 49. Plate Number | 50. Vehicle Yr. | 51. Color | 52. Make | 53. Body |
|---|---|---|---|---|---|

54. Vehicle Identification Number (V.I.N.) And / Or Other Descriptor(s)

ADP/OFFICER'S COPY

# Wildland Fire Investigation
## Origin & Cause

**USDA Forest Service**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| LEI - Incident Number | | | | | | | **8384192** |
| Incident Date | | | | | | | **09/03/2007** |

**LOCATION**

| Fire Name | Dispatch # | Account Code | Region | Forest | District | State | County |
|---|---|---|---|---|---|---|---|
| **Moonlight** | **CAPNF-670** | **P5DZC7** | **05** | **Plumas** | **Mt. Hough** | **CA** | **Plumas** |

Origin Location: geographical landmarks, highways, roads, trails, etc.
**Private timber land owned by Brooks Walter and managed by W.M. Beaty & Associates, Incorporated.   Slightly south of Moonlight Pass at the north end of Plumas County.**

| Township | Range | Section | ¼ Sec | Base Meridian |
|---|---|---|---|---|
| **27N** | **10E** | **9** | **NESW** | **MDBM** |
| Latitude (D – M' – S") | | | Longitude (D – M' – S") | |
| **40** | **12** | **48** | **120** **51** **51** | |

**JURISDICTION**

| USFS Only | Unified: Identify Other Agency | Lead Origin & Cause Investigator | Cost > 40K | Injuries |
|---|---|---|---|---|
| | **CALFIRE** | **Battalion Chief Josh White** | **Yes** | **Yes** |

**EVENT SEQUENCE**

| Estimated Time of Ignition | | | | Time Fire Reported | | | | Time Origin Protected | | | | Time Origin Released | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mo. | Day | Year | HHMM | Mo. | Day | Year | HHMM | Mo. | Day | Year | HHMM | Mo. | Day | Year | HHMM |
| **09** | **03** | **2007** | **12:15 PM** | **09** | **03** | **2007** | **2:24 PM** | **09** | | **2007** | | **09** | **04** | **2007** | **10:30 AM** |
| Who **Kelly Crismon** | | | | Who **Red Rock Lookout** | | | | Who **Josh White** | | | | Who **Josh White** | | | |

**FIRE BEHAVIOR**

| Estimated Acres | Fuel Type @ Origin Material First Ignited | Weather Observer (On Scene) | Date | Time | Temp | RH | Wind Dir | Wind Speed |
|---|---|---|---|---|---|---|---|---|
| **65,000** | **Conifer Litter** | | | | | | | |
| Slope % | Aspect: N E S W | Elevation | Weather Station | Date | Time | Temp | RH | Wind Dir | Wind Speed |
| **19** | **E** | **5275** | **Westwood (NFDRS)** | **09/03/07** | **1:47pm** | **82** | **10** | **S** | **9-21** |

**CAUSE DETERMINATION** Code: (I) = Included, (E) = Excluded, (P) = Partially-Included/Excluded (Explain in Narrative)

**E**   Lightning          (Detection Method)
**The BLM Lightning map for the previous two weeks from the date of the fire shows only two strikes within the Plumas National Forest area. Neither of those was within the fire perimeter (see attached exhibit). No struck objects were observed at the Specific Point of Origin.**

**I**   Equipment Use          (Exhaust, Brake Shoe, Mechanical, Friction, Aircraft, Vehicle Fire, Other)
**There was a dozer in the Specific Point of Origin area installing water bars in skid trails just prior to the fire as stated by the operator. Freshly chipped rocks were at the Point of Origin and fresh, shiny and blued metal fragments were recovered at each of these rocks with a magnet.**

**E**   Smoking          (Tobacco, Other)
**Dozer operator was the only person in the General Origin Area prior to the fire. The operator used "smokeless tobacco" in lieu of smoking.**

**E**   Campfire          (Cooking, Warming, Ceremonial, Other)
**No form of campfire was found in the Specific Origin Area.**

**E**   Debris Burning          (Land, Slash, Refuse, Other)
**No form of debris burning had taken place on this private land timber sale. Statewide ban in place prohibiting debris burning on private lands.**

**E**   Railroad          (Ignition Activities Associated with Railroad Companies)
**There are no railway lines anywhere near this remote area.**

**E**   Incendiary          (Ignition Component / Material First Ignited)
**Active timber sale area. Dozer operator observed no one else in the area just prior to the fire other than himself. Nothing to indicate this was a deliberate act. No device recovered at the Point of Origin.**

**E**   Children          (Ignition Activities Associated with Children; 12- years and younger)
**Remote location. Active timber sale. No recreational camps were observed anywhere near the fire area. No housing for many miles from the fire area.**

**E**   Miscellaneous          (Blasting, Structure, Fireworks, Weld, Cut, Grind, Pest Control, Logging, Power Line, Glass, Target Shooting, Spontaneous Combustion, Other)
**No powerlines in the area. Dozer operator did not observe anyone in the Specific Origin Area prior to the fire. No welding/cutting/grinding or blasting occurred. No structures in the area. Logging had not occurred this day.  No glass to refract. No evidence to support spontaneous combustion.**

**Cause Determined:** State brief reason & explain in narrative          **Cause Undetermined:** State brief reason & explain in the narrative
**Cause was determined to be metal grouser strikes on rocks at the Point of Origin by a dozer installing water bars.**

| Prepared by | **Diane Welton** | Date | **9/10/2007** | Submitted to | **Josh White** | Date | **9/15/07** |
|---|---|---|---|---|---|---|---|
| Attachments If Included | LE Incident Report | X | Supplemental Reports | X | Interviews | | Statements | X |
| | Fire Stat Report | X | Sketches / Diagrams | X | Maps | X | Photographs | X | Other |

# Wildland Fire Investigation
## Identification

| | |
|---|---|
| LEI – Incident Number | **8384192** |

**USDA Forest Service**

| | |
|---|---|
| Incident Date | **09/03/2007** |

(CODE:  S – Subject, W – Witness, V – Victim, RP – Reporting Party, O – Other)

| Name (Last, First, Middle) | Alias | DOB | Race | Gender |
|---|---|---|---|---|
| **S    Sierra Pacific Industries** | | | | |

| Address (Home) | Phone (Home) | Hair Color | Eye Color | SSN |
|---|---|---|---|---|
| | | | | |

| Address (Business)    (Tax Identification Number if Required) | Phone (Work) | Height | Weight | License / ID |
|---|---|---|---|---|
| **P.O. Box 496028, Redding, CA  96049-6028** | ████████ | | | |

| Name (Last, First, Middle) | Alias | DOB | Race | Gender |
|---|---|---|---|---|
| **S    Howell's Forest Harvesting** | | | | |

| Address (Home) | Phone (Home) | Hair Color | Eye Color | SSN |
|---|---|---|---|---|
| | | | | |

| Address (Business)    (Tax Identification Number if Required) | Phone (Work) | Height | Weight | License / ID |
|---|---|---|---|---|
| **P.O. Box 47, Shingletown, CA  96088** | ████████ | | | |

| Name (Last, First, Middle) | Alias | DOB | Race | Gender |
|---|---|---|---|---|
| **S    Crismon, Kelly** | | ████████ | **W** | **M** |

| Address (Home) | Phone (Home) | Hair Color | Eye Color | SSN |
|---|---|---|---|---|
| ████████████ | ████████ | | | |

| Address (Business)    (Tax Identification Number if Required) | Phone (Work) | Height | Weight | License / ID |
|---|---|---|---|---|
| **Howell's Forest Harvesting, P.O. Box 47, Shingletown, CA  96088** | ████████ | | | ████████ |

| Name (Last, First, Middle) | Alias | DOB | Race | Gender |
|---|---|---|---|---|
| **S    Bush, J.W.** | | ████████ | **W** | **M** |

| Address (Home) | Phone (Home) | Hair Color | Eye Color | SSN |
|---|---|---|---|---|
| ████████████ | ████████ | | | |

| Address (Business)    (Tax Identification Number if Required) | Phone (Work) | Height | Weight | License / ID |
|---|---|---|---|---|
| **Howell's Forest Harvesting, ████████** | | | | ████████ |

**VEHICLE INFORMATION**        (CODE:  D – Damaged, E – Evidence, I – Impound, S – Subject W – Witness, O – Other)

| | License Number | State | VIN | Year | Make | Style | Other Information |
|---|---|---|---|---|---|---|---|
| **S** | **Serial # 4NS00150** | | | | | | **Caterpillar 527** |
| | License Number | State | VIN | Year | Make | Style | Other Information |
| | License Number | State | VIN | Year | Make | Style | Other Information |
| | License Number | State | VIN | Year | Make | Style | Other Information |

**EVIDENCE / PROPERTY INFORMATION**      (CODE:  D – Damaged, E – Evidence, I – Impound, O – Other)

| | Description | Disposition | Date | Time | Who |
|---|---|---|---|---|---|
| **E-1** | **Metal particles recovered from origin** | **White retained custody** | 9/5/07 | **10:02 am** | **Josh White** |
| **E-2** | **Rock with damage consistent with contact from bulldozer blade or grousers** | **White retained custody** | 9/8/07 | **2:54 pm** | **Josh White** |
| **E-3** | **Rock with damage consistent with contact from bulldozer blade or grousers** | **White retained custody** | 9/8/07 | **2:54 pm** | **Josh White** |

**INSURANCE INFORMATION**  (Home, Auto, Liability, Other)

| Insurance Company | Policy Number | Insurance Agent | Address | Phone Number |
|---|---|---|---|---|
| | | | | |

| Prepared By | Date | Submitted to | Date |
|---|---|---|---|
| **Diane Welton** | **9/10/2007** | **Josh White** | **9/15/2007** |

| | Wildland Fire Investigation | LEI - Incident Number | **8384192** |
|---|---|---|---|
| | **Narrative** | | |
| **USDA Forest Service** | | Incident Date | **09/03/2007** |

**SYNOPSIS:** (Date, Fire Name, Estimated Acres, Location, Jurisdiction)  (Estimated Cost, Damage; Property / Resource)  (Cause; Determined / Undetermined)

On Monday, September 3, 2007, the "Moonlight" wildland fire started on private lands within the Plumas National Forest protected by the United States Forest Service per agreement with CALFIRE.  The estimated suppression costs by federal, state and local resources, as well as property and resource damage have yet to be determined. Cause was determined to be grouser strike from dozer to rocks resulting in hot metal fragments igniting forest litter.

**DETAILS OF INVESTIGATION:** (Initial Report, Initial Attack, Initial Investigation, Fire Behavior Analysis, Statements, Origin Examination, Cause Determination)

## Initial Report:

At approximately 2:24 PM on September 3rd, 2007, Red Rock Lookout on the Plumas National Forest reported to Plumas National Forest-Emergency Communications Center (PNF-ECC), a wildfire southwest of the lookout near Moonlight Valley.  At 2:31 PM, Red Rock Lookout reported the smoke was building.

## Initial Attack:

PNF-ECC dispatched numerous ground and aerial firefighting resources to the Moonlight Valley area. The first unit to arrive on scene was Air Attack 06 who flew over the fire at 3:02 PM.  Air Attack 06 stated the fire was 20 – 25 acres in size, fast rate of spread with southwest winds.  One of the initial ground units to arrive was CALFIRE Engine 2261 at 3:18 PM.  CALFIRE Engine 2261 reported the fire was crowning and spotting in terrain with 80 percent slope with strong winds. By 4:00 PM the fire was reported to be 100 acres, spotting and had crossed the main road splitting fire fighting resources on either side.  At this time a request was submitted for a Type 2 Incident Fire Management Team to manage the fire.

## Initial Investigation:

Plumas National Forest Wildland Fire Investigator, Dave REYNOLDS (PT-23), responded and arrived on scene at 3:20 PM.  REYNOLDS was advised by Plumas National Forest Fire Prevention Technician Karen JUSKA (PT-22), a dozer operator from the timber sale where the fire started was at Moonlight Pass.  REYNOLDS met with J.W. BUSH, a dozer operator for Howell's Forest Harvesting.  Howell's Forest Harvesting was the contractor for Sierra Pacific Industries, the purchaser of the timber sale.  The timber sale was on land managed by W.M. Beaty & Associates, Incorporated.

BUSH stated to REYNOLDS, he and Kelly CRISMON were the only employees working on the sale area that day. BUSH and CRISMON were both operating dozers in two different locations installing water bars on skid roads.  They had started work between 6:00 – 6:30 AM and worked until 1:00 PM, when they stopped because of the high winds.  CRISMON returned to his place in Chester.

BUSH stated he went back to his camp to get his cell phone and returned to the sale area to be the fire watchman for the area they worked in, when he discovered the fire. The fire had already reached a size that hindered BUSH from being able to get to his dozer.  BUSH had no cell service; however he stayed at Moonlight Pass to direct fire fighting resources to the fire. BUSH informed REYNOLDS he believed Kelly CRISMON was working his dozer closest to the fire area and BUSH also believed dozer grousers scraping on rocks was the cause of the fire.  BUSH informed REYNOLDS he had caused a fire earlier this year with his dozer grousers scraping rocks on the same timber sale.  BUSH indicated on a map the area CRISMON had been working in and that was where the fire was.  REYNOLDS realized there would not be access to the fire's origin area for some time as it was well within the fire perimeter.

At 4:42 PM, REYNOLDS called PNF-ECC to request a CALFIRE Wildland Fire Investigator to take the lead on the fire investigation due to the fires origin being within a private timber sale on a large section of private land under the direction of

the California Department of Forestry and Fire Protection.  CALFIRE Battalion Chief and Wildland Fire Investigator, Josh WHITE arrived on scene after dark and met with Investigator REYNOLDS.  REYNOLDS advised WHITE the fires suspected origin was well within the heel of the fire and it would be unsafe to go into that area at night with burning snags dropping.  WHITE and REYNOLDS agreed to meet the morning of September 4.

**Fire Behavior Analysis:**

All ground resources were overrun and could not engage to fight the fire due to its intensity.  The strong winds were driving the fire down hill initially creating spot fires that would run back uphill.  Substantial spotting was occurring out in front of the fire by erratic winds and the fire's convection column.


**Continuation of Investigation:**

On the morning of September 4th, WHITE and REYNOLDS started their search for the fires origin off of Road 3131 within the timber sale area.  This is the area REYNOLDS had observed all backing fire activity, uphill, into the wind, the previous night. Given the wind was very strong out of the southwest and the fire was running northeast, the heel of the fire would be the most logical area to search for the Point of Origin.  With J.W. BUSH's statement Kelly CRISMON had been working his dozer in this area installing water bars; WHITE and REYNOLDS traveled the activity in those skid trails.  Traveling from the west side of the hill by Road 3131, over the top and to the east side, WHITE and REYNOLDS observed aerial "macro indicators" such as "foliage freeze" and "angle of char". REYNOLDS had the advantage of actually watching the fires activity the day before and observing the "foliage freeze" in the opposite direction of the fire spread in this area. This was due to the wind blowing downhill, while the fire tried to back into it, uphill.

WHITE and REYNOLDS observed the General Origin Area to be approximately 75 feet by 50 feet.

At a point while walking down the skid trail to the east WHITE and REYNOLDS noticed several rocks in and near the edge of the skid trail that had fresh strikes on them. The following observations were found in the immediate fire area near the struck rocks:

Curling – the immature green cedar tree uphill from the rocks had limited damage, drooping limbs, indicating it had taken less heat, as being near the Point of Origin where the fire would just begin to build.

Staining–the rocks in the fire, west, north, and east of the skid trail from the struck rocks had sooting or staining micro indicators showing the spread of the fire out from the struck rocks in all three directions.

Ash        -the small trees west, north and east consumed near this area also showed white ash on the side facing the struck rocks indicating that the fire had come from that direction.

Damage Differential – downed logs also indicated the fire spread in three directions by alligatoring (heavy charring) on the side facing the rocks, with limited damage to the back side.

Protection – many obstacles in the path of the fire, in the three directions, such as rocks and logs had protected fuels to the backside of them left slightly or unburned coming from the struck rocks.



With these micro indicators, investigators WHITE and REYNOLDS were confident this was the Specific Origin Area and advised the suppression crews working the line to stay clear of the area.  The Specific Origin Area was approximately 10

feet by 10 feet.

WHITE took REYNOLDS past the landing below the Point of Origin where the two dozers and a fuel truck where parked. At this location WHITE and REYNOLDS examined the dozers, recorded information and took photographs.

WHITE and REYNOLDS wanted to re-interview J.W. BUSH and interview Kelly CRISMON.  WHITE called Kelly CRISMON's cell phone and left a message to call him as soon as possible.  WHITE and REYNOLDS traveled out of the fire area north to an old ranch site used by the loggers to keep their trailers.  There, they found J.W. BUSH who again stated he and CRISMON had finished working at 1:00 PM and immediately left the area.  CRISMON headed home and BUSH went to his trailer, approximately 20 minutes away, got his cell phone and a soda, then returned to the project site when he saw the fire.  While leaving the area, WHITE received a cell phone call from CRISMON.  WHITE advised CRISMON to return to the timber sale area for an interview.

CRISMON met WHITE and REYNOLDS at Moonlight Pass at approximately 4:00 PM and was issued fire protective clothing to enter the fire scene.  CRISMON first lead the investigators to the landing they believed was the closest to the Point of Origin.  After some general questions from WHITE about his activities the prior day, CRISMON lead the investigators up a skid road explaining in what direction he worked and what he had done.  At a point just west and uphill from the Point of Origin, yet unmarked by WHITE and REYNOLDS, CRISMON stated he had taken his dozer to the bottom of the skid trail and working backwards, installed water bars coming uphill. CRISMON indicated he had worked in that area at approximately 12:15 PM, went further uphill, finishing on a skid trail to the south by 12:45 PM.  WHITE and REYNOLDS inquired CRISMON's level of visibility when operating the dozer installing water bars, and CRISMON stated "limited".  CRISMON lead WHITE and REYNOLDS down to the landing where he indicated while installing water bars, if he sees logs forgotten by the skidders, it is part of his job to grapple them with his dozer and take them to the landing.

At the landing, REYNOLDS took a written statement from CRISMON.  CRISMON stated he and BUSH had started work at 6:00 AM in different locations.  CRISMON worked the area where the fire origin was, finished by 1:00 PM and walked the dozer back 7/10's of a mile to the service truck.  CRISMON left ahead of BUSH for home.  CRISMON had his window rolled down as he passed the area below the fire, not knowing it was there.  CRISMON was later notified by Damon, the usual fire watchman, at 2:30 PM of the fire. CRISMON returned to the scene to move equipment out of the way but was unable to get to it.

CRISMON stated J. W. BUSH went back to his camp to get his chainsaw to cut firewood and be the fire watch for one hour after they had finished operating.  CRISMON also stated his dozer was running mechanically sound and in particular no defects to the turbo exhaust system.  CRISMON was the only operator in the area where the fire started. This interview was concluded by 5:06 PM.

WHITE and REYNOLDS returned to the origin area and installed colored flags (red-advancing fire, yellow-lateral fire and blue-backing fire) near micro indicators.  At this point it was too dark to take photographs, the area was flagged and all resources were advised to stay out of the area for the evening.

On September 5, WHITE and REYNOLDS found the origin area to have been undisturbed and resumed installing flags and numbered photograph placards at each indicator.  REYNOLDS advised of each indicators meaning while WHITE recorded the information and photographed the items.  Two reference points were chosen (large fixed rocks) with distance and bearings to the Point of Origin from both.

California Department of Forestry and Fire Protection, Ivan HOUSER arrived on scene.


WHITE and REYNOLDS used a magnet in and around each struck rock with HOUSER observing.  Fresh, shiny and blued metal fragments were recovered at each rock.  The blue in the metal indicated it was very hot when it defragmented from

part of the dozer.  HOUSER indicated when the operator had installed the water bar below the Point of Origin, he would have backed up, turned the dozer on it's grousers to the right to observe the work, then turned back to the left to reverse up the hill for the next water bar. This action of grinding back and forth with the metal grousers on rocks will generate friction, heat and break off metal particles.

| | |
|---|---|
| **SUMMARY:**  (Cause Determined / Undetermined)   (Causes Included / Excluded or Partially – Included / Excluded)     (Subjects Known / Unknown)   (Other Actions) | |

Cause was determined to be from the friction created between metal dozer grousers on rock, defragmenting hot metal particles (Competent Ignition Source), to the Material First Ignited; cured forest litter, which created the Ignition Factor. This occurred at a point in the day with high temperatures, low relative humidity and strong winds.

| Prepared By | Date | Submitted To | Date |
|---|---|---|---|
| **Diane Welton** | **9/10/2007** | **Josh White** | **9/15/2007** |



| | Wildland Fire Investigation Sketch / Diagram | LEI - Incident Number | 8384192 |
|---|---|---|---|
| USDA Forest Service | | Incident Date | 09/03/2007 |

| Title | Moonlight Fire | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Latitude | 40 | 12 | 48 | Longitude | 120 | 51 | 51 | Map Key |

Include: STAND= Scale, Title, Author, North Arrow, Date and Time

Skid Trail

Reference Point 1
To
E/2 = 32 feet 9 inches
E/3 = 25 feet 4 inches

Reference Point 2
To
E/2 = 40 feet 5 inches
E/3 = 42 feet 3 inches

E/2 to E/3 = 10 feet 8 inches

**Moonlight Fire Origin Area Legend**

All measurements approximate
= Reference points
E = Evidence
= Advancing Fire
= Lateral Fire

U = Backing Fire
= Point of Origin
= Wind Direction

| | Not to scale | Author | Diane Welton | Date | 9/14/2007 | Time | 1215 |
|---|---|---|---|---|---|---|---|
| Prepared by | | Diane Welton | | Submitted to | | | Josh White |

Wildland Fire Investigation       Page 7 of 7       FSH-5309.11_23.41_04/2005

ParcelQuest by CD-DATA

## Property Detail

Plumas, CA  CHARLES LEONHARDT, ASSESSOR

Parcel # (APN):   **004-020-005-000**                   Use Description:

Parcel Status:    **ACTIVE**

Owner Name:       **WALKER BROOKS**

Mailing Address:  **PO BOX 990898 REDDING CA 96099-0898**

Situs Address:

Legal

Description:

### ASSESSMENT

| | | | | |
|---|---|---|---|---|
| Total Value: | $39,780 | Use Code: | 37 | Zoning: |
| Land Value: | $39,780 | Tax Rate Area: | 053135 | Census Tract: |
| Impr Value: | | Year Assd: | 2007 | Improve Type: |
| Other Value: | | Property Tax: | $503.28 | Price/SqFt: |
| % Improved | | Delinquent Yr | | |
| Exempt Amt: | | HO Exempt?: | N | |

### SALES HISTORY

| | Sale 1 | Sale 2 | Sale 3 | Transfer |
|---|---|---|---|---|
| Recording Date: | 03/07/2001 | 01/01/2000 | | 03/07/2001 |
| Recorded Doc #: | 2001R0001789 | 1900R7390814 | | 2001R0001783 |
| Recorded Doc Type: | | | | |
| Transfer Amount: | | | | |
| Sale 1 Seller (Grantor): | | | | |
| 1st Trst Dd Amt: | Code1: | | 2nd Trst Dd Amt: | Code2: |

### PROPERTY CHARACTERISTICS

| | | | | | |
|---|---|---|---|---|---|
| Lot Acres: | **520.000** | Year Built: | | Fireplace: | |
| Lot SqFt: | **22,651,200** | Effective Yr: | | A/C: | |
| Bldg/Liv Area: | | | | Heating: | |
| Units: | | Total Rooms: | | Pool: | |
| Buildings: | | Bedrooms: | | | |
| Stories: | | Baths (Full): | | Park Type: | |
| Style: | | Baths (Half): | | Spaces: | |
| Construct: | | | | Site Inflnce: | |
| Quality: | | Garage SqFt: | | | |
| Building Class: | | | | Timber Preserve: | |
| Condition: | | | | Ag Preserve: | |
| Other Rooms: | | | | | |

*** The information provided here is deemed reliable, but is not guaranteed.

| | A | APN | Owner 1 | D |
|---|---|---|---|---|
| 1 | | 004-020-002-000 | WALKER WALTER W | |
| 2 | | 004-020-003-000 | WALKER WALTER W | |
| 3 | | 004-020-004-000 | WALKER BROOKS | |
| 4 | | 004-020-005-000 | WALKER BROOKS | |
| 5 | | 004-020-006-000 | WALKER BROOKS | |
| 6 | | 004-020-007-000 | WALKER WALTER W | |
| 7 | | 004-020-008-000 | WALKER WALTER W | |
| 8 | | 004-020-009-000 | WALKER WALTER W | |
| 9 | | 004-020-010-000 | WALKER WALTER W | |
| 10 | | 004-020-011-000 | WALKER WALTER W | |
| 11 | | 004-020-013-000 | WALKER BROOKS | |
| 12 | | 004-020-014-000 | WALKER BROOKS | |
| 13 | | 004-020-015-000 | WALKER BROOKS | |
| 14 | | 004-020-016-000 | WALKER BROOKS | |
| 15 | | 004-020-017-000 | WALKER BROOKS | |
| 16 | | 004-020-018-000 | U S A | |
| 17 | | 004-020-019-000 | WALKER WALTER W | |
| 18 | | 004-020-020-000 | WALKER BROOKS | |
| 19 | | 004-020-021-000 | WALKER WALTER W | |
| 20 | | 004-020-022-000 | SIERRA PACIFIC INDUSTRIES | |
| 21 | | 004-020-023-000 | WALKER BROOKS | |
| 22 | | 004-020-024-000 | WALKER BROOKS | |
| 23 | | 004-020-025-000 | WALKER WALTER W | |
| 24 | | 004-020-026-000 | WALKER BROOKS | |
| 25 | | 004-020-027-000 | WALKER BROOKS | |
| 26 | | 004-020-028-000 | SIERRA PACIFIC INDUSTRIES | |
| 27 | | 004-020-029-000 | SIERRA PACIFIC INDUSTRIES | |
| 28 | | 004-020-030-000 | SIERRA PACIFIC INDUSTRIES | |

*** The information provided here is deemed reliable, but is not guaranteed.

1



THP. EXEMPTION OR EMERGENCY NO. 2-05-161-PLu

**TIMBER OPERATOR'S FIRE PROTECTION PLAN**          Date: 5/10/07

Name: Howell's Forest Harvesting          Permit No.: A7550

Address: street          city          zip          phone: work          home

**IN CASE OF FIRE NOTIFY:**

Damon Baker
Company Fire Chief, dispatcher, etc   address          phone: work          home

CDF Lassen-Modoc Ranger Unit
State/USFS/Co Ranger/Fire Pro Dist   address          phone: work          home

**FIRE ORGANIZATION**

Personnel authorized to act for operator in fire suppression

Damon Baker
Fire Chief          address          phone: work          home

Bill Dietrich
Asst. Fire Chief          address          phone: work          home

William Hofford
Asst. Fire Chief          address          phone: work          home

Eunice Howell
Dispatcher or other          address          phone: work          home

Location and number of men ordinarily available for fire fighting

|          | Crew Foreman | Dozer Operators | Fallers | Fire Fighters | Others | Total |
|----------|-------------|-----------------|---------|---------------|--------|-------|
| In woods | 2 | 2 | 7 | 4 | H2O Truck Driver | 15 |
| At mill  |   |   |   |   |   |   |

equipment available for fire fighting

|          |          | Location | Number | Make and Model | Size |
|----------|----------|----------|--------|----------------|------|
| Bulldozers | 2 with lights | Moonville T. Sale | 2 | 527 Dozer Cat's | 527 |
|          | without lights | (WM Beaty Job) |   |   |   |
| Crew trucks |   | ,, | 2 | Ford Crew Cab 4X4 350 | 3500 |
| Dozer service trucks |   | ,, | 1 | GMC | 2500 |
| Dozer transport trucks |   | -c- |   |   |   |
| Pickup trucks | conventional | Moonville T. Sale | 1 | Chev 4X4  2 Dodge 4X4) Ford 4X4 | 2500 3500 + 3500 |
|          | 4-wheel drive | ,, | 4 |   |   |
| Portable pumps | Landing | ,, | 1 |   | 500 Gal. |
| Power saws | Fallen saws | ,, | 2 7 | STIHL 046 Mag  2 0467 660  7 | 33" Bars 28 + 36" Bars |
| Tank trucks | with pumps | ,, | 1 | Kenworth Water Truck | 4000 Gal |
|          | without pumps |   |   |   |   |

This form is provided for timber operator convenience in complying with the fire plan provision of the Forest Practice Rules.   No contract is expressed or implied in submitting this plan.

FH-58 (Rev. 1-80)          (See Reverse)          7540-130-0058

Fxd 5/14/07 9:10 AM
257-8599

tools and equipment reserved for fire use, number of:

| location | Shovels | Chain saws | Scraping tools | Pump cans | Flash-lights | Canteens | Dozer headlights |
|---|---|---|---|---|---|---|---|
| Moonville T. Sale WnBeaty Lands Plumas Co. | 5 | 2 Landing Fallers 7 | 2 | 2 | 6 | 6 | 0 |

LOCATION CURRENT/PROSPECTIVE LOGGING AREAS

Sketch map

Show roads, landmarks, creeks, etc., so that fire crews can be easily directed by telephone to any fire on or near logging area.

Legal description of land

Section   Twp   Range   County

_OMIT_

Geographic location of logging areas

Scale _____ " equals one mile.

DETECTION, CONTROL AND SUPPRESSION OF FIRE IN LOGGING AREAS (describe your system and procedure for)

Side Rod Damon Baker Cell 945-0009 will be Responable for Detection, Control + Suppress

of Fire in Logging Areas. Loader operator Russ DeName will be on Site Around

DAILY FIRE INSPECTION OF LOGGING AREAS WILL BE MADE (describe when, by whom, and how)                    Fire t

Dai Daily Fire inspection will be Done By Side Rod Damon Baker + Russ

After work + in Evenings

DATE SUBMITTED TO LOCAL RANGER/COUNTY FIRE WARDEN

5/11/07                                        Howells Forest Harvesting
                                                           name of operator
                                                                                      ThP
                                     By _____  Point of Contact.
                                              name                    title

NOTICE: This form is furnished by the California Department of Forestry only as a convenience to assist operators who may not be familiar with fire plans. It is not a contract or agreement. A simple plan, well known to all concerned, which fits your operation and meets the requirements of the Forest Practice rules of your Forest District would be more useful than this generalized form. The purpose of any fire plan is to assure organization for a fire before it starts. Make a good plan, keep it up-to-date, and keep it posted, since you are the beneficiary. File copy of fire plan with the local ranger not later than April 1 or ten days prior to commencing operations. The requirement for filing a fire plan is set forth in the District Forest Practice rules.



STATE OF CALIFORNIA—THE RESOURCES AGENCY                                    ARNOLD SCHWARZENEGGER, *Governor*

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
Lassen – Modoc Unit
697-345 Highway 36
Susanville, CA 96130
(530) 257-4171

August 16, 2007

HOWELLS FOREST HARVESTING
EUNICE E HOWELL

### NOTICE OF INSPECTION
**Section 4604 of the Public Resources Code (PRC) requires the department to inspect timber operations for compliance with the Forest Practice Act and rules of the Board of Forestry and Fire Protection.**

Harvest Document: 2-05-161-PLU  COOKS CREEK
Inspection Date:  August 15, 2007
Inspection Number:  3
Person Contacted:  GLEN SCHALL DESIGNEE

Inspected area of recent operations and portions of active.  Informed RPF designee Glen Schall of mitigative work required of the LTO regarding road drainage and haul road crossings.  The RPF designee will convey the information to the LTO.

If you have any question about this matter, please contact Susanville Area Forester, Ivan Houser at 697-345 Highway 36, Susanville, CA 96130.  phone

/signature

Ivan J. Houser
Susanville Area Forester
Lassen Modoc Unit
697-345 Highway 36, Susanville, CA 96130

cc: Unit, Region, RPF, LTO, LO, PS

CONSERVATION IS WISE-KEEP CALIFORNIA GREEN AND GOLDEN

PLEASE REMEMBER TO CONSERVE ENERGY.  FOR TIPS AND INFORMATION, VISIT "FLEX YOUR POWER" AT  WWW.CA.GOV.

RECEIVED

**FORESTLAND**
**MANAGEMENT**

June 6, 2007

JUN 1 2 2007

LASSEN MODOC
UNIT

RECEIVED
JUN 0 7 2007
REDD...
FOREST PRACTICE

W. M. BEATY &
ASSOCIATES, INC.

845 BUTTE ST. / P.O. BOX 990898
REDDING, CALIFORNIA 96099-0898
530-243-2783 / FAX 530-243-2900

Mr. William E. Schultz
Deputy Chief, Forest Practice
CALIFORNIA DEPARTMENT OF FORESTRY
& FIRE PROTECTION
6105 Airport Rd
Redding CA 96002-9422

Re: COOKS CREEK THP No. 2-05-161-PLU(2)
COOKS CREEK T.S. / SHASTA FORESTS 123 & 7

| | |
|---|---|
| Reviewed by: | AD |
| Dist. by: | SM |
| Dist. Date: | 6/8/07 |
| PLU | AS |
| FG | TO |
| WQ | LTO |
| ARCH | |
| RPF | DMG |
| INSP | BOE |
| OTHER: | |
| FPS | |
| Status: | M |

Dear Mr. Schultz:

Please note that Howell's Forest Harvesting will be the L.T.O. on a portion of this plan as shown on the enclosed map. Pertinent information follows:

Howell's Forest Harvesting

██████████████

AM# 03

L.T.O. # A-7550

The responsible on-site contact will be Bill Dietrich at ████████ or ██ ██. We anticipate logging operations will commence on or about July 2, 2007.

Also enclosed is a completed Licensed Timber Operator Responsibility Acknowledgement form as required by Section 1035.3 Title 14, CCR.

No other changes are made.

This amendment conforms to the rules and Regulations of the Board of Forestry and Fire Protection and the Forest Practice Act.

Routed by: SM  Date Routed 6/8/07
PLU INSP TO BOE TLO LTO FG PS
RPF FGI WQS  Other:

Sincerely,

W. M.BEATY & ASSOCIATES, INC.

*John Van Duyn*

John Van Duyn
Staff Forester
RPF No. 2635
██████████

JRV:klh
Enclosures
cc: Jeff Pudlicki w/c
    Tom Downing
    Bill Dietrich

State of California
Department of Forestry and Fire Protection

(Administrative Use Only-Area _____)
(Plan No. _____)
(Date Received _____)
(Amendment Number _____)

**T.S. Name:** **COOKS CREEK T.S.**
**THP Name:** **COOKS CREEK THP**
**Owner:**      **BROOKS WALKER, ET AL.**

## LICENSED TIMBER OPERATOR RESPONSIBILITY ACKNOWLEDGEMENT
(As per Section 1035.3 Title 14, CCR)

**Harvesting Plan Number:** ____ 2-05-161-PLU (2) _____

**Licensed Timber Operator Information**

Name: ____ Howell's Forest Harvesting _____

Street Address / P.O. Box ▮▮▮    City: ▮▮▮    State ▮    Zip Code: ▮▮▮

Telephone Number: ▮▮▮▮    LTO Number: ____ A-7550

As the Licensed Timber Operator (LTO) listed above I acknowledge responsibility for the following:

1) Inform the responsible RPF or plan submitter orally or in writing of any site conditions, which in the LTO's opinion prevent implementation of the approved plan and amendments.
2) Be responsible for the work of his or her employees and familiarize all employees with the intent and details of the operational and protection measures of the plan and amendments that apply to their work.
3) Keep a copy of the applicable approved plan and amendments available for reference at the site of active timber operations.
4) Comply with all provisions of the Act, Board rules and regulations and the applicable approved plan.
5) Attend an on-site meeting or discuss archaeological site protection with the RPF or supervised designee familiar with on-site conditions.
6) To inquire of the plan submitter, timberland owner or their authorized agent, RPF who wrote the plan, or the supervised designee, if any mitigation measures or specific operating instructions are contained in the Confidential Archaeological Addendum or any other confidential addendum to the plan.
7) Provide the RPF responsible for professional advice throughout the timber operations, the name, address, and phone number of an on-site contact employee authorized by the LTO to receive RPF advice.
8) Keep the RPF responsible for professional advice throughout the timber operations advised of the status of timber operation activity.
9) Within 5 days before, and not later than the startup of timber operations, notify the RPF of the start of timber operations.
10) Within 5 days before, and not later than the shutdown of a timber operation, the LTO shall notify the RPF of the shutdown of timber operations.
11) Cease operations, except for emergencies and operations needed to protect water quality, upon receipt of written notice of an RPF's withdrawal of professional services from the plan. The LTO shall not resume operations until written notice is received from the plan submitter that another RPF has visited the site and accepts responsibility for providing advice regarding the plan as the RPF of record.

   In addition to the above, I have specific responsibilities for the following:  I am responsible for operations on the additional area of the THP as shown on the Timber Sale Map

I have read and understand my responsibilities as the LTO summarized above and specifically described in 14 CCR 1035.3. I certify that I will fulfill my legal obligation as stated in the forest practice rules, and agree to fulfill my responsibilities as described above.

**LTO Signature:** *Gunne Howell*    Date: 5/30/07

**Responsible On-Site Contact (if different)**

Signature: *Billy Dietrich*

Printed Name: *Billy Dietrich*    Date: 5/30/07

Street Address / PO Box: ▮▮▮▮

5/23/07:klh



**RECEIVED**

**MAY 14 2007**

REDDING
**FOREST PRACTICE**

FORESTLAND
MANAGEMENT



W. M. BEATY &
ASSOCIATES, INC.

845 BUTTE ST. / P.O. BOX 990898
REDDING, CALIFORNIA 96099-0898
530-243-2783 / FAX 530-243-2900

May 10, 2007

**RECEIVED**

MAY 17 2007

LASSEN MODOC
UNIT

Mr. William E. Schultz
Deputy Chief, Forest Practice
California Department of Forestry
& Fire Protection
6105 Airport Road
Redding, CA 96002-9422

**AM#. 02**

Reviewed by AD
Dist by: ☐
Dist. Date 5/14/07
RU _____    PS _____
FG _____    TO _____
WO _____    TL ☐
ARCH        LT ☐
RPF         DM ☐
INSP.       BO ☐
OTHER: _____
FPS _____
Status: M

Attn. Mr. William E. Schultz
Deputy Chief, Forest Practice

Re: Cooks Creek Timber Harvesting Plan #2-05-161-PLU (2)
Shasta Forests

Gentlemen:

As timber sale preparation has progressed an additional Class III watercourse was discovered.
The watercourse has two existing tractor road crossings associated with it. The crossings are at a
right angle to the watercourse and will be used as dry fords. No evidence of down cutting or
erosion has resulted from their previous use. Prior to operations the watercourse will be flagged
with a 25' foot WLPZ and the crossing locations will be identified with flagging. The
watercourse and crossings are shown on the attached map (S2800 & S2802). Upon completion of
use any material deposited in to the channel shall be excavated to form a channel which is as
close as feasible to the natural watercourse grade and orientation and is wider than the natural
channel. Water breaks will be installed on either side of the crossing to prevent runoff from
draining into the crossing.

CALFIRE Forest Practice Inspector, Ivan Houser has inspected the watercourse and crossings. It
was the opinion of Inspector Houser that these additional crossings and watercourse be treated as
a minor deviation to this THP.

No other changes are made at this time.

This amendment conforms to the rules and
Regulations of the Board of Forestry and Fire
Protection and the Forest Practice Act. . .

Routed by: ☐       Date Routed: 5/14/07
cc Unit(Insp)  CP  PW  BOF  TO  TLO  LTO  PS
IPP  FG/18  WQ 5  Other: _____

Houser

Enc.

Sincerely
**W.M. Beaty & Associates Inc.**

John Van Duyn
Staff Forester



**COOKS CREEK THP**
**SHASTA FORESTS 7 & 123**
TRACTOR CROSSINGS & IN-LIEU LANDINGS MAP
**T.27N.R.10E.     Map 1 of 2**
Map Equivalent of Greenville 1979 & Moonlight Peak 1980
USGS 7.5 Minute Quadrangles
THP Area

✳ In-Lieu Landings
☒ Tractor Crossings
▭▭▭ Sensitive Road Segments

Mount Diablo Base & Meridian
80' Contour Interval
Scale:  3" = 1 Mile

○ Springs
Seasonal Public Road
Seasonal Private Road
Class I Watercourse
Class II Watercourse
Class III Watercourse

STATE OF CALIFORNIA—THE RESOURCES AGENCY                                    ARNOLD SCHWARZENEGGER, Governor

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
Lassen – Modoc Unit
697-345 Highway 36
Susanville, CA 96130
(530) 257-4171

May 09, 2007

JOHN VANDUYN
W M BEATY & ASSOCIATES

**NOTICE OF INSPECTION**

**Section 4604 of the Public Resources Code (PRC) requires the department to inspect timber operations for compliance with the Forest Practice Act and rules of the Board of Forestry and Fire Protection.**

Harvest Document: 2-05-161-PLU  COOKS CREEK
Inspection Date:  May 09, 2007
Inspection Number:  2
Person Contacted:  JOHN VAN DUYN

The RPF contacted CDF and requested a site visit where a Class III watercourse not included in the plan was located while marking had progressed.  The RPF will prepare an amendment as suggested by CDF to include the watercourse and a discussion regarding two tractor crossings for inclusion into the plan.  The RPF will propose use of crossing locations when dry.

If you have any question about this matter, please contact Susanville Area Forester, Ivan Houser at 697-345 Highway 36, Susanville, CA 96130.  phone: (530) 257-8504.

_signature_

Ivan J. Houser
Susanville Area Forester
Lassen Modoc Unit
697-345 Highway 36, Susanville, CA 96130

cc:  Unit, Region, RPF, LTO, LO, PS

CONSERVATION IS WISE-KEEP CALIFORNIA GREEN AND GOLDEN

PLEASE REMEMBER TO CONSERVE ENERGY.  FOR TIPS AND INFORMATION, VISIT "FLEX YOUR POWER" AT  WWW.CA.GOV

**RECEIVED**

**MAY 0 9 2007**

FOR**RECEIVED**

MAY 1 4 2007

LASSEN MODOC
UNIT

**A M # · 0 1**

F O R E S T L A N D
M A N A G E M E N T

W. M. BEATY &
ASSOCIATES, INC.

845 BUTTE ST. / P.O. BOX 990898
REDDING, CALIFORNIA 96099-0898
530-243-2783 / FAX 530-243-2900

May 8, 2007

Mr. William E. Schultz
Deputy Chief, Forest Practice
CALIFORNIA DEPARTMENT OF FORESTRY
& FIRE PROTECTION
6105 Airport Rd
Redding CA 96002-9422

Re:  COOKS CREEK THP No. 2-05-161-PLU(2)
MOONVILLE T.S. / SHASTA FORESTS 7

Dear Mr. Schultz:

Please note that Howell's Forest Harvesting will be the L.T.O. on a portion of this plan as shown on the enclosed map.  Pertinent information follows:

Howell's Forest Harvesting

L.T.O. # A-7550

The responsible on-site contact will be Bill Dietrich at ▮▮▮▮▮▮.  We anticipate logging operations will commence on or about May 14, 2007.

Also enclosed is a completed Licensed Timber Operator Responsibility Acknow-ledgement form as required by Section 1035.3 Title 14, CCR.

No other changes are made.

This amendment conforms to the rules and
Regulations of the Board of Forestry and Fire
Protection and the Forest Practice Act.

Routed by: CN      Date Routed 5-9-07
cc   OA   Insp   CP   PW   BOE   TO TLO LTO   PS
GDF   FG   PA   WO   Other:

Sincerely,

W. M.BEATY & ASSOCIATES, INC.

John Van Duyn

John Van Duyn
Staff Forester
RPF No. 2635

JRV:kih
Enclosures
cc: Jeff Pudlicki w/c
    Tom Downing
    Bill Dietrich

Reviewed by:
Dist by:
Dist. Date:
RU ___   PS
FG ___   TO
WO ___   TLO
ARCH     LTO
RPF      DMG
INSP     BOE
OTHER:
FPS
Status:  M

State of California
Department of Forestry and Fire Protection

(Administrative Use Only-Area _____)
(Plan No. _____)
(Date Received _____)
(Amendment Number _____)

**T.S. Name:** MOONVILLE T.S.
**THP Name:** COOKS CREEK THP
**Owner:** SHASTA FORESTS 7

## LICENSED TIMBER OPERATOR RESPONSIBILITY ACKNOWLEDGEMENT
(As per Section 1035.3 Title 14, CCR)

**Harvesting Plan Number:** ____ 2-05-161-PLU(2) _____

**Licensed Timber Operator Information**

Name: ____ Howell's Forest Harvesting _____

Street Address / P.O. Box: ██████ ██ _____ City ██████ State ████ Zip Code: ██████

Telephone Number: ██████████ LTO Number: ___ A-7550 _____

As the Licensed Timber Operator (LTO) listed above I acknowledge responsibility for the following:

1) Inform the responsible RPF or plan submitter orally or in writing of any site conditions, which in the LTO's opinion prevent implementation of the approved plan and amendments.
2) Be responsible for the work of his or her employees and familiarize all employees with the intent and details of the operational and protection measures of the plan and amendments that apply to their work.
3) Keep a copy of the applicable approved plan and amendments available for reference at the site of active timber operations.
4) Comply with all provisions of the Act, Board rules and regulations and the applicable approved plan.
5) Attend an on-site meeting or discuss archaeological site protection with the RPF or supervised designee familiar with on-site conditions.
6) To inquire of the plan submitter, timberland owner or their authorized agent, RPF who wrote the plan, or the supervised designee, if any mitigation measures or specific operating instructions are contained in the Confidential Archaeological Addendum or any other confidential addendum to the plan.
7) Provide the RPF responsible for professional advice throughout the timber operations, the name, address, and phone number of an on-site contact employee authorized by the LTO to receive RPF advice.
8) Keep the RPF responsible for professional advice throughout the timber operations advised of the status of timber operation activity.
9) Within 5 days before, and not later than the startup of timber operations, notify the RPF of the start of timber operations.
10) Within 5 days before, and not later than the shutdown of a timber operation, the LTO shall notify the RPF of the shutdown of timber operations.
11) Cease operations, except for emergencies and operations needed to protect water quality, upon receipt of written notice of an RPF's withdrawal of professional services from the plan. The LTO shall not resume operations until written notice is received from the plan submitter that another RPF has visited the site and accepts responsibility for providing advice regarding the plan as the RPF of record.

In addition to the above, I have specific responsibilities for the following: I am only responsible for operations on the area of the THP as shown on the timber sale map attached to the LTO amendment.

I have read and understand my responsibilities as the LTO summarized above and specifically described in 14 CCR 1035.3. I certify that I will fulfill my legal obligation as stated in the forest practice rules, and agree to fulfill my responsibilities as described above.

**LTO Signature:** *Lonnie Howell*                    Date: 5/7/07

**Responsible On-Site Contact (if different)**

Signature: *Billy L. Dietrich*

Printed Name: *Bill Dietrich*                    Date: 5/7/07

Street Address / PO Box: ██████        ████████ ██ ██ ███

Telephone Number: ████████████

5/02/07:klh



RECEIVED

AUG 1 4 2006

LASSEN MODOC
RANGER UNIT

**AM# 1**

**FORESTLAND**
**MANAGEMENT**

August 2, 2006

RECEIVED

AUG 0 3 2006

REDDING
FOREST PRACTICE



W. M. BEATY &
ASSOCIATES, INC.

845 BUTTE ST. / P.O. BOX 990898
REDDING, CALIFORNIA 96099-0898
530-243-2783 / FAX 530-243-2900

Mr. William E. Schultz
Deputy Chief, Forest Practice
CALIFORNIA DEPARTMENT OF FORESTRY
& FIRE PROTECTION
6105 Airport Rd
Redding CA 96002-9422

Reviewed by: MK
Dist by:
Dist. Date:
RU _____ S
FG _____ TO
WO _____ TLO
ARCH _____ LTO
RPF _____ DMG
INSP _____ BOE
OTHER: _____

Re:  MOONLIGHT THP No. 2-05-162-PLU(2)
MOONLIGHT T.S. / RRFP

Dear Mr. Schultz:

Please note that Medici Logging, Inc. will be the L.T.O. on a portion of this plan
as shown on the enclosed map.  Pertinent information follows:

Medici Logging, Inc.

L.T.O. # A-7213
Contact person:  Jack Medici

We anticipate logging operations will commence on or about August 7, 2006.

Also enclosed is the completed LTO Responsibility Acknowledgement form as
required by Section 1035.3 Title 14, CCR.

No other changes are made.

This amendment conforms to the rules and
Regulations of the Board of Forestry and Fire
Protection and the Forest Practice Act.

Routed by: _____ Date Routed: 8-7-06
cc: Unit Insp. CP PW BOE TO TLO LTO PS
RPF FG WO 5 Other: _____

Sincerely,

W. M.BEATY & ASSOCIATES, INC.

John Van Duyn

John Van Duyn
Staff Forester
RPF No. 2635

JRV:klh
Enclosures
cc: Jeff Pudlicki
    John Forno

State of California
Department of Forestry and Fire Protection

T.S. Name: **MOONLIGHT T.S.**
THP Name: **MOONLIGHT THP**
Owner:   **RRFP**

(Administrative Use Only-Area _____)
(Plan No. _____)
(Date Received _____)
(Amendment Number _____)

## LICENSED TIMBER OPERATOR RESPONSIBILITY ACKNOWLEDGEMENT
(As per Section 1035.3 Title 14, CCR)

**Harvesting Plan Number:** _____2-05-162-LAS(2)_____

**Licensed Timber Operator Information**

Name: __Medici Logging, Inc._____

Street Address / P.O. Box: ▮▮▮▮   City: ▮▮▮▮   State ▮▮   Zip Code: ▮▮▮▮

Telephone Number: ▮▮▮▮▮   LTO Number: __A-7213_____

As the Licensed Timber Operator (LTO) listed above I acknowledge responsibility for the following:

1) Inform the responsible RPF or plan submitter orally or in writing of any site conditions, which in the LTO's opinion prevent implementation of the approved plan and amendments.
2) Be responsible for the work of his or her employees and familiarize all employees with the intent and details of the operational and protection measures of the plan and amendments that apply to their work.
3) Keep a copy of the applicable approved plan and amendments available for reference at the site of active timber operations.
4) Comply with all provisions of the Act, Board rules and regulations and the applicable approved plan.
5) Attend an on-site meeting or discuss archaeological site protection with the RPF or supervised designee familiar with on-site conditions.
6) To inquire of the plan submitter, timberland owner or their authorized agent, RPF who wrote the plan, or the supervised designee, if any mitigation measures or specific operating instructions are contained in the Confidential Archaeological Addendum or any other confidential addendum to the plan.
7) Provide the RPF responsible for professional advice throughout the timber operations, the name, address, and phone number of an on-site contact employee authorized by the LTO to receive RPF advice.
8) Keep the RPF responsible for professional advice throughout the timber operations advised of the status of timber operation activity.
9) Within 5 days before, and not later than the startup of timber operations, notify the RPF of the start of timber operations.
10) Within 5 days before, and not later than the shutdown of a timber operation, the LTO shall notify the RPF of the shutdown of timber operations.
11) Cease operations, except for emergencies and operations needed to protect water quality, upon receipt of written notice of an RPF's withdrawal of professional services from the plan.  The LTO shall not resume operations until written notice is received from the plan submitter that another RPF has visited the site and accepts responsibility for providing advice regarding the plan as the RPF of record.

In addition to the above, I have specific responsibilities for the following:  I am only responsible for operations on the area of the THP as shown on the attached timber sale map.

I have read and understand my responsibilities as the LTO summarized above and specifically described in 14 CCR 1035.3. I certify that I will fulfill my legal obligation as stated in the forest practice rules, and agree to fulfill my responsibilities as described above.

**LTO Signature:** _Joel J. Medici._   Date: _7-28-06_

**Responsible On-Site Contact (if different)**

Signature: _____

Printed Name: _____   Date: _____

Street Address / PO Box: _____   City: _____   Zip: _____

Telephone Number: _____

7/26/06:klh

2



3

STATE OF CALIFORNIA— THE RESOURCES AGENCY                                              Arnold Schwarzenegger, Governor



## DEPARTMENT OF FORESTRY AND FIRE PROTECTION
**NORTHERN OPERATIONS CENTER**
6105 Airport Road
Redding, California 96002
Website: www.fire.ca.gov
(530) 224-2445

February 20, 2007

                                        Timber Harvesting Plan
                                        No. 2-05-161-PLU
                                        COOKS CREEK

W BEATY & ASSOCIATES INC



Dear Gentleperson(s):

Enclosed is a true copy of your Timber Harvesting Plan identified by date and file number shown above. The Director of Forestry finds that the plan conforms with the rules and regulations of the Board of Forestry pursuant to the provisions of the Z'Berg-Nejedly Forest Practice Act of 1973. Conformance is indicated by the facsimile signature of his duly constituted representative being shown on the attached copy of the plan.

You may begin the timber operations proposed in the plan according to the conditions specified therein, and subject to the Forest Practice Act, Forest Practice Rules of the Forest District in which the operations will take place, related Board of Forestry regulations and other applicable laws, regulations and ordinances.

The Forest Practice Act requires the filing of the two reports listed below for each timber harvesting operation undertaken:

1.  Timber operations after completion of work described in a Timber Harvesting Plan, excluding work for stocking, a report shall be filed by the timber owner or his agent with the Director that all work, except stocking, has been completed.

2.  Report of Stocking - within five (5) years after completion of timber operations covered by a Timber Harvesting Plan, a report of stocking shall be filed by the timber owner or his agent with the Director.

The Timber Harvesting Plan will expire on **February 19, 2010.** Any request for an extension must be received ten (10) days prior to the expiration date shown above.

CONSERVATION IS WISE-KEEP CALIFORNIA GREEN AND GOLDEN
PLEASE REMEMBER TO CONSERVE ENERGY. FOR TIPS AND INFORMATION, VISIT "FLEX YOUR POWER" AT  WWW.CA.GOV

THP 2-05-161-PLU
Page Two

The effective period of this Timber Harvesting Plan is up to three years from the date the Director's representative signed the plan as being in conformance with the Forest Practice Act and Rules unless extended pursuant to Public Resources Code 4590.

In future correspondence, please refer to the number in the box in the upper right corner of the plan.

Sincerely,

William E. Schultz, RPF #1974
Deputy Chief
Forest Practice

Enclosure
cc:     LMU
        RPF
        TLO (2)
        Board of Equalization
        County Planning: Lassen
        F&G 1 & 2
        WQ 5

CONSERVATION IS WISE-KEEP CALIFORNIA GREEN AND GOLDEN
PLEASE REMEMBER TO CONSERVE ENERGY.  FOR TIPS AND INFORMATION, VISIT "FLEX YOUR POWER" AT  WWW.CA.GOV

| FOR ADMIN. USE ONLY<br>Amendments-date & S or M | |
|---|---|
| 1. LMI1 | 7. PLU-CP |
| 2. FG1 | 8. CGS |
| 3. FG2 | 9. RT |
| 4. WQ5 | 10. HOUSER |
| 5. PNF | 11. |
| 6. LAS-CP | 12. |

**TIMBER HARVESTING PLAN** ~~RECEIVED~~
STATE OF CALIFORNIA
DEPARTMENT OF FORESTRY
AND FIRE PROTECTION FEB 2 6 2007
RM-63 (01-00)

LASSEN MODOC UNIT

THP Name: **COOKS CREEK THP**
Owner: **SHASTA FORESTS 123 & 7**

If this is a Modified THP, check box: [ ]

FOR ADMIN. USE ONLY

THP No. **2 - 0 5 - 1 6 1 - PLU (2)**

Dates Rec'd **OCT 1 7 2005**

**NOV 1 5 2005**

Date Filed **NOV 2 6 2005**

Date Approved **FEB 2 0 2007**

Date Expires **FEB 1 9 2010**

Extensions 1) [ ]  2) [ ]

This Timber Harvesting Plan (THP) form, when properly completed, is designed to comply with the Forest Practice Act and Board of Forestry and Fire Protection rules. See separate instructions for information on completing this form. NOTE: The form must be printed legibly in ink or typewritten. The THP is divided into six sections. If more space is necessary to answer a question, continue the answer at the end of the appropriate section of your THP. If writing an electronic version, insert additional space for your answer. Please distinguish answers from questions by *font change*, **bold** or underline.

## SECTION I - GENERAL INFORMATION

This THP conforms to my/our plan and upon approval, I/we agree to conduct harvesting in accordance therewith. Consent is hereby given to the Director of Forestry and Fire Protection, and his or her agents and employees, to enter the premises to inspect timber operations for compliance with the Forest Practice Act and Forest Practice Rules.

1. TIMBER OWNER(S) OF RECORD: Name **BROOKS WALKER, ET AL.**

Address **c/o W. M. BEATY & ASSOCIATES, INC.**  /

City _____ State _____ Zip _____ Phone _____

Signature _____ Date 10/12/05

NOTE: The timber owner is responsible for payment of a yield tax. Timber Yield Tax information may be obtained at the Timber Tax Section, MIC: 60, State Board of Equalization, P.O. Box 942879, Sacramento, California 94279-0060; phone 1-800-400-7115; BOE Web Page at http:// **www.boe.ca.gov**.

2. TIMBERLAND OWNER(S) OF RECORD: Name **BROOKS WALKER, ET AL. and RED RIVER FORESTS PARTNERSHIP**

Address **c/o W. M. BEATY & ASSOCIATES, INC.**  /

City _____ State _____ Zip 06000 _____ Phone _____

Signature _____ Date 10/12/05

3. LICENSED TIMBER OPERATOR(S): Name **Unknown - CDF will be notified upon determination** Lic. No. _____
(If unknown, so state. You must notify CDF of LTO prior to start of operations)

Address _____

City _____ State _____ Zip _____ Phone _____

Signature _____ Date _____

4. PLAN SUBMITTER(S): Name **W. M. BEATY & ASSOCIATES, INC.**

Address _____

City _____ State _____ Zip _____ Phone _____

Signature _____ Date 10/12/05

**RECEIVED**
OCT 17 2005
REDDING
FOREST PRACTICE

**RECEIVED**
NOV 16 2005
REDDING
FOREST PRACTICE

5. a. List person to contact on-site who is responsible for the conduct of the operation.  If unknown, so state and name must be provided for inclusion in the THP prior to start of timber operations.

Name   *Unknown At this time - CDF will be notified upon determination of LTO*

Address

City         State    Zip     Phone

b. [X] Yes  [ ] No    Will the timber operator be employed for the construction and maintenance of roads and landings during conduct of timber operations?  If no, who is responsible?

c. Who is responsible for erosion control maintenance after timber operations have ceased and until certification of the Work Completion Report?  If not the LTO, then a written agreement must be provided per 14 CCR 1050 (c).

*Licensed Timber Operator will be responsible*

6. a. Expected date of commencement of timber operations:

    [X] date of THP conformance, or [ ]          (date)

b. Expected date of completion of timber operations:

    [X] 3 years from date of THP conformance, or [ ]       (date)

7. The timber operation will occur within the:

[ ] COAST FOREST DISTRICT        [ ] The Tahoe Regional Planning Authority Jurisdiction
[ ] Southern Subdistrict of the Coast F. D.    [ ] A County with Special Regulations, identify:

[ ] SOUTHERN FOREST DISTRICT
[ ] High use subdistrict of the Southern F. D.   [ ] Coastal Zone, no Special Treatment Area
                [ ] Special Treatment Area(s), type and identify:
[X] NORTHERN FOREST DISTRICT

                [ ] Other

8. Location of the timber operation by legal description:
  Base and Meridian:    [X] Mount Diablo    [ ] Humboldt     [ ] San Bernardino

*7.5 Minute Quadrangles: Greenville 1979, Moonlight Peak 1980*

| Section | Township | Range | Acreage | County |
|---------|----------|-------|---------|--------|
| 2 | 27N | 10E | 210 | Plumas |
| 3 | 27N | 10E | 80 | Plumas |
| 4 | 27N | 10E | 600 | Plumas |
| 5 | 27N | 10E | 270 | Lassen |
| 8 | 27N | 10E | 560 | Lassen |
| 9 | 27N | 10E | 640 | Plumas |
| 10 | 27N | 10E | 160 | Plumas |
| 14 | 27N | 10E | 15 | Plumas |
| 15 | 27N | 10E | 95 | Plumas |
| 16 | 27N | 10E | 330 | Plumas |
|  |  | TOTAL ACERAGE: | 2,960 | (Logging Area Only) |

Planning Watershed: CALWATER Version, Identification Number, and Name:   *CALWATER Version 2.2 Upper Cooks Creek #5518.530302  Moonlight Creek #5518.530120 Moonlight Pass #5518.450400*

- 2 -

9.   [ ] Yes  [X] No  Has a Timberland Conversion been submitted?  If yes, list expected approval date or permit number and expiration date if already approved.

_____

10.  [X] Yes  [ ] No  Is there an approved Sustained Yield Plan for this property?  Number _00-002_   Date app. _6/13/01_

       [ ] Yes  [ ] No  Has a Sustained Yield Plan been submitted but not approved? Number _____ Date sub. _____

11.  [ ] Yes  [X] No  Is there a THP or NTMP on file with CDF for any portion of the plan area for which a Report of Satisfactory Stocking has not been issued by CDF?
               If yes, identify the THP or NTMP number(s): _____
       [ ] Yes  [X] No  Is there a contiguous even aged unit with regeneration less than five years old or less than five feet tall? If yes, explain. Ref. Title 14 CCR 913.1 (933.1, 953.1) (a)(4).

12.  [X] Yes  [ ] No     Is a Notice of Intent necessary for this THP?
     [X] Yes  [ ] No  If yes, was the Notice of Intent posted as required by 14 CCR 1032.7 (g)?

13.  RPF preparing the THP:  Name _John Van Duyn_           RPF Number _2635_

     Address ███████████

     City ████████   State ██  Zip █████    Phone ████████

     a. [ ] Yes  [X] No   I have notified the plan submitter(s), in writing, of their responsibilities pursuant to 14 CCR 1035 of the Forest Practice Rules.
       [ ] Yes  [X] No   I have notified the timber owner and the timberland owner of their responsibilities for compliance with the Forest Practice Act and rules, specifically the stocking requirements of the rules and the maintenance of erosion control structures of the rules.

*As the employer of the RFP who prepared the plan, W.M. Beaty & Associates, Inc. is fully aware of all THP responsibilities identified in 14 CCR 1035 concerning this plan.*

*W.M. Beaty & Associates, Inc. is retained by the timberland owner under a Management Services contract addressing all aspects of timber management including compliance with all pertinent regulations.  As agent for the timberland owners, W.M. Beaty & Associates, Inc. accepts for the owners, all the responsibilities identified in 14 CCR 1035.*

     b. [ ] Yes  [X] No   I will provide the timber operator with a copy of the portions of the approved THP as listed in 14 CCR 1035 (e).  If "no", who will provide the LTO a copy of the approved THP?

*Plan Submitter – W. M. Beaty & Associates, Inc.* _____

     I or my supervised designee will meet with the LTO prior to commencement of operations to advise of sensitive conditions and provisions of the plan pursuant to 14 CCR 1035.2.

     c. I have the following authority and responsibilities for preparation and administration of the THP and timber operation.  (Include both work completed and work remaining to be done):

*I have the authority and responsibility for the preparation of this THP and have been retained to provide professional advice throughout the timber operations.  I, any other RPF or supervised designee, under the direction of W.M. Beaty & Associates Inc. shall be present on the logging area at a sufficient frequency to know the progress of operations and advise the LTO and timberland owner.  I or any other RPF, under the direction of W.M. Beaty & Associates Inc. has the authority to amend the THP on behalf of the submitter, supervise timber marking, identify watercourse and lake protection zones or other activities.  THP implementation, compliance and satisfactory completion are the responsibility of the LTO through contractual agreement.  Notification of commencement of operations will also be the responsibility of the LTO as allowed in 1035.4*

     d. Additional required work requiring an RPF, which I do not have the authority or responsibility to perform:

     *N.A.* _____

- 3 -

e. After considering the rules of the Board of Forestry and Fire Protection and the mitigation measures incorporated in this THP, I have determined that the timber operation:

[ ] <u>will</u> have a significant adverse impact on the environment. (Statement of reasons for overriding considerations contained in Section III).

[X] <u>will not</u> have a significant adverse impact on the environment.

Registered Professional Forester:  I certify that I, or my supervised designee, personally inspected the THP area, and this plan complies with the Forest Practice Act, the Forest Practice Rules and the Professional Foresters Law.  If this is a Modified THP, I also, certify that:  1) the conditions or facts stated in 14 CCR 1051 (a) (1) - (16) exist on the THP area at the time of submission, preparation, mitigation, and analysis of the THP and no identified potential significant effects remain undisclosed; and 2) I, or my supervised designee, will meet with the LTO at the THP site, before timber operations commence, to review and discuss the contents and implementation of the Modified THP.

Signature _John Van Duyn_____   Date _11/15/05_

### SECTION II - PLAN OF TIMBER OPERATIONS

NOTE: If a provision of this THP is proposed that is different than the standard rule, the explanation and justification should normally be included in Section III unless it is clearer and better understood as part of Sec. II.

14.   a. Check the Silvicultural methods or treatments allowed by the rules that are to be applied under this THP.  Specify the option chosen to demonstrate Maximum Sustained Production (MSP) according to 14 CCR 913 (933, 953) .11. If more than one method or treatment will be used show boundaries on map and list approximate acreage for each.

[ ] Clearcutting _____ ac.        [ ] Shelterwood Prep. Step _____ ac.    [ ] Seed Tree Seed Step _____ ac.

[ ] Shelterwood Seed Step _____ ac.  [ ] Seed Tree Removal Step _____ ac  [ ] Shelterwood Removal Step _____ ac.

[X] Selection _2,960___ ac.        [ ] Group Selection _____ ac.        [ ] Transition ____ ac.

[ ] Commercial Thinning _____ ac.   [ ] Road Right of Way _____ ac.        [ ] Sanitation Salvage _____ ac,

[ ] Special Treatment Area _____ ac.  [ ] Rehab. of _____ ac.            [ ] Fuelbreak _____ ac.
                                        Understocked Area

[ ] Alternative _____ ac.         [ ] Conversion _____ ac.             [ ] Non-Timberland Area _____ ac.

Total acreage _2,960_____ ac.: Explain if total is different from that in 8.    MSP option chosen:  (a) [ ]   (b) [X]   (c) [ ]

b. If Selection, Group Selection, Commercial Thinning, Sanitation Salvage or Alternative methods are selected the post harvest stocking levels (differentiated by site if applicable) must be stated. Note mapping requirements of 1034 (x) (12).

<u>The plan area is comprised of site III and IV timberland.  Post harvest stocking levels will retain a minimum of 75 square feet per acre of basal area on site III timberland and a minimum of 50 square feet of basal area per acre on site IV timberland.</u>

c. [ ] Yes  [X] No     Will evenage regeneration step units be larger than those specified in the rules (20 acres tractor, 30 acres cable)? If yes, provide substantial evidence that the THP contains measures to accomplish any of subsections (A) - (E) of 14 CCR 913 (933, 953) .1 (a) (2) in Section III of the THP.  List below any instructions to the LTO necessary to meet (A) - (E) not found elsewhere in the THP.  These units must be designated on map and listed by size.

d.  Trees to be harvested or retained must be marked by or marked under the supervision of the RPF.  Specify how the trees will be marked and whether harvested or retained.

<u>Trees to be harvested will be painted with a horizontal stripe at least 2/3 of the circumference at DBH or higher. Two stump marks will be painted as well, strategically placed to remain after timber is harvested.</u>

–4–

[ ] Yes [X] No    Is a waiver of marking by the RPF requirement requested? If yes, how will LTO determine which trees will be harvested or retained? If yes and more than one silvicultural method, or Group Selection is to be used, how will LTO determine boundaries of different methods or groups?

e. Forest products to be harvested: ___*Sawlogs, Veneer Logs, Woodfuel and Pulp Chips*___

f. [ ] Yes [X] No    Are group B species proposed for management?
   [ ] Yes [X] No    Are group B or non-indigenous A species to be used to meet stocking standards?
   [ ] Yes [X] No    Will group B species need to be reduced to maintain relative site occupancy of A species?

If any answer is yes, list the species, describe treatment, and provide the LTO with necessary felling and slash treatment guidance. Explain who is responsible and what additional follow-up measures of manual treatment or herbicide treatment are to be expected to maintain relative site occupancy of A species. Explain when a licensed Pest Control Advisor shall be involved in this process.

g. Other instructions to LTO concerning felling operations:    *Prior to the commencement of operations the LTO shall meet with the RPF or his supervised designee who is familiar with on-site conditions. At this meeting the LTO will be advised of any sensitive conditions requiring special care during operations.*

h. [ ] Yes [X] No    Will artificial regeneration be required to meet stocking standards?

i. [ ] Yes [X] No    Will site preparation be used to meet stocking standards? If yes, provide the information required for a site preparation addendum, as per 14 CCR 915.4 (935.4, 955.4).

j. If the rehabilitation method is chosen provide a regeneration plan as required by 14 CCR 913 (933, 953) .4 (b).

PESTS

15. a. [ ] Yes [X] No    Is this THP within an area that the Board of Forestry and Fire Protection has declared a Zone of Infestation or Infection, pursuant to PRC 4712 - 4718? If yes, identify feasible measures being taken to mitigate adverse infestation or infection impacts from the timber operation. See 14 CCR 917 (937, 957) .9 (a).

    b. [ ] Yes [X] No    If outside a declared zone, are there any insect, disease or pest problems of significance in the THP area? If yes, describe the proposed measures to improve the health, vigor, and productivity of the stand(s).

HARVESTING PRACTICES

16. Indicate type of yarding system and equipment to be used:

| GROUND BASED* | CABLE | SPECIAL |
|---|---|---|
| a. [X] Tractor, including end/long lining | d. [ ] Cable, ground lead | g. [ ] Animal |
| b. [X] Rubber tired skidder, Forwarder | e. [ ] Cable, high lead | h. [ ] Helicopter |
| c. [X] Feller buncher | f. [ ] Cable, Skyline | i. [ ] Other _____ |

* All tractor operations restrictions apply to ground based equipment.

- 5 -

17.    Erosion Hazard Rating:  Indicate Erosion Hazard Ratings present on THP.  (Must match EHR worksheets)

[X] Low            [X] Moderate            [ ] High                    [ ] Extreme
If more than one rating is checked, areas must be delineated on map down to 20 acres in size (10 acres for high and
Extreme EHRs in the Coast District).

18.    Soil Stabilization:  In addition to the standard waterbreak requirements describe soil stabilization measures or additional
erosion control measures to be implemented and the location of their application.  See requirements of 14 CCR 916.7 (936.7,
956.7), and 923.2 (943.2, 963.2) (m), and 923.5 (943.5, 963.5) (f).

*Distances between waterbreaks shall not exceed the following standards.  EHR is Low and Moderate.*

|              | *Max. Distance between* |
| *Slope*      | *Waterbreaks*           |
| *< 10%*      | *200'*                  |
| *11% - 25%*  | *150'*                  |
| *26% - 50%*  | *100'*                  |
| *> 50%*      | *75'*                   |

*Within the WLPZ adjacent to Class I & II watercourses, areas exceeding 800 continuous square feet in size, where mineral
soil has been exposed by timber operations, shall be treated for reduction of soil loss or sediment transport.  Treatment shall
be done prior to October 15th except that such bare areas created after October 15th shall be so treated within 10 days.  90-
100 percent of areas of exposed soil will be seeded with annual rye grass and mulched to a minimum depth of 2" inches.*

*Where mineral soil has been exposed by timber operations on approaches to Class III watercourse crossings, the disturbed
area shall be stabilized to the extent necessary to prevent the discharge of soil into watercourses or lakes in amounts
deleterious to the quality and beneficial uses of water.  Upon completion of use the RPF and or CDF Inspector shall
determine if additional stabilization measures are necessary.  Stabilization may include distribution of slash, straw mulch and
or seeding with grass.*

19.    [ ] Yes  [X] No     Are tractor or skidder constructed layouts to be used?  If yes, specify the location and extent of use:

20.    [ ] Yes  [X] No  Will ground based equipment be used within the area(s) designated for cable yarding?  If yes,
                        specify the location and for what purpose the equipment will be used.  See 14 CCR 914.3
                        (934.3, 954.3) (e).

21.    Within the THP area will ground based equipment be used on:

a. [ ] Yes  [X] No    Unstable soils or slide areas?  Only allowed if unavoidable.
b. [ ] Yes  [X] No    Slopes over 65%?
c. [ ] Yes  [X] No    Slopes over 50% with high or extreme EHR?
d. [ ] Yes  [X] No    Slopes between 50% and 65% with moderate EHR where heavy equipment use will not be
                      restricted to the limits described in 14 CCR 914 (934, 954) .2 (f) (2) (i) or (ii)?
e. [ ] Yes  [X] No    Slopes over 50% which lead without flattening to sufficiently dissipate water flow and trap
                      sediment before it reaches a watercourse or lake?

If a. is yes, provide site specific measures to minimize effect of operations on slope stability below.  Provide explanation and
justification in section III as required per 14 CCR 914 (934, 954) .2 (d).  CDF requests the RPF consider flagging tractor
road locations if "a." is yes.
If b., c., d. or e. is yes:
       1) The location of tractor roads must be flagged on the ground prior to the PHI or start of operations if a PHI is not
          required, and

- 6 -

2) You must clearly explain the proposed exception and justify why the standard rule is not feasible or would not comply with 14 CCR 914 (934, 954).

The location of heavy equipment operation on unstable areas or any use beyond the limitations of the standard rules must be shown on the map. List specific instructions to the LTO below.

*An unstable area described in the Shasta Forests SYP as an area of slow creep is located within the plan area. The unstable area will have an Equipment Exclusion Zone (EEZ) flagged by the RPF or his supervised designee. Activities within the unstable area will be limited to hand falling and long lining of trees out of the zone. Erosion control facilities on skid trails above and adjacent to this area will direct runoff away from the unstable area. (See map page 21 for slide location)*

22.  [ ] Yes  [X] No  Are any alternative practices to the standard harvesting or erosion control rules proposed for this plan? If yes, provide all the information as required by 14 CCR 914 (934, 954) .9 in Section III. List specific instructions to the LTO below.

## WINTER OPERATIONS

23.  a. [X] Yes [ ] No  Will timber operations occur during the winter period? If yes, complete "b, c, or d." State in space provided if exempt because yarding method will be cable, helicopter, or balloon.
     b. [ ] Yes [X] No  Will mechanical site preparation be conducted during the winter period? If yes, complete "d".
     c. [X]  I choose the in-lieu option as allowed in 14 CCR 914 (934, 954) .7 (c). Specify below the procedures listed in subsections (1) and (2), and list the site specific measures for operations in the WLPZ and unstable areas as required by subsection (3), if there will be no winter operations in these areas, so state.
     d. [ ]  I choose to prepare a winter operating plan per 14 CCR 914 (934, 954) .7 (b).

*(1) Tractor yarding or the use of tractors for constructing firebreaks or other tractor roads shall be done only during dry, rainless periods where soils are not saturated. Saturated soil conditions means that site conditions are sufficiently wet that timber operations displace soils in yarding or mechanical site preparation areas or displace road and landing surface materials in amounts sufficient to cause a turbidity increase in drainage facilities that discharge into Class I, II, III, or IV waters, or in downstream Class I, II, III, or IV waters that is visible or would violate applicable water quality requirements. In yarding and site preparation area, this condition may be evidenced by: a( reduced traction by equipment as indicated by spinning or churning of wheels or tracks in excess of normal performance, b) inadequate traction without blading wet soil, c) soil displacement in amounts that cause visible increase in turbidity of the downstream waters in a receiving Class I, II, III, or IV waters, or in amounts sufficient to cause a turbidity increase in drainage facilities that discharge into Class I, II, III, or IV waters, or d) creation of ruts greater than would be normal following a light rainfall.*

*On Logging roads and landing surfaces, this condition may be evidenced by: a) reduced traction by equipment as indicated by spinning or churning of wheels or tracks in excess of normal performance, b) inadequate traction without blading wet soil, c) soil displacement in amounts the cause visible increase in turbidity of the downstream waters in a receiving Class I, II, III, or IV waters, or in amounts sufficient to cause a turbidity increase in drainage facilities that discharge into Class I, II, III, or IV waters, or d) pumping of road surface materials by traffic, or e) creation of ruts greater than would be normal following a normal road watering, which transports surface material to a drainage facility that discharges directly into a watercourse..*

*(2) Installation of drainage facilities and structures, is required from October 15 to May 1 on all constructed skid trails and tractor roads prior to sunset if the National Weather Service forecast is a " chance" (30% or more) of rain within the next 24 hours, and prior to weekend or other shutdown periods. (3) Prior to the Winter Period (November 15th) fills shall be excavated to form a channel which is as close as feasible to the natural watercourse grade and orientation and is wider than the natural channel. The excavated material and any resulting cut bank shall be sloped back from the channel and stabilized to prevent slumping and to minimize soil erosion. Where needed, this material shall be stabilized by seeding, mulching, rock armoring, or other suitable treatment. From the period of November 15th to April 1st, operations within the WLPZ shall be limited to hand falling and long lining of trees out of the zone.*

7 Revised

JUN 2 2 2006

PART OF PLAN

NOTE: "Winter period" means the period between November 15 and April 1, except as noted under special County Rules at Title 14 CCR 925.1, 926.18, 927.1, and 965.5... (a) except as otherwise provided in the rules: (1) All waterbreaks shall be installed no later than the beginning of the winter period of the current year of timber operations. (2) Installation of drainage facilities and structures is required from October 15 to November 15 and April 1 to May 1 on all constructed skid trails and tractor roads prior to sunset if the National Weather Service forecast is a "chance" (30% or more) of rain within the next 24 hours.

ROADS AND LANDINGS

24.  Will any roads be constructed?        [X] Yes  [ ] No, or reconstructed?  [ ] Yes  [X] No. If yes, check items "a." through "g."
     Will any landings be constructed?    [X] Yes  [ ] No, or reconstructed?  [ ] Yes  [X] No. If yes, check items "h." through "k."

| | | |
|---|---|---|
| a. [ ] Yes  [X] No | Will new or reconstructed roads be wider than single lane with turnouts? |
| b. [ ] Yes  [X] No | Are logging roads proposed in areas of unstable soils or known slide-prone areas? |
| c. [ ] Yes  [X] No | Will new roads exceed a grade of 15% or have pitches of up to 20% for distances greater than 500 feet? Map must identify any new or reconstructed road segments that exceed an average 15% grade for over 200 feet. |
| d. [ ] Yes  [X] No | Are roads to be constructed or reconstructed, other than crossings, within the WLPZ of a watercourse? If yes, completion of THP Item 27 a. will satisfy required documentation. |
| e. [ ] Yes  [X] No | Will roads be located across more than 100 feet of lineal distance on slopes over 65%, or on slopes over 50% which are within 100 feet of the boundary of a WLPZ? |
| f. [ ] Yes  [X] No | Will any roads or watercourse crossings be abandoned? |
| g. [ ] Yes  [X] No | Are exceptions proposed for flagging or otherwise identifying the location or roads to be constructed? |
| h. [ ] Yes  [X] No | Will any landings exceed one half acre in size? If any landing exceeds one quarter acre in size or requires substantial excavation the location must be shown on the map. |
| i. [ ] Yes  [X] No | Are any landings proposed in areas of unstable soils or known slide prone areas? |
| j. [ ] Yes  [X] No | Will any landings be located on slopes over 65% or on slopes over 50% which are within 100 feet of the boundary of a WLPZ? |
| k. [ ] Yes  [X] No | Will any landings be abandoned? |

25.  If any section in "item 24" above is answered yes, specify site-specific measures to reduce adverse impacts and list any additional or special information needed by the LTO concerning the construction, maintenance, and/or abandonment of roads or landings, as required by 14 CCR Article 12. Include required explanation and justification in THP Section III.

*Sensitive Road segments: Four road segments are within the WLPZ of Class I and II watercourses. These road segments are existing and stable. Where road grading is necessary all material shall be bladed to the road edge furthest from the watercourse and equipment will not be allowed between the road edge and the watercourse. A fifth sensitive road segment is located within and adjacent to a grassy area where a higher water table exists. Road segment (SR2) will only be used when dry and a stable operating area exists. Sensitive road segment #4 and that landing will not be used. The southern most portion of this road segment will be blocked with a large berm to prevent vehicular traffic. The sensitive road segments have been mapped on pages 19 & 20*

*From in-lieu landing #7 to just below tractor road crossing 37,(SR1) will be abandoned. Each end of the road will be blocked with a large berm to prevent vehicular traffic. Water breaks shall be installed on this abandoned segment at a distance not to exceed 100' feet.*

*The haul road west of crossing #5 shall be blocked with a large berm to prevent vehicular traffic.*

*One new lading will be constructed. The new landings will not exceed ½ acre in size. Waste organic material, such as uprooted stumps cull logs, accumulations of limbs and branches, or un-merchantable trees, shall not be buried in landing fills. Woody debris or cull logs and chunks may be placed and stabilized at the toe of landing fill to restrain excavated soil from moving downslope. The construction of this landing will be outside of the Class II WLPZ. The landing location has been mapped on page 17.*

*Approximately 300' feet of new road will be constructed. The identified route for the new road location has been surveyed for archaeological sites, unstable areas and other sensitive conditions. The roads will be constructed as seasonal single lane roads with turnouts. Road grades do not exceed 15 percent. The roads will be constructed with rolling dips and out-sloped where feasible. The old road segment that is within the ELZ will be blocked by installing a impassable berm.*

8 Revised                                        JUN 2 2 2006

## WATERCOURSE AND LAKE PROTECTION ZONE (WLPZ) AND DOMESTIC WATER SUPPLY PROTECTION MEASURES

26.  a. [X] Yes  [ ] No    Are there any watercourse or lakes which contain Class I through IV waters on or adjacent to the plan area?  If yes, list the class, WLPZ or ELZ width, and protective measures determined from Table I and/or 14 CCR 916 (936, 956) .4 (c) of the WLPZ rules for each watercourse.  Specify if Class III or IV watercourses have WLPZ , ELZ or both.

    b. [X] Yes  [ ] No    Are there any watercourse crossings that require mapping per 14 CCR 1034 (x) (7)?

    c. [X] Yes  [ ] No    Will tractor road watercourse crossings involve the use of a culvert? If yes state minimum diameter and length for each culvert (may be shown on map).

    d. [ ] Yes  [X] No    Is this THP Review Process to be used to meet Department of Fish and Game CEQA review requirements?  If yes, attach the 1603 Addendum below or at the end of this Section II; provide the background information and analysis in Section III;  list instructions for LTO below for the installation, protection measures, and mitigation measures;  as per THP Form Instructions or CDF Mass Mailing, 07/02/1999, "Fish and Game Code 1603 Agreements and THP Documentation".

S . 1

JUN 2 2 2006

*For Class I Watercourses*

- Prior to the commencement of operations Class I watercourses will have a 75' WLPZ where adjacent slopes are < 30% and a 100' WLPZ where slopes are 30%-50% flagged by the RPF or his supervised designee.

- To ensure retention of shade canopy filter strip properties and maintenance of a multi-storied stand, a base mark below the cut line of harvest trees within the zone a sample mark shall be done in advance of the pre-harvest inspection by the RPF or his supervised designee. Trees within the WLPZ to be harvested will be marked in advance of falling operations by the RPF or his supervised designee.

- To protect water temperature, filter strip properties, upslope stability, and fish and wildlife values, at least 50% of the overstory and 50% of the understory canopy covering the ground and adjacent waters shall be left in a well distributed multi-storied stand composed of a diversity of species similar to that found before the start of operations. The residual overstory canopy shall be composed of at least 25% of the existing overstory conifers. To recruit large woody debris for instream habitat a minimum of two living conifers per acre at least 16 inched DBH and 50 feet tall within 50 feet of the Class I watercourse will be retained.

- See Item # 26 addendum for Class I watercourse crossing installation and removal requirements

*For Class II Watercourses*

- Prior to the commencement of operations Class II watercourse will have a 50' WLPZ where slopes are < 30% and a 75' WLPZ where slopes are 30%-50% flagged by the RPF or his supervised designee.

- To ensure retention of shade canopy filter strip properties and maintenance of wildlife values, a base mark below the cut line of harvest trees will be done in advance of falling operations by the RPF or his supervised designee.

- To protect water temperature, filter strip properties, upslope stability, and fish and wildlife values, at least 50% of the total canopy covering the ground shall be left in a well distributed multi-storied stand composed of a diversity of species similar to that found before the start of operations. The residual overstory canopy shall be composed of at least 25% of the existing overstory conifers. To recruit large woody debris for instream habitat a minimum of two living conifers per acre at least 16 inched DBH and 50 feet tall within 50 feet of the Class II watercourse will be retained.

- See Item # 26 addendum for Class II watercourse crossing installation and removal requirements

*For Class III Watercourses*

- Prior to the commencement of operations Class III watercourses will have a 25'foot WLPZ where slopes are < 30% and a 50' WLPZ where slopes are 30%-50% flagged by the RPF or his supervised designee.

- To ensure retention of shade canopy filter strip properties and maintenance soil stability in the zone, a base mark below the cut line of harvest trees will be done in advance of falling operations by the RPF or his supervised designee.

- At least 50% of the understory vegetation present before timber operations shall be left living and well distributed within the WLPZ to maintain soil stability.

- See Item # 26 addendum for Class III watercourse crossing installation and removal requirements

PART OF PLAN

**For Springs and Wet Meadows**

- A perimeter ELZ shall be clearly identified on the ground by the RPF who prepared the plan, or his designee, with blue and white stripe flagging prior to the start of timber operations. Equipment shall not be allowed within the ELZ. All trees designated for harvest shall be felled away from the spring.

27.  Are site specific practices proposed in-lieu of the following standard WLPZ practices?

a. [X] Yes   [ ] No    Prohibition of the construction or reconstruction of roads, construction or use of tractor roads or landings in Class I, II, III, or IV watercourses, WLPZs, marshes, wet meadows, and other wet areas except as follows:
    (1) At prepared tractor road crossings.
    (2) Crossings of Class III watercourses which are dry at time of timber operations.
    (3) At existing road crossings.
    (4) At new tractor and road crossings approved by Department of Fish and Game.

b. [ ] Yes  [X] No    Retention of non-commercial vegetation bordering and covering meadows and wet areas?

c. [ ] Yes  [X] No    Directional felling of trees within the WLPZ away from the watercourse or lake?

d. [ ] Yes  [X] No    Decrease of width(s) of the WLPZ(s)?

e. [ ] Yes  [X] No    Protection of watercourses which conduct class IV waters?

f. [ ] Yes  [X] No    Exclusion of heavy equipment from the WLPZ except as follows:
    (1) At prepared tractor road crossings.
    (2) Crossings of Class III watercourses which are dry at time of timber operations.
    (3) At existing road crossings.
    (4) At new tractor and road crossings approved by Department of Fish and Game.

g. [ ] Yes  [X] No    Establishment of ELZ for Class III watercourses unless sideslopes are <30% and EHR is low?

h. [ ] Yes  [X] No    Retention of at least 50% of the overstory canopy in the WLPZ?

i. [ ] Yes  [X] No    Retention of at least 50% of the understory in the WLPZ?

j. [ ] Yes  [X] No    Are any additional in-lieu or any alternative practices proposed for watercourse or lake protection?

NOTE: A yes answer to any of items "a." through "j." constitutes an in-lieu practice. If any item is answered yes, refer to 14 CCR 916 (936, 956).1 and address the following for each item checked yes:
1. The RPF shall state the standard rule;
2. Explain and describe each proposed practice;
3. Explain how the proposed practice differs from the standard practice;
4. The specific location where it shall be applied, see map requirements of 14 CCR 1034 (x) (15) and (16);
5. Provide in THP Section II an explanation and justification as to how the protection provided is equal to the standard rule and provides for the protection of the beneficial uses of water, as per 14 CCR 916 (936, 956) .1 (a). Reference the in-lieu and location to the specific watercourse to which it will be applied.

*The standard rule prohibits the construction or reconstruction or roads, construction or use of tractor roads or landings in Class I, II, III or IV watercourses, WLPZ's marshes, wet meadows and other wet areas. I am proposing the use of eight landings that are within the WLPZ's of Class II and III watercourses. The landings are existing and stable. Landings 2, 3, 4 are bisected by Class III watercourses. These landings may not be used if water is present. Upon completion of use of these landings fills shall be excavated to form a channel which is as close as feasible to the natural watercourse grade and orientation and is wider than the natural channel. The excavated material and any resulting cut bank shall be sloped back from the channel and stabilized to prevent slumping and to minimize soil erosion. This material shall be stabilized by placing slash over the disturbed area and or seeding and mulching. Landings 1, 5, 6, 7, 8 are within the WLPZ and will have brow logs placed as far as practical away from the stream channel to protect existing vegetation and exclude equipment. In these landing logs may be decked within the zone but may not hang over the watercourse. In-lieu landings will not be used during the winter period. The in-lieu landings have been mapped on pages 19 & 20*

*The standard rule Prohibits the construction or reconstruction of roads, construction or use of tractor roads or landings in Class I, II, III, or IV watercourses, WLPZ's, marshes, wet meadows, and other wet areas except as follows:  (1)  At prepared tractor road crossings.  (2)  Crossings of Class III watercourses which are dry at time of timber operations.  (3)  At existing road crossings.  (4)  At new tractor and road crossings approved by Department of Fish and Game.  I am proposing the use of 4 Class II tractor road crossings and 3 haul road crossings to be used as existing dry fords. The crossings do not meet the exception of item (1) or (2) listed above due to being classified as Class II Watercourses and fords not considered as prepared tractor road crossings. These crossings have been mapped on page 19.*

10  Revised 7/7/06            JUL 0 7 2006

PART OF PLAN

28.   a. [X] Yes  [ ] No      Are there any landowners within 1000 feet downstream of the THP boundary whose ownership adjoins or includes a class I, II, or IV watercourse(s) which receives surface drainage from the proposed timber operations? If yes, the requirements of 14 CCR 1032.10 apply. Proof of notice by letter and newspaper should be included in THP Section V. If No, "28 b." need not be answered.

      b. [ ] Yes  [X] No      Is an exemption requested of the notification requirements of 14 CCR 1032.10? If yes, an explanation and justification for the exemption must appear in THP Section III. Specify if requesting an exemption from the letter, the newspaper notice or both.

   c. [ ] Yes  [X] No      Was any information received on domestic water supplies that required additional mitigation beyond that required by standard Watercourse and Lake Protection rules? If yes, list site specific measures to be implemented by the LTO.

29.   [ ] Yes  [X] No Is any part of the THP area within a Sensitive Watershed as designated by the Board of Forestry and Fire Protection? If yes, identify the watershed and list any special rules, operating procedures or mitigation that will be used to protect the resources identified at risk?

HAZARD REDUCTION

30.   a. [X] Yes  [ ] No      Are there roads or improvements which require slash treatment adjacent to them? If yes, specify the type of improvement, treatment distance, and treatment method.

      b. [ ] Yes  [X] No      Are any alternatives to the rules for slash treatment along roads and within 200 feet of structures requested? If yes, RPF must explain and justify how alternative provides equal fire protection. Include a description of the alternative and where it will be utilized below.

*Snags greater than 16 inch DBH and 20 feet in height which are within 100 feet of all landings and seasonal or permanent roads will be felled if they pose a hazard to the roadway. Also, within 50 feet of all private roads and landings or within 100 feet of public roads logging slash created and trees knocked down will be lopped to a maximum height of 30 inches.*

31.   [X] Yes  [ ] No Will piling and burning be used for hazard reduction? See 14 CCR 917.1-.11, 937.1-.10, or 957.1-.10, for specific requirements. Note: LTO is responsible for slash disposal. This responsibility cannot be transferred.
*Piles and concentrations of slash/brush shall be sufficiently free of soil and other noncombustible material for effective burning. To minimize smoke generated from burning slash/brush piles, and to promote fuel consumption, sufficient time must pass to allow the fuels to dry. Therefore, piles produced from this timber harvesting operation will be burned prior to January of the following year.*

BIOLOGICAL AND CULTURAL RESOURCES

32.   a. [X] Yes  [ ] No      Are any plant or animal species, including their habitat, which are listed as rare, threatened or endangered under federal or state law, or a sensitive species by the Board, associated with the THP area? If yes, identify the species and the provisions to be taken for the protection of the species.

      b. [ ] Yes  [X] No      Are there any non-listed species which will be significantly impacted by the operation? If yes, identify the species and the provisions to be taken for the protection of the species.

      NOTE: See THP Form Instructions or the CDF Mass Mailing, 07/02/1999, section on "CDF Guidelines for Species Surveys and Mitigations" to complete these questions.

*Sustained Yield Plan 00-002 describes the special status species that are known, or could potentially occur within the THP area. Additionally, the general protection measures used by WBA for each of these species is detailed (see SYP 00-002, Section FW-2, Listed Species).*

*Any listed species that occurs in forested habitats in this general geographic region could potentially inhabit this area. Northern goshawks are the terrestrial species most likely to occur in the general habitat types found in or near the THP area. Although goshawks have been known to nest within and adjacent to the THP area, none have been detected in these known territories since 2000.*

11 Revised                                    JUN 2 2 2006

*Although there are several species on the California Native Plant Society 1B list that could potentially occur in the general geographic region, none are known to occur within or adjacent to the THP area. The light single tree selection silvicultural prescription proposed under this THP will not result in significant habitat modifications or impacts to any plant species present.*

*If during operations (including marking, field preparations, supervision, etc.) any listed species not already addressed in this THP should be discovered or suspected to be using habitat within the THP area, operations will cease within 0.25 miles (unless otherwise noted below) of the site and the RPF, LTO, CDF, and DFG will be notified immediately so that proper mitigations can be employed.*

33.　[X] Yes　[ ] No　Are there any snags which must be felled for fire protection or safety reasons? If yes, describe which snags are going to be felled and why.

*Snags greater than 16 inches DBH and 20 feet in height which are within 100 feet of roads and landings, will be felled if they lean towards roads and present a safety hazard, or a potential hindrance to future access for initial attack of wildfire. All other un-merchantable snags and cull trees will be retained for wildlife.*

34.　[ ] Yes　[X] No　Are any Late Succession Forest Stands proposed for harvest? If yes, describe the measures to be implemented by the LTO that avoid long-term significant adverse effects on fish, wildlife and listed species known to be primarily associated with late succession forests.

35.　[X] Yes　[ ] No　Are any other provisions for wildlife protection required by the rules? If yes, describe.

*All trees to be harvested shall be marked and all sawlog sized trees will be inspected prior to harvest. As such, WBA field personnel (foresters, marking crews, etc.) will have thoroughly covered the THP area prior to operations. During this inspection and other THP preparation and administrative activities, care has been and will be taken to determine if any large stick or visible cavity nests are present. Any trees containing large stick nests or visible cavity nests shall be identified with a painted "W" and/or a metal "Wildlife Tree" sign. Trees containing suspected raptor nests shall be examined and/or monitored by or under the supervision of WBA Wildlife Biologist Bob Carey to determine if they are active and to which species they likely belong. Active nests shall be provided a buffer zone according to the Forest Practices Rules; in no case shall trees containing raptor nests be harvested.*

*All unmerchantable snags and live culls ≥22 inches DBH within the logging area shall be retained to provide wildlife habitat (except as noted under Item 33). All trees and snags with visible nesting sites of eagles, hawks, owls, waterfowl, or any rare or endangered species shall be left standing as prescribed under 14 CCR 939.1 and 939.2(d). Other trees and snags within the THP area that have special value to wildlife shall be identified with a painted "W" and/or a metal "Wildlife Tree" sign during the course of THP preparation and shall similarly be identified and retained.*

36.　a. [X] Yes　[ ] No　Has an archaeological survey been made of the THP area?

　　b. [X] Yes　[ ] No　Has a current archaeological records check been conducted for the THP area?

　　c. [X] Yes　[ ] No　Are there any archaeological or historical sites located in the THP area? Specific site locations and protection measures are contained in the Confidential Archaeological Addendum in Section VI of the THP, which is not available for general public review.

37.　[ ] Yes　[X] No　Has any inventory or growth and yield information designated "trade secret" been submitted in a separate confidential envelope in Section VI of this THP?

- 12 -

PART OF PLAN

38.   ·   Describe any special instructions or constraints that are not listed elsewhere in Section II.

*The LTO shall sign the plan and major amendments to the plan, or sign and file with the director a facsimile of the plan or amendments, agreeing to abide by the terms and specifications of the plan.  This shall be accomplished prior to the implementation of those operations listed under the plan and amendments proposing substantial deviations from the plan for which the LTO has responsibility for implementing.  Through contractual agreement, LTO is responsible for following guidelines outlining shutdown requirements when "hotsaw" type felling equipment is utilized during fire season.*

*Routine use and maintenance of roads and landings shall not take place when, due to general wet conditions, equipment cannot operate under its own power.  Operations may take place when roads and landings are generally firm and easily passable or during hard frozen conditions.  Isolated wet spots on these roads or landings shall be rocked or otherwise treated to permit passage.  However, operations and maintenance shall not occur when sediment discharged from landings or roads will reach watercourses or lakes in amounts deleterious to the quality and beneficial uses of water.  This section shall not be construed to prohibit activities undertaken to protect the road or to reduce erosion.*

DIRECTOR OF FORESTRY AND FIRE PROTECTION

This Timber Harvesting Plan conforms to the rules and regulations of the Board of Forestry and Fire Protection and the Forest Practice Act:

By: _William Schultz_ _____

FEB 2 0 2007

(Signature)
WILLIAM E. SCHULTZ, RPF #1974

DEPUTY CHIEF
FOREST PRACTICE

_____
(Printed Name)

_____
(Title)

13 Revised

JUN 2 2 2006

PART OF PLAN

**26-** Haul road crossing 26 will be deleted as it will not be used.

**27-** On page 15, state watercourse classes for haul road crossings 2, 6, 17 and 18 and for tractor crossings 11, 12, 13, 16,and 32 on page 16.

**28-** The existing culvert crossing located northwest of haul road crossing 21 will have the inlet of the culvert cut back at an angle to improve drainage capability.  A critical dip will be installed just north of the culvert.

**29-** On THP page 7, item 21, change "areas" to read "area".

**30-** Change map references on THP pages 8 and 10 to reference the correct map pages.

**31-** State that crossings not numbered will not be used.

**32-** Show appurtenant road segment in section 5 and include full discussion of crossings.  Map all of the crossings.

**33-** State in THP item 31 that piles will be burned prior to January of the following year.

**34-** State that in-lieu landings bisected by a watercourse will not be used if water is present.

**35-** Respond to all recommendations and / or revisions as directed by Richard Jenkins for Archaeology.

**********************************************************************

**RPF RESPONSE:**

_√_ I agree to the above recommendation(s) and include the recommendation(s) and/or attachment(s) as part of the plan.

___ I agree to the above recommendation(s) with the following exceptions as noted and explained below.

___ I agree to an extension of the date of plan determination.  Such extension is granted to _____.
                                     (Date)


_____ Date
          RPF Signature

13.1                                        JUN 2 2 2006

**REGISTERED PROFESSIONAL FORESTER (RPF) RESPONSIBILITY ACKNOWLEDGEMENT**
(As per Section 1035.1 Title 14, CCR)
**RPF Certified to Provide Professional Advice:**

Name: _John Van Duyn_

Street Address/PO Box: ▉▉▉▉▉▉                   City ▉▉▉▉▉         Zip Code: ▉▉▉▉

Telephone Number ▉▉▉▉▉ .   RPF Number: _2635_

As of January 1, 2001, I have read and understand my responsibility as RPF, as described under 14 CCR 1035.1(a-g).  I agree to fulfill my responsibilities as an RPF as they pertain to this plan.

[X] Yes   [ ] No        I have been retained as the RPF, available to provide professional advice to the licensed timber operator and timberland owner upon request throughout the active timber operations regarding: (1) the plan, (2) the forest practice rules, (3) and other associated regulations pertaining to timber operations.

RPF Signature: _John Van Duyn_

**PLAN SUBMITTER RESPONSIBILITY ACKNOWLEDGEMENT**
(As per Section 1035 Title 14, CCR)

**Plan Submitter**

Name: _W.M. Beaty & Associates, Inc._

Street Address/PO Box: ▉▉▉▉▉         City: ▉▉▉▉        Zip Code ▉▉▉▉

Telephone Number: ▉▉▉▉▉

As of January 1, 2001, I have read and understand my responsibilities as Plan Submitter as described under 14 CCR 1035.   I certify that I have fulfilled my legal obligation as stated in the forest practice rules, and agree to fulfill my responsibility as the plan submitter as it pertains to this plan.

[X] Yes   [ ] No        I have retained the services of an RPF to provide professional advice to the LTO and timberland owner upon request during active timber operations regarding: (1) the plan, (2) the forest practice rules, (3) and other associated regulations pertaining to timber operations.

[ ] Yes   [X] No        I have authorized the timberland owner, to perform the services of a professional forester, understanding that the services will be provided personally on lands owned by the timberland owner.

Plan Submitter Signature: _Jeffrey D. Mathew_

- 14 -

PART OF PLAN

**Item # 26 Addendum**

All construction and removal of watercourse crossings will follow the Guidelines for Construction and Maintenance of Watercourse Crossings contained in Appendix G of the Shasta Forests Sustained Yield Plan # 00-002 and programmatic 1603 # 02-0174.  Any crossing that has not been addressed in this addendum shall not be used.

**Haul Road Crossings**
**1, 4, 8, 9, 14, 15, 16, 20, 21, 22, 23, 24, 27, 28, 29, 31, 32**
These haul road crossings are poorly incised channels of Class III watercourses with existing ford type crossings.  If water is present at the time operations or they are used during the winter period fords will be rocked to a depth of 6 inches using 3 inch minus rock for a minimum distance of 15 feet on either side of the crossing measured from the channel centerline.  Ford crossings will only be used during low flow.  Where necessary, upon completion of use the channel may be dipped to ensure high flows stay within the active channel.  Water breaks will be installed on either side of the crossing to prevent road runoff from draining into the crossing.  These crossings may only be used as tractor crossings when dry and no other feasible alternative exists and they have been pre-approved by the RPF.

**19, 7, 34**
The haul road crossings are poorly incised channels of Class II watercourses with existing ford type crossings.  If water is present at the time operations or they are used during the winter period the fords will be rocked to using 3 inch minus rock for a minimum distance of 25 feet on either side of the crossing measured from the channel centerline.  Where necessary, upon completion of use the channel may be dipped to ensure high flows stay within the active channel.  Water breaks will be installed on either side of the crossing to prevent road runoff from draining into the crossing.  Crossing #7 shall have two large rolling dips constructed on the west approach.  These crossings shall not be used as tractor road crossings.

**2, 6, 17, 18, 30**
These existing crossings are currently used as dry fords for pick-up truck traffic.  Crossings 2, 6, 30 are located on Class III watercourses and crossing 17 and 18 are located on Class II watercourses.  To allow for log truck passage a temporary log (Humboldt) crossing will be installed at these locations.  Vegetation will be pruned along the alignment and from the streambed and banks.  Logs that are sufficient in size and number to allow for the passage of water expected during the period of operation will be placed in the channel to within 18 inches of the temporary crossing grade.  Logs may be bundled together with chokers to aid in their removal or may be installed and removed with equipment utilizing grapples.  Logs will be covered with a minimum of 6 inches of straw and capped with dirt fill.  Upon completion of use the dirt and straw covering will be bladed off taking care not to deposit material into the watercourse.  Water breaks will be installed on either side of the crossing to prevent road runoff from draining into the crossing.  These crossings may only be used as tractor crossings when dry and no other feasible alternative exists and they have been pre-approved by the RPF.

**5**
A rock armored berm shall be constructed on the south side of the existing haul road culvert.  The berm shall direct all flows into the haul road culvert and be sufficient in size to block vehicular traffic.  Large rock shall be used to armor the berm.  Additionally a fail safe dip shall be constructed on the main haul road located 30'-50' feet south of the existing culvert.

**10**
The crossing is a failed culvert crossing of a Class II watercourse.  The watercourse has formed a new channel with two deflection bends that are actively eroding.  To restore the watercourse into its original channel and prevent further erosion the culvert will be removed and the crossing will be upgraded to a rocked ford.  The current channel location will blocked to keep all flows within the original channel.  The bed of the watercourse will be rocked with 4" to 6" inch rock and the approaches will be rocked with 3" inch minus rock to the first drainage structure on each side of the crossing.  Disturbed material adjacent to the running surface of the road will be seeded with grass and mulched to a depth of 2" inches.  Where necessary, upon completion of use the channel may be dipped to ensure high flows stay within the active channel.  Water breaks will be installed on either side of the crossing to prevent road runoff from draining into the crossing.  This crossing will be constructed under the direct supervision of the RPF.  The crossing shall not be used as a tractor road crossing.

**11, 12, 13, 25**
These crossings are existing rocked fords of Cooks Creek a Class I watercourse.  The bed of the watercourse will be rocked with 4" to 6" inch rock and the approaches will be rocked with 3" inch minus rock for a distance of 50' feet.  Where necessary, upon completion of use the channel may be dipped to ensure high flows stay within the active channel.  Water breaks will be installed on either side of the crossing to prevent road runoff from draining into the crossing.  Crossing 13 shall have a berm reconstructed on the west bank upon completion of use.  The berm will be seeded and mulched if rock armoring is insufficient.  These crossings shall not be used as tractor road crossings.

15 Revised

JUN 2 2 2006

PART OF PLAN

**33**

This existing culvert crossing will be constructed to be a vented ford. The road bed over the culvert will be dipped for a distance of 30' feet and the berm on the downstream side shall be pulled back. Both the inlet and outlet head wall will be rock armored using large rock. Prior to armoring the downstream head wall geo-textile fabric will be placed covering the entire outlet fill area, including onto the road bed wall. The road running surface over the vented ford will be rocked with 4 to 6 inch rock and may have a 3" inch minus rock running surface.

The culvert crossing directly north of haul road crossing #21 will have the inlet of the culvert cut back at an angle to improve drainage capability. A critical dip will be installed just north of the culvert.

**Appurtenant Road Crossings**

**35,36**

The haul road crossings are poorly incised channels of Class II watercourses with existing ford type crossings. If water is present at the time operations or they are used during the winter period the fords will be rocked to using 3 inch minus rock for a minimum distance of 25 feet on either side of the crossing measured from the channel centerline. Where necessary, upon completion of use the channel may be dipped to ensure high flows stay within the active channel. Water breaks will be installed on either side of the crossing to prevent road runoff from draining into the crossing.

**37, 38**

These haul road crossings are poorly incised channels of Class III watercourses with existing ford type crossings. If water is present at the time operations or they are used during the winter period fords will be rocked to a depth of 6 inches using 3 inch minus rock for a minimum distance of 15 feet on either side of the crossing measured from the channel centerline. Ford crossings will only be used during low flow. Where necessary, upon completion of use the channel may be dipped to ensure high flows stay within the active channel. Water breaks will be installed on either side of the crossing to prevent road runoff from draining into the crossing.

15.1 Revised

JUN 2 2 2006

**Tractor Road Crossings**

PART OF PLAN

All Class I & II Humboldt type or log and culvert type crossings will have a layer of plastic or other suitable geo-textile fabric placed over the first course of large diameter logs and will be covered with small diameter logs.

**1, 3, 5, 7, 8, 10, 14, 15, 17, 22, 23, 24 25, 26, 33, 34, 35, 36, 37, 39**
These tractor road crossings have poorly incised Class III channels where existing dry fords will be utilized.  Upon completion of use any material deposited in to the channel shall be excavated to form a channel which is as close as feasible to the natural watercourse grade and orientation and is wider than the natural channel.  Water breaks will be installed on either side of the crossing to prevent runoff from draining into the crossing.

**2, 6, 19, 20, 21, 28, 31**
A temporary log (Humboldt) crossing will be installed at these Class III crossing locations.  Vegetation will be pruned along the alignment and from the streambed and banks.  Logs that are sufficient in size and number to allow for the passage of water expected during the period of operation will be placed in the channel.  Logs may be bundled together with chokers to aid in their removal or may be installed and removed with equipment utilizing grapples.  Water breaks will be installed on either side of the crossing to prevent road runoff from draining into the crossing.

**4, 29, 27, 39**
The tractor road crossings are existing dry fords of Class II watercourses.  Upon completion of use any material deposited in to the channel shall be excavated to form a channel which is as close as feasible to the natural watercourse grade and orientation and is wider than the natural channel.  Water breaks will be installed on either side of the crossing to prevent runoff from draining into the crossing.
To reduce soil loss on tractor road crossings of Class II watercourses the approaches to the crossing will be seeded with grass and mulched to a minimum depth of 2 inches to the first water break on each side of the crossing.

**11, 12, 13, 16, 32**
Crossings 11, 16 and 32 are located on Class II watercourses.  Crossings 12 and 13 are located on a Class I watercourse.  Temporary log (Humboldt) crossing will be installed at these locations.  Vegetation will be pruned along the alignment and from the streambed and banks.  If water is present logs and a culvert that is a minimum diameter of 18" inches and 16' feet in length will be placed in the channel at stream bed level.  At these crossings the stream gradient is low.  The culvert size shall not constrict flows and increase stream velocity.  The crossings shall allow for unrestricted passage of all life stages of fish that may be present, and for unrestricted passage of water.  If no water is present logs only may be used.  Logs may be bundled together with chokers to aid in their removal or may be installed and removed with equipment utilizing grapples. Upon Completion of use water breaks will be installed on either side of the crossing to prevent road runoff from draining into the crossing.
To reduce soil loss on tractor road crossings of Class I watercourses the approaches to the crossing will be seeded with grass and mulched to a minimum depth of 2 inches to the first water break on each side of the crossing.

**18**
The crossing is an existing culvert on a Class II watercourse.  Upon completion of use the culvert shall be removed.  The banks will be sloped back and stabilized with seed and mulch.  Removal of the culvert will only occur when the watercourse is dry.

16 Revised

JUN 2 2 2005



COOKS CREEK THP
SHASTA FORESTS 7 & 123
ROADS, WATERCOURSES, CROSSINGS
& SILVICULTURE MAP
Map based on Greenville 1979 & Moonlight Peak1980 USGS 7.5 Minute Quadrangle

**Map 1 of 2**

THP Area ( 100% Selection)
⊙ Existing Culverts
▲ Haul Road Crossings
✱ New Landing
••••• New Road Construction
—·—·— Class I Watercourse
—··—··— Class II Watercourse
———— Class III Watercourse

Mount Diablo Base & Meridian
80' Contour Interval
Scale: 3" = 1 Mile

○ Springs
———— Seasonal Public Road
———— Seasonal Private Road

17 Revised

JUN 2 2 2006



COOKS CREEK THP
SHASTA FORESTS 7 & 123
ROADS, WATERCOURSES, CROSSINGS
& SILVICULTURE MAP
T.27N.R.10E.        Map 2 of 2
Map based on Moonlight Peak 1980 USGS 7.5 Minute Quadrangle

THP Area ( 100% Selection)

⊙  Existing Culverts

▲  Haul Road Crossings

— · — · —  Class I Watercourse
— · · — · ·  Class II Watercourse
— — — —  Class III Watercourse
— · — · —  Class IV Watercourse

Mount Diablo Base & Meridian
80' Contour Interval
Scale; 3" = 1 Mile

♀  Springs

Seasonal Public Road
Seasonal Private Road

- 18 -