1   DOWNEY BRAND LLP
    WILLIAM R. WARNE (Bar No. 141280)
2   MICHAEL J. THOMAS (Bar No. 172326)
    ANNIE S. AMARAL (Bar No. 238189)
3   621 Capitol Mall, 18th Floor
    Sacramento, CA  95814-4731
4   Telephone: (916) 444-1000
    Facsimile: (916) 444-2100
5   bwarne@downeybrand.com
    mthomas@downeybrand.com
6   aamaral@downeybrand.com

7   Attorneys for Defendant/Cross-Defendant
    SIERRA PACIFIC INDUSTRIES

8

9                  UNITED STATES DISTRICT COURT

10                EASTERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12   UNITED STATES OF AMERICA, | Case No.  2:09-CV-02445-KJM-EFB |
| 13                  Plaintiff, | **SIERRA PACIFIC INDUSTRIES AND EUNICE HOWELL'S JOINT REPLY TO** |
| 14          v. | **UNITED STATES' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| 15   SIERRA PACIFIC INDUSTRIES, et al., | |
| 16                  Defendant. | |
| 17 | Judge:      Hon. Kimberly J. Mueller |
| | Courtroom:  3 |
| | Date:       April 12, 2012 |
| 18 | Time:       10:00 a.m. |
| 19 | Trial Date:  July 2, 2012 |
| 20   AND ALL RELATED CROSS-ACTIONS. | |

21

22

23

24

25

26

27

28

1222093.8

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| A. | The United States Cannot Establish Negligent Supervision. | 1 |
| B. | The U.S. Cannot Save its Negligence Per Se Claim | 4 |
|  | 1. Section 938.8 Did Not Require Howell To Conduct A Fire Watch | 4 |
|  | 2. Defendants Satisfied Any Section 938.8 Fire Watch Requirement | 6 |
| C. | The Government's Common Law Negligence Claims Also Fail | 7 |
|  | 1. Expert Testimony is Required to Establish the Standard of Care | 7 |
|  | 2. Garland and Boston Remain Unqualified, Unreliable, and Unhelpful | 9 |
|  | 3. The United States' Additional "Evidence" of Negligence is Not Relevant | 11 |
| D. | Public Resources Code Section 4435 Has No Application Here | 12 |
| E. | The Government Cannot Establish Strict Liability Under Section 261.5(c) | 13 |
|  | 1. *Mendez Concrete* Is Correct And Does Not Conflict With *Lindsey* | 13 |
|  | 2. The 2008 Amendments Support Defendants' Position | 14 |
|  | 3. Section 261.5(c) Cannot Impose Strict Liability And Regulate Conduct Beyond Federal Lands | 14 |
|  | 4. The Rule Of Lenity Provides Another Reason To Interpret 261.5(c) Narrowly | 15 |
| F. | The U.S. May Not Invoke Res Ipsa Loquitur | 15 |
|  | 1. The Government Can Prevail, If At All, Only By Proving Its Sole Theory Of Origin And Cause | 15 |
|  | 2. Defendants' Evidence Rebuts Any Res Ipsa Loquitur Presumption | 19 |
| G. | The U.S. Is Not Entitled to Double Damages under Civil Code Section 3346 | 20 |

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*CHY Co. v. Utility Tree Service, Inc.,*
   2008 WL 4838684, *6-7 (Cal. 3rd Dist. 2008) ......................................................... 22

*Daubert v. Merrill Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993) ........................................................................................................ 9

*Hendrix v. Evenflo Co.,*
   255 F.R.D. 568 (N.D. Fla. 2009) ............................................................................... 9

*Hutchinson v. U.S.,*
   838 F.2d 390 (9th Cir. 1988) ...................................................................................... 11

*Liparota v. United States,*
   471 U.S. 419 (1985) ........................................................................................................ 15

*Lust By and Through Lust v. Merrell Dow Pharm., Inc.,*
   89 F.3d 594 (9th Cir. 1996) .......................................................................................... 9

*Miller v. Glenn Miller Prod., Inc.,*
   454 F.3d 975 (9th Cir. 2006) ........................................................................................ 9

*Radobenko v. Automated Equipment Corp.,*
   520 F.2d 540 (9th Cir. 1975) ........................................................................................ 4

*Ross v. Willard,*
   2007 WL 4374027 (M.D. La. Dec. 13, 2007) ....................................................... 11

*Scott v. City and Cty of San Francisco,*
   1995 WL 705160, *2 (N.D. Cal. 1995) ..................................................................... 4

*Sipe v. Countrywide Bank,*
   690 F.Supp.2d 1141 (E.D. Cal. 2010) ...................................................................... 13

*U.S. v. Hermanek,*
   289 F.3d 1076 (9th Cir. 2002) ...................................................................................... 9

*U.S. v. Mendez Concrete,*
   2009 WL 733881, at *4 (C.D. Cal. March 16, 2009) ...................................... 13, 15

*United States v. Lindsey,*
   595 F.2d 5 (1979) ............................................................................................................. 14

## STATE CASES

*County of Los Angeles v. Workers' Comp. Appeals Bd.,*
   30 Cal.3d 391 (1981) ...................................................................................................... 24

*Disabled & Blind Action Committee of Cal. v. Jenkins,*
   44 Cal.App.3d 74 (1974) ............................................................................................... 20

ii

DEFENDANTS' REPLY ISO MOTION FOR SUMMARY JUDGMENT

**TABLE OF AUTHORITIES**
(continued)

Page

*Elton v. Anheuser-Busch Beverage Group, Inc.*,
    50 Cal.App.4th 1301 (1996)......................................................................... 21, 23

*Federico v. Sup. Ct.*,
    59 Cal.App.4th 1207 (1977)......................................................................... 3

*Flowers v. Torrance Memorial Hosp.*,
    8 Cal.4th 992 (1994) ..................................................................................... 11

*Garbell v. Conejo Hardwoods, Inc.*,
    193 Cal. App. 4th 1563 (2011)..................................................................... 16, 18

*Gould v. Madonna*,
    5 Cal.App.3d 404 (1970)........................................................... 20, 21, 23, 25

*Henniger v. Dunn*,
    101 Cal.App.3d 858 (1980).......................................................................... 25

*Hooker v. Dept. of Trans.*,
    27 Cal.4th 198 (2002) ................................................................................... 3

*Howe v. Seven Forty Two Co.*,
    189 Cal. App. 4th 1155 (2011)..................................................................... 20

*Huang v. Garner*,
    157 Cal.App.3d 404 (1984),
    *disapproved on other grounds in*
    *Aas v. Sup. Ct.*,
    24 Cal.4th 627 (2000) ................................................................................... 11

*Juarez v. Boy Scouts of Am.*,
    81 Cal.App.4th 377 (2000).......................................................................... 3

*Kelly v. CB&I Constructors, Inc.*,
    179 Cal.App.4th 442 (2009)......................................................................... 20, 21

*Kramer v. Intuit Inc.*,
    121 Cal.App.4th 574 (2004)......................................................................... 20

*Levy-Zentner Co. v. Southern Pacific Trans. Co.*,
    74 Cal.App.3d 762 (1977)............................................................................ 8

*Mariott Int'l, Inc. v. Prolink, Inc.*,
    No. E046504, 2009 WL 4613720 (Cal. App. Dec. 8, 2009)........................ 16

*McDonald v. Shell Oil Co.*,
    44 Cal.2d 785 (1955) ................................................................................... 2

*Miller v. L.A. County Flood Control Dist.*,
    8 Cal. 3d 689 (1973) ..................................................................................... 7

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*Palmer v. GTE California, Inc.,*
   30 Cal.4th 1265 (2003) ..................................................................... 20

*People v. Dillon,*
   34 Cal.3d 441 (1983) ..................................................................... 22

*People v. S. Pac. Co.,*
   139 Cal.App.3d 627 (1983) ........................................................... 25

*Roddiscraft Inc. v. Skelton Logging Co.,*
   212 Cal.App.2d 784 (1963) ....................................... 7, 8, 16, 18

*Seeley v. Combs,*
   65 Cal. 2d 127 (1966) ..................................................................... 7

*Shoemaker v. Myers,*
   52 Cal.3d 1 (1990) ..................................................................... 21

*Slater v. Kehoe,*
   38 Cal. App. 3d 819 (1974) ........................................................... 19

*Southwest Research Inst. v. Unemploy. Insur. Appeals Bd.,*
   81 Cal.App.4th 705 (2000) ........................................................... 2

*Stephen v. Ford Motor Co.,*
   134 Cal. App. 4th 1363 (2005) ..................................................... 16

*U.C. Regents v. Superior Court,*
   225 Cal.App.3d 972 (1990) ........................................................... 20

*U.S. v. Corey,*
   232 F.3d 1166 (9th Cir. 2000) ....................................................... 22

*Van Horn v. Watson,*
   45 Cal.4th 322 (2008) ..................................................................... 20

*Viera v. Atchison, Topeka and Santa Fe Railway Co.,*
   10 Cal. App. 267 (1909) ................................................................. 7

*Voigts v. Brutoco Engineering & Construction Co,*
   57 Cal.Rptr.2d 87 (1996) ............................................................... 3

*Wright v. Williams,*
   47 Cal.App.3d 802 (1975) ............................................................. 11

**STATE STATUTES**

Cal. Civ. Code § 1714(a) ..................................................................... 3

Cal. Civ. Code § 3346 ..................................................... 20, 21, 22, 24

**TABLE OF AUTHORITIES**
**(continued)**

Page

Cal. Evid. Code § 604 ................................................................................................ 19

Cal. Evid. Code § 646 ................................................................................................ 19

Cal. Evid. Code § 669(a)(2) ........................................................................................ 5

Cal. Health and Saf. Code §§ 13007-13008 ........................................................ 21, 22

Cal. Penal Code § 602(i) ........................................................................................... 23

Cal. Pol. Code § 3344 (1872) .................................................................................... 21

Cal. Pub. Res. Code § 4435 ....................................................................................... 12

**FEDERAL RULES**

Fed. R. Civ. P. 1 ........................................................................................................ 16

Fed. R. Civ. P. 15(a)(2) ............................................................................................... 4

Fed. R. Civ. P. 26(a)(2)(B)(iv) ................................................................................... 9

Fed. R. Civ. P. 56(a) .................................................................................................. 19

Fed. R. Evi. 702 .......................................................................................................... 9

**STATE REGULATIONS**

14 C.C.R. § 938.8 ................................................................................................. 10, 13

**OTHER AUTHORITY**

*Notice of Final Rule*, 74 Fed. Reg. 303050-1 .......................................................... 14

Restatement (Second) of Tort, § 328E *et seq.* ............................................................ 3

Stats. 1931, ch. 790, § 1, p. 1644 .............................................................................. 22

West's Annotated California Codes, Preface at XV (2007) ........................................ 22

1    If one begins with the assumption that Defendants caused the Moonlight Fire, as the

2    government's opposition does (and as the government's investigators have done since

3    immediately after the fire started), it is easy to write a mocking brief.  The U.S. has done just that,

4    variously describing Defendants' arguments as "absurd" and "wild," and repeatedly suggesting

5    that Defendants' arguments lack merit because *Defendants started the fire! Defendants started*

6    *the fire! Defendants started the fire!*  The Court should recognize this for what it is: misdirection

7    born of weakness.  Whether Defendants started the fire is highly contested (Defendants are

8    certain they did not), and it is not at issue in this motion for summary judgment.  The arguments

9    Defendants raise in this motion are based on undisputed facts and law; they cannot be defeated by

10   pounding the table about who supposedly caused the fire.

11   When the government's strategic table pounding and mocking are ignored, what is left of

12   its opposition are factual obfuscation and specious legal arguments.  The United States attempts

13   to avoid summary judgment by manufacturing triable issues of material fact where none exist and

14   misconstruing legal doctrines.  The government's overreaching tactics are consistent with its

15   investigation of the Moonlight Fire and its conduct throughout this litigation.[1]  A careful review

16   of the evidence and law will reveal that summary judgment is appropriate.

17   **A.    The United States Cannot Establish Negligent Supervision.[2]**

18   In opposition to Sierra Pacific's motion for summary judgment of its negligent

19   supervision claim, the U.S. erroneously contends that there is a triable issue of fact regarding

20   whether Howell was Sierra Pacific's independent contractor or employee.  Notwithstanding its

21   contention that Howell was an employee, the United States agrees on the applicable factors

22   utilized to determine independent contractor status, and even agrees that several of these factors

23   were met, including: (1) Sierra Pacific does not own logging equipment and does not conduct

24   logging operations; (2) Howell entered into a logging agreement for the work it would conduct on

25

26   [1] The U.S. filed the final version of its opposing brief to Defendants' motion, and the vast majority of its
evidence, a day late, despite having received multiple extensions and specifically agreeing to the operative

27   deadline.  This Court has made it clear that it expects the parties to understand and strictly comply with
procedural requirements, and that it will not tolerate abuses or violations.  The U.S. defied this Court's

28   expectation and its untimely filings should be stricken.
[2] The U.S. concedes that summary adjudication of its Negligent Hiring claim is appropriate.  (RSUF 57.)

1222093.8                              1

1  the Cooks Creek timber sale; (3) the Logging Agreement was a limited term contract; (4) Howell

2  agreed to provide all the necessary labor, machinery, and materials required to perform the work;

3  (5) Howell agreed to conduct the work in compliance with all laws and regulations; (6) Sierra

4  Pacific and Howell agreed that Howell was an independent contractor; (7) Howell was not an

5  exclusive employee of Sierra Pacific; and (8) Howell was paid by volume of timber harvested.

6  (Reply to U.S.'s Response to Separate Statement of Undisputed Facts ("RSUF") at 21, 33-37, 39-

7  40.) Each concession relates directly to the applicable factors and demonstrates that Howell was

8  an independent contractor as opposed to an employee.

9         Despite these concessions, the U.S. contends (without citation to any evidence) that

10  "Sierra Pacific had the power to and did exercise control over Howell's logging operations,

11  particularly those dealing with fire safety, through its furnishing of fire safety plans and

12  instructions, preoperational meetings, and weekly inspections" and that Sierra Pacific's "control"

13  is evidenced by its attendance at the pre-operational meeting and Mr. Forno's subsequent site

14  visits. (Opp. at 24:14-16.)  The U.S. blatantly ignores, however, the well-established rule that the

15  retention of "a broad general power of supervision and control as to the results of the work" does

16  not change the independent contractor status.  *McDonald v. Shell Oil Co.*, 44 Cal.2d 785, 788

17  (1955).  Consequently, the alleged fact that Mr. Baker thought of Mr. Forno as his "boss" because

18  he visited the work site and generally supervised the results of the work, is immaterial because

19  that type of supervisory control does not modify the independent contractor relationship.[3]

20         Nor does the fact that Sierra Pacific and Howell attended the pre-operational meeting and

21  reviewed fire safety and fire policy regulations destroy the independent contractor relationship.

22  Indeed, such a conclusion is contrary to the holding in *Southwest Research Inst. v. Unemploy.*

23  *Insur. Appeals Bd.*, 81 Cal.App.4th 705 (2000), where the court determined that the agent

24  remained an independent contractor despite the employer's requirement that he "follow very

25  precise and detailed instructions" and attend training sessions.  *Id.* at 708.  Because the detailed

26  instructions and training sessions were dictated by government agencies, the employer was not

27

28  [3]      Of course, Sierra Pacific disputes the U.S.'s characterization of these facts.  *See* Sierra Pacific's Response to the U.S.'s improper Separate Statement of "Undisputed" Facts ("ISS") at 102-110.

1222093 8

2

1    exercising the manner and means of control as an employer but was complying with laws and

2    regulations. *Id.* at 709.  The same analysis applies here, because any review by Sierra Pacific of

3    Howell's fire safety equipment, fire plan, and/or general fire safety measures was intended to

4    ensure compliance with the laws and regulations promulgated by the State of California.

5    Accordingly, any such action by Sierra Pacific does not equate to control over the means and

6    manner of Howell's work and therefore cannot transform Howell into an employee.  In short, it

7    remains undisputed that Sierra Pacific did not control the manner in which Howell conducted its

8    work and Howell remained an independent contractor operating as an LTO in a highly regulated

9    industry.  SPI had no duty to supervise Howell and cannot be liable for negligent supervision.

10         Assuming *arguendo* that such a duty did exist, summary judgment remains appropriate

11   because: (1) the United States relies only upon the existence of the Greens and Lyman Fires as its

12   bases to assert that Sierra Pacific should have known Howell was allegedly unfit and (2) it is

13   undisputed that the investigatory reports for those fires were not published until *after* the

14   Moonlight Fire occurred.  (RSUF 47 & 51.)  The United States has not presented any evidence

15   that the alleged causes of the Greens and Lyman fires were known prior to the Moonlight Fire or

16   even prior to when the reports were published, and it has not properly disputed the fact that

17   Howell's operations had never been accused of starting a fire prior to September 2007.  (*See id.* at

18   31.)  The mere fact that Sierra Pacific knew that the Greens and Lyman fires occurred is not

19   enough to put Sierra Pacific on notice of Howell's alleged unfitness and consequently the United

20   States cannot establish the elements of its negligent supervision claim.  *Juarez v. Boy Scouts of*

21   *Am.*, 81 Cal.App.4th 377, 395 (2000) (explaining that there can be no liability for negligent

22   supervision "in the absence of knowledge by the principal that the agent or servant was a person

23   who could not be trusted to act properly without being supervised.").

24         In an ill-fated attempt to rescue its negligent supervision claim, the United States asserts

25   three new theories of liability, none of which was pled in the operative complaint or made known

26   in discovery prior to its closure.[4]  These three never-before-pled theories are:

27

28   [4] The United States is attempting to sweep these new theories under the rug by implying that they are
     merely separate methods of proving negligent supervision.  (*See* Opp. at 20:26-21:2.)

1222093.8                                          3

1.   <u>Negligent Retention:</u>  In its Opposition, the U.S. makes a single passing reference to a theory of negligent retention, yet provides no evidence in support of it.  (*See* Opp. at 20:25.)  A negligent retention claim was not pled in the SAC and is a separate theory of liability.  *Federico v. Sup. Ct.*, 59 Cal.App.4th 1207 (1977), 1215-16 (addressing plaintiff's negligent retention claim separately from negligent supervision); *see also Juarez, supra*, 81 Cal.App.4th at 385, 395, 397.

2.   <u>Negligent Exercise of Retained Control:</u>  The U.S. alleges that Sierra Pacific negligently exercised retained control in violation of Restatement (Second) of Torts, section 414.  (Opp. 25:21-26:5.)  The theory of retained control is a separate and distinct theory of liability that the United States has never raised before.[5]  *See Voigts v. Brutoco Engineering & Construction Co*, 57 Cal.Rptr.2d 87 (1996) (discussing separate causes of action for (1) non-delegable duty; (2) negligent retention of control; and (3) negligent retention of the independent contractor.).

3.   <u>Negligent Possession of Land:</u>  The United States contends that Sierra Pacific is "Directly Liable as a 'Possessor of Land'" pursuant to Civil Code section 1714(a) or the Restatement (Second) of Tort, section 328E *et seq*.[6]  (Opp. at 27:6-24.)  This theory is also a separate cause of action that has not been pled.[7]

These newly asserted theories of liability and any information accompanying them must be disregarded as it is well-settled that a party opposing summary judgment may not rely on sham evidence to avoid summary judgment.  *See Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir. 1975); *see also Scott v. City and Cty of San Francisco*, 1995 WL 705160, *2 (N.D. Cal. 1995) (disregarding discovery responses that contradicted earlier deposition testimony because plaintiff's "sudden 'recollection' smacks of re-creation more than recollection of actual facts" and finding that "plaintiff's contradictory story is a 'sham'").  The U.S. apparently believes it can litigate claims for years, allow discovery to close, allow Defendants to file a motion for summary judgment, and then in its opposition request leave to add new claims if the claims it has

---

[5] Elements of this claim include (1) retained control and (2) proof that exercise of that retained control "affirmatively contributed to the [] injury." *Hooker v. Dept. of Trans.*, 27 Cal.4th 198, 202 (2002).  The U.S. has made no such showing and discovery was not conducted on this separate theory of liability.
[6] The United States first promulgated this new theory in supplemental discovery responses served on December 30 2011, long after the close of discovery on August 15, 2011, and only two days after the parties had met and conferred about their various dispositive motions before the then-imminent filing deadline of January 4, 2012.  The supplemental responses include changes that are untethered to any factual information that was not available to the government when it served its original responses on August 8, 2011.  (*See* Declaration of Michael J. Thomas in Support of Reply ("Thomas Decl."), ¶ 26, Ex. Y.)
[7] The U.S.'s implied contention that the duty to manage land creates a duty to supervise independent contractors is contrary to law.  California does not recognize a common law duty to supervise an independent contractor, and it makes little sense to impose such a duty via Civil Code section 1714(a).  To do so would require the owner of land to supervise an independent contractor hired to conduct highly specialized work that, in this case at least, requires a separate license and is subject to state regulation.  If the United States' theory were correct (which it is not), it would mean that unqualified persons are required to make supervisory decisions that involve highly regulated industry practices they know nothing about.  The result is untenable; fortunately it is not the law.

1222093.8                                                    4

1   pled fail.  This is not how our system works.  Amending a complaint after the Rule 16 deadline

2   for doing so requires a showing of good cause.  Fed. R. Civ. P. 16(b).  The good cause standard

3   "primarily considers the diligence of the party seeking the amendment."  *See Johnson v.*

4   *Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992).  At this late date, after the close

5   of discovery, and given that the U.S. *still* has not made a motion to amend, the U.S. cannot

6   possibly show good cause.  *See Rooney v. Sierra Pacific Windows*, 2011 WL 5034675, at *6

7   (denying leave to amend even before the close of discovery due to unexcused 79-day delay in

8   seeking to amend).  Moreover, the amendments would be futile.

9   **B.      The U.S. Cannot Save its Negligence Per Se Claim.**

10          **1.      Section 938.8 Did Not Require Howell To Conduct A Fire Watch.**

11          After unreasonably maintaining throughout this litigation that building water bars triggers

12  section 938.8 – even though building water bars plainly does not constitute "felling, yarding or

13  loading" as defined in the regulations – the U.S. quietly abandons that position in its opposition.

14  The government also abandons its equally meritless allegation that Howell's handwritten Fire

15  Plan is a "regulation" whose violation may constitute negligence per se.[8]  At the very least,

16  therefore, summary adjudication of these issues should be granted.

17          Although the U.S. attempts to hide it, the effect of these retreats is to eliminate negligence

18  per se as an issue in this case.  The reason is simple: although the U.S. argues that the scant

19  yarding Crismon performed on September 3rd triggered section 938.8's fire watch requirement,

20  *the government does not contend that Crismon started the Moonlight Fire by yarding*.  On the

21  contrary, the government contends that Crismon started the fire when his dozer struck a rock

22  while being used to build water bars.  RSUF 12; White Decl. ¶ 19.  It is axiomatic that the

23  violation of a regulation constitutes negligence per se only if the violation causes the plaintiff's

24  harm.  Cal. Evid. Code § 669(a)(2).  Since it is undisputed that yarding did not cause the fire, it

25  follows that an alleged failure to watch for fires caused by yarding did not cause the fire.

26  

---

[8] If the U.S. had met and conferred in good faith, it would have informed Defendants it intended to
27  abandon these positions before Defendants devoted many pages of their moving papers (and Court
resources) to establishing that building water bars is not covered by section 938.8 and that Howell's Fire
28  Plan is not a regulation.

1    The undisputed evidence establishes that Crismon did not yard any logs at the time and

2    place the government contends the fire started.  Although the government does its best to

3    obfuscate the evidence regarding when and where Crismon yarded logs, that evidence is fairly

4    simple.  At his deposition, Crismon testified that before 10:00 a.m. he yarded a few logs on the

5    skid trail near where the government alleges the fire started.  RSUF 8.  If this evidence is credited,

6    then Crismon's yarding did not start the fire because the government contends the fire ignited in

7    the afternoon.  RSUF 12.  Moreover, Crismon built water bars on the same skid trail after he

8    yarded logs, and he saw no smoke or fire.   RSUF 9, 11.

9    There is another story about when and where Crismon yarded logs, and it comes from

10   Josh White, CDF's lead investigator who interviewed Crismon shortly after the fire.  According

11   to White, Crismon told him he yarded the logs in the afternoon.  White Decl. ¶ 23.  Crucially,

12   however, White says Crismon yarded the logs down a different skid trail than the one that runs

13   near the government's alleged point of origin.  *Id.* ¶ 24.  Thus, even if White's story is believed,[9]

14   there is no evidence that Crismon yarded logs at the government's alleged point of origin in the

15   afternoon.  According to the U.S.'s own evidence, yarding did not start the fire.

16   The harm that section 938.8 is designed to prevent is wildfire caused by felling, yarding or

17   loading.  A fire inspection is required only in areas where these activities have taken place.  *See*

18   Mot. at 5:16-19.  Accordingly, even if Crismon yarded logs elsewhere on the afternoon of

19   September 3, he was not required under section 938.8 to conduct a fire watch at the U.S.'s alleged

20   point of origin.  And because section 938.8 is designed to prevent fires caused by felling, yarding

21   or loading, failing to detect a fire caused by a different activity does not implicate the regulation.

        **2.      Defendants Satisfied Any Section 938.8 Fire Watch Requirement.**

23   Even assuming, arguendo, that section 938.8 required Howell to conduct a fire watch after

24   it finished work on September 3, the undisputed evidence demonstrates that the requirement was

25   satisfied.  In 1989, the Board of Forestry amended section 938.8 to allow fire inspections to be

26   conducted by an aircraft flying over "large portions of forested area."  Request for Judicial Notice

27   ("RJN"), Ex. W at 4; Mot. at 7:20-8:7.  It is undisputed that Defendants mounted such an air

28   ───────────────
     [9] White's credibility will be a substantial issue at trial.

1    patrol on September 3, that it actually noticed evidence of the Moonlight Fire and was flying

2    closer to investigate when it heard someone at Red Rock report the fire at 2:24 p.m., and that this

3    was well within two hours of Howell's cessation of operations. (RSUF 5-8.)  Given these

4    undisputed facts, there can be no question that Defendants satisfied any fire watch requirement

5    under section 938.8.

6         The government argues that the aerial fire patrol was inadequate because it did not

7    specifically circle Howell's logging operations, was not scheduled to fly over the worksite until

8    5:00 p.m., and spotted the fire from 20 miles away.  These arguments miss the point: *Defendants'*

9    *aerial patrol actually spotted the fire within the time allotted by section 938.8.*  If this were not

10   the case, the government might have an argument (though it would be a difficult one given that

11   the drafters of section 938.8 contemplated fire patrols over "large portions of forested area").  But

12   it is preposterous to argue that an aerial patrol that actually spotted the fire within the time allotted

13   did not satisfy section 938.8.  Would the government have had the pilot wait to call in the fire

14   until he could actually circle the worksite, even though he had spotted smoke from miles away?

15        Notwithstanding the government's mockery, any section 938.8 fire watch requirement

16   also was satisfied when Bush attempted to return to the worksite and encountered the fire.  This,

17   too, occurred within the regulation's two-hour timeframe.  The U.S. argues that Bush's actions do

18   not constitute a "diligent" fire watch because he left the worksite to get his phone and a drink

19   before returning and spotting the fire.  The government accuses Defendants of "focusing

20   myopically" on the actual language of section 938.8, which requires a diligent inspection "within

21   two hours."  According to the government, common sense suggests that a "diligent" inspection

22   must begin immediately upon shutdown, and "within two hours" simply puts an outer bound on

23   how long the inspection may last.  But "diligent" clearly modifies the quality of the inspection

24   itself (*i.e.*, the care with which it is performed), not its timing; "within two hours" addresses

25   timing.  The Board could have required a diligent inspection "for two hours," or "starting

26   immediately."  It did not.  It mandated a diligent inspection "within two hours."  Bush's

27   inspection was within two hours, and it was diligent enough to spot the fire.  Section 938.8 does

28   not require more.  For these reasons, and because the government's own reporting of the fire at

1   2:24 p.m. broke the causal connection between any violation of section 938.8 and the fire, any

2   fire watch requirement under section 938.8 was both satisfied and moot.

3   **C.    The Government's Common Law Negligence Claims Also Fail.**

4       **1.    Expert Testimony is Required to Establish the Standard of Care.**

5           Although it spent millions of taxpayers' dollars on expert opinions to support its theory of

6   how the Moonlight Fire started, and that the Defendants violated the relevant standard of care in

7   the logging industry, the U.S. now argues that this is a simple fire case which requires no expert

8   testimony.  The government either grossly misapprehends Defendants' arguments, or it is

9   intentionally attempting to distract the Court from the true issues at hand.

10          The U.S. cites *Seeley v. Combs*, 65 Cal.2d 127 (1966) and *Viera v. Atchison, Topeka and*

11  *Santa Fe Railway Co.*, 10 Cal.App. 267 (1909) in support of the proposition that juries may rely

12  on res ipsa loquitur instead of experts as a basis for determining causation in fire cases.  This is

13  incorrect, as discussed later, but in any event it misses the point here.  Defendants' arguments

14  here pertain to the necessity of expert testimony regarding the standard of care, not regarding

15  causation.  Whether fire patrols are required in connection with professional logging operations is

16  not common knowledge.  Consequently, the U.S. must offer valid expert testimony to establish

17  the standard of care.  *See Miller v. L.A. County Flood Control Dist.*, 8 Cal. 3d 689, 700-02 (1973).

18          The U.S. cites *Roddiscraft Inc. v. Skelton Logging Co.*, 212 Cal.App.2d 784 (1963), a res

19  ipsa case involving a forest fire, and claims that the plaintiff in that case "produced no expert

20  testimony on any standards of care in the logging industry." (Opp. at 9:1-2.)  *Roddiscraft* does

21  not support this statement.  The opinion is silent regarding whether expert testimony on standard

22  of care was introduced.  It does summarize the evidence necessary to establish causation, and the

23  court even remarked that the summary (cited by the U.S.) was incomplete. 212 Cal.App.2d at

24  793, n.2.  Remarkably, however, the U.S. asserts that "[t]he court held that such testimony

25  [regarding standard of care] was unnecessary." (Opp. at 9:3.)  The court did no such thing.

26          Plaintiff's reliance on *Levy-Zentner Co. v. Southern Pacific Trans. Co.*, 74 Cal.App.3d

27  762 (1977), another res ipsa case, is equally misplaced.  The U.S. cites this case for the premise

28  that no expert is required to opine on the standard of care for timely detecting and suppressing

1222093.8                                              8

DEFENDANTS' REPLY ISO MOTION FOR SUMMARY JUDGMENT

1   fires. (Opp. at 9:27-10:5.) But in *Levy*, too, it is unclear whether there was expert testimony on

2   standard of care. Even assuming there was not, the facts there were such that laypeople could

3   much more readily determine the standard of care on their own. The defendant had ignored the

4   presence of itinerant trespassers who had started fires before and then observed but failed to

5   report the fire for 30 minutes. *Levy*, 74 Cal.App.3d at 776-79. The court merely found that a

6   layperson probably does not need an expert to explain that it is negligent to ignore known

7   trespassers and watch a fire spread without reporting it.

8       In contrast, a layperson does need an expert to explain the risks associated with logging

9   operations and the precautions that are reasonable to take in light of those risks. Instead of

10  addressing this reality, the U.S. glosses over it by arguing in a single sentence that this is a simple

11  case of a dozer operator leaving the worksite for a soda. If this were truly the case, why did the

12  U.S. hire and disclose not just one, but two purported "experts" to opine on such matters?

13      **2.    Garland and Boston Remain Unqualified, Unreliable, and Unhelpful.**

14      As the proponent of Garland and Boston's "expert" testimony, the U.S. bears the burden

15  of proving admissibility. *Lust By and Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594,

16  598 (9th Cir. 1996). The test for admissibility has three factors: are the experts qualified, is their

17  testimony reliable, and is it helpful? Fed. R. Evi. 702. These three factors are explicitly set forth

18  in the text of the rule, and the latter two – reliability and helpfulness – are the focus in the

19  Supreme Court's seminal *Daubert* opinion. *See* 509 U.S. 579, 591-93 (1993). Cases cited by the

20  U.S. set forth this tripartite analysis, including both *Daubert* and *Hendrix v. Evenflo Co.*, 255

21  F.R.D. 568, 578 (N.D. Fla. 2009). (*See* Opp. at 14:24-28.) *Hendrix* goes so far as to explain that

22  the factors are separate issues and courts should not conflate them. 255 F.R.D. at 578.

23      Despite the three-factor test that it must satisfy, the U.S. spends no time whatsoever

24  arguing that Garland and Boston's opinions are reliable or helpful. The failure to do so is fatal.

25  The U.S. has patently failed to meet its burden under Rule 702. The Court has no evidence that

26  Garland or Boston's opinions satisfy Rule 702's prerequisites; consequently, admitting their

27  testimony would be reversible error. *See U.S. v. Hermanek*, 289 F.3d 1076, 1096 (9th Cir. 2002).

28  Because the U.S. has no other standard of care experts and it is the government's burden to

1   establish a prima facie case, and because Defendants' experts provide evidence that they did not

2   breach the standard of care, summary judgment is appropriate.  (*See* Thomas Decl. ¶ 16, Ex. N,

3   Roseberry Depo., at 18-19 (133:20-134:4).)  *See also Miller v. Glenn Miller Prod., Inc.*, 454 F.3d

4   975, 987 (9th Cir. 2006).

5          Given the government's lack of analysis on reliability and helpfulness, the Court need not

6   determine whether Garland or Boston are qualified to offer their opinions.  Nor does it need to

7   spend the time combing through the new qualifications identified in their declarations and

8   proffered to save their opinions, since as reporting experts they were required to disclose all their

9   qualifications as part of their reports.  Fed. R. Civ. P. 26(a)(2)(B)(iv).  Garland and Boston's

10  testimony is inadmissible as a matter of law, and the question of weight versus admissibility is

11  completely irrelevant.

12         If it does parse their declarations, however, the Court will find only statements that are

13  vague and inconsequential.  For instance, what does it mean that Garland and Boston are Oregon

14  forest engineers?  What good is Boston's statement that he has experience inspecting logging

15  activities for compliance with the California forest practices rules when he doesn't say when,

16  where, or how often he performed these inspections, or if the compliance assessments related to

17  fire patrols?  How does Garland's involvement in writing Oregon codes, or providing training to

18  loggers in 1973 when California's Forest Practices Act was adopted, or Boston's preparation of

19  timber sales contracts in other states and countries, render them qualified in 2012 to opine on

20  California's standard of care in the logging industry?  They don't, particularly since Garland and

21  Boston are not and never have been LTOs.  (RSUF 72, 78.)  Nowhere in their declarations do

22  Garland or Boston state that, even without the license, they do what LTOs do, i.e install water

23  bars, analyze when fire patrols are required, and then carry out said patrols in California, either

24  pursuant to industry standard or regulation.

25         Even Garland's statements about "operations used in the Moonlight fire" are non-specific

26  and off point.  (Garland Decl. ¶ 13.)  He states that he has "dealt with" ground based yarding and

27  associated water bar construction, but has not stated – indeed, cannot state – that as an LTO or

28  RPF, he has supervised or participated in these activities or knows what constitutes a diligent fire

DEFENDANTS' REPLY ISO MOTION FOR SUMMARY JUDGMENT

1   patrol in California's logging community.  Even Boston, an RPF, does not make such claims,

2   presumably because he has not done so.  And although Garland says he taught California loggers

3   to use certain skid trails, he does not state when or where this instruction occurred, or why it is

4   relevant to his opinions in this case.  Because he testified during his deposition that, in the past

5   five years, his exposure to dozers on skid trials was limited to 5-6 days (RSUF 74), the likely

6   answer is that these details would undermine the general qualifications he listed for the Court.

7       The government attempts to distract the Court from Garland and Boston's lack of

8   pertinent regional knowledge by arguing, without authority, that "the forest industry and

9   principles of forest fire safety transcend state borders."  (Opp. at 14:17-18.)  This statement

10  disregards the fact-specific inquiry this Court must conduct (if it undertakes to evaluate Garland

11  and Boston's qualifications at all).  The U.S. criticizes Defendants for purportedly failing to

12  comply with section 938.8, a rule that is in effect only in California's Northern Region and for

13  which there is no known corollary in Oregon.  *See* 14 C.C.R. § 938.8 *and* RSUF 81.  The U.S.

14  also alleges that Defendants were negligent based on Howell's purported violation of a company

15  policy.  Of course, when it was still in business Howell operated only in Northern California and,

16  consequently, any company's practice outside of that region would be irrelevant to whether it was

17  acting in accordance with industry standard.  *See generally Wright v. Williams*, 47 Cal.App.3d

18  802, 809 (1975) (the "standard is that of members of the profession 'in the same or a similar

19  locality under similar circumstances'"); *Ross v. Willard*, 2007 WL 4374027 (M.D. La. Dec. 13,

20  2007) (excluding expert who was licensed truck operator in Texas and Idaho, because there was

21  no evidence he was licensed or had experience in Louisiana, where accident occurred).

22  Determining whether Garland or Boston has pertinent knowledge of the logging industry's

23  practices in this geographic region is part and parcel of the inquiry this Court must make in

24  determining whether either of them is qualified.  Neither is.

25      **3.      The United States' Additional "Evidence" of Negligence is Not Relevant.**

26      The U.S. attempts to rely on a variety of other evidence to establish Defendants'

27  negligence, including an alleged violation of Howell's internal policy, percipient testimony by

28  one of Sierra Pacific's experts, and a 2008 pilot plan applicable to property owned by Sierra

1222093.8                                11

1  Pacific. None of this evidence is relevant, however, because under California negligence law,

2  when expert testimony is required, the standard of care can be established *only* through expert

3  testimony, which is "conclusive and cannot be disregarded." *Flowers v. Torrance Memorial*

4  *Hosp.*, 8 Cal.4th 992, 1001 (1994). The U.S. cannot rely on lay witnesses' opinions as a

5  substitute for expert testimony, *see Hutchinson v. U.S.*, 838 F.2d 390, 392-93 (9th Cir. 1988), or

6  rely on Sierra Pacific's expert's *percipient* testimony, which is irrelevant to the standard of care,

7  *see id.*, or rely on a post-2007 fire plan that is no longer in effect and has no application to actions

8  in 2007. (ISS 74.) *See Huang v. Garner*, 157 Cal.App.3d 404, 413 (1984), *disapproved on other*

9  *grounds in Aas v. Sup. Ct.*, 24 Cal.4th 627 (2000) (explaining that in a professional negligence

10  case where no expert was offered to opine on the standard of care, it was insufficient for plaintiff

11  to rely on defense witness's testimony to show that defendant had departed from usual practice).

12  **D.**   **Public Resources Code Section 4435 Has No Application Here.**

13       Public Resources Code section 4435 concerns fire that originates from the operation of

14  certain listed equipment, and assumes that when carefully operated, certain equipment will not

15  "originate" a fire. Thus, when a fire originates from such equipment, section 4435 provides that

16  "the fire is prima facie evidence of negligence in the maintenance, operation, or use of such"

17  equipment. Section 4435 separately provides that allowing a negligently caused fire to "escape"

18  constitutes a misdemeanor. It <u>does</u> <u>not</u> provide for or establish a prima facie case of negligence

19  where one fails to detect or suppress a fire or allows a fire to escape.

20       Here, the U.S. has asserted that a bulldozer's metal tracks contacted rocks and issued hot

21  metal fragments that allegedly originated a fire. The government admits contact with rocks was

22  unavoidable – *i.e.*, even a perfect dozer operator could not have avoided contacting rocks and

23  (according to the U.S.) issuing hot metal fragments that ignited the fire. Thus, on these facts,

24  there is no basis upon which any jury could reasonably conclude that Howell *negligently* operated

25  or used its bulldozer. Section 4435 is therefore inapplicable.

26       Recognizing that it has no basis to criticize the manner in which Howell operated or used

27  its vehicles, the government's claim as explained in its interrogatory responses and its expert

28  reports criticizes Howell for allegedly failing to conduct certain fire inspections following

1   cessation of dozer operations.  (Thomas Decl., ¶ 26, Ex. Z at 5:25-28.)  Then, in its opposition,

2   the government contends that Howell must "explain" why its operators were allowed to operate

3   "without supervision," and why Howell's employees left the jobsite following cessation of

4   bulldozer operations.  Not so for purposes of section 4435.  Under the U.S.'s theory, whether

5   Howell had one or one hundred supervisors on site on September 3, and whether Howell's

6   employees left the job site or stayed for ten more hours, has no bearing on the fact that its

7   bulldozer operator necessarily drove over rocks.  The government's arguments conflate the issues

8   of how the fire "originated," with which section 4435's prima facie clause is concerned, with

9   whether it was allowed to "escape," an issue with which it is not concerned.

10          Recognizing that its theory of the case is inconsistent with a proper application of section

11  4435, the government bizarrely postulates that is was negligent for Howell to have used

12  bulldozers *at all* on September 3, 2007, given that it was allegedly a high fire danger day.  This

13  absurd contention necessarily fails, as a matter of law, for at least five reasons.  First, the U.S.'s

14  own interrogatory responses admit that Howell was allowed "pursuant to law and governing fire

15  plans" to operate tracked equipment so long as it shut down by 1:00 p.m., which Howell

16  undisputedly did.  (*Id.* at ¶ 26, Ex. Z at 5:24-26.)  Second, yarding (*i.e.*, skidding) operations,

17  which are carried out with metal tracked skidders/bulldozers, are expressly permitted under

18  California's Forest Practice Rules "during the dry period when fire is likely to spread."  14 C.C.

19  R. § 938.8.  Third, the government's own rules for logging conducted on federal land allowed

20  tracked equipment to operate up to 1:00 p.m. under allegedly similar conditions.  (Thomas Decl.,

21  ¶ 24, Ex. W at 7.)  Fourth, the federal government itself used bulldozers to fight the Moonlight

22  Fire.  (*Id.* at ¶ 11, Ex. I at 2 (Case Depo. at 279:4-7.)  Fifth, as a matter of public policy there can

23  be no duty to refrain from operating a bulldozer before 1:00 p.m. on 87-degree days with four-

24  mile-per-hour winds.  (ISS 11.)  *See Sipe v. Countrywide Bank*, 690 F.Supp.2d 1141, 1152 (E.D.

25  Cal. 2010).  To hold otherwise could result in the effective shutdown of all dozer operations in

26  this district during the half of the year when they are not already impeded by snow and rain.[10]

---

27  [10] Furthermore, Defendants' experts have expressed the opinion that Howell was not negligent on September 3, 2007, which necessarily includes a sub-opinion that Howell's operation of its bulldozers was non-negligent.  (Thomas
28  Decl., ¶ 16, Ex. N at 18-19 (Roseberry Depo. at 133:20-134:4.)  This opinion remains unrebutted.

DEFENDANTS' REPLY ISO MOTION FOR SUMMARY JUDGMENT

E.   **The Government Cannot Establish Strict Liability Under Section 261.5(c).**

　　　1.　　*Mendez Concrete* **Is Correct And Does Not Conflict With** *Lindsey.*

　　　The U.S. has no substantive argument that *U.S. v. Mendez Concrete* was incorrectly decided. Its entire argument consists of the following ipse dixit: "Section 261(c) was not intended to require permits for fires; rather, it was intended to prohibit fires that threaten national forest lands, subject to an exception where a permit has been granted." (Opp. at 38:12-14.)  As *Mendez Concrete* explains, because the permits in question apply only on federal land, it follows that section 261(c) applies only on federal land.  2009 WL 733881, at *4 (C.D. Cal. Mar. 16, 2009).  If section 261.5(c) really applied beyond federal land, then it would be a criminal offense for any private landowner *ever* to burn "timber, trees, slash, brush or grass," even in a totally safe and controlled manner, because by its terms section 261.5(c) allows doing so only with a permit issued by the USFS – and the USFS cannot issue permits on private land.  Such a reading of the regulation makes no sense.

　　　The U.S. next asserts that *Mendez Concrete* conflicts with *United States v. Lindsey*, 595 F.2d 5 (1979).  Not so.  While *Lindsey* holds that the U.S. has the *power* to regulate conduct on non-federal land under certain circumstances, it does not hold that the U.S. has actually *exercised* that power through any particular regulation, much less through section 261.5(c).

　　　2.　　**The 2008 Amendments Support Defendants' Position.**

　　　The U.S. argues that the 2008 amendments bolster its position, but in fact they further undermine it.  The amendments added subsection (g) and significantly amended subsection (e) in order, for the first time, to impose liability for conduct beyond federally owned lands.  If section 261.5(c) already created liability for activities on private land, then new subsections (e) and (g) not only were unnecessary, but they were futile in view of the continued presence of subsection (c).  Subsection (e) imposes liability when an unprescribed fire escapes to national forest land, and subsection (g) imposes liability when a prescribed fire is negligently allowed to escape to national forest land.  If subsection (c) imposes liability merely for starting a fire on private land, then every controlled burn is criminal regardless of subsection (e) and (g)'s limitations.

　　　The government's reliance on a quotation from the 2008 publication notice for the

14

amendments is misplaced.  The notice merely recognizes that without subsection (g)'s mens rea requirement, "adjacent landowners might be discouraged from using prescribed burns." *Notice of Final Rule*, 74 Fed. Reg. 303050-1, at 30305.  This is true enough – and, if the reading of section 261.5(c) the government urges here were correct, adjacent landowners would indeed be discouraged from doing so notwithstanding subsection (g).

### 3. Section 261.5(c) Cannot Impose Strict Liability And Regulate Conduct Beyond Federal Lands.

The U.S. asserts that section 261.5(c) creates strict liability and governs activity beyond federal lands.  Defendants have described why, so construed, section 261.5(c) could not impose strict liability for activities that occur over a mile and a half from the nearest federal land.  (Mot. at 32:23-34:21.)7  The government offers no response to this argument, because there is none.

### 4. The Rule Of Lenity Provides Another Reason To Interpret 261.5(c) Narrowly.

The government argues that the rule of lenity does not apply because section 261.5(c) unambiguously governs conduct beyond federal property.  For reasons already discussed, and as *Mendez Concrete* held, the opposite is true.  A reasonable person on notice of section 261.5(c) would not believe that inadvertently and non-negligently causing a fire over a mile and a half from federal land might result in criminal liability.  To the extent the Court finds section 261.5(c) in any way ambiguous, therefore, the rule of lenity requires a narrow construction.  *Mendez Concrete*, 2009 WL 733881, at *4 (citing *Liparota v. United States*, 471 U.S. 419, 427 (1985)).

The U.S. also argues that the notices for the 2008 amendments "provide ample notice that section 261.5 reaches conduct on private land . . . ."  (Opp. at 39:11-12.)  The inability of a document published in 2008 to provide notice in 2007 speaks for itself.[11]

## F. The U.S. May Not Invoke Res Ipsa Loquitur.

### 1. The Government Can Prevail, If At All, Only By Proving Its Sole Theory Of Origin And Cause.

The U.S. misconstrues Defendants' argument regarding the necessity of expert evidence on causation in a complex fire case and the consequent inapplicability of res ipsa loquitur here.

---

[11] The U.S.'s footnote requesting leave to amend is egregiously improper, and it is futile.  Defendants lack the space here to discuss why, but they will vehemently oppose any Rule 16 motion that the U.S. may file.

1   According to the government, Defendants argue that "because the United States has produced

2   evidence on the origin and cause of the Moonlight Fire, [it] may not rely on the theory of res ipsa

3   loquitur to prove causation." (Opp. at 28:17-19.)  To be clear, this is emphatically <u>not</u>

4   Defendants' argument; in fact, it is essentially its opposite.  The reason the government may not

5   rely on res ipsa is not because it has adduced specific proof of origin and cause – it is because it

6   has adduced expert evidence supporting *only one* origin and cause, and the law forecloses a jury

7   finding liability in a complex fire case based on causal theories unsupported by expert evidence.

8          Defendants <u>do not</u> argue that res ipsa is incompatible with specific proof of origin and

9   cause.  Nor, as the government elsewhere suggests, do Defendants argue that res ipsa may not

10  apply in a fire case.  Rather, Defendants argue that under established California law, in a complex

11  fire case such as this, any theory of origin and cause upon which a plaintiff seeks to recover must

12  be supported by expert testimony.  *See Stephen v. Ford Motor Co.*, 134 Cal.App.4th 1363, 1373

13  (2005); *Garbell v. Conejo Hardwoods, Inc.*, 193 Cal.App.4th 1563, 1569 (2011); *Mariott Int'l,*

14  *Inc. v. Prolink, Inc.*, No. E046504, 2009 WL 4613720 (Cal. App. Dec. 8, 2009).[12]  If the

15  government's experts pointed to a number of possible causes for which Defendants were

16  potentially responsible, all of which they concluded might have caused the fire but none of which

17  they could say individually more likely than not did cause the fire, then the government

18  potentially could rely on res ipsa.  In such a scenario, the jury would be permitted to conclude that

19  one of the multiple causes supported by expert testimony probably was responsible for the fire,

20  and to find that Defendants caused the fire without determining specifically how.  But this is

21  impossible here, because all of the government's experts point to a single origin and cause.

22         After repeatedly mischaracterizing Defendants' position, the government accuses

23  Defendants of "misrepresent[ing]" the Court of Appeal's decision in *Roddiscraft, supra*.  It is the

24  U.S., however, that misconstrues (or misunderstands) *Roddiscraft*.  The bulldozer in that case was

25  not equipped with a spark arrester, as required by law, and was seen belching sparks from its

26  exhaust pipe shortly after the fire began.  212 Cal.App.2d at 791.  The defendants did not contest

---

27  [12] The U.S. incorrectly argues that this Court may not rely on *Mariott*, an unpublished case, because doing
    so violates CRC 8.1115.  Federal courts follow federal procedural rules, *see* Fed. R. Civ. P. 1, and the
28  government cites no federal rule prohibiting this Court from considering an unpublished case.

1   that they had violated the law requiring a spark arrester, and the only question given to the jury

2   "was whether such violation was the proximate cause of the fire." *Id.* at 805.  The jury answered

3   in the negative, "apparently conclud[ing] that the failure to equip the tractor with a spark arrester

4   was not a proximate cause of the fire." *Id.*  The Court of Appeal nevertheless held that the trial

5   court's failure to give a res ipsa instruction was prejudicial error "because there are other facts

6   and circumstances present which establish a foundation for the doctrine other than the absence of

7   the spark arrester . . . in particular, the testimony that *the tractor did in fact emit sparks*." *Id.*

8   That is, because the plaintiffs had a second supported causal theory in addition to their lack-of-

9   spark-arrester theory, they were entitled to a res ipsa instruction.  (The two causal theories are

10  closely related but distinct: the jury could have believed that a spark arrester would not have been

11  effective in blocking all sparks, such that the lack of a spark arrester did not cause the fire, but

12  simultaneously have believed that a spark negligently did cause the fire.)  *Roddiscraft* supports

13  Defendants' position here because the government has supported only one theory of origin and

14  cause, not two or more.  The doctrine of res ipsa therefore has no room to operate.

15          The government further argues that the Moonlight Fire, which it has spent millions of

16  dollars on scientific experts attempting to pin on Defendants, is not a complex fire case requiring

17  expert causation evidence within the meaning of *Garbell*, *Stephen* and *Mariott*.  But

18  notwithstanding the government's facile assertion that "even children know that metal striking

19  rock causes sparks, and that sparks cause fire," it is decidedly not a matter of common knowledge

20  whether bulldozer tracks striking the particular kinds of rocks at issue under the conditions that

21  obtained on September 3, 2007, can start a fire – let alone whether such a fire could smolder for

22  an hour and a half before bursting into flame, and then could spread linearly in only one direction

23  against the wind as the government alleges the Moonlight Fire did.  Nor are the subtle burn

24  indicators and tiny metal fragments upon which the government bases its case within common

25  knowledge.  Nor can laypeople be expected to know whether government investigators followed

26  proper scientific protocols, reliably searched for relevant evidence, or reasonably excluded other

27  possible causes.  Children believe a lot of things, and children are often wrong.[13]  The fact is that

28  _____

[13]Indeed, Plaintiff's newly announced reliance on what it contends children know about sparks

1  there are many different kinds of "sparks" – including mere flashes of light, static electricity

2  sparks, tiny pieces of hot metal, and small pieces of burning carbon from exhaust systems.  There

3  is a highly contested issue in this case regarding whether the tiny pieces of metal at issue here

4  were capable of starting a fire.  The government has spent millions unsuccessfully trying to prove

5  that they were.  Its argument that the issue is one of common sense must be rejected, as the

6  scientific issues here are far more difficult than those in *Garbell* and *Mariott*.

7       The U.S. cites a number of fire cases in which California courts permitted res ipsa to

8  operate.  But, consistent with the above analysis, each of those cases involved a noncomplex fire

9  in which res ipsa can operate without expert evidence.  To be clear: in fire cases where causal

10 issues are simple and within the understanding of laypeople, res ipsa may operate even absent

11 expert evidence regarding causation; and in fire cases where causal issues are more complex, it

12 may operate to the extent the plaintiff supplies expert testimony establishing multiple possible

13 causes.  *Seeley*, upon which the government relies and which is discussed above, is an example of

14 the former.  That case merely stands for the proposition that juries do not need experts to

15 understand simple causal mechanisms that are within common human experience – for instance,

16 that engines emit hot gasses and burning carbon sparks, and that these emissions can ignite

17 nearby flammable materials. [14]  The other fire cases the U.S. cites are to the same effect.

18 underscores why expert testimony concerning causation in a complex fire case is required, lest lay jurors
   be allowed, under the guise of res ipsa, to speculate based on common misinformation, as the U.S. does
19 here.  Issues of science and physics are often counterintuitive, and children and adults alike are mistaken
   often enough for the Exploratorium in San Francisco, a science museum for children that receives much of
20 its funding from plaintiff the United States, to feature an exhibit specifically demonstrating, contrary to
   popular mistaken belief, that burning metal sparks superheated to about 2000°F have so little energy that
21 they cannot even be felt when bombarding the hand of a child.  (Thomas Decl., ¶ 23, Exs. U-V.)  It is for
   similar reasons, among others, that Defendants' experts from U.C. Berkeley and U.C. Davis do not believe
22 a bulldozer rock strike as envisioned by the Plaintiff ignited the Moonlight Fire.

23 [14] *Roddiscraft* makes the same observation: "It is also a matter of common experience that sparks emitted
   from machinery and equipment in close proximity to inflammable materials may cause a fire."  212
24 Cal.App.2d at 796 (citation omitted).  Carbon sparks emitted by internal combustion engines are
   essentially small bits of burning charcoal, and it is probably common knowledge that they carry sufficient
25 heat and energy to ignite flammable materials.  (There was also expert testimony to the same effect in
   *Roddiscraft*.  *Id.* at 792-93.)  But whereas nearly everyone has experience with cars, few work closely with
26 bulldozers, and common knowledge does not extend to whether bulldozers striking rocks (let alone rocks
   of particular composition under particular conditions) can start fires.  The government's attempt to
27 conflate the internal combustion exhaust sparks at issue in *Seeley*, *Viera* and *Roddiscraft* with the hot
   metal fragments at issue here must be recognized and rejected.  Whether hot metal fragments from a
28 bulldozer could have started the Moonlight Fire, a question upon which the parties' scientific experts

1222093.8

18

1    Because establishing origin and cause in this case involves complex scientific issues that

2    are beyond common knowledge, the U.S. must support with expert testimony any theory of origin

3    and cause it wishes the jury to consider.  *See Garbell*, 193 Cal.App.4th at 1569.  But the

4    government has no expert evidence tending to prove that Defendants started the fire elsewhere or

5    in some other way.  Notwithstanding the U.S.'s mischaracterization of Defendants' argument, it is

6    the government's absence of evidence, not the evidence it does have, that constrains its case.

7        There is a second reason the government may not rely on res ipsa, and it *is* related to the

8    government's claimed evidence.  In its opposition, the U.S. claims to have "overwhelming

9    evidence . . . that all other potential ignition sources have been excluded."  (Opp. at 30:8-12.)

10   Defendants dispute that the U.S. has excluded all other potential ignition sources, including, for

11   example, a young man admittedly angry and on drugs when the fire started, who lied to

12   investigators about what he was doing that day and where he was, who was seen fleeing the area

13   of the fire, and who took the Fifth Amendment in response to the question, "Did you make up the

14   story about the bulldozer operator starting the fire so as to create a diversion and distract attention

15   from you?" (RSUF at 155.)  But Defendants are willing to concede that the U.S. has excluded all

16   other potential ignition sources for which Defendants might be responsible.  Thus, both sides

17   agree that if Defendants are to be held liable for the fire, it could only be if the U.S. proves a

18   Howell's dozer struck a rock and shed a hot piece of metal at the U.S.'s alleged specific area of

19   origin.  This means there is no genuine issue of material fact regarding whether Defendants

20   started the fire elsewhere or in some other way, no room for res ipsa to apply, and no basis for the

21   U.S. to oppose Defendants' motion.

22       **2.    Defendants' Evidence Rebuts Any Res Ipsa Loquitur Presumption.**

23       The U.S. does not deny that Defendants' have adduced substantial evidence that they

24   played no role in starting the Moonlight Fire, and it does not deny that such evidence causes any

25   res ipsa presumption to vanish.  *See* Cal. Evid. Code §§ 604, 646; *Slater v. Kehoe*, 38 Cal.App.3d

26   819, 833 (1974).  Contrary to the government's suggestion, there is no reason this issue should

27   not be decided on summary judgment, *see* Fed. R. Civ. P. 56(a), and every reason it should be

28   disagree, is manifestly an issue upon which expert testimony is required.

1222093.8                                        19

DEFENDANTS' REPLY ISO MOTION FOR SUMMARY JUDGMENT

1    given the extensive evidence Defendants have adduced.[15]

2         Citing *Howe v. Seven Forty Two Co.*, 189 Cal.App.4th 1155 (2011), the U.S. also argues

3    that even if the res ipsa presumption is rebutted and disappears, a plaintiff still may rely on the

4    circumstantial evidence that triggered res ipsa in the first place, and may even have the jury

5    instructed accordingly.  This is true, but it is beside the point, which is that Defendants have

6    rebutted any res ipsa presumption as a matter of law.  Moreover, for the reasons discussed in

7    section 1, above, the only conclusion the U.S. could seek to establish with its circumstantial

8    evidence is the single one alleged by its expert witnesses.

9    **G.    The U.S. Is Not Entitled to Double Damages under Civil Code Section 3346.**

10        Predictably, the U.S. urges this Court to disregard *Gould v. Madonna*, 5 Cal.App.3d 404

11   (1970), which holds that Civil Code section 3346 does not apply to fire damages, and instead

12   follow the contrary holding of *Kelly v. CB&I Constructors, Inc.*, 179 Cal.App.4th 442 (2009).

13   While *Gould* carefully scrutinized the purpose and history behind Civil Code section 3346, *Kelly*

14   engaged in no such analysis, and instead focused on the plain language of the statute, which it

15   erroneously interpreted using a definition of "trespass" developed more than a century after

16   enactment.  Of the two decisions, *Gould* represents the better-reasoned authority because its

17   holding comports with well-established cannons of statutory interpretation and common sense.

18        The "primary duty" of a court "interpreting a statute is to determine and effectuate the

19   Legislature's intent." *Van Horn v. Watson*, 45 Cal.4th 322, 326 (2008) (citation omitted).  The

20   U.S. unreasonably contends that when carrying out this duty, a court cannot consider the

21   legislative history or purpose unless the words of a statute "are sufficiently flexible to admit of

22   some other construction."  (Opp. at 40:22-25.)  Numerous cases have rejected this contention,

23   holding that an ambiguity is not required before a court may consider legislative history and that

24   the language "may be disregarded . . . to uphold clear contrary intent of the legislature." *Disabled*

25

---

26   [15] The U.S. also incorrectly asserts that Defendants seek summary judgment on this issue so they can "avoid presenting their so-called 'evidence' of other causes to the jury . . . ."  (Opp. at 34:11.)  Defendants

27   have no burden to prove other causes of the fire.  Nevertheless, if the case reaches trial, Defendants reserve the right to present whatever evidence is relevant, including overwhelming evidence of other potential

28   causes, that the government's investigation was neither systematic nor scientific, and that it resulted in unreliable conclusions.

1222093.8                                        20

1    *& Blind Action Committee of Cal. v. Jenkins*, 44 Cal.App.3d 74, 81 (1974); *see also Palmer v.*

2    *GTE California, Inc.*, 30 Cal.4th 1265, 1271 (2003); *Kramer v. Intuit Inc.*, 121 Cal.App.4th 574

3    (2004); *U.C. Regents v. Superior Court*, 225 Cal.App.3d 972, 987 (1990).

4          Even if the U.S. were correct in its assertion that legislative history cannot be considered

5    absent "flexible" language in the statute, then *at the very least*, the competing definitions of the

6    term "trespass" would create such "flexibility" or "ambiguity" in Civil Code section 3346. At the

7    time the Legislature enacted section 3346 in 1872, the term "trespass" was not understood to

8    encompass the spread of fire. *See Gould*, 5 Cal.App.3d at 408; *Kelly*, 179 Cal.App.4th at 460.

9    Had the term been understood in such a manner, the Legislature would have had no need to

10    <u>simultaneously</u> enact two separate damage multiplier statutes: Political Code section 3344, which

11    pertained to injuries caused by the spread of fire, and Civil Code section 3346, which pertained to

12    injuries to timber, trees or underwood through trespass. *Compare* Pol. Code § 3344 (1872)

13    (repealed in 1931 by Chapter 790), *with* Civ. Code §3346 (1872). If the Legislature understood

14    "trespass" to include fire, then Political Code section 3344 would have been superfluous. *See*

15    *Shoemaker v. Myers*, 52 Cal.3d 1, 22 (1990) ("We do not presume that the Legislature performs

16    idle acts, nor do we construe statutory provisions so as to render them superfluous.").

17          More than a century after the Legislature enacted Civil Code section 3346, a court

18    interpreted "trespass" (in the context of a different statute) to encompass the spread of fire and

19    other non-traditional "intrusions" like the "kinetic energy of vibrations." *Elton v. Anheuser-*

20    *Busch Beverage Group, Inc.,* 50 Cal.App.4th 1301, 1307 (1996). Because this definition is

21    contrary to the historical understanding, the word "trespass" as used in Civil Code section 3346 is

22    susceptible to more than one interpretation. While Defendants believe that "trespass" should be

23    interpreted according to its meaning at the time of enactment, the competing definitions

24    undisputedly allow this Court – as conceded by the government – to consider statutory

25    interpretation aids other than plain language, including legislative history and purpose.

26          The U.S. does not and cannot seriously dispute that the legislative history of Civil Code

27    section 3346 supports the conclusion that the statute does not apply to damages caused by fire.

28    For example, the U.S. never meaningfully addresses the critical fact that the Legislature repealed

1    Political Code section 3344, the statute that created a damage multiplier for the negligent

2    spreading of fire, and simultaneously enacted replacement legislation, now known as Health and

3    Safety Code sections 13007 and 13008, that does not contain any damage multiplier.[16] *See CHY*

4    *Co. v. Utility Tree Service, Inc.*, 2008 WL 4838684, *6-7 (Cal. 3rd Dist. 2008) ("[T]he legislative

5    treatment of various statutes makes clear that the penalty provisions in this statute [Civil Code

6    section 3346] exclude damages to timber that result from a fire, because the Legislature removed

7    fire damages from the ambit of predecessor penalty statutes and made them the express subject of

8    a separate scheme (Health and Saf. Code §§ 13007-13008) without including the availability of

9    any penalty damages."). Courts have recognized that this type of legislative action – repeal and

10   replacement – is intended to effectuate a substantial change in the law, *see People v. Dillon*, 34

11   Cal.3d 441, 467 (1983), yet the U.S. asks this Court to act as though this change never happened.

12        The only legislative history the U.S. cites relates to an entirely different statue, Penal Code

13   section 602. (*See* Opp. at 42:17-43:2.) Originally enacted in 1872, this statute stands for the

14   unremarkable proposition that trespassing on the land of another constitutes a misdemeanor.

15   According to the government, in 1927 the Legislature amended this statute to expand trespass to

16   the "building of fires upon the land of another." (Opp. at 42:21-23.) The U.S. contends that the

17   Legislature had this broader definition of "trespass" in mind when, in 1957, it amended Civil

18   Code section 3346 and did not specifically address fire. (*Id.* at 42:18-21.) Not only is this

19   argument convoluted and speculative, *see e.g. U.S. v. Corey*, 232 F.3d 1166, 1173 (9th Cir. 2000)

20   ("We doubt whether the beliefs of subsequent legislatures have *any* bearing upon the

---

[16] In its Opposition, the United States constructs an argument based on its erroneous understanding of the timing of the repeal of Political Code section 3344, the enactment of Health and Safety Code section13007, and the amendment of Civil Code 3346. (*See* Opp. at 42:9-16.) In 1931, the Legislature repealed Political Code section 3344 and simultaneously enacted new statutory provisions, then known as Chapter 790, which "defined civil liability for failure to control fire." (Stats. 1931, ch. 790, § 1, p. 1644.) Chapter 790 was not placed in any specific California code book at the time of its enactment. *See generally* West's Annotated California Codes, Preface at XV (2007) (explaining why many state laws were not included in any specific code book until the 1950's). In 1953, Chapter 790 was finally codified, with no substantive changes, as Health and Safety Code sections 13007 and 13008. Health & Saf. Code §§ 13007, 13008 (West's 1953). Civil Code section 3346 was amended four years later in 1957. *See* Civ. Code § 3346 (1959). Therefore, the repeal of Political Code section 3344 and the enactment of the language in Health and Safety Code sections 13007 and 13008 both occurred in 1931, not twenty years apart as the U.S. suggests. Likewise, the language in the Health and Safety Code was not promulgated in the same decade as the amendment of Civil Code section 3346, as the United States suggests.

DEFENDANTS' REPLY ISO MOTION FOR SUMMARY JUDGMENT

1    interpretation of a statute already on the books"), it is based on the false premise that in 1927 the

2    Legislature intended to make the spreading of fire from one property to another a trespass, as

3    opposed to the situation in which a person actually enters the land of another and then builds a

4    fire on that land without permission. The full language of Penal Code section 602(i), which the

5    U.S. conveniently fails to include in its Opposition, confirms that the Legislature understood

6    trespass as used in Penal Code section 602 to address the later, not the former, situation.[17]  The

7    fact that the spreading of fire from one property to another was not understood to constitute a

8    trespass in 1927 or 1957 is underscored by the fact that no court had reached that conclusion by

9    1970, *Gould*, 5 Cal.App.3d at 406, or for that matter, by 1995, *see Elton*, 50 Cal.App.4th at 1307.

10         The U.S. suggests that Defendants contend Civil Code section 3346 applies only to the

11   removal or theft of trees, and based on this misleading premise, argues that such an interpretation

12   would make certain language in the statute ("wrongful injuries" or "removal of") superfluous.

13   (Opp. at 41:16-19.) While true that the legislative history suggests that the Legislature enacted

14   and later amended Civil Code section 3346 to address problems associated with timber theft, the

15   question before this Court is not whether the statute is inapplicable to *all other types of potentially*

16   *injurious conduct*. Rather, the narrower question presented is whether Civil Code section 3346 is

17   applicable to one, specific type of conduct: the spreading of fire. *Cf. Gould*, 5 Cal.App.3d at 407

18   (explaining "the Legislature . . . set up a statutory scheme concerning timber *fires* completely

19   separate from the scheme to meet the situation of the *cutting* <u>or</u> *other type of injury* to timber")

20   (emphasis added). The legislative history confirms that it does not.

21         Finally, the U.S. contends that Defendants "sought legislation amending section 3346,"

22   but the "bill [Assembly Bill 992] did not pass," and Defendants "cannot do through this motion

23   what the Legislature refused to do." (Opp. at 40, n.13.) As the U.S. knows but failed to disclose,

24   the Legislature could not act on Assembly Bill 992 for *procedural* reasons, not because of any

25

---

26   [17]  As amended in 1927, Penal Code 602(i) provided: "Every person who willfully commits any trespass
     by . . . . [b]uilding fires upon any lands owned by another where no signs forbidding trespass are displayed

27   at intervals not greater than one-third mile along the exterior boundaries or along roads and trails passing
     through such lands, without first having obtained permission from the owner of such lands or his agent, or

28   the person in lawful possession thereof . . . . [i]s guilty of a misdemeanor."

DEFENDANTS' REPLY ISO MOTION FOR SUMMARY JUDGMENT

1   issue with the *substance* of the proposal.[18] (*See* Dock. No. 404, Ex. 23-1.)  In any event, the fact

2   that proposed legislation is not enacted "may indicate many things other than approval of a

3   judicial construction of a statute: the sheer pressure of other and more important business,

4   political considerations, or a tendency to trust to the courts to correct their own errors." *County of*

5   *Los Angeles v. Workers' Comp. Appeals Bd.*, 30 Cal.3d 391, 403-404 (1981).  Thus, the

6   suggestion that Assembly Bill 992 has any bearing on this motion is without merit.

7         Even if Civil Code section 3346 applied to fires – which clearly it does not – the statute

8   would authorize only the doubling of alleged timber damages, not damages associated with fire

9   suppression, reforestation, the Burned Area Emergency Rehabilitation and Assessment (BAER),

10  environmental harm, and interest.  Rather than directly address this issue, the U.S. instead focuses

11  on what categories of damages are recoverable under Health and Safety Code section 13007,

12  Civil Code section 3333, and case law.[19] (*See* Opp. at 44:7-15 and 45:46:3.)  This discussion is a

13  red-herring.  The question is not what categories of damages are recoverable in this action, but

14  which of these categories may be doubled under Civil Code section 3346.

15        The U.S. argues that once it establishes any injury to timber, trees or underwood, then *all*

16  its property damages are doubled.  (Opp. at 44:16-20.)  Later, the U.S. suggests that any damages

17  that "flow" from the burning of timber, trees or underwood, no matter how tangential, are

18  doubled.[20] (*Id.* at 45:21.)  Unfortunately for the government, that is not what the statute says.  To

---

19  [18] In the context of an Opposition to a different motion, the U.S. submitted legislative history for
20  Assembly Bill 992 that disclosed the fact that the legislation failed for procedural rather than substantive
    reasons. (*See* Dock. No. 404, Ex. 23-1.)  As this submittal reveals, Assembly Bill 992 expired pursuant to
21  Article IV, Section 10(c) of the California Constitution, which provides that "any bill introduced during
    the first year of the biennium of the legislative session that has not been passed by the house of origin by
    January 31 of the second calendar year of the biennium may not be acted on by the house."
22  [19] The U.S. asserts that its fire suppression, reforestation, BAER, environmental harm, and interest are all
23  "separate, compensable categories of damages." (Opp. at 45:17-21.)  This argument underscores the
    problem with the government's claim: while the U.S. argues that every single category of its damage claim
24  constitutes an injury to timber, trees, or underwood in order to obtain the benefit of Civil Code section
    3344, it simultaneously maintains that its damages claim does not constitute improper double or triple-
    counting because each addresses a separate and distinct injury.  The two positions are irreconcilable.
25  [20] There would be no practical limit to the scope of Civil Code section 3346 if any and all damages that
    "flow" from the burning of timber, trees or underwood were doubled.  For example, the U.S. seeks fire
26  suppression damages that include costs like lodging at various hotels, including Circus Circus and the
    Excalibur, meals at local restaurants, including the Pizza Factory, Marie Calendar and Burrito Bandito,
27  and miscellaneous items from Wal-Mart, Rite Aid, Walgreens, and Office Depot, like plastic folding
    tables. (SUF 99.)  Under the government's argument, the cost associated with burritos and chicken pot
28  pies, a comfortable night's sleep, and plastic folding tables are subject to doubling because they relate to

1    correctly interpret the statute, two interrelated parts must be read and construed together: the

2    prefatory language specifying that the statute applies to "injuries to timber, trees, or underwood,"

3    and the concluding language providing that the measure of damages "shall be twice the sum as

4    would compensate for the actual detriment." *See* Cal. Civ. Code § 3346.  Read in this manner,

5    the statute allows a party to recover twice the actual detriment for injuries to timber, trees, or

6    underwood, which makes sense given the purpose of the statute: "to protect timber from being cut

7    by others than the owner" by "increasing the risks of timber appropriation to the point of making

8    it unprofitable." *Gould*, 5 Cal.App.3d at 407-08 (citations omitted).

9         Finally, the U.S. relies on *Henniger v. Dunn*, 101 Cal.App.3d 858 (1980), to support the

10   doubling of all its damages claims.  (Opp. at 44:21-16.)  "The facts of *Heninger* are inapposite.

11   In that case, there was only one element of damage – the loss of trees and vegetation . . . ."

12   *People v. S. Pac. Co.*, 139 Cal.App.3d 627, 635 (1983).  A careful reading of *Henniger* confirms

13   that the decision does not support the U.S.'s assertion that its alleged damages for fire

14   suppression, reforestation, BAER, environmental harm, and interest are subject to doubling.

15        For all the foregoing reasons, Defendants' motion should be granted in its entirety.

16   DATED:  April 5, 2012                        DOWNEY BRAND LLP

17

18                                               By:_____/s/ Michael J. Thomas_____
                                                        MICHAEL J. THOMAS
19                                                  Attorney for Defendant/Cross-Defendant
                                                      SIERRA PACIFIC INDUSTRIES
20

21   DATED:  April 5, 2012                        RUSHFORD & BONOTTO, LLP

22

23                                               By: _/s/ Phillip Bonotto (as authorized on 4/5/2012)_
                                                        PHILLIP BONOTTO
24                                                 Attorneys for Defendants/Cross-Defendants
                                                   EUNICE HOWELL, INDIVIDUALLY and d/b/a
25                                                    HOWELL'S FOREST HARVESTING

26

27

28   fire suppression, which in turn, relate to an injury to a tree.  Such an argument has no logical bounds.

DEFENDANTS' REPLY ISO MOTION FOR SUMMARY JUDGMENT