1   DOWNEY BRAND LLP
    WILLIAM R. WARNE (SBN 141280)
2   MICHAEL J. THOMAS (SBN 172326)
    ANNIE S. AMARAL (SBN 238189)
3   621 Capitol Mall, 18th Floor
    Sacramento, CA  95814-4731
4   Telephone: (916) 444-1000
    Facsimile: (916) 444-2100
5   bwarne@downeybrand.com
    mthomas@downeybrand.com
6   aamaral@downeybrand.com

7   Attorneys for Defendant/Cross-Defendant
    SIERRA PACIFIC INDUSTRIES
8
    RUSHFORD & BONOTTO, LLP
9   PHILLIP R. BONOTTO, Esq. (SBN 109257)
    DEREK VANDEVIVER, Esq. (SBN 227902)
10  2277 Fair Oaks Blvd., Suite 495
    Sacramento, CA 95825
11  Telephone: (916) 565-0590

12  Attorneys for Defendant, EUNICE E.
    HOWELL, individually, and DBA
13  HOWELL'S FOREST HARVESTING CO.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BENJAMIN B. WAGNER
United States Attorney
KELLI L. TAYLOR
RICHARD ELIAS
Assistant United States Attorney
501 "I" Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900
Kelli.L.Taylor@usdoj.gov
Richard.Elias@usdoj.gov

Attorneys for the UNITED STATES
*Additional Counsel and Parties Listed on Following Page*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

SIERRA PACIFIC INDUSTRIES, et al.,

                Defendant.

AND ALL RELATED CROSS-ACTIONS.

Case No.  2:09-CV-02445-KJM-EFB

**JOINT PRE-TRIAL STATEMENT**

1  MATHENY SEARS LINKERT & JAIME, LLP
   RICHARD S. LINKERT (SBN 88756)
2  KATHERINE E. UNDERWOOD (SBN 249308)
   DANIEL C. KIM (SBN 272680)
3  3638 American River Drive
   Sacramento, CA 95864
4  Telephone: (916) 978-3434
   Facsimile: (916) 978-3430
5
   Attorneys For Defendants W.M. BEATY &
6  ASSOCIATES, INC. AND MCKEEVER HATCH,
   as Trustee of the Hatch 1987 Revocable Trust, et al.
7
   KEKER & VAN NEST LLP
8  JOHN W. KEKER (SBN 49092)
   STEVEN P. RAGLAND (SBN 221076)
9  633 Battery Street
   San Francisco, CA 94111-1809
10 Telephone: (415) 391-5400
   Facsimile: (415) 397-7188
11
12 Attorneys for LANDOWNER DEFENDANTS
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JOINT PRETRIAL STATEMENT**

1

2

**I.**
**JURISDICTIONAL-VENUE**

3        Jurisdiction is predicated upon 28 U.S.C. § 1345, and venue on 28 U.S.C. § 1391(b).

4   Defendants do not contest jurisdiction or venue.

5

**II.**
**JURY/NON-JURY**

6

7        Plaintiff has demanded a jury trial with respect to all issues suitable for determination by

jury.

8

9        Defendants also request a jury trial.  For any equitable issues/defenses that the Court

elects to decide, Defendants request that the Court first obtain an advisory opinion from the jury.

10

11

**III.**
**UNDISPUTED FACTS**

12        The parties agree that the following core facts are undisputed:

13        1.        At all relevant times, Howell's was a licensed timber operator.

14        2.        September 3, 2007 was the Labor Day holiday.

15        3.        The Moonlight Fire burned approximately 46,000 acres of National Forest

16   Systems land in the Plumas and Lassen National Forests.[1]

17

18   _____

19   [1] The defendants have refused to stipulate to the following fact: "Had the Moonlight Fire been reported
thirty minutes before it was called in at 2:24 p.m., it would have been suppressed before it spread to
National Forest Systems land."  This is a fact that is essential to the defendants' contributory negligence
defense based on alleged delays at the lookout.  Because defendants dispute this fact, there is no triable
issue to submit to the jury, and the defense fails as a matter of law.

20

21

22   In the course of preparing this joint pretrial statement, Plaintiff demanded that Defendants stipulate to the
following language: "Had the Moonlight Fire been reported thirty minutes before it was called in at 2:24
p.m., it would have been suppressed before it spread to National Forest System land."  Defendants
declined, for a number of reasons.  The time for sending contention interrogatories is long past, and
Plaintiff has no right to demand stipulations.  Furthermore, the proposed stipulation is an incomplete
statement of a complex factual issue.  Whether the fire could have been put out at various points before it
was reported is a complicated subject that will be addressed by experts and that turns on a number of
factors.  Further complicating the factual questions the jury will have to decide by throwing in an
imperfect stipulation would only cause confusion, which is perhaps why Plaintiff wishes to do so.
Defendants' refusal to enter into this stipulation does not mean, as Plaintiff contends, that Defendants
"dispute" that the fire probably would have been extinguished if reported thirty minutes earlier.  It means
only that Defendants believe this is an issue for the jury and therefore will not so stipulate.

23

24

25

26

27

28

1

**JOINT PRETRIAL STATEMENT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.**
**DISPUTED FACTUAL ISSUES**

**Plaintiff's Section**

**United States Statement of Disputed Factual Issues.[2]**

      1.      Whether defendants, and each of them, were negligent in using or operating bulldozers, or allowing bulldozers to be used or operated, on a red flag warning day.

      2.      Whether defendants, and each of them, were negligent in using and operating bulldozers, or allowing bulldozers to be used or operated, with no supervisor present.

      3.      Whether defendants, and each of them, were negligent in using and operating bulldozers, or allowing bulldozers to be operated or used, with no means of communicating with the outside world.

      4.      Whether defendants, and each of them, were negligent in abandoning the work site for a soda, or allowing the work area to be abandoned for a soda.

      5.      Whether defendants, and each of them, were negligent in failing to conduct a post-operation fire inspection and fire watch.

      6.      Whether defendants, and each of them, were negligent in failing to properly supervise fire safety.

      7.      Whether defendants, and each of them, were negligent in retaining Howell's after its negligence should have been apparent in its starting of two prior fires.

      8.      Whether defendants, and each of them, were negligent in violating established company safety policy, statutes, regulations, industry standards, and common sense.

      9.      Whether each defendant, personally or through another, set fire to, allowed fire to be set to, or allowed a fire kindled by them to escape to property of the United States, either negligently or in violation of law.  (Cal. Health & Safety Code 13007).

---

[2] The United States and the defendants disagree over the appropriate format of the statement of Disputed Factual Issues.  The United States believes that it is more helpful to the Court to provide a statement of the essential facts to be decided.  The defendants believe that a detailed recitation of all facts is appropriate.

2

1        10.     Whether defendants, and each of them, caused fire to be set to any forest, brush, or

2   other flammable material which is on land of the United States, without permission (Cal. Pub.

3   Res. Code 4421).

4        11.     Whether defendants, and each of them, allowed a fire kindled or attended by them

5   to escape from their control or to spread to the land of the United States (Cal. Pub. Res. Code

6   4422).

7        12.     Whether Kelly Crismon started a forest fire through the operation and use of his

8   bulldozer, thus giving rise to a statutory presumption of negligence in the maintenance, operation,

9   or use of the bulldozer, as well as a common law inference of negligence in starting the fire and

10   failing to suppress it.  (Cal. Pub. Res. Code 4435; *Roddiscraft, Inc. v. Skelton Logging Co.,* 212

11   Cal. App. 2d 784, 796 (1963);   *Levy-Zenter Co. v. S. Pac. Trans. Co.*, 74 Cal. App. 3d 762

12   (1977)).

13        13.     Whether Bush and Crismon violated their company policy by failing to do the

14   required ground inspection and fire watch, thus giving rise to an inference of negligence.

15   (*Dillenbeck v. City of Los Angeles*, 69 Cal. 2d 472, 478 (1968)).

16        14.     Whether defendants conducted a diligent aerial or ground inspection within the

17   first two hours after cessation of felling, yarding, or loading operations, and whether the person

18   conducting any inspection had adequate communication available for prompt reporting of any fire

19   (Cal. Code Regs. 938.8).

20        15.     Whether the Moonlight Fire is the kind of accident that normally does not occur in

21   the absence of negligence, was caused by an instrumentality in the exclusive control of Howell's

22   employees, and was not due to any voluntary action on the part of the United States (Cal. Evid.

23   Code 646).

24        16.     Whether negligence or other legal violations of each defendant was a substantial

25   factor in causing the Moonlight Fire or allowing it to escape.

26        17.     Whether Howell's was Sierra Pacific's agent.

27        18.     Whether Sierra Pacific retained control over Howell's in ensuring that Howell's

28   operated in a fire-safe manner.

3

1    19.    Whether defendants were aware of prior operations fires started by Howell's and

2    whether Defendant's took reasonable precautions to ensure that subsequent fires did not occur.

3    20.    Whether Sierra Pacific exhibited deliberate indifference to the obvious risk of

4    wildfire by failing to conduct any inquiry after learning of the prior fires.

5    21.    Whether conducting logging operations in forestland under hazardous fire

6    conditions is an inherently dangerous activity, presents a peculiar risk of harm, or is likely to

7    cause a trespass.

8    22.    Whether the activity of overseeing and implementing fire safety precautions,

9    policies, and measures in a timber harvest occurring in forested land under hazardous fire

10   conditions is an inherently dangerous activity or presents a peculiar risk of harm.

11   23.    Whether it was feasible for the defendants to have refrained from operating

12   tracked bulldozers in forested areas on red flag warning days.

13   24.    Whether it was feasible for the defendants to have required walking ground

14   inspections of all areas that tracked bulldozers worked while the operators were still working and

15   continuing for at least two hours after shutdown.

16   25.    Whether sparks from bulldozer rock strikes can cause forest fires.

17   26.    What damages are required to compensate all detriments caused by the fire,

18   including suppression costs, lost timber value, reforestation costs, and environmental degradation.

19   27.    What detriment(s) was caused by wrongful injuries to the United States' timber,

20   trees, or underwood.  (Cal. Civil Code 3346).

21   28.    Whether discretionary interest should be awarded under state law.

22   29.    What penalties and interest the United States is entitled to under the Federal Debt

23   Collection Act.

24   **Defendants' Disputed Core Facts:**[3]

25

---

26   [3] Defendants are unable to use the current format that Plaintiff insists upon because it generally consists of
*legal* issues, not *factual* issues, which is inconsistent with Local Rule 281 (b)(4).  Plaintiff initially
27   circulated a list of approximately 100 facts and, although Defendants did not agree with the substance of
those facts, they were amenable to adopting the government's approach and drafted their core facts in a
28   manner that was consistent. Obviously, there is an ambiguity in the Rules with respect to what constitutes

4

**Regarding Liability Issues**

1.  Sierra Pacific Industries is a third-generation family-owned forest products company based in Anderson, California.  It has approximately 3000 employees in California, as well as 11 sawmills, six electric co-generation plans, three millwork and remanufacturing plants, and a window manufacturing plant.

2.  Landowner Defendants[4] own timberland adjacent to Plumas and Lassen National Forests in Plumas and Lassen Counties, California.  At all relevant times,

---

"core," as what is meant by that word has much to do with the case and with the court's preferences. Defendants' counsel are of course eager to submit "core facts" in whatever format this Court will find most helpful in this difficult case, and will immediately provide something else at this Court's request. Importantly, in light of the size of this matter, the number and complexity of the issues, and how those issues are all interrelated to the Defendants' affirmative defenses, it is difficult to assess what constitutes a "core fact" versus, for instance, an "important fact" or, perhaps, a "significant" or "relevant" fact.  Thus, while Defendants' attached list is an effort to identify "core" facts, it is by no means exhaustive, nor does it reference even every important fact, as doing so would have resulted in a longer, and perhaps less useful document.  Defendants counsel certainly understand that more is not always better, but is also concerned, without further input from the Court, that providing a far less comprehensive list could result in violating the Local Rule, upsetting this Court, and/or prejudicing their clients' rights by waiving issues.  Defendants have endeavored to assess this Court's preference on this issue by reviewing, for instance, the facts as set forth in the joint pretrial statement in *Chopourian v. Catholic Healthcare West*, Case No. 2:09-cv-02972-KJM-KJN, which appears to have ultimately resorted to setting forth legal issues, as opposed to facts.  But without knowing the details of why that decision was made, and without being privy to the Court's reason for accepting such legal issues in lieu of core factual issues in that case, Defendants did not feel comfortable adopting that approach wholesale here because of the language in Local Rule 281(b)(4). Again, Defendants stand ready to modify their approach by adding, subtracting or altering in some other way, if doing so would be helpful to this Court.  It is Landowner Defendants' position that factual issues pertinent to individual defendants have, in part, already been set forth in the factual recitations of their motions for summary judgment, and incorporate those recitations herein by reference.  *See e.g.*, Doc. No. 324.

[4] The "Landowner Defendants" or "Landowners" are: Ann McKeever Hatch, As Trustee of the Hatch 1987 Revocable Trust; Richard L. Greene, As Trustee of the Hatch Irrevocable Trust; Brooks Walker, Jr., As Trustee of the Brooks Walker, Jr. Revocable Trust, and the Della Walker Van Loben Sels Trust for the Issue of Brooks Walker, Jr.; Brooks Walker, III, Individually and as Trustee of the Clayton Brooks Danielsen Trust, the Myles Walker Danielsen Trust, the Margaret Charlotte Burlock Trust, and the Benjamin Walker Burlock Trust; Leslie Walker, Individually, and as Trustee of the Brooks Thomas Walker Trust, the Susie Kate Walker Trust, and the Dell Grace Walker Trust; Wellington Smith Henderson, Jr., As Trustee of the Mark W. Henderson Revocable Trust; Elena D. Henderson, Individually; Mark W. Henderson, As Trustee of the Mark W. Henderson Revocable Trust; John C. Walker, Individually, and as Trustee of the Della Walker Van Loben Sels for the Issue of John C. Walker; James A. Henderson, Individually; Charles C. Henderson, As Trustee of the Charles C. and Kirsten Henderson Revocable Trusts; Joan H. Henderson, Individually; Jennifer Walker, Individually, and as Trustee of the Emma Walker Silverman Trust, and the Max Walker Silverman Trust; Kirby Walker, Individually; and Lindsey Walker-Silverman, Individually, and as Trustee of the Reilly Hudson Keenan Trust, and the Madison Flanders Keenan Trust.  Mr. Greene is named as a Defendant solely in his capacity as trustee of the Hatch Irrevocable Trust.

**JOINT PRETRIAL STATEMENT**

Landowner Defendants exercised reasonable care in the use and maintenance of their lands.[5]

3.    W.M. Beaty & Associates, Inc. is a forest management company established by William M. Beaty in 1969.

4.    Beaty manages timberland owned by the Landowners pursuant to a Management Contract dated May 1, 1983.

5.    The Management Contract provides that Beaty is "an independent contractor, and not…an agent or employee."

6.    Eunice Howell, individually and d/b/a Howell's Forest Harvesting Products, was started by Eunice's husband, Gary, and his father in 1965 as B&G Logging. Eunice began running the company in 1997 after Gary passed away.

7.    Since approximately 1989, Sierra Pacific has been hiring Howell as an independent contractor to harvest timber on Sierra Pacific's own fee land, and on other private property where Sierra Pacific has purchased the right to harvest timber.

8.    John Van Duyn, a Registered Professional Forester employed by Beaty, prepared the Cooks Creek Timber Harvest Plan and submitted it to the California Department of Forestry and Fire Protection for approval on November 26, 2005.

9.    Beaty, as RPF for the Cooks Creek Timber Harvest Plan, acknowledged its responsibility to be "available to provide professional advice to the licensed timber operator and timberland owner upon request throughout the active timber operations regarding:  (1) the plan, (2) the forest practice rules, (3) and other associated regulations pertaining to their operations."

10.   Howell's represented that it had received, read, and understood the THP.

11.   California Department of Forestry and Fire Protection approved the Cooks Creek Timber Harvest Plan on February 20, 2007.

12.   On or about May 30, 2007, Howell's executed a Licensed Timber Operator Responsibility Acknowledgement, which became part of the THP.

13.   California Department of Forestry and Fire Protection assigned Registered Professional Forester Ivan J. Houser, the Susanville Area Forester for the Lassen Modoc Unit, to the Cooks Creek Timber Harvest Plan.

14.   As a Registered Professional Forester employed by the California Department of Forestry and Fire Protection, Ivan Houser had the authority to determine violations of the Forest Practices Act, including violations of 14 CCR §938.8, and Public Resources Code violations, including §4435.

[5]

**JOINT PRETRIAL STATEMENT**

15. Landowners planned to put the following three timber sales under the Cooks Creek Timber Harvest Plan out for bid: Moonville Timber Sale, Cooks Creek Timber Sale, and Eastwood Timber sale.

16. Beaty solicited bids for the Moonville Timber Sale and the Cooks Creek Timber Sale.

17. Sierra Pacific was the high bidder on both the Moonville Timber Sale and the Cooks Creek Timber Sale, and was awarded the sales.

18. On July 27, 2006, Sierra Pacific and certain Landowner signatories executed a Timber Sales Agreement for the Moonville timber sale wherein Sierra Pacific purchased the right to harvest the timber covered by that sale.

19. On June 7, 2007, Sierra Pacific and certain Landowner signatories executed a Timber Sales Agreement for the Cooks Creek timber sale wherein Sierra Pacific purchased the right to harvest the timber covered by that sale.

20. Sierra Pacific hired Eunice Howell's company as an independent contractor to be the Licensed Timber Operator for the Moonville and Cooks Creek timber sales.

21. On March 15, 2007, Sierra Pacific and Howell executed a "Logging Agreement" wherein Howell agreed to cut and remove timber covered by the Moonville and Cooks Creek timber sales, and in exchange Sierra Pacific agreed to pay for these services.

22. Also in the Logging Agreement, Sierra Pacific and Howell further agreed, among other things, that Howell would be an independent contractor.

23. Pursuant to California Forest Practice Rule 1035.2, prior to the commencement of logging operations under the Cooks Creek Timber Harvest Plan, a Pre-Harvest Meeting was conducted and involved personnel from Beaty, Sierra Pacific, and Howell's.

24. As an independent contractor for Sierra Pacific, Howell began harvesting the timber purchased by Sierra Pacific in the Moonville timber sale during summer 2007, prior to the Moonlight Fire.

25. Beaty's Forester, Glen Schall, working under the supervision of John Van Duyn, visited the Moonville timber sale approximately every other day during active operations to ensure that Sierra Pacific and Howell's were harvesting their timber in a way that complied with Cooks Creek Timber Harvest Plan and did not damage the residual timber stands.

26. Sierra Pacific's forester, John Forno, visited the logging operation sites covered by the Cooks Creek Timber Harvest Plan approximately three times per month, during which he checked for log-quality issues, if any, and looked at road maintenance.

7

27.   A small (¼ acre) fire, known as the Greens Fire, occurred on or near the Moonville timber sale on June 21, 2007.

28.   Ivan Houser inspected the Moonville timber sale before and after the Greens Fire and did not issue any fire safety violations to Howell's.

29.   The United States Forest Service did not finalize an investigative report regarding the origin and cause of the Greens Fire until September 2007, after the Moonlight Fire occurred.  Landowners did not learn of the Greens Fire until 2008, after the Moonlight Fire.

30.   In mid-summer 2007, operations began on the Cooks Creek timber sale.

31.   John Van Duyn visited the Cook's Creek timber sale two to three times a week during active operations to ensure that Sierra Pacific and Howell's were harvesting their timber in a way that complied with Cooks Creek Timber Harvest Plan and did not damage the residual timber stands.

32.   John Van Duyn observed Howell's employees conducting walking fire patrols on the Cook's Creek timber sale prior to the Moonlight Fire.

33.   In mid-August 2007, Ryan Bauer was hired by Howell as a knotbumper, although he wanted and attempted to be a faller.

34.   Ivan Houser conducted inspections of the Cooks Creek timber sale prior to the Moonlight Fire, including an inspection on August 15, 2007, and after the Moonlight Fire, and at  no time did he find any violations that related to fire safety.

35.   Timber harvesting operations were not scheduled to take place on the Cooks Creek timber sale over the 2007 Labor Day weekend.

36.   In 2007, Sierra Pacific and Beaty belonged to a cooperative of timberland owners/managers known as the Northern California Fire Association.

37.   Prior to and during 2007, the Northern California Fire Association paid for aerial fire patrols to inspect members' lands for fire, regardless of cause.

38.   In 1989, the Board of Forestry inserted the words "aerial or ground" into 14 CCR § 938.8 because it determined that aerial inspections covering large sections of land were a suitable alternative to ground inspection - "practical experience has shown that it is a suitable means of inspection."

39.   On August 31, 2007, Howell employee Damon Baker asked J.W. Bush and Kelly Crismon to work the Labor Day holiday to catch up on water barring, a form of erosion control.

40.   On August 31, 2007, when he asked Bush and Crismon to work on Monday, September 3rd, Baker believed that Labor Day would be a "red flag day," and he told them this.

8

41.     Sierra Pacific Forester John Forno and Beaty RPF John Van Duyn do not recall whether Howell's told them that they were planning to be present on the Cooks Creek timber sale site on Monday, September 3, 2007.

42.     On August 31, 2007, Beaty instructed Sugarpine Aviators to fly the Almanor Air Patrol over the Cooks Creek timber sale in the "general location" of the "moonlight pass area."

43.     Bush and Crismon traveled to the worksite early on the morning of September 3, 2007 in separate pick-up trucks; Crismon drove his personal truck, and Bush drove a company pick-up truck, which was equipped with a CB radio.

44.     Bush and Crismon parked their trucks at a landing (the "Equipment Landing") where other Howell's equipment was parked, including (among other things) their two bulldozers, a rubber tired skidder, and a fuel tender. A grader was also nearby, which was equipped with a CB radio.

45.     Between approximately 6:00 a.m. and 12:45 p.m. on September 3rd, Bush and Crismon operated their bulldozers to install water bars. Bush worked south of the Equipment Landing, and Crismon worked north of it.

46.     That morning, while he was installing water bars, Crismon also yarded a few logs that had been missed the previous week. He placed these logs in a pile of other logs at a landing northeast of the Equipment Landing (the "Log-pile Landing").

47.     Bush saw at least one vehicle near where he was working that day, a black jeep. He also reported that he saw an abandoned quadrunner that morning on his way to the work area near Roads 3130 and 3131. No one was around the vehicle.

48.     Other individuals also reported seeing quadrunners and various individuals in the area as well.

49.     Throughout the day, while they were installing water bars, both Bush and Crismon walked the skid trails where they were working to look for fire.

50.     Bush and Crismon both believed it was a red flag day, so they headed back to park their dozers at the Equipment Landing by 1:00 p.m.

51.     Shortly after parking their dozers at the Equipment Landing, Bush and Crismon fueled and greased their dozers and left the site in their pick-up trucks. As they left, their windows were down, and they did not see, hear, or smell any signs of a fire.

52.     Crismon returned to his trailer in Chester; Bush headed to the loggers' "Base Camp," about 15 minutes away, where he got something to drink and his cell phone. He got in his personal pick-up truck because the company truck would not start and headed back to the Equipment Landing, where he was going to do a further fire watch.

9

53.   Before Bush returned to the Equipment Landing, he was stopped by smoke at the intersection of Logging Roads 3130 and 3131 (the "3131 Landing"), which is north of the Log-pile Landing.  Based on the smoke, he determined it would not be safe to continue farther and that he needed to report the smoke as soon as possible, so he turned around and headed away from the fire.

54.   As Bush was driving northerly, away from the fire, he ran into two individuals: one male driving a red pick-up truck and one male driving a green quad.  Both individuals turned around and headed northerly with Bush, away from the fire.

55.   Before Bush could call in and report the fire, he ran into a red fire engine that was responding to the fire.  Bush followed the engine in to help, if he could.

56.   United States Forest Service seasonal fire lookout Caleb Lief was on duty at the Red Rock Lookout Tower on September 3, 2007.

57.   Earlier that fire season, on June 30, 2007, USFS employee Karen Juska reported seeing a plastic baggie with a what she believed was a pot pipe and pot in the Red Rock Lookout Tower when Lief was on duty.

58.   On September 3, 2007, Juska was headed to the Red Rock Lookout Tower to check on supplies and collect a broken radio.  She reported this plan via radio, which she understood was heard by dispatch and by Lief at Red Rock.

59.   Juska drove for 10-15 minutes on a dusty road to the lookout and arrived that afternoon between 2:05 and 2:10.

60.   Juska parked at the base of the lookout on the north side.  She walked up the steps to the catwalk surrounding the cabin and when she got to the landing on the east side, Lief was facing her and urinating on his bare feet.  He was surprised  by Juska's arrival and turned around, telling her that urination was an old cure for athlete's feet.

61.   Juska and Lief entered the lookout together and talked about supplies/equipment. While inside, she noticed a blue/green marijuana pipe on the counter, by the sink. Lief grabbed the pipe and put it behind his back, maybe in his pocket, and said "you weren't supposed to see that" or "I should not have left this out, my bad."

62.   Lief handed Juska the broken radio she had come to repair and when he did, his hand and the radio had a heavy odor of marijuana.

63.   Juska was in the lookout tower for approximately ten minutes, and makes various statements about whether she did a 360-degree scan of the horizon while she was there.

64.   Juska and Lief exited the lookout tower and took a bag of trash to her USFS vehicle.  As they were standing near her truck on the northerly side of the tower, they saw smoke from the fire.

10

65. Juska and Lief dispute which one of them saw the smoke first, and what the smoke looked like, but Juska got in her truck and called in the fire at 2:24 p.m., before Lief. Lief returned to the tower and Juska responded to the fire.

66. Pursuant to the Northern California Fire Association's request, Sugarpine Aviators pilot, Hershel Beail, flew the aerial patrol on Monday, September 3, 2007.

67. Mr. Beail, spotted what he suspected was smoke several minutes before the Red Rock Lookout reported the Moonlight Fire at 2:24 p.m. on September 3, 2007.

68. Juska notified her direct supervisor, Ron Heinbockel, of the events that occurred at Red Rock before she and Lief saw the fire.

69. Heinbockel's superiors were also informed of the events, and the forest supervisor, together with other USFS managers, discussed whether an investigation should occur.

70. When Juska initially spoke to USFS Special Agent Diane Welton, the Forest Service's lead investigator on the Moonlight Fire, she informed Welton of what had occurred at the Red Rock Lookout on September 3rd.

71. Welton told her that, even though she was a law enforcement officer, she wasn't there to investigate those events. Welton specifically instructed Juska not to make reference to what she saw and smelled regarding the possibility that Lief was using marijuana in the afternoon of September 3, 2007, during her witness interview for the Moonlight Origin and Cause Report (the "Report").

72. Juska and Lief's witness statements that are attached to the Moonlight Fire origin and cause report were both written by Diane Welton and both omit any reference to what Juska claims to have seen regarding the potential use of marijuana, as well as any reference to her being able to surprise Lief while he urinated on his feet.

73. Between September 3, 2007, and September 11, 2007, Juska memorialized the Red Rock events in two separate sets of documents. One set contains no mention of her encounter with Lief, but confirms in Juska's handwritten notes that she was asked to leave these details out by Welton. Juska's other written statements confirm, however, that she, while she approached the tower on a dusty road, she was still able to surprise Lief while he was peeing on himself and that she had discovered a marijuana pipe and smelled the heavy odor of marijuana on Lief's hand and on the radio.

74. Around the same time that Juska created these documents, she also submitted documentation of her encounter with Lief on June 30, 2007, when she saw the baggie of marijuana. No investigation was conducted of that accusation either.

75. On September 14, 2007, Heinbockel gave Lief a "fully successful" performance appraisal.

11

76. On September 21, 2007, Heinbockel wrote an email to the acting district ranger, Dave Loomis, and stated he was "very uncomfortable giving [Lief] a 'FULLY SUCCESSFUL' on his final Performance Appraisal . . . ." Heinbockel states in that email that, despite it being a safety issue, Loomis told him "not to reflect [Lief's] behavior on his final Performance Appraisal," and references the issue having been discussed by higher levels in the forest, regional, and Washington offices.

77. On October 1, 2007, Heinbockel's direct supervisor, Larry Craggs, approved and executed Lief's performance appraisal.

78. Having received a fully satisfactory review from Heinbockel and Craggs, Lief applied for the same seasonal job in spring 2008.

79. Heinbockel did not want to re-hire Lief and told him the position had already been filled, to which Lief responded by filing a discrimination complaint on the basis that the new lookout employee was female.

80. Plumas Forest Supervisor Alice Carlton elected to settle Lief's complaint and offer him his position again, which she wanted to do "asap."

81. Thereafter, Lief was re-hired as the Red Rock lookout for the 2008 and 2009 fire seasons. Heinbockel testified that these acts were taken to "keep him on our team."

82. In July 2009, Juska and Lief had a dispute about whether Lief yelled at and threatened Juska and about whether he had raised a screen door to throw at her while she was at the lookout one day.

83. Alice Carlton requested an investigation to determine whether any misconduct had occurred, and to determine whether Lief's behavior was sexual harassment.

84. As part of that investigation, a USFS employee interviewed a number of USFS employees with knowledge of Lief and Juska's relationship, and these interviews reference the ongoing dispute between them regarding who saw the Moonlight Fire first.

85. The investigation concluded with a finding that Lief and Juska both engaged in misconduct and Lief's employment was terminated.

86. The purpose of a wildland fire investigation is to determine the origin, cause, and responsible party.

87. With few exceptions, the proper methodology for a wildland fire investigation is to first establish the origin and then determine the cause. Generally, if the origin of a fire cannot be determined, the cause cannot be determined.

88. In wildland fire investigations, the general area of origin is the area of the fire that can be narrowed down based on macro-scale indicators, witness statements, and

12

fire behavior. Within the general area of origin is a smaller area known as the specific area of origin.  Contained within the specific area of origin is the point where the ignition source came into contact with the material first ignited.  It is known as the point of origin.

89.    USFS Fire Prevention Technician Dave Reynolds responded to the fire and arrived at Five Corners at approximately 3:30 p.m.  As he was approaching Five Corners, he encountered Karen Juska, who was leaving the area.  Juska informed Reynolds that someone who had been operating in the area of the fire, J.W. Bush, was at Five Corners and that he (Reynolds) should speak to him.

90.    Reynolds spoke to J.W. Bush and wrote a witness statement for him, which purports to memorialize their conversation.  In that statement, Reynolds wrote that Bush "believes cat tracks scraped rock to cause fire."

91.    Bush signed the statement written by Reynolds, but during his deposition, disclosed that he cannot read and that Reynolds did not read the statement to him before he signed it.

92.    Because the fire began on joint responsibility land, the USFS requested a state investigator be assigned to perform a joint investigation of the fire's origin and cause.  CDF Battalion Chief Josh White, who had investigated a number of other fires that day, was assigned to the Moonlight Fire.

93.    White met with Reynolds on the night of September 3, 2007, but they were not able proceed with the investigation because of the heat and the lack of light.  They agreed to meet the next morning.

94.    Both Reynolds and White acknowledge that they were to conduct their investigation using the systematic and scientific methodology set forth in NFPA-921, FI-210, and the NWCG Wildfire Origin & Cause Determination Handbook.

95.    The FI-210 course is based on the guidelines provided in the NWCG Handbook

96.    The NWCG Handbook presents guidelines which should be followed to the largest extent possible by the investigator in the field.

97.    These guidelines were developed to follow a science-based, systematic methodology which has been peer reviewed and is generally accepted by the wildland fire investigation profession.

98.    According to the NWCG Handbook, there are 20 common mistakes in wildfire investigations, including, but not limited to, not applying a systematic methodology, not interviewing/identifying witnesses, leaving the origin unsecured, looking for the cause and not following the indicators to the origin and a failing to exclude/address other potential causes.

99.    White has taught the FI-210 approximately 10 times, and approximately 5 times before investigating the Moonlight Fire in September of 2007.

13

100. Reynolds took the FI-210 training course and was certified under the methodology employed in that training course.

101. In the context of a wildland fire investigation such a Moonlight, the systematic methodology uses a science-based series of prescribed steps to determine a fire's origin.

102. Both Reynolds and White assert that they understood that in order to reach a valid conclusion as to the fire's origin and cause, they were obligated to engage in a scientific and systematic investigation.

103. The scientific method is applied using a process where the investigators collect data, analyze the data, develop a hypothesis and test the hypothesis before selecting the final hypothesis.

104. To begin his investigation, White arrived at approximately 6:30 a.m., drove south on road 3130, and took photographs of bulldozers and other equipment parked on a landing south of the fire.  These were the first photographs he took during his investigation.

105. A bit later that morning, after meeting with representatives of Howell's, White met up with Reynolds.  The Report asserts that Reynolds and White used a skid road to make their way south into the area of the fire's southern perimeter, where the saw a fire line and a hose lay.

106. As they approached the southern end of the burn pattern, they turned left on the skid trail and made their way downhill to the east.

107. After turning east, they eventually saw rocks in the skid trail that bore what they thought was evidence of having been struck by a bulldozer.

108. Reynolds and White state that they observed burn indicators in an area their report claims was the general origin area, and that there were numerous rock strikes in what they thought was the specific area of origin.  The report also claims the strikes were placed where the left track of the dozer would be provided it was constructing bars as it progressed up the hill.

109. Confident that they had located the specific area of origin, Reynolds and White decided to interview Howell dozer operators Bush and Crismon, and they left the area without securing it.

110. Reynolds and White interviewed Bush at the loggers' base camp. They contacted Crismon by cell phone and ultimately interviewed him at a landing below their alleged area of origin, and then up on the skid trial in the alleged general area of origin at a point west of the unmarked point of origin.

111. Crismon told the investigators he had limited visibility when operating his bulldozer.

**JOINT PRETRIAL STATEMENT**

1

2

112.   Crismon told investigators there were ATV drivers and hunters everywhere in the area, and White said he had been seeing "hunters all over and is thinking about wrapping his dog in orange."

3

4

113.   Crismon told investigators he grappled several logs with his bulldozer in the morning of September 3, before beginning is water barring operations, and took to them to the landing below the government's alleged area of origin.

5

6

7

114.   Sometime shortly after 5 p.m, after Reynolds and White finished interviewing Crismon, Reynolds turned his attention to the alleged area of origin, and White took Crismon back to his truck.

8

115.   Reynolds began by marking the alleged general origin area by encircling the area with pink tape (or flagging).

9

10

11

116.   After marking the alleged general area of origin, Reynolds began placing directional indicator flags, blue for backing, yellow for lateral, and red for advancing.

12

13

117.   White returned to the alleged general origin area and began taking photos of the flags Reynold's had placed, and of Reynolds kneeling next to a rock with a GPS unit sitting on top of it.

14

15

118.   Because of the advancing darkness, they finished their work in the alleged area of origin shortly after 6:30 p.m., and agreed to meet back up on the site the next morning.

16

17

119.   Both Reynolds and White returned to the scene of the alleged general origin area at approximately 8:00 a.m. on Wednesday, September 5, 2007.

18

19

120.   They began that morning by installing additional directional indicator flags. Reynolds placed the flags and advised of each indicator's meaning while White took notes and photographed the items.

20

21

121.   Reynolds and White marked two reference points, both large rocks just south of the skid trail, and drew distance and bearing measurements to the alleged point of origin from both.

22

23

122.   Reynolds drafted a sketch that was not included in the report that recorded the distance and bearing measurements from their two reference points to a single origin point near the skid trail.

24

25

26

123.   White took three photographs from reference point number one at 8:18 a.m., with each depicting a white flag in the center which was placed near a large rock in the skid trail.

27

124.   In wildfire investigations, white flags are used to depict evidence or a point of origin.

28

15

125. White took two photographs from reference point number 2 at 8:20 a.m. with each depicting the same white flag in the center.

126. Both Reynolds and White deny ever placing a white flag anywhere in their alleged area of origin, and denied the existence of the white flag when first presented with White's five photographs.

127. Both the NWCG Handbook and the FI-210 training manual set forth guidelines relating to the manner in which the specific origin area should be searched.

128. Reynolds and White did not comply with the guidelines set forth in the NWCG Handbook and the F1-210 instructor and training manuals when working their alleged specific origin area, including but not limited to, those guidelines regarding the scene processing technique called "gridding."

129. Reynolds and White's testimony describes a search wherein they conducted a visual search working on their hands and knees to downhill to the east and then employed a magnet search after that working up to the west.

130. White failed to consider whether he was corrupting the scene by not following the gridding methodology set forth in the NWCG handbook and the FI-210 instructor and training manual.

131. After using a magnet to collect shards of metal from an area in their alleged specific area of origin, White placed the metal he collected in one bag, labeling it "E1."

132. Neither White nor Reynolds used the magnet in order to determine if there were also metal particles at any other rocks in the area.

133. Reynolds placed numbered evidence placards at 15 separate directional indicators while White photographed each placard and indicator.

134. At just after 10:00 a.m., White poured the contents of E1 on a piece of white paper placed on top of his vehicle at the landing below the alleged area of origin and took photos.

135. CDF employee Ivan Houser arrived on the scene that morning and found Reynolds and White on the hillside using a magnet in the soil.

136. Houser told Reynolds and White that during normal timber harvesting operations, a fire watch person is to patrol behind the feller buncher machine to detect any fires, but when dozers install water bars, they are self-watched.

137. Reynolds included Houser's statement about water barring being self-watched in his draft origin and cause report, but Houser's statement was removed from the final USFS origin and cause report before it was signed by Welton.

16

138. Houser prepared a supplemental witness statement but it was not included in the Report.

139. Reynolds and White released the scene at 10:15 a.m. on the morning of September 5, and Reynolds testified that they "were done," that they had properly excluded all other potential causes, and that were certain that the fire was caused by Crismon's bulldozer striking a rock and creating hot metal particles that ignited cured forest litter.

140. Reynolds filled out an "incident report" on September 5, 2007, and listed Sierra Pacific Industries as the defendant.

141. The scientific method requires fire investigators to consider all relevant data.

142. The training manuals relied upon by Reynolds and White confirm that interviews are an important component of many fire investigations and the information collected from witnesses must be assessed before reaching a conclusion.

143. The only individuals who were interviewed before Reynolds reached his conclusion on September 5, 2007, as to what caused the fire were Howell bulldozer operators Bush and Crismon.

144. Reynolds never interviewed Ryan Bauer before reaching his conclusion as the United States' lead investigator that Sierra Pacific Industries was the defendant; Reynolds did not know Bauer existed until after the litigation began.

145. Reynolds and White failed to interview numerous critical witnesses, including but not limited to, Benny Wallace, Andrea Terry, and Jennifer Bauer.

146. Reynolds and White never interviewed Michael McNeil, a USFS employee who was suspected of being a serial arsonist and who was in the vicinity of where the Moonlight Fire allegedly began on September 3, 2007.

147. On or about September 7, 2007, Reynolds was replaced as the USFS's lead investigator when it was learned that he wasn't qualified to investigate a fire with damages exceeding $50,000.

148. On or about September 7, 2007, Special Agent Diane Welton replaced Reynolds and the USFS's lead investigator.

149. On September 8, 2007, Welton visited the heel of the fire with White and with Marion Matthews, another Special Agent working for the USFS.

150. Although Welton was unable to conduct a NWCG/FI-210 investigation because the scene had already been released, she approved of her predecessor's conclusions about the origin and cause.

17

**JOINT PRETRIAL STATEMENT**

1

2

151.   Special Agent Matthews, however, had certain misgivings about what she saw in reviewing the work of Reynolds and White, including her belief that they should have expanded the general origin area further up the hill.

3

4

152.   Marion Matthews, however, was not overly concerned because she believed, based on what she was told, that Reynolds and White may have found the wrong location but they still had the right reason.

5

6

7

153.   Before they left the site, White and Welton collected two rocks as evidence which they believed bore marks consistent with having been stricken by a bulldozer grouser or blade.  These rocks have been identified as E-2 and E-3.

8

9

154.   On or about September 14, 2007, Welton prepared the official sketch for the Moonlight Report; that sketch places red indicators depicting the fire advancing primarily to the northeast.

10

11

12

155.   The official Report concludes that Crismon water barred in the area where Reynolds and White believe the fire stated at 12:15, but that the fire "maintained in the incipient stage, smoldering in the dry fuel bed for approximately 1.5 hours until it entered into the free-burning stage."

13

14

156.   On September 6th, White spoke with CDF investigators Deiter Schmitt and George Gonzales, gave them a status report on the investigation, and asked them to speak to a list of people.

15

16

157.   On September 7th, Schmitt and Gonzales spoke to a number of witnesses, including Leo Whitlock, Eddie Bauer and Ryan Bauer.

17

158.   Leo Whitlock told the investigators that he found Eddie Bauer and his wife Jennifer Bauer up in the area of the fire looking for their son Ryan Bauer.

18

19

20

159.   Leo Whitlock, a private fire patrolman who monitored activities on the Landowners' and Sierra Pacific's property, heard the fire reported while he was in Chester.  He headed towards it because he recognized the property as being on his patrol.

21

22

23

160.   When Whitlock reached Westwood, he stopped briefly at the CDF station and asked a CDF employee in the front if they were going to respond to the fire.  The CDF employee had not yet heard about the fire and told Whitlock that they would wait until they were officially sent out by the dispatch center.

24

25

161.   Whitlock pointed out the smoke to the CDF employee and was disgusted that they did not respond immediately.

26

27

162.   Whitlock eventually made his way south on the 3000 Road towards the heel of the fire.  He went past the heel and realized the fire was burning in the opposite direction, so he turned around and headed north, back towards Five Corners.

28

18

163.   When he was on the 3000 Road still near the heel of the fire, but before he reached the 3130 and 3000 intersection, Whitlock encountered Eddie and Jennifer Bauer, Ryan's parents, who were driving a greenish/grey Toyota pick up truck.

164.   Whitlock spoke to Eddie and asked him what he and Jennifer were doing. Eddie told Whitlock that they were looking for their son, who was supposed to have been back there cutting firewood that day.

165.   Whitlock continued heading northerly towards Five Corners, but Eddie said he and Jennifer were going to travel a bit farther south to continue looking for Ryan.

166.   Ryan Bauer told the investigators a number of inconsistent things, including that he had left his personal chainsaws on the mountain and that he had gone to retrieve them, and then that a CDF firefighter had retrieved his chainsaws for him.

167.   During his interview, Bauer repeatedly asked why they were talking to him. At one point during his interview, he said, "I was with my girlfriend all day. She can verify that if I do get blamed for the fire . . . ."

168.   His girlfriend at the time, Andrea Terry, lived across the street from the CDF station where Schmitt and Gonzales took the interview of Ryan Bauer.

169.   Notwithstanding Ryan Bauer's asserted alibi, no investigator working on the Moonlight Fire ever interviewed Andrea Terry.

170.   Bennie Wallace testified in his deposition that he witnessed Ryan Bauer driving in a green Toyota pickup truck on the Moonlight Valley Road away from the fire at a high rate of speed, and that he (Bennie Wallace) stopped Ryan.

171.   Bennie Wallace testified that Ryan Bauer told him that he was coming from the area of the fire because he had to rescue his chain saws from the fire.

172.   Wallace testified that he looked in the bed of Ryan's truck and saw multiple chainsaws.

173.   Bennie Wallace also testified that Ryan Bauer came back from the other direction 20 minute or so later and that he said he had to go back in to rescue more of his equipment.

174.   Andrea Terry has now testified that Ryan Bauer was not at her house all day, and that he only stopped by for a brief while.

175.   According to Andrea Terry, Ryan was driving a green Toyota pickup truck when he arrived at her house that day. He was dirty and covered in sawdust, and looked like he had been cutting wood. He had at least one chainsaw with him in the bed of his truck.

176.   Ryan Bauer had a side business of cutting firewood for people in the town of Westwood, and he cut wood in the area of the Cooks Creek work site. Bauer

19

scouted for wood in the area covered by the Cooks Creek Sale during the week preceding the Moonlight Fire, including in the government's alleged origin area.

177.    On the morning of September 3, 2007, Bauer told his parents that he was going to cut wood that day in the Cooks Creek area.

178.    The government's alleged origin area had recently been logged by Howell's Forest Harvesting, and photos taken the day following the fire show down logs which have been cut with a chainsaw.

179.    Chainsaws are a known potential ignition source of fire.

180.    Bauer used to work in a chainsaw shop, and bragged that he knew how to modify a chainsaw to increase horsepower better than anyone, and claimed to have done so to his own chainsaw that he used for firewood cutting.

181.    The USFS issued wood cutting permits throughout 2007, including while the Moonlight Fire was burning.

182.    Andrea Terry said that, while Ryan Bauer was in their front yard on the afternoon of September 3rd, he spotted smoke in the hills and then made a phone call.

183.    Andrea Terry's parents both confirm that Ryan visited Andrea that day, but that he was at the house for only a short time before he spotted smoke from the fire.

184.    Andrea's father recalls that Ryan spoke on the phone with someone about the fire while he was in the backyard, and that he left shortly thereafter.

185.    Bennie Wallace, a deputy sheriff in the town of Westwood, was never interviewed by the Moonlight Fire investigators.

186.    Ryan, Eddie and Jennifer Bauer all acknowledge having seen Benny Wallace in the meadow on September 3, 2007.

187.    Ryan Bauer knew it was against law and regulation to cut wood after 1pm on a Red Flag Day.

188.    Ryan Bauer was addicted to and taking narcotics at time of Moonlight Fire.

189.    Josh White investigated approximately four other fires on September 3, 2007, including the A-1 Fire near Chester and the Amesbury Fire in Susanville.

190.    The A-1 or "Butt Creek" Fire was reported at approximately 5:15 a.m. that morning.  White responded and, after participating in suppression efforts, began investigating the origin and cause.

191.    White located a general and specific origin area.  He did not grid the specific origin area.  Within it, he found a cigarette butt and several shell casings.  He

20

1    determined the fire was caused by a discarded cigarette, but could not fully
2    exclude arson as a potential cause.

3    192.   White stated in his origin and cause report for the A-1 Fire that, "based on the
       remote location, I believe it to be possible that a person or persons unknown could
4      have purposefully started the fire using a direct flame device (match or lighter)."

5    193.   The Amesbury Fire was reported at approximately 12:30 p.m. on September 3, in
       Susanville.  White responded and when he arrived, USFS Battalion Chief Michael
6      McNeil was already present.

7    194.   McNeil represented to White that he had already determined the origin and
       believed the cause was a lawnmower.  White stated in his origin and cause report
8      that he read the burn indicators and determined the general and specific origin
       areas of the fire, and that the cause was a spark exiting the exhaust of the mower.
9

10   195.   White did not grid the specific origin area of the Amesbury Fire.

11   196.   At the time of the Amesbury Fire, McNeil was suspected by the USFS of being a
       serial arsonist.  White was aware of this.
12

13   197.   McNeil was investigated by Special Agent Diane Welton as a potential arsonist for
       various fires that had occurred in Southern California.

14
15   198.   Neither White nor Welton ever investigated McNeil as a possible arsonist of the
       Moonlight Fire.

16   199.   The Green Fire, which is referenced in the Report, burned on June 21, 2007, and
       was investigated by USFS employee Bridgett Foster.
17

18   200.   At the time she investigated the Greens Fire, Foster had been trained under FI-210.

19   201.   The equipment identified by Foster in the Greens O&C Report bears the same VIN
       as Kelly Crismon's dozer, which is referenced in the Moonlight Fire O&C Report.
20

21   202.   Foster testified that Damon Baker was operating this bulldozer on 6/21/07.

22   203.   Baker claims he was operating a rubber tired skidder on 6/21/07, not Crismon's
       metal-tracked dozer.

23   204.   The United States claims that Bush confessed to having started the Greens Fire on
       6/21/07 with his bulldozer, different from Crismon's and different from the rubber
24     tired skidder.

25   205.   Foster did not finish her origin and cause report until after the Moonlight Fire
       investigation began.  She submitted it to Dave Reynolds, per his specific request,
26     on or about September 6, 2007.

27

28

21

**JOINT PRETRIAL STATEMENT**

206.   When she investigated the Greens Fire, Foster did not read burn indicators to locate the origin and did not grid the scene.  She never located an ignition source and did not find a point of origin.  Foster did not exclude other potential causes on the Greens Fire.

207.   The USFS did not send a letter of demand to recover the suppression costs it incurred in fighting the Greens Fire.

208.   Foster created another origin and cause report in the fall of 2010 regarding the Greens Fire that was materially different in numerous respect from the original origin and cause report.

209.   The Lyman Fire, which is referenced in the Moonlight Report, burned on August 17, 2007.  It reportedly occurred on a ripping operation that SPI had hired Howell's to conduct as an independent contractor.  It was investigated by CDF employees Les Anderson and Greg Gutierrez.

210.   At the time they investigated the Lyman Fire, Anderson had not been trained under FI-210.  He participated in the investigation for "on-the-job training."  Gutierrez had been trained under FI-210.

211.   Neither Anderson nor Gutierrez located an ignition source and did not find a point of origin. They did not grid the scene.  Gutierrez did not determine that the Lyman fire was caused by Howell's equipment.

212.   Anderson and Gutierrez did not finish the origin and cause report for the Lyman Fire until after the Moonlight Fire began.  It was submitted on or about September 18, 2007.

213.   The CDF issued an origin and cause report for the Lyman Fire stating that the fire was due to equipment working in the area, and did so after the Moonlight Fire began.

214.   Despite the fact that no investigator reached a conclusion as to what caused the fire, the CDF sought and received a payment of $46,000 payments from Eunice Howell.

215.   The Sheep Fire, which is referenced in the Moonlight Report, burned on September 17, 2007, and was investigation by CDF employee David Harp.  Harp's report concluded that the Sheep Fire was caused by Howell's equipment.

216.   Harp had taken the FI-210 training course at the time he investigated the Lyman Fire.

217.   Harp did not locate an ignition source and did not find a point of origin.  He did not grid the scene.  Harp did not exclude other potential causes, and did not locate either an ignition source nor a point of origin.

22

218.    The origin and cause reports for the Green, Lyman or Sheep fire had not yet been issued at the time the Moonlight Fire started, so no purported cause had yet been determined.

219.    Landowners did not know of the existence of the Green, Lyman or Sheep fires before the Moonlight Fire started.

220.    Beaty did not know of the existence of the Lyman or Sheep fires before the Moonlight Fire started.

221.    Division Chief Alan Carlson was White's supervisor at the time of the Moonlight Fire, and was responsible for overseeing White's work as the investigation progressed.

222.    Carlson had taken and taught FI-210 at the time the Moonlight Fire occurred.

223.    Carlson reviewed drafts of the Report and was the initial case manager, which meant he was responsible for working with the Attorney General's office in commencing a cost recovery action.

224.    White circulated a draft of the Report to Carlson as early as September 16, 2007, and Carlson provided feedback within a few days.

225.    White interviewed Sierra Pacific employees Mike Mitzel and John Forno on September 6, 2007, and promised to let them know when a cause was determined.

226.    White submitted a finalized report for approval in or about January 2008.

227.    The Report was not published or made available to the public until June 30, 2009.

228.    White did not inform Mitzel or Forno or anyone else on behalf of the Defendants that the Report was released.

229.    This was not the first time that Alan Carlson had attempted to file a cost recovery action against Sierra Pacific.  In the late 1990's or early 2000's, CDF responded to a fire on Sierra Pacific's property known as the "Gun" Fire.  The Gun Fire burned approximately 125 acres.

230.    As the Gun Fire was nearly contained, CDF crews were mopping up and an ember escaped.  The fire ("Gun II") spread and grew much larger than the Gun fire.

231.    CDF conducted an origin and cause investigation and concluded that the Gun II fire was caused by Sierra Pacific, who was conducting salvage operations.

232.    The USFS disagreed with CDF's conclusion.  The USFS concluded that the fire was due to CDF's oversight during mop up operations.

233.    Alan Carlson oversaw and/or participated in CDF's investigation of the Gun II Fire and its attempt to collect suppression costs from Sierra Pacific.

23

234.   Investigator White became the case manager for the CDF regarding the Moonlight Fire in approximately February of 2008, and while he was still the investigator for the Moonlight Fire.

235.   CDF receives a percentage of any suppression damages collected on investigated fires.

**Regarding Damages**

236.   The United States' Initial Rule 26 Disclosure, dated April 15, 2012 claims damages in the amount of $791,367,246.76.

237.   The United States' Supplement Rule 26 Disclosure, dated October 20, 2011, claims damages in the amount of $662,480,066.

238.   As a result of the Moonlight Fire, the United States is claiming damages in each of the following categories, all of which are disputed.

        a.   Lost timber value
        b.   Reforestation costs
        c.   Habitat, Environmental and Ecological Losses
        d.   Fire Suppression Costs
        e.   Burden
        f.   Interest
        g.   Burned Area Emergency Rehabilitation and Assessment
        h.   Site Planning, Preparation and Administration
        i.   Double Damages

239.   The burn severity range was from "low" and "none" through "moderate" and "high."

240.   The land burned by the Moonlight Fire within the Plumas and Lassen National Forests affected by the Moonlight Fire has historically been used for commercial timber production and has, in fact, been logged in the past.

241.   The USFS buys, sells and exchanges timberland.

242.   Plumas National Forest has engaged in land exchanges with private owners, including the Landowner Defendants and Sierra Pacific.

243.   When the USFS buys, sells, or exchanges land, valuation is determined by the Uniform Appraisal Standards for Federal Land Acquisition (FSM 5410.7) which directs that only economic uses are considered when establishing market value. This manual is also referred to as the "Yellow Book."

244.   "The Uniform Appraisal Standards for Federal Land Acquisition (FSM 5410.7) provides, in part:   "Accordingly, a highest and best use of conservation, preservation, or other use that requires the property to be withheld from economic production in

24

perpetuity, is not a valid use upon when to estimate market value. Such an estimate is, therefore, not in conformance with the Uniform Appraisal Standards for Federal Land Acquisition."

245.    The majority of the land in Plumas and Lassen National Forests affected by the Moonlight Fire has the county zoning classification of "General Forest."

246.    None of the land affected by the Moonlight Fire is designated "Wilderness Area."

247.    None of the land affected by the Moonlight Fire is designated Quincy Library Group "Off- Base" or any other similar designation.

248.    All of the land encompassed within Plumas and Lassen National Forests has been exposed to naturally occurring fires over time and fire is a part of the ecology.

249.    In July 2007, a series of lightning strike fires occurred in the Plumas National Forest adjacent to what later became known the Moonlight Fire, the fires are known as the Wheeler Fire (aka Antelope Lightning Complex Fires), and burned approximately 23,000 acres.

250.    The United States did not conduct a pre-fire Fair Market Value appraisal of the land burned by the Moonlight Fire.

251.    The pre-fire Fair Market Value of the land affected by the Moonlight Fire is $115 million.

252.    Experts retained by the United States, including Frank Mileham, could have conducted pre-fire Fair Market Value appraisal of the land burned by the Moonlight Fire but were not asked to make such an appraisal.

253.    The change in Fair Market Value of the land affected by the Moonlight Fire is $19.7 million.

254.    Experts retained by the United States, including Frank Mileham, could have determined the change in Fair Market Value of the land affected by the Moonlight Fire but were not asked to make such an appraisal.

255.    The United States contends that the Moonlight Fire damaged 492,916,300 board feet of timber.

256.    The United States contends that the value of the burned timber is $50.9 million.

257.    Fire-killed trees retain value if harvested within a reasonable time after a fire.

258.    The United States Forest Service recognizes that fire damaged trees burned by the Moonlight Fire had value.

259.    Plumas National Forest Supervisor Alice Carlton requested an emergency situation determination from the Regional Forester that would allow Plumas National Forest to

25

1    avoid a waiting period between the approval of the Environmental Impact Statement
2    for salvage operations and the auctioning of salvage sales.

3    260.    In June 2008, the USDA Forest Service published a report entitled "Fire Behavior and
         Effects in Fuel Treatments and Protected Habitat on the Moonlight Fire."

4
5    261.    On June 4, 2009, Ryan Tompkins, Silviculturalist for the Plumas National Forest
         prepared a report entitled "Moonlight and Wheeler Fires Recovery and Restoration
6        Project Forest vegetation, Fuels, Fire, and Air Quality Report."

7    262.    On June 22, 2009, Plumas National Forest published the "Moonlight and Wheeler
         Fires Recovery and Restoration Project Emergency Restoration Analysis."

8
9    263.    The United States could have recovered at least 453,000,000 board feet of timber
         through prompt salvage.

10   264.    The market value that would have been realized through prompt salvage was in the
         range of $4.9 million to $9.7 million.
11

12   265.    Katherine Carpenter, the NEPA Coordinator for Plumas National Forest,
         recommended to Forest Supervisor Alice Carlton that an Environmental Impact
13       Statement be prepared for the combined Wheeler/Moonlight Fires.

14   266.    Plumas National Forest Supervisor Alice Carlton did not follow the EIS
         recommendation made by Katherine Carpenter.
15

16   267.    Plumas National Forest Supervisor Alice Carlton did not follow the EIS
         recommendation made by Katherine Carpenter for tactical reasons related to pursuit of
17       the Moonlight Fire litigation.

18   268.    As a result of the failure to follow the recommended EIS process, over a year and a
         half delay occurred in the salvage harvest.
19

20   269.    The delay in conducting the salvage harvest caused deterioration of the trees,
         rendering them worthless in the market place and leaving a vast forest of hazard trees.

21   270.    The USFS was able to salvage 25,556,000 board feet of timber and sell it for
         $691,036.
22

23   271.    The United States contends that the total cost of the NEPA planning related to the
         salvage of the 25,556,000 board feet of timber was $3,620,498.

24   272.    The United States disclosed Ron O'Hanlon as an expert witness on reforestation.
         O'Hanlon opines that 30,068 acres should be reforested at 400 trees per acre.  He
25       opines that reforestation efforts will require: 1) preparing the site, 2) planting new
         trees, and 3) conducting related follow-up work, such as site exams, weed removal and
26       pre-commercial thinning.

27

28

26

273. O'Hanlon claims a range of $66,988,656 to $73,730,384 to reforest timberland burned by the Moonlight Fire.

274. The United States prepared detailed reforestation plans for the Moonlight Fire that call for planting 100 to 200 trees per acre in widely spaced clusters.  The United States rejected planting high density plantations (300 to 400 trees per acre) because of the likelihood of such plantations propagating a high severity crown fire.

275. Pursuant to its reforestation plan, the United States has prepared and planted trees on approximately 22,000 acres.  Additionally, the United States has completed most, but perhaps not all, of the required follow-up work on these 22,000 acres.

276. The United States spent less than $10 million completing its reforestation activities on these 22,000 acres.

277. Although the United States completed roughly two-thirds of its reforestation efforts before O'Hanlon disclosed his expert report, O'Hanlon did not take the actual costs into consideration in his expert analysis.  Instead, O'Hanlon relied on his own estimate of the hypothetical cost of reforestation, which on a per acre basis, is more than four-and-a-half times the actual, out-of-pocket cost incurred by the United States.

278. The land that burned in the Moonlight Fire should not be restocked to the unhealthy, dense, and overstocked stands that existed at the time of the Moonlight Fire.

279. Using usual, customary, reasonable unit costs for the reforestation contemplated by Plumas National Forest, reforestation costs are in a range of $3 million to $10.7 million.

280. U.S. Expert Frank Mileham is a California Registered Professional Forester.

281. Mileham testified that a reasonable reforestation cost in the 2007 post fire period was $200 - $300 per acre.

282. U.S. Expert Ron O'Hanlon has opined that reforestation costs are in a range of $1,443 - $2,388 per acre for all areas requiring site preparation.

283. The United States claims a range of $43,700,000 to $469,950,634 for habitat, environmental, and ecological loses.

284. The claim of $43,700,000 is based upon a Habitat Equivalency Analysis (HEA) developed by Robert Unsworth.

285. The Unsworth Report fails to consider any aspect of ecological conditions prior to the fire, except overstory tree size.

286. The Unsworth Report fails to recognize that many of the functioning ecosystem components were not destroyed by the fire despite the loss of living trees.

27

287.   The Unsworth Report fails to consider that a number of resource services recover habitat functionality more rapidly than is measured by the quadratic mean diameter of the overstory trees.

288.   The Unsworth Report fails to consider an appropriate risk of future fires based on current fire risk.

289.   The Unsworth Report fails to adequately consider important direct and quantifiable collateral benefits in its analysis of net damages.

290.   The Unsworth Report fails to accurately assess baseline levels of habitat prior to the Moonlight Fire.

291.   The Unsworth Report improperly estimates degree of injury to the ecosystem.

292.   The Unsworth Report fails to consider an appropriate recovery trajectory following the Moonlight Fire.

293.   The Unsworth Report fails to accurately identify the current risk of fire within the Plumas and Lassen National Forests.

294.   The Unsworth Report fails to include avoided fire suppression costs in its estimation of collateral benefits.

295.   The failure to include the collateral benefit of avoided fire suppression costs is inconsistent with the methodology employed by Unsworth in prior wildfire HEA opinions.

296.   The maximum supportable damages using the HEA methodology, and taking collateral benefits into consideration, is $2,200,000.

297.   The government's upper range of $469,950,634 for alleged habitat, environmental and ecological loses is the product of doubling alleged economic losses.

298.   The Unsworth Report opines that lost habitat and environmental services could be redressed by acquiring 14,521 acres of land similar to that impacted by the Moonlight Fire at a cost of $42 million.

299.   The damages sought by the United States are duplicative, overlapping, exaggerated and in excess of the pre-fire Fair Market Value of the land affected by the Moonlight Fire.

300.   There is no rational or legal basis for doubling of alleged environmental damages already encompassed within a diminution of Fair Market Value analysis.

301.   The United States' "doubling" of damages under California Civil Code section 3343 results in the "doubling" of damages already "doubled" and is without any factual, rational or legal basis and is confiscatory in violation of the California and United States Constitutions.

28

JOINT PRETRIAL STATEMENT

302.   The "$100,000,000+" claimed as HEA damages in the United States' Supplemental Rule 26 Disclosure (or other arbitrary number) is without any factual, rational, or legal basis.

303.   U.S. Fisheries and Wildlife prepared a BAER Assessment called the "BAER SPECIALIST REPORT" in September 2007.

304.   The "BAER SPECIALIST REPORT" determined that an emergency did not exist for the Foothill Yellow-Legged Frog as a result of the Moonlight Fire.

305.   The "BAER SPECIALIST REPORT" determined that an emergency did not exist for the Willow Flycatcher as a result of the Moonlight Fire.

306.   The "BAER SPECIALIST REPORT" determined that an emergency did not exist for the California Spotted Owl as a result of the Moonlight Fire.

307.   The "BAER SPECIALIST REPORT" determined that an emergency did not exist for the Northern Goshawk as a result of the Moonlight Fire.

308.   The "BAER SPECIALIST REPORT" determined that an emergency did not exist for Mule Deer forage as a result of the Moonlight Fire.

309.   On April 24, 2008, a "Biological Assessment/Biological Evaluation" for the "Moonlight Roadside Safety and Hazard Tree Removal Project, Mt. Hough Ranger District" (Biological Assessment) was prepared by Wildlife Biologist Chris M. Collins and reviewed by George Garcia, Plumas National Forest Wildlife, Fish & Rare Plains Program Manager.

310.   The "Biological Assessment" project area analyzed was the entire perimeter of the Moonlight Fire (64,986 acres).

311.   The project area does not include suitable habitat for the California Red-Legged Frog.

312.   The most recent survey prior to the fire (2005) did not detect any Mountain Yellow-Legged Frogs within the project area.

313.   The most recent survey prior to the fire (2005) did not detect any Foothill Yellow-Legged Frog populations within the project area.

314.   Historic surveys, including the most recent survey in 2001 resulted in no historic or recent sightings of the Willow Flycatcher.

315.   Historic surveys, including the most recent survey in 2003, did not detect any Great Gray Owls within the project area.

316.   Based upon past survey work, including larger scale survey efforts in 2005, no American Marten have been observed in the project area.

29

317.   There is no evidence of death or injury to American Bald Eagles, Greater Sandhill Cranes, Pacific Fishers, California Wolverine, Sierra Nevada Red Fox, turtles, or hawks.

318.   The United States claims fire suppression costs in a range of $20,503,187 to $22,535,050.

319.   Defendants contend that "reasonable and necessary" fire suppression costs are approximately $14,149,000.

320.   Defendants contend that the claimed "Burden" of $226,997 is arbitrary, unreasonable, and lacks foundation.

321.   Defendants dispute the amount of prejudgment interest claimed, including the rate, methodology and starting date.

322.   Defendants contend that the costs associated with site planning, preparation and administration would not have been required had the United States performed a timely salvage.

323.   With regard to those areas replanted, there is no evidence that the United States conducted any mechanical site preparation.

324.   The United States claims Burned Area Emergency Rehabilitation and Assessment damages of $1,428,623.

325.   The United States further claims additional "BEAR Assessment" costs of $109,293.

326.   Defendants dispute the reasonableness and/or the basis of the BEAR damages and whether the damages were actually incurred.

327.   Defendants dispute the reasonableness and/or basis for the additional "BEAR Assessment and whether the damages were actually incurred.

328.   Defendants dispute the ability to claim "double damages" or any multiplier in a wildfire case based upon "negligence" or "casual or involuntary trespass."

329.   Defendants contend that the claimed damages that are the subject of the "doubling" claim are duplicative, overlapping, fictitious, without foundation, and otherwise excessive or non-existent.

## V.
## DISPUTED EVIDENTIARY ISSUES

**Plaintiff's Statement**

### A.   The United States' Disputed Evidentiary Issues.

The United States has filed a number of *motions in limine* and *Daubert* motions,

30

1     alerting the Court to a number of evidentiary issues expected to arise at trial.  The following is a

2     list of those motions.  Additionally, a number of other evidentiary disputes that have arisen are

3     described below.

4                     _Motions in Limine:_

5            1.      Motion to exclude evidence regarding red rock lookout.  FRE 401, 402, 403

6            2.      Motion to exclude argument of government conspiracy and cover up.  FRE 401,

7     402, 403.

8            3.      Motion to exclude speculative and unsupported arson defenses.  FRE 401, 402,

9     403.

10           4.      Motion to exclude inadmissible character evidence related to Ryan Bauer.  FRE

11    401, 402, 403, 404.

12           5.      Motion to exclude lay opinions and speculation that Ryan Bauer could have started

13    the Moonlight Fire.  FRE 403, 404, 602, 701.

14           6.      Motion to exclude reference to Ryan Bauer's prior assertion of Fifth Amendment

15    privilege.

16           7.      Motion to exclude any playing of video testimony of Bauer in prison garb and

17    shackles.  FRE 403, 404(b).

18           8.      Motion to exclude impermissible character evidence related to Michael McNeil.

19    FRE 401, 402, 403, 404

20           9.      Motion to exclude hearsay interview recordings of non-party witnesses.  FRE 801,

21    802

22           10.     Motion to exclude reference to double damages.  FRE 401, 402, 403.

23           11.     Motion to exclude reference or evidence to the impact of a judgment on

24    Defendants.  FRE 401, 402, 403.

25           12.     Motion to exclude evidence and argument critical of post-fire salvage sale for not

26    using "extraordinary efforts."

27           13.     Motion to exclude testimony evidence of timber value based on 2009 values.

28           14.     Motion to exclude late opinions of David Howitt.  FRCP 37

                                           31

                                  **JOINT PRETRIAL STATEMENT**

15.     Motion to exclude late opinions of Timothy Feller.  FRCP 37

16.     Motion to exclude late opinions of Chris Lautenberger. FRCP 37

17.     Motion to exclude late opinions of John Cunningham.  FRCP 37

18.     Motion to exclude late opinions of Mark Menz.  FRCP 37

*Daubert Motions*

1.     Dean Bundy

2.     Jason Dorris

3.     Paul Kayfetz

4.     Timothy Feller

5.     David Shear

6.     Duane Miller

7.     Chris Lautenberger

8.     Steve Carmen

9.     John DeHaan

10.     David Howitt

11.     Carlos Pello

12.     Phillip Hall

13.     Mark Rasmussen

14.     David Saah

15.     Richard Fields

Other Evidentiary Disputes:

   *1.     Evidence Related to Equitable Defenses:*  In this pretrial statement,

Defendants have for the first time revealed (still without the specificity required by Fed. R. Civ.

Proc. 9(b)) that their equitable defenses of unclean hands, estoppel, waiver, and laches are based

on "spoliation of evidence, manufacturing of evidence, perjury, suborning perjury, and

obstruction of justice."  For the reasons stated in the United States' Points of Law section below,

these defenses fail as a matter of law.  But even if the Court exercised its discretion to consider

these defenses, it should exclude this evidence from the jury.  The "determination of equitable

32

1    defenses and equitable remedies is a matter for the court to decide, not the jury." *Smith v. World*

2    *Ins. Co.*, 38 F.3d 1456, 1462 (8th Cir. 1994); *Bonners Farms Ltd. v. Fritz*, 355 Fed. Appx. 10,

3    2009 WL 4112352, at * 8 (6th Cir. 2009) (unclean hands defense an issue for court not jury).  Nor

4    should the court grant the defendants' request to submit these issues to the jury in an advisory

5    capacity under Rule 39(c).  Doing so here will likely confuse and mislead the jury as to the legal

6    issues it is empaneled to decide versus the issues it is deciding in an advisory capacity only.

7    There is also a substantial risk of unfair prejudice against the United States, as the evidence

8    related to the unclean hands and other defenses will invite the jury to render its decision based on

9    the equitable defenses, which is for the Court, not the jury, to do.  *See Pioneer Hi-Bred Intern,*

10   *Inc. v. Ottawa Plant Food, Inc.*, 219 F.R.D. 135, 149-50 (D. Iowa 2003) (refusing to empanel

11   advisory jury on equitable defenses of laches, waiver, and estoppel where jury was also rendering

12   a verdict in a non-advisory capacity because of risks of jury confusion and unfair prejudice).

13         *2.      Evidence of Purported Fair Market Value*:   For the reasons stated in the United

14   States' Daubert challenge to Mark Rasmussen, as well as the United States' opposition to Beaty's

15   motion for summary judgment, the United States also objects to any evidence of market value or

16   diminution in market value, and seeks to have that evidence excluded.

17         *3.      Non-Party Deposition Testimony*.  Defendants have designated deposition

18   testimony of witnesses who are available for trial and whose statements do not constitute

19   admissions against party opponents.  These witnesses include, Ryan Bauer, Eddie Bauer, Jennifer

20   Bauer, Benny Wallace, Andrea Jackson, Josh White, and Dave Reynolds.  The Bauers, Wallace,

21   White, and Reynolds have all been properly served with trial subpoenas and will all be available

22   to testify at trial.  Although Dave Reynolds was a Forest Service employee at the time of the fire,

23   he was not at the time his deposition was taken.  Upon information and belief, Andrea Jackson

24   will be available for trial.  Thus, these witnesses must be called live, and use of their deposition

25   testimony should not be admitted unless it is used as a prior inconsistent statement with their trial

26   testimony.

27         *4.      Evidence Relating to Alleged Delays in Salvage Logging*.  The Court has granted

28   summary judgment in favor of the United States on the defendants' mitigation defense, including

33

1    the issue of alleged inadequate salvage logging.  (ECF # 522).  Thus, any evidence or argument

2    that the United States could have salvaged more lost timber or obtained a higher value for timber

3    salvaged is no longer a defense and is irrelevant.  Any such evidence should be excluded.

4        *5.      Evidence Relating to Alleged Inadequacies in Fire Suppression.*  The Court has

5    granted summary judgment in favor of the United States on the defendants' mitigation defense,

6    including the alleged inadequacy of fire suppression tactics.  (ECF # 522).  Thus, any evidence,

7    opinions, or argument that the United States inadequately suppressed the fire is irrelevant.  Any

8    such evidence or argument should be excluded.

9        The United States reserves the right to amend the aforementioned list of in limine

10   motions, and to raise any other evidentiary objections as they arise at trial.  The United States

11   reserves its right to assert foundational, hearsay, and all other evidentiary objections as

12   appropriate depending on the exhibits, oral testimony, or other evidence ultimately offered at trial

13   or intended for admission and publication before the jury.

14       The United States anticipates utilizing trial presentation software, a laptop computer,

15   poster board blow-ups of specific exhibits determined prior to trial and other demonstrative

16   evidence.

17   **Defendants' Statement**

18       Defendants anticipate examining witnesses via live and deposition testimony and Plaintiff

19   indicates that it intends to do so as well.[6]  Defendants will make their objections to any such video

20   designations in accordance with the Federal Rules of Civil Procedure, and believe any such

21   objections can best be addressed depending on the circumstances surrounding each individual

22   deponent.

23       Defendants anticipate utilizing both physical and demonstrative exhibits, which will

24   require the use of special technology at trial.  By way of example, but not limitation, Defendants

25   will be introducing numerous photograph- and video-based exhibits, and will seek to do so using

26   a high definition monitor they bring that portrays said exhibits in high resolution.  Defendants do

27   not know if Plaintiff intends to dispute their right to do this.

28   _____
     [6] The government states that it intends to use video testimony for impeachment, or if a witness is unavailable.

**JOINT PRETRIAL STATEMENT**

1        For any exhibits that were produced in native as well as hard copy form, Defendants will

2   seek leave to utilize both versions.

3        Defendants' filed a number of *Daubert* and *in limine* motions on May 31, 2012, and a list

4   of those motions is set forth below.  Defendants reserve the right to make any additional

5   objections as the need arises.

6        **Defendants' Motions *in Limine***

7        1.   Motion to Preclude Argument That Defendants Could Be Liable Even if Howell

8             Did Not Start The Moonlight Fire

9        2.   Motion to Preclude Evidence of Deputy Wallace's Motion for a Restraining Order

10            Against Third Party Edwin Bauer

11       3.   Motion to Preclude Evidence Regarding the Sheep Fire

12       4.   Motion to Preclude Reference to The "Howell" Fire

13

14       5.   Motion to Preclude Introduction and/or Use of Certain Statements By Co-

15            Defendants

16       6.   Motion to Exclude Evidence of Robert Brown's Convictions

17       7.   Motion to Exclude Defendants' Post-Fire Safety Plans

18       8.   Motion to Exclude Lay Witness Testimony Regarding Rock Strikes

19       9.   Motion to Exclude Expert Testimony of Other Fires Regarding Rock Strike Fires

20       10.  Motion to Exclude Expert Legal Conclusions Regarding Negligence

21       11.  Motion to Exclude Testimony of Frank Holbrook

22       12.  Motion to Preclude Evidence of Contacts With Federal Employees

23       13.  Motion to Exclude Evidence Regarding Legislative Efforts

24       14.  Motion to Exclude Evidence of Damages From Fred's & Power Fires

25       15.  Motion to Preclude Evidence of Wildlife And Habitat Issues

26       16.  Motion to Preclude Evidence of Reforestation Costs

27       17.  Motion to Exclude Evidence of "Baer" Costs

28       18.  Motion to Exclude Expert Mark Cohen

**JOINT PRETRIAL STATEMENT**

1    19. Motion to Exclude Untimely Expert Opinion of P. Shires

2    20. Motion to Exclude Expert Testimony of Gerald Quigley

3    21. Motion to Exclude Expert Testimony of David Stone

4    22. Motion to Exclude Expert Testimony of Richard Mangan

5    23. Motion to Exclude Expert Testimony of Rajeev Kelkar

6    24. Motion to Exclude Expert Testimony of S. Werner And P. Wang

7    25. Motion to Exclude Untimely Expert Opinions of N. Sitar

8    26. Motion to Exclude Untimely Expert Opinions of J. Wallace

9    27. Motion to Exclude Reference to Crossclaims Among Defendants During Trial of

10        Plaintiff's Claims

11    28. Motion To Exclude Evidence Regarding Heroism Of Firefighters

12    29. Motion To Exclude Evidence Regarding Financial Condition And/Or Personal

13        Wealth Of Landowner Defendants

14    **Defendants' *Daubert* Motions**

15    1.  Motion to Exclude Expert Testimony of John Garland

16    2.  Motion to Exclude Expert Testimony of Kevin Boston

17    3.  Motion to Exclude Expert Testimony of Richard Mangan

18    4.  Motion to Exclude Expert Testimony of Neil Wheeler

19    5.  Motion to Exclude Expert Testimony of Cliff Merck

20    6.  Motion to Exclude Expert Testimony of Lester Hendrickson

21    7.  Motion to Exclude Expert Testimony of Rajeev Kelkar

22    8.  Motion to Exclude Expert Testimony of Stephen Werner

23    9.  Motion to Exclude Expert Testimony of Nicholas Sitar

24    10. Motion to Exclude Expert Testimony of Patrick Shires

25    11. Motion to Exclude Expert Testimony of John Wallace

26                              **VI.**
    **SPECIAL FACTUAL INFORMATION (RE: PROPERTY DAMAGE)**
27
    **Plaintiff's Statement**
28

36

1   The United States submits the following special factual information:

2       (iv) <u>In tort actions for personal injury, wrongful death or property damage</u>:

3       (A)   **Date, place and general nature of the incident**: The fire began on September 3,

4   2007, on private property in Plumas County, California before spreading to the Plumas and

5   Lassen National Forests.   The Moonlight Fire ultimately burned over 65,000 acres, including

6   46,000 acres of public land in the Plumas and Lassen National Forests.

7       (B)   **Property Damage**: Itemized in section VII below.

8   **<u>Defendants' Statement</u>**

9       The Moonlight Fire began on private timber land in Plumas County, California, on

10   September 3, 2007, and eventually burned approximately 65,000 acres of forest land, roughly

11   42,000 of which belong to the United States.  The government alleges that the Moonlight Fire

12   was caused by a rock-strike from a metal-tracked bulldozer operated by Defendants Howell while

13   it was constructing "water bars" on what are known as "skid trails."

14       The United States asserts causes of action for: 1) negligence against all Defendants; 2)

15   liability under California Health & Safety Code §§ 13007-13009.1 and Civil Code §§ 3287 &

16   3288 against all Defendants; 3) negligence and negligence *per se* under 14 Cal. Code Regs. §

17   938.8; 4) trespass by fire against all Defendants; 5) negligent supervision against Sierra Pacific,

18   Beaty, Landowners, and Eunice Howell; and 6) interest and penalties against all Defendants.

19       The doctrine of strict liability and res ipsa loquiter is addressed below in the section

20   entitled "Points of Law."  The damages sought by the United States, including its alleged property

21   damages, are discussed below in the section entitled "Relief Sought."

22                          **VII.**
                         **<u>RELIEF SOUGHT</u>**

23   **Plaintiff's Section:**

24   **A.   <u>United States' Statement</u>.**

25       The United States seeks the following relief:

26   Fire Suppression Costs                       $ 22,535,051

27   _____

28

**JOINT PRETRIAL STATEMENT**

| | |
|---|---|
| Lost Timber Values | $ 50,984,757 |
| Reforestation | $ 68,261,085 |
| Environmental/Ecological Damages | To be determined by Jury |
| | ($ 43,700,000)[7] |
| Burned Area Emergency Rehabilitation | $ 1,525,093 |
| Total | $187,005,986. |

The United States will ask the jury for compound interest under California Civil Code section 3288.  Alternatively, the United States may ask the Court for interest under the Fair Debt Collection Act (31 U.S.C. § 3717).  Simple and compound interest from October 1, 2007 through April 23, 2012 is

$77,663,271 and $87,934,047, respectively.  Although the amount of prejudgment interest on its resource damages is within the discretion of the jury under state law; prejudgment interest on the United States' fire suppression costs is mandatory, under either the Federal Debt Collection Act, 31 U.S.C. § 3717, or state law, and the amount of such interest is determined by the Court.  The United States also seeks to double all of its damages under California Civil Code § 3346(a).  Such doubling should automatically occur post verdict and prior to any offsets or deductions for salvage (if any) or interest calculations.  The United States seeks costs and additional further relief that the Court deems appropriate.[8]

**Defendants' Statement:[9]**

---

[7] The United States intends to submit an instruction allowing the jury to assess the environmental and ecological damages based on their common experience, as allowed in *United States v. Merco Constr. Eng'rs, Inc.,* 2010 WL 1068413, at *2-3 (C.D. Cal. 2010).  That number cannot be ascertained at this time.  In the alternative, the United States will provide expert testimony of a "habitat equivalency analysis" that estimates the environmental and ecological recovery at $43.7 million.

[8] The United States objects to the defendants' seventeen pages of legal argument that follows.  Such argument is contrary to the purpose and intent of this section, which is entitled "Relief Sought," and asks for "the elements of monetary damages, if any, and the specific nature of any other relief sought."  L.R. 281(b)(7).  Nothing more is required, and the briefing that follows is unauthorized and disruptive to the purposes of the pretrial statement.  The United States will not respond to these arguments here, and requests that the Court strike this portion of the statement.

[9] In this "Relief  Sought" section, Defendants have included their "Points of Law" that pertain to damages in order to streamline the discussion and avoid duplication between the two sections.

38

On October 20, 2011, the United States served Supplemental Initial Disclosures that contained the following damages computation:

| | |
|---|---|
| Fire Suppression Costs | $22,535,051.00 |
| Timber Damages | $50,984,757.00 |
| Reforestation Costs | $68,261,085.00 |
| Burned Area Emergency Rehabilitation (BAER) | $1,525,093.00 |
| Habitat, Environmental and Ecological Losses | $100,000,000+ |
| Interest on all categories of damages listed above at 7% | $87,934,047.00 |
| Double Damages on all damages listed above under California Civil Code section 3346 | $331,240,033 |
| **TOTAL** | **$662,480,066.00+** |

In this Joint Pre-Trial Statement, the United States claims substantially less in damages (see above).

A.    <u>**Choice of Law Analysis**</u>

Before addressing the damages recoverable by the United States, if any, a preliminary issue must be addressed: what law – federal or state – applies in this action?  Jurisdiction in this case is predicated on 28 U.S.C. section 1345.  In actions brought under this statute, federal law provides the rule of decision, even when the right to recovery is created by state law.  *United States v. City and County of San Francisco*, 446 F.Supp.2d 1140, 1145-46 (E.D. Cal. 2006); *see also U.S. v. Union Pacific Railroad Co.,* 2007 WL 1500551, * 2 (E.D. Cal. May 23, 2007).  If there is no clear federal law to apply, then the court may look to state law to fashion the rule of decision unless there is a significant conflict between a federal policy or interest and the use of state law.  *See U.S. v. State of Cal.*, 655 F.2d 914, 919-20 (9th Cir. 1980); *U.S. v. State of Cal.*, 932 F.2d 1346, 1349 (9th Cir.1991).  As discussed below, the present case presents a mixed bag: clear federal law for some issues but not for others.

39

1    **B.    Fair Market Value**

2        Defendants contend that the pre-fire fair market value of the land affected by the

3    Moonlight Fire is $115 million, and that the change in fair market value as a result of the

4    Moonlight Fire is $19.7 million.  Defendants filed a motion for summary judgment arguing that

5    damages should be capped at the pre-fire fair market value of the property.  The Court disagreed

6    with this argument, finding that market value "is merely one way to ensure that the damages will

7    fully and reasonably compensate an injured party as required by California statutes; it does not

8    follow that such a calculation is a blanket requirement in determining every award of damages."

9    Dock. 474.  The Court held that whether or not damages in the amount of the pre-fire fair market

10   value of the land in question will serve to fully compensate United States is a question to be

11   decided by the jury.  *Id.*  Accordingly, at trial, Defendants intend to argue that that damages

12   sought by the United States are unreasonable in relation to the pre-fire fair market value and in

13   relation to the diminution in market value caused by the fire.

14   **C.    Natural Resource Damages**

15       Defendants contend that the United States seeks three improper, duplicative and legally

16   unsupportable categories of natural resource damages allegedly caused by the Moonlight Fire: (1)

17   lost timber value for both mature and immature timber, (2) reforestation costs for both mature and

18   immature timber, and (3) environmental damages.

19       Briefly summarized, Defendants contend that under federal common law the natural

20   resource damages recoverable by the United States are limited to the difference between the value

21   of the mature timber before and after the fire plus the cost of replanting immature trees.  *See*

22   *Corvallis & E. R. Co. v. United States,* 191 F. 310 (9th Cir. 1911) (holding that "[t]he measure of

23   damages in this case is the difference, if any, between value of this timber immediately before the

24   fire, and immediately after"); *Feather River Lumber Co. v. United States*, 30 F.2d 642 (1929)

25   (explaining that "[a]s to the merchantable timber, the measure of damages was the value of the

26   trees," while "[a]s to the young growth . . . the trial court . . . might properly include the cost of

27   restoring the land to the condition it was before the fire"); Norman J. Wiener, *Uncle Sam and*

28   *Forest Fires: His Rights and Responsibilities*, 15 Envt'l L. 623, 633-34 (1985) ("When a fire

40

1  burns a federal forest, Uncle Sam may recover as damages, injury to its timber and immature

2  forest growth . . . . The measure of damages for merchantable timber is the difference between its

3  value before and after the fire . . . . [For immature trees], the courts instead may award the

4  reasonable cost of restoring the forest land to its condition immediately before the fire.").  Under

5  Ninth Circuit case law, there is no separate category of damages for environmental loss over and

6  above the market value of mature trees or the cost of replacing immature trees.

7    Alternatively, under state law, the United States can recover *either*: (1) the diminution in

8  value of the land, or (2) restoration (i.e. reforestation) costs for all injured or destroyed trees,

9  mature and immature.  *See e.g. Mozzetti v. City of Brisbane*, 67 Cal. App. 3d 565, 576 (1977);

10  *Mozzetti v. City of Brisbane*, 67 Cal. App. 3d 565, 576 (1977).  The United States is limited to

11  recovering the lesser of these two amounts, unless the government establishes the applicability of

12  the "personal reason" exception at trial, in which case it can recover restoration costs even if they

13  exceed the diminution in value.  *See Heninger v. Dunn*, 101 Cal. App. 3d 858, 862-63 (1980)

14  (noting, however, that damage claims under the "personal reason" exception still cannot be

15  "unreasonable in relation to the damage inflicted upon the land or its value prior to the trespass").

16    Therefore, Defendants contend that regardless of whether federal or state law applies, the

17  United States cannot recover both the value of all mature and immature timber as well as

18  reforestation costs for that same timber, both mature and immature.  *See generally* 6 Witkin,

19  *Summary of Cal. Law* § 1728, at 1264-65 (10th ed. 2005); *id.* § 1550, at 1023-24 ("it is reversible

20  error to allow both" diminution in value and cost of restoration damages).  Likewise, regardless of

21  what law applies, the United States cannot recover timber losses for immature timber.  *See e.g.*

22  *Feather River*, 30 F.2d 642 (explaining that immature timber has no market value).

23    **1.    Timber Losses**

24    With respect to timber losses, the United States disclosed Frank Mileham as its expert

25  witness on mature timber damages, who opines that the United States incurred timber losses of

41

$50,984,757.[10]  Defendants contend that these damages are unreasonable, unsupported and speculative, and that using usual, customary, reasonable measures, timber losses are in a range of $3 million to $10.7 million.  Defendants also contend that the United States failed to mitigate its timber damages by conducting timely and comprehensive salvage logging operations.

The United States disclosed Ron O'Hanlon as its expert witness on immature timber damages, who opines that the immature timber burned in the Moonlight Fire would reach maturity in fifteen years and, at that time, would have a value of $1,272,429.  Defendants contend that the United States cannot recover timber damages for immature timber that has no economic value, and that such damages are unreasonable, unsupported and speculative.

## 2.   Reforestation Damages

The United States also seeks reforestation damages for replanting mature and immature timber burned in the fire.  The government disclosed Ron O'Hanlon as its expert witness on reforestation.  O'Hanlon opines that 30,068 acres should be reforested and that the reforestation work will cost the United States $68,261,085.00 – an average of $2,125 per acre.   Defendants contend that these costs are unreasonable, unsupported and speculative, and that using usual, customary, reasonable unit costs for the reforestation contemplated by Plumas National Forest, reforestation costs are in a range of $3 million to $10.7 million.

To date, the United States has prepared and planted trees on approximately 22,000 acres.  Additionally, the United States has completed most, but perhaps not all, of the required follow-up work on these 22,000 acres.  The United States spent less than $10 million completing the reforestation activities on these 22,000 acres, which is less than $454 per acre.  Assuming that reforestation damages are recoverable, Defendants contend that the United States is limited to recouping its out-of-pocket expenses for reforestation activities that have already been completed.

## 3.   Habitat, Environmental and Ecological Losses

The United States demands an amorphous $43.7 million to $100 million, plus interest, in

---

[10]  The United States also belatedly disclosed David Stone on the topic of timber damages.  Defendants have filed a motion in limine to exclude Stone and his untimely opinions under Federal Rules of Civil Procedure 26 and 37.

1    damages for alleged habitat, environmental and ecological losses.  On August 30, 2011, the

2    United States disclosed damages expert Robert Unsworth, who opines that the Moonlight Fire

3    caused habitat, environmental, and ecological damages of $43.7 million.  However, when the

4    United States subsequently supplemented its Initial Disclosures on October 24, 2011, the

5    government did not utilize the damages calculation performed by Mr. Unsworth.  Instead, the

6    United States revealed its intention to request a jury instruction that would allow the jury to

7    "calculate" the economic value of alleged harm to habitat, environmental, and ecological

8    resources caused by the Moonlight Fire without the aid of expert testimony.  In its supplemental

9    Initial Disclosures, the government estimated that a jury would place such a value at $100 million

10   or more.

11        Whether such an approach is appropriate – and whether environmental damages are

12   recoverable in the first place – is currently a question before the Ninth Circuit.  *See United States*

13   *v. Merco Construction Engrs., Inc.* ("*Merco*"), 2010 WL 1068413, *4 (C.D. Cal. Jan. 25, 2010).

14   In *Merco*, the United States sought an award of "intangible" environmental damages for the

15   "Copper Fire."  *Id.* at *1.  At trial, the government introduced evidence that 18,000 acres of

16   burned federal land was not usable by the public as a result of the fire, that parts of the forest were

17   closed to the public for more than a year, and that the fire destroyed animal habitat, soil, and plant

18   life.  *Id.* at *3.  The United States did not, however, offer any evidence of the value or amount of

19   intangible environmental damages, and instead took the position that such damages are "'not

20   susceptible to empirical calculation because the losses sustained are measured by their value to

21   the public and for posterity.'"  *Id.*  To calculate the amount of intangible environmental damages,

22   the United States suggested that the jury apply a multiplier of two or three times the amount of

23   "hard damages" awarded, or alternatively to apply a price per acre.  *Id.*  The jury ultimately

24   awarded $28.8 million for intangible environmental damages, which was a little less than four

25   times the approximate "hard damages" of $7.6 million or about $1,600 per acre.  *Id.*

26        Defendant CB&I Constructors, Inc. ("CB& I") challenged the award of environmental

27   damages on a motion for judgment as a matter of law.  *Id.* at 1.  CB&I argued that intangible

28   environmental damages were not recoverable as a matter of law, that such damages were

43

1    speculative, that the award was excessive, and that the government did not introduce sufficient

2    evidence to support the jury verdict.  *Id.*  As to the later argument, CB&I argued that damages

3    must be ascertained in some rational way, and because the United States did not provide evidence

4    of a "rational way" to access such damages, the intangible environmental damages awarded could

5    not stand.  *Id.*  The United States countered that intangible environmental damages are similar to

6    that of a plaintiff seeking emotional distress, where jurors base an award on their common sense

7    rather than a formula.  *Id.* at *4.  The district court found the analogy to emotional distress

8    damages persuasive, held that environmental damages were recoverable, and found that the

9    United States had provided  sufficient evidence for the jurors to quantify that harm.  *Id.*

10        CB&I appealed this decision to the Ninth Circuit.  On appeal, the issues are: (1) whether

11   the United States can recover intangible environmental damages as noneconomic damages for

12   harm to property; and (2) whether the United States offered sufficient evidence to support the

13   award of environmental damages.  Oral arguments were held on November 15, 2011, and the case

14   is now submitted.  Similar to the issues on appeal in *Merco*, Defendants contend that the United

15   States cannot recover intangible environmental damages, or alternatively, that the United States

16   must present expert testimony or other competent evidence of the amount of such damage.

17   **D.**    **Fire Suppression Costs**

18        Pursuant to the California Health and Safety Code, the United States seeks to recover

19   $22,535,051 plus interest in fire suppression costs.  The United States has divided its suppression

20   costs into twelve categories, and each category includes an array of different costs.  For example,

21   under the materials and supplies category, the United States seeks reimbursement for items such

22   as lodging at various hotels, including Circus Circus and the Excalibur, meals at local restaurants,

23   including the Pizza Factory, Marie Calendar and Burrito Bandito, and miscellaneous items from

24   Wal-Mart, Rite Aid, Walgreens, and Office Depot, such as plastic folding tables.  Defendants

25   dispute the reasonableness of the claimed fire suppression damages and whether the damages

26   were actually incurred in connection with the Moonlight Fire.  If liability is established,

27   Defendants contend that the United States cannot recover more than $14,149,000.

28

44

**E.**     **Burned Area Emergency Rehabilitation and Assessment (BAER) Damages**

The United States also seeks $1,525,093.00 plus interest in damages associated with its Burned Area Emergency Rehabilitation and Assessment (BAER).  The United States seeks two types of BAER damages: assessment costs, which are the costs associated with the initial review of post-fire conditions, and rehabilitation costs, which are the costs associated with the treatments implemented.  Defendants do not presently know what statute or other legal authority the United States relies on for recovery of its BAER damages.  Defendants dispute the reasonableness of the BEAR damages and whether the damages were actually incurred.

**F.**     **Prejudgment Interest**

The United States seeks compound prejudgment interest under California Civil Code section 3288 in the amount of $87,934,047.  Alternatively, the government seeks simple interest under the Fair Debt Collection Act in the amount of $77,663,271.  Under either alternative, the United States appears to contend that prejudgment interest should be calculated at the rate of 7% from October 1, 2007, through the start date of trial.

Defendants believe that because there is clear federal common law on point, federal law – not state law – governs any award of prejudgment interest.  Indeed, the federal jurisprudence on prejudgment interest is long and robust.  *See e.g. City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 194 (1995); *Funkhouser v. J.B. Preston Co.*, 290 U.S. 163, 168-69 (1933) (explaining that "courts have dealt with the question of allowing interest according to their conception of the demands of justice and practicality"); *Amoco Production Co. v. U.S.,* 663 F.Supp. 998, 1000 (D. Utah 1987) (explaining "since the United States is itself a party and one of the defendants who will receive the prejudgment interest, it would make little sense to apply state law"); *Blanton v. Anzalone*, 813 F.2d 1574, 1576 (9th Cir. 1987); *see also* Local Rule 590.

Under federal common law, trial courts are vested with the discretion whether or not to award prejudgment interest.  *Vance v. American Hawaii Cruises, Inc.*, 789 F.2d 790, 794 (9th Cir. 1986); *see also Purcell v. U.S.*, 1 F.3d 932, 942-43 (9th Cir. 1993) (holding that this rule is only "trumped" if a federal statute mandates the award).  Similarly, the rate of interest and the timeframe for awarding interest are questions for the court.  *See Blanton,* 813 F.2d at 1576.  The

45

1   trial court has the ability to calculate prejudgment interest itself, *see Jackson & Perkins*

2   *Wholesale, Inc. v. Smith Rose Nursery, Inc.,* 303 Fed.Appx. 481, 483 (9th Cir. 2008), or can ask

3   the parties to submit calculations with the proposed judgment, *see Frank v. Wilbur-Ellis Co.*

4   *Salaried Employees LTD Plan,* 2009 WL 1812826 (E.D. Cal. June 25, 2009).  Defendants

5   recommend that the Court and parties revisit the issue of prejudgment interest, if necessary, after

6   the jury returns its verdict and before entering final judgment.  Defendants would like, however,

7   to briefly outline a couple issues at this juncture.

8       First, the United States has disclosed an expert, Mark Cohen ("Cohen"), who drafted a

9   prejudgment interest "worksheet" to give the jury.  The purpose of his testimony and worksheet is

10   to allow the jury to compute prejudgment interest.  However, under federal law, prejudgment

11   interest is not an issue the jury will decide.  Rather, the question of whether or not to award

12   prejudgment interest, and if so, at what rate and what timeframe, rest entirely with the Court.

13   Defendants have filed a motion to exclude this testimony from trial under Federal Rules of

14   Evidence 401, 402, 403 and 702.

15       Second, the United States is seeking prejudgment interest for each category of its alleged

16   damages starting October 1, 2007, just a week or so after the Moonlight Fire had been

17   extinguished.  Defendants contend that this length of time is improper.  Moreover, prejudgment

18   interest may not be awarded if it duplicates compensation or for damages that will accrue

19   subsequent to judgment.  *See Columbia Brick Works, Inc. v. Royal Insurance*, 768 F.2d 1066,

20   1068 (9th. Cir. 1985).  Defendants contend that the United States is seeking prejudgment interest

21   that would violate this rule.[11]

22   **G.    Double Damages**

23       In its Supplemental Initial Disclosures, the United States doubled every category of its

24   alleged damages under California Civil Code section 3346, including its damages for timber, fire

---

25   [11] For example, government expert Robert Unsworth calculates environmental damages in 2011 dollars,
26   yet the United States also seeks interest on his damages claim for the years 2007, 2008, 2009, and 2011.
     The United States is also seeking prejudgment interest that will accrue subsequent to judgment.  For
27   example, Mr. Unsworth analyzes damages that will allegedly accrue over the next 100 years.  Also of note,
     the United States is improperly seeking to double all of its alleged prejudgment interest under California
28   Civil Code section 3346, which is discussed *infra*.

suppression costs, reforestation, BAER costs, environmental damages, and interest, which together total $331,240,033.  Defendants Sierra Pacific and Howell filed a motion for summary judgment, arguing that Civil Code section 3346 does not apply to damages caused by fire, or at the very least, does not authorize the United States to double every aspect of its damages claim. On May 31, 2012, the Court issued an order finding that Civil Code section 3346 applies in this case, but also holding that the United States can recover double damages only for the actual detriment caused by wrongful injuries to timber, trees or underwood.  *See* Dock. No. 485.

**VIII.**
**POINTS OF LAW**

**Plaintiff's Statement**

**THE UNITED STATES' THEORIES OF RECOVERY:**

**A.**    **Strict Liability**

Defendants are strictly liable under California Health and Safety Code ("H&S") § 13007 and § 13009.  To establish this claim the United States will prove that Defendants, "in violation of law," set fire to, allowed fire to be set to, or allowed a fire kindled by them to escape to the property of the United States.  H & S Code §§ 13007, 13009, and 13009.1 (2002).  By imposing liability where there is negligence "or" a violation of law, the statutory language dictates strict liability for any legal violation.  *Id.*  The United States will prove that Defendants violated the following laws:

1.    *California Public Resources Code § 4421*, which states that "[a] person shall not set fire or cause fire to be set to any forest, brush or other flammable material which is on any land that is not his own, or under his legal control, without the permission of the owner, lessee or agent of the owner or lessee of the land."  Cal. Pub. Res. Code §4421.

2.    *California Public Resources Code § 4422*, which states that "[a] person shall not (a) willfully or knowingly allow fire to burn uncontrolled on land which he owns or controls, or to escape to the lands of any person other than that of the owner[ or] (b) [a]llow any fire kindled or attended by him to escape from his control or to spread to the land of any person other than from the land from which the fire originated."  Cal. Pub. Res. Code §4422.

47

3.       *14 Code of California Regulations §938.8*, which provides "(a) [t]he timber operator or his/her agent shall conduct a diligent aerial or ground inspection within the first 2 hours after cessation of felling, yarding, or loading operations each day during the dry period when fire is likely to spread.  The person conducting the inspection shall have adequate communication available for prompt reporting of any fire that may be detected. …"  14 C.C.R. § 938.8.

**B.      Negligence**

Defendants' negligence resulted in significant damage to the United States.  The United States will prove that:

1.       Defendants were negligent;

2.       Defendants' negligence was a cause of injury, damage, loss or harm to the United States.  BAJI 3.00 (2009).

A cause of injury, damage, loss or harm is something that is a substantial factor in bringing about the injury, damage, loss or harm.  BAJI 3.76 (2009).

The United States will prove Defendants negligence under numerous theories.  Below is a non-exclusive list of those theories:

The fact that Crismon started the fire with his bulldozers creates a presumption of negligence in the use and operation of the bulldozer.  California Public Resources Code §4435; *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 990 (E.D. Cal. 2004); *People v. Southern Pacific Co.*, 139 Cal. App. 3d 627, 632-33 (1983).  Thus, Defendants must prove by a preponderance of the evidence that they were non-negligent in the use and operation of the bulldozer.  *Id.*  Proving that they were not-negligent necessarily requires Defendants to explain: (1) why they allowed operation on a red flag day, (2) why they allowed unsupervised operation on a red flag day, (3) why they did not provide Crismon with any training on how to use the bulldozer, (4) why Crismon was unable to avoid causing a fire, and (5) why Crismon failed to inspect the areas where he operated his bulldozer to ensure that a fire did not start.

Bush and Crismon's violation of Howell's fire safety policies is prima facie evidence of negligence.  *Grudt v. City of L.A.*, 2 Cal. 3d 575, 588 (1970); *Dillenbeck v. City of Los Angeles*,

69 Cal. 2d 472, 478 (1968). Howell's corporate representative, Damon Baker will testify that Bush and Crismon violated Howell's policy by failing to perform the mandatory walking inspection of all areas where they operated and by failing to perform a continuous, two-hour fire watch immediately after operations. These policy violations are sufficient in themselves to establish negligence.

The doctrine of *res ipsa loquitur* creates a presumption of negligence (and a presumption of causation) when a forest fire starts in the woods where a bulldozer conducted logging operations. *Roddiscraft, Inc. v. Skelton Logging Co.,* 212 Cal. App. 2d 784, 796 (1963); *see also Seeley v. Combs*, 65 Cal. 2d 127 (1966). The presumption of negligence extends to efforts to detect, suppress, and report the fire. *Levy-Zenter Co. v. S. Pac. Trans. Co.*, 74 Cal. App. 3d 762 (1977).

Under California Evidence Code section 669(a), a presumption of negligence arises from Defendants' violation of several statutes and regulations, including 36 C.F.R. section 261.5(c)-(e), section 938.8 of the California Forest Practice Rules (codified at 14 Cal. Admin. Code § 938.8), and California Public Resource Code sections 4421 and 4422.

Howell's is vicariously liable for the acts of its employees. *Perez v. Van Groningen & Sons, Inc.*, 41 Cal.3d 962, 967 (1986); *Hinman v. Westinghouse*, 2 Cal.3d 956, 962 (1970).

Howell's is directly liable for failing to properly train and supervise Bush and Crismon. *Doe v. Capital Cities*, 50 Cal.App.4th 1038, 1054 (1996); *Delfino v. Agilent Technologies, Inc.,* 145 Cal.App.4th 790, 815 (2006).

Sierra Pacific is vicariously liable for Howell's negligence acts. There are multiple legal theories supporting vicarious liability, including (1) California Public Resource Code § 13007, which holds parties liable for willfully, negligently, or in violation of law causing fire damages "through another"- including contractors (*see United States v. Pacific Gas & Elec. Co.*, 2010 WL 2836190, at *5 (E.D. Cal. 2010)); (2) peculiar and inherent risk (*see LaCount v. Henzel Phelps Constr. Co*, 79 Cal. App. 3d 754, 762-63 (1978)); (3) conduct likely to cause a trespass (*see* Restatement (Second) of Torts § 427B)); and (4) agency (*see Holley v. Crank*, 400 F.3d 667, 673 (9th Cir. 2005)). Under section 13007, Sierra Pacific will automatically be liable for any of

**JOINT PRETRIAL STATEMENT**

1   Howell's liability, and the jury need not be instructed on the issue.  If the jury is instructed on the

2   issue, they need be instructed only that if they find Howell's was negligent or in violation of law

3   in starting the fire or allowing it to escape, the jury must assess an equal amount of liability

4   against Sierra Pacific.  In the alternative, the United States will be entitled to submit to the jury

5   the issues of agency, peculiar and inherent risk, and conduct likely to cause a trespass.

6          Sierra Pacific is liable for its own negligent supervision and retention of Howell's.  *See*

7   *Delfino v. Agilent Technologies, Inc.*, 145 Cal. App. 4th 790, 815 (216), *citing* 2 Dobbs, The Law

8   of Torts (2001), § 333, p. 906; *see also Phillips v. TLC Plumbing, Inc.*, 172 Cal. App. 4th 1133,

9   1140 (2009), quoting Restatement (Third) of Agency, § 213, Comment d; *see* Restatement

10  (Third) of Agency, § 7.05(1) (2006).  Sierra Pacific failed in its supervision of Howell's by

11  allowing Bush and Crismon to operate unsupervised on a red flag day despite its knowledge of

12  two other operations fires caused by Howell's earlier that season.  Sierra Pacific should have

13  intervened and insisted that the scheduled work not occur, or, at a minimum, that a supervisor be

14  present to ensure proper fire safety measures were employed.

15         Sierra Pacific is liable under the doctrine of retained control for failing to exercise its

16  power to prevent Howell's from operating in an unsafe manner, including allowing Bush and

17  Crismon to operate unsupervised on a red flag day.  *Yanez v. United States*, 63 F.3d 870, 874

18  (1995); Restatement (Second) of Torts, § 414.

19         As a "possessor of land" Beaty is liable for negligently allowing Bush and Crismon to

20  operate unsupervised on a red flag warning day.  One who "carries on activity" on behalf of a

21  possessor of land is  "subject to the same liability . . . for physical harm caused thereby to others .

22  . . outside of the land as though he were a possessor the possessor of the land."  Restatement

23  (Second) Torts § 383.  As a possessor of land, Beaty had a non-delegable duty to manage the

24  property in a reasonable and prudent manner so as to prevent harm to others.  *Davert v. Larson*,

25  163 Cal. App. 3d 407, 409-410 (1985).  Beaty had the duty to oversee Howell's operations and

26  the power to control Howell's on fire safety issues.  Beaty failed to reasonably exercise that

27  control and allowed Bush and Crismon to operate unsupervised on a red flag day.  Beaty allowed

28  them to operate despite knowing that Bush caused the Greens Fire earlier that year.  Beaty should

                                                    50

1  have intervened and insisted that the scheduled work not occur, or, at a minimum, that the

2  employees be supervised.

3      The Landowners are liable because - as an owner of land - they have a non-delegable duty

4  to manage the property in a reasonably and prudently manner so as to prevent harm to others.

5  *Davert*, 163 Cal. App. 3d at 410; *Brown v. George Pepperdine Foundation*, 23 Cal. 2d 256, 260-

6  61 (1943); *Swanberg v. O'Mectin*, 157 Cal. App. 3d 325, 330-32 (1984).  The fact that they hired

7  Beaty to manage the property does not insulate them from liability.  *Id.*  The Landowners are also

8  vicariously liable for Beaty's negligence under the doctrine of peculiar risk and inherent risk.

9  *LaCount v. Henzel Phelps Constr. Co.*, 79 Cal.App.3d 754, 762-63 (1978).

10  **C.    Trespass**

11      Defendants' negligence allowed the Moonlight Fire to escape and spread onto the United

12  States' federally owned property, the Plumas and Lassen National Forests, causing Trespass by

13  Fire.  To establish this claim the United States will show:

14          1.    The United States owned the property;

15          2.    Defendants intentionally, recklessly, or negligently caused fire to enter the United

16  States' property;

17          3.    The United States did not give permission for the entry;

18          4.    The United States was actually harmed; and

19          5.    The Defendants' conduct was a substantial factor in causing the United States'

20  harm.

21      Entry can be on, above, or below the surface of the land.  Entry may occur indirectly such

22  as by fire.  *Judicial Council California Civil Jury Instruction* 2000 (2009).

23  **D.    Damages**

24      As the Court held in its recent order denying Beaty's motion for summary judgment (ECF

25  # 474),  the United States public is entitled to all damages to the National Forests as a result of

26  the fire.  *See* Cal. H&S Code § 13007 ("Any person who ... sets fire to, allows fire to be set to, or

27  allows a fire kindled or attended by him to escape to, the property of another, whether privately or

28  publicly owned, *is liable* to the owner of such property *for any damages* to the property caused by

51

1    the fire."); Cal. Civil Code § 3333 (that the measure of damages for an obligation not arising in

2    contract is "the amount which will compensate for *all the detriment* proximately caused thereby,

3    whether it could have been anticipated or not").  The damages include the following categories:

4        1.      *Suppression Costs.*  The United States is entitled to recover the costs it incurred

5    suppressing the Moonlight Fire.  Cal. H&S Code §§ 13007; 13009, 13009.1.  The transaction

6    register is prima facie evidence of suppression costs incurred and a "presumption of regularity in

7    the acts of government agencies" supports the validity of the transaction register.  *People v.*

8    *Southern Cal Edison Co.*, 56 Cal. App. 3d 593, 605-06 (1976); *United States v. Stonehill*, 702

9    F.2d 1288, 1293-94 (9th Cir. 1983); *United States v. Chemical Foundation*, 272 U.S. 1 (1926).

10       2.      *Lost Merchantable Timber Value.*  The Moonlight Fire killed nearly 500 million

11   board feet of merchantable timber—enough to build over 30,000 homes.    While these damages

12   are in excess of $50 million, they constitute but a fraction of the United States' actual loss, as

13   only a small percentage of trees killed by the fire were of commercially merchantable.

14       3.      *Reforestation.*  Reforestation costs are recoverable for the separate injury of harm

15   to the soil, legally required replanting costs, or destruction of young growth and pre-merchantable

16   timber. *United States v. Union Pacific*, 565 F.Supp.2d 1136, 1143 (E.D. Cal. 2008); *Kelly v.*

17   *CB&I Constructors, Inc.*, 179 Cal. App. 4th 442, 453 (2009); *Heninger v. Dunn,* 101 Cal.App.3d

18   858, 863 (1980).

19       4.      *Interim Environmental Degradation.*  The forest as we knew it is gone, and it will

20   not be back for over a century (and if it is not properly reforested, it may be gone permanently).

21   During this period of re-growth, scenic value is lost, recreational value is lost, habitat for sensitive

22   species is lost.  The public has suffered a substantial loss in the form of environmental

23   degradation, and it will not be fully compensated unless it recovers for this interim loss. *United*

24   *States v. Union Pacific*, 565 F.Supp.2d 1136, 1143 (E.D. Cal. 2008).

25       Because environmental degradation is a loss that the public can readily identify with, it is

26   within the province of the jury to assess the value of this loss.  *United States v. Merco Constr.*

27   *Eng'rs, Inc.,* 2010 WL 1068413, at *2-3 (C.D. Cal. 2010) (appeal pending); *Moylan v. Dykes*, 181

28   Cal. App. 3d 561, 574 (1986); *Ojala v. Bohlin*, 178 Cal. App. 2d 292, 304 (1960) ("Having

52

**JOINT PRETRIAL STATEMENT**

1  established the fact of harm, it was within the "sound judgment and discretion of the trier of fact"

2  to determine the amount of the damages to award for that harm.); *see also* 23 Cal. Jur. 3d (2008)

3  *Damages* 32, pp. 67-69.  To assist the jury in assessing this loss, the United States will present

4  evidence of the types and extent of the injury to the forests.

5      5.    *Prejudgment Interest.*  The United States is entitled to prejudgment interest as a

6  matter of law on its fire suppression costs.  Cal. Civ. Code § 3288; Fair Debt Collection Act (31

7  U.S.C. § 3717).  The United States is entitled to prejudgment interest in the discretion of the jury

8  on the other damages.  *Id.*

9      6.    *Double damages.*  The United States is entitled to double all of its damages arising

10  from the Moonlight Fire since all such damages resulted from injury to timber, trees and

11  underwood.  Cal. Civ. Code § 3346; *Kelly v. CB&I Constructors, Inc.*, 179 Cal. App. 4th 442,

12  453 (2009); *Heninger v. Dunn,* 101 Cal.App.3d 858, 863 (1980).  Such doubling should

13  automatically occur post verdict and prior to any offsets or deductions for salvage (if any) or

14  interest calculations.

15  **E.    Defendants' Affirmative Defenses.**

16      1.    *Unclean hands, waiver, estoppel, laches.*

17      The defendants' equitable defenses fail as a matter of law.  First, they have not been

18  properly pled.  This pretrial statement is the ***first*** time the defendants disclosed that they were

19  asserting any equitable defenses based on allegations such as "the government investigators'

20  intentional failure to properly investigate the fire, cover-up of relevant evidence, manufacturing

21  of evidence, and intentionally untruthful deposition testimony and sworn interrogatory responses

22  about the same."  The defendants' failure to plead these allegations and the specific factual

23  circumstances underlying this alleged misconduct  is fatal to their equitable defenses.

24      Where equitable defenses such as unclean hands are based on fraudulent or inequitable

25  conduct, they must be pled with particularity as required under Rule 9(b) of the Federal Rules of

26  Civil Procedure.  *Powertech Tech., Inc. v. Tessera, Inc.*, 2012 WL 1746848, at *5 (N.D. Cal.

27  2012) (striking affirmative defense of unclean hands based on fraudulent or inequitable conduct

28  where not plead with specificity under Rule 9(b)); *Collaboration Prop., Inc. v. Tandberg ASA*,

1   2007 WL 205065, at *7 (N.D. Cal. 2007) (same).  Under Rule 9(b), a party must "state with

2   particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b).  This requires a

3   party, at a minimum, "to state precisely the time, place, and nature of the misleading statements,

4   misrepresentations, and specific acts of fraud."  *Kaplna v. Rose*, 49 F.3d 1363, 1370 (9th Cir.

5   1994) (district court properly refused to consider four alleged false statements not identified in

6   plaintiff's complaint).  "Conclusory facts and neutral allegations are insufficient."  *Hockey v.*

7   *Medhekar*, 30 F. Supp. 2d 1209, 1213 (N.D. Cal. 1998).

8         Here, the defendants failed to plead their unclean hands and other equitable defenses with

9   the required particularity; indeed, they were not pled at all.  Defendant Howell's pled none of

10  these defenses.  (ECF # 54)  Defendants Beaty and the Landowners did not plead the defense of

11  unclean hands, nor did they plead defenses of waiver or estoppel.  (ECF ## 55 and 56).  While

12  Sierra Pacific did plead the defenses, it pled them generally without asserting any factual support.

13  (ECF # 57, Defenses 3-6).  Nowhere in any pleading did a defendant plead an equitable defense

14  of unclean hands, waiver, estoppel, or latches based on allegations such as "the government

15  investigators' intentional failure to properly investigate the fire, cover-up of relevant evidence,

16  manufacturing of evidence, and intentionally untruthful deposition testimony and sworn

17  interrogatory responses about the same."  Further, these new allegations themselves are *still* too

18  vague and fail "to state precisely the time, place, and nature of the misleading statements,

19  misrepresentations, and specific acts of fraud."  *Kaplan,* 49 F.3d at 1370.  What "intentional

20  failure" to properly investigate??  What "cover up" and "manufacturing" of evidence?  What

21  "intentionally untrue" deposition testimony?  The specific factual allegations underlying these

22  claims are anyone's guess.  Thus, the defendants have not met their burden of properly pleading

23  the equitable defenses, and they may not proceed on them.

24        The United States is prejudiced by the defendants' failure to properly plead the defense.

25  As the defendants concede in footnote 17, *infra*, their affirmative defenses, as originally pled,

26  were not based on the conduct that they now allege.  Once it became apparent that the bases for

27  these defenses had changed, it was incumbent upon them to seek leave to amend their complaint

28  to put the United States on notice of the defenses.  They did not, and to this day Howell's, Beaty,

and the Landowners have failed to plead an unclean hands defense.  Had the United States been aware that the defendants were asserting such a defense, it would have raised the issue on summary judgment.  Thus, Defendants may not proceed on their equitable theories..

Even if the defendants had properly pled their equitable defenses, they still fail as a matter of law.  The defendants have no conceivable basis for a defense based on waiver, laches, or estoppel, and thus they cannot proceed on these claims.

The unclean hands defense also fails.  First, the equitable remedy of unclean hands cannot be applied to thwart the United States' effort to vindicate the public interest.  It "has been quite properly said that because a governmental agency is charged with the protection of public interests a court should be very cautious in permitting equitable defenses to be asserted against it."  *N.L.R.B. v. Pease Oil Co.*, 279 F.2d 135, 137 (2d Cir. 1960).  Thus, "where the defenses of unclean hands or laches have been used against the government when it is asserting public rights, courts have repeatedly held that equitable principles will not be applied to thwart public policy or the purpose of federal laws."  *Kelley v. Thomas Solvent Co.*, 714 F. Supp. 1439, 1451 (W.D. Mich. 1989) (citing cases).  Following this principle, the Ninth Circuit has refused to apply the doctrine of unclean hands against the National Labor Relations Board when it brings suit in the public interest.  *Henderson for and on Behalf of NLRB v. Int'l Union of Operating Eng'rs*, 420 F.2d 802, 808 (9th Cir. 1969).  Here, the United States is seeking to vindicate an important public interest—i.e., recovery for a substantial and enduring injury to National Forest land.  The defendants cannot rely on the doctrine of unclean hands to thwart this right.

Further, the unclean hands defense fails because the United States has purged itself of any alleged cover up.  The defense of unclean hands is inappropriate where a party purges itself of the inequitable conduct giving rise to the defense.  *See Republic Molding Corp. v. B.W. Photo Util.*, 319 F.2d 347, 349-350 (9th Cir. 1963).  Here, the only basis for an unclean hands defense that any defendant has arguably pled is Sierra Pacific's vague allegation that the Forest Service "suppressed" evidence of conduct at the Red Rock Lookout.  *See* Sierra Pacific's Answer to Second Amended Complaint [ECF # 57], at ¶ 78.  But all of the internal memos, emails, and other documents upon which Sierra Pacific bases its defense were voluntarily disclosed by the United

55

1  States.  Had it not been for the United States disclosure of documents, Sierra Pacific could not

2  have made these allegations in the first place.  Thus, even if the defendants could prove that

3  evidence of Lief's conduct was "suppressed," such suppression was purged by the United States'

4  subsequent full disclosure of the information.

5        Finally, the equitable defenses fail because they are without merit.  It is within the Court's

6  sound discretion to reject the defense of unclean hands and similar equitable defenses.  *Trans*

7  *World Airlines v. American Coupon Exch., Inc.*, 913 F.2d 676, 694 (9th Cir. 1990); *Washington*

8  *Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 478 (9th Cir. 1969).  The Court should

9  exercise that discretion here.  The defendants continue to evade responsibility for the fire by

10  blaming others, including the United States, the State of California, and innocent people in the

11  communities surrounding the fire.  The defendants' allegations of a massive conspiracy to get

12  them are not rationally based, and for this reason, the United States has moved to exclude this

13  evidence in a *motion in limine* pending before the Court.  The Court should exercise its discretion

14  and reject the defendants' defense of unclean hands, and their other equitable defenses based on

15  this far-fetched conjecture of a conspiracy.

16        We also note the irony in Sierra Pacific accusing the United States of "unclean hands,"

17  when this Court has issued three orders admonishing Sierra Pacific's counsel for behaving

18  unethically in this suit. (ECF ## 92, 124 and 326).  The Court held that it was "troubled by SPI's

19  counsel's behavior" and "ethical lapse" in making misleading statements while making forbidden

20  ex parte contacts with represented United States employees.  (ECF # 124, at 6:12-7:17).  Should

21  the Court entertain the unclean hands defense, it must consider and weigh this misconduct.

22  *Republic Molding*, 319 F.2d 347 at 350 ("The relative extent of each party's wrong upon the other

23  and upon the public should be taken into account, and an equitable balance struck.").

24        2.    *Contributory Negligence.*

25        The defendants' defense of contributory negligence has been summarily adjudicated in

26  favor of the United States on the issue of the United States' fuels management practices.  [ECF #

27  522].  The Court, however, has ruled that there is a triable question of fact as to whether the Red

28  Rock Lookout's conduct in reporting the fire prior to anyone else while it was still burning on

1   private land met the standard of reasonableness.  The defendants will be unable to prove that the

2   lookout untimely spotted the fire.  Further, the defendants dispute that had the fire been reported

3   thirty minutes prior to the time that Red Rock reported it at 2:24 p.m. it would have been

4   suppressed prior to spreading to federal land.  Therefore, the defendants **concede** that they cannot

5   prove this defense, and the United States will be entitled to a directed verdict on the defense.

6          3.     *Mitigation.*

7          The Court has entered judgment in favor of the United States on the defense of

8   mitigation.[ECF # 522].

9          4.     *Recoupment.*

10         The Court has entered judgment in favor of the United States on the defense of mitigation.

11  [ECF # 522].

12  **Defendants' Statement**

13  **A.     Plaintiff's Claims**

14       **1.     Strict Liability**

15         There is no basis for strict liability against any Defendant.  It is well established in

16  California that "[l]iability for the escape of fire is based on negligence."  6 B.E. Witkin, Summ. of

17  Cal. Law (Torts) § 1427, p. 850 (10th ed. 2005).  Indeed, "it is beyond the power of the

18  Legislature to impose a liability for an accidental and unavoidable fire, which accidentally and

19  unavoidably escapes, if there be no negligence in causing the fire or in allowing it to escape."

20  *Paiva v. California Door Co.*, 75 Cal. App. 323, 333 (1925).  In fact, despite its statement *supra*,

21  Plaintiff acknowledged in the course of summary judgment proceedings that there is no basis for

22  strict liability, at least as to Landowner Defendants.

23       **2.     Negligence**

24         Plaintiff will be unable to establish all of the essential elements of negligence, which are

25  required for all of its claims.  To establish negligence as to any particular defendant, a plaintiff

26  must prove by a preponderance of the evidence that the defendant was negligent, that the plaintiff

27  was harmed, and that the defendant's negligence was a substantial factor in causing the plaintiff's

28  harm.  CACI 400 (citing Cal. Civ. Code § 1714).  Specifically, Plaintiff will be unable to prove

1   that Defendants were negligent or that any negligence by Defendants was a substantial factor in

2   causing Plaintiff's harm.  More specifically:

3

4   •   Plaintiff will be unable to prove that Defendants ignited the fire.

5   •   Defendants owed no duty to Plaintiff to protect Plaintiff from fires caused by
        others, or to prevent, detect, suppress or report such fires.  "The existence of a duty

6       is a question of law for the court."  *Ky. Fried Chicken of California v. Superior
        Court*, 14 Cal. 4th 814, 819 (1997).  If a third party started the fire, Defendants

7       cannot be liable because "an individual is under no duty to control the conduct of
        third parties unless a special relationship exists between the individual and either

8       the third parties or the persons affected by their conduct."  *Id.* at 215 (citing

9       *Williams v. State of California*, 34 Cal. 3d 18, 23-24 (1983)) (additional citations
        omitted); 6 Witkin, Summary of California Law § 1038 (10th ed. 2005) ("A person

10      who has not created a peril is ordinarily not liable in tort merely for failure to take
        affirmative action to assist or protect another, no matter how great the danger in

11      which the other is placed, or how easily he or she could be rescued, unless there is
        some relationship between them that gives rise to a duty to act.") (citations

12      omitted).  Defendants had no special relationship with Plaintiff.  If Defendants did
        not start the Moonlight Fire, then Defendants did not create the peril and thus had

13      no duty to prevent the fire from damaging the United States.

14  •   Plaintiff will be unable to prove that Defendants violated any applicable standard

15      of care.  *See, e.g.,* CACI 401.

16  •   Contrary to Plaintiff's contention, the doctrine of res ipsa loquitur does not create a
        presumption of negligence or causation "when a forest fire starts in the woods

17      where a bulldozer conducted logging operations."  On the contrary, the

18      applicability vel non of res ipsa loquitur depends on the totality of the particular
        circumstances of each case.  Here, the doctrine of res ipsa loquitur does not apply

19      because neither the area where the Moonlight Fire originated nor the agency of its
        ignition was within Defendants' exclusive control.  *See Gicking v. Kimberlin*, 170

20      Cal. App. 3d 73, 75 (1985).  Nor does the presumption necessarily extend to

21      "efforts to detect, suppress, and report the fire," as Plaintiff contends.  Again, the
        analysis is fact specific.  Furthermore, here any res ipsa loquitur presumption will

22      be rebutted as a matter of law by Defendants' evidence.  *See Slater v. Kehoe*, 38
        Cal. App. 3d 819, 833 (1974) ("[T]he mere introduction of evidence sufficient to

23      sustain a finding of the nonexistence of the presumed fact causes the presumption,
        as a matter of law, to disappear.").

24

25  •   Public Resources Code section 4435 will not be triggered because Plaintiff will be
        unable to prove that Defendants started the fire.  Even if Plaintiff could prove that

26      Defendants started the fire, Defendants will prove that Howell's bulldozer was not
        negligently maintained, operated or used.

27

28

**JOINT PRETRIAL STATEMENT**

**3.     Health & Safety Code sections 13007-13009.1; Civil Code sections 3287 and 3288**

Health and Safety Code section 13007 provides:

> Any person who personally or through another willfully, negligently, or in violation of law, sets fire to, allows fire to be set to, or allows a fire kindled or attended by him to escape to, the property of another, whether privately or publicly owned, is liable to the owner of such property for any damages to the property caused by the fire.

Plaintiff does not bring a claim under section 13007's willful prong.  Plaintiff will be unable to prove a claim under section 13007's negligence prong for the same reasons it will be unable to prove a negligence claim (discussed above).  Plaintiff will be unable to prove a claim under section 13007's "violation of law" prong because it will be unable to prove that Defendants caused the Moonlight Fire.  Nor can Plaintiff prove that Defendants set, allowed to be set, kindled, or attended a fire.  Plaintiff also will be unable to prove such a claim based on an alleged violation of 36 C.F.R. section 261.5(c).  The Court has granted summary judgment for Defendants regarding section 261.5(c).  Further, Plaintiff will be unable to prove that Sierra Pacific, Beaty or the Landowners violated section 13007 "through another" because, inter alia, doing so would require establishing an agency relationship between Howell and the other Defendants, which Plaintiff will be unable to do.

Plaintiff also invokes California Public Resources Code sections 4421 and 4422 and alleges that Defendants ignited or allowed the Moonlight fire to spread in violation of these statutes.  But these state statutes cannot serve as a predicate for liability under the unlawful prong of the Health and Safety Code because they also require proving negligence, which Plaintiff cannot do for the reasons discussed above. *See In re Jennings*, 34 Cal. 4th 254, 267 (2004).  Furthermore, the SAC fails to state a claim for violation of section 4421 or 4422 because it does not allege that Defendants "set fire" or "cause[d] fire to be set.  "These terms denote intentionally igniting a fire, which the SAC does not allege.  Nor did Defendants allow the fire to "escape from [their] control."  The fire was never within Defendants' control, so it could not have escaped therefrom. Finally, any claim based on these sections is time barred. *See* Pen. Code § 802 (one-

59

1    year statute of limitations on misdemeanors).

2          Plaintiff also invokes 14 C.C.R. section 938.8 as a predicate for liability under section

3    13007's "violation of law" prong.  As discussed below, Plaintiff will be unable to establish a

4    violation of section 938.8.  Even if Plaintiff could establish such a violation, it cannot establish

5    that it constitutes a "violation of law" under section 13007.  *See* Health & Saf. Code § 13007

6    ("Any person who personally or through another willfully, negligently, or in violation of law, *sets*

7    *fire to, allows fire to be set to, or allows a fire kindled or attended by him* to escape to, the

8    property of another . . . .") (emphasis added).

9          Health and Safety Code section 13008 provides: "Any person who allows any fire burning

10   upon his property to escape to the property of another, whether privately or publicly owned,

11   without exercising due diligence to control such fire, is liable to the owner of such property for

12   the damages to the property caused by the fire."  Plaintiff will be unable to prove a claim under

13   section 13008 because doing so would, at a minimum, require proving negligence, which Plaintiff

14   will be unable to do (for reasons discussed above).  Furthermore, Plaintiff will be unable to prove

15   a claim under section 13008 against Sierra Pacific, Howell or Beaty because the fire did not

16   escape from their property to Plaintiff's property.  Plaintiff also will be unable to prove a claim

17   against Landowners because they did not allow a fire to burn on their property.

18         California Health and Safety Code sections 13009 and 13009.1 similarly impose liability

19   for various fire investigation and suppression costs on "any person who personally or through

20   another wilfully, negligently, or in violation of law" causes certain fires.  For the foregoing

21   reasons, Plaintiff will be unable to prove a claim under these sections.

22         California Civil Code section 3287 provides:

23              (a) Every person who is entitled to recover damages certain, or
                capable of being made certain by calculation, and the right to
24              recover which is vested in him upon a particular day, is entitled also
                to recover interest thereon from that day, except during such time as
25              the debtor is prevented by law, or by the act of the creditor from
                paying the debt. This section is applicable to recovery of damages
26              and interest from any such debtor, including the state or any county,
                city, city and county, municipal corporation, public district, public
27              agency, or any political subdivision of the state.

28              (b) Every person who is entitled under any judgment to receive

                                            60

damages based upon a cause of action in contract where the claim
was unliquidated, may also recover interest thereon from a date
prior to the entry of judgment as the court may, in its discretion, fix,
but in no event earlier than the date the action was filed.

Plaintiff will be unable to recover interest under section 3287(a) because it will be unable

to prove its entitlement to damages, let alone to damages certain, among other reasons. Plaintiff

will be unable to recover under section 3287(b) because it has no cause of action in contract,

among other reasons. Plaintiff will be unable to recover interest under section 3288 because it

will be unable to prove lost wealth, among other reasons. *See Cassinos v. Union Oil Co.*, 14 Cal.

App. 4th 1770 (1993).

**4.      Negligence Per Se under 14 C.C.R. § 938.8 and the Fire Protection Plan**

In order to establish negligence *per se*, a plaintiff must prove, among other things, that the

defendant "violated a statute, ordinance or regulation of a public entity," and that the violation

"proximately caused the defendant's damages." Cal. Evid. Code § 669(a). Plaintiff's allegation

of negligence per se rests on section 938.8 of the Forest Practice Rules, 14 Cal. Code Regs. § 896

*et seq.*[12] Section 938.8 provides:

The timber operator or his/her agent shall conduct a diligent aerial
or ground inspection within the first 2 hours after cessation of
*felling, yarding, or loading* operations each day during the dry
period when fire is likely to spread.

14 C.C.R. § 938.8 (emphasis added). In its opposition to Defendants' motion for

summary judgment, Plaintiff tacitly conceded that section 938.8 does not apply to building water

bars because building water bars does not constitute felling, yarding or loading. Plaintiff will be

unable to establish negligence per se because it will be unable to prove that Defendants started the

fire, that Defendants violated section 938.8, and that a violation of section 938.8 proximately

caused Plaintiff's damages, if any.

**5.      Trespass by Fire**

Plaintiff will be unable to prove trespass by fire for the same reasons it will be unable to

---

[12] Plaintiff tacitly conceded in its opposition to Defendants' motion for summary judgment that it
cannot state a claim for negligence per se based on the Fire Protection Plan. That concession was
appropriate, for the reasons set forth in Defendants' motion, and it is binding.

**JOINT PRETRIAL STATEMENT**

prove negligence (discussed above), which is required to establish trespass by fire.  See Gallin v.

Poulou, 140 Cal. App. 2d 638, 644 (1956).  Plaintiff is not entitled to double damages under Civil

Code section 3346 for the reasons set forth in Defendants' motion for summary judgment and

also discussed below.[13]

### 6.     Negligent Supervision

Plaintiff will be unable to prove negligent supervision.  For the reasons set forth above,

Plaintiff will be unable to establish negligence.  It follows that if Defendants did not cause, let

alone negligently cause, the Moonlight Fire, negligent supervision did not cause the Moonlight

Fire.  Furthermore, neither Sierra Pacific, nor Beaty, nor the Landowners had or assumed a duty

to supervise Howell, an independent contractor.  *See McDonald v. Shell Oil Co.*, 44 Cal.2d 785,

788 (1955); *Toyota Motor Sales, U.S.A., Inc. v. Superior Court*, 220 Cal.App.3d 864, 873 (1990);

*Johnson v. Tosco Corp.*, 1 Cal.App.4th 123, 139 (1991).  There is no common law duty to

supervise an independent contractor, *Asplund v. Selected Invs. in Fin. Equities, Inc.*, 86

Cal.App.4th 26, 29, 38-39, 45 (2001), and no such duty has been breached.  Further, Plaintiff will

be unable to prove that any negligent supervision or retention caused the Moonlight Fire.  *See*

*Dixon v. City of Livermore*, 127 Cal.App.4th 32, 43 (2005).

### 7.     Negligent Hiring

Plaintiff has withdrawn its negligent hiring claim.

### 8.     Interest and Penalties

Plaintiff will be unable to prove its entitlement to interest and penalties because it will be

unable to prove any underlying claim, as well as for the reasons discussed above, among others.

## B.     Affirmative Defenses

- Failure to State a Claim: As discussed in Sierra Pacific's motion for summary judgment, Plaintiff cannot recover because various of its claims, including but not limited to its claim for negligent hiring, fail to allege facts sufficient to constitute a cause of action upon which relief can be granted.  Plaintiff also fails to state a claim for double damages

---

[13] In addition, "the trespass exception [to the rule of no liability for independent contractors] is inapplicable as a matter of law."  Order at 11 (Doc. No. 521).

1   pursuant to Civil Code section 3346.  Plaintiff also fails to state a claim upon which
2   attorneys' fees may be awarded, and it has abandoned any claim to attorneys' fees.

3   • Statute of Limitations: Any claim premised on an alleged violation of California Public
    Resources Code section 4421 or 4422 is barred by the applicable one-year statute of
4   limitations.  *See* Cal. Pen. Code § 802.

5   • Unclean Hands, Waiver, Laches and Estoppel: Plaintiff is precluded from recovering by
    its own grossly inequitable conduct.  Dismissal is warranted where "a party has engaged
6   deliberately in deceptive practices that undermine the integrity of judicial proceeding."
7   *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995).
    Plaintiff's inequitable conduct in this case has been extensive.  "Spoliation of evidence
8   can constitute the necessary 'inequitableness or bad faith' for successful assertion of the
    unclean hands defense.  *Infor Global Solutions (Michigan), Inc. v. St. Paul Fire and*
9   *Marine Ins. Co.*, 2009 WL 5909255, *2 (N.D. Cal. 2009); *see State Farm Fire and*
    *Casualty Co. v. Broan Manufacturing Co., Inc.*, 523 F. Supp. 2d 992, 995, 998 (D. Ariz.
10  2007) (dismissing action for spoliation of evidence when the plaintiff failed to preserve
11  the fire scene).

12  • Comparative Fault: Each and every claim for relief is barred, in whole or in part, by the
    comparative fault of Plaintiff.  Such comparative fault completely or proportionally bars
13  Plaintiff's recovery, if any.  *See Li v. Yellow Cab Co.*, 13 Cal. 3d 804 (1975).  Plaintiff's
    comparative fault centers on its failure to reasonably maintain its own forests, its violation
14  of the Herger-Feinstein Quincy Library Group Forest Recovery Act, 16 U.S.C. § 2104
    note, and its failure at the Red Rock Lookout to exercise reasonable care for the protection
15  of its own property.  *See* Doc. No. 57 at 11-14.
16
    • No Penalties or Double Damages: Plaintiff's claims for penalties and/or double damages
17  are barred to the extent that such damages are not properly available and/or violate the
    Eighth Amendment to the Unites States Constitution.  *See Austin v. United States*, 113
18  S.Ct. 2801 (1993).

19  • Comparative Fault of Third Parties: Plaintiff's recovery, if any, should be barred or
20  reduced by the amount of such damages attributable to the fault of third parties.  *See Li v.*
    *Yellow Cab Co.*, 13 Cal. 3d 804 (1975).
21
    • Proposition 51: Plaintiff's recovery, if any, is limited as against each Defendant by
22  Proposition 51, Civil Code section 1431 et seq.

23  • Election of Remedies: Plaintiff's causes of action for trespass and negligence are barred
24  by the doctrine of election of remedies because Plaintiff seeks mutually inconsistent and
    cumulative remedies.  *See Roam v. Koop*, 41 Cal. App. 3d 1035 (1974).
25
    • Unconstitutional Takings: Plaintiff's claim for double damages under Civil Code section
26  3346 violates the Takings Clause of the Fifth Amendment to the United States
27  Constitution.
28

63

- Deprivation of Due Process: Plaintiff's claim for double damages under Civil Code section 3346 violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

The Court recently entered summary judgment in favor of the United States on the affirmative defenses of contributory negligence and mitigation insofar as they relate to inadequate fire suppression, salvage logging and fuels management.  In its portion of the Joint Statement, the United States argues that any evidence related to these topics is irrelevant and should be excluded from trial.  Defendants disagree with this overbroad contention.  Despite the recent summary judgment ruling, certain evidence regarding fire suppression, salvage logging and fuels management remains relevant to the separate and distinct issue of the reasonableness of the damages claimed by the government.  *See* Cal. Civ. Code § 3359 ("Damages must, in all cases, be reasonable"); *Basin Oil Co. of Cal. v. Baash-Ross Tool Co.,* 125 Cal.App.2d 578, 609 (1954).

For example, one witness described seeing firefighters playing football while the Moonlight Fire was burning.  While such evidence would be relevant to the adequacy of fire suppression efforts, it is also relevant to the question of whether claimed fire suppression costs are reasonable.  As another example, a United States expert contends that that area affected by the fire should be reforested at 400 trees per acre at a cost of over $60 million, while defense experts contend that a lower per-acre planting ratio is appropriate, thereby reducing reforestation costs, because the affected area was overstocked with trees and other fuels at the time of the fire.  Because of the fact-sensitive nature of this and other damages evidence, Defendants suggest that the Court and the parties address the admissibility of evidence related to fire suppression, salvage logging and fuels management on a case-by-case basis at trial.  If the Court prefers to address this issue pre-trial, Defendants respectfully request a full and fair opportunity to brief the issue, particularly since the government did not raise its evidentiary challenge until the day this Joint Statement is due.

## C.     No Vicarious Liability

- Absence of Vicarious Liability: Even if Plaintiff could prove a claim against Howell, it would have no claim against Sierra Pacific, Beaty or the Landowners.

64

Hirers of independent contractors generally are not vicariously liable for the independent contractors' actions. *See Privette v. Superior Court*, 5 Cal. 4th 689, 691 (1993). Plaintiff will be unable to establish the elements of the peculiar risk doctrine. *See* CACI 3708.

- No Agency: Plaintiff will be unable to prove that Howell was the agent, employee or servant of any other Defendant, or that it was acting within the scope of any agency or employment during the relevant times. *See* BAJI 13.20.

- Plaintiff will be unable to prove that Sierra Pacific, Beaty or the Landowners ignited the Moonlight Fire "through another." Health & Saf. Code § 13007. *See Planck v. Hartung*, 98 Cal. App. 3d 838, 842 (1979) (evidence of each defendant's "negligence, wilful misconduct, or other violation of law . . . is essential to liability under this statute.").

- Restatement (Second) of Torts section 427(B): Plaintiff failed to allege vicarious liability under this theory in its SAC, this theory has not been adopted in California, and, in any event, Plaintiff will be unable to prove that Defendants knew or had reason to know that Howell's activities were likely to involve a trespass upon the land of another or the creation of a public or private nuisance.

**D.    Plaintiff's Improper Dispositive Motion Re Unclean Hands**

Plaintiff includes in its portion of this joint pretrial statement an untimely and unfair motion to dismiss Defendants' unclean hands affirmative defense. It is untimely because the deadline for filing dispositive motions passed months ago (and Plaintiff already used up all of the pages it was allotted for dispositive motions at that time). It is unfair because Plaintiff waited until Monday of this week – three days before the deadline for filing this joint pretrial statement – to spring its arguments on Defendants, leaving Defendants inadequate time to respond.

Plaintiff justifies its actions as follows: "The United States was not on notice that the defendants were using equitable defenses in an attempt to bar the United States recovery *even if* the United States proves that they negligently caused one of the biggest forest fires in California history. Had the United States been aware that the defendants were asserting such a defense, it would have raised the issue on summary judgment. Thus the defenses must be dismissed." (original emphasis). This is nonsense.[14] An affirmative defense is relevant *only if* the plaintiff

---

[14] Plaintiff included the quoted language in earlier versions of this joint pretrial statement, then removed it at 8:30 on the night this filing is due. No doubt Plaintiff removed it because it is nonsense. The fact that Plaintiff included it in the first place, however, reveals the bankruptcy of its position.

1    proves the elements of its case.  Why, if not to "bar the United States' recovery even if the United

2    States proves" its case, did Plaintiff think Defendants raised their equitable defenses?  Plaintiff

3    has no excuse for failing to bring its motion by the deadline, and it should not be permitted to

4    bring it now.

5           If the Court is nevertheless inclined to consider Plaintiff's new arguments, Defendants

6    request that it set a briefing schedule.  Defendants need that time to fully research and respond to

7    Plaintiff's arguments.  Based on the limited research they have had time to do, Defendants

8    preliminarily respond to Plaintiff's arguments as follows:

9

10    •   Defendants agree that the Court, rather than the jury, should pass upon its equitable
      defenses,[15] but disagree about the utility of the Court's first obtaining an advisory opinion

11       from the jury.  It is beyond dispute that courts can, and regularly do, obtain advisory
      opinions from juries on equitable claims and defenses. Fed. R. Civ. P. 39(c); *see, e.g.,*

12       *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 2008 WL 6873811 (C.D. Cal. Jan 3,
      2008) (obtaining advisory opinion and noting that "[i]ssues of fact going solely to an

13       equitable issue should be decided by the Court, after consideration of any advisory
      findings of the jury.") (citing *In re Metoprolol Succinate Pat. Lit.*, 494 F.3d 1011, 1020

14       (Fed. Cir. 2007)); *Hana Financial, Inc. v. Hana Bank*, 2011 WL 2581458 (C.D. Cal. June
      29, 2011) (obtaining advisory opinion regarding equitable defenses of unclean hands and

15       laches).  Here, the facts relevant to Defendants' equitable defenses are completely
      intertwined with the facts relevant to Plaintiff's claims – indeed, many of them are the

16       same facts.  Defendants' equitable defenses are based on government investigators'
      intentional failure to properly investigate the fire, cover-up of relevant evidence,

17       manufacturing of evidence, and intentionally untruthful deposition testimony and sworn
      interrogatory responses about the same.  These actions not only establish Defendants'

18       equitable affirmative defenses but bear directly on the credibility of the government
      investigators upon whose testimony Plaintiff's own case depends.  In fact, some of the

19       evidence of the government investigators' misconduct is to be found in the investigators'
      own photographs of the alleged point of origin.  There is no way to try this case while

20       hiding the evidence of the government's wrongdoing from the jury.  Given this, it only
      makes sense for the Court to draw on the jury for an advisory opinion regarding

21       Defendants' equitable affirmative defenses.

22    •   Plaintiff has been on notice of Defendants' equitable defenses and their factual bases
      throughout this case.  Not only did Sierra Pacific assert unclean hands, waiver, estoppel,

23       and laches in its answer to the SAC (including detailed allegations about the misconduct
      at Red Rock and the subsequent cover-up), but Defendants have detailed numerous

24       aspects of the government's inequitable conduct in the briefs they have filed during the
      pendency of this case.  In August 2010, nearly two years ago, Sierra Pacific filed a motion

25       to amend the pretrial scheduling order informing the Court that "[r]ecent discovery efforts
      ha[d] raised additional doubts about the integrity of the Investigative Report."  Doc. No.

26       59 at 12.  Since then, discovery and further investigation have justified those doubts and

27    ———————
   [15] Landowner Defendants have not pleaded an affirmative defense of unclean hands, but reserve the right
to amend their pleadings to conform to the evidence presented at trial pursuant to Federal Rule of Civil

28    Procedure 15(b).

revealed widespread, intentional misconduct by government investigators – misconduct that Defendants have described in any number of filings. *See, e.g.*, Doc. Nos. 131, 142, 338-1, 344. As these filings reveal, Defendants have been talking as clearly and loudly as possible about the government's spoliation of evidence, manufacturing of evidence, perjury, suborning perjury, and obstruction of justice – all of which amounts to some very unclean hands. *See, e.g.*, Doc No. 344 at 1:16-18 ("The government's only hope is to get in and out before the jury overcomes its natural disinclination to believe that government investigators and administrators would cover up exculpatory evidence, manufacture inculpatory evidence, and commit perjury."); *id.* at 2:11-14 ("In fact, these additional fires show a pattern of fraud by government investigators who, among other things, created a false investigation report on one of these other fires after the Moonlight Fire burned, then backdated it, in order to manufacture evidence in this case."). Plaintiff's contention that it was not on notice of these facts until it received a draft of this joint pretrial statement is demonstrably untrue.[16]

- If Plaintiff believed Defendants had not pleaded the allegations underlying their unclean hands affirmative defense with sufficient particularity, it should have brought a motion to dismiss on that ground by the deadline for filing dispositive motions. If it had, and if Defendants' allegations were indeed inadequate, Defendants should have been granted leave to amend. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."); *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 826 (9th Cir. 1979) (noting that absent prejudice to opposing party, leave to amend struck affirmative defense should be freely given). In any event, Plaintiff is incorrect in arguing that a heightened pleading standard applies. Defendants do not seek to prove actual fraud, but rather a pattern of dishonest and inequitable conduct constituting unclean hands. Whether some of the government's inequitable conduct might establish one or more elements of a fraud claim under California law is irrelevant, as, accordingly, is Rule 9(b)'s heightened pleading standard. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945) ("[O]ne's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character [to constitute unclean hands]. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient . . . .").[17]

- Defendants' equitable defenses are viable because Plaintiff's suit is not to enforce public policy or federal law. *See United States v. City of Milwaukee*, 395 F. Supp. 725, 727 (D. Wis. 1975) ("While the United States may be subject to the general principles of equity, including the 'unclean hands' doctrine, these principles cannot be applied to 'frustrate the purpose of its laws or to thwart public policy.") (quoting *Pan American Petroleum and Transport Co. v. United States*, 273 U.S. 456, 506 (1927) (internal citation omitted)). Here, Plaintiff is suing as a landowner for damages to property, not to vindicate public policy or federal law in its capacity as sovereign. Plaintiff relies on *Kelley v. Thomas Solvent Co.*, 714 F. Supp. 1439 (W.D. Mich. 1989), but there the United States was suing under CERCLA, not only a federal law but a federal regulatory regime "contain[ing] a clearly defined liability scheme and an explicit limitation on defenses," *id.* at 1441. Plaintiff also relies on *Henderson for and on Behalf of NLRB v. Int'l Union of Operating Eng'rs*, 420 F.2d 802 (9th Cir. 1969), but, again, there a federal agency was suing under a

---

[16] It is ironic that Plaintiff, which asserts that it adequately pled a claim for negligent retention based on a single word in its SAC, now argues that Defendants inadequately alleged their equitable affirmative defenses.

[17] Furthermore, it is absurd to suggest that Defendants should have included particularized allegations regarding Plaintiff's cover-ups, deposition perjury, etc. in an answer filed before Plaintiff's inequitable conduct was revealed through discovery and investigation.

federal regulatory regime, and the court held merely that the unclean hands defense was unavailable "under the facts of this case," *id.* at 808.  The present circumstances could not be more different.  Indeed, if the United States were not subject to equitable defenses here, it never would be.  *Cf. City of Milwaukee*, 395 F. Supp. at 727 ("[T]he United states *may be* subject to the general principles of equity, including the 'unclean hands doctrine' . . . .") (emphasis added).

- Plaintiff has not "purged itself" of its unclean hands.  Relying on a patent case, *Republic Moulding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 350 (9th Cir. 1963), Plaintiff argues that its failure to successfully hide all of the documents evidencing the Red Rock misconduct and the related cover-up by government investigators renders its conduct innocuous.  Not so.  First, the purging doctrine mentioned in *Republic Moulding* appears limited to the patent context.  *See id.* ("In patent cases a patent owner who has misused his patents in a manner contrary to the public interest is not denied relief in enforcing his patent rights if he can demonstrate that the consequences of misuse have been dissipated or 'purged.'").  Second, Plaintiff has not and cannot undo the consequences of the Red Rock cover-up, because Defendants will never be able to know all the details of what happened they would have if the government had honestly investigated the incident at the time.  Thus, Defendants' comparative fault affirmative defense based on Red Rock's failure to timely spot the fire has been irreparably damaged by the government's cover-up.  Third, Defendants' unclean hands affirmative defense is based on far more than the Red Rock cover-up.  It also includes the manufacturing of causation evidence (regarding the Moonlight Fire and other fires upon which Plaintiff's allegations depend) by multiple government investigators – investigators who demonstrably lied under oath and who to this day have failed to recant their false testimony.

- It is for this Court, after it has heard the evidence, to decide whether Defendants' unclean hands defense is "rationally based."  Contrary to Plaintiff's suggestion (and as Plaintiff well knows), the evidence of widespread wrongdoing by government investigators is overwhelming.  Plaintiff understandably hopes the Court will decide the merits of Defendants' affirmative defenses now, but the proper course – the only course – is to wait until the evidence has been presented.

- Sierra Pacific welcomes any comparison between the government's widespread misconduct in this case, which Defendants will demonstrate at trial, and what Plaintiff describes as unethical behavior by counsel for Sierra Pacific.  Sierra Pacific's counsel attended a USFS-sponsored public tour in good-faith reliance on Rule 2-100(C) of the California Rules of Professional Conduct, which provides that "[t]his rule shall not prohibit . . . [c]ommunications with a public officer, board, committee or body . . . .," and on the First Amendment.  To their great surprise and dismay, the Court nevertheless interpreted Rule 2-100 to prohibit contact with certain federal employees and to require counsel to identify their affiliations in order to participate in a government-sponsored public event.  Sierra Pacific disagrees with that decision but respects it and has carefully abided by it.  *See* Doc. No. 328.  There can be no comparison between what was at worst an honest mistake by counsel for Sierra Pacific that had no effect on this case and the government investigators' widespread pattern of intentional misconduct and dishonesty that provides the very foundation of Plaintiff's case.  Defendants believe the Court will agree once they have had the opportunity to demonstrate the government's wrongdoing at trial.

- Contrary to Plaintiff's contention, the equitable defenses of waiver, estoppel and laches are also in play.  "[A]ny case in which the facts lead one to consider the application of estoppel or unclean hands is one in which the other doctrine should also be considered."  2 Cal. Affirmative Def. § 45:24.  Waiver, too, is an equitable defense grounded in fairness that can arise from conduct inconsistent with an intent to enforce a right.  *See* 2 Cal.

Affirmative Def. § 47:1.  Finally, Defendants will be able to establish laches based on the government's long delay in filing this case coupled with its investigators' spoliation of evidence, which together severely prejudiced Defendants.  *See* 2 Cal. Affirmative Def. § 26:2 ("Laches requires unreasonable delay in bringing the action as well as either acquiescence in the defendant's conduct or prejudice to defendant.").

**E.      Damages**

Defendants incorporate by reference the discussion under "Relief Sought."

**IX.**
**ABANDONED ISSUES**

**Plaintiff's Statement**

The United States has already advised the Court [ECF #400], it is not pursuing a negligent hiring theory against Defendants, but it is pursuing a theory of negligent supervision and retention.  The United States has not abandoned any other legal theories.

**Defendants' Statement:**

Defendants may be willing to abandon certain affirmative defenses because they are matters Plaintiff bears the burden of proving at trial: lack of inherent/peculiar risk; lack of causation; independent, intervening and/or superseding cause; lack of injury in fact; no damages; speculative damages.  Assuming Plaintiff stipulates that it bears the burden of proof with respect to the foregoing, Defendants are willing to abandon them as affirmative defenses.  Regardless of Plaintiff's willingness to stipulate, Defendants are presently willing abandon their "Act of God" affirmative defense.

**X.**
**WITNESSES**

The United States' Witness List is attached hereto as **Exhibit 1**.

Defendants' witness list is attached hereto as **Exhibit A**.

**XI.**
**EXHIBITS**

**Plaintiff's Statement**

The United States' Exhibit List is attached hereto as **Exhibit 2**.

**Defendants' Statement**

69

1   Defendants' current draft exhibit list is attached hereto as **Exhibit B**.  There are currently

2   numerous motions *in limine* pending with the Court.  Depending upon how the Court rules,

3   certain exhibits may be removed from this list, and/or certain other exhibits may necessarily be

4   added.  Defendants may also have evidentiary objections to exhibits they have listed in an

5   abundance of caution, pending the Court's rulings on various motions.  Accordingly, Defendants

6   reserve the right to amend or modify its list as necessary.  Defendants further reserve the right to

7   use or offer into evidence any exhibits identified by Plaintiff.  In addition, Defendants do not yet

8   have a sense of which witnesses Plaintiff intends to call at trial because they have submitted two

9   separate lists, one of which includes dozens of witnesses who "may" be called at trial.

10  Accordingly, Defendants may necessarily have to add additional exhibits to this list to the extent

11  the United States elects to call at trial these presently contingent witnesses.

12   Moreover, many of the exhibits listed may be designated by official deposition exhibit

13  number or by bates stamp number as produced in this or another action, or by a native file number

14  or name.  To the extent that any such documents are designated either by a native file number or a

15  deposition exhibit number, or by a bates stamped number as produced, Defendants reserve the

16  right to designate and potentially introduce into evidence all such exhibits in any and all forms in

17  which they were produced.

**XII.**
**DISCOVERY DOCUMENTS**

**Plaintiff's Statement**

A.   **The United States' Discovery Documents**

   The United States expects to present its case primarily through live testimony and will use

depositions transcripts or video recordings for impeachment or if a witness fails to appear or

otherwise becomes unavailable.  The United States reserves its right to use such excerpts

notwithstanding the fact that they are not listed herein.  Currently, the United States expects it

may use the following excerpts from video depositions:

Deposition of Howell's 30(b)(6) representative Damon Baker (August 8, 2011):
6:1-21; 7:5-25; 8:20-9:3; 9:12-19; 11:25-12:4; 13:1-15; 14:6-10; 14:13-18; 29:3-14; 30:22-31:11;
32:6-34:6; 34:18-35:21; 36:18-39:1; 39:7-41:11; 41:14-22; 44:9-45:2; 47:24-48:25; 51:18-52:13;
53:18-57:16; 58:20-61:20; 66:16-19; 68:4-69:11; 69:12-71:12; 71:18-72:11; 72:23-73:19; 74:2-

70

15; 74:21-75:10; 75:16-76:14; 77:2-8; 77:12-78:1; 79:4-17; 80:23-81:14; 82:2-83:2; 84:14-85:22; 87:20-89:23; 90:23-92:8; 93:22-94:5; 96:16-97:7; 98:2-7; 99:14-101:20; 103:7-104:2; 104:8-12; 105:6-106:4; 106:13-22; 107:4-19; 108:12-109:3; 114:1-20; 115:3-116:21; 119:7-120:19; 132:5-133:7; 133:16-134:16; 134:20-135:13; 136:3-6; 137:4-139:13; 142:10-143:7; 146:4-21; 147:13-148:14; 151:3-155:4; 155:7-15; 156:2-25; 157:10-159:7; 159:12-160:13; 160:20-162:6; 163:14-164:7; 165:6-166:6; 168:19-169:2; 169:15-170:4; 170:12-18; 170:23-171:23; 172:11-173:19; 174:2-176:21; 177:15-178:12; 179:2-180:23; 182:8-24

Deposition of Howell's 30(b)(6) representative Eunice Howell (August 9, 2011):
8:24-9:15 , 9:25-10:10, 31:24-32:6, 32:15-21, 33:1-23, 34:6-36:4, 36:5-37:14, 38:2-39:4, 40:10-12, 41:9-13, 42:11-19, 44:1-45:5, 47:16-19, 48:13-49:1, 50:9-51:15, 52:11-53:5, 53:6-10, 54:8-15, 55:6-22, 56:23-57:13, 62:15-21, 63:5-9, 66:19-67:4, 67:25-68:21, 68:22-69:4, 69:5-11, 73:3-5, 73:12-74:13, 75:9-17, 76:24-77:24, 78:6-10, 85:8-86:19, 87:21-88:15, 89:8-19, 90:1-91:21, 92:12-93:17, 94:12-95:3, 100:2-24, 102:14-19, 105:1-21, 106:1-9, 107:1-5, 107:23-108:7, 108:21-109:11, 109:23-110:17, 111:20-24, 113:12-22, 115:18-116:8, 117:11-24, 118:25-119:23, 120:8-122:4, 125:11-16, 126:12-127:7, 127:20-128:4, 128:5-18, 131:25-132:6, 132:24-133:20, 135:7-11, 136:2-23, 139:1-140:21, 141:4-142:2, 143:11-25, 144:14-145:15, 147:13-24, 148:13-22, 151:10-23, 152:14-22, 153:16-25, 154:1-12, 154:18-24, 155:7-10, 156:9-25, 157:1-158:25, 159:1-7, 160:21-161:4, 162:19-163:8, 167:22-168:3, 168:6-20, 169:3-10, 170:2-15, 172:2-17, 174:15-20, 175:2-176:7, 176:10-12.

Deposition of Beaty's 30(b)(6) representative Don Beaty (August 11, 2011):
6:18-23; 7:2-11; 8:1-4; 8:12-19; 8:22-9:4; 12:8-20; 39:14-23; 45:3-25; 46:1-8; 46:21-24; 49:5-21; 49:22-50:3; 51:8-12; 52:3-16; 52:18-53:20; 53:23-54:2; 54:5-55:7; 56:9-11; 56:14-24; 56:25-57:6; 57:9-14; 57:15-19; 57:20-23; 58:15-24; 58:25-59:9; 59:10-15; 59:16-20; 59:21-60:2; 61:8-12; 61:15-20; 61:21-62:4; 62:5-11; 62:12-18; 62:19-63:3; 63:4-6; 65:21-66:6; 66:7-11; 66:12-66:25; 70:3-10; 70:21-71:2; 71:3-10; 71:14-25; 72:4-13; 72:17-23; 77:21-78:13; 78:22-79:4; 79:5-10; 80:8-18; 83:6-15; 83:18-84:3; 84:8-14; 84:15-85:2; 85:3-14; 86:17-87:2; 87:5-9; 87:10-22; 92:13-93:1; 93:2-10; 93:15-21; 93:22-25; 94:1-9; 96:8-14; 96:23-97:11; 97:12-16; 97:17-20; 97:25-98:9; 98:18-21; 98:22-99:4; 99:6-12; 99:13-17; 100:4-20; 103:9-17; 103:24-104:17; 106:5-25; 107:3-17; 107:18-108:1; 108:21-23; 109:5-16; 109:17-21; 110:12-21; 111:7-17; 111:18-23; 112:9-18; 113:6-10; 113:11-114:1; 114:2-8; 114:9-13; 114:14-20; 115:9-15; 116:15-117:2; 124:21-125:13; 125:14-22; 127:7-12; 128:12-129:4; 129:9-14; 132:3-20; 133:13-15; 134:5-8; 134:9-16; 134:19-25; 135:16-24; 135:25-136:2; 136:3-10; 136:11-21; 141:2-5; 141:6-22; 141:24-142:13.

Deposition of Sierra Pacific's 30(b)(6) representative Edward Murphy (August 12, 2011):
7:17-8:4, 9:6-13, 9:22-10:20, 11:1-13:7, 13:19-14:5, 16:14-15, 21:1-9, 22:1-12, 23:14-22, 33:25-34:25, 37:22-38:8, 40:4-18, 54:20-58:5, 65:6-66:16, 72:19-73:8, 73:24-75:11, 76:1-17, 76:18-79:11, 82:11-20, 117:2-22, 120:23-121:8, 126:23-129:22, 131:11-132:5, 141:2-10, 145:19-146:9, 147:14-149:2, 155:9-156:14, 157:22-158:11, 162:4-9, 162:19-166:15, 166:22-167:2, 168:18-171:12, 175:13-176:21, 184:2-12, 186:24-187:11, 189:19-190:1, 192:10-193:16, 199:8-200:18, 213:17-214:9, 217:16-218:4, 221:5-222:6, 229:2-230:13, 231:9-232:15, 235:5-237:10, 240:13-22, 245:7-23, 247:5-11.

Deposition of Richard Green (December 13, 2011):
18:1-12, 19:12-16, 26:2-12, 30:14-31:19, 32:18-33:7, 33:12-22, 38:9-39:10, 41:16-43:22, 44:12-45:8, 47:6-17, 48:11-21, 49:6-53:1, 60:19-61:17, 67:17-20, 68:2-5, 86:16-88:2, 89:8-14, 90:16-20, 96:19-25, 97:2-24, 101:18-102:6, 102:16-103:15, 103:22-104:5, 106:25-107:13, 108:24-109:15, 109:18-110:17, 111:13-18, 111:25-112:6, 114:24-115:4, 116:5-11, 117:12-22, 118:11-119:11, 120:15-121:2, 122:19-123:15, 124:10-18, 127:22-128:4, 138:17-25, 139:24-140:19, 149:5-153:2, 153:24-154:9, 155:8-157:1, 164:11-18, 165:5-166:6, 166:19-167:22, 168:10-169:4, 203:4-21.

Deposition of Michael Neff (October 6, 2011):

71

7:2-10; 11:19-12:3, 12:7-13:13; 20:24-21:13; 23:9-24:21; 32:13-19; 34:3-18; 35:24-36:12; 38:1-9; 40:9-11; 43:6-15; 48:15-50:1; 55:9-25; 57:7-58:5; 58:22-59:21; 60:8-61:2; 61:18-62:23; 63:17-23; 66:2-14; 79:4-20; 101:5-11; 102:3-19; 102:20-23; 168:3-12; 169:2-21; 204:20-205:16; 206:18-207:18; 208:20-209:14; 209:15-211:15.

Deposition of Richard Fields (November 10, 2011)
8:1-23; 11:8-14; 140:10-141:18; 142:5-25;143:12-24;144:12-23;145:22-146:8; 182:24-183:12; 183:20-184:21;288:23-289:5;305:4-15;306:23-307:17

Deposition of Kevin Lewis (November 14, 2011):
6:17-25; 249:9-19; 249:25-250:3; 250:4-255:13; 256:5-23; 257:1-258:18;  258:19-259:3

Deposition of David Howitt (August 23, 2011):
6:20-8:7; 144:6-145:24; 147:15-22; 147:1-13; 150:6-12; 168:14-24; 179:16-181:1

Deposition of Al Wolfson
12:1-4,7,10-25; 13:1-10,14-17; 16:13-20; 20:8-21:4; 23:5-8,11-12; 28:5-18; 29:11-20,23-25;30:1-4; 31:11-14; 33:3-12; 34:16-20; 38:8-25; 39:4-6;39:25-40:21; 41:24-43:6; 48:16:49:4; 61:5-13; 72:24-74:22; 77:14-78:20; 81:7-24; 86:2-5,8-11,16-18; 86:23-87:4; 90:13-16, 20-22; 90:23-91:14; 93:13-94:8; 94:9-95:4,7-15; 95:16-23; 98:11-18; 99:1-4,6-7,16-18; 101:4-12; 105:13-15; 108:1-5,8-15; 108:16-109:8; 110:9-17,20-23; 110:24-111:9; 114:9-115:3; 115:4-117:10; 121:14-18,21-23; 122:15-16, 19-123:7; 130:10-19; 134:8-17; 134:18-136:4; 137:4-138:25; 141:21-142:5-15; 144:24-145:23; 151:24-152:17; 157:23-158:6,11-14,18-20; 159:3-10; 161:7-9,13-17,20; 164:19-165:2,7-21; 167:7-13; 176:13-16,20-23; 202:5-16; 203:11-19; 204:7-205:4; 211:18-213:20; 214:10-19; 231:6-232:11; 240:19-242:6; 242:7-21; 257:4-12

Deposition of Arlo Storing, deceased (February 28, 2011):
11:15-12:2; 19:5-9; 21:15-22:1; 22:14-23:12; 23:19-24:2; 28:7-29:4; 32:23-40:10; 40:20-43:5; 43:7-46:23; 48:13-49:3; 50:11-52:23; 53:8-15; 55:21-25; 56:13-24; 57:5-14; 65:11-16; 69:22-25; 77:4-10; 78:2-5; 79:6-12; 79:25-80:12; 87:12-18; 90:1-10; 106:10-107:18; 159:19-161:8

Deposition of Andrea (Terry) Jackson (September 23, 2010):
13:9-11, 24:17-25:5, 29:4-12, 37:21-38:1, 43:22-44:8, 53:1-5, 74:14-75:7, 106:7-25, 145:19-146:6, 155:2-157:17, 161:21-24, 169:14-175:24, 180:1-3, 181:19-182:9, 185:1-3, 192:14-21, 197:4-14.

Deposition of Cliff Berry (September 7, 2010):
18:2-22; 19:10-18; 19:25-20:9; 20:24-21:13; 22:7-9;22:23-23:5; 24:15-20; 25:12-14; 28:3-7; 28:25-29:1; 29:9-22; 29:24-30:13; 31:6-11; 38:10-19; 49:19-24; 55:7-11; 56:4-20; 58:14-18; 59:9-60:1; 60:20-62:7; 62:13-63:16; 64:4-23; 68:6-17; 100:5-8; 136:11-24; 137:22-140:24; 141:1-6;  141:22-142:13; 144:1-8,11,14-25; 145:1-146:11;171:1-14; 173:10-19; 174:9-11,20-24; 174:25-175:6; 175:11-24; 197:4-9

Deposition of James Berry (June 22, 2011)
15:4-15; 17:6-9; 17:19-18;16; 18:20-23; 19:17-20:20; 29:21-30:8; 31:6-25; 37:16-39:7; 47:1-4; 49:23-51:1; 51:5-13; 53:10-23;

Deposition of John Van Duyn (9/17/10):
8:22-9:3; 19:12-20:20; 21:5-22:10; 144:23-145:17; 189:8-22

        The United States has separately listed discovery documents and pleadings that it intends

to offer at trial in its Appendix of Exhibits.  The United States also identifies them herein:

72

1

2

| No. | Beaty and Landowners' Pleadings and Responses to Discovery |
|---|---|
| 1. | Beaty Response to Second Amended Complaint (ECF #54) |
| 2. | Landowners' Response to Second Amended Complaint )ECF #55) |
| 3. | Beaty Response to US Requests for Admissions, set 1 (##1-216) |
| 4. | Beaty Response to US Requests for Admissions, set 2 (##217-454) |
| 5. | Beaty Response to US Requests for Admissions, set 3 (##455-457) |
| 6. | Beaty and Landowners' Rsp to US RFAs, set 4 (##458-830) |
| 7. | Beaty' Response and Supp Rsp. to US Interrogatories (##1-24) |
| 8. | Hatch Response to US Interrogatories (##1-11) |
| 9. | Beaty's Response to CalFire's Special Rogs, set 1 (##1-98) |

| No. | Eunice Howell's, individually and dba Howell's Forest Harvesting, Pleadings and Responses to Discovery |
|---|---|
| 1. | Howell's Response to Second Amended Complaint (ECF #56) |
| 2. | E. Howell's Resp and Amended Rsps to US RFAs, set 1 (##1-190) |
| 3. | E. Howell's Resp and Amended Rsps to US RFAs, set 2 (##191-483) |
| 4. | E. Howell's Response to US RFAs, set 3 (##484-500) |
| 5. | E. Howell's Response to US RFAs, set 4 (##501-503) |
| 6. | E. Howell's Response to US RFAs, set 5 (##504-875) |
| 7. | E. Howell's Rsp and Amended Rsp to US Rogs, set 1 (##1-24) |
| 8. | E. Howell's Response to US Rogs, set 2 (#25) |
| 9. | Howell's Rsp and Amended Rsp to US Rogs, set 1 (##1-16) |
| 10. | Howell's Rsp and Amended Rsp to US Rogs, set 2 (##17-25) |
| 11. | Howell's Responses to CalFire Special Rogs, set 1(##1-254) |
| 12. | Howell's Responses to CalFire Special Rogs, set 2(##255-274) |
| 13. | Howell's Responses to CalFire Special Rogs, set 3(##275-365) |
| 14. | Howell's Responses to CalFire Special Rogs, set 1(##1-254) |
| 15. | Crismon's Responses to CalFire Special Rogs, set 1(##1-47) |
| 16. | Crismon's Responses to CalFire Special Rogs, set 2(##48-74) |

| No. | Sierra Pacific Industries' Responses to Discovery |
|---|---|
| 1. | SPI's Response to Second Amended Complaint (ECF #57) |
| 2. | SPI's response and supp. response to US RFAs, set 1 (##1-190) |
| 3. | SPI's response to US requests for admissions, set 2 (##191-193) |
| 4. | SPI's response to US requests for admissions, set 3 (##194-413) |
| 5. | SPI's response to US requests for admissions, set 4 (##414-786) |
| 6. | SPI's response to and supplement rsp to US rogs, set 1 (##1-25) |

**Defendants' Statement**

1    Defendants anticipate offering at trial the sets of written discovery responses identified

2    below, including but not limited to the individual responses identified.  The portions of

3    depositions that Defendants currently anticipate using at trial are attached hereto as **Exhibit C**.

4    Regarding the deposition excerpts that Defendants have designated, Defendants note that

5    there are currently numerous *in limine* and Daubert motions pending with the Court.  Defendants

6    also note that Plaintiff has provided two witness lists, one which includes witnesses that Plaintiff

7    "may" call to trial.  Accordingly, Defendants are unsure as of this filing which deposition

8    excerpts will actually be necessary.  Depending upon how the Court rules, and depending upon

9    which witnesses Plaintiff actually calls, and depending upon their testimony, certain deposition

10   excerpts may be removed from this list, and/or certain other deposition excerpts may need to be

11   added.  Accordingly, many of the deposition excerpts identified herein are provided provisionally

12   depending, and Defendants reserve the right to object on any and all available grounds to the

13   introduction of any of the clips listed herein into evidence.  Moreover, Defendants reserve the

14   right to amend or modify this list as necessary.  Defendants further reserve the right to use or

15   offer into evidence any deposition excerpts identified by Plaintiff.

16   **USA'S Responses to SPI's Written Discovery:**

17   • Response to Interrogatories Set One, including but not limited to nos. 1 and 2

18   • Response to Interrogatories Set Two

19   • Response to Interrogatories Set Three

20   • Response to Interrogatories Set Three Amended

21   • Response to Interrogatories Set Three Second Amended, including but not limited to nos.

22   4, 5, 6 and 7

23   • Response to Interrogatories Set Four

24   • Response to Interrogatories Set Four Supplemental, including but not limited to no. 8

25   • Response to Interrogatories Set Five

26   • Response to Interrogatories Set Five Amended

27   • Response to Interrogatories Set Five Supplemental, including but not limited to nos. 11

28   and 11-2

74

**JOINT PRETRIAL STATEMENT**

1  • Response to Interrogatories Set Six, including but not limited to nos. 16 and 17

2  • Response to Interrogatories Set Six Amended, including but not limited to nos. 12, 14 and

3  15

4  • Response to Interrogatories Set Seven

5  • Response to Interrogatories Set Seven Amended

6  • Response to Request for Admissions Set One, including but not limited to nos. 2, 4, 17,

7  18, 19, 20, 23, 24, 25, 33, 36, 40 and 41

8  • Response to Request for Admissions Set Two, including but not limited to nos. 55, 62 and

9  65

10  • Response to Request for Admissions Set Three, 84, 85, 87, 104, 107, 155, 160, 172, 191

11  and 192

12  • Response to Request for Admissions Set Three Amended. including but not limited to

13  nos. 127 and 138

14  • Response to Request for Admissions Set Four

15  • Response to Request for Admissions Set Four Amended, including but not limited to nos.

16  330 and 331

17  • Response to Request for Admissions Set Five

18  • Response to Request for Admissions Set Six

19  • Response to Request for Admissions Set Six Amended, including but not limited to no.

20  339

21  **USA's Responses to Howell's Written Discovery Requests**

22  • Response to Interrogatories of Eunice Howell Set One

23  • Response to Interrogatories of Eunice Howell Set One Amended

24  • Response to Interrogatories of Howell Forest Harvesting Company Set One

25

26  **USA's Responses to W.M. Beaty and Landowner Defendants' Discovery Requests**

27  • Response to Interrogatories of W.M. Beaty & Ann McKeever Hatch Set One, including

28  but not limited to nos. 1, 2 and 3

75

1      • Response to Interrogatories of W.M. Beaty & Ann McKeever Hatch Set One Amended

2      • Response to Interrogatories of W.M. Beaty & Ann McKeever Hatch Set Two, including

3        but not limited to nos. 4, 6, 7, 8, 9, 10 and 11

4      • Response to Interrogatories of W.M. Beaty & Ann McKeever Hatch Set Three

5      • Response to Interrogatories of W.M. Beaty & Ann McKeever Hatch Set Three Amended

6      • Response to Interrogatories of Ann McKeever Hatch Set Four

7      • Response to Interrogatories of John Walker Set One, including but not limited to nos. 1, 2,

8        3, 4, 5, 6, 7, 17, 18

9      • Response to Interrogatories of Brooks Walker, Jr. Set One, including but not limited to

10       nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 19, 20, 21, 22, 23, 24, 25

11     • Response to Interrogatories of Brooks Walker, Jr. Set One Amended

12     • Response to Interrogatories of Henderson Set One, , including but not limited to nos. 1, 2,

13       3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25

14     • Response to Request for Admissions of W.M. Beaty & Ann McKeever Hatch Set One

15     • Response to Request for Admissions of W.M. Beaty & Ann McKeever Hatch Set One

16       Amended

17     • Response to Request for Admissions of W.M. Beaty & Ann McKeever Hatch Set Two,

18       including but not limited to nos. 33, 36, 37, 38, 39, 40, 43, 62, 63, 83, 84, 85, 86, 87, 88,

19       89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111,

20       112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129,

21       130, 131, 132, 133, 134, 136, 137, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 159,

22       160, 161, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 186, 187, 191, 222,

23       231, 239, 240, 247

24     • Response to Request for Admissions of W.M. Beaty & Ann McKeever Hatch Set Two

25       Supplemental, including but not limited to nos. 130

26     • Response to Request for Admissions of W.M. Beaty & Ann McKeever Hatch Set Three,

27       including but not limited to nos. 261, 262 and 279

28     • Response to Request for Admissions of W.M. Beaty & Ann McKeever Hatch Set Three

76

Amended

- Response to Request for Admissions of W.M. Beaty & Ann McKeever Hatch Set Three Second Amended

- Response to Interrogatories of Ann McKeever Hatch Set One

- Response to Ann McKeever Hatch, As Trustee of the Hatch 1987 Revocable Trust Interrogatories, Set Three

## XIII.
## FURTHER DISCOVERY OR MOTIONS

**Plaintiff's Statement:**

The United States has proposed a number of stipulations on authenticity and admissibility of documents.  The defendants have not yet agreed to any stipulations.

**Defendants' Statement:**

Defendants do not anticipate any requests for further discovery or further motions, but reserve the right to do so if the need arises.

## XIV.
## STIPULATIONS

**Plaintiff's Statement:**

To the extent the parties have reached stipulations concerning the authenticity and/or admissibility of certain trial exhibits, those stipulations are identified on the Exhibit Lists, attached as Exhibits 2 and B hereto.  No other stipulations have been reached.

**Defendants' Statement:**

None at this time.  Defendants suggest that the parties meet and confer after exhibit lists are finalized to determine whether any exhibits should be listed jointly and to determine whether admissibility and/or authenticity can be stipulated to for any exhibits.

## XV.
## AMENDMENTS/DISMISSALS

**Plaintiff's Statement:**

The parties do not seek any amendments of the pleadings or dismissals.  [United States would seek to amend the complaint in the event the Court deemed it necessary to assert violations

77

1  under 261.5(d) and (e).]

2  **Defendants' Statement:**

3      None known at this time.

4                            **XVI.**
                  **SETTLEMENT NEGOTIATIONS**
5
        The parties participated in a court-ordered settlement conference on June 5, 2012.  The
6
   case did not settle.
7
                            **XVII.**
8                   **AGREED STATEMENTS**

9  **Plaintiff's Statement:**

10  The parties do not intend to submit any issue to the jury on an agreed statement.

11      The parties are unable to agree upon the language for the Agreed Statement and submit

12  the following proposed language:

13  A.      The United State's [Proposed] Statement:

14      This case arises out of the Moonlight Fire.  The Moonlight Fire ignited on September 3,

15  2007, Labor Day, on private land.  The fire burned 65,000 acres of land, including around 46,000

16  acres of National Forest land.

17      The United States seeks monetary damages against the defendants in this lawsuit for the

18  Moonlight Fire.  At the time of the fire, the defendants were participating in a timber sale and

19  harvest that occurred on private land owned by some of the defendants.  On the day fire, two

20  employees from one of the defendants conducted operations with bulldozers that had metal tracks

21  and metal blades.  These employees were unsupervised.  The United States alleges that the fire

22  started when one of the tracks or blades of the bulldozers struck a rock and created sparks, which

23  ignited the surrounding dry forest fuels.  The United States alleges that the defendants are liable

24  for this fire because they were negligent and in violation of several statutes and regulations.

25  Specifically, the United States alleges that the defendants are responsible for (1) allowing

26  operations to occur under hazardous fire conditions, (2) allowing the workers to operate

27  unsupervised, (3) starting the fire with a bulldozer, (4) failing to have adequate communication to

28  report a fire, (5) failing to have appropriate suppression equipment on hand, (6) failing to conduct

                                    78

1  a ground inspection for fire after operations, and (7) failing to conduct a two hour continuous fire

2  watch after operations shutdown.

3      The defendants, and each of them, deny that the fire was equipment caused or that it

4  started as a result of their logging operations.  The defendants, and each of them, deny that they

5  were negligent or that they violated any statutes or regulations.

6  **Defendants' Statement:**

7      Defendants do not agree that presentation of any part of this action can be presented upon

8  an Agreed Statement of Facts.  Defendants read Plaintiff's proposed statement as a suggestion for

9  a joint statement of the case to be read to the jury at the commencement of trial; Defendants do

10  not stipulate to the version suggested by Plaintiff and have provided their alternative suggestion

11  below.

12                              **XVIII.**
                    **SEPARATE TRIAL OF ISSUES**

13  **Plaintiff's Statement**

14  A.      **United States' Position.**

15      1.  Trial Should Not Be Bifurcated Between Liability and Damages.

16      The defendants' argument for bifurcating the liability and damages phases of trial reveals

17  how unnecessary and wasteful that such bifurcation would be.  They argue that during the

18  liability portion of the trial, it is imperative that the jury be presented with evidence of the

19  widespread devastation that the fire caused and the amount that the United States seeks in

20  compensation for the loss.  Then, after the jury deliberates and renders a verdict for the United

21  States, the defendants want the jury to be recalled once again to hear evidence of the widespread

22  devastation that the fire caused and the amount that the United States seeks for the loss.

23      This is wasteful.  Not only is it an unnecessary drain on the Court's resources, it is unfair

24  to the jury.  If the defendants have their way, the jury will be forced to hear evidence, deliberate,

25  and render verdicts three times in this case: (1) once on issues of liability, (2) once on issues

26  damages, and (3) once the issues raised by the cross claims.  They would be subject to three

27  opening statements from multiple parties, three closing arguments, and multiple sets of

28

                              79

1    instructions.  There is no good reason to split trial in this fashion, particularly where the

2    defendants concede that duplicative evidence must be presented during the different phases.

3          The issue of damages will not take weeks or months, as Defendants claim.  The Court's

4    recent order granting judgment in the United States' favor on the defense of mitigation has vastly

5    simplified the damages issues.  Fuels management is no longer an issue.  The reasonableness of

6    the Forest Service's suppression efforts is no longer an issue.  Likewise, the reasonableness of the

7    United States' efforts to salvage timber is also out of the case.  The United States will present its

8    damages evidence efficiently and expects that it needs no more than three days to present the

9    evidence.

10          The pending appeal on *United States v. Merco Constr. Eng'rs, Inc.,* 2010 WL 1068413

11   (C.D. Cal. 2010) does not justify bifurcation.  It is anybody's guess as to when the Ninth Circuit

12   will issue a decision on this case.  It is unsound to subject the Court, the parties, the witnesses,

13   and the jury to a prolonged trial on the off chance that the Ninth Circuit may issue a ruling that

14   may or may not provide guidance on one element of the United States' elements of damages.

15   Thus, the Court should deny the defendants' request to split the liability and damage phases of the

16   trial.

17          2.      Defendants' Equitable Claims Should Be Tried Separately by the Court.

18          For the reasons stated in the Points of Law section above, the defendants' equitable

19   defenses based on "spoliation of evidence, manufacturing of evidence, perjury, suborning perjury,

20   and obstruction of justice," which they raise for the first time, lack merit.  But if the Court

21   exercises its discretion to decide these improperly pled equitable claims, the Court should decide

22   these issues separately after the jury trial.  The equitable defenses of unclean hands, waiver,

23   estoppel, and laches are to be tried by the Court, not the jury.  Smith v. World Ins. Co., 38 F.3d

24   1456, 1462 (8th Cir. 1994); Bonners Farms Ltd. v. Fritz, 355 Fed. Appx. 10, 2009 WL 4112352,

25   at * 8 (6th Cir. 2009).  Thus the Court should decide the equitable defenses following the jury

26   trial.

27          The Court should not (as defendants request) submit the issues to the jury in an advisory

28   capacity under Rule 39(c) of the Federal Rules of Civil Procedure.  Such a submission is

**JOINT PRETRIAL STATEMENT**

1    inappropriate where, as here, the jury is also charged with deciding issues in a non-advisory

2    capacity.  Such issues, particularly those related to the Forest Service's post-fire personnel

3    decisions regarding Caleb Lief, will undoubtedly mislead and confuse the jury as to what issues

4    they are to decide in what capacity, and will unfairly prejudice the United States by inviting the

5    jury to render a verdict based on the equitable defenses, which it cannot do.  *See Pioneer Hi-Bred*

6    *Intern, Inc. v. Ottawa Plant Food, Inc.*, 219 F.R.D. 135, 149-50 (D. Iowa 2003) (refusing to

7    empanel advisory jury on equitable defenses of laches, waiver, and estoppel where jury was also

8    rendering a verdict in a non-advisory capacity because of risks of jury confusion and unfair

9    prejudice).  Thus, if the Court exercises its discretion to entertain these equitable defenses, it

10    should exercise its right under Rule 42(b) of the Federal Rules of Civil Procedure and hold a

11    separate trial on the equitable defenses if the United States receives a jury verdict in its favor on

12    its claims.  *Id.*

13    **Defendants' Statement**

14         Beaty and the Landowners' crossclaims against Sierra Pacific and Howell have been

15    bifurcated from the other plase(s) of the trial in this action, to be decided (if necessary) after trial

16    of Plaintiff's claims and before any final judgment.  (*See* Docket Nos. 470-473.)

17         Pursuant to Rule 42 of the Federal Rules of Civil Procedure, Defendants seek to bifurcate

18    trial so that liability is tried first, followed by damages (if necessary).  Trying liability separately

19    from damages would carry two significant advantages.  First, if Defendants win on liability, the

20    Court and jury will be spared from having to hear from as many as 30 expert witnesses, plus

21    percipient witnesses, who will testify on damages issues.  This volume of evidence could take

22    weeks, if not months, to put on.  Second, the risk of overloading, overwhelming and confusing the

23    jury with too many issues and too much evidence would be significantly reduced.  The liability

24    issues in this case will alone take months to try are complex enough without adding equally

25    complex damages issues into the mix for simultaneous determination.

26         Defendants do not seek to bifurcate liability and damages in order to prevent Plaintiff

27    from arguing, during the liability phase, that the Moonlight Fire caused extensive damages.

28    Defendants would not object to a general reference regarding the impact of the fire.  Indeed,

**JOINT PRETRIAL STATEMENT**

1    Defendants themselves must be able, during the liability phase, to reference the fact that Plaintiff

2    seeks to recover hundreds of millions of dollars in this case.  Doing so is crucial to Defendants'

3    theory of the case, which involves establishing Plaintiff's bias and motive.[18]

4         Bifurcation is also advisable because the Ninth Circuit has not yet issued a decision in the

5    *Merco* (Copper Fire) case (discussed *supra* in the "Relief Sought" section), which may impact

6    whether the United States can recover environmental damages and, if so, what type of evidence

7    must be presented of these damages at trial.  *See* 2010 WL 1068413.

8         Defendants believe bifurcation of Plaintiff's claims for liability and damages is in the

9    interests of both parties, the Court and the jury, and they hope Plaintiff will stipulate to such

10   bifurcation.

11                                       **XIX.**
                        **IMPARTIAL EXPERTS/LIMITATION OF EXPERTS**

12   **Plaintiff's Statement:**

13        Plaintiff does not request the appointment of an impartial expert in this case.

14   **Defendants' Statement:**

15        Defendants do not believe that an impartial expert is necessary or advisable at this

16   juncture.  Defendants do believe that experts should be limited, consistent with the Daubert

17   motions they have filed regarding various Plaintiff experts.

18                                       **XX.**
                                  **ATTORNEYS' FEES**

19

20   **Plaintiff's Statement:**

21

22   _____

     [18] Plaintiff somehow takes from this paragraph that Defendants believe "it is imperative that the jury be
     presented with evidence of the widespread devastation that the fire caused and the amount that the United
23   States seeks in compensation for the loss," and therefore that bifurcation would be duplicative and
     inefficient.  This is not Defendants' position at all.  Defendants certainly do not believe "it is imperative
24   that the jury be presented with evidence of the widespread devastation that the fire caused" during the
     liability phase.  Defendants only believe Plaintiff should be able, if it wishes, to make reference to the fact
25   that the fire caused significant damage.  If Plaintiff does not want to do so, Defendants certainly have no
     objection.  For their part, Defendants do not seek to take up time putting on extensive evidence of the
26   amount the United States seeks to recover through this action; they just need to be able to reference
     Plaintiff's astronomical ambitions so the jury will understand the government investigators' motive and
27   bias.  Doing so should take at most five minutes.  In summary, Defendants merely seek to try the already
     lengthy liability phase before the also-lengthy damages phase.  It makes no sense to try the second half of
28   this huge case unless it proves necessary to do so.

                                          82

                           **JOINT PRETRIAL STATEMENT**

1      Any attorneys' fees issues will be ascertained following trial.  .

2 **Defendants' Statement:**

3      Any attorneys' fees issues will be ascertained following trial.

4
## XXI.
## TRIAL EXHIBITS

5

6      The parties do not currently envision a need for any special handling of trial exhibits.  The parties do not envision any need for the Court to retain exhibits pending any decision on appeal

7 after trial.  The parties suggest that trial exhibits be maintained by the parties' counsel after trial.

8
     Defendants do anticipate that the exhibits will be voluminous, and can produce these

9 documents in whatever format the Court prefers to accommodate space issues.

10
## XXII.
## TRIAL PROTECTIVE ORDER

11

12 **Plaintiff's Statement:**

13      The parties have not requested that any protective order be entered for purposes of trial.

14 **Defendants' Statement:**

15      Defendants may seek a protective order during trial to govern the admissibility of any

16 confidential documents they have produced during discovery in this action, should Plaintiff

17 attempt to introduce any said documents during trial.

18
## XXIII.
## MISCELLANEOUS

19

20 **Plaintiff's Statement:**

21      The United States requests that the jury be permitted to view certain portions of the

22 Moonlight Fire area.  The parties anticipate that certain trial exhibits, such as photographs and

23 maps which were created in an electronic format, will need to be used and displayed at trial in

24 their native format.

25 **Defendants' Statement:**

26      Defendants are currently aware of the following issues that will need to be addressed

27 before trial commences or during the proceedings:

28      1.      The United States spoiled evidence and will request that this issue be determined

1  as part of its unclean hands defense.

2       2.       Defendants request that their equitable defenses[19] be the subject of an advisory

3  opinion from the jury.

4       3.       In an effort to guide their efforts at drafting jury instructions, Defendants seek a

5  determination regarding whether the state court decision of Grijalva applies in this federal action.

6       4.       Defendants request a special instruction be given to the jury any time an exhibit is

7  introduced that depicts a post-salvage image of the area burned by the Moonlight Fire.

8       5.       Defendants request a special instruction be given to the jury that government

9  exhibits identifying the "point of origin" be identified as the "alleged point of origin."

10      6.       Defendants request that they be permitted to present their evidence in the

11  following order:  Sierra Pacific Industries, Eunice Howell, individually and d/b/a Howell's Forest

12  Harvesting Company, W.M. Beaty and Associates, followed by the Landowner Defendants.

13      7.       Defendants will seek guidance from the Court on how to handle insurance issues

14  that may arise during trial, including using the names of Defendants' insurers (e.g. AIG, Chartis,

15  Safeco) in a manner that will avoid any prejudicial effect.

16      8.       Defendants request that the Court employ a juror questionnaire in this matter

17  before court room voir dire.  Of course, courts frequently use this tool in complex cases in an

18  effort to make voir dire proceed more efficiently, but the use of a questionnaire has become

19  especially important in this case due to extensive press coverage relating to fire damage

20  legislation issues which runs the significant risk of having tainted the jury pool.  Specifically, the

21  United States Attorney has made comments to the press which have denigrated Sierra Pacific

22  Industries and potentially damaged other defendants and which have been widely disseminated in

23  the media.  Mr. Wagner has made these comments in the context of his opposition to the

24  Governor's legislative effort and has been quoted as saying that Sierra Pacific is engaged in a

25  "cynical effort" and that it has attempted to "tilt" this case in its favor by limiting its damages.

26  These comments are not accurate and they have potentially created the inappropriate and

27  _____

28  [19] As noted in footnote 12, *supra*, Landowner Defendants have not pleaded an affirmative defense of unclean hands, but reserve the right to amend their pleadings to conform to the evidence presented at trial.

**JOINT PRETRIAL STATEMENT**

1   inaccurate impression that the Defendants' defense is focused on alleged damages when, in

2   reality, their defense is primarily focused on liability. Sierra Pacific believes that these public

3   statements on the eve of trial have potentially prejudiced Defendants' right to a fair trial by

4   tainting the jury pool. Sierra Pacific has sent letters to United States Attorney, asking that he

5   immediately refrain from making similar comments in the future and that he issue a retraction,

6   and it will forward the existing correspondence to this Court through a separate declaration.  In

7   any event, at this point, the Defendants believe that at the very least a questionnaire must be used

8   in order to poll potential jurors regarding their exposure to these stories and the impact of Mr.

9   Wagner's public comments in particular so that such inquiries are not initially made in open

10  court.  If it would assist the Court, Defendants would be happy to provide copies of the relevant

11  news articles.

12          9.      Plaintiff and Defendants have both indicated that they intend to call certain experts

13  disclosed by the other side as part of their case-in-chief.  Defendants are concerned that this may

14  cause undue hardship on the witnesses, particularly because many of the defense witnesses whom

15  Plaintiff apparently intends to call are from outside the area.  Defendants raise the issue now,

16  before trial, so that an arrangement can be worked out which will enable the parties to fully

17  question these witnesses in a manner that imposes the least amount of inconvenience on them.

18  The Court maintains authority to schedule proceedings in a manner that will "avoid wasting time"

19  and "protect witnesses from harassment." *See* Fed. R. Evid. 611(a) *and Lyman v. St. Jude*

20  *Medical S.C., Inc.*, 580 F.Supp.2d 719, 728 (E.D. Wis. 2008) (adopting a "one appearance rule"

21  to protect witnesses who were being called by more than one party).

## XXIV.
## NON-DISCOVERY MOTIONS

Pursuant to this Court's practice of requesting that parties list all non-discovery motions
that have been filed and their resolution, Defendants provide the following list of non-discovery
motions that have been filed by the parties, and the current status of said motions:

| DATE | DOCKET (Motion) | MOTION | RESOLUTION | DOCKET (Order) |
|---|---|---|---|---|

| DATE | DOCKET (Motion) | MOTION | RESOLUTION | DOCKET (Order) |
|---|---|---|---|---|
| 3/5/10 | 47 | USA's Motion to Dismiss SPI's Counterclaims | Withdrawn. Stipulated to file Second Amended Complaint | 52 |
| 8/4/10 | 58 | SPI's Motion to Amend Status (Pre-Trial Scheduling) Order | Granted. | 71 |
| 10/7/10 | 83 | SPI's Motion to Recuse the Honorable Edmund F. Brennan | Denied. | 91 |
| 11/30/10 | 106 | SPI's Motion for Reconsideration | Denied. | 114 |
| 7/19/11 | 242 | USA's Motion to Hold Counsel for Sierra Pacific Industries in Contempt | Denied. | 326 |
| 11/16/11 | 321 | Landowner's MSJ | Denied | 521 |
| 12/2/11 | 328 | SPI's Motion for Reconsideration of Magistrate Judge's Ruling re Contempt | **Pending** | |
| 12/8/11 | 329 | SPI's Motion for Summary Judgment | Resubmitted pursuant to Court order | 372 |
| 12/21/11 | 343 | SPI's Motion to Amend Status (Pre-Trial Scheduling Order) [Howell joinder] | Granted | 409 |
| 1/12/12 | 351 | USA's Motion for Summary Judgment | Granted in part and denied in part | 522 |
| 1/13/12 | 356 | Beaty's Motion for Partial Summary Judgment | Resubmitted pursuant to Court order | 372 |
| 1/13/12 | 357 | Howell's Motion for Summary Judgment re Negligence Per Se | Resubmitted pursuant to Court order | 372 / 379 |
| 1/13/12 | 358 | Howell's Motion for Summary Judgment of Plaintiff's claims Based on California Public Resources Code Sec. 4435 | Resubmitted pursuant to Court order | 372 / 379 |
| 1/13/12 | 360 | Beaty's Motion for Partial Summary Judgment to cap property damage at pre-fire fair market value | Resubmitted pursuant to Court order | 373 |
| 1/13/12 | 361 | SPI's Motion for Partial Summary Judgment | Resubmitted pursuant to Court order | 372 / 379 |
| 1/13/12 | 362 | SPI and Howell's Motion for Summary Judgment | Resubmitted pursuant to Court order | 372 / 379 |
| 1/13/12 | 363 | SPI and Howell's Motion for Summary Judgment | Resubmitted pursuant to Court order | 372 / 379 |
| 1/13/12 | 365 | SPI and Howell's Motion for Summary Judgment | Resubmitted pursuant to Court order | 372 / 379 |
| 1/13/12 | 366 | SPI and Howell's Motion for Summary Judgment | Resubmitted pursuant to Court order. | 372 / 379 |
| 1/13/12 | 367 | SPI and Howell's Motion for Summary Judgment | Resubmitted pursuant to Court order | 372 / 379 |
| 1/17/12 | 370 | USA's Request to Strike SPI and Howell's Motion for Summary Judgments | Granted. | 372 |
| 1/27/12 | 380 | Beaty's Motion for Summary Judgment | Denied. | 474 |
| 2/29/12 | 417 | SPI and Howell's Motion for Summary Judgment | Granted in part and denied in part. | 485 |

86

**JOINT PRETRIAL STATEMENT**

1

**XXV.**
**JOINT STATEMENT OF THE CASE**

2

**Plaintiff's Statement**

3

4

The United States is unaware of a requirement that the parties develop a joint statement of

5

the case.  The parties are unable to agree on any such statement.  If the Court desires to present

the jury with a statement of the case, the United States proposes the following statement:

6

7

This case arises out of the Moonlight Fire.  The Moonlight Fire ignited on September 3,

8

2007, Labor Day, on private land.  The fire burned 65,000 acres of land, including around 46,000

acres of National Forest land.

9

10

The United States seeks monetary damages against the defendants in this lawsuit for the

Moonlight Fire.  At the time of the fire, the defendants were participating in a timber sale and

11

harvest that occurred on private land owned by some of the defendants.  On the day fire, two

12

employees from one of the defendants conducted operations with bulldozers that had metal tracks

13

and metal blades.  These employees were unsupervised.  The United States alleges that the fire

14

started when one of the tracks or blades of the bulldozers struck a rock and created sparks, which

15

ignited the surrounding dry forest fuels.  The United States alleges that the defendants are liable

16

for this fire because they were negligent and in violation of several statutes and regulations.

17

Specifically, the United States alleges that the defendants are responsible for (1) allowing

18

operations to occur under hazardous fire conditions, (2) allowing the workers to operate

19

unsupervised, (3) starting the fire with a bulldozer, (4) failing to have adequate communication to

20

report a fire, (5) failing to have appropriate suppression equipment on hand, (6) failing to conduct

21

a ground inspection for fire after operations, and (7) failing to conduct a two hour continuous fire

22

watch after operations shutdown.

23

The defendants, and each of them, deny that the fire was equipment caused or that it

24

started as a result of their logging operations.  The defendants, and each of them, deny that they

25

were negligent or that they violated any statutes or regulations.

26

**Defendants' Statement**

27

Pursuant to this Court's practice of requesting that the parties prepare a joint statement of

28

87

1  the case to be read to the jury, Defendants submit the following suggestion:

2      This case arises out of the Moonlight fire, a forest fire that ignited on the afternoon of

3  September 3, Labor Day, in 2007.  It was the start of deer hunting season.  The fire ignited on

4  private land and spread to and burned both private and public land.  The fire affected

5  approximately 65,000 acres, 45,000 acres of which was in the Plumas and Lassen National

6  Forest.  The fire burned for approximately two weeks, and was eventually contained later in

7  September 2007.

8      The California Department of Forestry and Fire Protection (aka "CalFire" or "CDF") and

9  the United States Forest Service jointly conducted an investigation of the origin and the cause of

10  the fire.  On June 30, 2009, these state and federal investigators made available to the public for

11  the first time their Origin and Cause Investigation Report.

12      In the Origin and Cause Report, the United States alleges that the fire started when a

13  bulldozer being used to build anti-erosion berms at a work site struck a rock.  According to the

14  United States, a bulldozer struck a rock and issued a tiny fragment of hot metal sheared off and

15  landed in forest litter, and ignited at approximately 12:15 p.m.  The United States contends that

16  the fire smoldered for approximately one hour and forty-five minutes before bursting into flame.

17  The government contends that the bulldozer operator did not adequately inspect for fire after they

18  ceased operations at about 1:00 p.m. that day.  The fire was reported at 2:24 p.m.

19      On August 31, 2009, the United States filed this federal lawsuit seeking to recover

20  damages.  The Defendants in the case are Howell's Forest Harvesting, the company whose

21  employee was operating the bulldozer; Sierra Pacific Industries, a company that had contracted

22  with Howell to selectively harvest some trees; the owners of the land where the fire started; and

23  the landowners' property manager, W.M. Beaty & Associates.  The government alleges that each

24  of the Defendants was negligent and is liable for hundreds of millions of dollars in alleged

25  damages.

26      After conducting their own investigation and questioning the government's investigators,

27  the Defendants have a different view of what caused the fire, and have concluded that the

28  government failed to conduct a scientific and systematic investigation under the applicable fire

88

investigation standard set forth in NFPA 921 "Guild for Fire and Explosion Investigation"
published by the National Fire Protection Association.  As a result, Defendants believe the
investigation's conclusions are unreliable.  Defendants contend that Plaintiff's alleged origin and
cause conclusion is baseless, and Defendants deny that they are responsible for the fire.  Among
other things, the Defendants contend that the government failed to correctly identify the location
of the origin of the fire, failed to establish that metal fragments ignited the fire, and failed to
exclude other potential causes of the fire.  The Defendants also have asserted a number of
affirmative defenses, including that the investigators engaged in inequitable and wrongful
conduct that bars the United States' recovery in this matter.

DATED: June 7, 2012                  DOWNEY BRAND LLP


                                     By:_____/s/ William R. Warne_____
                                            WILLIAM R. WARNE
                                     Attorneys for Defendant/Cross-Defendant
                                        SIERRA PACIFIC INDUSTRIES


DATED:  June 7, 2012                 RUSHFORD & BONOTTO, LLP


                                     By: /s/ Phillip Bonotto (as authorized on 6-7-12 )
                                            PHILLIP BONOTTO
                                     Attorneys for Defendants/Cross-Defendants
                                     EUNICE HOWELL, INDIVIDUALLY and d/b/a
                                        HOWELL'S FOREST HARVESTING

DATED: June 7, 2012                  MATHENY SEARS LINKERT & JAIME


                                     By: /s/  Richard Linkert (as authorized on 6-7-12 )
                                            RICHARD LINKERT
                                        Attorney for Defendants
                                     W.M. BEATY & ASSOCIATES AND
                                        LANDOWNER DEFENDANTS

JOINT PRETRIAL STATEMENT

1    DATED:  June 7, 2012                KEKER & VAN NEST LLP

2

3                                        By: _/s/  Steven Ragland (as authorized on 6-7-12 )_
                                             STEVEN RAGLAND
4                                            Attorney for LANDOWNER DEFENDANTS

5

6    DATED: June 7, 2012                 BENJAMIN B. WAGNER
                                         United States Attorney
7

8                                        By: _/s/  Richard M. Elias (as authorized on 6-7-12 )_
                                             RICHARD M. ELIAS
9                                            Assistant U.S. Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JOINT PRETRIAL STATEMENT**