DOWNEY BRAND LLP
WILLIAM R. WARNE (SBN 141280)
MICHAEL J. THOMAS (SBN 172326)
ANNIE S. AMARAL (SBN 238189)
MEGHAN M. BAKER (SBN 243765)
621 Capitol Mall, 18th Floor
Sacramento, CA 95814-4731
Telephone: (916) 444-1000
Facsimile: (916) 444-2100
bwarne@downeybrand.com
mthomas@downeybrand.com
aamaral@downeybrand.com
mbaker@downeybrand.com

BRACEWELL & GIULIANI LLP
RICHARD W. BECKLER
D.C. Bar No. 262246
(*Pro Hac Vice Application Pending*)
JENNIFER T. LIAS
Virginia Bar No. 85608
(*Pro Hac Vice Application Pending*)
2000 K Street NW, Suite 500
Washington, DC 20006-1809
Telephone: (202) 828-5874
Facsimile: (800) 404-3970
richard.beckler@bgllp.com
jennifer.lias@bgllp.com

Attorneys for Defendant/Cross-Defendant
SIERRA PACIFIC INDUSTRIES

MATHENY SEARS LINKERT & JAIME, LLP
RICHARD S. LINKERT (SBN 88756)
JULIA M. REEVES (SBN 241198)
3638 American River Drive
Sacramento, CA 95864
Telephone: (916) 978-3434
Facsimile: (916) 978-3430

Attorneys For Defendants W.M. BEATY &
ASSOCIATES, INC. AND ANN MCKEEVER
HATCH, as Trustee of the Hatch 1987
Revocable Trust, et al.

RUSHFORD & BONOTTO, LLP
PHILLIP R. BONOTTO (SBN 109257)
DEREK VANDEVIVER (SBN 227902)
1010 Hurley Way, Suite 410
Sacramento, CA 95825
Telephone: (916) 565-0590

Attorneys for Defendant, EUNICE E.
HOWELL, INDIVIDUALLY and d/b/a
HOWELL'S FOREST HARVESTING

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SIERRA PACIFIC INDUSTRIES, ET AL.,<br><br>Defendants.<br><br>———————————————<br>AND ALL RELATED CROSS-ACTIONS. | Case No. 2:09-CV-02445-KJM-EFB<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 60(d)(3) MOTION TO SET ASIDE A JUDGMENT FOR FRAUD ON THE COURT**<br><br>Date: November 21, 2014<br>Time: 10:00 a.m.<br>Dept: Courtroom 3, 15th floor<br>Judge: Hon. Kimberly J. Mueller |

DOWNEY BRAND LLP

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................ 1

II.  EXECUTIVE SUMMARY.......................................................................................... 5

III. BACKGROUND ......................................................................................................... 9

    A.   A Brief Overview of the Moonlight Fire ....................................................... 9

    B.   The Moonlight Fire Investigation, as Told Through the Joint Report ................. 11

    C.   The Initiation of the State Actions .......................................................... 14

    D.   The Initiation of the Federal Action........................................................ 15

    E.   The Resolution of the Federal Action ...................................................... 18

    F.   The Resolution of the State Actions........................................................ 18

    G.   AUSA Robert Wright and His Experiences Relating to the Moonlight Fire and Other Wildfire Cases in the Year He Filed the Moonlight Action................ 20

    H.   AUSA Eric Overby ............................................................................. 22

    I.   Filing with OPR ................................................................................. 24

IV. SELECTED EXAMPLES OF FRAUDULENT MISCONDUCT ................................. 24

    A.   Ethical Obligations of Government Attorneys and Investigators ....................... 24

    B.   The Prosecutors Remained Passive While The Investigators Repeatedly Lied under Oath about the Very Foundation of Their Investigation.................... 27

    C.   The Prosecutors Participated in Advancing the Fraud at the Heart of the Investigation into the Realm of this Court's Jurisdiction .................................... 35

    D.   The Federal Prosecutors Proffered False Testimony Regarding the Investigation in Opposition to Defendants' Motion for Summary Judgment....... 39

    E.   The Prosecutors Misrepresented J.W. Bush's "Admission" that the Moonlight Fire Was Caused by a Rock Strike.............................................. 40

    F.   Ryan Bauer and the AUSA's Failure to Disclose an Alleged Two Million Dollar Bribe.................................................................................... 42

    G.   The United States Made Reckless Misrepresentations About Cal Fire's Civil Cost Recovery Program, Which the Court Relied Upon in Its Pre-Trial Rulings ................................................................................... 47

    H.   The Federal Prosecutor Misrepresented Evidence to Wrongfully Claim that Howell Started Other Wildland Fires..................................................... 59

    I.   The Lead Investigator Destroyed Critical Evidence Even Though He Reasonably Anticipated the Moonlight Fire Litigation ...................................... 64

    J.   The United States, with the Aid of Its Prosecutors, Covered-Up Misconduct at the Red Rock Lookout................................................... 65

    K.   The Overhead Video, the "New Diagram," and the Prosecutors' Failure to Disclose and Correct Admittedly False Expert Reports, as Required Under Rule 26(a)(2)(E) and Rule 26(e) ....................................................... 70

i

DOWNEY BRAND LLP

**TABLE OF CONTENTS**
**(continued)**

Page

V.  LEGAL STANDARD ................................................................................................ 77

VI. LEGAL ANALYSIS ............................................................................................... 79

    A.  Fraud Has Been Committed on this Court ............................................... 79

    B.  The Settlement Agreement Is No Bar to Relief ...................................... 89

    C.  The Fraud on the Court Warrants Dismissal of the Entire Action ........................ 91

VII. CONCLUSION ....................................................................................................... 92

DOWNEY BRAND LLP

ii

**FEDERAL COURT CASES**

*Alexander v. Robertson,*
    882 F.2d 421 (9th Cir. 1989) ............................................................................. 9, 77

*Aoude v. Mobil Oil Corp.,*
    892 F.2d 1115 (1st Cir. 1989) ........................................................................ 89, 90

*Berger v. United States,*
    295 U.S. 78 (1935) ........................................................... 17, 24, 25, 39, 45, 90

*Brady v. Maryland,*
    373 U.S. 83 (1947) ........................................................ 3, 25, 26, 44, 45, 69, 84

*Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp.,*
    12 F.3d 1080 (Fed. Cir. 1993) ........................................................................... 88

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991) ........................................................................... 2, 83, 85, 90

*Demjanjuk v. Petrovsky,*
    10 F.3d 338; 353 (6th Cir. 1993) .............................................................. 8, 26, 27

*Derzack v. Cnty. of Allegheny Children & Youth Servs.,*
    118 F.3d 1575 (3d Cir. 1997) ............................................................................. 36

*Derzack v. Cnty. of Allegheny, Pa.,*
    173 F.R.D. 400 (W.D. Pa. 1996) ....................................................................... 36

*Dixon v. C.I.R.,*
    316 F.3d 1041 (9th Cir. 2003) .............................................................. 3, 77, 79, 85

*EEOC v. Los Alamos Constructors, Inc.,*
    382 F. Supp. 1373 (D.N.M. 1974) .................................................................... 25

*England v. Doyle,*
    281 F.2d 304 (9th Cir. 1960) .............................................................................. 76

*Freeport-McMoRan Oil & Gas Co. v. FERC,*
    962 F.2d 45 (D.C. Cir. 1992) ............................................................................. 24

*Hazel–Atlas Glass Co. v. Hartford–Empire Co.,*
    322 U.S. 238 (1944) ........................................ 2, 8, 76, 87, 88, 89, 90

*Herring v. United States,*
    424 F.3d 384 (3rd Cir. 2005) ............................................................................. 88

*In re Hunter,*
    66 F.3d 1002 (9th Cir. 1995) ............................................................................. 88

*In re Levander,*
    180 F.3d 1114 (9th Cir. 1999) ............................................................. 2, 8, 76, 87

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ................................................................................... 26, 84

*Morris v. Ylst,*
    447 F.3d 735 (9th Cir. 2006) ....................................................................... 37, 44

DOWNEY BRAND LLP

# TABLE OF AUTHORITIES
## (continued)

*Northern Mariana Islands v. Bowie,*
   243 F.3d 1109 (9th Cir. 2001)................................................................. 37

*Pumphrey v. K.W. Thompson Tool Co.,*
   62 F.3d 1128 (9th Cir. 1995)..................................... 2, 76, 78, 83, 84, 85, 86, 87

*Southerland v. Irons,*
   628 F.2d 978 (6th Cir. 1980)................................................................. 89

*Southerland v. Irons,*
   77 F.R.D. 727 (E.D. Mich. 1978)........................................................ 8, 89

*Sperry & Hutchinson Co. v. FTC,*
   256 F. Supp. 136 (S.D.N.Y. 1966)........................................................ 25

*Tennison v. City and County of San Francisco,*
   570 F.3d 1078 (9th Cir. 2008)........................................................ 26, 84

*U.S. v. Buck,*
   281 F.3d 1336 (10th Cir. 2002)............................................................ 76

*U.S. v. Olsen,*
   737 F.3d 625 (9th Cir. 2013).................................................................. 3

*United States v. Blanco,*
   392 F.3d 382, 388) (9th Cir. 2004) ........................................................ 3

*United States v. Chu,*
   5 F.3d 1244 (9th Cir. 1993)........................................................... 25, 45

*United States v. Estate of Stonehill,*
   660 F.3d 415 (9th Cir. 2011)............................... 1, 2, 8, 76, 77, 78, 81, 82

*United States v. Kojayan,*
   8 F.3d 1315 (9th Cir.1993)................................................................. 92

*United States v. Maloney,*
   755 F.3d 1044 (9th Cir. 2014)............................................................. 92

*United States v. Young,*
   470 U.S. 1 (1985)..................................................................... 25, 46

*Wyle v. R.J. Reynolds Indus., Inc.,*
   709 F.2d 585 (9th Cir. 1989)............................................................. 92

*Youngblood v. West Virginia,*
   547 U.S. 867 (2006)................................................................. 27, 86

*Zone Sports Center Inc. LLC, et. al. v. Red Head, Inc.,*
   No. 11-CV-00634-JST, 2013 WL 2252016, at *6 (N.D. Cal. May 22, 2013) ........................ 77

DOWNEY BRAND LLP

**FEDERAL STATUTORY AUTHORITIES**

18 U.S.C. § 4 ......................................................................................................................... 37

18 U.S.C. § 1519 ............................................................................................................... 37, 82

28 U.S.C. § 535(b) ................................................................................................................. 37

**STATE STATUTORY AUTHORITIES**

Cal. Health & Safety Code § 13009 ....................................................................................... 47

Cal. Penal Code § 424 ............................................................................................................ 55

Cal. Welf. & Inst. Code § 15610.30 ................................................................................. 86, 87

**FEDERAL RULES AND REGULATIONS**

Fed. R. Civ. P. 60 .......................................................................................................... 77, 89, 90

Fed. R. Civ. Proc. 26 .............................................................................................................. 47

**STATE RULES AND REGULATIONS**

Cal. R. Prof. Conduct 5-200(A) ............................................................................................ 45

DOWNEY BRAND LLP

# I. <u>INTRODUCTION</u>

In the fall of 2007, the Moonlight Fire burned 65,000 acres in the Sierra Nevada mountain range, near Westwood, California. Approximately 45,000 of those acres belonged to the United States. In 2009, as a result of conclusions reached by an investigation into the cause of the fire, numerous lawsuits were filed against the same Defendants. The two primary suits were jointly prosecuted by lawyers for the United States and for the California Department of Forestry and Fire Protection ("Cal Fire").

In July of 2012, the parties to the United States' Moonlight Fire action entered into a settlement. Defendants agreed to pay $55 million to the United States over five years, and Sierra Pacific agreed to transfer 22,500 acres of land through ongoing negotiations. Those payments and land transfers continue to this day.[1]

In contrast to the federal settlement, in February of 2014, Cal Fire's Moonlight Fire action was terminated by California Superior Court Judge Leslie C. Nichols, who described the action as "corrupt and tainted" and who sanctioned Cal Fire more than $32 million for "egregious," "pervasive" and "reprehensible" discovery abuses resulting from "governmental corruption." Much of Judge Nichols' opinions focused on his findings that the underlying origin and cause investigation for the Moonlight Fire, jointly carried out by members of the United States Forest Service (USFS) and Cal Fire, was fraudulent and, more importantly, on the willingness of prosecutors to allow that fraud to thoroughly invade and support their effort to prevail against the Defendants.

Under certain circumstances, radically different results are not necessarily a significant concern, as settlements can at times create divergent outcomes. But that is not the point of this motion. This motion is instead focused on a particular "species of fraud" perpetrated upon two courts, "an effort by the government to prevent the judicial process from functioning 'in the usual manner'" and that "involved perjury or nondisclosure [ ] so fundamental that it undermined the

---

[1] Presently, Sierra Pacific Industries has transferred approximately 1500 acres, and the process of selecting and finalizing conveyance of various parcels is moving forward.

DOWNEY BRAND LLP

workings of the adversary process itself." *United States v. Estate of Stonehill*, 660 F.3d 415, 445 (9th Cir. 2011). Defendants are not now before this Court to argue that they were fraudulently induced to settle the federal action.[2] They knew some but not all of what they were up against at the time of the settlement: a corrupt investigation prosecuted by federal and state lawyers focused on winning regardless of their own professional responsibilities and despite pervasive dishonesty on key facts at the core of the Moonlight Fire's underlying origin and cause investigation.[3]

Importantly, this motion, brought under Federal Rule of Civil Procedure 60(d)(3), is about "far more than an injury to a single litigant," it is about "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944). This motion asks this Court to utilize its "historic power of equity to set aside [a] fraudulently begotten judgment[]" in order to uphold the "preservation of the integrity of the judicial process." *Id; see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("[This] inherent power […] allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court. […] Moreover, a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud."). As the Supreme Court commanded in *Hazel-Atlas*, "the public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud." *Hazel-Atlas* at 246.[4]

---

[2] Thus, unless this Court finds by clear and convincing evidence that the underlying matter constitutes a fraud upon the Court, or unless this Court stays the settlement pending review and/or the outcome of other matters, the Defendants will of course continue to fully abide by the terms of their settlement agreement.

[3] Indeed, Defendants do not seek recourse under Rule 60(b) for other reasons as well. Rule 60(b) allows a court to relieve a party from a final judgment, for fraud, misrepresentation, or misconduct by an opposing party, but such a motion must be filed within one year of entry of judgment. Here, since judgment was entered more than a year ago, a Rule 60(b) motion would be untimely. A motion under Rule 60(d)(3) for fraud on the court, however, has no time limitation, but sets a higher bar (a bar cleared by the egregious conduct discussed herein) to set aside a final judgment. *Stonehill*, 660 F.3d at 443.

[4] Under Ninth Circuit authority, such motions are granted if the defendants can, by clear and convincing evidence, establish "that species of fraud which does or attempts to defile the court itself, or is a fraud perpetuated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *In re Levander*, 180 F.3d 1114 (9th Cir. 1999) (finding that perjury and nondisclosure that defiled the bankruptcy court amounted to a fraud on the court) (quoting 7 James Wm. Moore et al., Moore's Federal Practice ¶ 60.33, at 515 (2d ed. 1978)). A party can be found to have engaged in a scheme to

DOWNEY BRAND LLP

The Ninth Circuit has faithfully followed the Supreme Court's mandate that misconduct resulting in a fraud on the court shall not be tolerated. It has recognized that such fraud "corrupt[s] the legitimacy of the truth-seeking process" and "defile[s] the sanctity of the court and the confidence of all future litigants." *Dixon v. C.I.R.*, 316 F.3d 1041, 1046-47 (9th Cir. 2003) (finding a fraud on the court based on the actions of two IRS attorneys in covering up relevant evidence, including sitting by silently as witnesses presented testimony the attorneys knew to be false). Further, the Chief Judge of the Ninth Circuit has poignantly acknowledged that there is currently an "epidemic of *Brady* violations" and other examples of prosecutorial misconduct "abroad in the land" and that "[o]nly judges can put a stop to it." *U.S. v. Olsen,* 737 F.3d 625, 625 (9th Cir. 2013) (Chief Judge Kozinski dissenting) ("failing to disclose evidence casting serious doubt on the reliability of the only dispositive piece of evidence in the case" should have amounted to a *Brady* violation). When judges allow prosecutors and other litigants to get away with such behavior, it "erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law." *Id.* at 632. "When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition." *Id.* at 632.[5]

The Court's assessment of this motion should include related factors. First, the conduct addressed in this motion is focused on governmental actors, who are required to operate under a higher standard of care in light of the power they hold in our society. When they fail to do so, it puts everyone at risk. Second, wildland fires threaten the lives and property of millions of citizens, as well as the economic viability of entire communities. Thus, one of the primary purposes of any legitimate fire investigation is to find the truth in order to *prevent* future fires.[6]

---

defraud the court and "improperly influence" its decisions through "the use of misleading, inaccurate, and incomplete responses to discovery requests, the presentation of fraudulent evidence, and the failure to correct [] false impression[s] created by [witness] testimony." *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1132 (9th Cir. 1995) (finding that defendant committed a fraud on the court by failing to disclose the existence of favorable evidence to the plaintiff and other violations of the rules of discovery and professional responsibility).

[5] Defendants suspect that the United States may attempt to argue that the settlement of this matter somehow precludes this Court's assessment of its conduct under FRCP Rule 60(d)(3). As discussed *infra*, such arguments would be misplaced.

[6] One of the leading scientific bodies on fire investigation, the National Fire Protection Association, ("NFPA"), expressly confirms that, "fire investigation or analysis and the accurate listing of causes are fundamental to the

3

DOWNEY BRAND LLP

Here, the Moonlight Fire investigators and prosecutors abandoned this fundamental objective, and abandoned any effort to seek an "accurate determination of cause and responsibility." Instead, they went "all in" to win at any cost. The fraud upon this Court therefore threatens not only the judicial process but also all citizens who are exposed to the threat of future wildland fires.

Finally, and importantly, Defendants perceive this Court as a victim of the conduct detailed herein, as it has neither had the chance to fully assess the trust it naturally placed in certain federal prosecutors[7] nor the ability to do so in the context of all that was eventually discovered about the thoroughly corrupt and financially driven Moonlight Fire investigation. The circumstances presented by this motion provide three separate layers of support for finding a fraud upon this Court: (1) pervasive and egregious corruption at the core of the underlying origin and cause investigation, (2) the repeated suppression or omission of key facts by certain prosecutors in a manner which seriously altered this Court's ability to properly adjudicate this matter, and (3) radically dissimilar results in these nearly identical and jointly prosecuted actions, in part occasioned by the underlying fraud upon the Court. On their own, each of these circumstances has caused grave damage to the integrity of our judicial process, and each separately draws support from the Supreme Court and Ninth Circuit for finding fraud upon the Court. Here, each of these layers has been laminated into an egregious fraud that goes well beyond what is required for this Court to exercise its inherent powers so as to effectuate justice and preserve the public's confidence in our judicial system.

---

protection of lives and property from the threat of hostile fire or explosions. It is through an efficient and accurate determination of the cause and responsibility that future fire incidents can be avoided." (Ex. 28 at 2.) Of course, with all fires, the good men and women of Cal Fire engage in heroic acts on a regular basis to protect the lives and property of California's residents.

[7] The great majority of federal prosecutors in this District and elsewhere are highly ethical and hardworking public servants. Sierra Pacific's co-counsel Richard Beckler is a former federal prosecutor. What happened in this matter is not only a profound affront to this Court, it is an affront to every prosecutor, many of whom will likely applaud this effort. Thus, with respect to comments in this motion relating to the conduct of "the federal prosecutors," those comments are directed to the two lead prosecutors on the Moonlight Fire action and their immediate supervisor, as discussed herein. Because of the significant size and scope of this matter, the facts of this case and the actual conduct of certain prosecutors regarding those facts could only truly be known by those with day-to-day responsibility for this action. Others in the office surely had little choice but to rely upon the supervising and lead AUSA's representations as to what was occurring. The same of course was true for this Court.

DOWNEY BRAND LLP

## II. **EXECUTIVE SUMMARY**

On February 4, 2014, California Superior Court Judge Leslie C. Nichols[8] terminated Cal Fire's Moonlight Fire action in its entirety after finding, among other things, "reprehensible," "egregious," and "pervasive" discovery abuses that "threatened the integrity of the judicial process." (Ex. 24 at 19; Ex. 25 at 30 attached to the Declaration of W. Warne ("Warne Decl.").)[9] Judge Nichols also awarded Defendants full compensatory attorney fees and expenses of more than $32 million, finding that Cal Fire's conduct "initiating, maintaining and prosecuting this action, to the present time, is corrupt and tainted." (Ex. 24 at 21.) Emphasizing the weight of the evidence in support of his ruling, Judge Nichols stated further that "[a]lthough the standard of evidence review is the civil standard of preponderance of the evidence, the Court has been fully satisfied even by the higher clear and convincing standard of review." (Ex. 24 at 9.)

In commenting on the conduct of the state attorneys, the court wrote, "[o]ne hopes that this conduct is not explained in our law schools as what 'good lawyers' do to win their cases." (*Id*. at 23.) With respect to the size of the award, the court noted the expense associated with being forced to "uncover governmental corruption" and then stated:

> To the observation that the award of attorney fees and expenses is a big number, a question is presented. Compared to what? The Plaintiffs went "all in," and in this case it meant all in to win at any cost. Defendants were forced to meet these challenges. The cost of Plaintiff Cal Fire's conduct is too much for the administration of justice to bear.

(*Id*. at 25.)

As Judge Nichols intimates above, Cal Fire did not act alone. There were seven related Moonlight Fire lawsuits -- one federal court action and six separate state court actions. Each

---

[8] Judge Nichols, a graduate of Stanford University and Hastings College of the Law, received an appointment to serve as a Superior Court Judge in Santa Clara County in 1984, where his Honor was, among other things, responsible for all cases filed under California's Environmental Quality Act. While Judge Nichols "retired" in 2009, for the past five years he has continued in his role as a Superior Court trial judge through numerous and ongoing appointments from the Chief Justice of the California Supreme Court, who issues such assignments within California's Assigned Judges Program (AJP) under Article VI, Section 6 of the California Constitution. Prior to his 30 years of service as an esteemed Superior Court trial judge, Judge Nichols practiced law in Palo Alto for 17 years, while also serving on Mountain View's City Council and as its Mayor just before his appointment. At the beginning of his Honor's career, Judge Nichols worked with the San Mateo Legal Aid Society, where he worked on civil rights cases.

[9] Unless noted otherwise, all references herein to an Exhibit refer to documents attached to the Warne Declaration.

5

sought damages for the wildland fire that began on September 3, 2007, and burned significant acreage in the Northern Sierra Nevada mountain range. Each relied upon the same origin and cause investigation, jointly conducted by agents of the United States Forest Service ("USFS") and Cal Fire. Each suit named essentially the same Defendants and was premised on the same fraudulent causation theory. While there were seven cases, the lawyers for the United States and Cal Fire jointly controlled the litigation effort, as the lawyers for four of the five private actions took a back seat and, unfortunately, did little but watch as this matter metastasized.

But the cooperation between the government plaintiffs went well beyond their reliance upon their joint investigators. Throughout the litigation, the federal and state lawyers worked under a joint prosecution agreement, proclaiming a "common interest" in prosecuting their actions against these Defendants.[10] They hired and relied upon the same consultants and experts, coordinated depositions, and jointly prepared critical witnesses. Regrettably, they also jointly allowed witnesses to testify falsely while under oath and violated their duties of disclosure and candor to the Court and these Defendants.[11]

Obviously, Judge Nichols reached grim determinations about the conduct of certain governmental actors and their lawyers, but he is not alone in his assessment. In fact, two highly respected and former Moonlight Fire prosecutors from the Eastern District have disclosed equally unpleasant information about the federal prosecution of this matter. Former Assistant United

---

[10] As stated in a declaration by federal prosecutor Richard Elias in the context of a previous motion: "Because of the joint nature of the investigation, and the common interest that the Forest Service and Cal Fire have in prosecuting their respective cases against Defendants, the USAO and California Attorney General's Office ('Cal AGO') entered into a Joint Prosecution Agreement." (Ex. 5 at 3.) Magistrate Judge Brennan also confirmed the existence of this partnership as follows, "Cal Fire voluntarily entered into a joint prosecution agreement with the United States, and is reaping the benefits of that arrangement." (Ex. 9 at 8.)

[11] Consistent with Judge Nichols' findings in the related state court actions that the investigators "repeatedly" lied under oath about critical aspects of their investigation, Judge Nichols found a "betray[al of] the primary purpose of the judicial system -- to reveal the truth." (Ex. 25 at 24.) "In all matters, the Court maintains the ability to adjudicate the conduct of all parties and their counsel, be they public or private, in order to protect the integrity of the court. Finding otherwise would do grave damage to the integrity of the judicial process and the public's confidence in it, especially for those who find themselves defendants in actions brought by a public agency that perceives itself immune from the court's oversight and control." (*Id.* at 30.) While Judge Nichols focused on Cal Fire's prosecution and the fraud it worked upon the state court, his orders also recognized (1) the false testimony provided by both the state and federal investigators regarding their most critical findings, (2) the federal and state prosecutors' joint and improper preparation of critical witnesses, (3) the falsity of the joint origin and cause report, and (4) the joint failure to disclose damaging evidence.

States Attorney ("AUSA") Robert Wright,[12] the previous head of the Eastern District's Affirmative Fire Litigation Team and the prosecutor charged with investigating, drafting, executing and filing the United States' Moonlight Fire complaint, strongly supports this motion. In his accompanying declaration, Wright exposes the pressure exerted upon him within the U.S. Attorney's office to withhold information damaging to other wildfire matters, his staunch refusal to do so, and his subsequent removal from the federal Moonlight Fire litigation in January 2010 by his immediate supervisor. Wright summarizes his experiences as follows: "The internal struggles that I encountered in 2009 with respect to my professional concerns on these wildland fire actions marked the first time in my 40 years of practicing law that I felt pressured to engage in unethical conduct as a lawyer." (Wright Decl. ¶ 18.)

Another senior and highly respected AUSA, Eric Overby, echoed similar concerns. In or about March of 2011, AUSA Overby came out to Sacramento from the United States Attorneys' office in Salt Lake City, Utah, to join the Moonlight Fire prosecution team in Sacramento. Several months later, Overby left in disgust, but not before requesting a meeting with Sierra Pacific's lead counsel.[13] During that meeting at Downey Brand on May 12, 2011, AUSA Overby disclosed his deep concerns regarding his co-federal prosecutors' tactics, saying, "In my entire career, yes, my entire career, I have never seen anything like this. Never." (Warne Decl. ¶ 22.) AUSA Overby also revealed that a few days earlier he had said to someone: "It's called the Department of Justice. It's not called the Department of Revenue. Since we are the Department

_____

[12] Throughout his career, Robert Wright has enjoyed a stellar reputation. After graduating from U.C. Berkeley in 1966, and serving as a captain in the U.S. Army, he obtained a J.D. from Harvard Law School in 1971. Over the course of practicing law for 40 years, which continues to this day in his capacity as Senior Counsel for a non-profit environmental public interest organization in Sacramento, Wright has built a career punctuated by prestigious positions, significant legal victories, and commendations for excellence as a lawyer. Wright is rated "AV" by Martindale-Hubbell, a distinction defined by its website as a "testament to the fact that a lawyer's peers rank him or her at the highest level of professional excellence." Among other positions, Wright served as a California Deputy Attorney General in its Environmental Unit, as a law firm partner, and as an adjunct Professor of Environmental Law at San Joaquin College of Law in Fresno from 1990 to 2003. Wright joined the Office of the United States Attorney for the Eastern District of California in December of 1997, where he served for more than twelve years. As an AUSA, Wright received significant praise for his work, and was appointed to lead the Office's Affirmative Fire Litigation Team after its formation by the Department of Justice in 2008, a position he maintained as he investigated and initiated the Office's Moonlight Fire prosecution. (Declaration of R. Wright ("Wright Decl.") ¶¶ 2-7.)

[13] AUSA Eric Overby died unexpectedly in 2012.

DOWNEY BRAND LLP

of Justice, we win if justice wins." (*Id.*) Before leaving, Overby also talked to others regarding his concerns, including former AUSA Wright, asking: "Is it just me, or is there something seriously wrong in the Eastern District Civil Division management?" (Wright Decl. ¶ 28.)

As detailed in this Rule 60(d)(3) motion,[14] the fraud worked upon this Court is, as one would expect with jointly prosecuted matters, similar to the fraud worked upon the state court. This Court's inherent powers exist in part to "further[] the pursuit of achieving complete justice by enabling the court to suspend those judgments whose enforcement leads to inequitable results." *In re Levander*, 180 F.3d 1114, 1118 (9th Cir. 1999) (quoting *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 244 (1944)).

While the trial court proceedings in the coordinated Moonlight Fire litigations have ended in two radically different results, there is little difference between these two cases in those areas that should concern this Court. Properly understood, the settlement of the federal matter does not resolve the issues presented by a motion focused upon egregious and unconscionable misconduct which "defiles the court itself," *Stonehill*, 660 F.3d at 443, and which, even after a settlement, still "presents a carefully planned scheme calculated to deceive the court . . . defense counsel, and his client," *Southerland v. Irons*, 77 F.R.D. 727, 733 (E.D. Mich. 1978), *aff'd sub nom* 628 F.2d 978 (6th Cir. 1980).

Here, the lead prosecutors turned a blind eye to a thoroughly corrupt investigation, transported that corruption into the jurisdiction of this Court, and then permitted pervasive dishonesty by the investigators on issues going to the core of this matter.[15] These prosecutors

---

[14] The evidence in support of this motion is substantial, which is to be expected on such a significant action involving so many multiple instances of misconduct related to this fraud upon the Court. This fact is not uncommon when making highly factual inquiries associated with a fraud upon the Court. For instance, the Ninth Circuit's published decision in *Stonehill* and the Sixth Circuit's published decision in *Demjanjuk*, each discussed *infra*, involve lengthy factual analyses resulting in lengthy decisions.

[15] As found by Judge Nichols regarding dishonesty on fundamental facts, "Not only does this evidence go to one of the most central, substantive issues in this case — the location of the origin, and thus the cause of the fire — it also goes directly to the credibility of the investigators on the Moonlight Fire. While credibility is important in any case, the Court notes that it is even more critical when the witnesses at issue are law enforcement officers who have access to the scene, are charged with gathering and documenting the evidence, and are responsible for determining who is to blame. The Court finds that the credibility of the investigators is also an issue of substantial importance to this case." (Ex. 25 at 42.)

DOWNEY BRAND LLP

recklessly omitted information favorable to these Defendants and coordinated their pervasive discovery abuses with both the state prosecutors and the investigators. The conduct of counsel for both the United States and Cal Fire constitutes a fraud which "defiles the court" and which was "perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir. 1989). Accordingly, Defendants respectfully request that this Court terminate this matter for fraud upon the Court and vacate the settlement.

## III. BACKGROUND

### A. A Brief Overview of the Moonlight Fire

The Moonlight Fire began on a Monday, Labor Day, September 3, 2007, on private property owned by members of the Walker family ("Landowner Defendants") and managed by W.M. Beaty and Associates ("Beaty"). Earlier that year, defendant Sierra Pacific Industries ("Sierra Pacific") had won a bid to harvest a portion of property owned by the Landowner Defendants. In turn, Sierra Pacific hired defendant Eunice Howell's Forest Harvesting Company ("Howell") to conduct the logging operations on the Landowner Defendants' land.

While somewhat remote, the property was prime firewood cutting area for local townspeople. The same property was also frequented by recreational users, including hikers, hunters, and motorcycle and ATV riders. (Ex. 80 at 7-8; Ex. 81 at 3-5.) Because the area has been logged over the course of many decades, the property is readily accessible through a substantial network of navigable dirt trails and roads beneath the tree canopy. (Ex. 80 at 8; Ex. 81 at 7.) A number of people were in the area on Labor Day, or may have been. *Id*. On the day of the fire, Ryan Bauer, a resident of the town of Westwood, told his parents he would be in the area to cut firewood, an activity he engaged in frequently through a side-business. (Ex. 76 at 14.) To do so, Bauer used an illegally modified chainsaw, which increased its fire danger. (Ex. 82 at 2-3.) Shortly after the Moonlight Fire began, Bauer's parents were found dangerously close to where the fire began by a private patrolman, who testified that the Bauers said they were looking for their son Ryan. (Ex. 79 at 2-4, 9.) During his deposition, their son encircled an area which

DOWNEY BRAND LLP

1 included where the fire started as his favorite place to cut firewood. (Ex. 77.)

2 Others may have been in the area too, including Michael McNeil, a USFS employee and

3 suspected serial arsonist on numerous fires that appeared to coincide with his arrival on a variety

4 of geographical assignments. (Ex. 41 at176-180.) After a lengthy attempt to catch McNeil using

5 transponders and surveillance, McNeil was inexplicably promoted to Battalion Chief, Fire

6 Prevention, and transferred to Lassen National Park about two months before the Moonlight Fire

7 began. (*Id.*) His whereabouts the morning and early afternoon on the day of the Moonlight Fire

8 are unknown because the investigators never bothered to look into, before releasing their origin

9 and cause scene, whether McNeil may have been responsible for starting the fire.[16]

10 Also, on the morning and early afternoon of the day the fire started, two Howell

11 employees, J.W. Bush and Kelly Crismon, were using bulldozers to create soil berms or "water

12 bars" across skid trails to help prevent erosion. Both operators wrapped up their work that day

13 before 1:00 p.m., drove down to a service road and then parked their bulldozers about a mile to

14 the south where they serviced them before leaving. (Ex. 73 at 2-6.) By 1:30 p.m., each was

15 headed back toward the nearby town of Westwood in their pickup trucks with windows down.

16 (*Id.* at 7-8.) At no time while working in the area that day, while at the log landing, or as they

17 drove out, did they smell or see any smoke or fire. (*Id.* at 28.) Within two hours of finishing their

18 work that day, J.W. Bush attempted to return to the general area in which he had been operating

19 but was prevented from doing so by the Moonlight Fire. (Ex. 73 at 117-124.)

20 ───────────────

21 [16] The investigators' failure to investigate the whereabouts of McNeil is even more inexcusable in light of what they

22 knew at the time. Lead investigator White was so concerned about McNeil's arrival in the area that summer that White quickly made a point of requesting that a transponder be placed on the bottom of McNeil's USFS issued pickup truck. (Ex. 41 at 178-180; Ex. 48 at 36-37.) Ultimately, McNeil was arrested and charged with arson in

23 another matter and with making extortionist email threats to various judges, law enforcement officials and politicians, including Senator Barbara Boxer and Congresswoman Mary Bono. McNeil pled guilty to the extortionist threats, a

24 crime he initially carried out through a complicated scheme designed to make it appear as if his ex-wife were the perpetrator. (Ex. 84 at 2-4.) Defendants were keen to take McNeil's deposition because of the "blame-someone-

25 else" nature of his crimes, the long-held suspicions that McNeil may be a serial arsonist who could easily perpetrate such crimes while in his USFS uniform and vehicle, and the timing of his arrival in Susanville in relationship to the

26 Moonlight Fire. Defendants therefore deposed McNeil in the State Actions on February 14 and 15, 2013, at the R.J. Donovan Correctional Facility, where he is serving a 19 year, 8 month sentence. (*Id.* at 2.) During that deposition,

27 McNeil testified that he understood how to make timing devices which could start wildfires, and that the types of devices and the length of the "fuses" was only limited by the imagination of the creator. He confirmed that such

28 delayed ignition mechanisms could be set to last anywhere between minutes to days. (*Id.* at 5-8.)

The Moonlight Fire was spotted from the closest United States Forest Service ("USFS") lookout tower and called in at 2:24 p.m. (Ex. 30 at 3.) The Red Rock lookout tower is located on Red Rock peak about ten miles away. Once the fire was called in, suppression resources were directed to the site, but the Moonlight Fire would still burn approximately 65,000 acres over the course of the next two weeks, some 45,000 acres of which were in the Plumas and Lassen National Forests, the property of the United States. USFS and Cal Fire jointly worked to extinguish the blaze.

B.      **The Moonlight Fire Investigation, as Told Through the Joint Report**

The USFS and Cal Fire jointly investigated the Moonlight Fire, and later jointly issued their official report on the cause of the fire, entitled "Origin and Cause Investigation Report, Moonlight Fire" (Joint Report). (Ex. 30 at 1.) The Joint Report was signed by Cal Fire's investigator Joshua White ("White") and the USFS's investigator Diane Welton ("Welton"). However, the first investigator on the scene was USFS investigator David Reynolds ("Reynolds"), who had been dispatched to the scene shortly after the fire was called in by the Red Rock lookout tower. He arrived at approximately 3:30 p.m. (*Id.* at 5.) White, a Cal Fire Battalion Chief and law enforcement officer, was also dispatched to the fire, arriving later that same evening. Because it was too hot and too dark to do any substantive investigative work on that first night, White and Reynolds agreed they would start their joint investigation the next morning. (Ex. 30 at 17.)

Early that next morning, on September 4, 2007, Reynolds and White began their investigation, with White taking the lead. (Ex. 30 at 17-19; Ex. 34 at 1.) As they walked into the fire area, they eventually found a skid trail.[17] After turning on that trail and walking down a slope, they located some rocks with strike marks, which they preliminarily identified as the general location of where the fire began. (Ex. 30 at 19-20.) Without securing the scene, they left, drove back towards Westwood for lunch, and used their phones to set up a meeting with Howell

_____

[17] "Skid trails" are pathways within the forest created by bulldozers dragging logs down to "landings" where the logs are then removed by logging trucks to take them to mills.

bulldozer operator Kelly Crismon. (*Id.*) The investigators conducted their first interview of Crismon back at the fire scene, in their chosen origin area, finishing that discussion at roughly 6:00 p.m. (*Id.* at 20-22.) During that meeting, Crismon confirmed that he had been in the area earlier that day installing water bars. (*Id.*) Thereafter, White took Crismon back down the hill, while Reynolds stayed behind to begin processing the scene, putting a pink tape around their chosen area of origin and marking the scene with indicator flags. (*Id.*)

When White returned, he and Reynolds continued placing indicator flags in the area they designated as the general area of origin. (Ex. 30 at 22.) According to their training, blue flags are used to denote where the fire was backing, yellow flags where the fire was moving laterally, and red flags where the fire was advancing. (*Id.*) A white flag typically designates the point of origin. (*Id*; Ex. 41 at 48.) White has conceded that one of the *primary* goals of a wildland fire investigation is to find a point of origin. (Ex. 41 at 55, 158-159.) White also testified that finding the fire's point of origin is necessary before determining the cause of the fire as it is at that point where any physical evidence of the actual ignition is likely to be located. (*Id.* at 157, 158-159.)[18]

White and Reynolds returned the next morning, September 5, at roughly 8:00 a.m. (Ex. 30 at 22; Ex. 41 at 45-46; Ex. 45 at 27-28.) The Joint Report provides that when they returned they placed "numbered plates" next to certain fire indicators, photographing those indicators as they went. (Ex. 30 at 22.) The Joint Report also provides that White and Reynolds used "a handheld magnet to 'sweep' the area in an effort to identify any ferrous material." (*Id.* at 23.) "Within close proximity of two of the rocks… a ferrous material consistent with that of metal shavings, were recovered." (*Id.* at 23-24.) According to the Joint Report, White and Reynolds placed the metal allegedly found at these two rocks into one bag, which they labeled E-1, for "Evidence #1." (*Id*. at 24.) After finding the metal, the investigators left the origin area and

---

[18] The USFS and Cal Fire's lead origin and cause investigator Larry Dodds, an expert in the science of origin and cause investigations, confirmed during his deposition that being off by eight feet regarding the point of origin can make "a world of difference," as locating the correct point of origin is critical to establishing causation. (Ex. 52 at 29.) If investigators find what they believe is a competent ignition source in a spot where the fire did not start, they are necessarily missing what could be far different causation potentials at the actual point of origin – a timing device, a gasoline spill, a match, a set of footprints, etc.

DOWNEY BRAND LLP

walked downhill to their trucks, where they photographed the metal at 10:02 a.m. (Ex. 41 at 94.)

By 10:15 a.m. on September 5, 2007, White and Reynolds concluded that the Moonlight Fire was caused by rock strikes from a Howell bulldozer. Importantly, they then "released" their area of origin. (Ex. 34 at 1.) According to Reynolds, they "were confident" and they "were "done." (Ex. 45 at 31.) Indeed, later that same day, Reynolds finished an "Incident Report" identifying Sierra Pacific as the "defendant." (Ex. 30 at 51.)

Three days later, on September 8, 2007, Special Agent Diane Welton, a law enforcement officer with the USFS, replaced Reynolds as the USFS's lead investigator. Welton visited the fire scene that morning with White, along with her supervisor and fellow USFS law enforcement officer Marion Matthews ("Matthews"). Both Welton and Matthews were directed to join the investigation by their supervisor Craig Endicott ("Endicott"), Assistant Special Agent in Charge. (Ex. 48 at 4; Ex. 50 at 2-7; Ex. 30 at 31.) Both Matthews and Welton REDACTED

REDACTED

REDACTED (Ex. 48 at 6-15; Ex. 83.) During their depositions, both Matthews and Welton REDACTED

REDACTED (*Id.*; Ex. 50 at 18-20.)

When Matthews and Welton visited the fire scene on September 8, 2007, Matthews told Welton that she had reservations about the size of the alleged origin area as established by White and Reynolds. (Ex. 50 at 10-11.) Matthews believed that the origin area should have been enlarged to encompass more area further up the hill to the west.[19] (*Id.* at 11-14; Wright Decl. ¶ 7.) The Joint Report, however, says nothing whatsoever about Matthews' stated concerns that the investigators should have enlarged their area of origin to extend further up the hill, nor does the

---

[19] Placing the fire further up the hill would have brought the alleged points of origin closer to the area where the 3:09 p.m. air attack video, discussed *infra*, shows the smoke plume.

DOWNEY BRAND LLP

1  Joint Report say anything about the arrival of USFS employee Michael McNeil into the area

2  several weeks before the Moonlight Fire.

3    After this investigation, nearly two years passed.  Finally, on June 30, 2009, the USFS and

4  Cal Fire released their Joint Report, which concluded that the cause of the Moonlight Fire was "a

5  rock strike with the grouser or front blade from S-2 CRISMON's bulldozer."  (Ex. 30 at 4.)  This

6  Joint Report contains an official sketch that identifies two separate points of origin, labeled E-2

7  and E-3.  (Ex. 39.)

8    As thoroughly discussed in this motion, however, the Defendants have discovered clear

9  and convincing evidence that the Joint Report fails to disclose what actually happened during the

10  Moonlight Fire origin and cause investigation and that, instead, the Joint Report covers up the real

11  conduct of these investigators during their origin and cause investigation.

12  **C.    The Initiation of the State Actions**

13    On August 4, 2009, approximately a month after the Joint Report was released, White

14  signed and sent a letter to each of the primary Defendants, claiming that they had been found

15  responsible for the Moonlight Fire and that they were therefore liable for the $8.1 million that Cal

16  Fire had incurred in suppressing and investigating the cause of the Moonlight Fire.  (Exs. 115-

17  117.)  However, instead of demanding full payment to the State of California, White sought the

18  reduced amount of $7.6 million for the State of California but then also demanded that the

19  Defendants issue a separate check in the amount of $400,000, payable to something called the

20  "CDAA Wildland Fire Training and Equipment Fund."[20]  (Ex. 115.)  White stated that if

21  Defendants failed to comply with the demand for payments as set forth in the letter within 30

22  days, Cal Fire would file its action against them and add interest to its damage claim.  (*Id.*)

23    Cal Fire did not wait 30 days.  On August 9, 2009, the Office of the California Attorney

24  General filed its Moonlight Fire action in Plumas County Superior Court on behalf of Cal Fire.

25  Cal Fire's lead counsel was Supervising Deputy Attorney General Tracy L. Winsor ("Winsor"),

26

27  [20] After settlement of the federal Moonlight Fire action, Defendants later learned that this "fund" was internally
referred to as "WiFITER" and, as discussed more fully below, was controlled by Cal Fire, not the California District
28  Attorneys Association.

DOWNEY BRAND LLP

primarily assisted by Deputy Attorney General Daniel M. Fuchs ("Fuchs").  (Ex. 1.)

Several other private parties who claimed damages from the Moonlight Fire also filed suit. In total, there were five private party lawsuits and one Cal Fire suit.  Because all six state court lawsuits (seeking well over $60 million in damages) relied on the same joint USFS and Cal Fire origin and cause investigation, the state court consolidated the actions early in the litigation for purposes of discovery, and later consolidated all matters for a trial on liability as well.

**D.      The Initiation of the Federal Action**

In the summer of 2008, before the Joint Report was released, and well before Cal Fire filed its action, AUSA Robert Wright, the acting head of the Affirmative Fire Litigation Team in the Eastern District, had become particularly interested in the Moonlight Fire because of the substantial damage it had caused to USFS land.  (Wright Decl. ¶ 7.)  In fact, Wright ultimately sought and obtained an "early referral" because he believed he had a strong case on liability and also knew that there were extensive damages.  (*Id.* ¶ 11.)  Wright also understood that such referrals were typically not given until after the Forest Service determined its amount of claimed damages.  (*Id.* ¶ 11.)

At some point prior to October of 2008, Wright retained several expert consultants and, on or about October 2, 2008, visited the fire site with consultants along with another AUSA.  (*Id.* ¶¶ 7-8.)  When they arrived in the area, they were joined by investigator White from Cal Fire and investigator Welton from the USFS.  (*Id.* ¶ 7.)  Consistent with what is described in their dishonest Joint Report, the investigators both claimed the Moonlight Fire was caused by a rock-strike from a metal tracked bulldozer working in their selected "area of origin."  (*Id.* ¶ 7.)  When driving back into town in a pickup truck with White and Welton, Welton told Wright "there's something that we need to tell you."  (*Id.* ¶ 7.)  Welton then explained that investigator Matthews, who had visited the alleged origin five days after it began, had wanted the investigators to declare a larger alleged origin area for the fire.  (*Id.* ¶ 7.)  At the time, Wright believed that White and Welton were "scrupulously honest and trustworthy in their conduct of the investigation and preparation of the Report."  (*Id.* ¶ 7.)  Later, however, when Defendants asked Welton about this

DOWNEY BRAND LLP

1 | issue in her deposition, she denied any memory of it.[21] (Ex. 48 at 28-29.)

2 | After discussing the matter with his consultants, and with investigators White and Welton,

3 | AUSA Wright began the process of drafting the Moonlight Fire complaint on behalf of the United

4 | States, eventually executing and filing that complaint on August 31, 2009, three weeks after Cal

5 | Fire's complaint and nearly two years after the fire began. (Wright Decl. ¶ 11.) Thereafter,

6 | AUSA Wright oversaw the Moonlight Fire litigation until January 4, 2010. On that day, Wright's

7 | supervisor, AUSA David Shelledy, abruptly removed Wright from the Moonlight Fire litigation

8 | with an additional instruction that Wright viewed as unprecedented in his many years of

9 | experience as a federal prosecutor. (*Id.* ¶ 21.) Specifically, Shelledy told Wright that he was not

10 | only being relieved as the lead prosecutor, but that he was barred as of that day from working on

11 | the Moonlight Fire matter in any capacity whatsoever. (*Id.*)

12 | Shelledy then replaced Wright with AUSA Kelli Taylor, who led the Moonlight Fire

13 | prosecution from that point forward. (*Id.* ¶ 23.) Three months later, Taylor signed the United

14 | States' first Rule 26 disclosure, claiming damages against these Defendants in excess of $791

15 | million. Together with estimated interest and attorney fees, Taylor's disclosure brought the total

16 | claim against these Defendants to more than $1 billion.[22] (Warne Decl. ¶ 7 & Ex. 3.)

17 |

18 | [21] In his declaration, Wright explains: "In hindsight, I believe that Matthews thought that the fire may well have originated in a location different from where the investigators had alleged." (Wright Decl. ¶ 7.) Wright's loss of trust

19 | is warranted on numerous levels, as discussed further herein. On this point, while Welton confessed Matthews' concerns to AUSA Wright, she was not so forthcoming to these defendants under oath and instead kept to the script

20 | of the falsified Joint Report. Specifically, Welton suppressed the harmful key fact regarding Matthews during her deposition. On August 15, 2011, Welton testified as follows:

21 | Q: Was there any discussion that you recall at the scene about the general area of origin being potentially larger than the area that was bounded by the pink flagging?

22 | A: I don't recall having that discussion.

23 | Q: Did Marion Matthews at any point in time ever express to you the thought that she believed the general area of origin should have been bigger, both uphill and downhill?

24 | A: Not that I recall.

25 | (Ex. 48 at 28-29.) The fact that Welton made a point of telling Wright about Matthews' critical commentary is directly at odds with what she told these Defendants under oath, yet another example of the investigators'

26 | willingness to cover-up information harmful to their goal of pinning blame for this fire on their chosen targets.

27 | [22] On October 21, 2011, the United States supplemented its initial disclosures, reducing its purported damages to approximately $662 million. (Ex. 4 at 11.) However, in that disclosure, the United States also reserved its right to

28 | seek a jury instruction that would permit the jury to assess environmental damages in an amount "significantly higher

For the next three years, the lawyers for the United States and Cal Fire collaborated under their joint prosecution agreement regarding this two-front litigation. (Warne Decl. ¶¶ 9-10.) For example, the federal and state prosecutors coordinated deposition scheduling so that testimony from certain witnesses could be used in both of their actions. They also collaborated so that certain depositions would only be taken in one action. Federal prosecutors would often attend depositions noticed only in the State Action, and vice versa. Additionally, the federal and state prosecutors jointly prepared the primary investigators for their depositions, hired many of the same consultants, and disclosed many of the same expert witnesses. (*Id.* ¶¶ 9-11; Ex. 7 at 7-8.)

## E.    The Resolution of the Federal Action

Defendants intended to defend themselves at trial by demonstrating the investigators' lack of credibility, by highlighting the absence of any credible evidence that Howell had started the fire, and by submitting compelling evidence showing that the fire was most likely started by a third party. (Warne Decl. ¶ 26.) The United States filed motions with this Court attempting to prevent Defendants from advancing these defenses at trial. (*Id.*; Ex. 14; Ex. 15.)

On July 2, 2012, at the urging of the United States, this Court issued tentative pretrial orders holding, among other things, that Defendants could not elicit any evidence to argue that someone else started the fire. (Ex. 19 at 8.) Additionally, the Court tentatively held that, under state forestry regulation 14 California Code of Regulation, section 938.8, Defendants could be liable even if a third party started the fire. (*Id.* at 9.) Moreover, with one of their primary defenses gone, Defendants were facing an economic death penalty case against federal prosecutors who had repeatedly demonstrated a willingness to breach their ethics while defrauding both Defendants and the Court.[23] Defendants therefore agreed to settle the federal

than the number listed herein." (*Id.* at 10.) The Moonlight Fire action continued to pose catastrophic damages for the Defendants. Thousands of jobs and the viability of entire communities in many already depressed Northern California logging regions hung in the balance.

[23] Although the Court's tentative rulings on the motions *in limine* were certainly factors for these Defendants in assessing whether to settle this matter, the Defendants were forced to assess those rulings in the context of having to also defend against prosecutorial misconduct. Thus, in reaching their reluctant decision to resolve the federal matter, Defendants understood the power held by federal prosecutors, as all courts have a right to assume that Assistant United States Attorneys would zealously comply with their obligations to the court and to their opponents. In fact, as acknowledged by the Supreme Court itself, the judicial system expects and relies upon a government attorney to act

1    Moonlight Fire action by collectively paying the United States $55 million over time and by

2    Sierra Pacific conveying to the United States 22,500 acres of its land over time.[24]  Because the

3    Settlement Agreement contemplated performance over a period of years, the parties expressly

4    agreed that this Court would retain jurisdiction over the enforcement of the Agreement.  (Ex. 20

5    at 10).  In connection with that agreement, the Court issued an order confirming its ongoing

6    jurisdiction.  (*Id.* at 28 ("Notwithstanding the entry of a dismissal herein, this Court (Kimberly J.

7    Mueller, District Judge) shall retain jurisdiction to enforce the terms of this compromise

8    settlement.").)

9    **F.    The Resolution of the State Actions**

10          After the federal settlement, discovery continued in the consolidated Moonlight Fire State

11   Actions.  In the spring of 2013, the state court issued two rulings rejecting the effort by Cal Fire

12   to repeat in the State Actions the tentative federal pretrial rulings that Defendants could be held

13   liable for a fire caused by a third party.  More specifically, in ruling on cross-motions for

14   summary judgment and/or adjudication, the state court found that Cal Fire could only recover its

15   suppression costs if Defendants caused the fire. In that same order, the state court also ruled that

16   state forestry regulation 14 California Code of Regulation, section 938.8 could not create a "duty"

17   on the part of any of the Defendants under California tort law to suppress or detect third party

18   fires.

19          Thereafter, the Honorable Leslie C. Nichols was assigned to the case for all purposes by

20   the Chief Justice of California under the Assigned Judges Program.  On July 26, 2013, following

21   a lengthy three-day hearing, Judge Nichols issued a series of orders dismissing all six state court

22

23   _____

24   in good faith and as a "servant of the law."  See *Berger v. United States*, 295 U.S. 78, 88 (1935).  Defendants were
     also acutely aware, as defense lawyer Brendan Sullivan recently commented, "if the government is not honest, it can
25   trump even the best efforts of those who work in the system."  Mr. Sullivan's comments apply with full force here.
     The lead prosecutors took full advantage of the Court's understandable inclination to believe that these AUSAs were
26   abiding by their professional responsibilities while they were actually doing just the opposite. This combination made
     it nearly impossible for the Defendants to succeed.

27   [24] In a press release, the United States publically valued the settlement (including cash and land) at $122.5 million,
     characterizing this amount as the "largest recovery ever received by the United States for damages caused by a forest
28   fire."  See USDA website at http://www.fs.usda.gov/detail/r5/news-events/?cid=STELPRDB5380322.

DOWNEY BRAND LLP

1   actions and entering judgment for the Defendants on the ground that, among other things,

2   Plaintiffs were unable to present a prima facie case of causation. (Ex. 23.)

3       After obtaining these dismissals, Defendants began their effort to expose the egregious

4   misconduct associated with the prosecution of the Moonlight Fire matters by filing a Motion for

5   Fees, Expenses and Sanctions on October 4, 2013.  The filing of this motion initiated a lengthy

6   process involving the submission by all parties of thousands of pages of briefing, declarations

7   with evidence, deposition transcripts and deposition video.

8       Four months later, On February 3 and 4, 2014, Judge Nichols heard oral argument on the

9   Motion for Fees, Expenses and Sanctions in the Plumas County courthouse in Quincy, California.

10  In the afternoon of February 4, 2014, Judge Nichols issued two orders, one 26 pages and the other

11  58 pages. The 26-page order contains the court's conclusions regarding Cal Fire and its counsels'

12  conduct as a whole, which the court read from the bench.  (Ex. 24.)  The other 58-page order

13  contains detailed findings supported by references to evidence.  (Ex. 25.)  Together, the orders

14  terminated Cal Fire's lawsuit in its entirety for its "egregious and reprehensible conduct."  (Ex. 24

15  at 19.)  Additionally, the orders awarded Defendants "full compensatory attorney fees and

16  expenses" amounting to approximately $32.4 million.  (*Id.* at 20 & Ex. 25 at 57-58.)

17      In these orders, the court found that "Cal Fire's actions initiating, maintaining, and

18  prosecuting this action, to the present time, is corrupt and tainted.  Cal Fire failed to comply with

19  discovery obligations, and its repeated failure was willful."  (Ex. 24 at 20-21.)  Additionally, the

20  court found that Cal Fire had engaged in "egregious and reprehensible conduct" and "a systematic

21  campaign of misdirection with the purpose of recovering money from Defendants."  (*Id.* at 19,

22  21.)  Although the misconduct was "so pervasive that it would serve no purpose for the Court to

23  recite it all," the court made specific findings that critical USFS and Cal Fire witnesses failed to

24  testify honestly, falsified witness statements, and falsified both the Joint Report for the Moonlight

25  Fire action, as well as other origin and cause reports, which they attempted to use in support of

26  their Moonlight Fire prosecution.  (*Id.* at 21-22.)  Judge Nichols specifically noted the misconduct

27  of various USFS witnesses, including the "improper efforts of the two federal investigators,

28

Reynolds and Welton." (Ex. 25 at 2.)

While the court elected not to sanction counsel for Cal Fire,[25] the court expressed

profound concerns regarding the conduct of the state prosecutors. The court stated:

> The sense of disappointment and distress conveyed by the court is so palpable,
> because it recalls no instance in experience over forty seven years as an advocate
> and as a judge, in which the conduct of the Attorney General so thoroughly
> departed from the high standard it represents, and, in every other instance, has
> exemplified.

(Ex. 24 at 20.)

The court also found that the state prosecutors created "a tremendous burden" on the court

"by allowing a meritless matter to go forward," and that this ran afoul of their responsibility "to

only advance just actions." (Ex. 25 at 18.)

**G.      AUSA Robert Wright and His Experiences Relating to the Moonlight Fire and Other
         Wildfire Cases in the Year He Filed the Moonlight Action.**

Former AUSA Robert Wright eventually obtained copies of the termination orders issued

by Judge Nichols in the State Actions. (Wright Decl. ¶ 30.) After reviewing Judge Nichols'

orders as well as a copy of the Joint Report and other materials, Wright concluded that a grave

injustice had occurred during the prosecution of the federal Moonlight Fire matter, which led to

his preparation of a declaration in support of this motion. (*Id*. ¶ 34.)

In the spring of 2009, AUSA Wright was working on other wildland fire prosecutions for

the office. In one of those cases he had determined that he was "ethically obligated to disclose a

document to the defense that called into question the viability of the government's prosecution in

that matter." (*Id*. ¶ 13.) At the time the Civil Chief in the Office was David Shelledy. (*Id*. ¶ 13.)

AUSA Wright sought advice from the Department of Justice's Professional Responsibility

---

[25] The court noted that its leniency regarding Cal Fire's counsel "in no way speaks to issues of legal ethics or
compliance with the requirements of the State Bar Act." (Ex. 24 at 19-20.) The court also noted that its "lenity,
prudence, and caution as it relates to sanctions against officers of the court should not in any way be seen as softening
or mitigating the force of this Court's decision, findings and orders as it relates to Cal Fire. It simply means that,
whatever else might be said about the conduct and advocacy of cited attorneys, it will not be sanctioned here." (*Id*. at
20.)

1    Advisory Office (PRAO) in Washington, D.C.[26]  PRAO supported Wright's understand that he

2    had to disclose the document and Wright dismissed the action.  (*Id*.)  Several months later, in

3    August of 2009, AUSA Wright filed the Moonlight Fire complaint for the United States. (*Id*. ¶

4    14.)

5           In the fall of that year, on a separate wildland fire action he was handling, AUSA Wright

6    had a significant disagreement with AUSA Shelledy regarding Wright's desire to carry out what

7    he believed were his ethical obligation to disclose to the defense a document which revealed a

8    serious calculation error which incorrectly increased the United States' damage claim in the

9    action by $10 million.  (Wright Decl. ¶ 14.)  Because AUSA Shelledy was resisting disclosing

10   this error, Wright "sought advice from PRAO to obtain support for the proper exercise of [his]

11   professional responsibilities."  (*Id*.)  When Wright received advice from PRAO stating it was his

12   ethical obligation to disclose the $10 million reduction to the defense, Shelledy continued to

13   oppose disclosure by sending his own email to PRAO, questioning the advice PRAO gave to

14   Wright on the matter.  (*Id*. ¶ 15.)  When that effort failed, Shelledy sent Wright an email stating,

15   "Okay, Bob, that's a beginning.  Now what can you do to avoid creating an ethical obligation to

16   volunteer a harmful document?"  (*Id*.)  Because Wright believed as a lawyer for the DOJ and

17   member of the California Bar he "had a broad duty of candor to the court and a responsibility to

18   seek justice and develop a full and fair record," he responded to AUSA Shelledy by explaining,

19   "David, pursuing our theory of timber loss requires disclosure.  The only way I am aware of to

20   moot the disclosure requirement would be to drop the claim for timber losses, which would result

21   in a lower damages number than simply disclosing the harmful document."  (*Id*. at ¶ 16.)  Wright

22   states that his supervisor Shelledy responded by calling his comment "flippant."  (*Id*.)

23          Thereafter, on October 23, 2009, PRAO attorney Kandice Wilcox responded with a

24   crystal clear directive, stating in an email, "Part of the issue in making a false statement means

---

26   [26] As Wright states in his declaration, "PRAO exists to provide ethical advice to DOJ attorneys helping to insure that
     DOJ attorneys conduct litigation appropriately and consistent with ethical requirements, and provides protection for
27   AUSA's from internal discipline by the Department's Office of Professional Responsibility (OPR) if disclosure of all
     material facts are made to PRAO and the attorney then acts in accordance with PRAO's recommendations." (Wright
28   Decl. ¶ 13.)

not only an affirmative mis-statement but deliberately withholding information which refutes the position you assert." (Wright Decl. ¶ 17.) Wright provided the calculation error document in the United States' initial disclosures and the case has since settled. (*Id*.)

Thereafter, Shelledy treated Wright with hostility. (Wright Decl. ¶ 18.) Wright further states, "the internal struggles that I encountered in 2009 with respect to my professional concerns on these wildland fire actions marked the first time in my 40 years of practicing law that I felt pressured to engage in unethical conduct as a lawyer." (*Id*.) On January 4, 2010, just after receiving a commendation from U.S. Attorney Benjamin Wagner for his work on another wildland fire matter, Civil Chief Shelledy abruptly relieved Wright of any and all responsibility for the Moonlight Fire, forbade him from working on the matter in any capacity, and replaced Wright with AUSA Kelli Taylor ("Taylor"). (*Id*. ¶¶ 21-23.) Shelledy told Wright that lately they disagreed about almost everything.[27] (*Id*. at ¶ 21.) Taylor remained lead counsel for the United States for the remainder of the case.

## H.   AUSA Eric Overby

AUSA Wright is not the only federal prosecutor who worked on the Moonlight Fire and who opened up about the misdirected prosecution of this matter. In March of 2011, Eric Overby, a highly respected senior AUSA from Salt Lake City, came to Sacramento to assist with the Moonlight Fire litigation.[28] (Warne Decl. ¶ 13.) Unfortunately, after working on the case for

---

[27] In response to Shelledy's assertion, Wright declares, "But in fact, there were only two things we had disagreed about. One was the duty of attorneys to sometimes have to disclose a harmful fact or document to the court or other side. The other was his insistence that our damages experts only talk to Forest Service personnel in the presence of the AUSA. It was noteworthy in that regard that the document revealing the $10 million overcharge in the fire case I referred to above was discovered by my expert, a retired Forest Service employee, during his one-on-one conversation with the Forest Service person who discovered her own mistake. Had I or another AUSA been present, I do not believe that action and document would have been revealed." (Wright Decl. ¶ 21.)

[28] Sometime after his arrival, Overby spoke with Katherine Underwood, an attorney working at the time for Rick Linkert at Matheny, Sears, Linkert & Jamie, who was acting lead trial counsel for Defendant Beaty and the Defendant Landowners. (Declaration of K. Underwood ¶¶ 3-5.) Overby told Underwood that he was working on the Moonlight Fire matter as an "evaluator." (*Id*. ¶ 7.) Overby also told Underwood that he had hoped his presence in this case could repair some of the damage that had been done by Taylor to the working relationship with defense counsel. (*Id*. ¶ 6.) Underwood's declaration summarizes a telling point of discussion with Overby as follows:

> In order to further explain his role in the Moonlight Fire prosecution, Mr. Overby told me about another United States prosecution he had been sent to evaluate shortly before trial. Mr. Overby said there was a deposition taken, essentially on the eve of trial, wherein evidence was obtained that demonstrated the government's case should be dismissed. Mr. Overby recommended

DOWNEY BRAND LLP

DOWNEY BRAND LLP

several months, Overby became frustrated with his inability to rectify the prosecutorial problems he was witnessing. In fact, Overby told an attorney representing the Landowner Defendants and Beaty the following: "Imagine you're on a train that is running out of control towards the edge of a cliff. You really only have two options: head to the front of the train and try to gain control or jump off. I'm choosing to jump off." (Declaration of D. Kim ¶ 7.)

On May 12, 2011, AUSA Overby contacted Sierra Pacific's lead trial counsel William Warne to inform him that he would be leaving the Moonlight prosecution team. (Warne Decl. ¶ 22.) Overby asked Warne if they could meet in person, and they set up a meeting later that same day at Downey Brand. (*Id.*) During that meeting, Overby confirmed with Warne that he was leaving the matter and going back to Utah. He said, "If I thought there was anything positive that would result from me staying, then I would stay." (*Id.*) Overby also told Warne that it was a physics problem, and that, "If I am banging my head against a brick wall, then my head loses." (*Id.*) Echoing similar sentiments as expressed by Judge Nichols regarding the rarity of what he was witnessing, Overby also said, "In my entire career, yes, my entire career, I have never seen anything like this. Never." (*Id.*) Overby told Warne that he told someone (presumably in his office) a few days earlier the following: "It's called the Department of Justice. It's not called the Department of Revenue. Since we are the Department of Justice, we win if justice wins." (*Id.*)

In May of 2011, Overby also contacted former federal prosecutor Robert Wright, who had left the U.S. Attorney's Office in December of 2010. (Wright Decl. ¶ 28.) During that call, Overby asked Wright, "Is it just me, or is there something seriously wrong in the Eastern District Civil Division management?" (*Id.*) Later in May of 2011, Overby met with Wright in person and discussed his dissatisfaction with the prosecution of fire cases by the Eastern District. (*Id.*) Later, Overby told Wright that he was so concerned with the management of fire litigation matters in the Eastern District that he altered his plans to stay in California and instead decided to return to the

---

dismissal with prejudice, his recommendation was accepted, and the United States reimbursed the defendant(s) their defense costs. Mr. Overby described this action to me as "the most satisfying act of my career."

(*Id.* ¶ 8.)

DOWNEY BRAND LLP

1  U.S. Attorney's Office for the District of Utah.  (*Id.*)

2  I.  **Filing with OPR**

3  The Office of Professional Responsibility (OPR) was established by order of the Attorney

4  General to ensure attorneys and law enforcement personnel with the Department of Justice

5  perform their duties in accordance with the highest professional standards expected of the

6  nation's principal law enforcement agency.  In July, Defendants submitted a lengthy brief to OPR

7  in Washington D.C. detailing the prosecutorial misconduct on the part of certain federal

8  prosecutors who took over the Moonlight Fire matter after AUSA Wright's removal.  (Warne

9  Decl. ¶¶ 206-207.)

10  **IV.  SELECTED EXAMPLES OF FRAUDULENT MISCONDUCT**

11  The fraud worked upon this Court in this matter was comprised of numerous acts of

12  misconduct.  Although recklessness is all that need be shown to establish a fraud on the Court

13  under the controlling authorities, the vast majority of the conduct here was clear, intentional, and

14  wilful.  Together, the acts amounted to a pervasive fraud driven by the goal of prevailing at

15  whatever the cost.  The following selected examples discuss only some of the more egregious acts

16  of fraud.   Indeed, Judge Nichols, who for months reviewed thousands of pages of legal briefing,

17  deposition testimony, photographs and exhibits, and who watched hours of deposition testimony,

18  found that "the misconduct in this case is so pervasive that it would serve no purpose for the

19  Court to even attempt to recite it all here."  (Ex. 24 at 21.)  Before setting forth these instances of

20  fraudulent misconduct, Defendants first include a brief survey of applicable case authority to aid

21  in this Court's review.

22  A.  **Ethical Obligations of Government Attorneys and Investigators**

23  A government attorney is "the representative not of an ordinary party to a controversy, but

24  of a sovereignty . . . [whose] interest in a . . . prosecution is not that it shall win a case, but that

25  *justice shall be done*."  *Berger v. United States*, 295 U.S. 78, 88 (1935) (emphasis added); *see*

26  *also* Prof'l Responsibility: Report of the Joint Conference, 44 A.B.A.J. 1159, 1218 (1958) (a

27  government lawyer possesses "governmental powers that are pledged to the accomplishment of

28

one objective only, that of impartial justice"). As such, an attorney representing the United States government is "held to a *higher* standard of behavior." *United States v. Young*, 470 U.S. 1, 25-26 (1985) (Brennan, J., concurring). The standard applies with equal force to both criminal and civil cases. See *Freeport-McMoRan Oil & Gas Co. v. FERC*, 962 F.2d 45, 47 (D.C. Cir. 1992); *see also* A.B.A. Code of Prof'l Responsibility 7-14; Model Code of Prof'l Responsibility EC 7-14 (1981) ("A government lawyer in a civil action" has the "responsibility to seek justice"). This higher standard requires that a government attorney refrain from using "his position or the economic power of the government to harass parties or to bring about unjust settlements or results." A.B.A. Code of Prof'l Responsibility 7-14. A government lawyer should similarly "refrain from instituting or continuing [civil] litigation that is obviously unfair." Model Code of Prof'l Responsibility EC 7-14 (1981).

Critically important to this case is the obligation of a lawyer representing the United States "to see that all evidence relevant to the case is presented, *even if unfavorable to its position*." *United States v. Chu*, 5 F.3d 1244, 1249 (9th Cir. 1993) (emphasis added). "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." *Id.* While the government's disclosure obligation encompasses more than just exculpatory evidence, the failure to produce evidence "material either to guilt or punishment" gives rise to constitutional violations. *Brady v. Maryland*, 373 U.S. 83, 87 (1947). Thus, an attorney who withholds such evidence not only violates his disclosure obligations, but also the due process clause. *Id.*

Although the Supreme Court has not yet explicitly stated that *Brady* applies in civil cases, numerous federal courts have opined that the policy justifications underlying *Brady* apply in civil settings as well. For example, in *EEOC v. Los Alamos Constructors, Inc.*, the court ordered the government to disclose a list of witnesses and stated that a defendant in a civil case brought by the government should be afforded no less due process of law than a defendant in a criminal case. 382 F. Supp. 1373, 1383 (D.N.M. 1974) (citing *Berger*, 295 U.S. at 88). Similarly, the court in

1  *Sperry & Hutchinson Co. v. FTC* stated that the due process requirements that inhere in a criminal

2  case, requiring the prosecution to "disclose evidence in its possession which may be helpful to the

3  accused," should also apply in civil actions brought by the government, as "[i]n civil actions, also,

4  the ultimate objective is not that the Government 'shall win a case, but that justice shall be

5  done.'" 256 F. Supp. 136, 142 (S.D.N.Y. 1966).  Finally, in *Demjanjuk v. Petrovsky*, a Sixth

6  Circuit case examining whether the government committed fraud upon the court in civil

7  extradition proceedings, the court stated that "*Brady* should be extended to cover . . . cases where

8  the government seeks [remedies] based on proof of alleged criminal activities of the party

9  proceeded against."  *Demjanjuk v. Petrovsky,* 10 F.3d 338; 353 (6th Cir. 1993).

10  The logic of *Demjanjuk* as it relates to *Brady* is equally applicable here, as this case is

11  tantamount to a criminal case. Indeed, the United States premised its claims against Defendants,

12  in part, on criminal violations of 36 Code of Federal Regulations 261.5, thus implicating its *Brady*

13  obligations.  (Ex. 2 at 10.)  Moreover, because of the significant damages claimed by these

14  prosecutors – far exceeding the fair market value of the land itself, and threatening the economic

15  ruin of each defendant – the Defendants are fully entitled to all of the procedural due process

16  afforded by *Brady*.

17  The duty to disclose material evidence is not limited to government attorneys; it also

18  applies to investigating agencies.  Both the Ninth Circuit and the Supreme Court have recognized

19  that "exculpatory evidence cannot be kept out of the hands of the defense just because the

20  prosecutor does not have it, where an investigating agency does." *Tennison v. City and County of

21  San Francisco*, 570 F.3d 1078 (9th Cir. 2008) (quoting *United States v. Blanco*, 392 F.3d 382,

22  388) (9th Cir. 2004)).  Such a rule "would undermine *Brady* by allowing the investigating agency

23  to prevent production by keeping a report out of the prosecutor's hands until the agency decided

24  the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give

25  him certain materials unless he asked for them." *Id.* (quoting *Blanco*, 392 F.3d at 388).  *Tennison*

26  relied in part on the Supreme Court's opinion in *Youngblood v. West Virginia*, where the Court

27  made clear that "*Brady* suppression occurs when the government fails to turn over even evidence

28

that is 'known only to police investigators and not to the prosecutor.'" 547 U.S. 867, 869-70 (2006) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)).

Although the conduct at issue in the Moonlight Fire prosecution was a coordinated effort among investigators and prosecutors, Courts have held that where the fraud is perpetrated by the United States acting through the Department of Justice, the lines of demarcation between lawyer and client are blurred, and that neither willful intent nor a plan or scheme to defraud need be shown to establish that a fraud upon the court has occurred:

> When the party is the United States, acting through the Department of Justice, the distinction between client and attorney actions becomes meaningless. The Department acts only through its attorneys. Although there are cases holding that a "plan or scheme" must exist in order to find fraud on the court, we agree with Judge Wiseman that a scheme, based on a subjective intent to commit fraud, is not required in a case such as this. Reckless disregard for the truth is sufficient.

*Demjanjuk v. Petrovsky* 10 F.3d 338; 353.

## B.   The Prosecutors Remained Passive While The Investigators Repeatedly Lied under Oath about the Very Foundation of Their Investigation.

Joshua White and Dave Reynolds repeatedly abused their discovery obligations while testifying on issues relating to the essence of their investigation – the point of origin.[29] Indeed, with respect to the essence of their investigation, they repeatedly lied under oath regarding issues that go to the core of their Joint Report. (Ex. 25 at 15-19.) As stated in the Joint Report, White testified that the only points of origin he and his co-investigator ever identified were two points on a spur trail, identified in the Joint Report as E-2 and E-3, and that he found the metal fragments they claimed were the ignition source adjacent to these two rocks. (Ex. 41 at 41-44, 99-100.) Reynolds testified similarly. (Ex. 47 at 17-18, 21-23.) The evidence of their lies under oath is beyond clear and convincing. Despite their effort to cover up what they actually did, discovery reveals that, just before releasing their scene, White and Reynolds each engaged in significant and focused conduct regarding a different, secret point of origin, the existence of

---

[29] White conceded that one of the *primary* goals of a wildland fire investigation is to find a point of origin. (Ex. 41 at 55, 158-159.) White also testified that finding that point is necessary before determining a fire's cause because that is where any physical evidence of the actual ignition is likely to be located. (*Id.* at 157.)

DOWNEY BRAND LLP

which they attempted to suppress during their depositions. Discovery also reveals that the investigators concocted their two "official" points of origin well after releasing the scene, and then lied repeatedly under oath.

Before discussing what the investigators did do, it is important to note what they did not do. Despite what it stated in the Joint Report, the investigators did absolutely nothing during their actual investigation with or to their "claimed" points of origin E-2 and E-3. White was forced to concede that neither he nor Reynolds ever marked their E-2 and E-3 points of origin with a white flag, the color that investigators use to denote the point of origin. (Ex. 41 at 47-48; Ex. 52 at 12-13.) Specifically, White testified that he and his co-investigator used blue, yellow, and red indicator flags as they processed the scene, but that they *never* placed a white flag in their scene for any purpose at all. (Ex. 41 at 5-6, 41-42.) In addition to conceding their failure to mark E-2 and E-3 as their point of origin, White and Reynolds admitted that they never documented those points in any way. (Ex. 41 at 36-37, 170; Ex. 47 at 21-22.) When asked why, White said, "I don't know." (Ex. 41 at 36-37, 170.) White took no photos of the rocks he testified were his "points of origin." When asked "can you tell me why you didn't do that?" White responded, "no." (*Id.* at 38, 170.) White's testimony is blatantly false. White and Reynolds simply did not want to reveal that they fabricated these points of origin *after* their investigation was over and suppressed evidence pointing to what they had actually done during their investigation.

In short, because their official points of origin E-2 and E-3 were created after the investigation, there is no evidence in the record which confirms any interest by the investigators in those points on September 4 and 5. On the other hand, discovery revealed that the investigators performed extensive work during these two days of investigation regarding their actual, and suppressed, point of origin. Specifically, the initially suppressed evidence reveals that on the evening of September 4, Reynolds and White focused on a different rock in a skid trail about 10 feet away from the "official" E-2 and E-3 points of origin. Reynolds took a GPS measurement from this rock and wrote the coordinates on a form entitled "Fire Origin Investigation Report," which the investigators ultimately omitted from their Joint Report. (Ex.

DOWNEY BRAND LLP

34; Ex. 47 at 18-20.)

The next morning, September 5, beginning at approximately 8:00 a.m., White and Reynolds established two reference points, labeled "RP1" and "RP2," from which they then took five separate photographs between 8:18 a.m. and 8:20 a.m., three from RP1 and two from RP2. (Ex. 31 at 9-13; Ex. 41 at 45-16; Ex. 45 at 27-28; Ex. 47 at 12-14.) Each one of these photographs depicts a white flag in the middle of the field of view, hanging from a metal stem placed into the soil next to a large rock on a skid trail different from the trail presented in the Joint Report. (*Id.*) The large white flag rock in these five photographs is the same rock White photographed Reynolds crouching over three times the day before, as Reynolds was staring down to take the only GPS reading of the investigation. (Ex. 31 at 6-8.)

Reynolds and White then took precise distance and bearing measurement from their two reference points directly to the same rock where they had placed the white flag, triangulating and measuring to that location with accuracy to a quarter-of-an-inch and to a single degree.[30] (Ex. 38.) Reynolds then recorded these distance and bearing measurements on a form entitled "Fire Origin Sketch," which the investigators also omitted from the Joint Report.[31] (*Id.*) The suppressed sketch shows a single point of origin alongside the same skid trail, which Reynolds marked with an "x" and then labeled "P.O." (*Id.*) The key on this same form also confirms his intent, as it states that "x = point of origin." (*Id.*) United States experts David Woolley, Larry Dodds and Christopher Curtis confirmed that these distance and bearing measurements intersect perfectly at the white flag rock. (Ex. 52 at 37-38; Ex. 53 at 2-111, 13-14; Ex. 54 at 23-39, 58-61.)

---

[30] While White denied under oath the importance of these reference points in relationship to their suppressed white flag in this case, in another wildland fire matter, White had no trouble explaining the process and the critical purposes of that process. Specifically, on August 8, 2008, in *Cal Fire v. Dustin White* (Lassen County Superior Court Case No. 43654), Joshua White testified that, "aside from trying to get the absolute measurement to be able to go and recreate that point of origin so that I establish two reference points. Then I take those measurements. That's the very foundation of a origin and cause investigation." (Ex. 44 at 3.)

[31] Both Reynolds and White denied any on-site connection to the sketch. (Ex. 41 at 129-130, 220-221; Ex. 45 at 26; Ex. 47 at 4-5, 45.) However, they actually took a photo of a portion of the sketch while they photographed the metal fragments on a sheet of white paper at 10:02 a.m. that same morning. (Ex. 58; Ex. 59; Ex. 61.) The Defendants would urge this Court to focus on these exhibits as they expose the depth of the investigators' corruption, as well as the prosecutors' wilful or reckless failure to disclose harmful information to this Court. These photos and exhibits are nearly enough on their own to confirm the extent of deceit and corruption in this matter.

29

DOWNEY BRAND LLP

Thereafter, after the investigators carefully set up the evidence of their work, White took two critical photographs, one at 9:16 a.m. and another at 9:25 a.m. Both of these photographs are in the Joint Report and entitled, eponymously, "Overview of Indicators." (Ex. 31 at 29, 34.) White confirmed under oath that he took these two photographs in order to create a photographic overview showing the substance of the investigators' primary scene processing work -- the blue backing flags, the yellow lateral flags, and the red advancing flag, along numbered placards to identify certain burn indicators related to their directional flagging. (Ex. 41 at 75-76, 46.) There is nothing whatsoever in either of these photographs signifying any interest in the investigators' claimed points of origin E-2 and E-3, a fact perfectly consistent with the investigators' after-the-fact fabrication of these so-called points of origin. Importantly, under magnification, this Court will see that there is in fact a white flag in the 9:16 a.m. "overview of indicators" photo, stuck in the ground at, as one would expect, the very same spot revealed by the five white flag photographs omitted from the Joint Report.[32]

Consistent with the investigators' focus on a single point of origin, there is one plastic bag containing metal shavings, which the Joint Report calls "Evidence #1" or E-1. (Ex. 30 at 24.) This Court will see that those metal shavings sit directly on top of a white sheet of paper in a photo taken at 10:02 a.m. just before the investigators released their scene, and that underneath that sheet of paper, sits the secret sketch containing the single point of origin that White repeatedly denied any knowledge of while under oath. (Ex. 41 at 129-130, 220-221; Ex. 45 at 26; Ex. 47 at 4-5, 45, Ex. 58; Ex. 59; Ex. 61.) White struggled to explain why -- if he *actually* had found two points of origin and collected metal from two separate spots -- he would have put what he claims are competent ignition sources into one bag; White then had no choice but to concede

---

[32] Importantly, the investigators decided to place this critical "overview of indicators" photo in their Joint Report, as such overview photos are an essential and required element of any origin and cause report. (Ex. 41 at 70-76, 80-82.) They must not have been too worried about being forced to do so, as each of these two overview photos as copied into the Joint Report is so small and of such poor resolution that the secret white flag is all but invisible to the naked eye. (Ex. 30 at 142, 145.) Their ruse nearly worked. Initially, defense counsel missed the white flag as they carefully reviewed the Joint Report as well as all of the native photographs of the investigators' work in those first two critical days. In all of those photographs, especially the 9:16 a.m. overview photograph, the white flag easily fades into the background. (Warne Decl. ¶ 80.) Eventually, however, defense counsel spotted the single white flag while reviewing the native photographic files on a computer screen with back-lit magnification. (*Id.*)

DOWNEY BRAND LLP

that doing so would have been a violation of evidence collection protocols. (Ex. 41 at 99-100.)[33]

In short, a timeline of the key events on September 4 and 5 reveals that the investigators did everything possible to document their actual, and suppressed, point of origin, while doing nothing to document their so-called "official" points of origin E-2 and E-3:



Despite the significant and purposeful nature of their multi-faceted effort, the investigators further frustrated discovery and violated their oaths by simply denying any knowledge of their actions, even when Defendants confronted them with indisputable evidence of those actions. During these questions and answers, prosecutors from the Attorney General's Office and from the United States Attorneys' Office sat on their hands, doing nothing to prevent the investigators' desperate efforts to avoid the truth. When initially provided with a copy of the first photograph

---

[33] At the time White collected the metal, it was of course not a violation of evidence protocols, as he and Reynolds only had a single point of origin, which is why they placed what they found into a single bag.

he took on September 5, 2007, at 8:18 a.m., White denied that there was any white flag in its view since he had earlier testified that he and Reynolds placed no white flags during their investigation. (Ex. 41 at 5-6, 45-48; Ex. 56.)  When he was forced to admit its existence, White claimed he was unable to explain why there was a white flag in the center of five photos he carefully aligned and took from his chosen points of reference, one of which is provided for reference below in a magnified and cropped format.  (*Id*. at 46-47.)



Thereafter, in March of 2011, and despite incontrovertible evidence to the contrary, Reynolds also repeatedly testified that the investigators did not use any white flags.  When Defendants confronted him with photographs of the white flag, including the one above, Reynolds denied ever placing any white flags, and claimed that it "looks like a chipped rock." (Ex. 45 at 20, 40; Ex. 56.)  Over a year later, after the federal settlement, and only when it became clear that his fraud was being exposed, Reynolds admitted during a state deposition to seeing a white flag, and then took a different tack by testifying that the investigators *may* have initially thought the rock marked with the flag was important, but that they must have abandoned it that same morning in favor of the E-2 and E-3 rocks.  (Ex. 47 at 15-16.)  But this belated effort to salvage their situation fails for numerous reasons, including because their own photographs reveal no interest of any kind in E-2 or E-3 during their investigation of the scene, and because the

DOWNEY BRAND LLP

documents they suppressed and lied about repeatedly reveal a singular interest and focus on their suppressed point of origin.

Contrary to Reynolds' last minute change in direction in the state action, White testified, falsely, that he and Reynolds *never* identified the point of origin as being in the vicinity of the rock marked with the white flag, that he never identified the rock as a potential point of origin before finding a different spot, and that he never searched for metal fragments in its vicinity. (Ex. 41 at 168-169.) White testified that he does not know why Reynolds was crouched over the same rock with a GPS unit (despite the fact that he took not one, but three photos of Reynolds performing this act), does not know when the white flag was placed on that rock, when it was removed, or why there are a series of photographs of it. He denied that the white flag was ever even the focus of the photographs. (*Id.* at 49-50.) He even testified that he took the five photos which depict the same white flag in the center not to photograph a white flag, but to instead photograph the reference rocks themselves, so that others could "go back out to this exact location and have this angle line up and be able to say, okay, that's Reference Point 1." (*Id.* at 166-168.) White refused to acknowledge that the photographs were centered, like a gun sight, on the white flag, as doing so would reveal that he and Reynolds were actually focused on a point of origin far different than the official points of origin he and Welton had already fully committed to in the official Joint Report. He also refused to concede the point as doing so would reveal that they released the scene before deciding that they had to change (and conceal the fact that they were changing) their actual point of origin.[34] (*Id.*)

Moreover, when White and Reynolds were shown the presence of the white flag in the 9:16 a.m. "Overview of Indicators" photo, magnified with the aid of a back-lit computer screen, each of them preposterously testified that they could not explain why it was there, despite the fact that the *very purpose* of their overview photo was to create a record of the most important

---

[34] In the same section of White's deposition, the following questions and answers were exchanged: "Q: And do you know why there is a white flag at that rock? A. I believe I have answered it. No, I don't. Q: Okay. And it's true that you guys changed your point of origin at some point in time after that morning of September 5th, correct? A: No." (Ex. 41 at 51.)

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1  indicators of their work, including, of course, just where they identified their point of origin

2  through the placement of the white flag.  (Ex. 41 at 45-48; Ex. 45 at 20-21, 40-41.)

3      White and Reynolds' "forgetfulness" about their numerous and meaningful acts and

4  denying them outright are not functions of misplaced memory.  Instead, they are the function of a

5  cover up, not of minor issues, but of the essence of their work.  They are a function of profound

6  investigative corruption regarding key facts, transported into the province of this Court's

7  jurisdiction for ill-intent and without regard for the solemn vow of honesty inherent in all

8  discovery.[35]  Not only was this immediately recognized by Moonlight Fire complaint signatory

9  AUSA Wright, once he had access to the records, but it was also recognized by the joint origin

10  and cause expert for the United States and Cal Fire, Larry Dodds, who after spending more than a

11  thousand hours on this record, finally conceded in May of 2013 during a state deposition that the

12  white flag raises "a red flag," creates a "shadow of deception" over the investigation, and caused

13  him to conclude "it's more probable than not that there was some act of deception associated with

14  testimony around the white flag."  (Ex. 52 at 43-47, 60, 64.)  Likewise, Cal Fire Unit Chief Bernie

15  Paul later admitted in the state case that the evidence and testimony surrounding the white flag

16  caused him to disbelieve the investigators.  (Ex. 55 at 11-12.)

17      As Dodds and Paul understand, investigators do not forget about the "very foundation" of

18  their work, and they do not forget about the time expended and the physical tasks associated with

19  performing that work, such as taking measurements with a GPS device, or standing behind each

20  reference point and taking five photos of the white flag at that same rock, carefully lining each up

21  so the white flag is centered.  The investigators did not forget about these actions when they

22  intentionally excluded the evidence of each of them from the Joint Report.  And they did not

23  forget about these actions when they pretended to remove them from their memories as they

24  violated their oaths.  Each act was purposeful, and the investigators' effort to deny any memory

25  _____

26  [35] Testifying in this manner is akin to two law enforcement officers, while under oath, "forgetting" about the
   apprehension of a criminal suspect – even though the officers recorded his weight and height, even though they

27  sketched his face, even though they photographed him not once, but numerous times, and even though his presence at
   the scene was recorded when the crime was committed – and then failing to weigh, sketch, measure or photograph

28  their new suspect at all.

of those acts or deny any understanding of just how a single white flag became the focus of their attention and their photographs is nothing less than a mockery of our judicial system and a substantial fraud upon this Court. In the end, there is a lattice work of lies in this matter, but the investigators' stubborn refusal to simply admit what became obvious through the Defendants' painstaking efforts to uncover the investigators' deception reflects a profoundly disturbing arrogance and cynicism towards the very purpose of our discovery rules and our legal system in general, as does the willingness of federal prosecutors to sit by in silence as the investigators repeatedly violated their oath.

**C.** **The Prosecutors Participated in Advancing the Fraud at the Heart of the Investigation into the Realm of this Court's Jurisdiction.**

In the context of the broad tapestry of prosecutorial misconduct presented by this action, there was perhaps nothing so primary and significant as the manner in which certain federal prosecutors aided and abetted the investigators as they provided false and misleading testimony on the most fundamental aspect of their investigation: their origin determination. AUSA Robert Wright, the federal prosecutor who initially investigated, drafted, and filed the federal Moonlight Fire complaint, describes in his declaration the importance of the white flag and what he would have done after reviewing the evidence:

> The change in the point of origin and the reasons for the change should have been, but were not, disclosed in the [Joint] Report. These omissions from the [Joint] Report were material. Had I been left in charge of the Moonlight Fire action, and as depositions began and I obtained government documents such as the Reynolds Report and the white flag photographs, I would have insisted that the material omissions from the [Joint] Report had to be disclosed to defendants through counsel regardless of the impact of such disclosures on the government's case.

(Wright Decl. ¶ 31.) The manner in which Wright would have handled his professional responsibilities in the Moonlight Fire litigation is identical to what Wright insisted upon doing (after seeking and receiving the full support of PRAO) in two other wildland fire matters, without regard to whether such material disclosure revealed information "harmful" to the government. His insistence on doing so is of course not unique nor is it heroic; it is required of

35

all federal prosecutors. As an attorney from PRAO stated in an email to Wright: "Part of the issue in making a false statement means not only an affirmative mis-statement but deliberately withholding information which refutes the position you assert…." (*Id.* ¶ 17.)

Here, the existence of malfeasance by the investigators on this critical aspect of their investigation, and their decision to transport that malfeasance into the realm of judicial process through false testimony, was unfortunately condoned by counsel for both the United States and Cal Fire after AUSA Shelledy removed Wright from this matter. In contrast to what Wright would have done, and to what PRAO confirmed in an email must always be done, the federal prosecutors in this action sat in silence as the investigators repeatedly testified in ways that were directly contradicted by their own concealed conduct, photographs, and documents. Instead of disclosing the omissions in the Joint Report, as the original signatory to the federal Moonlight Fire complaint would have done, the prosecutors who replaced him did what Wright was, in essence, instructed to do by his supervisor months earlier on a different matter. They simply chose not to report what Wright knew he would have been ethically required to report, never disclosing to Defendants or to the Court the gross inconsistencies between the photographs and sketches, on the one hand, and the Joint Report and deposition testimony on the other. These conscious acts of silence when addressing this Court contribute to the fraud. Moreover, the prosecutors' underlying discovery abuses which took place beyond the Court's direct purview still harmed our system of justice and are part and parcel of the fraud upon this Court.[36]

_____

[36] That the discovery process is relevant to the assessment of whether there is a fraud upon the court has been directly addressed by at least one court:

"The discovery process is an integral part of the judicial process, and in this case it was conducted under the auspices and with the participation of Magistrate Judge Mitchell, as were the settlement negotiations which also are integral to the process. . . . . Magistrate Judge Mitchell erroneously accepted plaintiff's argument that their fraud was not really fraud on the Court because the fraudulent tax returns had never been filed with the Court. . . . 'Although [the plaintiff] by his improper conduct did not violate a per se order of this court, the parties were engaging in court-ordered discovery under the authority and jurisdiction of the [court] and its rules and procedures. This knowing and intentional improper conduct occurred under this court's supervision and has grossly tainted the litigation process of the court. Because the inherent power of the court reaches conduct both before the court directly and beyond the court's confines, and because the discovery and settlement processes in this case were certainly within the penumbra of the court's authority and at the hands-on supervision of Magistrate Judge Mitchell, plaintiff's misconduct adversely impacts on the judicial system' . . . ."

DOWNEY BRAND LLP

But the joint prosecutors were not only silent, they affirmatively assisted and encouraged the investigators' false testimony, a fact recognized by Judge Nichols. In particular, in order to prepare for his deposition, Reynolds attended a January 2011 meeting at the U.S. Attorney's Office in the Eastern District with Josh White, Diane Welton, and the federal and state prosecutors, AUSA Kelli Taylor and Deputy A.G. Tracy Winsor. (Ex. 46 at 2-8; Ex. 47 at 34-43.) White also confirmed that he and Reynolds, as well as AUSA Kelli Taylor and Deputy A.G. Tracy Winsor were present at this January meeting in the morning for three hours, and that co-investigator Welton joined the group for another four hours after lunch. (Ex. 42 at 2-3.) During this meeting, which occurred after the first six days of White's deposition, the prosecutors used a computer screen to enhance the images and openly discussed the white flag that defense counsel exposed during White's earlier deposition. (Ex. 46 at 2-8; Ex. 47 at 34-43.) Instead of demanding answers – *as any properly focused federal prosecutor would have immediately done* – the prosecutors in the January meeting did the opposite by putting Reynolds at ease by saying the white flag was a "non-issue," as Reynolds revealed in the last day of his deposition during the state action on November 1, 2012.[37]

In March of 2011, a few weeks *after* this meeting January meeting, Defendants deposed Reynolds and asked him about this same topic.[38] In response, Reynolds feigned ignorance, responding "I don't really see a flag" and testifying it "looks like a chipped rock." (Ex. 45 at 20-21; Ex. 47 at 12-16.) As he repeatedly did so throughout his deposition, the federal prosecutors

---

*Derzack v. Cnty. of Allegheny, Pa.*, 173 F.R.D. 400, 416 (W.D. Pa. 1996) *aff'd sub nom, Derzack v. Cnty. of Allegheny Children & Youth Servs.*, 118 F.3d 1575 (3d Cir. 1997).

[37] During the last day of his state deposition, and after the federal settlement had been reached, Reynolds testified as follows: "And they said it was going to come up and saw it as a nonissue." (Ex. 47 at 42.)

[38] Curiously or tellingly, Reynolds was defended by newly-arrived AUSA Eric Overby, who was not at the meeting to prepare Reynolds for his deposition. The deposition transcript reflects that lead prosecutor AUSA Kelli Taylor was in attendance on the first day of the deposition, but skipped the second day when Sierra Pacific's counsel began asking questions about the white flag. While the timing of her departure is interesting, it does nothing to absolve her of her responsibility to have made sure that Reynolds testified honestly and to have corrected his testimony when she found out that he had not done so. Instead, Ms. Taylor did nothing to correct the record regarding this foundational dishonesty, apparently because she saw it as a "non-issue."

DOWNEY BRAND LLP

did nothing to intervene or to correct the record afterward, as was their responsibility.[39]  The

prosecutors apparently believed that Defendants would never discover what had been discussed

with Reynolds before his deposition, so they chose to stay mute.[40]  Months later, and only after

Defendants prevailed on a motion to compel, did Reynolds hesitantly revealed to Defendants the

facts associated with his pre-deposition meeting and the white flag discussion with the federal and

state prosecutors.[41]  (Ex. 46 at 2-8; Ex. 47 at 34-43.)

      Judge Nichols reviewed this series of events, which he said stood out "among so many

acts of evasion, misdirection and other wrongful acts…."  (Ex. 24 at 22; Ex. 26 at 5.)  His Honor

stated that the court was "deeply troubled by two things:" first, that Reynolds, one of the primary

Moonlight investigators "would admit one thing to a table of 'friends' and then refuse to admit

the same thing once put under oath," and second, that the prosecutors sat "idly by as Reynolds . . .

denied in his deposition what he had conceded in . . . counsel's presence several weeks earlier."

(Ex. 25 at 18, fn. 13.)

      Former AUSA Robert Wright, the most experienced wildland fire recovery lawyer in the

Eastern District' office, has this to say about these unfortunate facts:

> [T]he investigators and government attorneys who were present at
> the January 2011 meeting apparently obstructed discovery of the

---

[39] The Ninth Circuit has clearly defined the responsibilities of federal prosecutors when confronted with such conduct:

When a prosecutor suspects perjury, the prosecutor must at least investigate. The duty to act "is not discharged by attempting to finesse the problem by pressing ahead without a diligent and good faith attempt to resolve it. A prosecutor cannot avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the facts." *Northern Mariana Islands v. Bowie,* 243 F.3d 1109, 1118 (9th Cir. 2001)….The Court has emphasized that the presentation of false evidence involves "a corruption of the truth-seeking function of the trial process." *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392.  *Morris v. Ylst,* 447 F.3d 735, 744 (9th Cir. 2006).

[40] During the deposition of Reynolds in March of 2011, the federal and state prosecutors instructed him not to answer questions about what was discussed during the meeting at the U.S. Attorney's office, invoking the attorney-client privilege and their joint prosecution agreement.  (Ex. 45 at 3-12.)  Thereafter, Defendants were able to reopen his deposition after prevailing on a motion to compel because both Reynolds and White had been named as experts for the United States.  Indeed, because the United States had named both White and Reynolds as experts, Magistrate Judge Brennan ruled that none of the discussions which took place in their presence were confidential.  (Ex. 8.)

[41] After Magistrate Brennan's order, Defendants deposed Reynolds again in November of 2011.  Even then, Reynolds attempted to waffle on what he saw when viewing photographs with the federal and state prosecutors, but he ultimately conceded the existence of a white flag.  (Ex. 46 at 2-8.)  A year later, in November 2012, Defendants deposed Reynolds in the State Actions.  During that deposition, Reynolds clearly admitted that he conceded the existence a "white flag" in the photos when they were shown to him by the prosecutors.  (Ex. 47 at 38-43.)

DOWNEY BRAND LLP

truth by such means as investigator witnesses claiming that what might look like a white flag was instead a "chipped rock." The only reason not to have simply disclosed the original point of origin determination, and then the change in the Report or at least later during the litigation, would be to wrongly evade the adverse impact of the change on the perceived validity of the investigation and the credibility of the investigators. I believe that the omissions of the change in claimed point of origin and reasons for the change, the Reynolds report and sketch, and the white flag photographs from the Report, were intentional and that the omissions warranted being considered for possible charges against persons determined responsible for the omissions as obstructions of justice under 18 U.S.C. § 1519. I believe the AUSA(s) with knowledge of the facts constituting violations of federal criminal law by federal employees responsible for material omissions in the Report of Investigation and/or possible perjured testimony during their depositions were under a duty to report same to the Attorney General pursuant to 28 U.S.C. § 535(b). I also believe if the AUSA(s) concealed and failed to make the violations and/or possible perjured testimony known that would warrant consideration for possible charges for misprision of a felony under 18 U.S.C. § 4. Finally, I believe that continued prosecution of even a badly damaged civil case would likely not have been a realistic possibility. This is because the credibility of the investigation and the investigators would have been destroyed.

(Wright Decl. ¶ 31.)

The fact that the federal prosecutors on this matter would allow this conduct to occur is beyond troubling. Certainly, as confirmed by former AUSA Wright, it is simple to see that the investigators were engaged in a fraud. It is also simple to see that the federal prosecutors were as misguided as their state counterparts, a perfect storm of prosecutorial misconduct, with each side bolstering and feeding off the other as the promise of another large recovery, and all the commendations and awards that would come with it, hung in the balance.

As was the case initially with Judge Nichols,[42] this Court had the right to assume that the story it was receiving from federal prosecutors was true, and it had the right to assume that the prosecutors would immediately report and correct any dishonesty by their key witnesses on such key facts. When federal prosecutors, however, take advantage of the esteem they enjoy as a

---

[42] Judge Nichols found: "While declining to impose sanctions against cited counsel, the Court emphasizes that it relied on statements of counsel as officers of the court in considering a number of matters, including in limine motions and ex parte applications. On too many occasions, that reliance was misplaced, and that reliance directly impacted the Court's ruling on matters before the Court." (Ex. 24 at 20.)

DOWNEY BRAND LLP

consequence of their position, justice quickly breaks down. *Berger*, 298 U.S. at 88.[43]

**D.** **The Federal Prosecutors Proffered False Testimony Regarding the Investigation in Opposition to Defendants' Motion for Summary Judgment.**

On February 29, 2012, Defendants filed a Motion for Summary Judgment challenging each of the government's claims. On March 28, 2012, the United States filed its opposition, the centerpiece of which was a declaration by lead investigator Joshua White which omitted key facts regarding what actually occurred during the investigation. (Exs. 11-12.) At the time, the federal prosecutors knew that this declaration omitted critical information as they had already participated directly or indirectly in all 17 days of White's deposition, and since they had prepared and watched Reynolds testify as well. Among other things, as the prosecutors remained silent (or interfered with obstreperous objections), they heard White simply deny any knowledge of the white flag he photographed five times, measured and diagramed, and they witnessed first-hand the complete lack of effort during that same period by the investigators to document their "official" points of origin. It was of course this same testimony that Judge Nichols focused upon while finding that the action was "corrupt and tainted" and while finding that White had "repeatedly" given false testimony.[44]

Despite this background and their participation in it, the federal prosecutors chose to cite White's fraudulent declaration – which parroted his deposition testimony – in support of twenty-three separate statement facts. (Ex. 11 at 2-4, 8, 11, 24, 28-29.) Once again, just as he and Welton had done within the Joint Report, White simply omitted from his declaration to the Court the most critical details of his actual conduct with respect to marking, measuring and recording their secret point of origin. (See Ex. 12.) Instead, and with the aid and knowledge of the federal prosecutors, White represented to this Court that he and Reynolds found "small metal fragments

---

[43] Fabled lawyer Brendan Sullivan discussed the difficulty he encountered with such conduct on the matter involving Senator Ted Stevens. (Ex. 165 at 1.)

[44] Specifically, Judge Nichols found: "[I]t is this Court's responsibility to review whether Cal Fire abused the legal process through the false testimony of its lead investigator on the Moonlight Fire, Joshua White. This Court finds that Cal Fire, through White, repeatedly did so." (Ex. 25 at 14.)

40

DOWNEY BRAND LLP

near two of the rocks that we identified as having been struck by heavy equipment." [45] (*Id.* at 8.)

E. **The Prosecutors Misrepresented J.W. Bush's "Admission" that the Moonlight Fire Was Caused by a Rock Strike.**

Relying solely on Josh White and the Joint Report, the federal prosecutors presented the following as an "undisputed fact" in the United States' summary judgment briefing:

> In a signed statement that Bush submitted to investigators, he admitted that Crismon was operating in the area closest to the fire and that he believes that Cat tracks scraped rock to cause fire.

(Ex. 11 at 29.) In presenting this "undisputed fact" to the Court, the federal prosecutors failed to disclose that investigators interviewed J.W. Bush twice. The first, conducted by federal investigator Dave Reynolds on September 3, 2007, was summarized in writing, but not tape recorded. Reynolds prepared a write-up of what Bush allegedly said during that interview; that write-up says, in pertinent part: "Believes Cat [Caterpillar bulldozer] tracks scraped rock to cause fire." [46] (Ex. 70 at 1.) This was the only evidence the federal prosecutors offered as support for their "undisputed fact." (See Ex. 11 at 29.) The second interview of J. W. Bush, by Josh White on September 10, 2007, was summarized in writing and also recorded. (Exs. 71-72.) White included the written statements from both interviews in the Joint Report. (Ex. 30 at 59, 61.) He did not include the audio recording of the second interview, but Defendants obtained it in discovery.

---

[45] Judge Nichols, after discussing "just how incredible the investigators' testimony was on the most central issues in this case – indeed, on the very basis upon which this action was brought," also discussed a declaration White submitted in the State Actions, stating: "the Court also finds that White's Phase I declarations to this Court, wherein he repeated and advanced the absurdity of his deposition testimony regarding the white flag in effort to avoid the consequences of his actions, are also an affront to this Court, as is Cal Fire's counsel's willingness to allow such a declaration to be filed." (Ex. 25 at 18.)

[46] That particular Bush witness statement consists of a handwritten report of the interview conducted by Reynolds on September 3, 2007, a little over an hour after the fire was called in from the Red Rock Lookout. The statement asserts that Bush said that he "believes CAT tracks scraped rock to cause fire." The form calls for a signature by the officer issuing the report and the signature of a witness, neither of which is present on the version of the form included in the Joint Report. (Ex. 30 at 59.) Bush did sign the statement, but during his deposition denied making the statement that he believed the cat tracks scraped a rock and caused the fire. (Ex. 73 at 2-6.) When plaintiffs responded by challenging him with the fact that he had signed the statement, Bush then revealed that he is unable to read. (*Id.*) The attestation Bush signed starts with the language "I have read the foregoing statement," which in this case was not possible. All of this evidence was developed through discovery well before the federal prosecutors elected to rely on the first Bush interview in support of their summary judgment opposition and remain silent about his actual recorded statement, which was nowhere to be found in the Joint Report.

As confirmed by Judge Nichols, White's report of the second interview falsely attributes to Mr. Bush an admission of liability regarding the government's rock strike theory. In particular, during White's interview of Bush, White asked Bush whether he had ever told Reynolds he believed the bulldozer scraped a rock and started the fire, and Bush flatly denied having done so, a fact which the interview recording (and the transcript of that recording) confirms. (Ex. 71 at 2.) Nevertheless, White's written summary of that interview, advanced into the Joint Report and then into this civil matter through the United States' statement of undisputed facts, states that: "Bush reiterated the same information he had provided to I-1 Reynolds." (Ex. 72.) This of course was false, given that the most important component of Reynolds' written summary of his interview with Bush is his claim that Bush said he believes that "a Cat scraped a rock and started the fire," and one of the most important components of White's interview with Bush is Bush's statement that he never told anyone what caused the fire and that he did not know. When White was confronted during his deposition and asked why there was a glaring inconsistency between the actual tape recording of his interview and his written summary of the same he could not explain it, instead responding, "No. I don't know why."[47] (Ex. 41 at 132-133.) Judge Nichols recited these facts in finding that "Cal Fire's lead investigator falsified J.W. Bush's interview statement, and incorporated that falsification into its interrogatory responses." (Ex. 25 at 18.) Certainly, the federal prosecutor's duty of candor with the Court required, at a bare minimum, disclosure that Bush's alleged "admission" was anything but an "undisputed fact." Nevertheless, the federal prosecutors never corrected the record before the Court, and never withdrew their reliance on both of the statements in the Joint Report.

---

[47] Certainly, if White believed Bush was recanting or changing what he had allegedly told Reynolds during the first interview, White would have interrogated Bush on the issue. But White remained silent as Bush emphatically stated that he had never stated to anyone that he knew what started the fire, and thereafter prepared his falsified written summary of his interview with Bush, which states the opposite – that Bush "reiterated the same information he had provided to I-1 REYNOLDS." These facts alone strongly suggest that the first "confession" was fabricated by Reynolds, just as E-2 and E-3 were fabricated, and that White was simply there to perpetuate the fraud through the second interview, regardless of what Bush actually said.

**F.** **Ryan Bauer and the AUSA's Failure to Disclose an Alleged Two Million Dollar Bribe.**

At some point almost immediately after this matter was filed, Defendants found evidence that the investigators ignored and suppressed evidence of Ryan Bauer as a potential cause of the Moonlight Fire.[48] Thus, Defendants focused much of their discovery efforts on uncovering the facts regarding Bauer and his whereabouts on the day of the fire. That evidence showed that Ryan Bauer told his parents that he would be cutting wood that day in the area where the fire eventually started (Ex. 76 at 14) and that a private patrolman found his parents deep in the woods and dangerously near the fire, looking for their son shortly after it began. (Ex. 79 at 2-5, 9). **REDACTED**

**REDACTED**

**REDACTED** (Ex. 76 at 2-12). Moreover, a deputy sheriff encountered and stopped Ryan Bauer as he was speeding away from the area of the fire shortly after it started, with chainsaws in the back of his pickup. (Ex. 78 at 2-7) Bauer then lied about his whereabouts on the day of the fire,[49] and he provided a false alibi to investigators when they interviewed him four days after the fire started. (Ex. 74 at 6; Ex. 75 at 2-14.) The subject of his alibi, his then girlfriend, refuted his statements to the investigators and also told them Bauer could not be trusted. *Id.*

On May 31, 2012, the federal prosecutors for the United States filed various motions in limine in an effort to keep much of the evidence relating to Ryan Bauer away from the jury. (Ex. 14.) Defendants opposed all of these motions as being contrary to law and evidence. During the June 26, 2012, Final Pretrial Conference and motion hearing, the Court largely granted these motions, and later confirmed its rulings in its Final Pretrial Order. (Ex. 19 at 18.)

It appears, however, that the United States and its counsel failed to disclose to the Court

---

[48] That the government did not investigate Ryan Bauer, an individual unable to pay any damages, was consistent with lead investigator Josh White's status as a recipient of various benefits associated with Cal Fire's illegal WiFITER slush fund. The same can be said about the investigators' failure to investigate Michael McNeil.

[49] Bauer lied to the investigators during his interview about other issues as well, including that, on the day of the fire, an officer in a red fire engine helped to retrieve a chainsaw that Bauer had stashed behind a tree in the area of the fire. (Ex. 74 at 2-5, 7.) Later, during his deposition, when Bauer was asked about whether he had stashed a chainsaw in the area of the fire, he contradicted himself, saying that he had not stashed any chainsaws on the mountainside that day. (Ex. 172 at 2.)

and the Defendants the existence of critical information regarding the credibility of Ryan Bauer and/or his father Edwin Bauer. (Warne Decl. ¶ 37, 44.)  In November of 2013, while Defendants were working on various motions that led to the termination of Cal Fire's state court action, counsel for Sierra Pacific received a call from Ryan Bauer's father, Edwin Bauer. (*Id.* ¶ 30.) Edwin Bauer ostensibly called to request the return of documents the defendants had copied from his hard drive pursuant to a court order issued in the State Actions. (*Id.* ¶¶ 30-32.)  During that telephone call, Edwin Bauer made a comment about a $2 million bribe. (*Id.* ¶ 33.)  When Sierra Pacific's counsel immediately sought more information, Edwin Bauer claimed that Eugene Chittock, the lawyer he retained for his son Ryan Bauer, had told him that Downey Brand or Sierra Pacific had offered his son Ryan a $2 million bribe if Ryan would state that he had started the Moonlight Fire. (*Id.* ¶¶ 33-34.)  Edwin Bauer also revealed that he had told lead federal prosecutors Kelli Taylor and Richard Elias that his son had been bribed when those two prosecutors personally delivered a trial subpoena to him in advance of the federal trial. (*Id.* ¶¶ 35-36.)  Bauer said he filed a police report, and that the FBI had interviewed him and Mr. Chittock. (*Id.* ¶ 34.)

The next day, Sierra Pacific's counsel contacted Chittock to ask him about Mr. Bauer's story. (*Id.* ¶¶ 38-39; Declaration of E. Chittock ("Chittock Decl."), ¶ 6.)  Mr. Chittock said that he had "absolutely not" conveyed any bribe offer, but that one of the Bauers had apparently made the claim to federal employees working on this case.  Chittock stated that he had been contacted by two federal investigators or lawyers. (Warne Decl. ¶¶ 39-40; Chittock Decl. ¶ 6.)  Chittock stated that these two individuals, a man and a woman, came to his office in the spring of 2012, telling him that Ryan Bauer's parents had stated that Chittock conveyed the offer of a bribe to their son Ryan in the amount of $2 million and that the money would be coming from Downey Brand or Sierra Pacific. (Warne Decl. ¶¶ 39-40, Chittock Decl. ¶¶ 3, 6.)  Chittock told the investigators that the charge was "absolutely false," and he readily agreed to allow them to search his phone records and files. (*Id* ¶¶ 3, 4, 6.)  Chittock informed the federal employees that all they would find was a record of a single phone call he had received from Sierra Pacific's counsel

Warne, who was in the process of scheduling the continued deposition of Ryan Bauer within Susanville's adult detention facility, as Bauer was there serving a term for assaulting a police officer. Chittock described this single call as a predictable and normal event before the federal agents began their search. (*Id.* ¶ 4.) After finding nothing beyond a record of that single call, the federal employees left. (*Id.*)

The federal prosecutors neither revealed to the Court nor to Defendants the fact that Edwin Bauer had made the false claim that Chittock had communicated a $2 million bribe to his son Ryan Bauer, nor did they reveal the fact that Chittock denied the allegation and that the federal investigators or employees found no evidence supporting Bauer's claim. (Warne Decl. ¶ 44.) The federal attorneys never revealed the existence of a federal investigation into the matter concerning the Bauers, even after the investigation revealed the falsity of the charges. (*Id.*)

Revealing such information to Defendants would have been damaging to the government's case, as it would have raised the possibility that Edwin Bauer made a false assertion to strengthen the government's claims against Sierra Pacific while diverting attention from his son. (*Id.*) Obviously, had it been true, it would have been more serious than the charges set forth in the Moonlight Fire action. Since it is not true, the false report of such a crime is also serious, demonstrating, among other things, a willingness to manufacture evidence harmful to an innocent party and an effort to deflect attention away from someone who may have actually started the fire. It raised numerous questions, including whether the Bauers had engaged in similar conduct when Edwin Bauer told investigators that a man in a silver pickup had told him that "a bulldozer hit a rock." (Ex. 30 at 77.) Mr. Bauer's false allegation of a multi-million dollar bribe in this case by Downey Brand or Sierra Pacific can only have been made in an effort to falsely inculpate Sierra Pacific, and thus it actually has the opposite effect, and tends to incriminate Mr. Bauer and his son Ryan as a failed attempt to deflect focused attention from themselves and what role they had in starting the Moonlight Fire. But instead of receiving this information, which is harmful to the government's case, Defendants heard and received nothing -- another instance of the government withholding harmful evidence.

Government attorneys have a responsibility to do justice and seek the truth. Their responsibility to do so is not only imposed through *Brady*, but also through the Rules of Professional Conduct, as well as compliance with the rules of discovery. *See, e.g.*, *Morris v. Yilst*, 447 F.3d 735, 744 (9th Cir. 2006) (stating the obligations of the state to "collect potentially exculpatory evidence, to prevent fraud upon the court, and to elicit the truth."). Under the *Brady* doctrine, the federal prosecutors had the absolute responsibility to disclose this information to the Court and to Defendants. *Brady*, 373 U.S. at 87; *Berger*, 295 U.S. at 88. Moreover, the Supreme Court has "long emphasized" that an attorney representing the United States government "is held to a *higher* standard of behavior." *United States v. Young*, 470 U.S. 1, 25 (1985) (Brennan, J. concurring and dissenting in part) (emphasis in original) (citations omitted). The evidence concerning the alleged bribe and the evidence concerning the results of the investigation that ensued -- which ultimately revealed Mr. Bauer's allegation as false -- is without question "evidence relevant to the case" which the government had an obligation to produce. See *Chu*, 5 F.3d at 1249.

Separate and apart from their *Brady* obligations, the federal prosecutors had additional independent duties, as officers of the Court, to disclose this critical information to the Court and Defendants. First and foremost, given their motion to exclude evidence concerning Ryan Bauer as a potential cause of the fire, they had an obligation under the Professional Rules of Conduct to ensure that the record evidence before the Court and their arguments based on them were fair, complete, and not misleading. See Cal. R. Prof. Conduct 5-200(A) ("In presenting a matter to a tribunal, a member shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with the truth."); *id.* 5-200(B) ("In presenting a matter to a tribunal, a member shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law."); *id.* 5-220 ("A member shall not suppress any evidence that the member or the member's client has a legal obligation to reveal or to produce.").[50]

---

[50] Local Rule 180(e) incorporates the Rules of Professional Conduct of the State Bar of California as standards of professional conduct in the Eastern District of California.

DOWNEY BRAND LLP

Additionally, the United States and its attorneys also had an independent duty to disclose the information about Bauer and the alleged bribe pursuant to their discovery obligations. Indeed, early in the Federal Action, Defendants propounded requests for documents, including Request for Production No. 186, which sought "All notes taken during witness interviews conducted by YOU, the USFS, and/or CAL FIRE in connection with investigating the MOONLIGHT FIRE," and Request for Production No.188, which requests "All DOCUMENTS RELATING TO witness interviews conducted in connection with the MOONLIGHT FIRE." (Ex. 22 at 90, 91.) The United States agreed to produce all responsive documents (*id.*), and had an obligation to update all such responses well in advance of their pre-trial motions in limine. See Fed. R. Civ. Proc. 26. Despite this obligation, the United States never provided any information to Defendants or this Court about the alleged bribe.

**G.** **The United States Made Reckless Misrepresentations About Cal Fire's Civil Cost Recovery Program, Which the Court Relied Upon in Its Pre-Trial Rulings.**

After this Court entered its final Pre-trial Order premised on the federal settlement, Defendants discovered facts which revealed that the federal prosecutors made, even under the most charitable view, reckless misrepresentations to this Court about the legitimacy of Cal Fire's civil cost recovery program, which were directly relevant to the Court's pretrial rulings. The true facts flatly contradicted positions taken by the United States in its pretrial motions.

As part of its pre-trial Omnibus Motion in Limine, the United States included a request styled "Motion to Exclude Argument of Government Conspiracy and Cover Up." (Ex. 14 at 8-10.) In support of that Motion, the United States first attacked a straw man, arguing that Defendants' so-called conspiracy allegations were premised in part on the fact "that Cal Fire has a fire cost recovery program . . . ." (*Id.* at 8:17-18.) Of course, the mere existence of a cost recovery program was never Defendants' real concern. Instead, Defendants were troubled by the possibility that, under its program, Cal Fire might be diverting a portion of the money it was recovering from those it accused of starting wildland fires into accounts controlled by wildland fire investigators. The United States nevertheless claimed that "defendants' allegations of a

conspiracy are unsupported" (*id.* at 9:18), and described for the Court Cal Fire's cost recovery

system as a benign public program established for altruistic purposes, as follows:

> The other evidence Defendants rely upon is equally flimsy. That Cal Fire has a fire cost recovery program does not support an inference that investigators concealed evidence. Under the program, a portion of assets recovered from Cal Fire's civil recoveries can be allocated to a separate public trust fund to support investigator training and to purchase equipment for investigators (e.g., investigation kits and cameras). A public program established to train and equip fire investigators is hardly evidence of a multi-agency conspiracy.

(*Id.* at 9:27-10:4.)

For their part, Defendants were convinced that, to the extent a program within Cal Fire

earmarked *any* civil cost recovery dollars for accounts controlled by Cal Fire investigators

(thereby creating beneficiaries out of those responsible for reaching causation decisions), any

such practice could create an unacceptable bias in favor of blaming affluent parties to the

exclusion of other possible causes. In other words, in order to perpetuate such a fund and the

benefits flowing from it, investigators might name affluent individuals and entities as defendants

as opposed to penurious culprits, such as arsonists, who generally provide little or no prospect of

financial recovery. At the time of the motions in limine briefing, Defendants' discovery efforts

had uncovered remarkably little information to support their common sense conclusion.

In the State Actions, Defendants propounded discovery on Cal Fire in October 2010,

seeking "All DOCUMENTS evidencing the use of any money recovered from any wildfire

litigation to which YOU were a party in the last ten years." (Ex. 148 at 28.) In response, Cal Fire

and its attorneys produced only two responsive documents concerning an outside fund: a single

cryptic accounting spread sheet, and what Cal Fire described as a "CDAA Audit Report"

pertaining to a November 2009 Cal Fire internal audit of a program labeled the "Wildland Fire

Investigation Training and Equipment Fund" (WiFITER) administered by the California District

Attorneys' Association (CDAA) for Cal Fire.[51]  (*Id.*; see also Ex. 124.)  This audit report

---

[51] Under California law, Cal Fire is the state agency charged with pursuing wildland fire cost recovery actions under Health and Safety Code section 13009, the proceeds of which are required by law to be returned to the state's general

DOWNEY BRAND LLP

generally found WIFITER to be of "considerable value" and stated that the audit "did not reveal any significant internal control problems or weaknesses." (Ex. 124 at 4.) Thus, Cal Fire proffered material that made WiFITER appear to be a legitimate program controlled not by Cal Fire, but by the CDAA.

Defendants encountered similar road blocks in the federal action. During the federal deposition of United States expert Chris Parker (a recently retired Cal Fire Deputy Chief of Law Enforcement), Parker reluctantly admitted that he had conceived of and founded the WiFITER account in 2005. (Ex. 147 at 6-7.) But Parker testified that the account was created only for altruistic purposes for the benefit of all Californians and rejected any suggestion that the fund might bias investigators or that it was improper in any way. (*Id.* at 4, 15-17.) At no time did Parker ever suggest that the account was established to circumvent state fiscal controls. Thus, at the time of the federal pretrial conference, Defendants had limited evidence to prove a cover-up or conspiracy associated with WiFITER, or that the WiFITER account (ostensibly controlled by the CDAA) instilled any bias in those individuals controlling the Moonlight Fire investigation, including Joshua White and his supervisor and mentor Alan Carlson. (Warne Decl. ¶ 203.)

Given the state of the evidence then available to the Court and Defendants, the Court granted the government's motion with respect to conspiracy arguments as it pertained to the impact of Cal Fire's cost recovery program. (Ex. 19 at 17:22.) That ruling contributed to the increased risks of trial and the Defendants' settlement assessment. (Warne Decl. ¶ 204.)

Although Defendants respectfully disagreed with the Court's ruling, it was not necessarily a surprise in view of the limited evidence then available to the Court. Indeed, when initially confronted with a similar motion *in limine* in the state court action one year later, Judge Nichols issued a similar ruling, excluding from trial altogether evidence of Cal Fire's WiFITER program.

---

fund. Moreover, State Administrative Manual, Section 8002 makes it illegal for any agency to set up a separate account without express authority from the Department of Finance. Given this Request for Production, and given the state prosecutors' duties of disclosure, Defendants had every right and expectation that, as officers of the court, the government attorneys would disclose any facts which called into question the credibility of investigators flowing from the WiFITER account. As discussed, *infra*, during the pendency of the federal action, Cal Fire, its in-house general counsel, and its litigation counsel from the Office of the California Attorney General concealed virtually all evidence favorable to the defense concerning WiFITER.

49

DOWNEY BRAND LLP

1   (Warne Decl. ¶ 205.)  Judge Nichols eventually dismissed the state action on other grounds,

2   including the fact that Cal Fire was unable to present a *prima facie* case of causation, but his

3   tentative ruling on WiFITER remained intact at the time of his Honor's dismissals in late July of

4   2013.  (*Id.*)

5          Circumstances, however, changed rather dramatically after October 15, 2013, when the

6   California State Auditor issued a Formal Audit Report concerning "Accounts Outside the State's

7   Centralized Treasury System."[52]  (Exs. 139, 149.)  The *final* portion of the State Auditor's report

8   (at pages 26-39) contains findings regarding WIFITER, which the State Auditor summarized as

9   follows:

> Cal Fire had $3.7 million in settlement payments for the cost of
> fire suppression and investigation (cost recovery revenues)
> deposited into an outside account, the Wildland Fire and
> Investigation Training and Equipment Fund (Wildland Fire Fund),
> that was neither authorized by statute nor approved by Finance.[53]
> Further, it did not subject the money in this outside account to its
> own internal controls, nor did it track or monitor the account's
> revenues adequately. Specifically, the management of Cal Fire's
> law enforcement unit bypassed Cal Fire's accounting and
> budgeting processes by failing to submit a request to its accounting
> office to establish the account and by diverting and spending cost
> recovery revenues without submitting the appropriate request to
> increase its budget appropriations.  As a result, this portion of Cal
> Fire's cost recovery revenue was not subject to Cal Fire's normal
> internal controls or to oversight by the control agencies or the
> Legislature, leaving Cal Fire open to possible misuse of these
> revenues.

20  (Ex. 149 at 3.)

21         The State Auditor's findings were based in part on a critical January 8, 2005, internal Cal

22  Fire email by Chris Parker to other high ranking Cal Fire managers regarding the formation of

23  WIFITER.  (Ex. 149 at 38.)  The State Auditor described and analyzed the Parker email as

24  follows:

> An e-mail dated January 2005 from the former deputy chief to a

---

[52] The full State Auditor Report is available online at: http://www.bsa.ca.gov/pdfs/reports/2013-107.pdf

[53] Elsewhere, the State Auditor confirmed that State Administrative Manual 8002 requires all accounts established outside the State Treasury to be approved and authorized by the California Department of Finance.  (Ex. 119.)

former cost recovery case manager [Parker] suggests that cost recovery program management designed the Wildland Fire Fund, at least in part, to avoid state fiscal controls. Specifically, the former deputy chief discussed using the attorneys association or another third party to set up and manage a fund with the purpose of training and equipping Cal Fire's fire investigators. He said he would like to see an outside organization receive the money so it could be used in a more effective manner. He went on to say that if the State received the money, there would be a lot of limiting factors on how, when, and where it could be used, such as budgeting, purchasing, and contracting limitations, and spending freezes.

\* \* \*

By directing and spending portions of cost recovery revenues through the Wildland Fire Fund account instead of following normal state processes, cost recovery program management prevented Finance and the Legislature from performing their role in deciding how state money should be spent, including whether some of it should be spent on non-state entities.

(Ex. 149 at 38; Ex. 150.)

Parker's email, which had never been produced by Cal Fire or the United States, conflicts with his sworn testimony in the federal action regarding the purpose of the fund (Parker never disclosed it was designed "to avoid state fiscal controls"), and evidences scienter in forming WIFITER.  Despite eventual orders by the state court in 2013 requiring Cal Fire and its counsel to produce all WiFITER documents, Cal Fire withheld this critical document and thousands of other documents.  In fact, but for the issuance of the State Auditor's report, Defendants would have never discovered these documents.  (Warne Decl. ¶ 177-178.)

Once this report (and the existence of this unproduced document) became public, Defendants immediately notified Cal Fire of its failure and demanded production.  (Warne Decl. ¶ 179.)  That demand then precipitated an admission by Cal Fire and its attorneys that the Office of the Attorney General had failed to produce the critical email identified by the State Auditor, and thousands of pages of additional critical WiFITER documents.  (*Id.*)  After Defendants secured a *third* order requiring production of all WiFITER documents, Cal Fire's attorneys belatedly produced two tranches of documents:  first, approximately 5,000 pages, and then (after assuring Judge Nichols in a telephonic hearing that there was "nothing" else) Cal Fire belatedly produced

DOWNEY BRAND LLP

more than 2,000 additional pages, many of which were directly responsive to Defendants' 2010 request for production, and to its subsequent requests in October 2012.[54]  (*Id*. ¶¶ 180-182.)

It is through this belated process that Defendants finally obtained critical documents revealing the true reason Cal Fire created WiFITER, confirming Defendants' suspicions that such free money (unencumbered by any State oversight or control) created the motivational context which drove this unfortunate matter, causing investigators – the lead here being a WiFITER beneficiary himself – to seek out moneyed defendants.[55]  More specifically, documents eventually produced by Cal Fire's counsel, none of which had been provided to Defendants by the time this Court issued its rulings on motions in limine, revealed, among other things, the following:

- Cal Fire law enforcement and wildland fire investigators created WiFITER without obtaining approval from the California Department of Finance (DOF) as required by state law.  (Ex. 120 at 5-6; Ex. 122 at 2; Ex. 123 at 1, 26, 27; Ex. 126; Ex. 149 at 13, 32-33; Ex. 151 at 1; Ex. 154; Ex. 155.)

- Cal Fire established WiFITER for the purpose of facilitating Cal Fire investigators' circumvention of strict limitations in expenditure of State general fund dollars.  (Ex. 149 at 38; Ex. 150.)

- Cal Fire senior management, including those overseeing the Moonlight investigation, strategized on how to conceal WiFITER from regulators.  (Ex. 122 at 6; Ex. 151 at 1.)

- During the time frame when Cal Fire Northern Region Chief Alan Carlson, who eventually assisted the United States in this action, was reviewing and revising his mentee Joshua White's draft Moonlight Fire report in February 2008, Carlson was also concerned that WiFITER was "running in the red" and emphasized that the fund would remain so, "unless someone is going to make a high % recovery."  In another email that same day, Carlson denied a request to use WiFITER funds to enhance Cal Fire's ability to find arsonists on the stated ground that "it is hard to see where our arson convictions are bringing

---

[54] Further indicia of Cal Fire's lawlessness, and of its failure to produce all information pertinent to the WiFITER account, can be found in several documents which indicate that Cal Fire civil cost recovery staff including Josh White used personal email accounts and text messaging on certain occasions when discussing WiFITER.  (Ex. 152; Ex. 153.)

[55] In this regard, on February 7, 2013, former Eastern District of California AUSA and Civil Chief Matthew Jacobs, now General Counsel for CalPers, published an article deriding the practice of creating financial incentives for investigators and prosecutors, and raising the very concerns expressed herein by these Defendants relating to the motivational biases created by such practices.  (Ex. 156.)

DOWNEY BRAND LLP

in additional cost recovery." (Ex. 36; Ex. 151 at 2-3; Warne Decl. ¶ 190.)[56]

- Three months prior to Moonlight, lead investigator White admitted in an email to circumventing the chain of command ("CoC") so as to check on whether WiFITER funds would allow him to get his hands on additional WiFITER-funded equipment – in this instance, an expensive computer voice stress analyzer ("CVSA"). He tells the person he is writing to that he "figured [she] wouldn't rat him out for circumventing the CoC" on this question because "as Alan's boy, I can do no wrong …. "[57] (Ex. 125 at 1-2; Ex. 141 at 1-2.)

- Cal Fire's counsels' failure to produce WiFITER documents enabled United States expert witness Chris Parker, a former Cal Fire investigator and the creator of WiFITER, to provide misleading testimony in this case about WiFITER and the purpose and benefits of it, which was inconsistent with his own wrongfully withheld January 8, 2005, internal email, which showed that WiFITER was created to circumvent rules restricting expenditure of state money. (Ex. 147; Ex. 149 at 38; Ex. 150.)

- The November 2009 internal WiFITER audit report produced by Cal Fire (one of only two WiFITER documents provided to Defendants as of the federal trial date) was a fraudulent document that supplanted earlier versions of the audit report, which had contained a finding that the account was not formed in compliance with law, and had never been approved. (Ex. 146 at 7-8; Ex. 120 at 2; Ex. 124; Ex. 126.)

---

[56] Given these statements by the very person supervising the Moonlight Fire investigation, the United States' repeated representations to the Court that there was no evidence of arson because "[t]he government investigators Josh White and Dave Reynolds found no evidence of arson during their investigation" can now be seen as simply one more step in advancing this pervasive fraud on the Court, as this representation is obviously misleading in view of the motivational context in which the supposed vacuum of evidence exists. (Ex. 14 at 11:9-10.) White, as lead investigator, along with Reynolds, had exclusive control over the alleged origin scene. While the investigators' obligation was to report what they "found," the evidence in this matter clearly and convincingly demonstrates that these investigators, instead of doing so, simply reported whatever they *wanted* to find, or what they *needed* to find, and that they frequently suppressed whatever they found when it interfered with their favored conclusions – what they initially found on the skid trail, what they found out about Red Rock, what they heard from Ryan Bauer, or from J.W. Bush, what Ivan Houser revealed in his witness statement (which they suppressed from the Joint Report), and who knows what else. In any event, the Court was certainly entitled to far more than these prosecutors gave, as they papered over facts concerning the motivations of those overseeing the Moonlight Fire investigation at the time the Court was engaged in the careful balancing of interests and evidence when ruling on (and granting) the United States' motion in limine to preclude argument by Defendants that others were responsible for igniting the Moonlight Fire (through arson or otherwise).

[57] In other instances, Alan Carlson and White (the lead Moonlight Fire investigator) strategized together about how much money they should initially demand for the WiFITER account from their chosen defendants to perpetuate their illegal off-books account. In one instance involving another fire only a few short months before he sent the Moonlight Fire demand letters, White wanted to divert 20% of what Cal Fire was demanding from the defendants on that fire to WiFITER. But Carlson, apparently heeding the advice of Cal Fire's general counsel Giny Chandler to "keep a low profile," directed White to divert only 5%. White reluctantly complied, but not before pleading to Carlson: "Giving up money for the CDAA fund? Can't we wait until we get the CVSA?" (Ex. 166.)

DOWNEY BRAND LLP

- The finding of illegality in the first final audit report was deleted and suppressed at the urging of Alan Carlson, shortly after the state and federal Moonlight Fire complaints were filed in 2009. (Ex. 120 at 2; Ex. 124; Ex. 126; Ex. 143 at 16-18; Ex. 144 at 7-9, 10-12, 15-16; Ex. 146 at 7-8.)

- Cal Fire ultimately and *illegally* siphoned approximately $3.66 million dollars of state money into the WiFITER account between 2005 and 2012, and spent some $2.9 million of those funds for the benefit of its wildland fire investigators -- the very people who, with exclusive and private access to fire scenes, assign blame -- including numerous "training" events at various locations including a beach front resort in Pismo Beach and expensive equipment, such as $1800 camera packages. (Ex. 135; Ex. 138 at 9; Ex. 140; Ex. 141; Ex. 142; Ex. 149.)

- Many of the training events and WiFITER purchases were coordinated and overseen, or requested by, Moonlight Fire lead investigator Joshua White, who also attended numerous WiFITER funded events. (Ex. 140; Ex. 141; Ex. 142.)

- The CDAA merely processed the expenditure of WiFITER money only as directed by Cal Fire civil cost recovery staff and investigators, including Alan Carlson. Thus, the same investigators and case managers responsible for assigning blame and recovering money for wildland fires controlled the unlawful expenditure of millions of dollars in recovered funds. (Ex. 127; Ex. 128; Ex. 130; Ex. 131; Ex. 132; Ex. 133; Ex. 134; Ex. 136; Ex. 140; Ex. 141; Ex. 142; Ex. 143 at 2-3; Ex. 151 at 49, *passim*.)

- Alan Carlson, the case manager on the Moonlight Fire prosecution, was one of only a handful of Cal Fire staff members on a committee that made all decisions on how to spend WiFITER money, and he suggested and received approval for multiple expenditures of WiFITER money. (Ex. 127; Ex. 128; Ex. 130; Ex. 140; Ex. 141; Ex. 142; Ex. 143 at 2-3); Ex. 145; Ex. 149; Ex. 151 at *passim*.)

- Alan Carlson apparently received personal payments from the WiFITER account for his participation as an instructor at WiFITER training events, while at the same time he was also receiving a salary as a state employee. (Ex. 137 at 5.)

- Lead investigator White's Moonlight Fire demand letter of August 4, 2007, which required the payment of $8.1 million in two separate checks, one short-changing the State of California and the other requiring an illegal payment to CDAA in the amount of $400,000, would have effectuated one of the largest WiFITER cash infusions in the history of the illegal off-book account. (Exs. 115-118.)

- In March 2008, while concerned that the WiFITER account was "running in

54

DOWNEY BRAND LLP

the red" Alan Carlson urged other Cal Fire law enforcement personnel to divert an even greater percentage of wildland fire settlement dollars from the state's general fund into the WiFITER account. In response, Cal Fire's then lead in-house general counsel, an officer of the Court, advised against it -- not because the fund was illegal, but to prevent discovery of the fund by state regulators. Specifically, Cal Fire's general counsel stated: "the point is to keep a low profile. If we take a cut off the top of a recovery where assets are say $100K but costs are $1 Million, that will look fishy." This advice was repeated in an email from Cal Fire's highest ranking law enforcement official in a March 2008 email to Alan Carlson, not because the fund was illegal, but to ensure the fund was not discovered by regulators. (Ex. 151 at 1.)

- In late January, 2013, after Defendants exposed WiFITER, the Wall Street Journal, the Los Angeles Times, and the Sacramento Bee ran stories on Cal Fire's malfeasance. Thereafter, Cal Fire's lead in-house general counsel, who provided the above-quoted advice, was terminated from Cal Fire in March 2013.[58] (Ex. 164 at 3-4.)

The California Department of Finance also issued its own review of WiFITER, and similarly concluded that Cal Fire had failed to obtain the legally required authorization for the outside bank account, and that Cal Fire had not complied with state mandated restrictions on the expenditure of state money. Shortly after publication of that report, retired Cal Fire Law Enforcement Chief Tom Hoffman came forward as yet another "whistle blower," offering his own revealing criticism of WiFITER and Cal Fire's civil cost recovery unit responsible for the state Moonlight Fire action, stating:

> I feel vindicated. I tried so hard to get centralized management of cost recovery monies. I was stymied at every turn by the North Region and the South Region. It became the wild west with everyone doing their own thing. The system was doomed. Lack of

---

[58] The termination of Cal Fire's in-house general counsel occurred in the spring of 2013, and appears to have been the product of significant press coverage about the WiFITER scandal in national news outlets, including the Wall Street Journal and The L.A. Times. (Ex. 157.) Those articles appeared to be a product of a number of revealing WiFITER documents obtained in 2012 in response to California Public Records Act requests to Cal Fire. Perhaps because the responses to those requests were not filtered by the California Attorney General's Office, these materials began to reveal, for the first time, the true nature of WiFITER. Nevertheless, it was not until after the October 15, 2013, State Auditor's report, which revealed that Cal Fire and its lawyers had withheld the most important documents, that the Office of the Attorney General finally began to provide the most damaging documents (those most favorable to the Defendants). These documents, largely in the form of internal emails, prove the existence of a conspiracy to actively conceal WiFITER. It was this last batch of documents that also revealed most clearly the motivational bias that WiFITER instilled in fire investigators to target affluent defendants, partially explaining the effort here to pin blame on these Defendants, regardless of evidence pointing to other parties and the damage it would cause to our system of justice.

DOWNEY BRAND LLP

> support from my management to do the right thing is what led to
> my early retirement. I also recommend [sic] CALFIRE go to
> Department of Finance for approval of the Wildland Investigation
> and Training Fund. This was in the original draft report, but
> someone wiped it out, (shortly after I retired) thereby covering up
> what was the right thing to do.

(Ex. 126.)

In stark contrast to these facts, the federal prosecutors essentially represented to this Court that WiFITER was a noble cause, stating that "[a] public program established to train and equip fire investigators is hardly evidence of a multi-agency conspiracy;" and that "Defendants' allegations of a conspiracy are unsupported." (Ex. 14 at 9-10.) The federal prosecutors recklessly misrepresented WiFITER was a "separate public trust fund." (Ex. 14 at 10.) In fact, it was secret, not public; it was an off-books illegal account, not a trust; and, it was filled with money controlled and spent by wildland fire investigators on themselves after skimming a portion of wildland fire settlements that were legally required to be delivered to the state's general fund, and thus was anything by "separate." It is difficult to imagine a more reckless and misleading set of characterizations – which ultimately achieved their desired results with this Court.

Indeed, the eventual disclosure of the true facts has recently precipitated needed corrective action by California's Legislature. Specifically, Governor Brown signed into law two new pieces of legislation (SB 1074, and SB 1075) in August 2014, amending California's Government Code. SB 1074 now makes it a misdemeanor for a state employee to knowingly transfer money outside of the State Treasury System.[59] (Ex. 162.) The Senate Committee on Governmental Organization analysis indicates that this law was enacted because "it is unknown if any Cal Fire employees that were responsible for the misappropriation of funds were punished for their actions" and that "SB 1074 makes sure there are consequences to bad actions by employees doing what they know is wrong" and that "state agencies, such as Cal Fire will be held accountable ...."

---

[59] This legislative action was largely symbolic, because diversion of money by state employees, as was done in Cal Fire by numerous individuals acting in coordination, including Alan Carlson and the Moonlight Fire's lead investigator Joshua White, was and is already a felony under California law. *See* California Penal Code § 424. But despite a request by California State Senator Ted Gaines and others in open letters to Attorney General Kamala Harris urging her to undertake a criminal investigation, Attorney General Harris claimed she could not take any such action because her office represented Cal Fire. (Exs. 158-160.)

(*Id*. at 5.)  SB 1075 is a bill also specifically targeted at WiFITER.  (Ex. 163.)  That bill codifies

the recommendations of the State Auditor and imposes annual reporting requirements for Cal

Fire's Civil Cost Recovery Program and orders that the balance of the WiFITER account

(approximately $807,000 according to the bill) be turned over to the General Fund in

conformance with existing state law.  (*Id*.)  The State Controller's Office also sent notices to all

state agencies specifically calling out Cal Fire's malfeasance, in an effort to ensure that other

agencies would not engage in similar behavior.  (Ex. 161.)

In view of the egregious nature of the true facts, the concerted effort by officers of the

court to conceal them is that much more disappointing.  There can be no question that Judge

Nichols' initial WiFITER ruling, as well as this Court's ruling, were the product of a fraud

worked on two courts.  Indeed, Judge Nichols reached this very conclusion after finally having in

his possession a full accounting of what actually occurred with this illegal slush fund, including

documents showing the motivational bias it instilled in those involved with the Moonlight Fire

investigation, including Alan Carlson and Joshua White.  In particular, Judge Nichols found:

> First, this Court's determination regarding Cal Fire's motion in
> limine was tentative and thus subject to change as the case
> developed.  Additionally, this Court's initial determination
> regarding WiFITER was naturally based on the assumption that
> Cal Fire had disclosed all responsive evidence in its possession to
> the Defendants before this Court made its determination, as Cal
> Fire had earlier been ordered to do.  But the State Auditor's report
> regarding WiFITER ultimately revealed that Cal Fire had not
> complied with its discovery obligations or with the Court's order
> of April 10, 2013, which commanded the production of all
> responsive and non-privileged WiFITER documents on or before
> April 30, 2013.  Thereafter, Cal Fire belatedly produced thousands
> of documents.  In the context of reviewing the Defendants'
> Motions for Fees, Expenses and/or Sanctions, the Court has
> considered a number of belatedly produced documents and finds
> that certain of these documents are contrary to Cal Fire's
> representations to this Court regarding the lack of any evidence
> that WiFITER was improper, as alleged in its WiFITER motion in
> limine.  The Court further finds that many of the belatedly
> produced documents are supportive of Defendants' argument that
> WiFITER is relevant to the question of whether Moonlight Fire
> case manager Alan Carlson and Moonlight Fire investigator (and
> subsequent case manager) Josh White were biased towards affixing

57

blame on affluent defendants who could pay for Cal Fire's suppression costs (and who therefore could, by extension, help fund WiFITER) in order to perpetuate an illegal account for which Carlson, White and others were beneficiaries.

(Ex. 25 at 44-45.)

Judge Nichols' findings with respect to WiFITER were among his reasons for the imposition of terminating sanctions, and his conclusions that the action was "corrupt and tainted" and "too much for the administration of justice to bear." (Ex. 24 at 21 & 25.) But these state court findings regarding this joint prosecution do nothing to address or ameliorate the fraud worked upon this Court. Indeed the asymmetry between the state court actions and the federal action, and the impact of the WiFITER revelations, only serve to underscore the need for this Court to assess the facts of this prosecution anew and to do so with a focus on whether it too was defrauded, whether through its own review or through the appointment of a special master to reach findings of fact and conclusions of law.

Judge Nichols' orders provide much of what is necessary to appreciate that the fraud perpetrated by Cal Fire, its investigators, and its attorneys saturated virtually every corner of the action. But fraud perpetrated so thoroughly and on such a broad scale is not confined to one tribunal when it is based on a joint investigation and joint prosecution. Cal Fire's investigators and attorneys plainly knew that their actions and decisions to disclose or not disclose evidence favorable to the defense had a direct and material effect on *this* Court's concurrent Moonlight proceedings, and their fraud necessarily extended to the oversight and workings of this Court.[60]

---

[60] The United States listed Joshua White and David Reynolds as expert witnesses. The United States then asserted that in view of its Joint Prosecution Agreement with Cal Fire, it had no obligation to produce what it claimed were privileged communications with these experts germane to their opinions. (Ex. 7 at 9.) On May 26, 2011, Magistrate Judge Brennan entered an order granting Defendants' Motion to Compel production by the United States, despite finding that, "[t]he USAO and the AGO have entered into a joint prosecution agreement." (Ex. 8 at 2, n. 2.) Defendants also served a Rule 45 document subpoena on Cal Fire, seeking documents pertaining to Joshua White and David Reynolds' expert opinions for the United States. Cal Fire similarly refused to produce documents, and on November 8, 2011, Magistrate Judge Brennan entered an order on Cal Fire's motion for protective order. (Ex. 9.) In ordering Cal Fire to comply with much of the subpoena, Judge Brennan again found that Cal Fire and the United States had "voluntarily entered into a joint prosecution agreement" and that Cal Fire was "reaping the benefits of that arrangement." (*Id.* at 8.) Judge Brennan also ruled that discoverability of the expert files turned on whether the documents are "germane to the subject matter on which the expert has offered an opinion." (*Id.* at 7.) Certainly, counsel for Cal Fire and the United States were obligated to disclose to the Court the WiFITER program and White's role within it. It is difficult to imagine material more "germane" to an expert opinion than a contingent

58

Cal Fire institutionalized a system where wildland fire investigators had a personal, direct, and contingent financial interest in the outcome of their own investigations, and Cal Fire and its counsel did so knowing that their investigations would form the basis for both criminal and civil proceedings in courts of *all* jurisdictions. Doing so, while simultaneously concealing the evidence of that motivational context, works a fraud on every court where any such investigations are at issue. The impact of this decision making was woven into this action with the additional stratagem of obfuscation on the part of the federal prosecutors, as so thoroughly evidenced by the record in this action.

**H.     The Federal Prosecutor Misrepresented Evidence to Wrongfully Claim that Howell Started Other Wildland Fires.**

In its trial brief, the United States claimed: "All the defendants should have foreseen the fire, because Howell's had already started two other fires earlier that same summer while performing similar work for Sierra Pacific with bulldozers, and Beaty, Howell's, and Sierra Pacific all learned of those fires weeks before the Moonlight Fire. The Greens Fire ignited on June 21, 2007, on another job site where Howell's had yarded logs." (Ex. 16 at 8.) The federal prosecutors also represented: "The Lyman Fire ignited later that same season, on August 17, 2007, once again in close proximity to Howell's operations. Howell's learned the next day that the cause of the fire was an equipment-to-rock strike by a Howell's employee conducting operations on Sierra Pacific land." (*Id.* at 9.) However, these representation to the Court, designed as they were to wrongly paint Howell's as an irresponsible operator, intentionally omitted key facts associated with each of these fraudulent investigations.

The Greens Fire broke out on June 21, 2007, about a mile west of where Moonlight eventually started, on property owned by the Landowner Defendants, managed by W.M. Beaty, and harvested by Sierra Pacific through Howell's logging outfit. Although the USFS investigator on the fire, Brigitte Foster ("Foster"), conducted a perfunctory investigation on June 21, 2007,

---

financial/beneficial interest in the investigation/outcome. Yet, the prosecutors here failed to disclose any of it, and instead entered their defense of the WiFITER program.

DOWNEY BRAND LLP

1  Foster submitted no origin and cause report on this extremely small fire until September 8, 2007,

2  five days *after* the Moonlight Fire began and only then at the specific request of Dave Reynolds.

3  (Ex. 105 at 4.)  Thus, this so-called origin and cause report blaming Howell for another bulldozer

4  caused fire suddenly surfaced -- at the request of a Moonlight Fire investigator -- more than two-

5  and-a-half months after the Greens Fire but just days after the Moonlight Fire.  Also, it surfaced

6  just after the Moonlight Fire despite investigator Foster's confirmation that the USFS has a

7  requirement that origin and cause reports be completed within two weeks of a fire.  (*Id.* at 2-3.)

8  Further, when defense counsel asked investigator Foster why she had failed to comply with this

9  deadline on the Greens Fire, she could not explain why.[61]  (*Id.*)

10       Foster's sudden production of this forgotten report blaming Howell's for another fire at

11  the request of a Moonlight Fire investigator who had just blamed Howell's for causing the

12  Moonlight Fire is not the only reason the prosecutors here should have paused before defrauding

13  the Court with claims that Howell was a bad operator.  Indeed, aside from the fact Foster only

14  generated the Greens Report at the request of Reynolds, there were certainly other reasons for the

15  prosecutors to pause before making such a claim to this Court, especially since lead prosecutor

16  Taylor defended Foster's deposition performance in its entirety on March 3, 2011.  Among other

17  things, Foster's testimony revealed that she neither located a point of origin nor even a specific

18  area of origin.  (Ex. 105 at 10-11; Ex. 30 at 159.)  Under accepted fire investigation standards,

19  Foster's failure to even look for the origin, let alone find one, should have resulted in a finding

20  that the fire's cause was "undetermined."  (Ex. 28 at 3-4.)[62]  In addition to failing to find a point

21  of origin, Foster also admitted that she found no ignition source.  (Ex. 105 at 24.)  Foster also

---

23  [61] Curiously, Foster claimed to have submitted a single-page excerpt of the report in July under her married name
24  "Foster," and then in the section designed for her supervisors' approval, Foster filled in her maiden name "Boysen."
As was the case throughout her deposition, Foster could give no explanation for her apparent act of deception, simply
stating, "I don't why I . . . put 'Approved by Boysen.'"  (Ex. 105 at 9, 23.)

25  [62] Joint state and federal origin and cause expert, Larry Dodds ("Dodds") confirmed under oath that it is almost
26  always the case that an investigator must find a point of origin before he or she can discover a fire's cause.  (Ex. 52 at
27-28.)  Dodds also confirmed that in order to identify the origin and cause of a fire, the investigator must locate a
competent ignition source and find where that competent ignition source came into contact and ignited a fuel.  (*Id.* at
27  78.)  Here, not only did Foster fail to find a point of origin, she failed to even locate the far broader specific area of
origin, as well as any ignition source.

28

60

testified that she saw rock strikes but took no photographs of them and could not explain why she failed to do so. Indeed, she was unable to say if there were 100 rock strikes or two. (*Id*. at 17.) Strangely, Foster also testified that, even though she had a magnet with her, she made no effort to search for metal as potential ignition source because "the area was disturbed and I didn't feel the need to pull out the magnet." (*Id*. at 15.) When Foster was then asked whether she thought the fire was caused by "fragment that came off of a caterpillar," she paused and could only say, "possibly." (*Id*. at 16.) Finally, while accepted scientific methodology required her to test her claimed hypothesis, Foster admitted that she failed to do so. (*Id*. at 30-32.)

Despite these investigative failures, Foster's report still inexplicably concludes that Howell caused the Greens Fire. Moreover, while Foster testified that Damon Baker was the Howell employee responsible for starting the fire (Ex. 105 at 18-19), a year later the United States prepared and filed a sworn declaration from Josh White in which he stated that Howell employee Bush admitted to starting the fire (Ex. 12 at 13).

There are additional oddities with the Greens Fire's investigation and its report. When the United States produced the Greens Fire investigation report during litigation, Foster created an entirely new version of the report from whole cloth. Foster conceded that she decided to manufacture a new report from memory and pass it off as the actual report. But a side-by-side comparison of her original report and her new report exposes significant differences between the two, as Foster simply manufactured an entirely different scene sketch, photo descriptions, and incident report. (*Compare* Ex. 106, *with* Ex. 107; *see also* Ex. 105 at 33-41.)

The United States never discussed or tried to reconcile the competing theories discussed above, nor did it cause Foster to correct her report to reflect that the cause of the Greens Fire was "undermined." Moreover, while Foster's deposition revealed Foster to be either entirely incompetent or deceptive, the lead prosecutor did nothing to correct her testimony. A properly focused AUSA would have, for instance, demanded answers as to why Foster would engage in at least two separate acts of deception by using her maiden name in a box reserved for another, and by fabricating her report and producing it in discovery. Instead, the prosecutor continued to rely

DOWNEY BRAND LLP

on this sham report, and then caused the Court to do so as well.

As outrageous as are the circumstances with respect to the Greens Fire origin and cause report, the circumstances regarding the Lyman Fire origin and cause report are perhaps worse. Like the Greens Fire, the August 17, 2007, Lyman Fire also broke out before the Moonlight Fire. Like the Greens Fire, there was no origin and cause report on the Lyman Fire until *after* the Moonlight investigators blamed Howell for the Moonlight Fire. On September 24, 2007, more than a month after the Lyman Fire broke out, Cal Fire finally issued its report. Purportedly written by Cal Fire employee Les Anderson, it concluded that the Lyman Fire was caused by a Howell bulldozer. (Ex. 30 at 179-182.)

However, when Defendants took the deposition of Anderson on July 14, 2011, and took the deposition of another Lyman Fire investigator, Greg Gutierrez ("Gutierrez"), on October 19, 2011, a far different story emerged. Both Anderson and Gutierrez testified that they had *not* concluded that Howell caused the Lyman Fire. Anderson testified that he was not an investigator, did no real investigation, and only relied upon Gutierrez. (Ex. 103 at 2-3, 6-8.) Gutierrez then testified that he reached no formal conclusion at all and that he was unable to rule out arson or other possible causes. (Ex. 102 at 2-4; Ex. 103 at 4-5.) Despite these facts, Cal Fire still issued the Lyman Fire report on September 24, 2007, shortly after the Moonlight Fire broke out, concluding that it was caused by, yet again, a Howell bulldozer striking a rock. On the same day, Cal Fire's Battalion Chief David Harp ("Harp") sent Eunice Howell a demand letter, stating that "The [Lyman] fire . . . was caused by one of your bulldozers striking a rock within a timber harvest clear cut area." Among other things, Harp alluded to the potential for criminal charges and demanded that Eunice Howell immediately send Cal Fire a check in the amount of $46,206.26. (Ex. 100.) Harp then sent Eunice Howell another demand letter on December 10, 2007, and then a letter on January 6, 2008, confirming receipt of $26,206.26, and Ms. Howell's agreement to make monthly installment payments until the balance was paid off. (Ex. 101.) Eunice Howell closed the business shortly thereafter. Despite Anderson and Gutierrez's testimony, Cal Fire never returned Howell's money, and neither Cal Fire nor the United States

62

ever amended or withdrew its reliance on this false origin and cause report in their pleadings and discovery responses. (See e.g. Ex. 109 at 6, 9, 15, 18, 25, 28.) Indeed, as noted above, the United States continued to rely upon it in an effort to help make its case against these Defendants in various interrogatories, Request for Admission's, the operative pleadings, and even in its trial brief to this Court. (Ex. 16 at 9.) Regarding Cal Fire's similar conduct, Judge Nichols summarized the issue as follows:

> With respect to the Lyman Fire, Cal Fire does not even attempt to deny that the conclusion of the Origin and Cause Report for that fire prepared by Lester Anderson was false. There is no dispute that his conclusion, that a Howell's bulldozer ignited the Lyman Fire, was flatly contradicted by the lead investigator of the Lyman Fire, Officer Greg Gutierrez, who testified that the cause was properly classified as undetermined.

(Ex. 25 at 23.)[63]

The Sheep Fire, also referenced in the United States' complaint as a Howell caused fire, is more of the same. It occurred on either September 17 or September 18, 2007, in close proximity to where the Lyman Fire had occurred a month prior. Cal Fire purportedly investigated the Sheep Fire and, as was the case with Greens and Lyman, failed to locate a point of origin and failed to identify a source of ignition. (Ex. 108 at 4-5.) This fact should have led to a conclusion that the fire's cause was undetermined. (Ex. 28 at 3-4; Ex. 52 at 27-28, 78.) Once again ignoring the scientific method, the origin and cause report for the Sheep Fire stated that the fire was caused by "the bulldozer tracks or rippers contacting the rocks" in an outcropping. (Ex. 30 at 194.)

In the end, there is clear and convincing evidence that the "investigations" on the Greens, Lyman and Sheep fires were nothing but opportunities to manufacture evidence to buttress the government's allegations that Howell was a dangerous and rogue operator and that it started the Moonlight Fire, even if doing so meant an elderly woman had to pay $46,000. In fact, before these fraudulent investigations, Howell had operated for over 30 years without such an incident. (Ex. 173 at 2.) Again, only *after* the Moonlight Fire broke out, three separate origin and cause

---

[63] Moreover, with respect to Cal Fire's discovery responses, which relied upon the Lyman Fire and its false report, Judge Nichols stated, "[t]hose responses were demonstrably false, as confirmed by Gutierrez's testimony." (Ex. 25 at 23.)

DOWNEY BRAND LLP

reports "finding" that Howell started each fire with a rock strike suddenly surfaced, ultimately finding their way into the Moonlight origin and cause report.[64] None of those reports, however, is scientifically based. Each in fact is unsupported. Indeed, as the governments' primary origin and cause investigator Larry Dodds testified, based on what he read, the fires were not investigated by "first-string investigators," they drew conclusions which did not appear to be sufficiently supported, and, based on the limited material he read, the three fires appeared better classified as "undetermined." (Ex. 52 at 14-15.)[65] But the United States' prosecutors did not have limited material. The lead investigator defended Foster's deposition, and understood that the Lyman Fire report had been exposed as a sham, yet the prosecutors pressed forward without regard to their duties of disclosure to this Court.

I.     **The Lead Investigator Destroyed Critical Evidence Even Though He Reasonably Anticipated the Moonlight Fire Litigation.**

        The Moonlight investigators' "unconscionable plan or scheme . . . designed to improperly influence the court in its decisions," is further evidenced by the lead investigators' spoliation of critical evidence that goes to the heart of the case -- their fraudulent alleged points of origin. According to USFS employee Reynolds, Joshua White took copious notes when processing the alleged origin scene. (Ex. 47 at 6-11.) These notes would have likely included the investigators' careful steps with respect to the placement of the white flag and their measurements of it, their collection of metal, and its documentation. In addition to destroying these notes, White also deleted his computer files before the lawsuit was filed. (Ex. 41 at 12-23.) At the time he took these notes, he knew the Moonlight Fire was likely to result in litigation.[66] White nevertheless

---

[64] Although beyond the scope of this particular motion, the investigators' alleged rock strike theory of ignition by a Howell bulldozer was never scientifically established by federal experts. This area of the case is an equally fertile ground for prosecutorial reliance on fraudulent forensic evidence.

[65] Importantly, the governments' joint expert Dodds also confirmed that an "undetermined" fire results in no civil or criminal action. (Ex. 52 at 10-11.)

[66] On September 5, 2007, the day White and Reynolds processed the alleged origin scene, Reynolds listed Sierra Pacific Industries as the "Defendant" on an incident report. (Ex. 30 at 51.) That same day, Cal Fire retained *litigation* consultant/metallurgist Lester Hendrickson, and Joshua White met with him five days later. (Ex. 41 at 61-63, 88, 200-202; Ex. 42 at 11-12.) By September 5, 2007, the Moonlight Fire had already grown to over 22,000 acres. (Ex. 37.) On September 7, 2007, apparently with his WiFITER biases fully intact, Joshua White interviewed

DOWNEY BRAND LLP

destroyed his notes (Ex. 41 at 206-212), thereby giving himself freedom to create whatever false narrative he desired.[67]  By doing so, the Moonlight Fire investigators were able to select and shape the evidence without being impeded by contemporaneous notes of what actually occurred.[68]

**J.      The United States, with the Aid of Its Prosecutors, Covered-Up Misconduct at the Red Rock Lookout.**

According to the Joint Report, the Moonlight Fire was spotted and reported from Red Rock Lookout at 2:24 p.m.  (Ex. 30 at 3.)  Except for Red Rock's role in reporting the fire, the Joint Report is written as if all was normal in the tower on that Labor Day.  The Joint Report's account is false.  Indeed, the investigators' and the prosecution team's misrepresentations with respect to the events that transpired at Red Rock Lookout have been partially revealed through existing court filings in this case.  (Ex. 178.)

USFS employee Caleb Lief was manning the Red Rock Lookout on September 3, 2007.  At roughly 2:00 p.m., Karen Juska, another federal employee, was in the process of responding to Lief's request that she come to the tower to repair or replace a radio.  The Joint Report, however, intentionally omits the following key material facts.  When Juska arrived in her USFS pickup truck after driving up the dusty switch-back road in plain view of the lookout tower, she parked just beneath the tower, walked up its steps, turned the corner and startled Lief who was standing on the catwalk in front of her, on the side opposite from where the fire was burning in the distance.  (Ex. 97 at 2-3.)  He was urinating on his bare feet.  (*Id.*)  Caught in this revealing position, Lief turned around to zip up his pants, saying over his shoulder that it was a cure for

---

Bill Dietrich of Howell and reported, "Dietrich said the [Safeco] policy was for $3 million liability insurance, as required by SPI.  Dietrich said he would fax me a copy of their insurance policy."  (Ex. 30 at 69-70.)  White testified that his investigation included assessing insurance policies of "potential defendants."  (Ex. 41 at 128.)  White also admitted that he understood that fires of every variety can result in litigation.  (*Id.* at 59-60.)

[67]  White did the same regarding his interview with J.W. Bush, as White admits to destroying his notes of that interview.  (See Ex. 41 at 133, 206-207.)

[68]  In the state action, attorneys for Cal Fire attempted to excuse such spoliation of evidence by arguing that White's "field notes were destroyed only after the information in them was transferred to his Report, which was and is the common practice," and that he "transferred all of the case file information to his laptop computer, so all this electronic information is in fact preserved."  This is incorrect.  White has demonstrated a propensity to conceal and omit numerous things from the Joint Report, including the only aspect of the scene processing that his co-investigator Reynolds felt was important enough to carefully document (the white flag rock diagram).

65

athletes foot fungus. (*Id.* at 3-4.) Taken aback, Juska then entered the cabin of the tower with Lief. Shortly after entering the cabin, Juska saw what she believed was a blue/green glass marijuana pipe on the counter, which Lief then placed in his back pocket, saying: "[M]y bad. You weren't supposed to see that." (*Id.* at 4-5.) Later, when Lief handed Juska the radio she had come to repair, Juska smelled the "heavy odor of marijuana" on his hand and on the radio. (*Id.* at 20.)

The investigators intentionally omitted these key facts of what occurred between Lief and Juska from their Joint Report, despite their relevance as to whether Lief was properly performing his duty to report fires as quickly as possible. [69] Indeed, the USFS's lead investigator at the time, Diane Welton, took the interviews of both Lief and Juska on September 12, 2007, but made sure that neither interview statement revealed what actually happened at Red Rock on September 3. (Ex. 85; Ex. 30 at 87-91, 93-98.) In fact, Juska testified that Welton expressly told her just before she began the interview to say nothing about Lief's misconduct on the tower that day. [70] (Ex. 97 at 9-18.)

Early in the case, before it obtained only limited documents that disclosed the above-referenced misconduct on the part of Lief, defendant Sierra Pacific had heard rumors that the United States was covering up something that occurred at the Red Rock Lookout Tower and that whatever occurred may have had some impact on whether the fire was reported in a timely manner. Accordingly, given that the USFS's diligence in spotting and reporting the fire was a central issue in the case, Sierra Pacific sought to expose the issue by propounding an

---

[69] From the outset of the action, Sierra Pacific asserted with its first appearance a number of affirmative defenses, including comparative fault on the part of the USFS. Accordingly, whether the USFS employee stationed at Red Rock Lookout on September 3, 2007, exercised due care in the performance of his duties was necessarily a central issue in the case for numerous reasons. This conclusion is confirmed in the Court's Pre-Trial Order (Ex. 19 at 17-18), and in its order denying the United States' motion for partial summary judgment (Ex. 179 at 12 ("Plaintiff's motion for partial summary judgment is denied as to comparative negligence based on the alleged conduct of the Red Rock Lookout.")).

[70] According to Juska's sworn testimony and her own notes, Welton instructed Juska just before her interview that Juska was to stay silent about Lief's misconduct on the day of the fire – essentially, that Juska was to omit those particular facts as Welton purported to record from Juska what she had witnessed on that day. (Ex. 97 at 9-18.) In this regard, Welton expressly told Juska, "I can't know about that." After providing those instructions, Welton prepared and signed a witness statement for Juska, which omitted any reference to Lief's misconduct at critical moments while the fire was in its initial stages. (Ex. 85.)

66

DOWNEY BRAND LLP

unambiguous interrogatory on the United States:

> Describe in detail all activity at Red Rock Lookout on September 3, 2007, including (without limitation) the IDENTITY of all PERSONS involved and all conduct and action taken by those PERSON.

(Ex. 91 at 3.)  The United States' response, verified by USFS Plumas Division Chief Larry Craggs ("Craggs"), reported a normal day which involved the arrival of Juska and the spotting and reporting of the Moonlight Fire at 2:24 p.m.  (Ex. 92.)  The United States' response, however, drafted by the federal prosecutors, deliberately withheld any and all references to Lief's obvious misconduct and malfeasance.  The federal prosecutors also denied a series of requests for admissions that clearly, based on the true facts, should have been admitted.  (Ex. 93.)  Only after those discovery responses, and after Defendants began to push for more information regarding Leif and Juska's personnel files, did the United States began to slowly produce internal memoranda and related emails, which revealed some of the true facts.

The information regarding what Juska observed at the Red Rock tower, and the investigators' efforts to conceal it – with, unfortunately, the assistance of the federal prosecutors– was highly relevant to whether Juska spotted the fire timely and, perhaps more importantly, to the investigators' propensity to conceal harmful information which might otherwise harm their chances of prevailing against their chosen defendants (a practice that apparently took hold after AUSA Wright's removal from the action by AUSA Shelledy.)  It was also highly relevant to their credibility as investigators and to the credibility of this investigation in particular.

Thereafter, on April 7, 2011, long after the briefing on the motion for reconsideration had closed, Defendants conducted the deposition of USFS employee Larry Craggs, who verified the patently false interrogatory response prepared for his signature by the federal prosecutor.[71] Craggs' deposition represented what Defendants perceived at the time was a turning point, as Craggs showed himself to be a remorseful man focused on attempting to tell the truth, regardless

---

[71] Neither the Magistrate Judge nor the District Court had the benefit of Mr. Craggs' testimony in assessing the facts in the context of Defendants' discovery motion or subsequent motion for reconsideration.

of what it revealed.  When Sierra Pacific's counsel put his verified interrogatory response before

him, ████████████████████████████████████ (Ex. 96 at 13-20.)

████████████████████████████████████████████████████████████

████ REDACTED ████[72]  (*Id.* at 17-18)

In view of Craggs' testimony, Defendants had hoped that the federal prosecutors would

finally move to make a full disclosure to the Court and these Defendants and that they would

relatedly correct their demonstrably false discovery responses.  Certainly AUSA Wright would

have done so.  However, after the deposition of Craggs, neither the lead federal prosecutor nor

any member of her team retracted any of the false discovery responses served on behalf of the

United States, and never informed the U.S. Magistrate or this Court of these additional facts to

correct the record or the Courts' orders.[73]

In view of the federal prosecutors' failure to correct the record, the Landowner

Defendants served requests seeking admissions from the United States that its previous response

to Interrogatory No. 1 about what transpired at Red Rock Lookout was false, and that the United

States knew it to be false before serving the verified response.  (Ex. 94 at 3.)  Answering the

Landowners' Request for Admissions, the federal prosecutors objected, stating: "[T]he United

States denies this request in full.  The United States denies that any portion of the response was

---

[72] A DVD containing relevant excerpts of the videotaped depositions of witnesses concerning the events that transpired at Red Rock Lookout; the concerted and systematic cover-up of those events by the Moonlight investigators in the Joint Report; and the effort to perpetuate that cover-up during the prosecution of this matter is provided as Exhibit 95 to the Warne Declaration.  Defendants urge the Court to carefully review this evidence  to gain a more thorough appreciation, through the testimony of the witnesses themselves, of the nature of this fraud on the Court. The DVD includes Ron Heinbockel, Lief's supervisor, ████████ REDACTED ████████ REDACTED ████████████████████ REDACTED ████████  (Ex. 98 at 13-15.)  Heinbockel also testified ████████ REDACTED ████████ REDACTED ████████  (Ex. 98 at 18.)  See Exhibits 89 and 90 for more detailed comments made by Heinbockel, filed under seal.

[73] It now appears that the fact Craggs was allowed to tell the truth had something to do with veteran prosecutor Eric Overby's defense of his deposition.  AUSA Eric Overby is discussed herein, but suffice it to say that Mr. Overby was all of those things one expects from a federal prosecutor – including being tough, principled and honest.  Unfortunately, his departure shortly after Craggs' deposition left little hope that the prosecution would adjust its stratagem.

68

DOWNEY BRAND LLP

false." (*Id.*) The federal prosecutors signed and served this response even though Craggs, who

verified the prior interrogatory response, had at this point ███████REDACTED███████

███████████████████REDACTED███████████████████ (Ex. 96 at 13-

20.) As with the United States' first interrogatory response, this subsequent discovery response is

controverted by the clear evidence. It also contravenes the clear directive from PRAO counsel

Kandice Wilcox in October of 2009, as disclosed by Wright. Specifically, Wilcox stated, "part of

the issue in making a false statement means not only an affirmative mis-statement but deliberately

withholding information which refutes the position you assert...." (Wright Decl. ¶ 17.)

As trial approached, the federal prosecutors continued their false narrative, using their trial

brief to state:

> Further, the unclean hands defense fails because the United States
> has purged itself of any alleged cover up. The defense of unclean
> hands is inappropriate where a party purges itself of the inequitable
> conduct giving rise to the defense. (citations) Here, the only basis
> for an unclean hands defense that any defendant has arguably pled
> is Sierra Pacific's vague allegation that the Forest Service
> "suppressed" evidence of conduct at the Red Rock Lookout. . . .
> Thus, even if the defendants could prove that evidence of Lief's
> conduct was "suppressed," such suppression was purged by the
> United States' subsequent full disclosure of the information.

(Ex. 16 at 21.)

In what manner had the United States and the federal prosecutors purged themselves? Any

suggestion that the federal prosecutors had "purged" themselves of their discovery abuses, after

all that they had done, and all that they had failed to do, or that they had somehow made a "full

disclosure" was itself a gross misrepresentation to this Court. Again, the videotaped deposition

excerpts provided with respect to this section tell the story better than anything else can. Properly

understood, the Red Rock lookout cover-up is the story of the Moonlight Fire investigation: if

there was information harmful to the goal of collecting money from these Defendants, the

investigators and their government lawyers worked to conceal it. Red Rock is simply another

spot on a broad tapestry of investigative and prosecutorial corruption, helping again to reveal

what Judge Nichols found was an "all-in" mentality to "win" regardless of the damage it did to

69

our system of justice and to this Court's ability to properly adjudicate this matter.

**K.     The Overhead Video, the "New Diagram," and the Prosecutors' Failure to Disclose and Correct Admittedly False Expert Reports, as Required Under Rule 26(a)(2)(E) and Rule 26(e).**

Approximately an hour or so after the Moonlight Fire began its "free burning" stage,[74] the first pilot over the scene captured low altitude video footage of the fire. That video, taken at approximately 3:09 p.m., was the subject of focused attention by all parties. (Ex. 111 at 20070903150911.mpg.) Under their Joint Prosecution Agreement, federal and state prosecutors retained expert Christopher Curtis ("Curtis"), a civil engineer and land surveyor.[75] Among other things, they retained Curtis to identify the precise location of the governments' alleged points of origin within relevant frames of the video taken from above. By doing so, the prosecutors hoped to demonstrate that the governments' alleged points of origin would be somewhere near the center of the plume of smoke depicted in the video. Defendants were doing the same with their own consultants.

Curtis' work, however, revealed something very interesting. Specifically, his expert report showed that the investigators' hastily chosen points of origin -- identified by a red dot he had placed in video frames taken from above -- existed in terrain that appeared to still be *outside* the smoke, underneath the unburned trees standing east and downhill from the plume. (Ex. 110 at 2-6; Ex. 111 at F-10150.pdf and Video Captures w Origin 30fps_Page_501.tif) Curtis' report, however, did not come as a surprise to these Defendants as his placement of the alleged points of origin in the video frames mirrored the work of Defendants' experts, a fact that Curtis did not contest in his own federal deposition, when commenting on the defense expert's assessment ("It

---

[74] The investigators use this phrase to describe when the fire "actually takes off." In this case, the investigators testified, and their report states, that the fire entered the free burning stage at approximately 1:45 p.m. (Ex. 30 at 44-45.) But the Joint Report also alleges that the fire began at 12:15 p.m. and remained in an "incipient state" until the "free burning" stage began. (*Id*.) When USFS investigator Reynolds was asked to explain the difference in time, he testified, "It was – you have to back into a number here," essentially stating that it was an arbitrary exercise primarily focused on when the bulldozer in this case was present in the location where the investigators alleged the fire started. (Ex. 45 at 22-24.)

[75] Curtis did a significant amount of work on this case for both the United States and Cal Fire, a joint engagement involving numerous joint meetings with state and federal prosecutors, for which he was paid, collectively, more than $700,000. (Ex. 54 at 2-3, 18-20.)

DOWNEY BRAND LLP

looks pretty close, actually.")  (Ex. 110 at 4-6 & 17.) [76]

Later deposition testimony in the state action from the governments' jointly retained origin and cause expert Larry Dodds ultimately revealed the significance of Curtis' findings. In the federal action, and notwithstanding their obligation under *Brady* to disclose exculpatory evidence, the federal prosecutors withheld Dodds' handwritten notes prepared during what he testified was over 1000 hours analyzing the case.  Thereafter, Cal Fire proffered Dodds as its own expert witness in the state action on the fire's origin and cause, and finally revealed the existence of and produced Dodds' handwritten notes. Those notes reveal that Dodds had in fact been struggling in consultation with the federal prosecutors to reconcile the location of the governments' alleged origin with the aerial video, particularly given the location where joint state/federal expert Chris Curtis had placed it in the video frames.

In Dodds' hand written notes prepared during his engagement with the federal prosecutors, Dodds states, "Chris Curtis testified to separation between the GAO [government's alleged origin] & the smoke seen in the AA [air attack] video."  (Ex. 52 at 24-30.)  Dodds confirmed during his state deposition that this was his understanding of Curtis' federal testimony. *Id.*  When questioned in the state action about this note, Dodds admitted that Curtis had announced his opinion during the federal action to the prosecution team in the presence of Kelli Taylor.  (Ex. 52 at 25.)  Dodds also produced his handwritten notes he prepared later during the state action. (Ex. 52 at 35.)   Therein, Dodds wrote that Curtis' opinion was not only that the GAO was not in the smoke, but that the GAO had "not burned yet" and that Dodds was trying to "square" Curtis' opinion with Dodds' assignment.  (Ex. 52 at 34, 35, 76, 77.)  Dodds conceded in the context of the state action that if the GAO had not yet burned when the video was taken (as Curtis announced to the prosecution group), "*it would negate the whole government's origin area.*"  (Ex. 52 at 78.)  Although Dodds would later struggle attempting to reconcile the alleged

---

[76] The defense experts independently reached the same conclusion as Curtis and placed the government investigators' alleged points of origin in approximately the same location, east and downhill from the plume of smoke.  (See e.g. Ex. 111 at JasonDorris_SPI_06_Zoom - PointCloud.wmv, JasonDorris_SPI_04_Zoom - Stabilized.wmv, JasonDorris_SPI_01_Track - APO.wmv.; *see also* Ex. 110 at 4-6 & 17.)

DOWNEY BRAND LLP

1  origin with the aerial video, the fact remains that the federal prosecutors never revealed Dodds'

2  exculpatory notes, and never revealed Curtis' announcement.

3      In any event, the inconvenience of these facts with respect to the investigators' ignition

4  theory was only compounded by the Joint Report and the testimony of Reynolds, as each had

5  asserted that the fire advanced downhill and northeast from the area where it allegedly began.[77]

6  Indeed, the official sketch in the Joint Report unmistakably alleges that their wrongly imagined

7  and incorrectly placed fire advanced from their alleged points of origin to the northeast, *downhill*

8  and *away* from the smoke plume.  (Ex. 39; Ex. 45 at 13-14; Ex. 111 at F-10146.pdf; Ex. 48 at 24-

9  25.)  In other words, before various experts analyzed the video frames, the investigators had all

10  stated that the fire moved *downhill and away* from the area where the plume was shown to exist

11  in relation to the investigators' alleged points of origin, further demonstrating the falsity of the

12  Joint Report's alleged points of origin.[78]

13      Curtis conducted additional work in this matter that is relevant to the location of the

14  alleged points of origin and the fire's spread, and also relevant to the ongoing fraud upon the

15  Court, that, as found by Judge Nichols, is inherent in nearly all that was done in this matter by the

16  government.  Specifically, Curtis testified that Carlson and "counsel from the state and from the

17  federal government" came to his office "before Christmas" in 2010. (Ex. 110 at 11-14.)  Speaking

18  of a new diagram he had created (which counsel had placed before him as Exhibit 10159), Curtis

19  testified, "they asked me if I could do this."  *Id.*

20      Later, in the state case, Curtis explained that, as requested by the prosecutors, he created a

21  diagram that attempted to plot each of the investigators' origin and cause photographs using

22  survey and LiDAR data.[79]  As requested by the prosecutors, Curtis testified that he thereafter

23  _____

24  [77] Reynolds testified as follows: Q: "Were you and Chief White in agreement that the fire was moving downhill, northeast from the cedar tree" A: "Yes."  (Ex. 45 at 15.)

25  [78] Frankly, in light of what should have been the proper focus of these federal prosecutors -- to seek justice -- the video and all that it revealed should not have presented an inconvenience or problem at all, as it was nothing but
26  another opportunity for these prosecutors to comply with their obligation to do actual justice by dismissing their case, something these somewhat naïve defense counsel initially hoped may result from the work of the experts who had
27  studied these video frames.  Defense counsels' hopes were misplaced.

    [79] LiDAR (light detection and radar) is a survey technology which measures distances with the use of a fixed laser.
28

72

worked with Alan Carlson, who brought to his office "the library of all the photographs" taken by the investigators. (Ex. 54 at 8-9.) Carlson would then hand each photo to Curtis while Curtis then resolved where the photograph should be plotted on the diagram using data he had developed. (*Id.*)

In reality, however, not all the photographs in the investigators' September 4 to September 5 "library" were plotted, as the new diagram has one glaring omission. When the Defendants deposed Curtis on January 30, 2013, in the state actions, they asked why he had failed to plot the white flag itself. In response, Curtis testified that Carlson never gave him any photographs depicting that flag. (Ex. 54 at 10-11.) (Q: "And it's your testimony that the only item placed by a human being, that [Carlson] did not ask you to identify and locate, is the white flag; is that true?" A: "That is the truth, yeah.") Shortly thereafter, Curtis testified: "I was never asked to place the white flag. I never even saw the white flag. I never saw the white flag. I never asked any questions about it because I wasn't aware of it . . . at the time of this exercise." (*Id.* at 14-15.) It was only later that Curtis discovered and discussed with others the existence of the white flag.[80] Specifically, Curtis testified that he later discovered that "the defense is trying to make an issue of that," and further testified that his discussions on this omission "may have" involved Carlson, the federal prosecutors and/or the state prosecutors. (Ex. 54 at 6-7.)

In addition to failing to plot the existence of the white flag (and the prosecutors' failure to correct that aspect of Curtis' report), there was something else quite extraordinary about the new diagram: it dramatically altered the direction of the advancing fire indicators as compared to the direction set forth in the official sketch, moving them a full 90 degrees and thereby showing the fire's advance moving to the northwest (generally up the hill, and towards the plume), as opposed to moving to the northeast as depicted three years earlier on the official sketch (generally down

---

[80] When Defendants confronted White about the lack of any plotting regarding his white flag, he testified that he did not know why the white flag was removed or when it was removed. When White was asked why it had not been plotted on the new diagram, he essentially parroted what Reynolds revealed they had been told by government prosecutors in January of 2011, that it was "a non-issue." Specifically, White testified "Because I don't believe that the white flag had any significance." (Ex. 42 at 8.)

DOWNEY BRAND LLP

the hill, and away from the plume).[81] (Ex. 40.)

But changing the directional vectors associated with the fire's advance is not all that was done to actively support their theories, regardless of the truth. The prosecutors also retained expert Kelly Close ("Close"), a fire spread behavior specialist who, among other things, would "model" the fire's behavior using software known as FARSITE. Close would use this program to depict the fire's likely spread using data sets including fuel loads, terrain and weather. When Close eventually produced his FARSITE modeling -- as was the case with the changed advancing indicators -- it miraculously showed the fire advancing from the alleged points of origin *uphill* to the west, directly towards the smoke plume. (Ex. 113 at 19.) Thus, the government would argue, the alleged points of origin were correct; the fire simply burned uphill to the west under the tree canopy until it burst through that canopy in the area of the smoke plume, as seen in the video.[82] (*Id.*)

However, Close's modelling was actually very wrong. Instead of correctly inputting the

---

[81] The prosecutors well knew that this directional change was significant, as they knew that the original placement of the fire's advancing indicators on the official sketch, clearly pointing to the northeast, were not placed through a careless drafting error. In fact, during her deposition, Welton testified that co-investigator White took a particular interest in the precise placement of the official sketch's critical north directional indicator, seen on the sketch in the vicinity of the red advancing indicators pointing northeast in relation to that same north directional indicator. In particular, Welton testified that White even instructed her to revise and to slightly cant their north directional indicator to the left so as to improve its accuracy before finalizing the official Moonlight Fire sketch. (Ex. 48 at 34-36.) Notwithstanding the care that went into the original placement of the northeast advancing indicators, and in furtherance of doing whatever was necessary to "win," state and federal prosecutors allowed White and Reynolds to change their indicators on Curtis' new diagram to show the fire moving toward the plume. The investigators' willingness to alter their original work on this critical issue, and the prosecutors' allowing them to do it, is yet another example, like their altered point of origin, of these investigators simply creating those "facts" that would advance their cause. When Curtis was presented with the facts of the changed directional indicators during his expert deposition, he testified he was just a "scrivener" and that White and Reynolds instructed him to place them in a northwest direction during a meeting at his office on January 25, 2011. (Ex. 54 at 42-45.) In response to deposition questions which revealed the background of the investigators' original placement of the indicators to the northeast, the care that Welton and White went through in selecting that original direction, and the 90 degree shift, Curtis testified that he was concerned. (*Id.* at 40-56.)

[82] The National Fire Protection Association publishes a fire investigation manual entitled NFPA 921: Guide for Fire and Explosion Investigations. NFPA 921 supports the use of certain analytical techniques and tools, ranging from simple algebraic equations to complex computer fire modeling, to develop and test origin hypotheses. Similarly, another well-known fire investigation manual, the Wildfire Origin & Cause Determination Handbook, directs fire investigators to use fire modeling "to scientifically model fire behavior." (Ex. 29 at 11.)

74

actual 9 degrees of slope in the area, Close inputted 33 degrees.  (Ex. 113 at 19-31.)[83]  (*Id.*)  In

Close's inaccurate steep slope environment, the fire would have burned straight up the hill to the

west, into the plume as seen in the video frame captured from above, regardless of the wind.  The

magnitude of Close's error is apparent from a demonstrative comparing the actual slope (in blue)

to Close's slope (in red).  (Ex. 111 at 01_CloseElevations_ Rev02_1cut2. wmv; Ex. 113 at 19-

31.)



Defendants' own fire modeling expert Dr. Chris Lautenberger ("Lautenberger")

discovered Close's error.  Using the correct data set, including the correct slope, Lautenberger's

FARSITE model revealed that the mild 9 degree slope would not override the effect of the

northeast wind and, consequently, the fire would have generally advanced in that same direction

during its initial phase.  Thus, had the fire actually started where the government had claimed it

started, it would have advanced away from the plume and it would have created a far different

boundary than what actually existed for the fire's initial advance, taking out green trees further

down and to the northeast that were not burned by the fire.  (Ex. 113 at 18-35.)  These facts of

course tended to prove that the fire did not start where the government claimed, and that it

actually started further up the hill.  (*Id.*)

In light of Lautenberger's work and his discoveries, Defendants were eager to take

Close's deposition, which took place on March 5, 2012.  While Lautenberger's supplemental

[83]As fire behaviorists and investigators recognize, slope has a tremendous impact on the rate and direction of fire
spread.  (Ex. 114 at 6-7.)  Fires will burn faster uphill than downhill because of the preheating of the uphill fuels and
the influence of upslope and up-canyon winds.

DOWNEY BRAND LLP

1  report clued Close into his error before the deposition began, Close nevertheless began by

2  testifying that he had no changes to make to his report. (Ex. 112 at 2.) In light of the severity of

3  his calculation error, defense counsel pressed the issue, asking him, "Do you understand that if in

4  fact you think you found a mistake, that you are obligated to make changes to your report?"[84]

5  AUSA Richard Elias objected to this line of questioning, accusing defense counsel of "misstating

6  the law" and instructing the witness not to "speculate." (*Id.* at 2-6.) After a lengthy back-and-

7  forth, and in a moment of understatement, expert witness Close finally admitted that "there was

8  an error in specifically a slope map error that I used for inputs in the FARSITE…that caused

9  some of the slope values to be somewhat exaggerated in some parts of the terrain that I was

10  examining." (*Id.* at 5.) When defense counsel asked Close if he had taken any steps to correct his

11  report, Close testified that he brought the error to the attention of the federal prosecutors on the

12  case. (*Id.* at 5-6.)[85] He also testified that had considered making changes but ultimately did

13  nothing to correct his report. (*Id*. at 14-19.) Close did testify, however, that after realizing his

14  mistake he went back into his models, fixed the slope error, and "for his own edification" re-ran

15  the model. (*Id.* at 7.) Close claimed that his results with the corrected slope "were very similar."

16  (*Id.*) Close's assertion, however, is completely unsubstantiated since the prosecutors allowed him

17  (or perhaps instructed him) to keep the results of his corrected work private. (*Id.* at 7-8, 20-21.)

18       In light of the federal prosecutors' failure to comply with their discovery obligations,

19  Defendants had no choice but to have Dr. Lautenberger re-run Close's modeling using Close's

20  actual inputs (as revealed by Close's report), and also using his inputs except for the incorrect

---

[84] Under Rule 26(a)(2)(E), as expressly informed by Rule 26(e)(1), "A party who has made a disclosure under Rule 26(a) -- or who has responded to an interrogatory, request for production, or request for admission -- **must supplement or correct its disclosure or response**: (A) in a timely manner **if the party learns that in some material respect the disclosure or response is incomplete or incorrect**, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. Rule 26(e)(1)(A)(emphasis added)

[85] Of course, a properly focused lead prosecutor would have quickly discussed the error with her expert, discussed the need to be careful with such important data sets, and immediately instructed her expert to comply with Rule 26 and get a corrected report out as soon as possible. Not here. Moreover, it appears that Ms. Taylor wanted Curtis to rebut Lautenberger. Curtis testified that he was asked to go out and do some filming from a helicopter, and that he was asked to give expert opinions on certain experts but that he "refused to do so because they were outside my area of expertise," and that one of those experts was "Chris Lautenberger." While he did not know why, he testified that "Ms. Taylor asked if I could rebut Lautenberger and I wouldn't do it." (Ex. 54 at 16-17.)

76

slope. Contrary to Close's unsubstantiated claim, Dr. Lautenberger's analysis revealed that Close's slope error *significantly* affected the output, just as one would expect in light of the magnitude of his error. Rerunning Close's modeling also tended to show that the fire could not have started at the government's alleged points of origin and then spread preferentially up the hill to the location burning in the video (Ex. 113 at 19-31), a fact which appears to explain why Close was not asked to provide a corrected report and the federal prosecutors never corrected the record.

## V. LEGAL STANDARD

Final judgments, including settlement agreements, are generally considered binding and are accorded a degree of finality. However, Rule 60 of the Federal Rules of Civil Procedure provides various mechanisms for a court to set aside a final judgment or order. Rule 60(b) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" for various reasons, including "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by the opposing party." Fed. R. Civ. P. 60(b)(3). Although also addressing fraud, Rule 60(d) provides a separate and distinct avenue for relief by recognizing and codifying the inherent power of the court to "set aside a judgment for fraud on the court." *Id.* 60(d)(3); *see also Hazel-Atlas*, 322 U.S. at 244. While most motions under Rule 60(b), including those for fraud, must be made no more than a year after the entry of a judgment, there are no such time restrictions when filing a motion for fraud upon the court under Rule 60(d).[86] *See id.* 60(c)(1); *Stonehill*, 660 F.3d at 443-44.

---

[86] Rule 60(d) supports two distinct procedural avenues to seek to set aside a judgment procured by fraud on the court: either by filing an independent action or through a motion. See Wright & Miller, 11 Fed. Prac. & Proc. § 2870 (3d ed.). The ability of a party to choose the preferred procedural route is demonstrated in Ninth Circuit cases analyzing allegations of fraud on the court. For example, in *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1130 (9th Cir. 1995), the court analyzed an independent action for fraud on the court, while in *England v. Doyle*, 281 F.2d 304 (9th Cir. 1960), the court analyzed a motion to set aside on the grounds of fraud on the court. Moreover, because a court's power to set aside a judgment for fraud on the court arises from the long-recognized "historic power [in] equity to set aside fraudulently begotten judgments," the substance of a party's filing related to fraud on the court controls over its form. *Hazel-Atlas*, 322 U.S. at 245; *U.S. v. Buck*, 281 F.3d 1336, 1342 (10th Cir. 2002) ("no purpose would be served by denying…relief on the ground that the motion misstyled the plea for relief…[t]he substance of the plea should control, not the label"). In fact, because the form of the filing is of no regard, the court has been understood to have the power to treat a motion as an independent action or vice versa. *Zone Sports Center Inc. LLC, et. al. v. Red Head, Inc.*, No. 11-CV-00634-JST, 2013 WL 2252016, at *6 (N.D. Cal. May 22, 2013) ("The Court has the authority to construe Plaintiff's request as either a motion brought under Rule 60(b) or as an independent action under Rule 60(d) because the substance of the relief sought is what controls, not the label of the submissions."); *Buck,* 281 F.3d at 1341-42 (finding that the federal courts have the power to construe a motion for

77

The Court's power, recognized under Rule 60(d), comes from its "historical power of equity" and its need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of [its] cases" and "further[] the pursuit of achieving complete justice." *In re Levander*, 180 F.3d 1114, 1118 (9th Cir. 1999) (internal quotations omitted). In determining whether to vacate a judgment pursuant to this inherent power, courts must exercise "restraint and discretion," *United States v. Estate of Stonehill*, 660 F.3d 415, 443 (9th Cir. 2011), weighing the "deep-rooted policy in favor of the repose of judgment" against "enforcement of [a] judgment [that] is manifestly unconscionable," *Hazel-Atlas*, 322 U.S. at 244-45. For these reasons, fraud on the court must be "established by clear and convincing evidence." *Stonehill*, 660 F.3d at 443 (quoting *England v. Doyle*, 281 F.2d 304, 310 (9th Cir. 1960)).

Courts have sometimes struggled to define what qualifies as a fraud on the court. *See Stonehill*, 660 F.3d at 444. Courts and commentators have acknowledged that not all "fraud 'connected with the presentation of a case to a court' is . . . necessarily a fraud on the court." *Id.* (quoting 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2870 (2d ed. 1987)). Rather, fraud on the court occurs when the conduct either "defiles the court or is perpetrated by officers of the court." *Dixon v. C.I.R.*, 316 F.3d 1041, 1046 (9th Cir. 2003). When the conduct harms "the integrity of the judicial process . . . and the fraud rises to the level of 'an unconscionable plan or scheme which is designed to improperly influence the court in its decisions,'" the court "not only can act, [but] should." *Id.* (citations omitted).

In its most recent published opinion addressing fraud on the court, the Ninth Circuit stated that "the relevant inquiry is not whether fraudulent conduct 'prejudiced the opposing party,' but whether it 'harm[ed] the integrity of the judicial process.'" *Stonehill*, 660 F.3d at 444 (quoting *Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir. 1989)). Accordingly, "to show fraud on the court, [the moving party] must demonstrate, by clear and convincing evidence, an effort by the

fraud on the court "either as an independent action….or, because there are no formal requirements for asserting a claim of fraud on the court, as a pleading invoking the court's inherent power to grant relief for fraud upon the court"); Wright & Miller, 11 Fed. Prac. & Proc. § 2868 (3d ed.) ("A party is not bound by the label used in the party's papers. A motion may be treated as an independent action or vice versa as is appropriate.").

DOWNEY BRAND LLP

DOWNEY BRAND LLP

[opposing party] to prevent the judicial process from functioning in the usual manner.  They must show more than the perjury or nondisclosure of evidence, unless that perjury or nondisclosure was so fundamental that it undermined the workings of the adversary process itself."  *Id.* at 445.

Importantly, fraud upon the court may be found in an entire course of conduct by a party, rather than a single act of fraud directed at the court.  For example, in *Stonehill*, the Ninth Circuit analyzed seven categories of evidence cited as fraud upon the court.  *See* 660 F.3d at 446-51.  The Ninth Circuit first examined each category of evidence in isolation to determine whether it constituted fraud upon the court, and determined that each category, on its own, did not qualify.  *Id.*  Importantly, the Ninth Circuit then proceeded to examine the allegations of fraud on the court as a whole, analyzing whether, taken together, the misrepresentations and nondisclosures "change[d] the story . . . presented to the district court."  *Id.* at 452.  While the Ninth Circuit ultimately found that the conduct, considered in its totality, did not constitute fraud upon the court because it did not go to the central issues of the case, *Stonehill* makes clear that a court is not limited to analyzing each alleged instance of misconduct in a vacuum, but must also consider whether a party's entire course of conduct rises to the level of undermining the judicial process sufficient to constitute fraud upon the court.  *Id.* at 454; see also *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1129-32 (9th Cir. 1995) (analyzing whether the defendant's course of conduct throughout the case constituted fraud on the court).

## VI.  LEGAL ANALYSIS

### A.  <u>Fraud Has Been Committed on this Court.</u>

The pervasive and coordinated misconduct of the Moonlight Fire prosecutors and investigators, whether viewed in isolated parts or as a whole, clearly and convincingly reflects "an effort by the government to prevent the judicial process from functioning 'in the usual manner,'" and that it also "involved perjury or nondisclosure [ ] so fundamental that it undermined the workings of the adversary process itself."  *Stonehill*, 660 F.3d at 445.

Here, USFS and Cal Fire investigators obfuscated the truth at every turn, a process which began with their so-called origin and cause search, continued with their drafting of a false Joint

Report, and then invaded their lengthy depositions. Ultimately, the prosecutors joined in the process by concealing key documents, falsifying responses to interrogatories and requests for admissions, and by allowing witnesses to lie under oath. Whether analyzed independently or collectively, these acts establish a fraud upon this Court. As set forth in this motion, these acts include:

*The White Flag:* Despite the Joint Report's very purpose – to report the truth and only the truth – it actually covered up the truth and advanced a false narrative regarding the investigators' most critical conclusions. As noted by former AUSA Wright, "The change in the point of origin and the reasons for the change should have been, but were not, disclosed in the Report." (Wright Decl. ¶ 31.) Thus, Defendants had no choice but to use discovery to uncover hidden sketches, reports, photographs and measurements, all exposing an ugly truth – that the Moonlight Fire investigators were corrupt and willing to say whatever they thought they had to say to lay blame for this large fire at the doorstep of those who might be able to pay.[87] They were willing to do so regardless of the existence of contrary evidence, and also willing to do so even if it meant manufacturing evidence, and even if it meant committing perjury.

The prosecutors participated in advancing the fraud at the heart of the invesigation into this Court's jurisdiction. Indeed, when defense counsel then confronted White with five photos which he had *not* included in his Joint Report but which they had found on his photo CD, the prosecutors sat on their hands as White continued to deny knowing anything about why there was a white flag in the middle of the scene he was in charge of securing, one that he had photographed five times. During their meeting with the investigators in January of 2011, with the full power of the United States Attorneys' Office behind them, indeed with the power of the Office literally surrounding them, the prosecutors put the white flag photos on a computer screen for all in attendance to see and assured Reynolds that it was a "non-issue." (Ex. 47 at 42.) Reynolds'

---

[87] The Defendants encourage this court to thoroughly review Exhibit 56 to Warne's Declaration. Exhibit 56 is a video montage of testimony from a number of critical witnesses regarding the white flag and the investigators' efforts to cover it up, even while they were under oath. It also contains testimony from experts in the state actions who were questioned on the issue of the white flag cover up.

DOWNEY BRAND LLP

admission in 2012 on this front is telling as both the federal and state prosecutors watched White's own cross-examination of the white flag, and could see for themselves that this "non-issue" destroyed White's credibility.

Thereafter, the prosecutors continued to allow both White and their star pupil Reynolds to testify dishonestly about the most critical aspect of what they did, about the essence of their case against these Defendants. Certainly, because of the core nature of this fraud, their conduct is alone enough to find a fraud upon the Court. See *Dixon v. C.I.R.*, 316 F.3d 1041, 1046-47 (9th Cir. 2003) (finding a fraud on the court based on the actions of two IRS attorneys in covering up relevant evidence, including sitting by silently as witnesses presented testimony the attorneys knew to be false).

But the white flag cover-up means far more than discovering that the most essential point of the investigation was actually at a spot 8 or 10 feet from the official points of origin, and it means far more than finding that the state and federal prosecutors were willing to play along.[88] The deceit by the government investigators on this issue, aided and abetted as they went by prosecutors, demonstrates a mindset focused on winning at whatever cost.

As stated by the state court, "corrupt intent knows no stylistic boundaries." (Ex. 24 at 22.) A willingness to lie repeatedly under oath with a camera rolling and attorneys present reveals a propensity towards dishonesty that would likely be even more adventurous with no attorneys

_____

[88] The investigators' deception regarding this central issue is far more meaningful than 10 feet, and it certainly does not mean that the investigators were 10 feet from being correct. Indeed the plume of smoke shown in the air attack video demonstrates that the investigators' secret point of origin and their fabricated but official points of origin all existed in an area too far down the slope, roughly 150 to 200 feet from the center of the smoke plume revealed by an air attack video taken overhead roughly an hour after the fire began. (Ex. 114 at 2-5.) Given their mindset, their error is not surprising. As these investigators quickly processed the scene, the entire point of that exercise was to pin blame on chosen defendants, not to find the truth. Thus, because they were not engaged in a scientific exercise they were way off from where the fire actually started. Once the mindset of these investigators is exposed, it is easy to also imagine that their "initial" and secret point of origin may not have even been their first point of origin. Since this matter clearly and convincingly demonstrates a willingness by these investigators to move their point of origin in a failed effort to "strengthen" their case, it also demonstrates the distinct possibility that the investigators suppressed other points of origin as well, that the white-flagged point of origin is not their only other point, but perhaps their second or third, which they abandoned in favor of a point more "connected" to their target defendants. Perhaps the investigators initially placed a completely different point of origin near the area where the plume is shown in the video, and thought better of it because it implicated the wrong party, a possibility suggested by the testimony of Sierra Pacific employee Mike Mitzel, who saw another flagged area further up on the ridge a few days after the fire started. (Ex. 167 at 2-7.)

DOWNEY BRAND LLP

present as they worked their exclusive scene with no one watching. It is, potentially, a willingness to ignore footprints 200 feet further up the hill; a willingness to destroy evidence of a gasoline spill from a person cutting firewood on the western ridge; a willingness to suppress a delayed-fuse arson device timed to go off at 2:00 p.m.; a willingness to overlook witness interview information pointing to a different cause;[89] a willingness to cover-up a confession from a third party who started the fire; and a willingness to manufacture a confession from someone they wanted to blame, as happened here. Once an investigation is discovered to have been infused with dishonesty, it is not about distances or a single point of origin or two. It is immediately about everything, making the investigation worse than merely useless – indeed, it appears that this investigation was simply a vehicle to affirmatively create or destroy evidence so as to frame these Defendants, especially when there was an illegal slush fund creating the financial motive to do just that.

But the fraud upon the Court on this key issue did not stop there. The prosecutors also advanced the fraudulent investigation into the judicial proceedings by submitting a false and misleading declaration from White in summary judgment practice (Exs. 11-12), and also by attaching the false Joint Report to that declaration (Ex. 12 at 3). Moreover, the federal prosecutors relied upon this false document in other ways as well, citing the Joint Report in verified interrogatory responses (Ex. 109 at 10, 19, 21, 29), and making it "Trial Exhibit No. 1" in their list of trial exhibits (Ex. 17 at 2).[90] When these attorneys chose to advance their prosecution

---

[89] That the government did not investigate Ryan Bauer, an individual unable to pay any damages, and that they covered up information regarding his potential culpability (such as not revealing critical aspects of his taped interview in the written summary found in their "official" report), is consistent with lead investigator Joshua White's status as a recipient of substantial benefits associated with Cal Fire's illegal WiFITER slush fund. It is also consistent with the mind-set of his supervisor and case manager Alan Carlson, who, in the spring of 2008, wrote an email denying the use of WiFITER money to purchase equipment which might aid in catching arsonists, saying, "it is hard to see where our arson convictions are bringing in additional cost recovery."

[90] The state prosecutors engaged in similar conduct in state court. After addressing the fraud inherent in the investigators' testimony regarding the white flag cover-up, Judge Nichols found: "Moreover, and perhaps more importantly, Cal Fire's discovery abuses, and Defendants' requests for sanctions, are not limited to just the white flag cover-up. Indeed, in its July 2010 false interrogatories responses, Cal Fire refused to provide substantive responses and instead invoked CCP § 2030.230, thus incorporating by reference the entire Joint Report, and all of its misrepresentations concerning the core issues in this case. All of Defendants' defense expenses are, in one way or another, inextricably intertwined with the falsehoods and omissions in the Origin and Cause Report." (Ex. 25 at 29.)

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1   by relying upon the corruption at the heart of the investigators' work, they defiled the Court.  In

2   this regard, it is worth noting that "some courts and commentators have suggested that perjury

3   should not usually constitute fraud on the court unless 'an attorney or other officer of the Court

4   was a party to it.' 11 Wright & Miller,§ 2870." *Stonehill*, 660 F.3d at 445.  Here, the lawyers

5   most certainly were a part of it, as they well knew what White and Reynolds were *not* telling this

6   Court, but they filed the declaration anyway.  Perhaps even more importantly, the Ninth Circuit

7   has also noted that, "most fraud upon the court cases involve a scheme by one party to hide a key

8   fact from the court and the opposing party." *Stonehill*, 660 F.3d at 444.  The Joint Report here

9   was "Exhibit 1" for these prosecutors.  There is no more "key fact" in this matter than the fraud at

10  the heart of that Joint Report and at the heart of White and Reynolds' false testimony, and the

11  perpetration of this fraud was actively supported by these prosecutors and then used to defend

12  against Defendants' Motion for Summary Judgment.[91]

13      ***The Falsified J.W. Bush Interview Summary***:  In furtherance of the type of scheme the

14  Ninth Circuit discusses in *Stonehill*, the investigators here falsified more than just their original

15  white flagged point of origin.  In another effort to sell their fraudulent scheme that a bulldozer

16  started this fire, the undisputed evidence establishes that Joshua White produced a witness

17  interview summary for J.W. Bush falsely attributing to Mr. Bush admissions of liability regarding

18  the government's rock strike theory.  Even after Defendants uncovered the falsification of Bush's

19  interview, prominently displayed in the Joint Report as tab 9, and even after White could not

20  answer why the tape of his Bush interview was in conflict with his written summary (Ex. 41 at

---

[91] Additionally, in ruling on the Motion for Summary Judgment, the Court relied extensively on White's Declaration in support of what it found to be genuine issues of material fact associated with whether Howell was negligent in its operations on September 3, 2007.  In this regard, the Court's analysis hinged in part on paragraphs 22-23 of White's Declaration, wherein he described the manner in which a Howell employee had supposedly conducted his work that day.  (Ex. 13 at 9.)  However, White's Declaration described events which were not consistent with the summary of his witness interview of that Howell employee in September 2007.  Defendants objected on the ground that White's Declaration was a sham affidavit.  The Court, approaching the issue with caution, overruled that objection, finding "Defendants have not cited to anything in the record that would indicate White's statement is a sham."  (*Id*.)  In light of Judge Nichols' finding that White has been untruthful on numerous fronts, and in view of what is revealed herein to this Court, there is no reason to conclude that White's recitation in his Declaration of the Howell employee's operations was the single jewel of truth in his otherwise falsified declaration.  In fact, there is every reason to now conclude the opposite.

132-133), the federal prosecutors still advanced in motion practice before this Court the so-called "undisputed fact" that Mr. Bush had admitted liability. Notably, in *Stonehill*, the Ninth Circuit spoke of a scheme to hide "**a** key fact." (*Id*. 444.) Here, White's false interview summary was one of <u>many</u> key facts hidden (or fabricated) by these investigators, as aided by these prosecutors, so as to advance a fraudulent scheme to frame these Defendants.

*The Alleged Bribe to the Bauers:* The failure of the federal prosecutors to comply with their duty of candor, as well as with their discovery obligations, by disclosing a key witness's fabrication of an alleged bribe to Ryan Bauer in exchange for admitting to starting the fire, necessarily deprived this Court of critical information, given that the Court was asked to engage in a careful balancing of interests on the important motions *in limine*, and did so here without the prosecutors providing a complete record to which the Court and Defendants were absolutely entitled. The failure by the federal prosecutors to comply with these obligations and rules constitutes yet another fraud upon the Court, as this conduct was a knowing and potentially criminal[92] attempt to hinder the judicial process, the subsequent suppression of which further tainted the Moonlight Fire prosecution while prejudicing these Defendants. *See Stonehill*, 660 F.3d at 445 (stating that fraud on the court exists where the fraudulent conduct "harm[ed] the integrity of the judicial process"); *see also Chambers*, 501 U.S. at 44 (stating that "tampering with the administration of justice . . . [is] a wrong against the institutions set up to protect and safeguard the public").

*WiFITER Fund:* Through discovery conducted after settlement of the federal action, Defendants uncovered evidence indicating that WiFITER served as one of the primary engines motivating Cal Fire investigators and cost recovery specialists to engage in a fraudulent effort to pin the blame for the Moonlight Fire on these Defendants. To the extent the United States attempts to argue that the motivations and biases of Cal Fire investigators are irrelevant in the context of this federal action, the United States would be incorrect. The United States voluntarily

---

[92] As noted by Wright in his declaration, the suppression or falsification of information in an investigation conducted by any agency of the United States is covered by 18 U.S.C. § 1519. (Wright Decl. ¶ 31.)

elected to undertake a joint investigation of the Moonlight Fire with Cal Fire. At every point along the path of the concurrent state and federal actions, the United States availed itself of the benefits of a joint prosecution and the evidentiary privileges associated with it. Given that the prosecutors aided and abetted one another in the prosecution of both actions, any failure to disclose critical facts associated with the WiFITER account are failures of the *entire* joint prosecution team. The United States cannot seize the benefits of its "common interest" at every turn with Cal Fire, and now distance itself from the acts of its joint prosecution partner. As in any joint venture, both parties become responsible for the acts of the other.

Moreover, in addition to their partnership with Cal Fire on this action, the United States, through its lead prosecutors, made recklessly false statements about WiFITER that this Court relied upon.[93] Thus, even if there were no joint prosecution agreement which bound the federal and state prosecutors together as one, the judgment should nonetheless be vacated and the case dismissed as a result of the fraud upon this Court committed by Cal Fire's general counsel and litigation counsel who, under the Ninth Circuit's rationale under *Pumphrey*, were also officers of this Court.

Moreover, the duty to disclose material evidence is not limited to government attorneys; it applies to investigating agencies. Both the Ninth Circuit and the Supreme Court have recognized that "exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does." *Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2008) (quoting *United States v. Blanco*, 392 F.3d 382, 388) (9th Cir. 2004)). Such a rule "would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided

---

[93] Even if this Court were to assume, counterfactually, that the United States is simply another victim of Cal Fire's concealment of the true facts associated with WiFITER, that would do nothing to lessen the fact that a fraud has been worked upon this Court, and that the settlement and judgment are a consequence of that fraud. *See Pumphrey*, 62 F.3d at 1130-31 (9th Cir. 1995) (finding fraud upon the court committed by defendant's general counsel although general counsel was not admitted to practice in court where trial occurred, did not enter an appearance in the case, was not admitted pro hac vice, and did not sign any documents filed with the court, when general counsel attended trial, gathered information to respond to discovery requests and framed answers, and participated in creation of video at issue).

DOWNEY BRAND LLP

the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them." *Id.* (quoting *Blanco*, 392 F.3d at 388). *Tennison* relied in part on the Supreme Court's opinion in *Youngblood v. West Virginia*, where the Court made clear that "*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" *Youngblood v. West Virginia, supra,* 547 U.S. 867, 869-70 (2006) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)).

Accordingly, regardless of whether the federal prosecutors even possessed evidence material to the defense, Cal Fire -- as the investigating agency and the federal prosecution team's joint prosecution partner -- *did* have such evidence and had a duty to disclose that evidence to the Court, at least in connection with a motion to compel all documents germane to the investigators' opinions.[94] Cal Fire's general counsel and litigation counsel, officers of the court, also had a duty to ensure this jointly prosecuted action did not work a fraud upon any court. *See Pumphrey*, 62 F.3d at 1130-31. Instead, Cal Fire's in-house counsel, with the cooperation of Cal Fire's litigation counsel, actively coordinated efforts with Cal Fire law enforcement management, including Alan Carlson, to suppress evidence of WiFITER's illegality and impact on wildland fire investigations. Cal Fire and its counsel did so even though they knew precisely which arguments the United States advanced before the federal trial.[95] Indeed, as a branch of the government

---

[94] Any question of whether the federal prosecution team considered Cal Fire to be the lead investigating agency was answered when the United States served its trial witness list. The United States witness list had two sections. The first section was a listing of those witnesses the United States absolutely intended to call. The United States included lead investigator Joshua White of Cal Fire in that section. He is the only Moonlight Fire investigator listed. (Ex. 18 at 11.) The United States' provisional witness list/section, included witnesses that may be called "if the need arises." USFS fire investigator Diane Welton can be found only in this section. (*Id.* at 25.) Perhaps recognizing that he could not withstand cross-examination with respect to the most important aspects of the investigation, namely the processing of the alleged origin scene and the placement of a white flag he later claimed was chipped rock, the United States did not list David Reynolds as a trial witness at all. *Id.* Lead prosecutor Taylor chose to exclude him even though he was the only USFS Moonlight investigator participating in the investigation before the scene was released. Of course, the prosecution team's election to exclude Reynolds did nothing to lessen the fraudulent nature of the action since key portions of the origin and cause investigation were highly dependent upon evidence he collected, observations he made, and witness interviews he alone conducted. Indeed, the omission of this critical witness was part and parcel of a broad effort by the prosecutors to help suppress and omit what actually happened on that hillside in the first critical days after the fire.

[95] Defendants are informed and believe that counsel for Cal Fire reviewed the United States' pre-trial filings, and attended the pretrial conference in the federal Moonlight Fire action.

86

working directly with the team of federal prosecutors under a joint prosecution agreement, Cal Fire's violations of these ethical rules, and any lack of investigation into WiFITER by federal prosecutors, coupled with their affirmative and reckless misrepresentations to this Court, only underscore the conclusion that the government, through its attorneys and its investigators, not only failed to meet the high standards of conduct expected and required of it, but also perpetrated a fraud on the Court by "tampering with the administration of justice," *Chambers*, 501 U.S. at 44, through an "unconscionable plan or scheme designed to improperly influence the court in its decision," *Dixon*, 316 F.3d at 1046.  In doing so, both Cal Fire and the government attorneys interfered with the "institutions set up to protect and safeguard the public" and harmed "the integrity of the judicial process" regarding a material issue central to the adjudication of the case. *Id.*

**Three Fires:** In furtherance of their scheme to defraud the Court, the investigators, with the support of the joint prosecutors, coordinated and fabricated three "rock strike" fires against Howell after the Moonlight Fire began.  Two of these fires occurred before the Moonlight Fire, but received little attention, and no origin and cause report, until after Howell was targeted as a defendant, along with Sierra Pacific and the Landowners.  Of course, the most egregious facet of this fraud is Cal Fire's willingness to fabricate an origin and cause report against Eunice Howell and its subsequent willingness to collect more than $46,000 from her in order to support its claims against Sierra Pacific and the Landowners.[96]  The heartless quality of such an act reveals much of what this Court needs to know about their government actors behind the Moonlight Fire action, as does the federal prosecutor's willingness to rely upon these fires in their filings with this Court. [97]

**Destruction of White's Notes:** Having elected to undertake a joint investigation with Cal Fire, and having entered into a joint prosecution agreement with Cal Fire by which the United

---

[96] California Welfare and Institutions Code Section 15610.30 defines financial abuse of an elder, in part, as appropriating "real or personal property of an elder . . . for a wrongful use with the intent to defraud or both."

[97] While Ms. Howell initially sued Cal Fire for fraud, the Superior Court granted Cal Fire's demurrer on a statute of limitations argument.  Eunice Howell, however, pressed on under a different theory regarding the illegality of the WiFITER fund, which Cal Fire settled last week by agreeing to pay $225,000.

DOWNEY BRAND LLP

States contends that the prosecution team's communications with Joshua White are "attorney client privileged" (Exhibit 5 at 2-3), the prosecution team had an obligation to ensure that its lead investigator preserved all evidentiary materials. Spoliation on this fundamental aspect of the investigation unquestionably evidences "an unconscionable plan or scheme." Indeed, the destruction of evidence here concerning Joshua White's abandoned point of origin is far more egregious than the mere concealment of evidence, as was the case in *Pumphrey*, which nevertheless amounted to a fraud on the court in that matter. 63 F.3d at 1131.

**Expert Work:** Before the deposition of government expert Kelly Close, the prosecutors were aware that he had used an egregiously invalid slope input and, at best, they did nothing to cause him to correct it, despite the requirement that they do so under Rule 26(e). Thereafter, one of the lead prosecutors sat on his hands while Close testified at his deposition that he had nothing to correct in his original expert report. That the federal prosecutors allowed Close to conduct additional fire modeling experimentation using the correct slope input data for his "edification," while discarding, or allowing Close to discard, the output of those experiments makes the abuse that much worse. Addressing a similar issue, the Ninth Circuit found that the purposeful concealment of experimental results that controvert or call into question the reliability of produced results was sufficient to support a finding of fraud upon the court. *Pumphrey v. K.W. Thompson Tool Co.* 62 F.3d 1128, 1130-31 (9th Cir. 1995).[98]

Additionally, the conduct of the federal prosecutors with respect to the invalid new scene diagram prepared by their expert Christopher Curtis was not only a violation of their heightened ethics as representatives of our government, but it was also similar to the conduct at issue in *Pumphrey*, where defendant and its in-house counsel omitted critical data from what they disclosed. The prosecutors were aware that the investigators had omitted the most essential aspect of their work from the new scene diagram, and they knew that the same diagram had

---

[98] Admittedly, the conduct in *Pumphrey* is different in that the fraud ultimately played out before the Court during trial. But case law confirms that such conduct throughout discovery is not immune from this Court's determination as to whether there was a fraud upon the Court. *Levander*, 180 F.3d at 1120. In fact, the *Pumphrey* court confirmed that defendants' fraud upon the Court in that matter included its failure to disclose in discovery the existence of favorable evidence to the plaintiff, as well as other discovery violations. *Id.* at 1132.

dramatically changed the direction of the advancing fire indicators from the direction detailed in the Joint Report. At best, they did nothing. At worst, they encouraged the behavior in a manner that was similar to what Reynolds testified they said to him about the white flag – a "non-issue." Either way, the conduct violated their ethical duties and constituted a fraud on the court.

**B.** **The Settlement Agreement Is No Bar to Relief.**

Defendants anticipate the government will argue that this Court is powerless to address the fraud perpetrated upon it because the judgment in this action resulted from a settlement between the parties. While the existence of the underlying settlement makes the posture of this Rule 60(d) motion for fraud on the court somewhat unique, it by no means renders the motion improper in any way, and says very little about this Court's ability to exercise its own inherent powers under Rule 60(d)(3). *See e.g. Hazel-Atlas*, 322 U.S. 238 at 245, 248 (vacating prior judgments and denying relief to the party that committed a fraud on the court, despite existence of underlying settlement agreement).

Rule 60 unequivocally applies to *any* "judgment, order, or proceeding," and makes no distinction with respect to its application to final dispositions such as stipulated judgments, consent judgments or settlement orders. See Fed. R. Civ. Proc. 60(b), (d)(3). Indeed, nothing in Rule 60(d) limits the ability of a court to "set aside a judgment for fraud on the court" based simply on the nature of the ultimate disposition of the case. This makes perfect sense since Rule 60(d) entails the court using its "historic power of equity to set aside fraudulently begotten judgments," a power that is characterized "by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations." *Hazel-Atlas*, 322 U.S. 238 at 245, 248. Regardless of whether the action culminated in a settlement or otherwise, fraud upon the Court is still fraud upon the Court, and the Court's ability to use its "historic power of equity" is not diminished by whatever agreements the parties may reach, as nothing they do between themselves can alleviate what has been done to this Court.

Numerous courts have conducted a full analysis of the merits of a claim of fraud on the

89

DOWNEY BRAND LLP

1   court despite the fact that the original litigation ended in a stipulated judgment or settlement

2   agreement. *See e.g. Herring v. United States*, 424 F.3d 384 (3rd Cir. 2005) (analyzing the merits

3   of a Rule 60 action to set aside a 50-year-old settlement agreement on the grounds that the

4   settlement was procured by fraud on the court); *Broyhill Furniture Indus., Inc. v. Craftmaster*

5   *Furniture Corp.,* 12 F.3d 1080 (Fed. Cir. 1993) (analyzing the merits of a Rule 60 motion to

6   vacate a consent judgment for fraud on the court and ultimately denying the motion for a failure

7   to show the requisite egregious fraud); *In re Hunter*, 66 F.3d 1002 (9th Cir. 1995) (noting that if

8   the petitioner had alleged fraud on the court, instead of filing a Rule 60(b)(3) motion to vacate a

9   satisfaction of judgment which was untimely, the court could have asserted ancillary jurisdiction

10   because that doctrine is available to a court to "vindicate its authority, and effectuate its

11   decrees").[99]

12       To the extent there are cases that allude to a narrow and artificial constraint on claims of

13   fraud on the court in cases that culminate in such final dispositions as settlement or consent

14   judgments, these cases are wrongly decided. The Supreme Court and the lower federal courts

15   have numerous times recognized the need to protect the institutions of justice from such

16   egregious fraud. *See Hazel-Atlas* at 246. The "Courts cannot lack the power to defend their

17   integrity against unscrupulous marauders; if that were so, it would place at risk the very

18   fundament of the judicial system." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir. 1989)

19   ("All in all, we find it surpassingly difficult to conceive of a more appropriate use of a court's

20   inherent power than to protect the sanctity of the judicial process—to combat those who would

21   dare to practice unmitigated fraud upon the court itself. To deny the existence of such power

22   would, we think, foster the very impotency against which the *Hazel–Atlas* Court specifically

23   warned.") To place such an illogical and superficial limitation on such a robust inherent power of

24   ――――――――――

25   [99] The majority of cases that have addressed a Rule 60(d) challenge where there is an underlying settlement agreement have found that there was no fraud on the court under the specific facts of the case, and thus the judgment

26   need not be set aside. *See, e.g.*, *Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp.*, 12 F.3d 1080 (Fed. Cir. 1993) (refusing to vacate consent judgment when no fraudulent evidence submitted to district court). The cases

27   that have denied Rule 60(d) challenges due to insufficient evidence, or due to procedural issues unrelated to the form of the final disposition, in no way speak to the propriety of granting a Rule 60(d) motion when the case involved a

28   settlement agreement.

the court, which is presently confronting such a robust fraud upon it, would do justice a

disservice.  Each case should rest on the merits of the allegations of fraud, and if a fraud on the

court is found by clear and convincing evidence, the integrity of our judicial system demands

relief. [100]

In the present case, the Court relied on the government's egregiously fraudulent

representations in ruling on motions for summary judgment and motions in limine, and those

rulings influenced Defendants' decision to settle the case rather than proceed to trial.  Because the

fraud on the Court here was so pervasive, and encompassed many of the most critical issues in the

case, the fraud permeated the Court's entry of judgment, threatening the sanctity of the judicial

process.  It is therefore appropriate to take the broad and equitable view that the judgment entered

here, as the result of the government's fraudulent conduct, is an affront to the Court and to all

who appeared before it in this matter as Defendants.

## C.    The Fraud on the Court Warrants Dismissal of the Entire Action.

The Supreme Court has held that dismissal of the plaintiff's case is appropriate, and

indeed necessary, when the plaintiff commits fraud upon the court.  *See Hazel-Atlas*, 322 U.S. at

250 (stating that "[t]he total effect of all this fraud [by plaintiff] . . . calls for nothing less than a

complete denial of relief"); *see also Chambers*, 501 U.S. at 44-45 ("[O]utright dismissal of a

lawsuit . . . is a particularly severe sanction, yet it is within the court's discretion.").  The Ninth

Circuit has also stated that "courts have inherent power to dismiss an action when a party has

willfully deceived the court and engaged in conduct utterly inconsistent with the orderly

---

[100] A number of courts have taken a very nuanced approach to examining fraud on the court, and have looked at whether the actions of officers of the court throughout litigation affected the course of the case to such an extent that settlement should never have been entered, or would not have been entered had the court known of the fraud upon it. For example, in *Southerland v. Irons*, the Sixth Circuit upheld a district court's decision to vacate a consent judgment obtained by fraud on the court where the defendant's attorney "through his fraudulent misrepresentations induced the court to approve a consent judgment…" *Southerland b. Oakland Cnty.*, 77 F.R.D. 727, 731 (E.D. Mich. 1978), aff'd sub nom *Southerland v. Irons*, 628 F.2d 978 (6th Cir. 1980).  The district court's order stated: "While [a lawyer] should represent his client with singular loyalty that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary, his loyalty to the court, as an officer thereof, demands integrity and honest dealings with the court.  And when he departs from that standard in the conduct of a case he perpetrated a fraud upon the court." *Id.* at 733 (quoting Moore's Federal Practice 513 (1975)).  The Sixth Circuit thus found the district court did not abuse its discretion in vacating the judgment which resulted from the settlement agreement. *Southerland v. Irons*, 628 F.2d 978, 980 (6th Cir. 1980).

DOWNEY BRAND LLP

administration of justice." *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1989) (dismissing district court's dismissal of a complaint as a sanction for plaintiff's numerous knowingly false statements and failure to comply with court's discovery orders). Similarly, other circuit courts have observed that "a federal district judge can order dismissal or default where a litigant has stooped to the level of fraud on the court." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir. 1989) (citations omitted).

As this Court has no doubt seen from this pleading, the Moonlight Fire action, and this motion under Rule 60(d)(3) presents a unique set of circumstances which cry out for this Court's review and action. Judge Nichols' orders and former AUSAs Wright and Overby's revelations only serve to heighten the need for a full review and the termination of this matter.

## VII. CONCLUSION

As former Moonlight Fire prosecutor Robert Wright essentially states in his declaration, and as former prosecutor Overby felt compelled to confirm before leaving this case, a federal prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *United States v. Maloney*, 755 F.3d 1044, 1046 (9th Cir. 2014) (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). "More succinctly: 'The prosecutor's job isn't just to win, but to win fairly, staying well within the rules.'" *Id.* (quoting *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir.1993)).

Here, instead, the federal prosecutors – shielded by the high level of trust our system of justice naturally places in them as representatives of the United States – pursued their goal at the expense of justice. Instead of serving as gatekeepers, these Assistant United States Attorneys aided and abetted the very type of conduct they were charged with preventing, an approach which ultimately led to the broad tapestry of fraud now presented in this motion. Today, the issue is no longer preparing an accurate origin and cause report or an honest prosecution, as there is no accurate record of what might have been discovered regarding the origin of the fire that day. The

issue is whether the foundation of the prosecution's case was created with intolerable falsehoods constituting a fraud upon the Court. Most emphatically, the answer, unfortunately, is that they did.

Defendants fully appreciate the burden this motion places upon the Court. But in light of what they now know, and as officers of the Court, the Defendants and their counsel see this motion as a moral imperative. Former prosecutor Wright, the original signatory to the Moonlight Action, does as well, stating in his declaration, "I concluded it was my ethical obligation to do what I could within the contours of my ethical obligations to take corrective action, particularly since I had set the federal civil action in motion by preparing and filing the Complaint." (Wright Decl. ¶ 34.)

Perhaps this Court will see fit to appoint a special master, a solution which some courts have turned to when assessing whether there has been a fraud upon the Court. Regardless, the profound misconduct of these federal prosecutors and the investigators has caused grave injury to our system of justice. Such misconduct, if not addressed by this Court, will only create an intolerable sense of invulnerability in those responsible and likely to perpetuate and accelerate additional frauds upon the Court, doing further damage to our entire judicial system. This Court has the power to act when our legal process is so thoroughly corrupted, and it is difficult to imagine a case more deserving of a decision by this Court to exercise the full measure of its power. Defendants therefore respectfully request that this Court find that an egregious fraud has been perpetrated upon the Court and the judicial system by the federal prosecution of the Moonlight Fire matter, that it terminate this matter, and that it vacate the settlement and award any other relief the Court believes is just and proper.

DATED: October 9, 2014                    DOWNEY BRAND LLP


By:＿＿＿＿＿＿＿＿＿＿*/s/  William R. Warne*＿＿＿＿＿＿＿＿
                                WILLIAM R. WARNE
                        Attorney for Defendant/Cross-Defendant
                        SIERRA PACIFIC INDUSTRIES

DATED: October 9, 2014          MATHENY SEARS LINKERT & JAIME


                                By: _/s/ Richard Linkert as auth'd on 10/8/14_
                                        RICHARD LINKERT
                                Attorneys For Defendants W.M. BEATY &
                                ASSOCIATES, INC. AND ANN MCKEEVER
                                HATCH, as Trustee of the Hatch 1987 Revocable
                                            Trust, et al.

DATED: October 9, 2014          RUSHFORD & BONOTTO, LLP


                                By: _/s/ Phillip Bonotto (as authorized on 10/8/14_
                                        PHILLIP BONOTTO
                                Attorneys for Defendant, EUNICE E. HOWELL,
                                    INDIVIDUALLY and d/b/a HOWELL'S
                                        FOREST HARVESTING