# EXHIBIT 6

# EXHIBIT 6

## TO DECLARATION OF WILLIAM WARNE IN SUPPORT OF RULE 60(d) MOTION FOR FRAUD UPON THE COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
--oOo--

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>        Plaintiff,<br>vs.<br>SIERRA PACIFIC INDUSTRIES,<br>ET AL.,<br>        Defendants.<br>_____ | No. 2:09-cv-02445-<br>JAM-EFG |

SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLUMAS
--oOo--

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF<br>FORESTRY AND FIRE<br>PROTECTION,<br>        Plaintiff,<br>vs.<br>EUNICE HOWELL, d.b.a.<br>HOWELL'S FOREST HARVESTING<br>COMPANY, et al.,<br>        Defendants.<br>_____<br><br>AND RELATED CROSS-ACTIONS.<br>_____ | No. CV09-00205 |

**CERTIFIED COPY**

VIDEOTAPED DEPOSITION OF

DAVID W. REYNOLDS

Volume 1 (Pages 1 - 327)

Tuesday, March 22, 2011


NOTICING ATTORNEY:  William R. Warne, Esq.



REPORTED BY:   LEIGH ANN OROZCO, CSR NO. 7607




207 W. Oak Street   Lodi, CA 95240
Tel  209.333.8485      Fax  209.333.1133      Toll Free 800.682.2323
www.marcusdepo.com
*Court Reporting You Can Count On.*

1    as the hourly rate that you agreed to with the State

2    of California?

3    A.       Yes.

4    Q.       Okay.  Can you tell me how many hours

09:57:51  5    roughly you have worked as a consultant with the

6    State of California since your retention in August

7    of 2010?

8              MS. WINSOR:  I instruct the witness not to

9    answer on the basis of work product.

09:58:03  10   Q.       BY MR. WARNE:  You indicated that you've had

11   conversations with -- you've had conversations with

12   Chief White in your capacity as a consultant for the

13   State of California, correct?

14             MS. WINSOR:  I instruct the witness not to

09:58:12  15   answer on the basis of work product.

16   Q.       BY MR. WARNE:  Have you had conversations

17   with Diane Welton in your capacity as a consultant

18   for the State of California?

19             MS. WINSOR:  I instruct the witness not to

09:58:22  20   answer on the basis of work product.

21             MR. OVERBY:  And in addition, any of that

22   would have been at the direction of counsel for the

23   United States and we object as to attorney-client

24   privilege.

09:58:29  25             MS. WINSOR:  And the joint prosecution

1    privilege.

2    Q.       BY MR. WARNE:  Can you tell me when it was,

3    sir, that you first started consulting -- in your

4    capacity as a retained consultant for the State of

09:58:38  5    California -- that is a contract that still exists

6    today, sir?

7    A.       Yes.

8    Q.       Okay.  In your capacity as a retained

9    consultant with the State of California, can you tell

09:58:49  10   me the first time you spoke with Josh White?

11           MS. WINSOR:  I instruct the witness not to

12   answer regarding any conversations that he has had

13   with Chief White.  Again, we haven't even established

14   that he has.

09:59:02  15           You're not entitled to know what he has done

16   for the Office of the Attorney General.  He is a

17   consulting expert and he is doing consulting work and

18   that is not something you are entitled to explore.

19   Those services are being rendered in an advisory

09:59:18  20   capacity.

21           We have just briefed this to the Court.

22   There is the National Steel Products case.  There's

23   the Scotsman Manufacturing case.  Those are advisory

24   services.  They are completely separate from his

09:59:29  25   percipient knowledge of this fire and you're not

```
 1    turned around on you if you are successful.

 2              I completely disagree with your analysis.

 3    There is case law that has been briefed to the judge

 4    in the state court case that says otherwise.  I have

 5    just cited you to two of the cases.  I think you have

 6    been overstating and misrepresenting the law

 7    regarding communications with experts since the

 8    beginning of these deposition proceedings and we

 9    should just move forward.

10    Q.        BY MR. WARNE:  Mr. Reynolds, did you -- in

11    your capacity as a consultant for the State of

12    California, did you have any conversations with any

13    of the other investigators that worked with respect

14    to the Moonlight fire investigation?  And that would

15    be, in my mind, Dieter Schmitt and Mr. Gonzalez.

16              MS. WINSOR:  I instruct the witness not to

17    answer on the basis of attorney work product and the

18    joint prosecution privilege.

19              MR. WARNE:  Okay.

20              MR. OVERBY:  And to the extent that any of

21    those involved the direction or presence of counsel

22    from the United States, object on the grounds of

23    attorney-client privilege as well.

24              MR. WARNE:  And that assertion, Eric, is a

25    little different because he is not your retained
```

4

1  consultant, correct?

2          MR. OVERBY:  He is not retained consultant

3  but he is a employee or former employee of the United

4  States.  And our position is that we are entitled to

10:04:29  5  attorney-client privilege with our employees,

6  including former employees.

7          MR. WARNE:  And let me lay a foundation --

8          MR. OVERBY:  Sure.

9          MR. WARNE:  -- With respect to that.

1C:04:38  10  Q.      Sir, you left the employ of the US Forest

11  Service in September of 2008, correct?

12  A.      Retired from, yes.

13  Q.      Right.  And now focusing on your status as

14  an ex -- and I'm not focusing on the state case right

10:04:51  15  now, since I'm taking you simultaneously at least for

16  2-1/2 days and we'll continue with you on the state

17  side of things.  But with respect to your work with

18  the US Forest Service, have you had discussions after

19  you left the US Forest Service's employ with Chief

10:05:09  20  White regarding the Moonlight fire investigation?

21          MS. WINSOR:  I instruct the witness not to

22  answer on the basis of the attorney work product

23  doctrine and joint prosecution privilege.

24          MR. OVERBY:  My objection is the same as

10:05:24  25  before.

1      MR. WARNE:  And you're instructing this

2  witness not to answer as well?

3      MR. OVERBY:  To the extent that any

4  conversations with Mr. White took place at the

10:05:30   5  direction of or in the presence of counsel for the

6  United States, I instruct you not to answer.

7      MR. WARNE:  And just so I've got a clear

8  record, Ms. Winsor, are you instructing this witness

9  not to answer any questions that pertain to any

10:05:42  10  discussions he's had with Josh White of any kind?

11      MS. WINSOR:  Well, here is the problem,

12  Bill.  This witness is not going to know necessarily

13  who has produced Chief White, assuming -- again, we

14  have not had a question answered that establishes he

10:05:55  15  had such a conversation.  But assuming that he did,

16  he is not going to know who produced Chief White for

17  him to talk to, if it was a joint prosecution

18  privileged, protected meeting.  So --

19      MR. WARNE:  Well, I think --

10:06:07  20      MS. WINSOR:  -- that is the nub of the

21  problem from my perspective.

22      MR. WARNE:  I think defense counsels'

23  position is going to be that it's a problem, but it's

24  not our problem.  I think it's the state's problem

10:06:16  25  and the US Forest Service's problem.

1          Just so I have a clear record, you have

2    instructed this witness not to answer any questions

3    that I've asked with respect to any conversations

4    that he may or may not have had with Mr. White,

10:06:25   5    correct?

6          MS. WINSOR:  With the exception that I will

7    allow you to ask him what he did to prepare the fire

8    scene diagram that was Exhibit 352 -- there was two

9    of them, 352 and 353 to the deposition of Chief

10    White.

11          MR. WARNE:  Just so we're clear on the

12    record for Judge Kauffman's purposes, are you

13    instructing this witness not to answer any questions

14    relating to any conversations he may have had with

10:06:53   15    Chief White at a time which preceded your retention

16    of him as a consultant in August of 2010?

17          MS. WINSOR:  Absolutely not.

18          MR. WARNE:  Okay.

19          MS. WINSOR:  Okay.  And just recognize that

10:07:02   20    you are not entitled to know whether or not he had a

21    conversation with Chief White if it was at the

22    direction of counsel.  And he would not have had a

23    reason -- it is our position that he would not have

24    had a reason to have such a conversation with Chief

10:07:18   25    white, assuming it happened, unless it was either at

1  the direction of the United States Attorney or the

2  office of the California Attorney General.

3         I think the better question for you to ask

4  is have you ever had a conversation with Chief White

10:07:30  5  that wasn't at the direction of counsel after August

6  of 2009.  I will allow him to answer that question.

7  If he had, you are entitled to ask him what he talked

8  about.

9         MR. WARNE:  Look, the point I'm trying to

10:07:42  10  make is I want to make sure what your instructions

11  are with respect to my seeking information from this

12  witness prior to your retention of him as a

13  consultant -- you or CDF's retention -- hang on -- of

14  him as consultant prior -- you know, you retained him

10:07:58  15  as a consultant in August of 2010.  I'm going to ask

16  this witness questions as to whether or not he spoke

17  to Chief White prior to August of 2010.

18  Q.       Sir, prior to you -- the point in time where

19  you were retained by the CDF or by the AG's office as

10:08:15  20  a consultant, did you have conversations with Chief

21  White regarding the Moonlight fire investigation?

22         MR. OVERBY:  And we object because any

23  conversations that he has had during his employment

24  and post-employment with the Forest Service are

10:08:30  25  protected by attorney-client privilege of the United

1    States.

2           MS. WINSOR:  And I object to the extent that

3    if there was a privileged communication that took

4    place, it would also be protected by the joint

10:08:39  5    prosecution agreement.

6           MR. LINKERT:  Let me state my position on

7    the record.  Number one, I don't believe, Ms. Winsor,

8    that you have the ability to instruct this witness

9    not to answer.  He is an independent witness.  You're

10:08:52  10    not representing him.  So I think it's his decision,

11    together with his counsel for the US Forest Service.

12           And secondly, I think we have the right to

13    know whether or not he spoke with Chief White in

14    between the sessions of Chief White's deposition in

10:09:07  15    November and February because my view is that is

16    ongoing testimony under oath and it would be improper

17    if such kind of meetings took place.

18           So, those are some foundational problems I

19    have.

10:09:21  20           MS. WINSOR:  Okay.  And for the record, my

21    position is that this is a percipient witness, has

22    percipient knowledge.  You are certainly entitled to

23    ask him anything that he discussed with Chief White

24    that was not at the direction of counsel at any point

10:09:35  25    from the fire through today.

                    1          What I have a problem with is that if he
                    2   communicated with anyone at the direction of counsel
                    3   after he was retained in August of 2010 -- and I
                    4   would have to look at the document but I think that's
      10:09:49     5   about right -- that it was at the direction of
                    6   counsel.  So he would have had no such communications
                    7   that I'm aware of with anyone that weren't at the
                    8   direction of counsel.
                    9          Second is that to the extent there was a
      10:10:02    10   communication that was attorney-client protected
                   11   prior to that, it's my obligation under the direct
                   12   prosecution agreement to protect that.  And I do have
                   13   the right to instruct the witness not to answer to
                   14   protect my work product because I'm the holder of
      10:10:17    15   that privilege.
                   16          MR. WARNE:  The problem with that -- and
                   17   again, I just -- it's killing us to spend this kind
                   18   of time on these issues.  But we have to so that --
                   19   and I'm actually starting to wonder if we shouldn't
      10:10:31    20   just split the state deposition from the federal
                   21   deposition because these things -- at this point I
                   22   would like to have a clean record as it relates to my
                   23   taking of this witness in his capacity as a federal
                   24   witness and a clean record of this person's testimony
      10:10:44    25   as a state witness in light of what appears to be,

1    you know, all this cross-over.  I'm just not sure how

2    these asserted objections and privileges that we

3    think are inappropriate are going to play out.  But

4    let's see how that plays out in the next few minutes.

10:10:59  5         You just told me that I have a right to ask

6    this witness questions relating to any conversations

7    he had with Chief White that was not at the direction

8    of counsel.  But this witness was just instructed not

9    to answer a simple question as to whether or not he

10:11:15  10   spoke with Chief White prior to his retention by the

11   CDF in August of 2010.

12        Is it still your position?

13        MR. OVERBY:  Correct.  We've got two

14   separate issues.  We're talking about the United

10:11:27  15   States protecting the attorney-client privilege with

16   respect to this witness.  Separate issue, obviously,

17   that Ms. Winsor is representing.  So I'm addressing

18   the attorney-client privilege.

19        MS. WINSOR:  And to the extent that there is

10:11:36  20   a privilege, it's joint prosecution protected.

21        MR. WARNE:  So you've got this written --

22   you've got him completely wrapped up.  He can't

23   answer any questions that I ask with respect to

24   whether or not he's talked to Chief White on any

10:11:49  25   front.  Is that what your position is?

1          MS. WINSOR:  Absolutely not correct.  I'll

2     say it one more time slow.

3          You can ask this witness if he talked to

4     Chief White at any time between the fire and today if

10:12:01  5     it was not at the direction of counsel.

6          MR. WARNE:  That's not the position that

7     Eric just took.  I just asked this witness if he's

8     had any discussions with Chief White prior to August

9     of 2010 and this witness was told not to answer the

10:12:17  10     question.

11          MR. OVERBY:  Well, he was instructed -- and

12     if I wasn't clear, let me clarify.

13          To the extent that your question is asking

14     for any conversations that he had with Chief White

10:12:26  15     that either involve counsel or were at the direction

16     of counsel, then I would instruct him not to answer.

17     If your question goes beyond that, then I'm not

18     instructing the witness not to answer.

19          MR. WARNE:  I appreciate that, Eric.  I mean

10:12:37  20     the question was pretty clear.  And I'm going to ask

21     it again so we've got a record.

22     Q.     Mr. Reynolds, have you had any conversations

23     with Chief White prior to August of 2010 when you

24     were retained by the CDF as a consultant?

10:12:51  25     A.     No.

1    Q.        And are you answering that question in the

2    context of your attorney's instructions?

3              I'm not asking you --

4    A.        No.

10:13:01    5    Q.        -- to even think about it other than just

6    give me an honest answer.

7              Have you spoken -- you left the federal --

8    the federal government's employ in September of 2008,

9    correct?

10:13:11    10   A.        Correct.

11   Q.        Between September of 2008 and August

12   of 2010, did you speak with Chief White at any point

13   in time?

14             MR. OVERBY:  Outside of the direction of

10:13:23    15   counsel or presence of counsel.

16             THE WITNESS:  Okay.  Well, yes, and now I'm

17   going back further.  You had me up in August.

18   Q.        BY MR. WARNE:  Sir, just -- I apologize.  I

19   know it's been confusing here this morning.  I

10:13:33    20   apologize.

21             Between the point of time when you left the

22   federal government's employ -- and that was September

23   of 2008, correct?

24   A.        Okay.  From then.

10:13:40    25   Q.        Are you with me?

```
 1   A.       From then.

 2   Q.       Yes, sir.

 3   A.       Okay.

 4   Q.       Until almost two years later when you were

 5   retained by the CDF as their consultant.  That was

 6   August of 2010?

 7   A.       (Nods head.)

 8   Q.       In that two-year period, did you have

 9   conversations with Chief White regarding the

10   Moonlight fire investigation?

11   A.       No.

12   Q.       Okay.  And you're saying no at any point in

13   time, correct?

14   A.       At any point.

15   Q.       Okay.  And you're not saying that with

16   respect to anything that --

17   A.       No.

18   Q.       -- Ms. -- your attorney has said, correct?

19   A.       No.  Because it was -- there was nothing

20   that ever happened during that time period.

21   Q.       Okay.

22   A.       I was off in another world.

23   Q.       Okay.  And did you have any conversations

24   with Diane Welton regarding the Moonlight fire

25   investigation from September of 2008 when you left
```

14

```
 1   the US Forest Service's office until August of 2010
 2   when you were employed as a consultant by the State
 3   of California?
 4   A.      No.
 5           MR. OVERBY:  And again --
 6           MR. WARNE:  Go ahead.
 7           MR. OVERBY:  -- the direction is to the
 8   extent that any such meetings took place at the
 9   direction of or presence of counsel for the United
10   States --
11           THE WITNESS:  Right.
12           MR. OVERBY:  -- I'd instruct you to answer
13   it not -- not to answer in terms of the privilege
14   but --
15           MR. WARNE:  I appreciate that, Eric.  But
16   not answering is a bit different than saying no.  I
17   just want to make sure that when he said no --
18   because it would save us a lot of time and brain
19   damage -- when he said no to the question did you
20   talk with Chief White between the moment in time when
21   you left the U.S. Attorney's office's employment and
22   the moment in time when you were retained as a
23   consultant by the CDF -- help me with this, if you
24   can -- did you speak to Chief White, regardless of
25   whether or not it was directed by counsel, and if his
```

 1   answer is "no," that's helpful.  And if it's "I can't

 2   answer," then that means that he is listening to your

 3   objections.

 4          MR. OVERBY:  I think he's answered no to

10:15:25   5   that but then you moved on to Ms. Welton.

 6          MR. WARNE:  I appreciate that.  You

 7   understand the distinction I'm making, right?

 8          MR. OVERBY:  Uh-huh.

 9          MR. WARNE:  Because we don't want to have to

10:15:32  10   file a motion relating to whether or not he actually

11   spoke with Chief White from September of 2008 through

12   August of 2010 based on some confusion that he is

13   actually only answering the question to the extent he

14   wasn't directed by counsel.  Fair?

10:15:43  15          MR. OVERBY:  Uh-huh.

16          MR. WARNE:  So I think this witness has

17   answered the question without regard to that.  And I

18   think I just want to confirm.

19   Q.      Without regard to whether or not you did so

10:15:51  20   at the instruction of counsel and/or on your own

21   initiative, is it your testimony, sir, that you did

22   not speak with Chief White between September of 2008

23   when you left the US Forest Service until August

24   of 2010 when you were retained by Ms. Winsor's

10:16:07  25   office?

1    A.        Yeah, I -- the way you asked, I'll have

2    to -- is that yes or no.  But I did not.

3    Q.        Thank you.

4              MR. WARNE:  Okay.  And now, just so we are

10:16:17  5  clear, you're instructing this witness not to

6    answer -- you are instructing this witness not to

7    answer any questions that may be similar from the

8    August 2008 period forward -- 2010 period forward,

9    correct?

10:16:29  10           MS. WINSOR:  With the exception that you are

11   entitled to explore with him what he did to prepare

12   the fire scene diagram.  There are two diagrams that

13   have been produced as Exhibits 352 and 353 to the

14   deposition of Chief White.  I did not even have to

10:16:44  15  disclose that to you but I'm telling you right now

16   that's the one thing you get to talk to him about

17   because I have waived work product as to those two

18   diagrams and you can ask him what he did to help

19   prepare them.

10:16:56  20           MR. WARNE:  Right.  So just to be clear,

21   what you're saying is aside from those two documents,

22   you're not allowing me to explore this witness'

23   recollection with respect to his conversations with

24   Josh White that he has had since he was retained by

10:17:08  25  you as a consultant.

```
 1              MS. WINSOR:  Your question assumes that he
 2     has had such conversations and my position is you're
 3     not entitled to know whether he has or has not had
 4     such conversations.  So my instruction is with the
 5     exception of the fire scene diagram where I will
 6     stipulate that he talked to Josh White to help
 7     prepare it, you are not entitled to know what he has
 8     done or who he has talked to at the direction of the
 9     office of the California Attorney General, period.
10     Q.        BY MR. WARNE:  Mr. Reynolds, have you been
11     directed to communicate with Josh White --
12              MR. OVERBY:  Object.
13     Q.        BY MR. WARNE:  -- by -- hang on.
14              MR. OVERBY:  Sure.
15     Q.        BY MR. WARNE:  Have you been directed to
16     communicate with Josh White by the US Forest
17     Service's counsel?
18     A.        I don't understand that question.
19     Q.        Has the US Attorney's office asked you to
20     communicate with Josh White?
21              MR. OVERBY:  Objection --
22              MS. WINSOR:  Object on the basis of the
23     joint prosecution privilege.
24              MR. OVERBY:  I object on the grounds of the
25     United States attorney-client privilege and work
```

10:17:18
10:17:30
10:17:38
10:17:50
10:17:58

1    something but...

2    Q.        Gun fire 2, is that -- do you have some

3    recollection that that was a large fire?

4    A.        No.

11:07:32   5    Q.        Okay.  Do you know a gentleman named Al

6    Carlson?

7    A.        Alan Carlson?

8    Q.        Yes.

9    A.        Yes.

11:07:39   10    Q.        How long have you known him?

11    A.        I met him at the FI-310.  He was one of the

12    instructors.

13    Q.        And that was roughly 2006?

14    A.        Correct.

11:07:54   15    Q.        And that was the first time you met him?

16    A.        Yes.

17    Q.        Have you had any discussions with Alan

18    Carlson since 2006?

19          MS. WINSOR:   I instruct the witness not to

11:08:03   20    answer to the extent any of those discussions, if

21    they occurred at the direction of the office of the

22    California Attorney General, with the exception that

23    we had such a discussion in the context of the fire

24    scene diagram, you can talk about it.

11:08:2?   25          MR. WARNE:   Again, is your instruction a

19

1    time-based instruction?  Are you saying from

2    August of 2010 onward you're instructing him not to

3    answer?  Or at any point in time after 2006 you're

4    instructing him not to answer?

11:08:34   5          MS. WINSOR:  Again, I need to go out and

6    pull out the document because I didn't look at it

7    before we started this deposition.  I think August

8    2010 is approximately correct time frame for the

9    context that we are talking about.

11:08:50   10         Yes.  After -- for the purpose of this

11   deposition we'll do August of 2010 forward.

12         MR. WARNE:  Well, I'll make it easier for

13   you.  Since you retained him as a consultant -- and

14   we think it's roughly August of 2010.  That's not the

11:09:05   15   point.  My point is are you instructing the witness

16   not to answer any question relating to his contact

17   with Alan Carlson from 2006 onward, aside from the

18   state fire scene diagram issues?

19         MS. WINSOR:  Well, you know that's not my

11:09:15   20   position.  My position is to any contact by this

21   witness is that if he has had a -- my position is

22   this.  You are not entitled to know who he has talked

23   to as a consultant for the office of the California

24   Attorney General, which was the time frame

11:09:32   25   August 2010 forward.

```
 1              I think the way you are packaging the
 2     question is the problem.  You can say outside the
 3     direction of the Office of the Attorney General or
 4     prior to August of 2010.  I have put a lengthy
 5     explanation on my position regarding --
 6              MR. WARNE:  That's fine.  Let's not waste
 7     time on the record.  I understand what your position
 8     is.  Let me ask the question this way.
 9              We don't need the speeches.  I just think
10     we're killing so much time.
11     Q.       Sir, prior to when you were retained by the
12     CDF as a consultant in roughly August of 2010, did
13     you have any discussions with Alan Carlson after you
14     met him for the first time in that FI-310 course?
15              MR. OVERBY:  And object to the extent that
16     it calls --
17              THE VIDEOGRAPHER:  I'm sorry to interrupt.
18     Mr. Overby, could I have you clip the mic on?
19              MR. OVERBY:  I'm sorry.
20              Objection to the extent that this calls for
21     you to relate anything where attorneys for the United
22     States were present or you did it at the direction of
23     the attorneys for the United States.  Outside of that
24     context, you are free to answer.
25              THE WITNESS:  There was no contact.
```

1    Q.        BY MR. WARNE:  Well, I'm not sure if you're

2    saying there were no contact other than what your

3    attorney just talked to you about or there was no

4    contact whatsoever.

11:10:42   5    A.        No contact whatsoever.

6    Q.        And has there been any contact since you

7    have been retained by the CDF?

8              MS. WINSOR:  And again --

9    Q.        BY MR. WARNE:  Don't tell me the nature of

11:10:50   10   the contact.  I don't want to know what you heard or

11   what you talked to about.  But have you spoken to

12   Alan Carlson since you were retained by the CDF in

13   August of 2010 as their consultant?

14             MS. WINSOR:  I object to the form of the

11:11:02   15   question.  The question as framed is inappropriate.

16             You need to ask this witness if he has ever

17   had any contact with Alan Carlson that was not at the

18   direction of the Office of the Attorney General after

19   August of 2010.  I have no problem with it as framed

11:11:15   20   that way.  Other than that, you have no right to know

21   whether or not he did have contact with Chief Carlson

22   at our direction, period.

23             MR. WARNE:  You're instructing the witness

24   not to answer?

11:11:26   25             MS. WINSOR:  As framed, yes.

1    Q.        BY MR. WARNE:   Okay.  Have you had contact

2    with Alan Carlson since being retained by the CDF at

3    the direction of the CDF or its attorneys since

4    August of 2010?

5    11:11:38        MS. WINSOR:   I instruct the witness not to

6    answer except to the extent that if he had such

7    contact in the context of preparing the fire scene

8    diagram that has been marked as Exhibit 352 and 353

9    to Chief White's deposition, you can ask him that.

10   11:11:51        MR. OVERBY:   And the same instruction

11   regarding anything that was done with the presence of

12   the United States counsel or at the direction of the

13   United States counsel.  You can answer outside of

14   that.

15   11:12:02        MR. WARNE:   And is there a temporal quality

16   to your objection, Eric?  Are you saying that at any

17   point in time after he left the employ of the US

18   Forest Service you're instructing him not to answer

19   questions?

20   11:12:11        MR. OVERBY:   With respect to this fire with

21   respect to anything that counsel was present for or

22   directed him to, yes.  If he talked to Alan Carlson

23   about some other matter, I have no objection to that

24   whatsoever.

25   11:12:24        MR. WARNE:   Thank you.

1    Q.       Did you have any contact with Alan Carlson

2    that was not at the direction of the US Forest

3    Service's lawyers and/or the direction of the CDF --

4    the CDF's lawyers since 2006?

11:12:40  5    A.       No.

6    Q.       Okay.  Did you have any conversations with

7    Alan Carlson during your investigation of the

8    Moonlight fire?

9         MR. OVERBY:  Same objection.

11:12:49 10         THE WITNESS:  No.

11         MR. WARNE:  And so I understand your

12    objection, what you're saying, Eric, is to the extent

13    he was investigating the Moonlight fire from

14    September 3rd, 2007 until September 5th, 2007, you

11:12:02 15    are instructing him not to answer if in fact those

16    discussions were directed by counsel?

17         MR. OVERBY:  No.

18         MR. WARNE:  Okay.

19         MR. OVERBY:  Let me clarify.  To the extent

11:13:11 20    that he had discussions with Alan Carlson with the

21    United States Attorney's office direction or

22    presence, which wasn't anywhere close to September

23    of 2007, that's the only thing I'm limiting it to.

24    If he talked to Alan Carlson in September of 2007, in

11:13:27 25    October, November, December, whenever, I'm not

```
 1                    CERTIFICATE OF REPORTER

 2           I, LEIGH ANN OROZCO, a Certified Shorthand

 3      Reporter, hereby certify that the witness in the

 4      foregoing deposition was by me duly sworn to tell the

 5      truth, the whole truth and nothing but the truth in

 6      the within-entitled cause;

 7           That said deposition was taken down in

 8      shorthand by me, a disinterested person, at the time

 9      and place therein stated, and that the testimony of

10      the said witness was thereafter reduced to

11      typewriting, by computer, under my direction and

12      supervision;

13           That before completion of the deposition,

14      review of the transcript was requested.  If

15      requested, any changes made by the deponent (and

16      provided to the reporter) during the period allowed

17      are appended hereto.

18           I further certify that I am not of counsel or

19      attorney for either or any of the parties to the said

20      deposition, nor in any way interested in the event of

21      this cause, and that I am not related to any of the

22      parties thereto.

23      DATED: 3/27/11

24      _____

25                    LEIGH ANN OROZCO, RPR, CSR 7607
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
--oOo--

UNITED STATES OF AMERICA,       )
     Plaintiff,            )
vs.                             )   No. 2:09-cv-02445-
SIERRA PACIFIC INDUSTRIES,      )      JAM-EFG
ET AL.,                         )
     Defendants.           )
_____     )

SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLUMAS
--oOo--

CALIFORNIA DEPARTMENT OF        )
FORESTRY AND FIRE               )
PROTECTION,                     )
     Plaintiff,            )
vs.                             )   No. CV09-00205
EUNICE HOWELL, d.b.a.           )
HOWELL'S FOREST HARVESTING      )
COMPANY, et al.,                )
     Defendants.           )
_____     )
                                )
AND RELATED CROSS-ACTIONS.      )
_____     )

VIDEOTAPED DEPOSITION OF

DAVID W. REYNOLDS

Volume 2 (Pages 328 - 650)

Wednesday, March 23, 2011

NOTICING ATTORNEY:  William R. Warne, Esq.

REPORTED BY:   LEIGH ANN OROZCO, CSR NO. 7607



27

1                    INDEX OF EXHIBITS (Continued)

2

       Defendants'
3      Exhibit              Description                    Page
       Ex 421/F-262    Plumas National Forest
4                      fire Origin
                       Investigation Report,
5                      Bates US071938-071939;
                       2 pages                             536
6
       Ex 422/F-263    Report of Investigation,
7                      Rich fire; 9 pages                  588

8      Ex 423/F-264    Wildland Fire
                       Investigation Sketch/
9                      Diagram, Bates US000058;
                       1 page                              608
10
       Ex 424/F-265    Various documents, Bates
11                     US082520-082536;
                       16 pages                            626
12
       Ex 425/F-266    SKIPPED
13

14

15

16

17              INSTRUCTION TO WITNESS NOT TO ANSWER

18                          PAGE - LINE

19                          447      23
                            449       9
20                          450      13

21

22
                            --o0o--
23

24

25

1    A.        And the magnet is down in that lower cup.

2    And when you pull that up, the magnet goes to the

3    upper cup and then releases whatever is in it on the

4    bottom.

11:39:22  5    Q.        Because there is a separator between the

6    magnet and the contents of what it pulled up?

7    A.        Right.  It's all plastic encased there.

8              MR. WARNE:  Can we just mark that?

9              THE REPORTER:  406/F-247.

11:39:38  10   Q.        BY MR. WARNE:  And when you say Josh White

11   used the magnet around some rocks, do you have a

12   memory as to which rocks he used the magnet around?

13   A.        Just that area between the V to the --

14   looking at it to the right side of the V.  What do we

11:40:01  15   call that?  Not the skid road but the other little

16   piece.

17   Q.        The spur?

18   A.        There you go.

19   Q.        Have you talked to Josh White about the

11:40:09  20   testimony that he gave in November with respect to

21   the way in which he used the magnet?

22   A.        No.

23   Q.        Have you talked to Josh White at any point

24   in time after reading his transcript?

11:40:19  25             MS. WINSOR:  I instruct the witness not to

1    answer on the basis of attorney work product to the

2    extent he had such a conversation.

3         Again, I think we have already established

4    through the questioning yesterday that any -- he

11:40:34   5    didn't have a conversation with -- or whether he did

6    or didn't would have been at the direction of counsel

7    after August of 2010.  So I object to the question on

8    the basis of work product, joint prosecution

9    privilege, attorney-client privilege.

11:40:48   10         MR. WARNE:  And you're instructing the

11    witness not to answer that question?

12         MS. WINSOR:  I'm instructing the witness on

13    attorney -- on my attorney-client privilege.  And I

14    believe any such conversation would also be joint

11:40:58   15    prosecution privilege.

16         MR. WARNE:  And just so the record is clear,

17    I'm asking this witness if he spoke with his

18    coinvestigator Josh White at any point in time after

19    reading the transcript of Josh White's deposition.

11:41:07   20         MS. WINSOR:  So to the extent that such a

21    conversation took place, again, my position is that

22    you are not entitled to know whether or not such a

23    conversation took place.  And if it did, it would

24    have been attorney work product on my end.  So that's

11:41:20   25    the basis of my instruction not to answer, and

1   potentially also joint prosecution privilege.

2         MR. OVERBY:  My objection would be if there

3   is any conversation that took place with Mr. White

4   that was in the presence of counsel for the United

11:41:33  5   States or at the direction of counsel for the United

6   States, do not answer as to that.

7         MR. WARNE:  Well, okay.  I'm trying to lay a

8   foundation.

9   Q.      Did you have conversations with Josh White

11:41:49  10  after reading his transcript that was created in

11  November of 2010?

12        MS. WINSOR:  Same instructions.

13        MR. WARNE:  I can't get a yes or no to that?

14        MS. WINSOR:  No.

15        MR. WARNE:  Okay.

16        MS. WINSOR:  Not on the -- it -- it's

17  basically -- my understanding of his responses to

18  testimony is that he has established any conversation

19  he had after August of 2010 was either at the

11:42:08  20  direction -- if there was one, was either at the

21  direction of California Attorney General's office or

22  the United States Attorney and that is work product,

23  attorney-client, joint prosecution protected.

24        MR. WARNE:  And, Eric, are you instructing

11:42:20  25  this witness not to answer the question as phrased,

1   that particular question, the question of whether he

2   did or didn't talk to Josh White after he read the

3   transcript?

4          MR. OVERBY:  My instruction is if you talked

11:42:30   5   to Josh White in the presence of the United States

6   counsel or at the direction of the United States

7   counsel, do not answer.  Other than that, I'm not

8   instructing him not to answer.

9          MR. WARNE:  Okay.

11:43:00   10          MR. GRANNIS:  Did we get an answer?

11          MS. WINSOR:  There was an instruction not to

12   answer.

13   Q.     BY MR. WARNE:  Given all those instructions,

14   can you answer my question?  Did you have a

11:43:12   15   conversation with Josh White after you read his

16   transcript?

17          MS. WINSOR:  And just in case the witness is

18   confused by the question, there has been an

19   instruction not to answer, so that means you don't

11:43:22   20   answer the question.

21   Q.     BY MR. WARNE:  All right.  Did you speak to

22   anyone from the CDF, including Josh White, regarding

23   what you perceived to be inconsistencies that you saw

24   in Mr. White's testimony as it might relate to your

11:43:51   25   own memory of what took place on the days that he was

1    asked questions about?

2            MS. WINSOR:  So I think we've got the same

3    question phrased a different way.  And again --

4            MR. WARNE:  I'm absolutely just trying to

11:44:07  5    set a record.  And if you're going to instruct him

6    not to answer, I understand that's your position.  I

7    disagree with it.  And I think we all on the defense

8    side of things do.

9            But I just want to make sure that you're

11:44:17 10    instructing the witness not to answer a direct

11    question I have given him regarding whether or not he

12    found inconsistencies in the testimony of Josh White

13    as it relates to his own memory of what occurred on

14    the days that he was investigating the Moonlight

11:44:32 15    fire.

16            MS. WINSOR:  But that's a different

17    question.  You're free to ask him that.  He read the

18    transcript and did he think it was consistent with

19    his own recall?  Totally legitimate question.  But

11:44:39 20    the way you just asked it was did he talk to anybody

21    about any such alleged issues.

22            MR. WARNE:  Let me ask the question this way

23    and then I'll get to the next one.

24    Q.        Did you have any conversations with Josh

11:44:49 25    White relating to what you might have perceived to be

1   inconsistencies in his version of the events and your

2   memory of the events?

3            MS. WINSOR:  The same objection.

4            MR. OVERBY:  To the extent that you had any

11:45:00   5   conversations with Chief White in the presence of or

6   at the direction of the United States counsel, I

7   instruct you not to answer.

8            MS. WINSOR:  And again, Bill, just to save

9   time, you can assume that if you ask him -- I think

11:45:12   10   this is not a good use of time.  You're certainly

11   entitled to run your depo how you want.

12            But you can assume that if you ask him about

13   anything that he talked to Chief White about after

14   August of 2010 -- my understanding of his testimony

11:45:24   15   is that he hasn't had any conversations with Chief

16   White.  And again, assuming those took place --

17   because that's not been disclosed.  If any such

18   conversations did take place after August 2010 at the

19   direction of either the California Attorney General's

11:45:40   20   office or the United States Attorney, you can assume

21   we're going to instruct him not to answer as to

22   whatever question you ask.

23            And that's my understanding.  If Eric

24   disagrees with me, he can speak otherwise.

11:45:51   25            MR. WARNE:  I really want to move on.  I

```
1                    CERTIFICATE OF REPORTER

2          I, LEIGH ANN OROZCO, a Certified Shorthand

3     Reporter, hereby certify that the witness in the

4     foregoing deposition was by me duly sworn to tell the

5     truth, the whole truth and nothing but the truth in

6     the within-entitled cause;

7          That said deposition was taken down in

8     shorthand by me, a disinterested person, at the time

9     and place therein stated, and that the testimony of

10    the said witness was thereafter reduced to

11    typewriting, by computer, under my direction and

12    supervision;

13         That before completion of the deposition,

14    review of the transcript was requested.  If

15    requested, any changes made by the deponent (and

16    provided to the reporter) during the period allowed

17    are appended hereto. .

18         I further certify that I am not of counsel or

19    attorney for either or any of the parties to the said

20    deposition, nor in any way interested in the event of

21    this cause, and that I am not related to any of the

22    parties thereto.

23    DATED: 3/27/11

24    _____

25                    LEIGH ANN OROZCO, RPR, CSR 7607
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
--oOo--

UNITED STATES OF AMERICA,           )
          Plaintiff,                )
vs.                                 )   No. 2:09-cv-02445-
SIERRA PACIFIC INDUSTRIES,          )       JAM-EFG
ET AL.,                             )
          Defendants.               )
_____        )

SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLUMAS
--oOo--

**CERTIFIED COPY**

CALIFORNIA DEPARTMENT OF           )
FORESTRY AND FIRE                  )
PROTECTION,                        )
          Plaintiff,               )
vs.                                )   No. CV09-00205
EUNICE HOWELL, d.b.a.              )
HOWELL'S FOREST HARVESTING         )
COMPANY, et al.,                   )
          Defendants.              )
_____       )
                                   )
AND RELATED CROSS-ACTIONS.         )
_____       )

RECEIVED
APR 04 2011

VIDEOTAPED DEPOSITION OF

DAVID W. REYNOLDS

Volume 3 (Pages 651 - 990)

Thursday, March 24, 2011

NOTICING ATTORNEY:  William R. Warne, Esq.

REPORTED BY:   LEIGH ANN OROZCO, CSR NO. 7607



207 W. Oak Street   Lodi, CA 95240
Tel 209.333.8485     Fax 209.333.1133     Toll Free 800.682.2323
www.marcusdepo.com
*Court Reporting You Can Count On.*

```
 1    Q.       BY MR. LINKERT:  Let's go back to our binder
 2    here.  So, when we got off on this sort of excursion
 3    here, I had asked you whether or not you had been
 4    with Mr. White when he took the pictures.  I
 5    understand you weren't.
 6             Let me just have you take a look at a couple
 7    of photographs.  Take a look at AD, if you will.
 8    Have you seen any of these before today?
 9    A.       Yes.
10    Q.       Okay.  And when did you see them and under
11    what circumstances?
12             MS. WINSOR:  Again, to the extent that he
13    was looking at them at the direction of counsel, if
14    it was joint protection -- sorry, joint prosecution
15    privilege work product, that sort of thing, I would
16    object to you asking him questions in that area.
17             MR. OVERBY:  And from the United States, to
18    the extent that you looked at this with counsel or at
19    the direction of counsel, I would direct you not to
20    answer.
21             MS. WINSOR:  With the exception of the fire
22    scene diagram because I think they did have that
23    photo binder there.
24             MR. OVERBY:  Yes.
25    Q.       BY MR. LINKERT:  With the objections and
```

1   admonitions of your two lawyers in mind, can you

2   answer my question or not?

3   A.        No.

4   Q.        Okay.  You see Photograph AD, there's a --

12:17:33   5   looks like a piece of peeled-back metal on this

6   coupling joint or U-joint?

7   A.        Yes.

8   Q.        Do you know what that was intended to depict

9   based upon anything you discussed with Chief White?

12:17:50   10   A.        Just showing that there is metal-to-metal

11   contact going on with this part of the equipment.

12   Q.        And from what you were told, was that at

13   least initially suspected as perhaps an ignition

14   source?

12:18:08   15   A.        I wasn't there when he took that, so I don't

16   know if that's what his thinking was.

17   Q.        Did he ever discuss the concept that some

18   kind of metal-to-metal contact amongst the parts of

19   the Cat was responsible for generating the hot piece

12:18:28   20   of metal that you folks believe started the fire?

21            MS. WINSOR:  Vague as to time.  And same

22   issue and problem if the discussion happened in the

23   presence or direction of counsel.

24   Q.        BY MR. LINKERT:  To make things simple, just

12:18:44   25   tell me if you can or can't answer those questions.

```
1                    CERTIFICATE OF REPORTER
2          I, LEIGH ANN OROZCO, a Certified Shorthand
3    Reporter, hereby certify that the witness in the
4    foregoing deposition was by me duly sworn to tell the
5    truth, the whole truth and nothing but the truth in
6    the within-entitled cause;
7          That said deposition was taken down in
8    shorthand by me, a disinterested person, at the time
9    and place therein stated, and that the testimony of
10   the said witness was thereafter reduced to
11   typewriting, by computer, under my direction and
12   supervision;
13         That before completion of the deposition,
14   review of the transcript was not requested.  If
15   requested, any changes made by the deponent (and
16   provided to the reporter) during the period allowed
17   are appended hereto.
18         I further certify that I am not of counsel or
19   attorney for either or any of the parties to the said
20   deposition, nor in any way interested in the event of
21   this cause, and that I am not related to any of the
22   parties thereto.
23   DATED: 3/28/11
24   _____
25                LEIGH ANN OROZCO, RPR, CSR 7607
```