BENJAMIN B. WAGNER
United States Attorney
DAVID T. SHELLEDY
KELLI L. TAYLOR
MATTHEW D. SEGAL
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>           v.<br><br>SIERRA PACIFIC INDUSTRIES, INC., et al.,<br><br>                    Defendants.<br><br>─────────────────────────────<br><br>AND RELATED ACTIONS. | CASE NO.  2:09-CV-2445 WBS AC<br><br><br>DATE: December 15, 2014<br>TIME: 2:00 p.m.<br>COURT: Hon. William B. Shubb |

**MOTION FOR DISQUALIFICATION OF COUNSEL AND ANCILLARY RELIEF**

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................2

III.    LEGAL ANALYSIS ...............................................................................................5

        A.      Wright Violated the State Bar Code and Rules of Professional Conduct. .........................5

                1.      Wright Breached His Duty of Confidentiality. ......................................................6

                2.      Wright Breached His Duty of Loyalty. ................................................................7

                3.      There Is No Excuse for Wright's Unethical Conduct. ...........................................9

        B.      The Defendants' Attorneys Engaged in Misconduct. ......................................................10

                1.      Defendants' Attorneys Unlawfully Solicited, Procured, and Assisted
                        Wright's Violations. ...................................................................................10

                2.      Defendants' Attorneys Intentionally Invaded an Opposing Party's
                        Privileges. ...........................................................................................11

                3.      Neither Waiver Nor the Crime-Fraud Exception Can Excuse
                        Defendants' Counsel's Intentional Invasion of Privilege. ....................................14

        C.      Appropriate Remedies ................................................................................17

                1.      The Court Should Strike Defendants' Rule 60(d) Motion. ....................................17

                2.      The Court Should Disqualify Counsel. ..............................................................18

                3.      The Court Should Order Ancillary Relief ..........................................................20

IV.     CONCLUSION .....................................................................................................21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Action Air Freight, Inc. v. Pilot Air Freight Corp.*, 769 F. Supp. 899
(E.D. Pa. 1991) ............................................................................. 14

*Cunningham v. Hamilton Cnty., Ohio,* 527 U.S. 198 (1999) ............................................ 17

*Fayemi v. Hambrecht & Quist, Inc.,* 174 F.R.D. 319, 324–27
(S.D.N.Y. 1997) .......................................................................... 17

*Glynn v. EBO Corp.,* 2010 WL 3294347 (D.Md.2010) .......................................... 17

*In re Cnty. of Los Angeles*, 223 F.3d 990 (9th Cir. 2000) .......................................... 18

*In re Grand Jury Proceedings*, 87 F.3d 377 (9th Cir. 1996). ......................................... 14, 15

*In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078 (9th Cir. 2007) ..................................... 14, 15

*Lynn v. Gateway Unified Sch. Dist.*, No. 2:10-CV-00981-JAM,
2011 WL 6260362 (E.D. Cal. Dec. 15, 2011) .................................. 17

*Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 130 S. Ct. 599,
175 L. Ed. 2d 458 (2009) ........................................................... 14

*Richards v. Jain*, 168 F. Supp. 2d 1195 (W.D. Wash. 2001) ...................................... 13

*Trone v. Smith*, 621 F.2d 994 (9th Cir. 1980). ........................................................... 2

*United States v. Martin*, 278 F.3d 988 (9th Cir. 2002) ......................................... 15, 16

*United States v. Quest Diagnostics Inc.*, 734 F.3d 154 (2d Cir. 2013).................................. 17

*United States v. Shaffer Equip. Co.,* 11 F.3d 450, 461–62 (4th Cir.1993) ............................... 17

*United States v. Zolin*, 491 U.S. 554 (1989) .......................................................... 15

## STATE CASES

*Anderson v. Eaton*, 211 Cal. 113 (1930)................................................................. 7, 8

*Civil Serv. Com. v. Superior Court,* 163 Cal. App. 3d 70 (1984)........................................ 7

*Clark v. Superior Court*, 196 Cal. App. 4th 37 (2011) .................................. 12, 18, 19, 20, 21

*Cnty. of Los Angeles*, 222 Cal. App. 3d 647 (1990) ...................................................... 14

*Earl Scheib, Inc. v. Superior Court of Los Angeles*,
253 Cal. App. 2d 703 (1967) ....................................................... 6, 7

*Elijah v. Superior Court*, 216 Cal. App. 4th 140 (2013) ..................................................... 6

*Ex parte McDonough*, 170 Cal. 230, 233 (1915)............................................................ 8

*Frazier v. Superior Court*, 97 Cal. App. 4th 23 (2002) ................................................ 6

*General Dynamics Corp. v. Superior Court*, 7 Cal. 4th 1164 (1994) ........................... 7

*In re Johnson*, 4 Cal. State Bar Ct. Rptr. 179, 189, 2000 WL 1682427
    (Cal. Bar Ct. Review Dept. 2000) ........................................................................ 6

*Kirsch v. Duryea*, 21 Cal. 3d 303 (1978) ................................................................... 12

*People ex rel. Dep't of Corporations v. SpeeDee Oil Change Sys., Inc.*,
    20 Cal. 4th 1135 (1999) ................................................................................ 7, 18

*People v. Singh*, 123 Cal. App. 365 (1932) ................................................................. 8

*People v. Thoi*, 213 Cal. App. 3d 689 (1989) .............................................................. 6

*Responsible Citizens v. Superior Court*, 16 Cal. App. 4th 1717 (1993) .................... 18

*Rico v. Mitsubishi Motors Corp.*, 42 Cal. 4th 807 (2007) ............................... 12, 14, 18

*State Comp. Ins. Fund v. WPS, Inc.*, 70 Cal. App. 4th 644 (1999) ................ 12, 14, 18

*Triple A Mach. Shop, Inc. v. State of California*,
    213 Cal. App. 3d 131 (1989) ............................................................................. 14

*Wutchumna Water Co. v. Bailey*, 216 Cal. 564 (1932) ............................................... 1

*Yorn v. Superior Court*, 90 Cal. App. 3d 669 (1979) ................................................... 6

## STATUTES

28 U.S.C. § 530B ..................................................................................................... 5, 6

Cal. Bus. & Prof. Code. § 6068(e) ....................................................... 1, 6, 9, 10, 11, 13

## RULES

Cal. R. Prof. Conduct § 1-120 .................................................................................... 10

Cal. R. Prof. Conduct § 2-100 ................................................................................... 2, 3

Cal. R. Prof. Conduct § 3-100 ................................................................................... 6, 9

Cal. R. Prof. Conduct § 3-600 .................................................................................... 10

Eastern District of California Local Rule 180(e) ......................................................... 10

Rule 4.4(a) of the ABA Model Rules of Professional Conduct ................................... 13

## OTHER AUTHORITIES

California State Bar Formal Opinion Number 2013-188,
    2013 WL 2894718 (2013) ................................................................................... 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

California State Bar Standing Committee on Professional Responsibility
    and Conduct, Formal Ethics Opinion 1996-146, 1996 WL 664843
    (1996) ................................................................................................................ 9

Formal Opinion 91-359 of the ABA Committee on Ethics and Professional
    Responsibility (1991) ...................................................................................... 13

Formal Opinion No. 00-1203 of the California Attorney General, 84
    Ops.Cal.Atty.Gen. 71, 2001 WL 577741 (2001) ........................................... 10

Formal Opinion Number 2013-188 of the California State Bar Standing
    Committee on Professional Responsibility, CA Eth. Op. 2013-188,
    2013 WL 2894718 (2013) ............................................................................... 12

Order re Request for Rule Change filed by the State Bar, Case No.
    S104682 (February 27, 2002) .......................................................................... 10

Restatement (Third) of the Law Governing Lawyers § 59 .................................... 6

Restatement (Third) of the Law Governing Lawyers § 74 .................................... 9

Restatement (Third) of the Law Governing Lawyers §§ 96-97 ........................... 10

Restatement (Third) of the Law Governing Lawyers § 97 ............................... 7, 10

Veto Message of Gov. Arnold Schwarzenegger re AB 2713
    (September 28, 2004) ....................................................................................... 10

Veto Message of Gov. Gray Davis re AB 363, (September 30, 2002) .................. 10

# I.      __INTRODUCTION__

Even if every word of the Declaration of E. Robert Wright, Esq. (Dkt. 593-4) were true, it would show that Wright and Defendants' attorneys have engaged in egregious professional misconduct. Wright's declaration and papers referring to it should be stricken from the record. Defense counsel should be disqualified. Wright's declaration and all originals and copies of documents received from Wright should be returned to the Government. Counsel should be enjoined from discussing the contents of the documents with anyone or providing work product in the action to either their clients or any representatives of their clients. Not one of these remedies is novel – each is supported by case law set forth below.

Wright was counsel for the United States in this very case. His duties to his client should have been obvious to anyone. But he secretly met with defense counsel and gave them information and a declaration about his work for the Government on this case and even others. Wright obviously breached his duty to preserve his client's confidences and secrets "at every peril" and to do nothing injurious to his former client or use information acquired by virtue of his previous relationship as counsel in this case. *See* Cal. Bus. & Prof. Code. § 6068(e); *Wutchumna Water Co. v. Bailey*, 216 Cal. 564, 572-74 (1932).

By meeting with Wright, accepting his information, preparing his declaration, and filing it in the public record, defense counsel breached their ethical obligation not to "knowingly assist in, solicit, or induce" Wright's violation of the State Bar Act. Cal. R. Prof. Conduct 1-120. They also knowingly invaded privilege. This is actually the third time in this very case that these same attorneys have engaged in professional misconduct in their dealings with United States' agents. The Court has already found two previous violations. (Dkt. 92, 124, 326.) The last time this occurred, defense counsel narrowly avoided a contempt finding and were specifically ordered "to comply with all applicable ethical rules." (Dkt. 326.)

The United States wants to forcefully address defendants' allegations as soon as the Court sets a briefing schedule. But the Government should not be forced to waive its privileges in so doing. Otherwise, the Defendants through their misconduct will have put the Government in the position where the only way to rebut their claims is to further disclose matters that should be subject to confidentiality.

Motion for Disqualification of Counsel and
Ancillary Relief

1  That would further aggravate the damage from defense counsel's misconduct by requiring the very

2  disclosures the rule is intended to protect against. *Cf. Trone v. Smith*, 621 F.2d 994, 999 (9th Cir. 1980).

3                     **II.       STATEMENT OF FACTS**

4           The Moonlight Fire started on September 3, 2007, on remote private property, miles from the

5  nearest paved road.  Although it was the Labor Day holiday and a "red flag" day, meaning fire danger

6  was extreme, Sierra Pacific Industries' contractor employed a two-man crew instead of the usual six-

7  man crew to bulldoze the area.  When the men finished work, they left the area without inspecting it for

8  fire or conducting the mandatory two-hour fire watch.  The Moonlight Fire was first called in from a

9  Forest Service fire lookout ten miles away.  Defendants' bulldozer operator only discovered the blaze

10  later, after he had left the work site to get a refreshment and come back over an hour later.  He returned

11  to a hundred-foot wall of smoke and searing heat emanating from the work area where Defendants had

12  operated their bulldozers earlier in the day.  The contractor's corporate representative conceded that

13  bulldozing causes sparks, sparks cause forest fires, and it was "imprudent" not to inspect the site after

14  finishing work.  The Moonlight Fire spread to public land, where it burned 46 thousand acres of the

15  Plumas and Lassen National Forests.  It burned for over two weeks before it could be suppressed, and

16  the Forest Service incurred costs in excess of $20 million for fire suppression alone.

17           Wright served as counsel for the United States in this case when the U.S. Attorney's Office

18  evaluated the merits and decided to file a complaint in July 2009.  The Chief of the Office's Civil

19  Division replaced Wright as litigation counsel in January 2010.  Wright met with the U.S. Attorney, who

20  the Wright Declaration says declined to overrule the Civil Chief's decision to reassign him from the

21  matter.  (Wright Dec., Att. C.)  According to the Wright Declaration, the U.S. Attorney concluded,

22  "Even when we disagree about particular case assignments or other matters, it is important to maintain

23  open communication."  (*Id.*)  Wright says that he contacted the DOJ Equal Employment Opportunity

24  office regarding his "imminent effort to try and get the [Moonlight Fire] case back," apparently through

25  an age discrimination claim for "downsizing [his] position and so forth."  (Att. D.)  But Wright never

26  filed a claim.

27           The Moonlight Fire litigation continued.  In the course of the litigation, Magistrate Judge

28  Brennan and Judge Mendez both found that counsel for Sierra Pacific had violated Rule 2-100 of the

California Rules of Professional Responsibility when a Downey Brand attorney misrepresented himself as only an interested member of the public in order to obtain evidence *ex parte* from line employees of the Forest Service.  (Dkt. 107 at 11; 124 at 4, 7.)  Judge Mendez cautioned, "[T]his Court . . . is troubled by [Sierra Pacific's] counsel's behavior and decisions with respect to this particular incident."  (*Id.* at 6.) The Court found that the Downey Brand attorney had misled the Forest Service employees and withheld the fact that he was "an attorney gathering evidence in the litigation," and that both that attorney and lead counsel, who instructed him "to stay confidential," engaged in conduct degrading and impugning the integrity of the Court and interfering with the administration of justice, in violation of Local Rule 180.  (*Id.* at 6-7.)  Judge Mendez warned, "Zealous advocacy overcame professional responsibility in this particular instance.  It should not, and, the Court is certain, will not happen again."  (*Id.*)

But it did happen again.  In November 2011, Judge Brennan issued an order finding Sierra Pacific's attorneys again violated Rule 2-100, this time by engaging in forbidden *ex parte* communications through a retained expert.  Dkt. 326.  Downey Brand attorneys Meghan Baker, Thomas Marrs, and William Warne met with the expert in advance and specifically approved of the expert contacting two federal agents, again to gather evidence in this case.  *Id.* at 2-3, 7-9.  In addition, the Court found they had intentionally frustrated the intent of a protective order entered by the Court after the first improper contact.  *Id.* at 10-11.  Judge Brennan lamented, "The undersigned trusted that counsel would conform their conduct to the analysis set out in the opinion and the opinion issued by Judge Mendez.  It appears, regrettably, that such trust may have been misplaced."  *Id.* at 11.  Therefore, the Court "amend[ed] its previous order to clearly and unmistakably include the following directive:  Sierra Pacific's counsel shall comply with *all applicable ethical rules including, but not limited to, Rule 2-100.*"  *Id.* at 12 (emphasis added).

Discovery and motions practice lasted for over two years.  Defendants only settled this case when they were about to face a jury.  Their anticipated trial defense appeared to involve attacking the Government's fire origin investigation, but that might not have been so effective.  Defendants' experts' reports also indicated that the Moonlight Fire had in fact started in Defendants' work area and the trial court had decided that the doctrine of *res ipsa loquitur* was available.  The trial was set for July 2, 2012. (Dkt. 566.)  The Court referred the matter for a settlement conference, and eventually continued the jury

trial to July 9, 2012.  (Dkt. 567, 568.)  The matter finally settled and the jury trial was vacated on July 5, 2012.  (Dkt. 577, 578.)

Thereafter, counsel for all parties executed a settlement agreement providing, *inter alia*: (a) that the defendants "agree[d] to settle and compromise each and every claim of any kind, known or unknown," (b) that the defendants released "any claims . . . arising out of or relating to the Moonlight Fire or the allegations in [these] actions," (c) that the defendants expressly acknowledged that the facts and/or their potential claims "may be different from facts now believed to be true or claims now believed to be available," and (d) that the defendants specifically released "all Unknown Claims."  (Dkt. 590.)  On the day that the settlement agreement was filed, Sierra Pacific's lead counsel issued a press release.  With the jury trial safely vacated in consideration for the Defendants' agreement to give the Government $55 million and 22,500 acres of forest land, counsel declared, "Typically, a settlement signifies the end of a dispute, but this is just the beginning."[1]

Unnamed "defense counsel" in this case contacted Wright in February 2014.  (Wright Dec. ¶ 34.)  Four months later, on June 12, 2014, Wright signed a declaration on Downey Brand pleading paper.  (Wright Dec. at 15.)  At no time did Wright request consent from, or even provide notice to, the U.S. Attorney for the Eastern District of California.  The declarations submitted in support of the defendants' motion conspicuously omit any identification of the defense counsel who elicited Wright's statements.  Defense counsel's two earlier instances of professional misconduct were carried out by Downey Brand attorneys.

Wright's declaration describes his work as counsel for the United States in this case.  It discusses, among other things:

- A visit he made to the fire site in summer 2008 with litigation "consultants" and another AUSA, and what was said among them regarding the origin of the fire.  (*Id.* ¶ 7.)
- Wright's October 2008 discussions with consultants.  (*Id.* ¶ 8.)
- Wright's reasoning about why and whether to seek an "early referral" of the Moonlight

---

[1] Sierra Pacific Press Release, available online at:  http://www.prnewswire.com/news-releases/sierra-pacific-corrects-misstatements-made-by-united-states-attorney-on-moonlight-fire-162790886.

Fire for a civil recovery action.  (*Id.*  ¶ 11.)

- Discussions of legal strategy among attorneys in the U.S. Attorney's office concerning *other* pending cases – not related in any way to this one – including legal analysis of a fact in a case for which Wright was responsible and an email specifically identifying the case.  (*Id.* ¶¶ 13-20 & Att. B.)

- Confidential legal advice and requests for legal advice between the U.S. Attorney's Office and the Justice Department's Professional Responsibility Advisory Office (PRAO), including requests for advice made by the Civil Division Chief and legal advice provided to the Civil Division Chief.  (*Id.* ¶¶ 13-17.)

- Wright's analysis of documents produced by the United States in discovery in this case, his opinion about a document, and his opinion, supposedly based on the law and facts of this case in which he was counsel, about whether successor counsel should have interrupted deposition testimony when a witness was testifying about the document.  (*Id.* ¶ 31.)

Thus, the declaration discloses (1) confidential work performed by counsel for the United States and other members of its litigation team on this case; (2) confidential thoughts and legal strategies of counsel for the United States in this case and in other, unrelated cases; and (3) confidential requests for legal advice by the U.S. Attorney's Office and its Civil Division Chief and legal advice they received in response.

The Government has demanded return of anything obtained from Wright.  The only attorneys who responded were from Keker & Van Nest, who stated that they have had no involvement in this motion and have nothing responsive to the Government's demand.  (Appendix ("App.") attached hereto at 1.)

## III.   LEGAL ANALYSIS

### A.   Wright Violated the State Bar Code and Rules of Professional Conduct.

As a California lawyer, Wright has always been bound to adhere to the State Bar Act and Rules of Professional Conduct.  He is not excused from those duties by virtue of his former employment as a government lawyer.  Congress passed 28 U.S.C. § 530B, the McDade Amendment, specifically to

1    require that Wright be subject to State laws and rules, and local Federal Court rules, "to the same extent

2    and in the same manner" as any other attorney in California.  *Id.*  Wright egregiously violated the State

3    Bar Act and the Rules of Professional Conduct.

### 1.    Wright Breached His Duty of Confidentiality.

5          Wright breached his duty as a California lawyer to maintain client confidences and secrets at his

6    "every peril."  Cal. Bus. & Prof. Code § 6068(e); Cal. R. Prof. Conduct 3-100.   "Few precepts are more

7    firmly entrenched than that the fiduciary relationship between attorney and client is of the very highest

8    character and, even though terminated, forbids (1) any act which will injure the former client in matters

9    involving such former representation or (2) use against the former client of any information acquired

10   during such relationship."  *Frazier v. Superior Court*, 97 Cal. App. 4th 23, 35 (2002); *Yorn v. Superior*

11   *Court,* 90 Cal. App. 3d 669, 675 (1979); *accord, People v. Thoi,* 213 Cal. App. 3d 689, 699 (1989).

12   Section 6068(e) required Wright to "maintain inviolate the confidence, and at every peril to himself or

13   herself to preserve the secrets, of his or her client."  And Rule 3-100 of the California Rules of

14   Professional Responsibility forbade Wright to reveal information protected by section 6068 "without the

15   informed consent of the client."  *Id.* ¶ (A).

16          The duty of confidentiality is broader than attorney-client privilege or work-product protection.

17   It covers "virtually everything the lawyer knows about the client's matter regardless of the source of the

18   information."  *Elijah v. Superior Court*, 216 Cal. App. 4th 140, 151 (2013).  "The definition includes

19   information that becomes known by others, so long as the information does not become generally

20   known.  The fact that information falls outside the attorney-client privilege or work-product immunity

21   does not determine its confidentiality[.]"  Restatement (Third) of the Law Governing Lawyers § 59.  A

22   California attorney may not even disclose a matter of public record if that information was

23   communicated to the attorney in confidence and might cause a client or a former client public

24   embarrassment.  *In re Johnson*, 4 Cal. State Bar Ct. Rptr. 179, 189, 2000 WL 1682427, at *10 (Cal. Bar

25   Ct. Review Dept. 2000) (attorney violated section 6068(e) by disclosing client's publicly available

26   criminal record).

27          Even the noblest intent cannot excuse disclosure of a client confidence.  Under section 6068(e),

28   "it does not matter that the intention and motives of the attorney are honest."  *Earl Scheib, Inc. v.*

1  *Superior Court of Los Angeles*, 253 Cal. App. 2d 703, 706 (1967).  Thus, "[t]he in-house attorney who

2  publicly exposes the client's secrets will usually find no sanctuary in the courts.  Except in those rare

3  instances when disclosure is explicitly permitted or mandated by an ethics code provision or statute, it is

4  never the business of the lawyer to disclose publicly the secrets of the client."  *General Dynamics Corp.*

5  *v. Superior Court*, 7 Cal. 4th 1164, 1190 (1994).

6      These rules apply with full vigor to government attorneys.  *See Civil Serv. Com. v. Superior*

7  *Court*, 163 Cal. App. 3d 70, 79, 84 (1984).  Except when a superseding law like FOIA specifically

8  requires a disclosure, "a lawyer for a governmental client must protect confidential client information of

9  the governmental client . . . to the same extent as would be required of a lawyer in a private-practice

10  representation."  Restatement (Third) of the Law Governing Lawyers § 97 comment d (2000).

11      It is ironic that Wright apparently considered suing the Department of Justice for employment

12  discrimination.  (Wright Dec. ¶ 25.)  If he had disclosed client confidences in pursuit of such a suit, he

13  could have been subject to State Bar disciplinary proceedings.  *See Gen. Dynamics Corp.*, 7 Cal. 4th at

14  1191.  Here, Wright disclosed client confidences without pursuing suit at all.  Nothing can justify what

15  he did.

16                    **2.       Wright Breached His Duty of Loyalty.**

17      Wright breached the duty of loyalty when he switched sides and assisted the defendants in the

18  very case in which he initiated suit against them on behalf of the United States.  "A related but distinct

19  fundamental value of our legal system is the attorney's obligation of loyalty.  Attorneys have a duty to

20  maintain undivided loyalty to their clients to avoid undermining public confidence in the legal

21  profession and the judicial process.  The effective functioning of the fiduciary relationship between

22  attorney and client depends on the client's trust and confidence in counsel."  *People ex rel. Dep't of*

23  *Corporations v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1146 (1999).

24      The duty of loyalty clearly precluded Wright from assuming a position adverse or antagonistic to

25  his former client in a case in which he served as its counsel.  *Anderson v. Eaton*, 211 Cal. 113, 116

26  (1930).  It was not for Wright to decide alone "to do what [he] could within the contours of [his] ethical

27  obligations to take corrective action."  (Wright Dec. ¶ 34.)  The duty of loyalty exists precisely to

28  preclude an attorney from engaging in such balancing.

> The rule is designed, not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent.

*Anderson*, 211 Cal. at 116.  One might fairly conclude from Wright's declaration that his judgment was clouded by his bitter feelings about being passed over.  But clouded judgment cannot excuse his conduct.  The duty of loyalty is absolute and Wright's breach is inexcusable.

The facts of this case are more aggravated than any reported case involving an attorney who tried to switch sides.  Wright secretly met with his former client's adversaries; he gave them information he considered adverse to his former client's position; and he gave them a declaration to try to undo the relief that his former client obtained in a case that he had initiated.  This was an egregious breach.  One has to go back more than eight decades to find a reported case in which an attorney, after representing a client in a matter and becoming disgruntled, then appeared as a witness for other side in the same matter.  In *People v. Singh*, 123 Cal. App. 365, 369 (1932), an attorney who appeared for a murder defendant, having gone unpaid, withdrew and gave testimony against the defendant.  The court found this clear breach of loyalty uniquely disgraceful:

> We state with some pride that our profession has been singularly free from instances of this sort.  From time immemorial the position of an attorney has been one of signal honor, reflecting much in the progress and strength of our jurisprudence.  The dignity of the lawyer has been recognized in every movement against oppression, and in every step for better government.  Approval of conduct here met would go a long way toward the undoing of the accomplishment of the past, and relegate the lawyer to the ranks of the charlatan and mountebank.

*Singh*, 123 Cal. App. at 370.   Even in a murder trial, it does not matter what counsel has to say.  "However desirable it may be to obtain proofs sufficient to insure the conviction of all persons who commit crimes of the character of those under investigation, and it will readily be conceded that it is most desirable, such proofs may not be obtained from those who are forbidden by our law to give them."  *Id.* (quoting *Ex parte McDonough*, 170 Cal. 230, 233 (1915)).

### 3.      There Is No Excuse for Wright's Unethical Conduct.

It is no small irony that Wright so self-righteously refers to his "ethical obligation" and "zero-tolerance of litigation misconduct" in the very declaration that so clearly violates the State Bar Act and Rules of Professional Conduct.  (Wright Dec. ¶¶ 32, 34.)  Even if Wright honestly did believe he was righting a wrong, it could not excuse his breach of loyalty and confidentiality.  "Information about client misconduct imparted to a lawyer in the course of a lawyer-client relationship or which is involved in the representation of a client is subject to California Business and Professions Code section 6068(e)."  California State Bar Standing Committee on Professional Responsibility and Conduct, *Formal Ethics Opinion 1996-146*, 1996 WL 664843, *2 (1996).  The duties of loyalty and confidentiality therefore preclude disclosure "that the client has committed perjury" or even that the client is engaged in *ongoing* fraudulent conduct.  *Id.* at *3-4.  The sole exception to this rule is that a lawyer may disclose a client secret "reasonably believe[d] necessary to prevent a criminal act that the attorney reasonably believes is likely to result in death [or] substantial bodily harm to[] an individual."  Cal. Bus. & Prof. Code § 6068(e)(2); Cal R. Prof. Conduct 3-100 (B).  And even when death or substantial bodily harm is threatened, the disclosure "must be no more than is necessary to prevent" the future criminal act, and the lawyer must give notice to the client.  *Id.* Rule 3-100 (C)(2), (D).  Of course, none of that applies here.  Wright's declaration is not at all about future conduct, and it certainly does not purport to describe a future crime involving death or substantial bodily harm.  Instead, it discloses confidential information about other cases and about confidential activities of the litigation team in this case that even Wright does not consider improper (Wright Dec. ¶¶ 13-17, 7-8.)  And Wright gave no notice to the United States that he decided to switch sides and disclose client confidences and secrets before making disclosures to unnamed "counsel" for one or more of the Defendants.  (*Id.* ¶ 34.)

Nor is it any excuse that Wright portrays himself as some kind of crusader against government misconduct.  (Wright Dec. ¶ 32.)  "[A] public agency . . . is entitled to engage in confidential communications with counsel to establish and maintain legal positions.  Accordingly, courts generally have construed . . . whistleblower[] and similar statutes as subject to the attorney-client privilege, recognizing that otherwise governments would be at unfair disadvantage in litigation, in handling claims and in negotiations."  Restatement (Third) of the Law Governing Lawyers § 74 comment d.  California

has repeatedly rejected proposals to create a whistleblower exception for government lawyers' duty of confidentiality. In the course of rejecting the first such proposal, the California Supreme Court announced that a government-attorney whistleblower exception would "conflict with [Business and Professions] Code section 6068(e)."[2] Thus, the ultimate authority has recognized that disclosure of client secrets or confidences by a self-appointed "whistleblower" violates the State Bar Code.

If Wright thought that there had been any impropriety in the conduct of this case by litigators for the United States, his duty was to follow the bar rules and raise his concerns with persons higher up in the organization. Cal. R. Prof. Cond. § 3-600(B); Restatement (Third) of the Law Governing Lawyers §§ 96-97. No rule allowed Wright to have secret meetings with his former client's litigation adversaries and agree to give testimony by declaration against his own former client in the very case in which Wright had been counsel.

### B.   The Defendants' Attorneys Engaged in Misconduct.

In this case, Defendants' attorneys had a duty to comply with the California State Bar Act and Rules of Professional Conduct. That is obviously true for those attorneys who are members of the California Bar. It is also true for the out-of-state attorneys whose conduct the Local Rules of the Eastern District of California also required comply with the California rules. E.D. Calif. Loc. R. 180(e).

### 1.   Defendants' Attorneys Unlawfully Solicited, Procured, and Assisted Wright's Violations.

The California ethics rules specifically forbade counsel for Defendants from assisting, soliciting, and inducing Wright's breach of confidentiality and loyalty. "A member shall not knowingly assist in, solicit, or induce any violation of these rules or the State Bar Act." Cal. R. Prof. Conduct § 1-120. The care taken in the defendants' moving papers to avoid naming the lawyers who dealt with Wright is

---

[2] *Order re Request for Rule Change filed by the State Bar*, Case No. S104682 (February 27, 2002) (App. at 2). The second and third proposals to create a whistleblower exception for government attorneys were vetoed by two different Governors. *Veto Message of Gov. Gray Davis re AB 363*, (September 30, 2002) (App. at 3); *Veto Message of Gov. Arnold Schwarzenegger re AB 2713* (September 28, 2004) (App. at 4). *See also Formal Opinion No. 00-1203 of the California Attorney General*, 84 Ops.Cal.Atty.Gen. 71, 2001 WL 577741 (2001) (whistleblower protections for state employees do not supersede the duty of confidentiality imposed by section 606(e)).

striking.  But *someone* definitely solicited and induced a violation when "defense counsel" contacted Wright – knowing that he previously represented the United States – to talk to him about his work on this fire case and others.  (Wright Dec. ¶ 34.)  Over the course of an unknown number of meetings, nameless "counsel" elicited fifteen pages of improper disclosures that any first year law student would know were forbidden by the most fundamental duties of our profession.  Since the declaration is on Downey Brand pleading paper bearing the names William Warne, Michael Thomas, Annie Amaral, and Meghan Baker, and is notarized by an employee of Downey Brand, [3] it appears that at least these four attorneys solicited, induced, and assisted Wright in disclosing the United States' secrets and confidences and testifying against his former client.  Then they wrote a brief citing Wright's improper disclosures fifty times, released the declaration to the press two days before filing it, and filed the declaration and their brief on the public record.

Counsel's violation was so obviously wrong and egregious that one cannot find a precedent for this kind of misconduct.  The defendant's moving papers clearly show attorneys Warne, Thomas, Amaral, and Baker knowingly "solicited" and "assisted in" Wright's violation of the duties of loyalty and confidentiality.  It seems unlikely that they kept this activity a secret from counsel for the other defendants.  The elusive phrase "counsel for one or more of the Defendants" in the Wright declaration suggests that inquiry is needed to determine who else participated in eliciting the United States' confidences and secrets through Wright in violation of Section 6068(e) and RPC 1-120.  (Wright Dec. ¶ 34.)

## 2.   Defendants' Attorneys Intentionally Invaded an Opposing Party's Privileges.

Disqualification is not limited to active participants like the Downey Brand lawyers.  California law requires counsel to avoid invading an opposing party's privilege, and disqualification is required if any other defense attorney failed to do so.

The California Supreme Court teaches that attorneys may not even seek advantage from *inadvertent* disclosures of privileged information, because "[a]n attorney has an obligation not only to protect his client's interests but also to respect the legitimate interests of fellow members of the bar, the

---

[3] According to public sources, Mary E. Taylor is an employee of the Downey Brand law firm.

1  judiciary, and the administration of justice." *Rico v. Mitsubishi Motors Corp.*, 42 Cal. 4th 807, 818

2  (2007) (quoting *Kirsch v. Duryea*, 21 Cal. 3d 303, 309 (1978)).

3      Here, even if only the Downey Brand lawyers actively procured and transcribed Wright's

4  improper disclosures, every attorney on the defense side had a duty to stop talking with Wright and stop

5  reading his declaration, and to notify the United States Attorney's Office, as soon as it became apparent

6  that Wright was disclosing information subject to the attorney-client privilege or work-product

7  protection:

8      When a lawyer who receives materials that obviously appear to be subject
to an attorney-client privilege or otherwise clearly appear to be

9  confidential and privileged and where it is reasonably apparent that the
materials were provided or made available through inadvertence, the

10  lawyer receiving such materials should refrain from examining the
materials any more than is essential to ascertain if the materials are

11  privileged, and shall immediately notify the sender that he or she
possesses material that appears to be privileged. The parties may then

12  proceed to resolve the situation by agreement or may resort to the court for
guidance with the benefit of protective orders and other judicial

13  intervention as may be justified.

14

15  *Rico*, 42 Cal. 4th at 817 (adopting the rule articulated in *State Comp. Ins. Fund v. WPS, Inc. ("State*

16  *Fund"),* 70 Cal. App. 4th 644, 656 (1999)).

17      It is settled law that the duty to stop reading and notify the privilege holder is not limited to

18  inadvertent disclosures but also applies where, as here, a third party (Wright) intentionally provides a

19  document containing privileged information.  The State Bar explicitly clarified the duty in both those

20  respects in a formal opinion in January 2013 – providing all the defendants' lawyers ample time to

21  conform their conduct.  Formal Opinion Number 2013-188 of the California State Bar Standing

22  Committee on Professional Responsibility, CA Eth. Op. 2013-188, 2013 WL 2894718 (2013) (App. at

23  5-10).  Thus, there is no room for any sophistry about the meaning of "inadvertently."  The *State Fund*

24  rule broadly describes "the ethical obligations of a lawyer when that lawyer comes into possession of

25  privileged materials without the holder of the privilege having waived it."  *Clark v. Superior Court*, 196

26  Cal. App. 4th 37, 48 (2011).

27      Obvious disclosures of work product in the Wright declaration begin at paragraphs 7-8, where it

28  discusses work and conclusions of "consultants" (not just expert witnesses) hired to assist in litigation.

Later, paragraphs 13-17 purport to summarize discussions of legal strategy among attorneys for the United States (not just Wright) and confidential legal advice and requests for legal advice between the U.S. Attorney's Office (again, not just Wright) and the Justice Department's Professional Responsibility Advisory Office.  No reasonable lawyer could read those passages without knowing they contained confidences and secrets of the United States protected by the work-product doctrine, attorney-client privilege, and § 6068(e).[4]

The duty not to invade another party's privilege is not limited to documents.  Where, as here, an attorney talks to a former employee of a represented party, the attorney must take every precaution to avoid receiving privileged information.  Rule 4.4(a) of the ABA Model Rules of Professional Conduct states:  "In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or *use methods of obtaining evidence that violate the legal rights of such a person.*"  (Emphasis added.)  Comment 1 to Rule 4.4(a) was amended in 2002 to clarify that the highlighted language "include[s] legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships, such as the client-lawyer relationship."  But long before the amendment, the impermissibility of receiving privileged information in communications with a former employee was established in Formal Opinion 91-359 of the ABA Committee on Ethics and Professional Responsibility (App. at 11-14).  The opinion explains that *ex parte* communications with former employees outside a represented party's control group are permissible, but that a lawyer must avoid invading privileges when communicating with former employees:

> Of course, the potentially-communicating adversary attorney must be careful not to seek to induce the former employee to violate the privilege attaching to attorney-client communications to the extent his or her communications as a former employee with his or her former employer's counsel are protected by the privilege (a privilege not belonging to or for the benefit of the former employee, by the former employer). Such an attempt could violate Rule 4.4 (requiring respect for the rights of third persons).

---

[4] *Cf. Richards v. Jain*, 168 F. Supp. 2d 1195, 1201 (W.D. Wash. 2001) (disqualifying entire firm and finding it "shock[ed] the conscience of th[e] Court" that lawyer did not comply with his affirmative duty to refrain from review of documents once he knew they contained privileged information).

1  *Id.* California follows the same rule. *Triple A Mach. Shop, Inc. v. State of California*, 213 Cal. App. 3d

2  131, 144 (1989) (allowing *ex parte* communications with opposing party's former employees but noting

3  that disqualification would be available if an attorney thereby "inadvertently or improperly obtain[s]

4  access to privileged information").[5]

5        These duties apply equally to information protected by attorney-client privilege and information

6  protected by the work-product doctrine. *See State Fund,* 70 Cal. App. 4th at 656 (attorney-client

7  privilege); *Rico*, 42 Cal. 4th at 817 (work product); *see also Cnty. of Los Angeles*, 222 Cal. App. 3d 647

8  at 657-58 (1990) (approving disqualification for receiving information protected by both).  The

9  defendants' attorneys here invaded both.

10            **3.    Neither Waiver Nor the Crime-Fraud Exception Can Excuse Defendants'**
                      **Counsel's Intentional Invasion of Privilege.**
11

12        In the Joint Status Report filed today, the wrongdoing attorneys assert that that their conduct was

13  justified by the crime-fraud exception.  That assertion does not excuse their breach of the Rules of

14  Professional Conduct.  Calif. State Bar Formal Opinion Number 2013-188, 2013 WL 2894718 (App. at

15  5-10) specifically addresses the crime-fraud exception and explains that it cannot excuse reading an

16  opposing party's privileged information.  The lawyer's absolute duty is to stop reading as soon as the

17  disclosure of privileged information is apparent, to notify the privilege holder, and to seek assistance

18  from the court if needed to determine the appropriate disposition of the document.  *Id.*

19        Federal law is no different.  The Government was entitled to be heard by a court on its privileges.

20  *See In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1093 (9th Cir. 2007) *abrogated on other*

21  *grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 130 S. Ct. 599, 175 L. Ed. 2d 458 (2009)

22  ("[I]n a civil case the party resisting an order to disclose materials allegedly protected by the attorney-

23  client privilege must be given the opportunity to present evidence and argument in support of its claim

24  of privilege.").   Defense counsel had no right to secretly hold the hearing in Downey Brand's offices

25

26        [5] *See also Action Air Freight, Inc. v. Pilot Air Freight Corp.,* 769 F. Supp. 899, 903 (E.D. Pa.
    1991) (*ex parte* communications with former employees is allowed, but "counsel must forgo inquiry into
27  attorney-client communications during the contact").

28

with William Warne playing the role of judge.  Further, the exception would not apply to everything, but "only to communications in furtherance of intended, or present, continuing illegality." *In re Grand Jury Proceedings*, 87 F.3d 377, 382 (9th Cir. 1996) (internal quotations omitted).

A judge, as opposed to an attorney already cited twice for ethical lapses in this case, would have seen that the crime-fraud exception is clearly inapplicable.  First of all, there is no crime-fraud exception to the attorney's duty of confidentiality other than what is set forth above.  As for any exception to the distinct concept of attorney-client privilege, "[t]he exception applies only when there is "reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme." *United States v. Martin*, 278 F.3d 988, 1001 (9th Cir. 2002) (internal quotations and citation omitted).  Wright's complaint is that his services were *not* utilized in the Moonlight Fire case.  Wright's statement that "[t]here would have been no rational reason whatsoever to preclude me from even assisting on the case unless there was concern I might learn something that would trigger my sense of ethical obligations and professional responsibility," (Wright Dec. ¶ 32) is insufficient on its face.  A "sneaking suspicion" is not enough to lift the privilege.  *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996).

A party asserting privilege is entitled to make an *in camera* showing to a court considering allegations of crime-fraud.  *United States v. Zolin*, 491 U.S. 554, 569 (1989).  If the Court issues an order consistent with *Zolin*'s teaching that "*in camera* review does not destroy the privileged nature of the contested communications," *id.*, the Government will be happy to disclose the communications *in camera*.  *See In re Napster, Inc. Copyright Litig.*, 479 F.3d at 1090.  David Shelledy explained his reasons to Wright, in detail, in the course of a 35-minute conversation.  After the meeting and on the same day, Mr. Shelledy actually took the trouble to write eight paragraphs of contemporaneous notes.  They run over a page and a half, single-spaced, and because of what defense counsel and Wright have done, the Government would like the Court to see Mr. Shelledy's notes without waiving the Government's privilege.

Anyway, no one could reasonably believe that any of the attorney-client communications or work product disclosed in the Wright declaration was in furtherance of illegality.  It all happened before the supposed scandal about which Wright speculates.  The litigation consultants (not expert witnesses)

1   whose work and conclusions are described in paragraphs 7 and 8 were retained by Wright himself and

2   were working at his behest at that time.  Surely Defendants' attorneys do not contend that either Wright

3   or his consultants were committing a fraud or crime.  State ethics law required they go no further once

4   they read, or perhaps even wrote, those paragraphs.

5          Nor can the defendants' attorneys plausibly contend that the requests by the U.S. Attorney's

6   Office for legal advice from the Justice Department's Professional Responsibility Advisory Office

7   described in paragraphs 13-17, or Wright's own attorney thought process and litigation strategy

8   discussed in those paragraphs, or the legal advice provided to the Office in response to those requests,

9   was in furtherance of a crime or fraud.  Once again, for that to be so, Wright himself would have to have

10  been committing a crime.

11         Even if narrowed to requests that the Civil Division Chief made for advice from PRAO (¶¶ 15-

12  16) and the advice PRAO gave in response (¶ 17), it is nonsensical for the defendants to suggest that

13  PRAO's services "were utilized in furtherance of [an] ongoing unlawful scheme." *Martin*, 278 F.3d at

14  1001.  The Wright declaration says the result of these communications was the office did what he

15  thought it should do.  (*Id.* ¶ 17.)  In sum, there can be no serious argument that any of the attorney-client

16  communications or protected work product in the Wright declaration is subject to the crime-fraud

17  exception.[6]

18         The wrongdoing attorneys also have asserted that *Wright* waived privilege when he provided his

19  declaration.  (Dkt. 602 at 5.)  That assertion is frivolous.  No one could think that Wright – a disloyal

20  former employee who was relieved of responsibility for this case and retired from the Justice

21  Department years before – had authority to waive privilege on behalf of the United States.  Counsel was

22  clearly aware of Wright's status, as they put in his declaration that he retired from government in

23

24         [6]  Even if the Wright declaration were true, the only statements that could conceivably relate to a
       crime or fraud appear at the end, where it offers Wright's opinions about unauthenticated documents and
25     the order of a county judge (¶¶ 29-31), his "belie[fs]" (¶ 31), and his rank speculation ("I suspect" are
       his words) that this case was reassigned because "there was or might be a problem" with the
26     investigation (¶ 32).  The crime-fraud exception cannot be applied to those portions of the declaration,
       because they are neither attorney-client communications nor work product.  Instead, they are simply
27     irrelevant and unworthy of belief, and they appear pages after every lawyer had a clear duty to stop
       reading.
28

1    December 2010.  (Wright Dec. ¶ 27.)

2        **C.    Appropriate Remedies**

3        Judge Mendez was the district judge who first expressed his disappointment with defense

4    counsel's conduct in this case.  After the first breach, Judge Mendez wrote of the Downey Brand

5    lawyers, "Zealous advocacy overcame professional responsibility in this particular instance.  It should

6    not, and, the Court is certain, will not happen again."  (Dkt. 124 at 6-7.)  Now that the same lawyers

7    have twice more violated the rules, Judge Mendez's teaching in another case is more appropriate:

8            When a party wrongfully obtains documents outside the normal discovery
             process, a number of different types of sanctions are available. These
9            include dismissal of the action, the compelled return of all documents,
             restrictions regarding the use of the documents at trial, disqualification of
10           counsel and monetary sanctions. *Fayemi v. Hambrecht & Quist, Inc.,* 174
             F.R.D. 319, 324–27 (S.D.N.Y. 1997).  Courts have considerable discretion
11           in choosing the appropriate sanction under its inherent authority and may,
             for example, dismiss claims, enter default judgment, and award attorney's
12           fees and costs. *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 461–62
             (4th Cir.1993); *see also Glynn v. EBO Corp.,* 2010 WL 3294347
13           (D.Md.2010).

14

15   *Lynn v. Gateway Unified Sch. Dist.*, No. 2:10-CV-00981-JAM, 2011 WL 6260362, at *5 (E.D. Cal. Dec.

16   15, 2011), *as amended* (Dec. 16, 2011) (disqualifying counsel), *appeal dismissed*, --- F.3d ---, 2014 WL

17   5741997 (Nov. 6, 2014) (order for disqualification of counsel and sanctions not final order subject to

18   appellate review), *citing Cunningham v. Hamilton Cnty., Ohio*, 527 U.S. 198, 205-207 (1999).

19       **1.    The Court Should Strike Defendants' Rule 60(d) Motion.**

20       Defendants' Rule 60(d) Motion cites the Wright Declaration fifty times.  It is a measured,

21   appropriate remedy to strike a pleading that so completely relies on information obtained in violation of

22   the State Bar Act and Rules of Professional Responsibility.  The Second Circuit affirmed the dismissal

23   of an entire *qui tam* action because *one* of the relators was the defendant's former attorney and plaintiffs

24   had "pursued [the] litigation on the basis that [the attorney relator] could 'spill his guts' and freely

25   disclose [defendant's] confidential information[.]"  *United States v. Quest Diagnostics Inc.*, 734 F.3d

26   154, 167 (2d Cir. 2013).  The Wright Declaration is important enough to Defendants that they cite it

27   fifty times and apparently want to use it as a roadmap for discovery.  Their Rule 60(d) Motion, which

28   says things that should never have been in the record at all, should be stricken.

## 2.    The Court Should Disqualify Counsel.

Disqualification is the appropriate remedy for counsel who obtains and actually uses an adversary's confidential information.  A motion to disqualify counsel is decided under state law.  *In re Cnty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000).  Under state law, "[t]he [disqualification] power is frequently exercised on a showing that disqualification is required under professional standards governing . . . potential adverse use of confidential information."  *Responsible Citizens v. Superior Court*, 16 Cal. App. 4th 1717, 1723-24 (1993); *Clark v. Superior Court*, 196 Cal. App. 4th 37, 47 (2011).

Disqualification is particularly warranted when counsel has actually used opposing party's confidences.  "[D]isqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility."  *People ex rel. Dep't of Corporations v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1145 (1999).  "The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process."  *Id.*  The attorney's duty of confidentiality is such a fundamental principle:

> Protecting the confidentiality of communications between attorney and client is fundamental to our legal system. The attorney-client privilege is a hallmark of our jurisprudence that furthers the public policy of ensuring the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.  To this end, a basic obligation of every attorney is to maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.

*SpeeDee Oil Change*, 20 Cal. 4th at 1146 (1999) (internal citations and quotations omitted).

Under California law, disqualification is the proper remedy on far less aggravated facts.  The California Supreme Court upheld disqualification for an attorney who merely received inadvertently disclosed confidential documents and distributed them among his litigation team, supposedly as part of an effort to show that the opposing party's experts had testified falsely.  *See Rico*, 42 Cal. 4th 807 (2007); *State Fund*, 70 Cal. App. 4th 644 (1999).  In this case, defense counsel actually sought out client confidences from a (disgruntled) former counsel, put them in a declaration, and used the Government's

1   confidences in a motion alleging, among other things, false testimony by the Government's experts.  The

2   Fourth District Court of Appeal upheld disqualification and ancillary relief when counsel's client had

3   purloined confidential records and counsel held them for a period of months, and used them to craft a

4   claim.  *See Clark*, 196 Cal. App. 4th at 53-54.  This is all in light of *SpeeDee Oil Change*'s teaching that

5   confidentiality is a fundamental principle of our legal system and disqualification is appropriate if

6   continued representation "could trigger doubts over the integrity of the judicial process" because

7   whenever the attorney's advocacy "began to touch on matters contained in the privileged documents . . .

8   the inevitable questions about the sources of [the attorney's] knowledge (even if [he] in fact obtained

9   such knowledge from legitimate sources) could undermine the public trust and confidence in the

10  integrity of the adjudicatory process."  *Clark*, 196 Cal. App. 4th at 55.

11          In addition, the prohibited invasion of the United States confidences and secrets is all the more

12  egregious in light of the prior orders finding Sierra Pacific's attorneys violated the Rules of Professional

13  Conduct and specifically directing all the defendants' lawyers "to comply with all applicable ethical

14  rules."  (Dkt. 326 at 15.)

15          Accordingly, disqualification here should extend to all counsel for the defendants except those (if

16  any) who can show

17          •   they neither participated in procuring client confidences and secrets from former

18              Assistant U.S. Attorney Wright

19          •   nor read either his declaration or the defendants' memorandum of points and authorities

20              (Dkt. 593-3) beyond the point where both documents are replete with protected work

21              product, privileged attorney-client communications, and client confidences and secrets.

22          For procuring and assisting Wright's unethical conduct, the disqualification should include at

23  least the attorneys and firm listed on the declaration itself:  William R. Warne, Michael J. Thomas,

24  Annie S. Amaral, Meghan M. Baker, and Downey Brand LLC.  The very appearance of their names on

25  the declaration indicates that they procured the improper declaration and assisted Wright by having it

26  filed on the public record.

27          However, whether those are the only attorneys who procured and assisted Wright's unethical

28  conduct is unknown.  The Court should therefore order the Downey Brand lawyers and all other

MOTION FOR DISQUALIFICATION OF COUNSEL AND          19
ANCILLARY RELIEF

1  attorneys of record for the defendants to disclose to the Court and the United States the details of each

2  one's participation in any and all communications with Wright and any other current or former

3  government employee or consultant.  They should disclose all knowledge they have about the entire

4  course of conduct by which Wright's declaration was procured.  This disclosure should specifically

5  include David H. Dun and Dun & Martinek LLP, additional counsel of record for Sierra Pacific, who

6  has worked hand-in-hand with the Downey Brand lawyers from the outset.  Only then will the Court

7  know which attorneys should be disqualified on this basis.

8          In addition, as explained above, the failure of defendants' attorneys to stop reading once

9  disclosure of the United States' privileged information was apparent provides independent grounds for

10 disqualification.  On those grounds, the Court should disqualify all attorneys and firms listed on the

11 defendants' memorandum of points and authorities in support of the motion to set aside the judgment

12 (Dkt. 593-3):  William R. Warne, Michael J. Thomas, Annie S. Amaral, Meghan M. Baker, and Downey

13 Brand LLP.; Richard S. Linkert, Julia M. Reeves, and Matheny Sears Linkert & Jaime, LLP; Phillip R.

14 Bonnotto, Derek Vandeviver, and Rushford & Bonnotto, LLP; and Richard W. Beckler, Jennifer T.

15 Lias, and Bracewell & Giuliani LLP.  In the exercise of minimum diligence, all of those lawyers must

16 have read the brief bearing their names and the Wright declaration filed in support of the brief and cited

17 therein fifty times.  But none of them complied with the requirement of state law that they notify the

18 United States of their receipt of those documents containing unauthorized disclosures.  It is a fair

19 inference that they also failed to stop reading as required by the same state law.  The Court should order

20 each of the named attorneys to disclose whether he or she read paragraphs 7-8 and/or 13-17 of the

21 Wright declaration, and pages 20-22 of the defendants' memorandum of points and authorities, and

22 should disqualify everyone who did.  *Clark*, 196 Cal. App. 4th at 49-56 (2011) (affirming

23 disqualification of entire law firm for reviewing information subject to attorney-client privilege which

24 was improperly disclosed by an attorney formerly employed by the opposing party).

25                    **3.     The Court Should Order Ancillary Relief**

26          Disqualification of counsel is not sufficient to protect the Government's right to confidentiality

27 and loyalty of its former counsel in this case.  This Court, as Magistrate Judge Brennan did before, must

28 further attempt to fashion a remedy sufficient to ascertain the scope of counsel's improper contacts and

prevent anyone from using information that defense counsel wrongfully obtained.  Appropriate ancillary relief would be similar to what Magistrate Judge Brennan ordered at the time of the first ethical breach, in November 2010.  (Dkt. 92 at 12.)  Counsel should identify any current or former federal employees or consultants they have contacted about this case, and they should disclose to the Government the full circumstances of the contact and any information obtained.

The Government also seeks the same ancillary remedies affirmed in *Clark*:  all defendants and their agents should immediately turn over the original and every copy of any record which contains or refers to attorney-client communications (including those between the U.S. Attorney's Office and PRAO), confidential activities of the United States' litigation team (including litigation consultants), discussions of litigation strategy and other attorney thought process (including those referred to in paragraphs 13-17 of the Wright declaration), and any other secrets and confidences of the United States.  This includes, of course, every draft of the Wright declaration and all correspondence by or among the defendants and their agents which discussed the Wright declaration or its contents.  In addition, Defendants' attorneys should be enjoined from discussing the contents of the documents with anyone or providing their work product in the action to either their clients or any representative of their clients, and any attorney appearing in this action for the defendants in the future should be required to certify that they have not received any confidences or secrets of the United States from the disqualified attorneys or as a result of their unethical conduct.

These measures are "prophylactic, not punitive," and are "necessary to protect [the Government's] rights as well as the integrity of the judicial proceedings," because, even assuming arguendo that Wright's declaration is true, "there exists a genuine likelihood that the . . . misconduct of [counsel] will affect the outcome of the proceedings before the court."  *Clark*, 196 Cal. App. 4th at 45 (internal quotations and citations omitted).

## IV.   <u>CONCLUSION</u>

Disqualification may work a hardship on Defendants, whose attorneys apparently have them convinced that their Rule 60(d) motion is somehow worth at try.  But a party is only entitled to a scorched-earth defense up to a point.  Counsel crossed that point sometime between their first and third breaches of the ethics rules.  The earlier orders by Judges Brennan and Mendez appear only to have

1   convinced these lawyers that they can take chances and if caught only be trusted and warned not to

2   repeat their transgressions.  This latest ethical breach is far more egregious than conduct that has

3   required disqualification under the controlling law.  No other remedy can suffice.

4

5   Dated:  November 17, 2014                          BENJAMIN B. WAGNER
                                                       United States Attorney

6

7                                            By:   _/s/ MATTHEW D. SEGAL_
                                                   MATTHEW D. SEGAL
8                                                  DAVID T. SHELLEDY
                                                   KELLI L. TAYLOR
9

10                                                 Assistant U.S. Attorneys

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX

| | |
|---|---|
| **From:** | Steven Ragland |
| **To:** | Taylor, Kelli L. (USACAE) |
| **Cc:** | John Keker |
| **Subject:** | U.S. v. Sierra Pacific Industries |
| **Date:** | Friday, November 14, 2014 4:19:56 PM |
| **Attachments:** | image003.png |

Dear Kelli:

Following up on our conversation yesterday, this email confirms that John Keker and I, and Keker & Van Nest LLP, are no longer involved in the Moonlight Fire litigation.  As we discussed, our representation of the Landowner Defendants in this matter ended in 2012, shortly after the settlement of the federal case.

Thank you for your attention to this matter and please let me know if you have any questions or need anything further from us.

Regards,
--Steven

**Steven P. Ragland**
Attorney at Law

**KEKER & VAN NEST** LLP

415 773 6604 direct  |  vCard  |  sragland@kvn.com
633 Battery Street, San Francisco, CA 94111-1809  |  415 391 5400 main  |  kvn.com

**APPENDIX 1**

SUPREME COURT
**FILED**

MAY 1 0 2002

Frederick K. Ohlrich Clerk

DEPUTY

S104682

# IN THE SUPREME COURT OF CALIFORNIA

## EN BANC

IN THE MATTER OF THE ADOPTION OF AMENDMENTS TO
RULE 3-600 OF THE RULES OF PROFESSIONAL CONDUCT

The State Bar Board of Governors' request to adopt amendments to the
Rules of Professional Conduct, rule 3-600, is denied because the proposed
modifications conflict with Business and Professions Code section 6068,
subdivision (e).

*Chief Justice*

**APPENDIX 2**

BILL NUMBER:   AB 363
VETOED          DATE: 09/30/2002


SEP 30 2002

To Members of the California State Assembly:

I am returning Assembly Bill 363 without my signature.

While this bill is well intended, it chips away at the
attorney-client relationship which is intended to foster candor
between an attorney and client.  It is critical that clients know
they can disclose in confidence so they can receive appropriate
advice from counsel.

The effective operation of our legal system depends on the
fundamental duty of confidentiality owed by lawyers to their clients.
  For these reasons, I must return this bill without my signature.

Sincerely,


GRAY DAVIS

**APPENDIX 3**

BILL NUMBER:  AB 2713
VETOED          DATE: 09/28/2004


To the Members of the California State Assembly:

I am returning Assembly Bill 2713 without my signature.

This is a well-intended bill and I applaud the efforts to expose
wrongdoing within government.  However, this bill would condone
violations of the attorney-client privilege, which is the cornerstone
of our legal system.   This bill will have a chilling effect on when
government officials would have an attorney present when making
decisions.   It is an attorneys duty to advise the governmental
officials when they are about to engage in illegal activity.   This
bill will ensure that advice is  not conveyed in every situation and
therefore it is too broad to affect the intended purposes.

Existing law already addresses the most egregious situations, which
is the only time the attorney-client relationship should be breached.
  It is critical to evaluate the recent changes to the law as it
relates to the attorney-client privilege prior to further eroding
this important legal principle.

For the reasons stated I am unable to support this measure.

Sincerely,


Arnold Schwarzenegger


**APPENDIX 4**

CA Eth. Op. 2013-188 (Cal.St.Bar.Comm.Prof.Resp.), 2013 WL 2894718

California State Bar
Standing Committee on Professional Responsibility and Conduct

Copyright (c) 2011, State Bar of California Reprinted with permission. All rights reserved.

ISSUE: IF AN ATTORNEY RECEIVES FROM A NON-PARTY A CONFIDENTIAL WRITTEN
COMMUNICATION BETWEEN OPPOSING COUNSEL AND OPPOSING COUNSEL'S
CLIENT, WHAT SHOULD THE ATTORNEY DO IF THE ATTORNEY REASONABLY
BELIEVES THAT THE COMMUNICATION MAY NOT BE PRIVILEGED BECAUSE
OF THE CRIME-FRAUD EXCEPTION TO THE ATTORNEY-CLIENT PRIVILEGE?

Formal Opinion Number 2013-188

2013

**DIGEST**: If an attorney receives an unsolicited intentionally transmitted written communication between opposing counsel and opposing counsel's client under circumstances reasonably suggesting that it is a confidential communication apparently sent without the consent of its owner, the attorney may not ethically read the communication, even if she suspects the crime-fraud exception might vitiate the privilege. The attorney must notify opposing counsel as soon as possible that the attorney has possession of the communication. The two attorneys should try to resolve the privilege issue or, if that fails, obtain the assistance of a court. Attorney may not read, disseminate, or otherwise use the communication or its contents absent court approval or consent of its owner.

*1 **AUTHORITIES INTERPRETED**: Rule I-100(A) of the Rules of Professional Conduct of the State Bar of California. [1]
Code of Civil Procedure section 2018.050.
Evidence Code sections 915, 952, 954, and 956.

## STATEMENT OF FACTS

Attorney represents Client in a fraud lawsuit against Company. During discovery, Attorney receives an unsolicited email from an anonymous Sender, with subject line "Client v. Company," and an icon notice of an attachment to the email. Upon opening the email, the first three lines of the email read, "From: [no sender]" / "To: Attorney" / "Subject: Client v. Company." Attorney's replies to the email consistently generate an automatic "undeliverable" bounce-back notification. The text of the email reads as follows:

> I am an ex-employee of Company. I wish to remain anonymous. I don't want any legal help from you and do not want to hear from you at all. Providing you with the attached document is all the help you will get from me. The attached document is a confidential communication between Company and your opposing counsel. It proves that Company planned and perpetrated the fraud with the advice and assistance of your opposing counsel, who was retained for that purpose, and who has been actively involved in the fraudulent scheme from the very outset, long before the incidents described in your complaint. The attached document will prove your case. Read it and see for yourself.

May Attorney ethically open and read the attachment? Must Attorney notify Company's counsel that Attorney has the attachment? When may Attorney use the attachment or the information conveyed in it?

## DISCUSSION

The attorney-client privilege protects disclosure of a confidential communication between client and lawyer. (Evid. Code. § 954.)

*2   "[Confidential communication between client and lawyer" means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."

(Evid. Code, § 952.)

The attorney-client privilege is a core value of the American justice system. It has been the "hallmark of our jurisprudence for almost 400 years." *Costco Wholesale Corporation v. Superior Court* (2009) 47 Cal.4th 725 [101 Cal.Rptr.3d758]:

Its fundamental purpose "is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. [Citation.] ... [¶] Although exercise of the privilege may occasionally result in the suppression of relevant evidence, the Legislature of this state has determined that these concerns are outweighed by the importance of preserving confidentiality in the attorney-client relationship. As this court has stated: 'The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence.'[Citations.]"'[T]he privilege is absolute and disclosure may not be ordered, without regard to relevance, necessity or any particular circumstances peculiar to the case. [Citation.]"

Mat p. 732.

in*State Compensation Insurance Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644 [82 Cal.Rptr.2d 799] *("State Fund")*, the California Court of Appeal stated:

> When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should [1] refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and [2] shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court for guidance with the benefit of protective orders and other judicial intervention as may be justified. We do, however, hold that whenever a lawyer ascertains that he or she may have privileged attorney-client material that was inadvertently provided by another, that lawyer must notify the party entitled to the privilege of that fact.

*3   *Id.* at pp. 656-657.[2]   This same language was adopted by the California Supreme Court in 2007, in *Rico v. Mitsubishi Motors Corp.* (2007) 42 Cal.4th 807, 817-818 [68 Cal.Rptr.3d 758] *("Rico")*, when it extended the *State Fund* rule beyond materials protected by the attorney-client privilege to materials protected by the attorney work-product doctrine, irrespective of whether the documents are marked as "confidential" or "work product."

The *State Fund/Rico* rule is an objective one. In assessing whether a lawyer has complied with the standard, courts must consider "whether reasonably competent counsel, knowing the circumstances of the litigation, would have concluded the materials were privileged, how much review was reasonably necessary to draw that conclusion, and when counsel's examination should have ended."*Rico, supra*, 42 Cal.4th at p. 818,*quoting State Fund, supra*, 70 Cal.App.4th at pp. 656-657.

Improper handling of an opposing party's confidential document(s) may result in serious adverse consequences to that lawyer and his or her client, such as disqualification of the lawyer and/or co-counsel, as well as the assessment of monetary or evidentiary sanctions. See, e.g., *Rico, supra,* 42 Cal.4th 807 (lawyers and experts disqualified). See also *Bak v. MCL Financial Group, Inc.* (2009) 170 Cal.App.4th 1118 [88 Cal.Rptr.3d 800] (lawyer sanctioned $7,500 for making cursory review, copying, and sending to arbitration staff privileged documents inadvertently produced by opposing counsel); *County of Los Angeles v. Superior Court* (1990) 222 Cal.App.3d 647 [271 Cal.Rptr. 698] (lawyer disqualified for receiving opposing party's confidential information from expert consultant). [3]

*Rico* and *State Fund* impose certain ethical duties upon the receiving lawyer when (a) the lawyer receives materials that "obviously appear" to be privileged or "otherwise clearly appear to be confidential and privileged" and (b) "it is reasonably apparent" that the materials were inadvertently disseminated. *State Fund, supra,* 70 Cal.App.4th at p. 656.

## 1. "Obviously Appear" or "Otherwise Clearly Appear to Be Confidential and Privileged"

In *Clark v. Superior Court* (2011) 196 Cal.App.4th 37, 49 [125 Cal.Rptr.3d 361], the court determined that the transmission of information between attorney and client is presumed to be privileged, regardless of its content. In that case, VeriSign sought the disqualification of Clark's lawyer, because the lawyer allegedly received from Clark numerous of Verisign's attorney-client privileged documents that Clark had taken when he left Verisign's employ. Clark's attorney did not return, nor did he destroy, the documents despite Verisign's demands based upon privilege. VeriSign then successfully moved for disqualification, after Clark admitted to have affirmatively employed the documents to pursue Clark's lawsuit against VeriSign.

\*4 In affirming disqualification, the Court of Appeal focused its inquiry on the relationship of the parties to the communication. It stated that where the party claiming privilege shows that the dominant purpose of the relationship between the parties to the communication was attorney-client, the court treats the communication as protected by the privilege, and review of its content is therefore prohibited. *Clark, supra,* 196 Cal.App.4th at pp. 51-52 (citing *Costco, supra,* 47 Cal.4th at pp. 739-740). Because all the disputed communications at issue were between a VeriSign agent and a VeriSign attorney, they were presumptively privileged, and further review should have ceased. The actions of Clark's attorney violated *Rico* and *State Fund,* because even after he was aware the documents were communications transmitted between VeriSign and its counsel, Clark's counsel continued his review of the content, and also used them to advance Clark's case. Finding these actions went beyond the permissible limits, the *Clark* court rejected Clark's argument that his counsel complied with his ethical obligations because he obtained the documents properly from Clark, did not hide his possession of them, met and conferred with VeriSign, and sequestered the documents. The court reached its conclusion, notwithstanding the fact that the case involved information that was not received by Clark's counsel inadvertently, but rather was information Clark purposefully took with him when he left VeriSign's employ, and which he then purposefully turned over to his counsel for use in his case against VeriSign. *Clark, supra,* 196 Cal.App.4th at p. 54.

Applying the foregoing authorities to our hypothetical, the attachment is privileged. The body of the email expressly states, "[t]he attached document is a confidential communication between Company and your opposing counsel."On its face, it is an attorney-client communication purporting to show advice and assistance from attorney to client, and "obviously appears" or "otherwise clearly appears" to be attorney-client privileged.

## 2. "Reasonably Apparent" that the Materials Were Inadvertently Disseminated

In our hypothetical, Attorney did not receive Company's document from opposing counsel through the Company's inadvertence. Rather, Attorney received Company's document from Sender, an unknown third party, who intentionally transmitted it. However, given the strong public policies underlying *State Fund* and *Rico,* we conclude the ethical duties set forth in *State Fund* and *Rico* apply both when "it is reasonably apparent that the materials were provided or made available through inadvertence" by the privilege holder's counsel himself, *or* when a third party intentionally sends privileged materials to another attorney, and it is reasonably apparent that those materials were sent without their owner's authorization. *Rico, supra,* 42 Cal.4th at p. 817.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

3

APPENDIX 7

*5 The Court's analysis in *Rico* supports this conclusion. The *Rico* court adopted the trial court's finding that the receiving lawyer "came into the document's possession through inadvertence,"*Rico, supra*, 42 Cal.4th at p. 812. even though the receiving lawyer claimed that a third party — a court reporter — gave him the relevant document in the first instance and, therefore, there was no inadvertence. The salient point of *Rico* was that it was reasonably apparent to the receiving lawyer in *Rico* that neither the author nor the intended recipient of the document authorized its dissemination.

Similarly, in *Clark*, the court rejected Clark's arguments that his attorney did not violate any ethical duties because he did not receive the documents in question inadvertently from VeriSign's counsel, but rather that he received them from Clark. Like the Supreme Court in *Rico*, the *Clark* court focused on the fact that VeriSign clearly did not authorize the document's dissemination. *Clark, supra*, 196 Cal.App.4th at p. 54.

### 3. Crime-Fraud Exception

Finally, under our hypothetical scenario, the crime-fraud exception to the attorney-client privilege does not vitiate Attorney's duties under *State Fund* and *Rico*.The crime-fraud exception, if established, expressly applies to communications otherwise shielded by the attorney-client privilege. Evidence Code section 956 (no attorney-client privilege if services were sought or obtained to enable or aid anyone to commit or plan to commit a crime or fraud); *State Farm Fire and Casualty Co. v. Superior Court* (1997) 54 Cal.App.4th 625, 643 [62 Cal.Rptr.2d 834] (presumptively privileged statements in declaration by ex-claims specialist who previously worked in insurer's litigation unit discoverable because of crime-fraud exception).[4] The burden is on the party claiming that the crime- fraud exception applies to make a prima facie showing that the services of the lawyer were "sought or obtained" to enable or to aid the client to plan to commit a crime or fraud. *BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240, 1249 [245 Cal.Rptr. 682] (proponent made prima facie showing that opposing counsel's letter was an attempt to defraud proponent). The mere assertion of a crime or fraud is insufficient to trigger the exception 55F there must be a prima facie showing by the proponent through non-privileged information, that the allegation that the attorney's services were sought or obtained to enable the planning of a crime or fraud has some foundation in fact. *Id.*

In *Costco, supra*. 47 Cal.4th at pp. 739-740, the California Supreme Court considered and rejected arguments that *Oxy Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874 [9 Cal.Rptr.3d 621] and *Cornish v. Superior Court* (1989) 209 Cal.App.3d 467, 480 [257 Cal.Rptr. 383] authorized an in camera review of privileged information to determine whether or not an exception to the privilege applied, absent such prima facie showing: "As we have explained, section 915 prohibits disclosure of information claimed to be privileged in order to determine if a communication is privileged. But after the court has determined that the privilege is waived or an exception applies generally, the court to protect the claimant's privacy may conduct or order an in camera review of the communication at issue to determine if some protection is warranted notwithstanding the waiver or exception."

*6 Thus, even though Attorney received a purported confidential attorney-client communication under circumstances suggesting that the communication may not be privileged because of the crime-fraud exception, that mere suggestion, standing alone, does not work to abrogate Attorney's ethical duties under *State Fund* and *Rico. Rico, supra*, 42 Cal.4th at p. 817.[5]

Our conclusion is also in accord with the deference traditionally afforded the attorney-client relationship. See, e.g., Evid. Code, § 915; *Costco, supra*, 47 Cal.4th 725; and *Titmas v. Superior Court* (2001) 87 Cal.App.4th 738. 740 [104 Cal.Rptr.2d 803] (holding that court may not order disclosure of document claimed to be protected by attorney-client privilege without full hearing with oral argument);but see *Oxy Resources California. supra*. 115 Cal.App.4th at p. 896 ("[C]ourts have recognized, if necessary to determine *whether an exception to the privilege applies*, the court may conduct an in camera hearing notwithstanding *section 915."*(emphasis in original)). "Extreme caution" must be exercised when an accusation is made that will invade the attorney-client relationship in connection with ongoing litigation. See *State Farm, supra*, 54 Cal.App.4th at pp. 644-645.

Accordingly, to establish applicability of the crime-fraud exception in a situation such as our hypothetical, Attorney would have to use non-privileged information to make a prima facie showing that opposing counsel's services were sought in order to assist the opposing party in committing that crime or fraud. See *BP Alaska, supra*, 199 Cal.App.3d at pp. 1264-1266, 1268-1269 (finding a prima facie showing had been made); see also *Costco, supra*, 47 Cal.4th at pp. 739-740; *See also United States v. Zolin* (1989) 491 U.S. 554, 572 [109 S.Ct. 2619, 2631] (judge should first require a showing of facts adequate to support a good faith belief by a reasonable person that in camera review of privileged materials may reveal evidence the crime-fraud exception applies).

## CONCLUSION

Given the state of the law and the value placed on the attorney-client privilege, attorneys must use caution when faced with an inadvertent or unauthorized disclosure situation — even under circumstances that may suggest an exception to the privilege applies. An attorney who receives an unsolicited intentionally transmitted written communication between opposing counsel and opposing counsel's client under circumstances reasonably suggesting that it is a confidential communication apparently sent without the consent of its owner may not ethically read the communication. Attorney must notify opposing counsel as soon as possible that the attorney has possession of the communication. At the very least, the attorneys should then try to resolve the issue of privilege, or the attorneys may seek court guidance as to the applicability of the crime-fraud exception. This opinion does not address what other options Attorney might have, provided that Attorney complies with the ethical obligation to not read the communication and to notify opposing counsel as described above.

**\*7** This opinion is issued by the Standing Committee on Professional Responsibility and Conduct of the State Bar of California. It is advisory only. It is not binding upon the courts, the State Bar of California, its Board of Trustees, any persons, or tribunals charged with regulatory responsibilities, or any member of the State Bar.

Footnotes

1  Unless otherwise indicated, all future references to rules in this opinion will be to the Rules of Professional Conduct of the State Bar of California.

2  Whether Attorney should actually return the email and/or attachments is a matter left to the Attorney's judgment. *See* ABA Model Rules Prof. Conduct, Rule 4.4, Comment [3] ("Some lawyers may choose to return a document unread, for example, when the lawyer learns before receiving the document that it was inadvertently sent to the wrong address. Where a lawyer is not required by applicable law to do so, the decision to voluntarily return such a document is a matter of professional judgment ordinarily reserved to the lawyer.").
    While California has not adopted the ABA Model Rules, they may nevertheless be used as guidance for lawyers absent on-point California authority or a conflicting state public policy.*City & County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal. 4th 839, 852 [43 Cal.Rptr.3d 771]. Thus, in the absence of related California authority, we may look to the Model Rules, and the ABA Formal Opinions interpreting them, as well as the ethics opinions of other jurisdictions or bar associations for guidance. Rule 1-100(A) (ethics opinions and rules and standards promulgated by other jurisdictions and bar associations may also be considered); *State Fund, supra*, 70 Cal.App.4th at p. 656.

3  This opinion only addresses the ethics issues arising from an attorney's receipt of another's potentially privileged documents from a third party, not any legal issues pursuant to, for example, Penal Code sections 496 (receiving stolen property) or 504 (computer crimes), Civil Code sections 3426 *et seq.* (Uniform Trade Secrets Act), or the provisions of any protective order. Conviction of the crimes of receiving or concealing stolen property (which are offenses constituting moral turpitude) may subject an attorney to discipline. See *In re Plotter* (1971) 5 Cal.3d 714 [97 Cal.Rptr. 193] (attorney disbarred after convictions for receiving stolen property and illegally supplying or administering an abortion); see also *Williams v. Superior Court* (1978) 81 Cal.App.3d 330 [146 Cal.Rptr. 311] (attorney convicted of concealing stolen property); and Bus. & Prof. Code, §§ 6100 et seq.
    This opinion also does not address duties, if any, owed by an attorney to a third party who sends an unsolicited private communication to a lawyer containing such potentially privileged documents. For a discussion of potential duties to a third person who attempts to communicate confidentially with a lawyer, see State Bar Formal Opinion No. 2003-161.

4  Conversely, the attorney work-product doctrine generally has no crime-fraud exception. See *BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240, 1251 [245 Cal.Rptr. 682]; but see Code of Civil Procedure section 2018.050 ("[notwithstanding

**APPENDIX 9**

Section 2018.040, when a lawyer is suspected of knowingly participating in a crime or fraud, there is no protection of work product under this chapter in any official investigation by a law enforcement agency or proceeding or action brought by a public prosecutor in the name of the people of the State of California if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or fraud.").

5      Whether or not the email in question is sufficient, in fact, to make the prima facie showing required to trigger the crime-fraud exception is a question of law that is beyond the province of this opinion.

CA Eth. Op. 2013-188 (Cal.St.Bar.Comm.Prof.Resp.), 2013 WL 2894718

---

End of Document                                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**APPENDIX 10**

ABA Formal Op. 91-359

ABA Comm. on Ethics and Professional Responsibility, Formal Op. 91-359

American Bar Association

CONTACT WITH FORMER EMPLOYEE OF ADVERSE CORPORATE PARTY

March 22, 1991

Copyright (c) by the American Bar Association

The prohibition of Rule 4.2 with respect to contactsby a lawyer with employees of an opposing corporate party does not extend to former employees of that party.

The Committee has been asked for its opinion whether a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without the consent of the corporation's lawyer, communicate about the subject of the representation with an unrepresented former employee of the corporate party.

The starting point of our inquiry is Model Rule of Professional Conduct 4.2, which states:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

The rule is, for purposes of the issue under discussion, substantially identical to DR 7-104(A)(1), which states as follows:

(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

The comment to Rule 4.2 Makes clear that corporate parties are included within the meaning of "party" in that Rule, and is helpful in defining the contours of that rule as it applies to present employees of corporate parties:

[1] This Rule does not prohibit communication with a party, or an employee or agent of a party, concerning matters outside the representation. For example, the existence of a controversy between a government agency and a private party, or between two organizations, does not prohibit a lawyer for either from communicating with non lawyer representatives of the other regarding a separate matter. Also, parties to a matter may communicate directly with each other and a lawyer having independent justification for communicating with the other party is permitted to do so. Communications authorized by law include, for example, the right of a party to a controversy with a government agency to speak with government officials about the matter.

[2] In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for the purposes of this Rule. Compare Rule 3.4(f).

**APPENDIX 11**

[3] This Rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question.

The rationale on which Rule 4.2 was formulated was identified in Wright v. Group Health Hospital, 103 Wash.2d 192, 691 P.2d 564, 576 (1984).

The purposes of the rule against ex parte communications with represented parties are "preserving the proper functioning of the legal system and shielding the adverse party from improper approaches." (Citing ABA Formal Opinion 108 (1934)).

The profession has traditionally considered that the presumptively superior skills of the trained advocate should not be matched against those of one not trained in the law. As discussed at 1 Law.Man.Prof.Conduct 71:302 (1984),

... The rule against communicating with the opposing party without the consent of that party's lawyer does not admit of any exceptions for communications with "sophisticated" parties. Maru, 10861 (Fla.Bar Op. 76-21 (4/19/77)). See also Waller v. Kotzen, 567 F.Supp. 424 (E.D.Pa.1983) (plaintiff's counsel contacted insurance company directly, after insurer was represented by counsel); Estate of Vafiades v. Sheppard Bus Service, 469 A.2d 971 (N.J.Super.1983) (negotiations were conducted with insurance company for defendants).

cf. Meat Price Investigators Assn. v. Iowa Beef Processors, 448 F.Supp. 1, 3 (S.D.Iowa 1977) (while leaving question of culpability of counsel's conduct to disciplinary authorities, court declined to disqualify counsel for interviewing an officer of an opposing party who was a "sophisticated businessman who was openly willing to share his knowledge of the beef industry with attorneys he knew to be plaintiff's counsel.") See also Code of Professional Responsibility EC 7-18:

The legal system in its broadest sense functions best when persons in need of legal advice or assistance are represented by their own counsel. For this reason a lawyer should not communicate on the subject matter of the representation of his client with a person he knows to be represented in the matter by a lawyer, unless pursuant to law or rule of court or unless he has the consent of the lawyer for that person....

The comment to Rule 4.2 limits those present corporate employees covered by this rule to:

persons having a managerial responsibility on behalf of the organization, and ... any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

The inquiry as to present employees thus becomes whether the employee (a) has "a managerial responsibility" on behalf of the employer-corporation, or (b) is one whose act or admission in connection with the matter that is the subject of the potential communicating lawyer's representation may be imputed to the corporation, or (c) is one whose "statement may constitute an admission" by the corporation.

Whether an employee falls into any of these three categories is inevitably an issue affected by a host of factors, the exploration of none of which need detain us. These include at least the terms of the relevant statutory and common law of the state of the corporation's incorporation; applicable rules of evidence in the relevant jurisdiction; and relevant corporate documents affecting employees' duties and responsibilities.

At least insofar as the test of imputable act or omission is concerned all of these factors, in turn, would have to be applied within the context of "the matter in representation" to determine whether the acts or omissions of the employee can be imputed to the corporation with respect to that particular matter. That requires a determination of the scope of the subject matter of the potentially-communicating lawyer's representation.

2

**APPENDIX 12**

The comment—by defining three categories of unrepresented corporate employees with whom communication "concerning the matter in representation" is prohibited absent the consent of the corporation's counsel or authorization of law—clearly implies that communication with all other employees on "the matter in representation" is permissible without consent, subject only to such other rules and other law as may be applicable. (E.g., Rule 4.1, requiring truthfulness in statements to others and Rule 4.3, addressing a lawyer's dealings with unrepresented persons.)

Neither the Rule nor its comment purports to deal with former employees of a corporate party. Because an organizational party (as contrasted to an individual party) necessarily acts through others, however, the concerns reflected in the Comment to Rule 4.2 may survive the termination of the employment relationship.

(It is appropriate to note here that those addressed by the Comment are not denominated "employees" but "persons." The Rule presumably covers independent contractors whose relationship with the organization may have placed them in the factual position contemplated by the Comment. Because the issue this Opinion addresses deals expressly with former employees, we need not explore the ramifications of this expansive terminology.)

While Rule 4.2 does not purport by its terms to apply to former employees, courts confronting the issue have interpreted Rule 4.2 (as illuminated by its comment) and DR 7-1-4(A)(1) (which does not have such a comment or comparable discussion in any Ethical Consideration) in various ways.

Most recently, in an aside in a case dealing with current employees under DR 7-104(A)(1), the New York Court of Appeals noted its agreement with the Appellate Division that the rule applies "only to current employees, not to former employees." Niesig v. Team I et al, 76 N.Y.2d 363, 558 N.E.2d 1030 (1990). See also Wright v. Group Health Hosp., 103 Wash.2d 192, 691 P.2d 564 (1984) (reasoning that former employees could not possibly speak for or bind the corporation, and therefore interpreting DR 7-104(A)(1) as not applying to them); and Polycast Technology Corp. v. Uniroyal, Inc., 129 F.R.D. 621 (S.D.N.Y.1990) (holding that DR 7-104 does not bar contacts with former corporate employees, at least in absence of a showing that the employee possessed privileged information).

On the other hand, other courts have held that former employees are covered (it is usually phrased that they will be considered "parties" for ex parte contact purposes) under certain circumstances. Thus, Rule 4.2 has been held to bar ex parte contacts with former employees who, while employed, had "managerial responsibilities concerning the matter in litigation." Porter v. Arco Metals, 642 F.Supp. 1116, 1118 (D.Mont.1987). In Amarin Plastics v. Maryland Cup Corp., 116 F.R.D. 36 (D.Mass.1987) the Court, while recognizing the possible applicability of Rule 4.2 to former employees, declined to apply it on the facts of that case. It noted, however, the additional possibility that communications between a former employee and his former corporate employer's counsel may be privileged. Id., at 41. See also In re coordinated Pre-Trial Proceedings in Petroleum Products Antitrust Litigation, 658 F.2d 1355, 1361 n. 7 (9th Cir.1981), cert. denied, 455 U.S. 99 (1982) (noting that the rationale of Upjohn v. United States, 449 U.S. 383 (181) with respect to corporate attorney-client privilege applies to former as well as current corporate employees). In Public Service Electric and Gas Company v. Associated Electric and Gas Ins. Services, Ltd., 745 F.Supp. 1037, (D.N.J.1990) the court interpreted Rule 4.2 to cover all former employees.

Commentators on the subject of ex parte contacts with former employees have likewise urged application of the prohibition on contacts to at least some former corporate employees. See, e.g., Stahl, Ex Parte Interviews with Enterprise Employees: A Post-Upjohn Analysis, 44 Wash. & Lee L.Rev. 1181 at 1227 (1987), recommending a functional approach deeming

any present or former employee who is identified with an enterprise, either for purposes of resolving disputed issues or effective representation of the enterprise, to be a party representative for discovery purposes. Any other rule would put enterprises at a distinct and unfair disadvantage and may effectively deny enterprises the full benefit of representation by counsel....

**APPENDIX 13**

See also Miller and Calfo, Ex Parte Contact with Employees and Former Employees of a Corporate Adversary: Is It Ethical?, 42 Bus.Law. 1053 at 1072-73 (1987):

> [C]ourt authorization or opposing counsel's consent to ex parte contact should be required if the former employee was highly-placed in the company (such as a former officer or director) or if the former employee's actions are precisely those sought to be imputed to the corporation.

While the Committee recognizes that persuasive policy arguments can be and have been made for extending the ambit of Model Rule 4.2 to cover some former corporate employers, the fact remains that the text of the Rule does not do so and the comment gives no basis for concluding that such coverage was intended. Especially where, as here, the effect of the Rule is to inhibit the acquisition of information about one's case, the Committee is loath, given the text of Model Rule 4.2 and its Comment, to expand its coverage to former employees by means of liberal interpretation.

Accordingly, it is the opinion of the Committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer.

With respect to any unrepresented former employee, of course, the potentially-communicating adversary attorney must be careful not to seek to induce the former employee to violate the privilege attaching to attorney-client communications to the extent his or her communications as a former employee with his or her former employer's counsel are protected by the privilege (a privilege not belonging to or for the benefit of the former employee, by the former employer). Such an attempt could violate Rule 4.4 (requiring respect for the rights of third persons).

The lawyer should also punctiliously comply with the requirements of Rule 4.3, which addresses a lawyer's dealings with unrepresented persons. That rule, insofar as pertinent here, requires that the lawyer contacting a former employee of an opposing corporate party make clear the nature of the lawyer's role in the matter giving occasion for the contact, including the identity of the lawyer's client and the fact that the witness's former employer is an adverse party. See, e.g., Brown v. Peninsula Hospital Centers, 64 A.D.2d 685, 407 N.Y.S.2d 586 (App.Div.1978) (attorneys for defendant hospital should have disclosed potential conflict of interest before talking to treating physician and producing him for deposition as hospital's representative); ABA Informal Opinion 908 (1966).

ABA Formal Op. 91-359

---

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

**APPENDIX 14**