DOWNEY BRAND LLP
WILLIAM R. WARNE (SBN 141280)
MICHAEL J. THOMAS (SBN 172326)
ANNIE S. AMARAL (SBN 238189)
MEGHAN M. BAKER (SBN 243765)
621 Capitol Mall, 18th Floor
Sacramento, CA 95814-4731
Telephone: (916) 444-1000
Facsimile: (916) 444-2100
bwarne@downeybrand.com
mthomas@downeybrand.com
aamaral@downeybrand.com
mbaker@downeybrand.com

BRACEWELL & GIULIANI LLP
RICHARD W. BECKLER
D.C. Bar No. 262246
(*Admitted Pro Hac Vice*)
JENNIFER T. LIAS
Virginia Bar No. 85608
(*Admitted Pro Hac Vice*)
2000 K Street NW, Suite 500
Washington, DC 20006-1809
Telephone: (202) 828-5874
Facsimile: (800) 404-3970
richard.beckler@bgllp.com
jennifer.lias@bgllp.com

MATHENY SEARS LINKERT & JAIME, LLP
RICHARD S. LINKERT (SBN 88756)
JULIA M. REEVES (SBN 241198)
3638 American River Drive
Sacramento, CA 95864
Telephone: (916) 978-3434
Facsimile: (916) 978-3430

Attorneys For Defendants W.M. BEATY &
ASSOCIATES, INC. AND ANN MCKEEVER
HATCH, as Trustee of the Hatch 1987
Revocable Trust, et al.

RUSHFORD & BONOTTO, LLP
PHILLIP R. BONOTTO (SBN 109257)
DEREK VANDEVIVER (SBN 227902)
1010 Hurley Way, Suite 410
Sacramento, CA 95825
Telephone: (916) 565-0590

Attorneys for Defendant, EUNICE E.
HOWELL, INDIVIDUALLY and d/b/a
HOWELL'S FOREST HARVESTING

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> SIERRA PACIFIC INDUSTRIES, W.M. BEATY AND ASSOCIATES, INC., EUNICE E. HOWELL, INDIVIDUALLY AND DOING BUSINESS AS HOWELL'S FOREST HARVESTING COMPANY; ANN McKEEVER HATCH, AS TRUSTEE OF THE HATCH 1987 REVOCABLE TRUST, ET AL. <br><br> Defendants. | Case No. 2:09-CV-02445-WBS-AC <br><br> **DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING THE MOONLIGHT PROSECUTORS' FRAUD ON THE COURT** <br><br> Date: April 6, 2015 <br> Time: 2:00 p.m. <br> Dept: Courtroom 5 <br> Judge: Hon. William B. Shubb |

DOWNEY BRAND LLP

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................. 2

II. WHAT DEFENDANTS MUST PROVE TO SEEK RELIEF UNDER RULE 60(D)(3). ................................................................................................................ 5

   A.  The Test for Fraud On the Court Within the Meaning of Rule 60(d)(3) ............... 5

   B.  Examples of Litigation Misconduct Which Have Been Held to Constitute Fraud on the Court ................................................................................................ 7

      1.  Hazel-Atlas Glass Company v. Hartford-Empire Company ..................... 7

      2.  United States v. Shaffer Equipment Company ......................................... 9

      3.  Pumphrey v. K.W. Thompson Tool Company ....................................... 12

      4.  In re Levander ....................................................................................... 13

      5.  Derzack v. County of Allegheny, Pennsylvania .................................... 14

      6.  Fraud Upon the Court May Arise From a Course of Conduct ................ 15

   C.  A Motion or Action For Fraud on the Court is Not Precluded By Passage of Time or Settlement ............................................................................................. 16

   D.  The Integrity of the Judicial Process is Most Severely Damaged When Government Actors Defraud the Court ................................................................ 20

      1.  Because They Represent the Sovereign, Government Attorneys Are Held to a Higher Standard ................................................................... 20

      2.  Recklessness by a Government Attorney is Sufficient to Constitute a Fraud Upon the Court ....................................................................... 25

III. EACH INSTANCE OF THE MOONLIGHT PROSECUTORS' MISCONDUCT CONSTITUTES A SEPARATE FRAUD ON THE COURT ...................................... 26

   A.  Background Facts Relevant to All Instances of the Moonlight Prosecutors' Misconduct ......................................................................................................... 27

      1.  A Brief Overview of the Moonlight Fire ............................................... 27

      2.  The Moonlight Fire Investigation, as Told Through the Joint Report ...... 29

      3.  The Initiation of the State Actions ......................................................... 31

      4.  The Initiation of the Federal Action ...................................................... 32

      5.  The Resolution of the Federal Action .................................................... 34

      6.  Resolution of the State Court Action ..................................................... 38

      7.  Wright and His Experiences Relating to the Moonlight Fire and Other Wildfire Cases in the Year He Filed the Moonlight Action .......... 40

      8.  Assistant United States Attorney Eric Overby ....................................... 41

      9.  Filing With The Office of Professional Responsibility ........................... 43

   B.  Selected Instances of Prosecutorial Misconduct, Each of Which Separately Constitutes Fraud on the Court ........................................................................... 43

i

DOWNEY BRAND LLP

1. The Moonlight Prosecutors Advanced a Fraudulent Origin and Cause Investigation in the Litigation and Allowed the Investigators to Repeatedly Lie under Oath about the Very Foundation of Their Work, Thereby Committing a Fraud Upon the Court ............................... 44

    a. What Transpired on the Hillside on September 4-5, 2007 .......... 44

    b. The Moonlight Investigators Are Confronted in Deposition with Evidence of Their Secret Origin ........................................ 53

    c. The Moonlight Prosecutors Affirmatively Assisted and Encouraged the Moonlight Investigators' False Testimony ........ 57

2. The Moonlight Prosecutors Misrepresented to the Court Bush's Alleged "Admission" That a Rock Strike Caused the Moonlight Fire, Which They Relied Upon in Procuring a Favorable Summary Judgment Ruling, Thereby Committing a Fraud Upon the Court ............ 62

3. The Moonlight Prosecutors Proffered False Testimony in Opposition to Defendants' Motion for Summary Judgment and Succeeded in Procuring a Favorable Ruling, Thereby Committing a Fraud Upon the Court ................................................................................. 67

4. The Moonlight Prosecutors Failed to Take Remedial Action After Learning of Evidence that Undermined the Government's Origin and Cause Conclusions and Failed to Produce Related Exculpatory Evidence, Thereby Committing a Fraud Upon the Court ....................... 72

5. The Moonlight Prosecutors Created a False Diagram to Further Their Case, Thereby Committing a Fraud Upon the Court ..................... 77

6. The Moonlight Prosecutors Failed to Disclose and Correct Admittedly False Expert Reports Thereby Committing a Fraud Upon the Court ................................................................................................... 79

7. The Moonlight Prosecutors Misrepresented Evidence to the Court to Wrongfully Claim that Howell Started Other Wildland Fires to Procure Another Favorable Ruling on Summary Judgment, Thereby Committing a Fraud Upon the Court ..................................................... 83

8. The Moonlight Prosecutors Actively Covered Up Misconduct at the Red Rock Lookout Tower in Verified Discovery Responses and Misrepresented the State of the Evidence to the Court, Thereby Committing A Fraud Upon the Court ...................................................... 91

    a. What actually happened in the Red Rock Lookout Tower .......... 93

    b. The Cover-Up: What the Investigators and the Moonlight Prosecutors said about what happened at the Red Rock Lookout Tower ......................................................................... 95

    c. The lead Moonlight Prosecutor Taylor joined in the effort to cover up what actually occurred at the Red Rock Lookout Tower ................................................................................... 100

DOWNEY BRAND LLP

ii

**TABLE OF CONTENTS**
**(continued)**

9.    The Moonlight Prosecutors Made Reckless Misrepresentations About Cal Fire's Civil Cost Recovery Program to Procure Another Favorable Pretrial Ruling on a Material Issue, Thereby Committing a Fraud Upon the Court ...................................................................... 109

    a.    The Moonlight Prosecutors' Misrepresentations to the Court Concerning WiFITER Constituted a Fraud Upon the Court ...... 119

    b.    Concealment of the Motivational Bias Created by WiFITER Constituted a Fraud Upon the Court........................................ 120

    c.    The Existence of WiFITER Constitutes a Fraud Upon the Court ...................................................................................... 122

10.   The Moonlight Prosecutors Concealed from the Court and Defendants Percipient Witness Edwin Bauer's False Report of a Two Million Dollar Bribe, Which Enabled Them to Obtain a Favorable Pretrial Ruling on a Material Issue, Thereby Committing a Fraud on the Court........................................................................... 124

IV.   THE MOONLIGHT PROSECUTORS' MULTIPLE INSTANCES OF MISCONDUCT COLLECTIVELY CONSTITUTE FRAUD ON THE COURT......... 134

V.    CONCLUSION.................................................................................... 137

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

**CASES**

*Alexander v. Robertson,*
  882 F.2d 421 (9th Cir. 1989) ........................................................................... 6, 19

*And in Southerland v. Oakland County,*
  77 F.R.D. 727 (E.D. Mich. 1978) ............................................................................. 18

*And in Sperry & Hutchinson Co. v. F.T.C.,*
  256 F. Supp. 136 (S.D.N.Y. 1966) ............................................................................ 22

*Aoude v. Mobil Oil Corp.,*
  892 F.2d 1115 (1st Cir. 1989) .......................................................................... 19, 20

*Benn v. Lambert,*
  283 F.3d 1040 (9th Cir. 2002) ................................................................................... 3

*Black v. Suzuki Motor Corporation,*
  No. 2:04-CV-180, 2008 WL 2278663 (E.D. Tenn. May 30, 2008) .................................... 18

*Brady v. Maryland,*
  373 U.S. 83 (1947) ........................................................... 21, 22, 23, 25, 53, 121, 133

*Broyhill Furniture Industries Inc. v. Craftmaster Furniture Corporation,*
  12 F.3d 1080 (Fed. Cir. 1993) ........................................................................... 17, 18

Cal Fire v. Dustin White  (Lassen County Superior Court Case No. 4365 ................................. 48

*Campbell v. United States,*
  365 U.S. 85 (1961) .................................................................................................. 22

*Chambers v. NASCO, Inc.,*
  501 U.S. 32 (1991) ............................................................................. 5, 11, 133, 134

*Demjanjuk v. Petrovsky, a Sixth Circuit,*
  10 F.3d 338 (6th Cir. 1993) ........................................................... 22, 25, 26, 119, 134

*Derzack v. Cnty. of Allegheny Children & Youth Servs.,*
  118 F.3d 1575 (3d Cir. 1997) ........................................................................... 14, 15

*Derzack v. Cnty. of Allegheny, Pa.,*
  173 F.R.D. 400 (W.D. Pa. 1996) ........................................... 14, 79, 107, 108, 122

*Dixon v. C.I.R.,*
  316 F.3d 1041 (9th Cir. 2003) ........................................... 6, 23, 61, 91, 106, 107

*EEOC v. Los Alamos Constructors, Inc.,*
  382 F. Supp. 1373 (D.N.M. 1974) ............................................................................. 22

*England v. Doyle,*
  281 F.2d 304 (9th Cir. 1960) ..................................................................................... 6

*Freeport-McMoRan Oil & Gas Co. v. F.E.R.C.,*
  962 F.2d 45 (D.C. Cir. 1992) .................................................................................... 20

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
  322 U.S. 238 (1944) 5, 6, 7, 8, 9, 11, 12, 16, 19, 20, 23, 65, 66, 70, 71, 72, 75, 77, 79, 89, 106, 134, 13

*Hennon v. Cooper,*
  109 F.3d 330 (7th Cir. 1997) ............................................................................. 23, 24

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

*Herring v. United States,*
424 F.3d 384 (3d Cir. 2005) .................................................................... 17

*Imbler v. Pachtman,*
424 U.S. 409 (1976) ................................................................................ 23

*In re Intermagnetics Am., Inc.,*
926 F.2d 912 (9th Cir. 1991) ..................................... 6, 7, 13, 15, 18, 91, 106, 123

*In re Levander,*
180 F.3d 1114 (9th Cir. 1999) ...................................................... 5, 13, 14, 15

*Islamic Shura Council of S. Cal. v. F.B.I.,*
779 F. Supp. 2d 1114 (C.D. Cal. 2011) ..................................................... 24

*Kyles v. Whitley,*
514 U.S. 419 (1995) .......................................................................... 23, 121

*Miranda v. Arizona,*
384 U.S. 436, 483 n.54 (1966) ................................................................. 3

*Morris v. Ylst,*
447 F.3d 735 (9th Cir. 2006) .................................................................... 22

*N. Mariana Islands v. Bowie,*
243 F.3d 1109 (9th Cir. 2001) .................................................................. 22

*O'Brien v. California State University, Fresno,*
967 F.2d 589 (9th Cir. 1992) .................................................................... 19

*Pumphrey v. K.W. Thompson Tool Co.,*
62 F.3d 1128 (9th Cir. 1995) ..........5, 6, 12, 13, 15, 17, 18, 20, 23, 66, 67, 76, 77, 79, 83, 107, 108, 120, 121, 122, 133, 134

*Southerland v. Irons,*
628 F.2d 978 (6th Cir. 1980) .............................................................. 18, 19

*Standard Oil of Cal. v. United States,*
429 U.S. 17 (1976) ................................................................................. 6

*Stirone v. United States,*
361 U.S. 212 (1960) ................................................................................ 23

*Tennison v. City and County of San Francisco,*
570 F.3d 1078 (9th Cir. 2008) .......................................................22, 23, 121

*Tiverton Bd. of License Comm'rs v. Pastore,*
469 U.S. 238 (1985) ................................................................................ 90

*Ty Inc. v. Softbelly's, Inc.,*
517 F.3d 494 (7th Cir. 2008) ..............................................................109, 113

*United States v. Agurs,*
427 U.S. 97 (1976) ................................................................................. 22

*United States v. Bernal-Obeso,*
989 F.2d 331 (9th Cir. 1993) ..................................................................... 3

*United States v. Blanco,*
392 F.3d 382 (9th Cir. 2004) .........................................................22, 23, 121

DOWNEY BRAND LLP

v

*United States v. Chu,*
   5 F.3d 1244 (9th Cir. 1993) ................................................................. 21

*United States v. Estate of Stonehill,*
   660 F.3d 415 (9th Cir. 2011) ...........5, 15, 16, 17, 24, 43, 59, 61, 65, 66, 70, 79, 133, 134, 137

*United States v. Maloney,*
   755 F.3d 1044 (9th Cir. 2014) ........................................................ 137

*United States v. Shaffer Equipment Company,*
   11 F.3d 450 (4th Cir. 1993) ......................... 9, 10, 11, 24, 25, 43, 71, 90, 107, 119

*United States v. Young,*
   470 U.S. 1 (1985) ............................................................................. 20, 24

*Youngblood v. West Virginia, in,*
   547 U.S. 867 (2006) ............................................................................ 23

## STATE COURT CASES

*Hare v. McGue,*
   178 Cal. 740 (1918) .......................................................................... 123

*Von Kesler v. Baker,*
   131 Cal. App. 654 (1933) ................................................................. 123

## FEDERAL STATUTORY AUTHORITIES

18 U.S.C. section 1519, ....................................................................... 68

18 U.S.C. § 1001 ................................................................................ 130

18 U.S.C. §§ 1503 ................................................................................ 93

18 U.S.C. § 1512(c) ........................................................................ 53, 109

## STATE STATUTORY AUTHORITIES

§ 938.8 .......................................................................................... 35, 38

§ 8002 ........................................................................................ 111, 112

Cal. Health & Safety Code § 13009 .................................................. 111

Cal. Penal Code § 424 ....................................................................... 118

## FEDERAL RULES AND REGULATIONS

Fed. R. Civ. P. 26(e) ................................................................ 65, 81, 82

Fed. R. Civ. P. 26(e)(1)(A) ................................................................. 81

Fed. R. Civ. P. 26(g)(1)(A) ................................................................. 64

Fed. R. Civ. P. 605, 11, 13, 15, 16, 17, 18, 25, 26, 27, 43, 77, 79, 83, 91, 106, 108, 120, 132, 134, 138

Fed. R. Civ. P. 60(c) ........................................................................... 16

Fed. R. Civ. P. 60(c)(1) ....................................................................... 16

Fed. R. Civ. P. 60(d) ....................................................................... 5, 25

Fed. R. Evid.403 ........................................................... 128, 129, 132, 134

DOWNEY BRAND LLP

vi

# TABLE OF AUTHORITIES
## (continued)

## STATE RULES AND REGULATIONS

Cal. R. Prof. Conduct 7-107(C) ............................................... 123

Cal. Rule Prof. Conduct 5-120(A) ............................................ 36

California Rule of Professional Conduct 5-120(C) ..................... 37

California Rule of Professional Conduct 7-107(C) ..................... 123

California Rule of Rule of Professional Conduct Rule 7-107(C) ............ 120

## TREATISES

7 *James Wm. Moore & J. Lucas, Moore's Federal Practice* (2d ed. 1978) ......................... 6, 123

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

Pursuant to the Court's November 24, 2014, Order (Docket No. 618), Defendants Sierra Pacific Industries ("Sierra Pacific"), W.M. Beaty and Associates, Inc. ("W.M. Beaty"), Eunice E. Howell, individually and doing business as Howell's Forest Harvesting Company ("Howell"); and Ann McKeever Hatch, as Trustee of The Hatch 1987 Revocable Trust, et al.[1] (collectively "Defendants"), all of whom seek relief from this Court under Federal Rule of Civil Procedure[2] 60(d)(3), submit this focused briefing addressing the following issues as specified by the Court:

(1) Identifying the test for "fraud on the court" under Rule 60(d)(3) and what Defendants must prove to seek relief under that subsection;

(2) Assuming at this stage the truth of the Defendants' allegations, assessing whether each alleged act of misconduct separately or collectively constitutes "fraud on the court" within the meaning of Rule 60(d)(3); and,

(3) Explaining how and when Defendants discovered the alleged misconduct, specifically identifying whether Defendants learned of each alleged act before or after the settlement and dismissal of the case.

---

[1] In addition to Ms. Hatch, the named Landowner Defendants seeking relief under Rule 60(d)(3) also include Richard L. Greene, As Trustee Of The Hatch Irrevocable Trust; Brooks Walker, Jr., As Trustee Of The Brooks Walker, Jr. Revocable Trust And The Della Walker Van Loben Sels Trust For The Issue Of Brooks Walker, Jr.; Brooks Walker III, Individually And As Trustee Of The Clayton Brooks Danielsen Trust, The Myles Walker Danielsen Trust, The Margaret Charlotte Burlock Trust, And The Benjamin Walker Burlock Trust; Leslie Walker, Individually And As Trustee Of The Brooks Thomas Walker Trust, The Susie Kate Walker Trust, And The Della Grace Walker Trust; Wellington Smith Henderson, Jr., As Trustee Of The Henderson Revocable Trust; Elena D. Henderson; Mark W. Henderson, As Trustee Of The Mark W. Henderson Revocable Trust; John C. Walker, Individually And As Trustee Of The Della Walker Van Loben Sels Trust For The Issue Of John C. Walker; James A. Henderson; Charles C. Henderson, As Trustee Of The Charles C. And Kirsten Henderson Revocable Trust; Joan H. Henderson; Jennifer Walker, Individually And As Trustee Of The Emma Walker Silverman Trust And The Max Walker Silverman Trust; Kirby Walker; And Lindsey Walker, A.K.A. Lindsey Walker-Silverman, Individually And As Trustee Of The Reilly Hudson Keenan Trust And The Madison Flanders Keenan Trust (collectively, "Landowners" or "Landowner Defendants").

[2] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise stated.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

## I. INTRODUCTION

The prosecutorial misconduct associated with the Moonlight Fire matter was not comprised of mistakes on the periphery. It was not the consequence of episodic errors of judgment. Instead, it was systematic, pervasive, and purposeful, with each act aimed at affecting the administration of justice through the use of a thoroughly corrupt investigation designed to frame these Defendants. As this misconduct marched towards its payoff, both investigators and prosecutors were more than willing to carry and place their deceptions deep within the machinery of this Court's legal processes. The numerous deceptions were not minor. They began at the very the heart of the underlying case against these Defendants and moved outward from there, ripples in a tainted pond ultimately touching every aspect of this case. In fact, the gross misconduct was so foreign to what one would expect from federal prosecutors that it ultimately caused Assistant United States Attorney Eric Overby, a senior and highly respected federal prosecutor on the Moonlight Fire prosecution team, to seek the company of one of Defendants' counsel while he explained just why he was leaving prosecution team. In fact, there is perhaps no better summary of why this case was so misdirected than the line Overby revealed that he delivered to his cohorts as he walked out the door: "It's called the Department of Justice. It's not called the Department of Revenue."

Overby was not alone in his disgust. On February 4, 2014, Judge Leslie C. Nichols, the only judge who has yet to review the legal record of the Moonlight Fire action, found by "clear and convincing" evidence that Cal Fire's underlying origin and cause investigation was "corrupt and tainted." The court also found that Cal Fire and its counsel – who co-prosecuted this federal action with federal lawyers working for our Department of Justice – engaged in "a stratagem of obfuscation that infected virtually every aspect of discovery in this case." Judge Nichols found that their conduct was not only grossly unfair to these Defendants, but an attack on the court and our system of justice. In this regard, Judge Nichols specifically held, "[t]he cost of Plaintiff Cal Fire's conduct is too much for the administration of justice to bear," and his honor further held that "the repeated and egregious violations of the discovery laws not only impaired Defendants' rights, but have 'threatened the integrity of the judicial process.'"

DOWNEY BRAND LLP

In pointedly addressing the prosecution of the matter, Judge Nichols rebuked the Deputy Attorneys General representing Cal Fire, stating, "[t]he sense of disappointment and distress conveyed by the Court is so palpable, because it recalls no instance in experience over forty seven years as an advocate and as a judge, in which the conduct of the Attorney General so thoroughly departed from the high standard it represents, and, in every other instance, has exemplified." In a separate order, Judge Nichols found:

> In all matters, the Court maintains the ability to adjudicate the conduct of all parties and their counsel, be they public or private, in order to protect the integrity of the court. Finding otherwise would do grave damage to the integrity of the judicial process and the public's confidence in it, especially for those who find themselves defendants in actions brought by a public agency that perceives itself immune from the court's oversight and control.

For these reasons and more, Judge Nichols terminated Cal Fire's cost recovery action and awarded Defendants more than $30 million in discovery abuse sanctions.

The Moonlight Fire investigation, however, was not just carried out by two public agencies, one state and one federal. It was jointly conducted by their own law enforcement officers, public servants duty-bound to discover and report the truth regarding what caused this massive forest fire.[3] Conducting an honest investigation was not only the Moonlight Investigators' sworn obligation, it was of course critical to the furtherance of justice. As noted by our Supreme Court, "we can have the Constitution, the best laws in the land, and the most honest reviews by courts – but unless the law enforcement profession is steeped in the democratic tradition, maintains the highest in ethics, and makes its work a career of honor, civil liberties will continually – and without end be violated." Miranda v. Arizona, 384 U.S. 436, 483 n.54 (1966) (quoting Hoover, Civil Liberties and Law Enforcement: The Role of the FBI, 37 Iowa L. Rev. 175, 177-82 (1952)). Similarly, the Ninth Circuit expects "prosecutors and investigators to take all reasonable measures to safeguard the system against treachery." Benn v. Lambert, 283 F.3d 1040, 1062 (9th Cir. 2002) (quoting United States v. Bernal-Obeso, 989 F.2d 331, 334 (9th Cir. 1993)).

---

[3] These investigators are referred to throughout this brief as the "Moonlight Investigators."

With respect to wildland fires, the integrity of the investigators is especially essential because they have exclusive access to the scene, because the area of origin is perishable and easily spoiled, and because their findings generally have a profound impact on whoever is held responsible. The written report of their investigation – the origin and cause report – is equally critical. Properly completed, it exists to provide a window into what the investigators found and what they did as they scientifically and systematically worked toward their conclusions.

All of these duties and promises were shattered here. The investigation was neither scientific nor systematic. Indeed, it was "corrupt and tainted." Instead of seeking the truth, the Moonlight Investigators concealed it, or they simply manufactured it. Instead of advancing justice, they obstructed justice, a federal crime that carries a penalty of up to twenty years. Worse, federal prosecutors, charged with the solemn responsibility of protecting the truth, ignored their "gatekeeper" function in favor of assisting the investigators with their treachery.[4] When their star investigator witnesses "repeatedly" lied under oath, the Moonlight Prosecutors sat on their hands. When it became abundantly clear that the Moonlight Investigators' core "findings" were the byproduct of a reprehensible effort to frame these Defendants, they pushed the case forward regardless, taking full advantage at every turn of the natural trust this Court placed in them as they sought a "pay day" for the United States. Consumed by their desire to win, they engaged in an unconscionable scheme by affirmatively advancing the Moonlight Investigators' sham conclusion, by creating false interrogatory responses, by hiding information from these Defendants and the Court, by repeatedly breaching their duty of candor to the Court, by telling the investigators that they need not fret over what Defendants discovered about their secret point of origin, and by knowingly and recklessly submitting information to this Court that was blatantly false on key issues going to the heart of their case. Ignoring their solemn obligation to seek justice, the Moonlight Prosecutors instead did violence to their essential charter by permitting these investigators to obstruct justice, all in a misguided effort to obtain "a win" through

---

[4] The prosecutors of the federal action are referred to throughout this brief as the "Moonlight Prosecutors." As Defendants noted in their initial Rule 60(d)(3) brief, their focus regarding prosecutorial misconduct is on certain prosecutors who worked on this case, not on the entire office. Defendants believe that most prosecutors are hardworking and dedicated public servants who are properly focused on protecting the truth and advancing justice.

DOWNEY BRAND LLP

improperly influencing this Court.  Uncomfortable as it is to recognize such conduct in individuals whose very purpose is to advance justice, it must be recognized here and publically dealt with in order to begin to repair the tremendous damage these particular prosecutors have already done to this Court and to the integrity of our judicial system.

## II.  WHAT DEFENDANTS MUST PROVE TO SEEK RELIEF UNDER RULE 60(d)(3).[5]

### A.  The Test for Fraud On the Court Within the Meaning of Rule 60(d)(3).

Rule 60 of the Federal Rules of Civil Procedure, entitled "Relief from a Judgment or Order," provides that judgments, while ordinarily accorded a degree of finality, are subject to being set aside when appropriate, whether for ministerial reasons at one end of the spectrum or for fraud at the other.  Fed. R. Civ. P. 60.

Rule 60(b), which is focused on fraud between parties, is governed by a one year statute of limitation.  Rule 60(d), on the other hand – the basis on this motion – is focused on fraud on the court and has no time bar whatsoever.  Moreover, Rule 60(d) "does not limit a court's power to . . . set aside a judgment for fraud on the court," Fed. R. Civ. P. 60(d), as it simply codifies a fundamental principle: federal courts have always had the "inherent equity power to vacate judgments obtained by fraud." United States v. Estate of Stonehill, 660 F.3d 415, 443 (9th Cir. 2011) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991); In re Levander, 180 F.3d 1114, 1118-19 (9th Cir. 1999)).  As found by the Supreme Court, a federal court's power to vacate a judgment procured by fraud originates from a rule of equity that "fulfill[s] a universally recognized need for correcting injustices which, in certain circumstances, are deemed sufficiently gross to demand a departure from rigid adherence" to the rule that a final judgment is typically binding and final. Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244 (1944), overruled on other grounds by Standard Oil of Cal. v. United States, 429 U.S. 17 (1976).

---

[5] In this portion of their focused briefing, Defendants outline the applicable test and controlling authority for assessing whether a fraud on the court has occurred, i.e., what Defendants must prove in order to obtain relief. However, Defendants acknowledge that the Court requested they explain what they must prove "in order to seek relief" under Rule 60(d)(3).  Because there is no case establishing a threshold burden that Defendants must satisfy to proceed under Rule 60(d)(3), nor a threshold showing set forth in the rule itself, it appears that the only prerequisite to seeking relief under Rule 60(d)(3) is that the complainant have been a party to the action in which the fraud on the court occurred.  Of course, it is beyond dispute that the Court itself also may initiate proceedings sua sponte if it discovers conduct constituting a fraud upon the court.  See Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128, 1130 (9th Cir. 1995) (proceedings initiated from court learning of conduct constituting fraud on court).

DOWNEY BRAND LLP

While courts have "struggled to define the conduct that constitutes fraud on the court," the Ninth Circuit confirms this particular species of fraud exists when the moving party demonstrates, by "clear and convincing evidence," that the opposing party's misconduct has harmed "the integrity of the judicial process . . . ." Stonehill, 660 F.3d at 443-44 (quoting England v. Doyle, 281 F.2d 304, 310 (9th Cir. 1960) (evidentiary standard); Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989) (standard for harm)); Dixon v. C.I.R., 316 F.3d 1041, 1046 (9th Cir. 2003). "[F]raud on the court . . . embrace[s] only that species of fraud which does[,] or attempts to, defile the court itself, or is perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are present for adjudication." In re Intermagnetics Am., Inc., 926 F.2d 912, 916 (9th Cir. 1991) (quoting 7 James Wm. Moore & J. Lucas, Moore's Federal Practice ¶ 60.33 (2d ed. 1978)). When conduct harms "the integrity of the judicial process . . . and the fraud rises to the level of 'an unconscionable plan or scheme which is designed to improperly influence the court in its decisions,'" there has been a fraud on the court, and the court "not only can act, [but] should." Dixon, 316 F.3d at 1046 (quoting England, 281 F.2d at 309).

"[T]he inquiry as to whether a judgment should be set aside for fraud upon the court . . . focuses not so much in terms of whether the alleged fraud prejudiced the opposing party . . . ."[6] Intermagnetics, 926 F.2d at 917. Fraud on the court "is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128, 1133 (9th Cir. 1995) (quoting Hazel-Atlas, 322 U.S. at 264). Thus, the question of whether one party "would have prevailed" but for the opposing party's fraud on the court is decidedly not the relevant inquiry. Id. at 1132. Instead, the question is "whether the alleged fraud harms the integrity of the judicial process." Intermagnetics, 926 F.2d at 917. As discussed herein, and as could be shown through an evidentiary hearing, the jointly prosecuted Moonlight Fire action

---

[6] This rule does not mean, as the government states in the Joint Status Report, that "[a]ccusations of conduct prejudicial only to the defendants are irrelevant." (Docket No. 612 at 18.) Prejudice to Defendants may be entirely relevant to determining whether "the judicial machinery [could not] perform in the usual manner . . . ." Intermagnetics, 926 F.2d at 916.

DOWNEY BRAND LLP

worked an egregious fraud upon two courts, grievously damaging the integrity of our judicial process.

**B.** **Examples of Litigation Misconduct Which Have Been Held to Constitute Fraud on the Court.**

Courts have held that a wide range of misconduct can constitute fraud on the court. The fraud perpetrated upon this Court through the Moonlight Fire prosecution is multi-faceted and pervasive, involving numerous, distinct types of misconduct, each one of which is sufficient to cause the Court to now terminate the action and vacate the settlement. The fact that the Moonlight Fire case serves as a veritable warehouse display of numerous types of misconduct that, on their own, would be sufficient to terminate an action for fraud upon the court only compounds the egregious quality of the fraud, as well as the need for this Court to use the full weight of its inherent powers to address the conduct of the Moonlight Investigators and Prosecutors.

**1.** **Hazel-Atlas Glass Company v. Hartford-Empire Company**

In Hazel-Atlas, the Supreme Court found a fraud on the court when the plaintiff in the underlying action, Hartford, presented manufactured evidence to the court in connection with a merits-based decision. 322 U.S. at 245. Specifically, Hartford had a pending application for a patent, which the Patent Office opposed. Id. at 240. In support of the application, Hartford's attorneys and officials wrote a bogus article describing the device at issue as a "remarkable advance in the art" and "revolutionary." Id. Thereafter, the attorneys and officials "procured the signature" of a disinterested expert and had it published in a trade journal. Id. Hartford subsequently submitted the article in support of its pending patent application, which was ultimately granted. Id. at 240-41. Hartford then brought suit against Hazel-Atlas for patent infringement. Id. at 241. While the case was pending before the district court, Hazel-Atlas heard rumors concerning the article's fraudulent authorship, but did not defend the suit on those grounds. Id. The district court dismissed the case in any event, finding Hartford failed to show patent infringement. Id. Hartford appealed. Id.

The Third Circuit reversed the district court's decision in favor of Hazel-Atlas, quoted the

7

DOWNEY BRAND LLP

fraudulent pro-Hartford article at length, and held that Hazel-Atlas had infringed Hartford's valid patent. Id. at 241-42. While the deadline for Hazel-Atlas's petition for rehearing of the appeal was approaching, Hartford obtained a signed statement from the supposed author of the article, stating that he had written the article. Id. at 242-43. Hazel-Atlas then "capitulated" and settled the case. Id. at 241. It paid Hartford $1,000,000 and "entered into certain licensing agreements." Id. As a result of the settlement agreement, Hazel-Atlas did not file a petition for rehearing, and the district court entered judgment against Hazel-Atlas in accordance with the Third Circuit's mandate. Id. at 253 (Roberts, J., dissenting). At the time the judgment was entered, Hazel-Atlas was actively investigating whether the article was fraudulent. Id. at 242.

Seven years later, when these facts fully came to light, Hazel-Atlas brought a motion to vacate the judgment for fraud on the court. Id. at 243. Finding the story "sordid," id., the Supreme Court stated: "Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury." Id. at 245. The Supreme Court also noted that even if it "consider[ed] nothing but Hartford's sworn admissions," Hartford's conduct amounted to "a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals." [7] Id.

Importantly, the Supreme Court firmly rejected Hartford's argument that fraud on the court exists only where reliance on the fraudulent evidence was "basic" to the underlying decision. Id. at 246-47. In this regard, the Supreme Court found it more than adequate that "Hartford's officials and lawyers thought the article material. They conceived it in an effort to

---

[7] As discussed in more detail, infra, this case is similar to Hazel-Atlas in that the Moonlight Investigators conceived a plan to manufacture a blatantly false official report of their investigation. Thereafter, the Moonlight Prosecutors knowingly and recklessly advanced the Moonlight Investigators' fraudulent report and their manufactured evidence into this litigation and then allowed the Moonlight Investigators to lie about it repeatedly under oath, all in a carefully executed scheme to not only defraud Defendants but the Court as well. As discussed infra, the Moonlight Prosecutors submitted White's false affidavit and the fraudulent origin and cause report in support of their opposition to Defendants' motion for summary judgment, just as the Hartford parties submitted the bogus article on their patent. The fraudulent report was not only a work of fiction with respect to its key findings, but it also attached and relied upon falsified official documents in the form of tampered witness statements and falsified origin and cause reports regarding other fires.

persuade a hostile Patent Office to grant their patent application, and went to considerable trouble and expense to get it published. . . . [T]hey urged the article upon the Circuit Court and prevailed." Id. at 247. The Court therefore concluded that Hartford was "in no position now to dispute its effectiveness." Id. Furthermore, the Court observed that, because "it is wholly impossible [to] accurately . . . appraise the influence that the article exerted on the judges," it would not attempt to do so. Id.

"The total effect of all this fraud . . . calls for nothing less than a complete denial of relief to Hartford for the claimed infringement of the patent thereby procured and enforced." Id. at 250 (emphasis added). The Supreme Court specifically acknowledged that while Hazel-Atlas had been aware of at least the possibility of Hartford's fraud at the time of both the trial and appeal, "every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments." Id. at 245. Hartford had "tamper[ed] with the administration of justice," and thus committed "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." Id. at 246. The Supreme Court's decision in Hazel-Atlas provides the foundation for assessing what constitutes a fraud on the court and confirms the intolerance the judiciary must have for misconduct which defiles the court.

## 2.   United States v. Shaffer Equipment Company

Of course, manufacturing evidence is not the only type of misconduct that can lead to a finding of fraud on the court. In United States v. Shaffer Equipment Company, 11 F.3d 450 (4th Cir. 1993), a government lawyer's failure to comply with his duty of candor was found to be sufficient. Specifically, in Shaffer, government attorneys for the Environmental Protection Agency brought suit to recover the costs of an environmental cleanup but wrongfully failed to reveal to the court and the defendants that the EPA's on-scene cleanup coordinator, Caron, had misrepresented his academic credentials in that case and in prior cases. Id. at 452. The same government attorneys also wrongfully obstructed the defendants' efforts to root out these discrepancies in Caron's credentials. Id. Indeed, Caron had admitted to one of the government attorneys "as early as September 1991 that he did not have a college degree," id. at 459, because

9

he had not "complete[d] his class work for a degree from Rutgers and never attended any classes at any . . . other schools," id. at 454. Instead of exposing this corruption, the government attorney simply watched as Caron falsely testified in his deposition that "he had completed all of the requirements for a degree at Rutgers and the only reason he had not received his diploma was a question of paperwork[,]" and that "he had continued taking courses at Drexel for a master's degree. [Caron] stated that his bachelor's degree work was in environmental science and his master's degree work was in organic chemistry." Id. at 454.

At a later deposition, the government directed Caron not to answer any questions about his resume in which Caron claimed to have received degrees from Rutgers and Drexel, claiming the inquiry was not relevant to the litigation. Id. This same government attorney researched the issue and concluded two days later that the coordinator's credibility was relevant as a matter of law, but he "did not supplement the government's response to an earlier interrogatory directed to Caron's credentials (to which the government had objected on the basis of irrelevance) and did not withdraw the relevancy objection to the discovery . . . ." Id. at 455. The government also failed to disclose to the court, and to defense counsel, that Caron was being investigated both criminally and by the EPA. Id. Despite these issues, the government "continued to litigate the matter unabated without disclosing the investigations to the Court." Id. at 456. Another government attorney, a supervisor, involved in the case was aware not only of these facts, but also aware that Caron had testified falsely in another litigation. Id. This attorney, however, prevented these facts from being disclosed to defense counsel. Id. The government also relied on the administrative record made by Caron in moving for summary judgment.[8] Id. at 460.

_____

[8] As was the case in Shaffer, but on a far greater scale, the Moonlight Prosecutors, including their supervisor, repeatedly breached their duty of candor to the Court, by aggressively defending the Moonlight Investigators' depositions and failing to inform the Court that they lied repeatedly while under oath about their secret point of origin and their hidden white flag. The Moonlight Prosecutors also breached their duty of candor by submitting the investigators' fictional origin and cause report to the Court and failing to inform the Court that its most fundamental findings were a fraud. They breached their duty of candor by failing to inform the Court that lead Moonlight Investigator Joshua White's declaration in opposition to Defendants' motion for summary judgment was false, and by failing to inform the Court that federal Moonlight Investigator Diane Welton engaged in witness tampering and obstruction of justice by telling witnesses what they could and could not say and by manufacturing false interview reports of these same witnesses. The Moonlight Prosecutors breached their duty of candor by themselves crafting and allowing witnesses to sign blatantly false interrogatories regarding the Red Rock Lookout Tower, thereby participating in and perpetuating this long-running federal cover-up, by failing to inform the Court that a third party had lied to investigators about his whereabouts on the day of the fire, and by generally continuing to litigate this case

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

The court found that the issue of Caron's "credentials, capability, and credibility [were] relevant to the examination of the administrative record," and the "integrity of the administrative record [was] relevant" to central issues in the case. Id. The court observed that "a general duty of candor to the court exists in connection with an attorney's role as an officer of the court," and that "[o]ur adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice." Id. at 457. "[L]awyers, who serve as officers of the court, have the first line task of assuring the integrity of the process[,]" id. at 457, and their duties to their client "are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit," id. at 458. Citing to Chambers, 501 U.S. 32, the Fourth Circuit found that there is a "broader general duty of candor and good faith required" of officers of the court "to protect the integrity of the entire judicial process." 11 F.3d at 458. The court cited to Hazel-Atlas for the rule that there is "general duty to preserve the integrity of the judicial process" which the government attorneys in Shaffer violated. 11 F.3d at 458 (citing 322 U.S. 238). The court found that, in repeatedly failing to advise the court of "the Caron problem and the civil and criminal investigations relating to it," and in "continuing to litigate the matter unabated," the government attorneys sufficiently "undermine[d] the integrity of the judicial process" and violated "the general duty of candor that attorneys owe as officers of the court." Id. at 459. These actions were sufficient to constitute a fraud on the court. [9] See id. at 461.

### 3. **Pumphrey v. K.W. Thompson Tool Company**

The Ninth Circuit's decision in Pumphrey, 62 F.3d 1128, is also instructive. Pumphrey

---

unabated, despite knowing that the entire investigation was teeming with dishonesty and corruption. If there has ever been a case where government lawyers grossly failed to carry out their responsibility to assure the integrity of the process, it is this one. Here, the best that can be said is that the Moonlight Prosecutors did absolutely nothing "to guard against the corruption that justice will be dispensed on an act of deceit." 11 F.3d at 458. The worst that can be said is that they affirmatively assisted in an effort to have justice dispensed based on numerous acts of deceit.

[9] Notably, the Fourth Circuit did not rely solely on Rule 60(d)(3) in upholding the district court's decision to vacate the judgment entered for the government. While the Fourth Circuit discussed fraud on the court and the Supreme Court's decisions in Hazel-Atlas, the Fourth Circuit found its ability to vacate the judgment from its inherent power. 11 F.3d at 461. The court stated: "[d]ue to the very nature of the court as an institution, it must and does have an inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates. This power is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers." Id.

DOWNEY BRAND LLP

involved a wrongful death action arising from an accidental shooting wherein the defendant gun manufacturer participated in a scheme to defraud the Court by withholding evidence. The primary issue in the case was whether a certain model of gun could accidentally fire when dropped despite having one or both safeties engaged. Id. at 1133. While the case was pending before the district court, the gun manufacturer videotaped drop tests involving the gun. Id. at 1131. During these tests, a company manager and its general counsel were present. Id. In the original video, which the company withheld, the gun fired when dropped. Id. In the second video, which the company produced, the gun did not fire when dropped. Id.

Before filming the videos, the company answered requests for production by stating it was not aware of any records relating to handgun testing, but if records were later discovered the company would make them available to the plaintiff. Id. During continued discovery, the company only produced the second video and, in answers to interrogatories, mischaracterized the results and stated there was no record of a test showing that the gun had accidentally fired. Id. at 1132. The general counsel also never disclosed to the company's trial counsel the existence of the original video or its results. Id. The general counsel then attended the trial and watched as the manager falsely testified that he had never seen the gun fire when dropped during tests.[10] Id. The general counsel was also present at depositions in subsequent cases when the manager gave false testimony about whether engaging the gun's safety affected whether the gun fired when dropped.[11] Id.

---

[10] The general counsel neither suborned this perjury nor presented it to the court; he merely observed as the manager perjured himself. 62 F.3d at 1132. The company's trial counsel who presented the testimony to the court did not know that it was perjured. Id. at 1131. It was enough that the general counsel "participated in the case," although he did not enter an appearance in the litigation, was not admitted pro hac vice, and did not sign any documents filed with the court. Id. at 1130-31. Thus, contrary to the Moonlight Prosecutors' statement in the Joint Status Report, the law is not that "perjury can only be a fraud on the court if counsel committed or intentionally suborned the perjury and presented it to the Court in an effort to influence its decision." (Docket No. 612 at 18.)

[11] As discussed infra, this case presents facts similar to those of Pumphrey, in that the Moonlight Investigators and Prosecutors routinely destroyed or concealed inconvenient facts. White, a law enforcement officer, destroyed his own field notes even though he understood that litigation would result from his findings. The Moonlight Prosecutors themselves failed to produce expert data that would have been harmful to their effort to pin blame on these Defendants, and on information and belief, instructed their expert not to create an amended report, even after he learned from Defendants' expert that he had used the wrong data set. The Moonlight Prosecutors also attempted to conceal what actually happened at the Red Rock Lookout Tower the day of the fire by drafting false interrogatory responses which omitted the most important facts.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

The Ninth Circuit found that "[b]y failing to disclose the original video, mischaracterizing the results of the drop-tests, and failing to correct the false impression created by [the manager's] testimony, [the general counsel] undermined the judicial process."[12] Id. at 1133. The court examined whether the fraudulent misrepresentations went to the main issue of the case, or instead went to "immaterial and technical inaccuracies." Id. The court found that the general counsel's "failure to abide by the [rules of discovery and professional responsibility]" harmed the integrity of the judicial process, and amounted to a fraud on the court committed by an officer of the court. Id. Importantly, the Court specifically considered and rejected the argument that fraud could not be found where the concealment of evidence did not affect the outcome of the case. In this regard, the Ninth Circuit stated that the defendant's argument "misse[d] the point." Id. at 1133. "The issue here is not whether [the plaintiff] would have prevailed had the original video been produced. As we noted in Intermagnetics, 'the inquiry as to whether a judgment should be set aside for fraud upon the court under Rule 60(b) focuses not so much in terms of whether the alleged fraud prejudiced the opposing party but more in terms of whether the alleged fraud harms the integrity of the judicial process." Id. (quoting Intermagnetics, 926 F.2d at 917).

### 4. In re Levander

In Levander, the Ninth Circuit found fraud on the court where the court relied on perjured testimony in issuing a decision. 180 F.3d at 1120. The Levanders were Chapter 11 bankruptcy debtors who were awarded attorneys' fees against a certain corporation. Id. at 1116. At the time the attorneys' fees were awarded, neither the debtors nor the bankruptcy court knew of the existence of a partnership to which the corporation had transferred all of its assets. Id. at 1117. The bankruptcy court therefore awarded the debtors attorneys' fees and costs against the corporation only. Id. The bankruptcy court and the Levanders were ignorant as to the existence of the partnership because one of the corporation's officers falsely testified at a deposition that the corporation had not sold its assets and was still an active company. Id. Notably, the Ninth

---

[12] The Ninth Circuit's focus on the defendant's "failure to disclose" directly and clearly refutes the Moonlight Prosecutors' contention that "failure to disclose . . . is not a fraud on the court." (Docket No. 612 at 18.) In the Ninth Circuit, it clearly is. Pumphrey, 62 F.3d at 1133.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

1  Circuit's opinion never discusses whether the corporation's attorneys were aware that this perjury

2  was being committed.[13]  Two years later, after the corporation failed to pay the attorneys' fees as

3  ordered, it was revealed the partnership had purchased the Corporation's assets several months

4  before the corporate officer testified.[14]  Id.  The court found there was a fraud on the court

5  because "not only did the Corporation and the Partnership deceive the Levanders, . . . they also

6  deceived the court, because the court relied on the Corporation's depositions to impose attorneys'

7  fees on the Corporation rather than on the party with the assets—the Partnership."  Id.

8  **5.    Derzack v. County of Allegheny, Pennsylvania**

9  Because "[t]he discovery process is an integral part of the judicial process," pervasive

10  discovery abuses and false discovery responses, even when not presented to the court, have been

11  found to amount to fraud on the court.[15]  Derzack v. Cnty. of Allegheny, Pa., 173 F.R.D. 400, 416

12  (W.D. Pa. 1996) aff'd sub nom Derzack v. Cnty. of Allegheny Children & Youth Servs., 118 F.3d

13  1575 (3d Cir. 1997).  In Derzack, the "parties were engaging in court-ordered discovery under the

14  authority and jurisdiction of the [court] and its rules and procedures."  Id.  The plaintiffs "engaged

15  in a pattern and practice of 'stonewalling, bad faith and lack of candor."  Id.  The plaintiffs

16  manipulated financial data relevant to their business loss claim, and turned over falsified,

17  fraudulent documents to the opposing party.  Id. at 404.  One of the plaintiffs then testified falsely

18  at his deposition about these documents and related facts.  Id. at 405.  The plaintiffs argued there

19  was no fraud on the court, per se, because the fraudulent documents were never submitted to the

20

21  [13] Levander is yet another case which clearly demonstrates that the United States misstates the law regarding fraud on the court in the Joint Status Report.  (Docket No. 612 at 18.)  Levander expressly refutes its assertion that "perjury

22  can only be a fraud on the court if counsel committed or intentionally suborned the perjury and presented it to the Court in an effort to influence its decision," as well as their statement that "[p]erjury by a party or witness is not fraud

23  on the court . . . ."  (Id.)

24  [14] As was the case in Levander, the Moonlight Investigators and Prosecutors not only deceived Defendants, they deceived the Court as well, and they did so not on peripheral issues but on issues going to the core of the case against

25  these Defendants.  The Moonlight prosecutors submitted White's declaration and the fraudulent Joint Report to this Court in opposition to the motion for summary judgment.  The Moonlight Prosecutors expected the Court to rely

26  upon the work of these investigators, and the Court did rely upon it, citing that declaration in its order denying the motion.

27  [15] Of course, Derzack directly contradicts the Moonlight Prosecutors' statement that "false answers to discovery requests are not fraud on the court."  (Docket No. 612 at 18.)

28

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

court. <u>Id.</u> at 403. However, the district court found that since the "parties were engaging in court-ordered discovery under the authority and jurisdiction of the [court] and its rules and procedures[,]" and the plaintiff's "knowing and intentional improper conduct occurred under this court's supervision and . . . grossly tainted the litigation process of the court," it did not matter that the plaintiff's "improper conduct did not violate a per se order of this court . . . ." <u>Id.</u> at 416. In short, the plaintiff's false discovery responses amounted to fraud <u>on the court</u> "[b]ecause the inherent power of the court reaches conduct both before the court directly and beyond the court's confines, and because the discovery and settlement processes in this case were certainly within the penumbra of the court's authority and at the hands-on supervision of [the magistrate judge] . . . ." <u>Id.</u> Thus, the "plaintiff's misconduct adversely impact[ed] the judicial system . . . ." <u>Id.</u>[16]

**6.      <u>Fraud Upon the Court May Arise From a Course of Conduct</u>.**

Fraud upon the court may also be found in an entire course of conduct by a party, rather than a single act of fraud directed at the court. <u>Pumphrey</u>, 62 F.3d at 1133 (listing course of conduct undertaken by general counsel which constituted fraud on the court). There is no authority suggesting that relief under Rule 60 depends on the existence of a single egregious act of litigation malfeasance. Rather, the case law makes clear that fraud on the court occurs when a party engages in "fraud which does[,] or attempts to, defile the court itself, or is perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are present for adjudication." <u>Intermagnetics</u>, 926 F.2d at 916 (citation omitted). Whether the fraud which defiles the court occurs in a single act, such as proffering perjured testimony for the court's reliance, <u>Levander</u>, 180 F.3d at 1120, or a course of conduct, <u>Pumphrey</u>, 62 F.3d at 1133, is immaterial. The sole issue is whether the conduct amounts to "an effort by the [opposing party] to prevent the judicial process from functioning in the usual manner." <u>Stonehill</u>, 660 F.3d at 445.

<u>Stonehill</u> evidences the Ninth Circuit's recognition of this rule. There, the Ninth Circuit analyzed seven separate instances of litigation malfeasance identified by complainant Stonehill,

---

[16] As found by Judge Nichols, the Moonlight Fire prosecution was plagued by "abuses affecting virtually every aspect of the discovery process."

who brought the Rule 60 action, as proof of the government's fraud on the court. 660 F.3d at 446-51. The Ninth Circuit first examined each instance of misconduct in isolation to determine whether it constituted a fraud upon the court, and determined that each category did not individually satisfy the standard. Id. at 466-51. The Ninth Circuit then examined whether the "allegations as a whole" "change[d] the story as presented to the district court" such that they amounted to fraud on the court. Id. at 451, 452. The court ultimately found that the conduct, considered in its totality, did not constitute fraud on the court because it did not go to the central issues of the case. Id. at 452. Despite this fact-specific conclusion, Stonehill makes clear that the law does not require that the court analyze each instance of misconduct in a vacuum. Rather, the court must also consider whether a party's entire course of conduct rises to the level of "harm[ing] the integrity of the judicial process" such that it was "prevent[ed] . . . from functioning in the usual manner." Id. at 444-45. Accordingly, several instances of litigation misconduct may collectively constitute a fraud upon the court, even where each instance, considered separately, does not.

### C. A Motion or Action For Fraud on the Court is Not Precluded By Passage of Time or Settlement.

There is no time bar to a motion or action to set aside a final judgment for fraud on the court. Fed. R. Civ. P. 60(c). Indeed, the rule makes clear that the one-year time-limit applicable to circumstances set forth in subdivision (b) does not apply to subdivision (d)(3). Fed. R. Civ. P. 60(c)(1). In keeping with the plain language of the rule, the Ninth Circuit has clearly held that Rule 60 "provides no time limit on courts' power to set aside judgments based on a finding of fraud on the court." Stonehill, 660 F.3d at 443 (citation omitted). "[T]he power to vacate for fraud on the court is . . . great," and is largely "free from procedural limitations . . . ." Id. at 444 (citing 11 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2870 (2d ed. 1987)). Thus, any delay in bringing a motion or action for fraud on the court does not bar the court from granting relief under Rule 60(d)(3). See, e.g., Hazel-Atlas, 322 U.S. at 247.

The Supreme Court has recognized, "[E]ven if [the moving party] did not exercise the highest degree of diligence [the] fraud cannot be condoned for that reason alone. . . . Surely it

16

cannot be that the preservation of the integrity of the judicial process must always wait upon the diligence of the litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud." Id. The Ninth Circuit echoed this reasoning in Pumphrey, stating: "[E]ven assuming that [the plaintiff] was not diligent in uncovering the fraud, the district court was still empowered to set aside the verdict, as the court itself was a victim of the fraud." 62 F.3d at 1133.

Lastly, Rule 60 unequivocally applies to any "judgment, order, or proceeding," and makes no distinction regarding its application to final dispositions such as stipulated judgments, consent judgments, or settlement orders. See Fed. R. Civ. P. 60. Indeed, Rule 60(d) does not tie the court's power to "set aside a judgment for fraud on the court" to the nature of the ultimate disposition of the case. The case law is consistent with this broad language. Contrary to the Moonlight Prosecutors' assertion in their Joint Status Report, the Supreme Court implicitly recognized in Hazel-Atlas that a court should grant relief from a judgment obtained by fraud on the court even when the underlying action, in which the fraud on the court was committed, involved a settlement agreement. 322 U.S. at 243.

Recognizing that resolution through a settlement agreement does not bar relief, other courts have conducted a full analysis of the merits of a claim of fraud on the court where the underlying litigation ended in a stipulated judgment or settlement agreement. For example, in Herring v. United States, the Third Circuit analyzed the merits of a Rule 60 action to set aside a fifty-year-old settlement agreement on the ground that the settlement was procured by fraud on the court. 424 F.3d 384 (3d Cir. 2005). The court's determination that no fraud had been committed was a substantive conclusion; the court did not even consider the amount of time that had passed or the fact that the parties had settled. Id. at 390-92. Thus, in undertaking this assessment, the court clearly recognized that the existence of the settlement itself was certainly no bar to relief.

In Broyhill Furniture Industries Inc. v. Craftmaster Furniture Corporation, the Federal Circuit engaged in a full analysis of the merits of a Rule 60 motion to vacate a consent judgment for fraud on the court. 12 F.3d 1080 (Fed. Cir. 1993). The court ultimately denied the motion for

DOWNEY BRAND LLP

a failure to show the requisite level of misconduct, but did not suggest that judgment entered in connection with settlement was somehow beyond the court's reach under Rule 60. Id. at 1086-87. In Black v. Suzuki Motor Corporation, the court found it "unquestionable that the settlement agreement reached by the parties in this case is rendered void by [the plaintiff's] false representations, clearly material to the matters at issue in this civil case" because "[t]he settlement agreement was procured through a fraud on the Court." No. 2:04-CV-180, 2008 WL 2278663, *3 (E.D. Tenn. May 30, 2008). And in Southerland v. Oakland County, after conducting an evidentiary hearing, the district court found that the attorney's "carefully planned scheme" in the underlying case departed from professional standards demanded of an officer of court and required vacating the consent judgment for fraud on the court. 77 F.R.D. 727, 733 (E.D. Mich. 1978) aff'd sub nom. Southerland v. Irons, 628 F.2d 978 (6th Cir. 1980).

These cases merely represent instances where courts have denied relief under Rule 60(d) due to insufficient evidence or procedural issues unrelated to the form of the final disposition of the underlying judgment; in no way do these cases speak to the propriety of granting a Rule 60(d) motion when the case involves a settlement agreement. The very fact that these cases address the substantive issue of whether a party committed fraud on the court makes clear that, should a moving party meet its burden of showing the existence of fraud on the court, a settlement agreement does not bar setting aside the underlying judgment pursuant to Rule 60(d)(3).

Still, other cases purport to limit the availability of relief under Rule 60(d)(3) in the face of a settlement agreement in the underlying action. To the extent any case law might suggest a narrow and artificial constraint on claims of fraud on the court in cases resolved through settlement or consent judgments, these cases are distinguishable or are wrongly decided and contrary to controlling Supreme Court precedent. As set forth above, the Supreme Court and lower federal courts have repeatedly recognized the need to protect the institutions of justice from egregious fraud. See Hazel-Atlas, 322 U.S. at 246. "Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system." Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1119 (1st Cir. 1989). As the First Circuit so precisely stated in Aoude, it is "[s]urpassingly difficult to conceive

DOWNEY BRAND LLP

DOWNEY BRAND LLP

of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process – to combat those who would dare to practice unmitigated fraud upon the court itself. To deny the existence of such power would . . . foster the very impotency against which the <u>Hazel-Atlas</u> Court specifically warned." <u>Id.</u> In light of the Supreme Court's decision in <u>Hazel-Atlas</u>, and the many cases recognizing the robust inherent power of a federal court to confront fraud worked upon it, a rule proscribing application of this power to judgments obtained through settlement would not only be superficial, it would allow a "wrong against the institutions set up to protect and safeguard the public" to go unchecked. <u>Pumphrey</u>, 62 F.3d at 1133 (quoting <u>Hazel-Atlas</u>, 322 U.S. at 246). Thus, there is nothing about the settlement of the federal action that limits or precludes in any way this Court's inherent power to address the egregious fraud upon the court committed here.

**D.** **The Integrity of the Judicial Process is Most Severely Damaged When Government Actors Defraud the Court.**

    **1.** **Because They Represent the Sovereign, Government <u>Attorneys</u> Are Held to a Higher Standard**.

The standards discussed above are applied even more stringently when the misconduct at issue is alleged to have been committed by a government attorney. These lawyers for the public play a unique role in our judicial system, as they are "the representative not of an ordinary party to a controversy, but of a sovereignty . . . [whose] interest in a . . . prosecution is not that it shall win a case, but that <u>justice shall be done</u>." <u>Berger</u>, 295 U.S. at 88 (emphasis added); <u>see also</u> A.B.A. Op. 150 ("The prosecuting attorney is the attorney of the state, and it is his primary duty not to convict but to see that justice is done."). As a result of this unique position, there are special rules and standards in place, applicable only to government attorneys, defining a government attorney's role, duties, and interests so as to safeguard the public and ensure the integrity of both the judicial process and our government. An attorney representing the United States, in particular, is "held to a <u>higher</u> standard of behavior." <u>United States v. Young</u>, 470 U.S. 1, 25-26 (1985) (Brennan, J., concurring) (emphasis in original). This standard applies equally to government attorneys in criminal and civil cases. <u>See</u> <u>Freeport-McMoRan Oil & Gas Co. v. F.E.R.C.</u>, 962 F.2d 45, 47 (D.C. Cir. 1992); <u>see also</u> A.B.A. Code of Prof'l Responsibility EC 7-

14 (discussing application to civil actions). Under this heightened standard, "[t]he public prosecutor cannot take as a guide for the conduct of his office the standards of an attorney appearing on behalf of an individual client. The freedom elsewhere wisely granted to a partisan advocate must be severely curtailed if the prosecutor's duties are to be properly discharged." Prof'l Responsibility: Report of the Joint Conference, 44 A.B.A.J. 1159, 1218 (1958).

Generally speaking, these standards require that "[a] government lawyer in a civil action . . . should not use his position . . . to harass parties or to bring about unjust settlements or results." A.B.A. Code of Prof'l Responsibility EC 7-14 (1980). A government lawyer also has an obligation to "refrain from instituting or continuing litigation that is obviously unfair." Id. More specifically, responsibility to seek justice requires lawyers representing the United States "to see that all evidence relevant to the case is presented, even if unfavorable to its position." United States v. Chu, 5 F.3d 1244, 1249 (9th Cir. 1993). A prosecutor thus occupies a "dual role, being obligated, on the one hand, to furnish the adversary element essential to the informed decision of any controversy, but being possessed, on the other, of important governmental powers that are pledged to the accomplishment of one objective only, that of impartial justice." Prof'l Responsibility: Report of the Joint Conference, 44 A.B.A.J. 1159, 1218 (1958). Prosecutors must present all relevant evidence because "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Id. While the government's disclosure obligation encompasses more than just exculpatory evidence, the failure to produce evidence "material either to guilt or punishment" gives rise to constitutional violations. Brady v. Maryland, 373 U.S. 83, 87 (1947). A prosecutor who withholds such evidence violates not only his disclosure obligations but also the due process clause. Id. Due process is violated "irrespective of the good faith or bad faith of the prosecution." Id.

Although the Supreme Court has not yet explicitly stated that Brady applies in civil cases, numerous federal courts have opined that the policy justifications underlying Brady apply in civil settings as well. For example, in Demjanjuk v. Petrovsky, a Sixth Circuit case examining

DOWNEY BRAND LLP

1  whether the government committed fraud on the court in civil extradition proceedings, the court

2  made clear that <u>Brady</u> should be extended to cover cases where the government seeks remedies

3  "based on proof of alleged criminal activities of the party proceeded against." 10 F.3d 338, 353

4  (6th Cir. 1993) (discussing denaturalization and extradition cases). Likewise, in <u>EEOC v. Los</u>

5  <u>Alamos Constructors, Inc.</u>, the court ordered the government to disclose a list of witnesses and

6  stated that a defendant in a civil case brought by the government should be afforded no less due

7  process of law than a defendant in a criminal case. 382 F. Supp. 1373, 1383 (D.N.M. 1974)

8  (citing <u>Berger</u>, 295 U.S. at 88). And in <u>Sperry & Hutchinson Co. v. F.T.C.</u>, the court stated that

9  the due process requirements that inhere in a criminal case should also apply in civil actions

10  brought by the government because "in civil actions," like criminal actions, "the ultimate

11  objective is not that the Government 'shall win a case, but that justice shall be done.'" 256 F.

12  Supp. 136, 142 (S.D.N.Y. 1966) (quoting <u>Campbell v. United States</u>, 365 U.S. 85, 96 (1961)).

13  <u>Brady</u> is also applicable here, as this case is tantamount to a criminal case. Indeed, the United

14  States premised its claims against Defendants, in part, on criminal violations of 36 Code of

15  Federal Regulations 261.5, thus implicating its <u>Brady</u> obligations.

16      A federal prosecutor's responsibilities also require him to take certain actions when he

17  suspects that a witness he has proffered has given perjured testimony: "When a prosecutor

18  suspects perjury, the prosecutor must at least investigate. The duty to act 'is not discharged by

19  attempting to finesse the problem by pressing ahead without a diligent and good faith attempt to

20  resolve it. A prosecutor cannot avoid this obligation by refusing to search for the truth and

21  remaining willfully ignorant of the facts.'" <u>Morris v. Ylst</u>, 447 F.3d 735, 744 (9th Cir. 2006)

22  (quoting <u>N. Mariana Islands v. Bowie</u>, 243 F.3d 1109, 1118 (9th Cir. 2001)). The Supreme Court

23  "has emphasized that the presentation of false evidence involves 'a corruption of the truth-seeking

24  function of the trial process.'" <u>Id.</u> (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976)).

25      Finally, the duty to disclose material evidence is not limited to government attorneys; it

26  also applies to investigating agencies. Both the Ninth Circuit and the Supreme Court have

27  recognized that "exculpatory evidence cannot be kept out of the hands of the defense just because

28  the prosecutor does not have it, where an investigating agency does." <u>Tennison v. City and</u>

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

County of San Francisco, 570 F.3d 1078, 1087 (9th Cir. 2008) (quoting United States v. Blanco, 392 F.3d 382, 388 (9th Cir. 2004)).  Giving investigators immunity from Brady's obligations "would undermine Brady by allowing the investigating agency to prevent production [to the defendant] by keeping the report out of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asks for them."  Id. (quoting Blanco, 392 F.3d at 388).  Tennison relies in part on Youngblood v. West Virginia, in which the Supreme Court made clear that "Brady suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'"  547 U.S. 867, 869-70 (2006) (quoting Kyles v. Whitley, 514 U.S. 419, 438 (1995)).

For purposes of this motion, these standards serve as the measure of whether the Moonlight Prosecutors' conduct constitutes "a wrong against the institutions set up to protect and safeguard the public."  Pumphrey, 62 F.3d at 1133 (quoting Hazel-Atlas, 322 U.S. at 246).

Appreciating the wrong committed by the Moonlight Prosecutors against these institutions requires not only an understanding of their unique role within the justice system, but an understanding of the trust placed in them – by the public and by this Court – as a direct result of their position as Assistant United States Attorneys.  "Because a prosecutor is a public official charged with law enforcement, a jury is likely to repose greater trust in his arguments than in those of the defendant's lawyer.  The prosecutor must not abuse that trust by misleading the jury about the law or the evidence or about the probity of the defendant's lawyer . . . ."  Hennon v. Cooper, 109 F.3d 330, 333 (7th Cir. 1997) (Posner, J.) (citing Berger, 295 U.S. 78; Stirone v. United States, 361 U.S. 212 (1960)); see also Imbler v. Pachtman, 424 U.S. 409, 424 (1976) (discussing "public trust" in prosecutors as reason prosecutors are immune from suits for damages).  Prosecutors' important obligations, and the trust that the courts and the public necessarily place in government attorneys and investigators to meet these obligations, unfortunately make it easier for government attorneys and government investigators to compromise "the integrity of the judicial process" and to "improperly influence the court in its decisions."  Dixon, 316 F.3d at 1046; see Berger, 295 U.S. at 88 ("It is fair to say that the average

DOWNEY BRAND LLP

jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.").

While much of the case law holds that a <u>jury</u> places greater confidence in a prosecutor, a judge, knowing the duties and responsibilities of a prosecutor, must also assume that a prosecutor is, at all times, seeking to do justice and acting in a manner befitting "a public official charged with law enforcement" and a representative of the United States. <u>See</u> <u>Hennon</u>, 109 F.3d at 333. A judge necessarily assumes that a prosecutor is not engaging in "an effort . . . to prevent the judicial process from functioning 'in the usual manner,'" <u>Stonehill</u>, 660 F.3d at 445, because any such action by a prosecutor is not only incongruous with their duties as an attorney, but also in direct violation of the "higher standard of behavior" to which a prosecutor is held, <u>Young</u>, 470 U.S. at 25-26. "The Court is charged with the humbling task of defending the Constitution and ensuring that the Government does not falsely accuse people, needlessly invade their privacy or wrongfully deprive them of their liberty. The Court simply cannot perform this important task if the Government lies to it." <u>Islamic Shura Council of S. Cal. v. F.B.I.</u>, 779 F. Supp. 2d 1114, 1125 (C.D. Cal. 2011). While "deception perverts justice[,] [t]ruth always promotes it." <u>Id.</u>

In engaging in the conduct detailed below, the Moonlight Prosecutors did not only violate this "higher standard of behavior." <u>Stonehill</u>, 660 F.3d at 445. They "pervert[ed] justice," <u>Islamic Shura Council</u>, 779 F. Supp. 2d at 1125, thereby "preventing the judicial process from functioning in the usual manner," <u>Stonehill</u>, 660 F.3d at 445, precisely because the judicial process assumes and requires prosecutors to behave in a certain way. Indeed, "[o]ur adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. . . . Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process." <u>Shaffer</u>, 11 F.3d at 457. By failing to meet this heightened standard through the commission of numerous fraudulent acts, the Moonlight Prosecutors damaged the validity of the process and, in so doing, worked a fraud on this Court.

**2.** **Recklessness by a Government Attorney is Sufficient to Constitute a Fraud Upon the Court.**

As the Supreme Court held in <u>Mapp v. Ohio</u>, "Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence . . . . Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example . . . . If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." 367 U.S. at 659. The Fourth Circuit echoed this concern, observing that when a government attorney violates his duty of candor to the tribunal, causing our judicial process to "falter," "the people are then justified in abandoning support for the system in favor of one where honesty is preeminent." <u>Shaffer</u>, 11 F.3d at 457. Given that Rule 60(d)(3) serves as a means through which the court can safeguard the integrity of the judicial process itself, relief under 60(d)(3) is particularly necessary and appropriate where the threat to the judicial process is occasioned by government attorneys, operating under a higher standard of care. Indeed, a fraud on the court perpetrated by government attorneys and government investigators has far more serious consequences for both the court and the public because of public trust placed in those individuals as government officers.

Given these duties, the Sixth Circuit found a government attorney's "reckless disregard" for the truth sufficient to establish a fraud on the court. <u>See</u> <u>Demjanjuk</u>, 10 F.3d at 354. In <u>Demjanjuk</u>, the court held that repeated failures to turn over exculpatory evidence was a fraud on the court, even though such conduct would not have constituted a fraud on the court if committed by a private attorney since a private attorney has no <u>Brady</u> obligations. <u>Id.</u> (finding the government attorneys "acted with reckless disregard for the truth and for the government's obligation to take no steps that prevent an adversary from presenting his case fully and fairly. This was fraud on the court in the circumstances of this case where, by recklessly assuming Demjanjuk's guilt, they failed to observe their obligation to produce exculpatory materials requested by Demjanjuk."). The Sixth Circuit found that this failure on the part of the government attorneys, and the resulting fraud on the court, "was not consistent with the government's obligation to work for justice rather than for a result that favors its attorneys'

24

preconceived ideas of what the outcome of legal proceedings should be . . . ." Id. at 349-50.

Demjanjuk's conclusion – that the showing necessary for establishing that a government attorney has defrauded the court is different and lesser than that applicable to a private attorney – is warranted in all cases involving fraud on the court by a government attorney. Indeed, it is necessitated by the principle articulated in Mapp, the heightened standard of behavior applicable to government prosecutors articulated in Berger, and the trust placed in prosecutors by the public and the courts. Contrary to the Moonlight Prosecutors' statement in their portion of the Joint Status Report that a party's fraud upon the court requires "the knowing and intentional participation of its counsel," the reckless disregard for the truth, committed by attorneys who are both officers of the court and federal prosecutors – charged with doing justice – is sufficient to warrant a finding of fraud on the court. But even if their statement were correct, the evidence here overwhelmingly demonstrates that the Moonlight Prosecutors knowingly and intentionally defrauded the court.

### III. EACH INSTANCE OF THE MOONLIGHT PROSECUTORS' MISCONDUCT CONSTITUTES A SEPARATE FRAUD ON THE COURT

Defendants understand that the Court will rule upon the sufficiency of the facts underlying their Rule 60(d)(3) Motion by assuming those facts to be true in all respects (Docket No. 618), and assessing them in relation to the standards for relief under Rule 60(d)(3). In accordance with this Court's November 24, 2014, Order, and in an effort to reframe the underlying allegations in the manner most convenient for the Court's assessment of whether the allegations, taken as true, state a claim upon which relief under Rule 60(d)(3) can be granted, Defendants provide below factual background that is germane to all instances of the Moonlight Prosecutors' misconduct, and then, as appropriate, additional facts which are relevant to each particular instance of misconduct.

Immediately following each instance of misconduct, Defendants address whether, assuming the truth of Defendants' allegations, the facts separately constitute fraud on the court within the meaning of Rule 60(d)(3). At the conclusion of the discussion regarding each separate instance of misconduct, Defendants address whether the multiple instances of misconduct

collectively constitute fraud on the Court within the meaning of Rule 60(d)(3).

A.    **Background Facts Relevant to All Instances of the Moonlight Prosecutors'**
      **Misconduct.**[17]

   1.    **A Brief Overview of the Moonlight Fire.**

The Moonlight Fire began on a Monday, Labor Day, September 3, 2007, on private property owned by members of the Landowner Defendants and managed by W.M. Beaty.  While somewhat remote, the property was a prime firewood cutting area for local townspeople.  The same property was also frequented by recreational users, including hikers, hunters, and motorcycle and ATV riders.  Because the area has been logged over the course of many decades, the property is readily accessible through a substantial network of navigable dirt trails and roads beneath the tree canopy.  A number of people were in the area on Labor Day, or may have been. On the day of the fire, Ryan Bauer, a resident of the town of Westwood, told his parents he would be in the area to cut firewood, an activity he engaged in frequently through a side business he ran. To do so, Bauer used an illegally modified chainsaw, which increased its fire danger.  Shortly after the Moonlight Fire started, a private patrolman found Bauer's parents dangerously close to where the fire began; he testified that the Bauers said they were looking for their son Ryan. During his deposition, their son encircled an area which included where the fire started as his favorite place to cut firewood.

Others may have been in the area too, including Michael McNeil, a United States Forest Service ("USFS") employee and suspected serial arsonist on numerous fires that appeared to coincide with his arrival on a variety of geographical assignments.  After a lengthy attempt to catch McNeil using transponders and surveillance, McNeil was inexplicably promoted to Battalion Chief, Fire Prevention, and transferred to Lassen National Park about two months before the Moonlight Fire began.  His whereabouts the morning and early afternoon on the day of the Moonlight Fire are unknown because the Moonlight Investigators never bothered to look into whether McNeil may have been responsible for starting the fire before they released their origin

---

[17] Defendants' previous brief filed in support of the Rule 60(d)(3) Motion provided extensive evidentiary factual details to support the relief sought.  Detailed evidentiary support for all of the facts identified herein is contained in Defendants' previous briefing (Docket No. 593-3), the Declaration of William R. Warne (Docket No. 596), and Defendants' Request for Judicial Notice (Docket No. 593-10).

1  and cause scene.[18]

2      On the morning and early afternoon of the day the fire started, two Howell employees,

3  J.W. Bush ("Bush") and Kelly Crismon ("Crismon"), were using bulldozers to create soil berms

4  or "water bars" across skid trails to help prevent erosion. They were there because earlier that

5  year, defendant Sierra Pacific had won a bid to harvest a portion of property owned by the

6  Landowner Defendants. In turn, Sierra Pacific hired Howell to conduct the logging operations on

7  the Landowner Defendants' land.

8      Both operators wrapped up their work that day before 1:00 p.m., drove down to a service

9  road and then parked their bulldozers about a mile to the south where they serviced them before

10  leaving. By 1:30 p.m., each was headed back toward the nearby town of Westwood in his pickup

11  truck with windows down. At no time while working in the area that day, while at the log

12  landing, or as they drove out, did they smell or see any smoke or fire. Within two hours of

13  finishing their work, Bush attempted to return to the general area in which he had been operating

14  but was prevented from doing so by the Moonlight Fire.

15      The Moonlight Fire was spotted from the closest USFS lookout tower and called in at

16  2:24 p.m. The Red Rock Lookout Tower is located on Red Rock peak about ten miles away.

17  Once the fire was called in, suppression resources were directed to the site, but the Moonlight

18  Fire would still burn approximately 65,000 acres over the course of the next two weeks, some

19  45,000 acres of which were in the Plumas and Lassen National Forests, the property of the United

20  States. The USFS and Cal Fire jointly worked to extinguish the blaze.

21

---

[18] The Moonlight Investigators' failure to investigate the whereabouts of McNeil is even more inexcusable in light of
what they knew at the time. Lead Moonlight Investigator White was so concerned about McNeil's arrival in the area
that summer that White quickly made a point of requesting that a transponder be placed on the bottom of McNeil's
USFS issued pickup truck. Ultimately, McNeil was arrested and charged with arson in another matter and with
making extortionist email threats to various judges, law enforcement officials, and politicians, including Senator
Barbara Boxer and Congresswoman Mary Bono. McNeil pled guilty to the extortionist threats, a crime he initially
carried out through a complicated scheme designed to make it appear as if his ex-wife were the perpetrator.
Defendants were keen to take McNeil's deposition because of the "blame-someone-else" nature of his crimes, the
long-held suspicions that McNeil may be a serial arsonist who could easily perpetrate such crimes while in his USFS
uniform and vehicle, and the timing of his arrival in Susanville in relationship to the Moonlight Fire. Defendants
therefore deposed McNeil in the state action on February 14 and 15, 2013, at the R.J. Donovan Correctional Facility,
where he is serving a nineteen year, eight month sentence. During that deposition, McNeil testified that he
understood how to make timing devices which could start wildfires, and that the types of devices and the length of
the "fuses" was only limited by the imagination of the creator. He confirmed that such delayed ignition mechanisms
could be set to last anywhere between minutes to days.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

## 2. The Moonlight Fire Investigation, as Told Through the Joint Report.

The USFS and Cal Fire jointly investigated the Moonlight Fire, and later jointly issued their official report on the cause of the fire, entitled "Origin and Cause Investigation Report, Moonlight Fire" ("Joint Report"). The Joint Report was prepared and signed by two law enforcement officers: Cal Fire's investigator Joshua White ("White") and the USFS's investigator Diane Welton ("Welton"). However, the first investigator on the scene was USFS investigator David Reynolds ("Reynolds"), who had been dispatched to the scene shortly after the fire was called in by the Red Rock Lookout Tower. He arrived at approximately 3:30 p.m. White, a Cal Fire Battalion Chief and law enforcement officer, was also dispatched to the fire, arriving later that same evening. Because it was too hot and too dark to do any substantive investigative work on that first night, White and Reynolds agreed they would start their joint investigation the next morning.

Early that next morning, on September 4, 2007, Reynolds and White began their investigation, with White taking the lead. As they walked into the fire area, they eventually found a skid trail.[19] After turning on that trail and walking down a slope, they located some rocks with strike marks, which they preliminarily identified as the general location of where the fire began. Without securing the scene, they left, drove back towards Westwood for lunch, and used their phones to set up a meeting with Howell bulldozer operator Crismon. The investigators conducted their first interview of Crismon back at the fire scene, in their chosen origin area, finishing that discussion at roughly 6:00 p.m. During that meeting, Crismon confirmed that he had been in the area earlier that day installing water bars. Thereafter, White took Crismon back down the hill, while Reynolds stayed behind to begin processing the scene, putting a pink tape around their chosen area of origin and marking the scene with indicator flags.

When White returned, he and Reynolds continued placing indicator flags in the area they designated as the general area of origin. According to their training, blue flags are used to denote where the fire was backing, yellow flags where the fire was moving laterally, and red flags where

---

[19] "Skid trails" are pathways within the forest created by bulldozers dragging logs down to "landings" where the logs are then removed by logging trucks to take them to mills.

DOWNEY BRAND LLP

the fire was advancing. A white flag typically designates the point of origin. White has conceded that one of the _primary_ goals of a wildland fire investigation is to find a point of origin. White also testified that finding the fire's point of origin is necessary before determining the cause of the fire as it is at that point where any physical evidence of the actual ignition is likely to be located.[20]

White and Reynolds returned the next morning, September 5, at roughly 8:00 a.m. The Joint Report provides that when they returned they placed "numbered plates" next to certain fire indicators, photographing those indicators as they went. The Joint Report also provides that White and Reynolds used "a handheld magnet to 'sweep' the area in an effort to identify any ferrous material." "Within close proximity of two of the rocks . . . a ferrous material consistent with that of metal shavings, were recovered." According to the Joint Report, White and Reynolds placed the metal allegedly found at these two rocks into one bag, which they labeled E-1, for "Evidence #1." After finding the metal, the investigators left the origin area and walked downhill to their trucks, where they photographed the metal at 10:02 a.m.

By 10:15 a.m. on September 5, 2007, White and Reynolds concluded that the Moonlight Fire was caused by rock strikes from a Howell bulldozer. Importantly, they then "released" their area of origin less than 48 hours after having commenced their investigation. According to Reynolds, they "were confident" and they "were done." Indeed, later that same day, Reynolds finished an "Incident Report" identifying Sierra Pacific as the "defendant."

Three days later, on September 8, 2007, Special Agent Welton, a law enforcement officer with the USFS, replaced Reynolds as the USFS's lead investigator. Welton visited the fire scene that morning with White, along with her supervisor and fellow USFS law enforcement officer Marion Matthews ("Matthews"). Both Welton and Matthews were directed to join the investigation by their supervisor Craig Endicott ("Endicott"), Assistant Special Agent in Charge. Both Matthews and Welton had a keen interest in the actions of USFS Fire Prevention

---

[20] As discussed _infra_, the USFS and Cal Fire's lead origin and cause investigator Larry Dodds, an expert in the science of origin and cause investigations, confirmed during his deposition that being off by eight feet regarding the point of origin can make "a world of difference," as locating the correct point of origin is critical to establishing causation. If investigators find what they believe is a competent ignition source in a spot where the fire did not start, they are necessarily missing what could be far different causation potentials at the actual point of origin – a timing device, a gasoline spill, a match, a set of footprints, etc.

Management Officer Michael McNeil, who they and others suspected of being a serial arsonist. In fact, Endicott instructed Welton to put together a "confidential" lengthy report cataloguing McNeil's disturbing criminal history before being hired by the USFS, as well as his geographical assignments and the numerous arson fires that invariably broke out in those areas shortly after his arrival. Yet during their depositions, both Matthews and Welton disclaimed any interest in McNeil with respect to the Moonlight Fire.

When Matthews and Welton visited the fire scene on September 8, 2007, Matthews told Welton that she had reservations about the size of the alleged origin area as established by White and Reynolds. Matthews believed that the origin area should have been enlarged to encompass more area farther up the hill to the west.[21] The Joint Report, however, says nothing whatsoever about Matthews' stated concerns that the investigators should have enlarged their area of origin to extend farther up the hill, nor does the Joint Report say anything about the arrival of USFS employee Michael McNeil into the area several weeks before the Moonlight Fire.

After this investigation, nearly two years passed. Finally, on June 30, 2009, the USFS and Cal Fire released their Joint Report, which concluded that the cause of the Moonlight Fire was "a rock strike with the grouser or front blade from S-2 CRISMON's bulldozer." This Joint Report contains an official sketch that identifies two separate points of origin, labeled E-2 and E-3.

As thoroughly discussed in this motion, however, Defendants have discovered clear and convincing evidence that the Joint Report fails to disclose what actually happened during the Moonlight Fire origin and cause investigation and that, instead, the Joint Report covers up the real conduct of these investigators during their origin and cause investigation.

**3.      The Initiation of the State Actions.**

On August 4, 2009, approximately a month after the Joint Report was released, White signed and sent a letter to each of the primary Defendants, claiming that they had been found responsible for the Moonlight Fire and that they were therefore liable for $8.1 million that Cal Fire allegedly incurred in suppressing and investigating the cause of the Moonlight Fire.

---

[21] Placing the fire farther up the hill would have brought the alleged points of origin closer to the area where the 3:09 p.m. Air Attack video, discussed _infra_, shows the smoke plume.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

However, instead of demanding full payment to the State of California, White sought the reduced amount of $7.6 million for the State of California, but then also demanded that Defendants issue a separate check in the amount of $400,000, payable to something called the "CDAA Wildland Fire Training and Equipment Fund."[22] White stated that if Defendants failed to comply with the demand for payments as set forth in the letter within thirty days, Cal Fire would file its action against them and add interest to its damage claim.

Cal Fire did not wait thirty days. On August 9, 2009, the Office of the California Attorney General filed its Moonlight Fire action in Plumas County Superior Court on behalf of Cal Fire. Cal Fire's lead counsel was Supervising Deputy Attorney General Tracy L. Winsor ("Winsor"), primarily assisted by Deputy Attorney General Daniel M. Fuchs.

Several other private parties who claimed damages from the Moonlight Fire also filed suit. In total, there were five private party lawsuits and one Cal Fire suit. Because all six state court lawsuits (seeking well over $60 million in damages) relied on the same joint USFS and Cal Fire origin and cause investigation, the state court consolidated the actions early in the litigation for purposes of discovery, and later consolidated all matters for a trial on liability (together referred to as the "state action".).

**4.     The Initiation of the Federal Action.**

In the summer of 2008, before the Joint Report was released, and well before Cal Fire filed its action, Assistant United States Attorney Robert Wright ("Wright"), the acting head of the Affirmative Fire Litigation Team in the Eastern District, had become particularly interested in the Moonlight Fire because of the substantial damage it had caused to USFS land. In fact, Wright ultimately sought and obtained an "early referral" because he believed he had a strong case on liability and also knew that there were extensive damages. Wright also understood that such referrals were typically not given until after the Forest Service determined its amount of claimed damages.

---

[22] After settlement of the federal action, Defendants later learned that this "fund" was internally referred to as "WiFITER" and, as discussed more fully below, was controlled by Cal Fire, not the California District Attorneys Association.

At some point prior to October of 2008, Wright retained several expert consultants and, on or about October 2, 2008, visited the fire site with consultants along with another Assistant United States Attorney. When they arrived in the area, they were joined by Moonlight Investigators White from Cal Fire and Welton from the USFS. Consistent with what is described in their dishonest Joint Report, the investigators both claimed the Moonlight Fire was caused by a rock strike from a metal tracked bulldozer working in their selected "area of origin." When driving back into town in a pickup truck with White and Welton, Welton told Wright "there's something that we need to tell you." Welton then explained that investigator Matthews, who had visited the alleged origin five days after it began, had wanted the investigators to declare a larger alleged origin area for the fire. At the time, Wright believed that White and Welton were "scrupulously honest and trustworthy in their conduct of the investigation and preparation of the Report." Later, however, when Defendants asked Welton about this issue in her deposition, she denied any memory of it.[23]

After discussing the matter with his consultants, and with investigators White and Welton, Wright began the process of drafting the Moonlight Fire complaint on behalf of the United States, eventually executing and filing that complaint on August 31, 2009, three weeks after Cal Fire filed its complaint and nearly two years after the fire began. Thereafter, Wright oversaw the federal Moonlight Fire litigation ("federal action") until January 4, 2010. On that day, Wright's supervisor, Assistant United States Attorney David Shelledy ("Shelledy"), abruptly removed

---

[23] In his declaration, Wright explains: "In hindsight, I believe that Matthews thought that the fire may well have originated in a location different from where the investigators had alleged." Wright's loss of trust is warranted on numerous levels, as discussed further herein. On this point, while Welton confessed Matthews' concerns to Wright, she was not so forthcoming to Defendants under oath and instead kept to the script of the falsified Joint Report. Specifically, Welton suppressed the harmful key fact regarding Matthews during her deposition. On August 15, 2011, Welton testified as follows:

> Q: Was there any discussion that you recall at the scene about the general area of origin being potentially larger than the area that was bounded by the pink flagging?
> A: I don't recall having that discussion.
> Q: Did Marion Matthews at any point in time ever express to you the thought that she believed the general area of origin should have been bigger, both uphill and downhill?
> A: Not that I recall.

The fact that Welton made a point of telling Wright about Matthews' critical commentary is directly at odds with what she told Defendants under oath, yet another example of the Moonlight Investigators' willingness to cover up information harmful to their goal of pinning blame for this fire on their chosen targets.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

1   Wright from the federal action with an additional instruction that Wright viewed as

2   unprecedented in his many years of experience as a federal prosecutor.  Specifically, Shelledy

3   told Wright that he was not only being relieved as the lead prosecutor, but that he was barred as

4   of that day from working on the federal action in any capacity whatsoever.

5       Shelledy then replaced Wright with Assistant United States Attorney Kelli Taylor

6   ("Taylor"), who led the prosecution of the federal action from that point forward.  Three months

7   later, Taylor signed the United States' first Rule 26 disclosure, claiming damages against

8   Defendants in excess of $791 million.  Together with estimated interest and attorney fees,

9   Taylor's disclosure brought the total claim against these Defendants to more than $1 billion.[24]

10  The fair market value of federal property where the fire burned were it placed on the open market

11  was approximately $100 million.

12      For the next three years, the Moonlight Prosecutors and Cal Fire collaborated under their

13  joint prosecution agreement regarding this two-front litigation.  For example, the federal and state

14  prosecutors coordinated deposition scheduling so that testimony from certain witnesses could be

15  used in both actions.  They also collaborated so that certain depositions would only be taken in

16  one action.  The Moonlight Prosecutors would often attend depositions noticed only in the state

17  action, and vice versa.  Additionally, the federal and state prosecutors jointly prepared the

18  primary investigators for their depositions, hired many of the same consultants, and disclosed

19  many of the same expert witnesses.

20      **5.      The Resolution of the Federal Action.**

21      Defendants intended to defend themselves at trial by demonstrating the investigators' lack

22  of credibility, highlighting the absence of any credible evidence that Howell had started the fire,

23  and submitting compelling evidence that the Moonlight Fire was most likely started by a third

24  party.  The Moonlight Prosecutors filed motions with this Court attempting to prevent Defendants

25  ────────────────

26  [24] On October 21, 2011, the United States supplemented its initial disclosures, reducing its purported damages to
    approximately $662 million.  However, in that disclosure, the United States also reserved its right to seek a jury
27  instruction that would permit the jury to assess environmental damages in an amount "significantly higher than the
    number listed herein."  The federal action continued to pose catastrophic damages for Defendants.  Thousands of jobs
    and the viability of entire communities in many already depressed Northern California logging regions hung in the
28  balance.

from advancing these defenses at trial.

On July 2, 2012, at the urging of the Moonlight Prosecutors, the Court issued tentative pretrial orders holding, among other things, that Defendants could not elicit any evidence to argue that someone else started the fire. As alleged more fully below, Defendants learned after the conclusion of the federal action that the Moonlight Prosecutors procured this ruling by defrauding the Court through concealment of critical evidence that would have been material to the Court's ruling. Additionally, the Court tentatively held that, under title 14, section 938.8 of the California Code of Regulations, Defendants could be liable even if a third party started the Moonlight Fire. This ruling was contrary to well-established California law.

With one of their primary defenses gone, Defendants faced going to trial in an economic death penalty case against the Moonlight Prosecutors, who had repeatedly demonstrated a willingness to breach their ethical duties to defraud Defendants and the Court. While the Court's tentative rulings on the motions in limine were certainly factored into Defendants' assessment of whether to settle the federal action, also of critical importance was the threat of ongoing misconduct by the Moonlight Prosecutors, who continued to engage in egregious fraud relating to the central issues of the case. Defendants thus reached the reluctant decision to resolve the federal matter.

In eventually agreeing to settle the federal action, Defendants understood the great power wielded by the Moonlight Prosecutors who, as Assistant United States Attorneys, were naturally (albeit incorrectly) presumed by the Court to be fulfilling their duty to "seek justice" and behaving not only in accordance with the ethical rules binding all attorneys, but also in accord with the heightened standards of conduct applicable to government attorneys.

Under the terms of the settlement agreement, Defendants agreed to collectively pay the United States $55 million over time and Sierra Pacific agreed to convey 22,500 acres of its land to the United States over time. Because the settlement agreement contemplated performance over a period of years, the parties expressly agreed that the Court would retain jurisdiction over the enforcement of the agreement. In connection with the settlement agreement, the Court issued an order confirming its ongoing jurisdiction.

DOWNEY BRAND LLP

In their portion of the Joint Status Report (Docket No. 612) the Moonlight Prosecutors assert, counterfactually, that Defendants only "pretended to settle" the federal Moonlight Fire action. The Moonlight Prosecutors contend that at the time of the federal settlement in July 2012, Defendants were supposedly concealing their "present intent" (apparently meaning at the time of the settlement) that they would seek to set aside the settlement for fraud upon this Court. In support of these contentions, the Moonlight Prosecutors cite to a Sierra Pacific July 17, 2012, press release. Therein, Sierra Pacific trial counsel William Warne is quoted as stating, "Typically, a settlement signifies the end of a dispute, but this is just the beginning." Properly understood in context, neither Sierra Pacific's press release nor Mr. Warne's statement support the Moonlight Prosecutors' preposterous assertion. Indeed, the circumstances surrounding this press release reveal yet additional misconduct by the Moonlight Prosecutors.

In their portion of the Joint Status Report, the Moonlight Prosecutors fail to apprise the Court of several critical considerations concerning Sierra Pacific's press release. First, notwithstanding the federal settlement, Defendants were still set for a jury trial in Plumas County several months later in the state action, in which damages in excess of some $60 million were claimed. Despite their ethical obligation not to make public comments that might unfairly influence the Plumas County jury pool, the Moonlight Prosecutors brazenly held a press conference immediately following the federal settlement in which they announced their "record settlement" and wrongly blamed Defendants for having started the Moonlight Fire, even though the agreed upon settlement contains Defendants' explicit denial of having started the fire. See Cal. Rule Prof. Conduct 5-120(A); A.B.A. Rule 3.8 ("Special Responsibilities of a Prosecutor").

In retrospect, the Moonlight Prosecutors' press conference appears to have served two purposes: first, it was an obvious effort to influence the Plumas County jury, thereby increasing the potential that a state court jury would essentially ratify what the Moonlight Prosecutors knew was otherwise a corrupt prosecution. And second, it was meant to trumpet their "record settlement" for purposes of career advancement and garnering personal accolades. The fact that such extrajudicial comments would interfere with Defendants' constitutional right to a fair and unbiased jury in their upcoming trial in the state action, and the fact that such statements are

DOWNEY BRAND LLP

proscribed by all applicable ethical rules, did nothing to dissuade the Moonlight Prosecutors.

Nevertheless, faced with the likelihood that the Moonlight Prosecutors' unethical extrajudicial statements had polluted the Plumas County jury pool (which is within the Eastern District), Defendants had no choice but to respond and publically deny these wrongful and improper allegations, as was their absolute right under California Rule of Professional Conduct 5-120(C). Sierra Pacific did so in its own July 17, 2012, responsive press release appropriately titled, "Sierra Pacific Corrects Misstatements Made by United States Attorney on Moonlight Fire." Sierra Pacific's counsel's statement that the federal settlement was "just the beginning" was merely an expression of Defendants' expectation that they would vindicate themselves in the trial of the state court actions – nothing more. The Moonlight Prosecutors' effort to mischaracterize Mr. Warne's comments as "crowing" to the press, while concealing from the Court the true circumstance which necessitated Sierra Pacific's press release, is simply more evidence that the Moonlight Prosecutors feel quite at liberty to continue misleading this Court.

At no time before the entry of Judge Nichols's February 4, 2014, Orders, wherein he found by "clear and convincing evidence" that the Moonlight Fire investigation and prosecution were "corrupt and tainted," had Defendants even considered the possibility of seeking to set aside the judgment in the federal action. Further underscoring the absurdity of the Moonlight Prosecutors' assertion that the federal settlement was a charade is the fact that Defendants have now paid the United States well over $30 million as part of the federal settlement, and the fact that Sierra Pacific has conveyed to the United States thousands of acres of land. Defendants can assure the Court that these payments and land conveyances most certainly are not "pretend."

As alleged further herein, new evidence has come to light since the federal settlement which demonstrates that the Moonlight Prosecutors' misconduct was even worse than suspected, and had the Court and Defendants known of this misconduct during the pendency of the federal action, it would likely have changed the outcome of Court rulings which were substantial factors in causing Defendants to settle. Despite Defendants' diligent efforts to obtain all discoverable information, they were unaware of this evidence due to the active and intentional efforts by the Moonlight Prosecutors and their joint prosecution partner Cal Fire and its attorneys to conceal it

36

DOWNEY BRAND LLP

in violation of all ethical and legal requirements.

### 6.     Resolution of the State Court Action.

After the settlement of the federal action, discovery continued in the state action.  In the spring of 2013, the state court issued two rulings rejecting Cal Fire's effort on cross-motions for summary adjudication to import the tentative pretrial rulings in the federal action into the state action, such that Defendants could be held liable for the Moonlight Fire even if it was caused by a third party.  In ruling on these cross-motions, the state court found that Cal Fire could only recover its suppression costs if Defendants caused the fire.  The state court likewise ruled that title 14, section 938.8 of the California Code of Regulations could not create a "duty" on the part of Defendants under principles of California tort law to suppress or detect third party fires.

Thereafter, Judge Nichols was assigned to the case for all purposes by the Chief Justice of California under the Assigned Judges Program.  On July 26, 2013, following a lengthy three-day hearing, Judge Nichols issued a series of orders dismissing the state court actions and entering judgment for Defendants on the ground that, among other things, Plaintiffs could not present a prima facie case on the element of causation.

After obtaining these dismissals, Defendants continued their effort to expose the egregious misconduct associated with the prosecution of these actions by filing a Motion for Fees, Expenses and/or Sanctions on October 4, 2013.  The filing of this motion initiated a lengthy process involving the submission by all parties of thousands of pages of briefing, declarations with evidence, deposition transcripts and deposition video.  As set forth more fully below, in late 2013, Defendants discovered by chance that during the entire pendency of the state and federal Moonlight Fire action, Cal Fire has been wrongfully and intentionally withholding documents and evidence which established that the lead Moonlight Investigator, law enforcement officer White and his direct supervisor and mentor Alan Carlson ("Carlson"), had been engaged in skimming millions of dollars of state wildfire settlements into an illegal off-books account which they and others controlled, such that they had a direct contingent personal/financial interest in the outcome of the Moonlight Fire investigation and litigation.

Four months later, on February 3 and 4, 2014, Judge Nichols heard oral argument on the

Motion for Fees, Expenses and/or Sanctions. In considering this motion, Judge Nichols was the first neutral arbiter to have an opportunity to consider the full scope of the governments' abuse in the investigation and prosecution of the state and federal actions. In the afternoon of February 4, 2014, Judge Nichols issued two orders, one twenty-six pages and the other fifty-eight pages. The twenty-six page order contains the court's conclusions regarding Cal Fire and its counsels' conduct as a whole, which the court read from the bench. The fifty-eight page order contains detailed findings supported by references to evidence. Together, the orders terminated Cal Fire's lawsuit in its entirety for its "egregious and reprehensible conduct."

Additionally, the orders awarded Defendants "full compensatory attorney fees and expenses" amounting to approximately $32.4 million.

In these orders, the court found that "Cal Fire's actions initiating, maintaining, and prosecuting this action, to the present time, is corrupt and tainted. Cal Fire failed to comply with discovery obligations, and its repeated failure was willful." Additionally, the court found that Cal Fire had engaged in "egregious and reprehensible conduct" and "a systematic campaign of misdirection with the purpose of recovering money from Defendants."

Although the misconduct was "so pervasive that it would serve no purpose for the Court to recite it all," the court made specific findings that critical USFS and Cal Fire witnesses failed to testify honestly, falsified witness statements, and falsified both the Joint Report for the state and federal actions, as well as other origin and cause reports, which they attempted to use in support of their prosecution of the state and federal actions. Judge Nichols specifically noted the misconduct of various USFS witnesses, including the "improper efforts of the two federal investigators, Reynolds and Welton."

While the court elected not to sanction counsel for Cal Fire,[25] the court expressed profound concerns regarding the conduct of the state prosecutors. The court stated:

---

[25] The court noted that its leniency regarding Cal Fire's counsel "in no way speaks to issues of legal ethics or compliance with the requirements of the State Bar Act." The court also noted that its "lenity, prudence, and caution as it relates to sanctions against officers of the court should not in any way be seen as softening or mitigating the force of this Court's decision, findings and orders as it relates to Cal Fire. It simply means that, whatever else might be said about the conduct and advocacy of cited attorneys, it will not be sanctioned here."

DOWNEY BRAND LLP

> The sense of disappointment and distress conveyed by the court is so palpable, because it recalls no instance in experience over forty seven years as an advocate and as a judge, in which the conduct of the Attorney General so thoroughly departed from the high standard it represents, and, in every other instance, has exemplified.

The court also found that the state prosecutors created "a tremendous burden" on the court "by allowing a meritless matter to go forward," and that this ran afoul of their responsibility "to only advance just actions."

### 7. Wright and His Experiences Relating to the Moonlight Fire and Other Wildfire Cases in the Year He Filed the Moonlight Action.

Wright, having left the United States Attorney's Office, eventually obtained copies of the termination orders issued by Judge Nichols in the state action. After reviewing Judge Nichols' orders as well as a copy of the Joint Report and other materials, Wright concluded that a grave injustice had occurred during the prosecution of the federal action, which led to his preparation of a declaration in support of this motion.

In the spring of 2009, Wright was working on other wildland fire prosecutions for the office. In one of those cases he had determined that he was "ethically obligated to disclose a document to the defense that called into question the viability of the government's prosecution in that matter." At the time the Civil Chief in the Office was Shelledy. Wright sought advice from the Department of Justice's Professional Responsibility Advisory Office ("PRAO") in Washington, D.C. PRAO supported Wright's understanding that he had to disclose the document, and Wright dismissed the action. Several months later, in August of 2009, Wright filed the United States' complaint in the federal action.

In the fall of that year, on a separate wildland fire action he was handling, Wright had a significant disagreement with Shelledy regarding Wright's desire to carry out what he believed was his ethical obligation to disclose to the defense a document revealing a serious calculation error which incorrectly increased the United States' damage claim in the action by $10 million. Because Shelledy resisted disclosing this error, Wright "sought advice from PRAO to obtain support for the proper exercise of [his] professional responsibilities." When Wright received

advice from PRAO stating it was his ethical obligation to disclose the $10 million reduction to the defense, Shelledy continued to oppose disclosure by sending his own email to PRAO, questioning the advice PRAO gave to Wright on the matter. When that effort failed, Shelledy sent Wright an email stating, "Okay, Bob, that's a beginning. Now what can you do to avoid creating an ethical obligation to volunteer a harmful document?" Because Wright believed that, as a lawyer for the Department of Justice and member of the California Bar, he "had a broad duty of candor to the court and a responsibility to seek justice and develop a full and fair record," he responded to Shelledy by explaining, "David, pursuing our theory of timber loss requires disclosure. The only way I am aware of to moot the disclosure requirement would be to drop the claim for timber losses, which would result in a lower damages number than simply disclosing the harmful document." Wright states that his supervisor Shelledy responded by calling his comment "flippant."

Thereafter, on October 23, 2009, PRAO attorney Kandice Wilcox responded with a crystal clear directive, stating in an email, "Part of the issue in making a false statement means not only an affirmative mis-statement but deliberately withholding information which refutes the position you assert." Wright provided the calculation error document in the United States' initial disclosures and the case has since settled.

Thereafter, Shelledy treated Wright with hostility. Wright further states, "the internal struggles that I encountered in 2009 with respect to my professional concerns on these wildland fire actions marked the first time in my 40 years of practicing law that I felt pressured to engage in unethical conduct as a lawyer." On January 4, 2010, just after receiving a commendation from United States Attorney Benjamin Wagner for his work on another wildland fire matter, Civil Chief Shelledy abruptly relieved Wright of any and all responsibility for the Moonlight Fire, forbade him from working on the matter in any capacity, and replaced Wright with Taylor. Shelledy told Wright that lately they disagreed about almost everything. Taylor remained lead counsel for the United States for the remainder of the case.

### 8. Assistant United States Attorney Eric Overby

Wright is not the only federal prosecutor who worked on the federal action and who

DOWNEY BRAND LLP

opened up about the misdirected prosecution of this matter. In March of 2011, Eric Overby ("Overby"), a highly respected senior Assistant United States Attorney from Salt Lake City, came to Sacramento to assist with the federal action.[26] Unfortunately, after working on the case for several months, Overby became frustrated with his inability to rectify the prosecutorial problems he was witnessing. In fact, Overby told Daniel Kim, an attorney representing the Landowner Defendants and W.M. Beaty, the following: "Imagine you're on a train that is running out of control towards the edge of a cliff. You really only have two options: head to the front of the train and try to gain control or jump off. I'm choosing to jump off."

On May 12, 2011, Overby contacted Sierra Pacific's lead trial counsel William Warne to inform him that he would be leaving the Moonlight prosecution team. Overby asked Warne if they could meet in person, and they set up a meeting later that same day at Downey Brand. During that meeting, Overby confirmed with Warne that he was leaving the matter and going back to Utah. He said, "If I thought there was anything positive that would result from me staying, then I would stay." Overby also told Warne that it was a physics problem, and that, "If I am banging my head against a brick wall, then my head loses." Echoing similar sentiments as expressed by Judge Nichols regarding the rarity of what he was witnessing, Overby also said, "In my entire career, yes, my entire career, I have never seen anything like this. Never." Overby told Warne that he told someone (presumably in his office) a few days earlier the following: "It's called the Department of Justice. It's not called the Department of Revenue. Since we are the Department of Justice, we win if justice wins."

---

[26] Sometime after his arrival, Overby spoke with Katherine Underwood, an attorney working at the time for Rick Linkert at Matheny, Sears, Linkert & Jamie, who was acting lead trial counsel for W.M. Beaty and the Landowner Defendants. Overby told Underwood that he was working on the Moonlight Fire matter as an "evaluator." Overby also told Underwood that he had hoped his presence in this case could repair some of the damage that had been done by Taylor to the working relationship with defense counsel. Underwood's declaration summarizes a telling point of discussion with Overby as follows:

> In order to further explain his role in the Moonlight Fire prosecution, Mr. Overby told me about another United States prosecution he had been sent to evaluate shortly before trial. Mr. Overby said there was a deposition taken, essentially on the eve of trial, wherein evidence was obtained that demonstrated the government's case should be dismissed. Mr. Overby recommended dismissal with prejudice, his recommendation was accepted, and the United States reimbursed the defendant(s) their defense costs. Mr. Overby described this action to me as "the most satisfying act of my career."

In May of 2011, Overby also contacted Wright, who had left the United States Attorney's Office in December of 2010. During that call, Overby asked Wright, "Is it just me, or is there something seriously wrong in the Eastern District Civil Division management?" Later in May of 2011, Overby met with Wright in person and discussed his dissatisfaction with the prosecution of fire cases by the Eastern District. Later, Overby told Wright that he was so concerned with the management of fire litigation matters in the Eastern District that he altered his plans to stay in California and instead decided to return to the United States Attorney's Office for the District of Utah.

### 9. Filing With The Office of Professional Responsibility

The Office of Professional Responsibility was established by order of the Attorney General to ensure attorneys and law enforcement personnel with the Department of Justice perform their duties in accordance with the highest professional standards expected of the nation's principal law enforcement agency. In July, Defendants submitted a lengthy brief to the Office of Professional Responsibility in Washington D.C. detailing the prosecutorial misconduct on the part of certain federal prosecutors who took over the federal action after Wright's removal.

### B. Selected Instances of Prosecutorial Misconduct, Each of Which Separately Constitutes Fraud on the Court.

Using as guideposts controlling legal authorities on the kind of conduct which triggers the need for judicial action under Rule 60(d)(3), it is clear that the interconnected conduct of the Moonlight Fire prosecutors and investigators rises well above what is required for finding a fraud upon the court – that species of fraud that does grave damage to the integrity of the judicial system. The Moonlight Fire case reflects a multi-faceted plan designed and executed within the realm of this litigation to "prevent the judicial process from functioning 'in the usual manner.'" Stonehill, 660 F.3d at 445. At every turn, these prosecutors and investigators attempted to cause the system to dispense justice based on various and repeated acts of deception. See Shaffer, 11 F.3d at 458. While the following examples are by no means exhaustive, they highlight some of the more obvious occurrences of investigative and prosecutorial misconduct which separately and collectively worked an egregious fraud upon this Court, an appalling expanse of misconduct

DOWNEY BRAND LLP

which now cries out for termination and the vacation of the settlement.

1. **The Moonlight Prosecutors Advanced a Fraudulent Origin and Cause Investigation in the Litigation and Allowed the Investigators to Repeatedly Lie under Oath about the Very Foundation of Their Work, Thereby Committing a Fraud Upon the Court.**

<u>The Relevant Facts</u>

The effort to "change the story" regarding the origin and cause of the Moonlight Fire began on the hillside September 4-5, 2007, continued with the drafting of the Joint Report, and persisted throughout the Moonlight Fire litigation, up until the time of that judgment was entered.

Specifically, the Moonlight Investigators attempted to create the fiction that their investigation focused on just two points of origin, identified as E-2 and E-3, a fiction which they then repeated in the Joint Report. In reality, however, the Moonlight Investigators conceived of these two "official" points of origin well after releasing the scene. Their investigation on the hillside on September 4-5, 2007, focused on a different, secret point of origin, denoted by a white flag, the existence of which they concealed from the Joint Report.

While these efforts by the Moonlight Investigators to "change the story" about the origin of the fire began pre-litigation, the Moonlight Prosecutors joined, advanced, and actively participated in that effort by transporting the fraudulent fire investigation and the fraudulent Joint Report into the jurisdiction and oversight of this Court. Ignoring their obligations as representatives of the government, the Moonlight Prosecutors allowed the Moonlight Investigators to testify falsely in their depositions about the most critical aspects of their work, and put them perfectly at ease as they repeatedly did so.

Discussed below are the facts relating to the secret, undisclosed point of origin marked by a white flag, and the efforts by the Moonlight Prosecutors to enhance their chance of prevailing against Defendants by advancing a false narrative regarding the E-2 and E-3 points of origin in the litigation.

a. <u>What Transpired on the Hillside on September 4-5, 2007.</u>

The primary purpose of any wildland fire investigation is to find where and how the fire started – to accurately locate its origin and to then find its cause. To accomplish this,

43

investigators are trained to use a systematic and scientific process. First, the investigators read burn indicators to locate the general origin area of the fire, then they locate a smaller specific origin area, and within that area they find the point of origin and next identify the competent ignition source at that location.

As this sequence reveals, locating the correct point of origin is critical to determining the actual cause of the fire. Finding that point of origin is necessary before determining the cause because that is where any physical evidence of the actual ignition is going to be located. Nat'l Fire Protection Ass'n § 17.1 ("Generally, if the origin of a fire cannot be determined, the cause cannot be determined."). The Moonlight Prosecutors' primary origin and cause expert testified that incorrectly locating the point of origin by even eight feet can make "a world of difference" because, without a correct origin, an investigator cannot identify the correct ignition source and thus cannot identify the correct cause of the fire.

Because of the critical importance of the origin to the cause determination, fire investigators are trained to carefully document their determination of its location. Thorough and proper documentation of the origin typically includes such tasks as placing a white flag at the origin, photographing the origin, identifying immovable reference points in the vicinity of the origin, taking measurements of the location of the origin in relation to these reference points, and sketching or diagramming the location of the origin.

Despite what they state in their Joint Report – and despite to their repeated testimony that they identified their official E-2 and E-3 points of origin before releasing the scene on the morning of September 5 – the Moonlight Investigators did absolutely nothing during their actual investigation to mark or assess these false points of origin. While under oath, White conceded that neither he nor Reynolds ever marked their E-2 and E-3 points of origin with a white flag, the color that investigators use to denote the point of origin. White testified that he and his co-Moonlight Investigator used blue, yellow, and red indicator flags as they processed the scene, but testified that they never placed a white flag in their scene for any purpose at all, and did not place any white flags at E-2 or E-3.

In addition to conceding their failure to mark E-2 and E-3 as their points of origin, White

DOWNEY BRAND LLP

and Reynolds admitted that they never documented, flagged, or marked those points in any way. When asked why, White said, "I don't know."  That White would profess under oath to having no explanation for having failed to mark the supposed points of origin, the identification of which was one of the primary goals of the entire investigation, is an affront to the judicial process. White took no contemporaneous photos fixed on the rocks he claimed to identify as his "points of origin" and no photos of the location where he testified that he collected the metal that supposedly started the fire.  When asked "Can you tell me why you didn't do that?" White responded, "No."  His testimony is blatantly false.  There is no record of any interest in these points because they had no interest in these points.  Under oath, the Moonlight Investigators simply did not want to reveal that they fabricated these points of origin <u>after</u> finishing their investigation, and suppressed evidence revealing what they had actually done during their investigation.  In short, because the official points of origin E-2 and E-3 were created after the Moonlight Investigators had processed and released the alleged scene of the origin of the fire, there is no evidence in the record which confirms the Moonlight Investigators had any interest by in those points when they processed the alleged origin scene on September 4-5.

On the other hand, the Moonlight Investigators performed extensive work during these two days of investigation before releasing the scene regarding their actual, and suppressed, point of origin.  Once one cuts through their deception, the suppressed evidence reveals that on the evening of September 4, the Moonlight Investigators were focused on a different rock in a skid trail about 10 feet away from the "official" E-2 and E-3 points of origin.  Reynolds took his only GPS measurement during the investigation from this rock and wrote the coordinates on a form entitled "Fire Origin Investigation Report," a critical document that the investigators never placed in their Joint Report.  White took three photographs of Reynolds as he took these measurements, one of which is presented here.

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1
2
3
4
5
6
7
8
9
10



11  The next morning, September 5, beginning at approximately 8:00 a.m., the Moonlight
12  Investigators established two reference points, labeled "RP1" and "RP2," from which they then
13  took five separate photographs between 8:18 a.m. and 8:20 a.m. – three from RP1 and two from
14  RP2. Each one of these photographs depicts a white flag in the middle of the field of view,
15  hanging from a metal stem placed into the soil next to a large rock on a skid trail in a different
16  location from the trail presented in the Joint Report. The large white flag rock in these five
17  photographs is the same rock White repeatedly photographed Reynolds crouching over on
18  September 4 as Reynolds took the only GPS reading of the investigation. All five of these
19  photographs of the white flag were suppressed from the Joint Report. One of White's five
20  reference point photographs of the white flag is provided for reference below in a magnified and
21  cropped format.

22
23
24
25
26
27
28



DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

The Moonlight Investigators then took precise distance and bearing measurements from their two reference points directly to the same rock where they had placed the white flag, triangulating and measuring to that location with accuracy to a quarter-of-an-inch and to a single degree.[27] Reynolds then recorded these distance and bearing measurements on a form entitled "Fire Origin Sketch," which the investigators also omitted from the Joint Report.[28]

The suppressed sketch, shown below, shows a <u>single</u> point of origin alongside the same skid trail, which Reynolds marked with an "x" and labeled "P.O"  The key on this same form also confirms his intent, as it states that "x = point of origin."  Retained United States expert land surveyors David Wooley and Christopher Curtis and fire investigator Larry Dodds all confirmed during their depositions that these distance and bearing measurements intersect perfectly at the large rock marked with the white flag.



---

[27] White attempted during this matter to deny under oath the importance of these reference points in relationship to their suppressed white flag.  Yet in another wildland fire matter, White had no trouble explaining the process and the critical purpose associated with triangulating measurement to his point of origin.  Specifically, on August 8, 2008, in <u>Cal Fire v. Dustin White</u> (Lassen County Superior Court Case No. 43654), White testified that, "aside from trying to get the absolute measurement to be able to go and recreate that point of origin so that I establish two reference points.  Then I take those measurements.  That's the very foundation of a origin and cause investigation."

[28] Both Reynolds and White denied any on-site connection to the sketch.  However, as discussed more fully, <u>infra</u>, Defendants discovered that these law enforcement officers actually took a photo of a portion of the sketch while they photographed the metal fragments on a sheet of white paper at 10:02 a.m. that same morning.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

As they processed the alleged origin scene on September 5, the Moonlight Investigators carefully set up the evidence of their work. White took two critical photographs, one at 9:16 a.m. and another at 9:25 a.m. Both of these photographs are in the Joint Report and entitled, eponymously, "Overview of Indicators."

White confirmed under oath that he took these two "Overview of Indicators" photographs to create a photographic record showing the substance of the investigators' primary scene processing work – the blue backing flags, the yellow lateral flags, and the red advancing flag, along with numbered placards to identify certain burn indicators related to their directional flagging. There is nothing whatsoever in either of these photographs signifying any interest in the Moonlight Investigators' claimed points of origin E-2 and E-3, a fact perfectly consistent with their after-the-fact fabrication of these so-called points of origin. Below is a copy of the photograph that White labeled "Overview of the Indicators."



Importantly, under computer magnification of a native photo, this Court will see that there is in fact a white flag in the 9:16 a.m. "overview of indicators" photo, stuck in the ground at, as

one would expect, the very same spot revealed by the five white flag photographs omitted from the Joint Report.[29]

Consistent with the Moonlight Investigators' focus on a single point of origin, there is one plastic bag containing metal shavings, which the Joint Report calls "Evidence #1" or E-1. This Court will see that those metal shavings sit directly on top of a white sheet of paper in a photo taken at 10:02 a.m. just before the investigators released their scene, and that underneath that sheet of paper sits the secret sketch containing the single point of origin.[30] A side by side comparison of the full sketch, and the photo showing the left edge of the sketch under a piece of paper, is provided below.[31]

---

[29] Importantly, the Moonlight Investigators decided to place this critical "overview of indicators" photo in their Joint Report, as such overview photos are an essential and required element of any origin and cause report. They must not have been too worried about being forced to do so, as each of these two overview photos as copied into the Joint Report is so small and of such poor resolution that the secret white flag is all but invisible to the naked eye in printed copies of the Joint Report. Their ruse nearly worked. Initially, defense counsel missed the white flag as they carefully reviewed the Joint Report as well as all of the investigators' work in those first two critical days. In all of those photographs, especially the 9:16 a.m. overview photograph, the white flag easily fades into the background. Eventually, however, defense counsel spotted the single white flag while reviewing the native photographic files on a computer screen with back-lit magnification.

[30] Consistent with his other acts of deception, when defense counsel showed White this "smoking gun" sketch, he repeatedly testified that he had not seen it during his investigation, knew nothing about it, and did not learn of its existence until it was shown to him by prosecutors well after this case began. Reynolds also attempted to distance himself from the sketch by testifying that he must have prepared it after the investigation but back at his office. Despite their deceit, they drafted the sketch during their investigation, and they had it with them when they took photos of the "cause of the fire," and it is their own photo that "gives them away" as it reveals that they had actually placed it on the hood of White's vehicle, just underneath the photo of the metal they collected from the hidden point of origin revealed by the sketch itself. On these lies alone, a properly aligned federal prosecutor would have dismissed the case immediately on the ground that the Moonlight Investigators had no respect for the law, had no qualms about lying under oath, and were attempting to collect money on the basis of a deception. Here, the Moonlight Prosecutors pressed forward, undeterred by the growing body of evidence demonstrating that they were aiding and abetting a colossal fraud upon the court.

[31] A more detailed analysis of this photographic comparison is provided in exhibit to the Declaration of William R. Warne (Docket No. 596) Ex. 41 at 129-130, 220-221; Ex. 45 at 26; Ex. 47 at 4-5, 45, Ex. 58; Ex. 59; Ex. 61.

49

DOWNEY BRAND LLP

White struggled to explain why – if he <u>actually</u> had found two points of origin and collected metal from two separate spots – he would have put what he claims are competent ignition sources into one bag; White then had no choice but to concede that doing so would have been a violation of evidence collection protocols.[32]

In short, a timeline of the key events on September 4 and 5 reveals that the investigators did everything possible to document their actual and suppressed point of origin, while doing nothing to document their so-called "official" points of origin E-2 and E-3:

---

[32] At the time White collected the metal, it was of course not a violation of evidence protocols, as he and Reynolds only had a single point of origin, which is why they placed what they found into a single bag.

50

DOWNEY BRAND LLP



Notably, on September 5, 2007, the date the Moonlight Investigators were doing everything possible to document their actual and suppressed point of origin, White was taking copious field notes. Reynolds, who was with White at all times during the scene processing, confirmed this fact during the course of his November 1, 2012, deposition. Had the notes been preserved, Defendants are informed and believe that they would have detailed the careful steps the Moonlight Investigators took with respect to the placement of the white flag at a single point of origin, their careful recordation of distance and bearing measurements to that single point from two fixed reference points, their collection of metal fragments from that single point, and their placement of those metal fragments into a single plastic bag, all before they released the alleged origin area at 10:15 a.m. on September 5, 2007.

At the time he created his notes, and at all times thereafter, White knew the Moonlight

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

Fire was likely to result in litigation.[33] White nevertheless destroyed his notes and his contemporaneous computer files before the federal action commenced.[34] Notably, at the time White destroyed these materials, Cal Fire did not have any policy requiring their destruction. White thus destroyed these notes of his own accord, and for his own reasons. After having done so, White advanced the false narrative in the Joint Report. With the notes gone, the Moonlight Investigators believed they were free to select and shape the evidence, unimpeded by contemporaneous notes of what actually occurred when the origin scene was processed.

        b.      The Moonlight Investigators Are Confronted in Deposition with Evidence of Their Secret Origin.

During their depositions, the Moonlight Investigators violated their oaths by denying any knowledge of the significant and purposeful nature of their multi-faceted effort with respect to their secret origin, even when Defendants confronted them with indisputable evidence of their focused work. White repeatedly testified that the only points of origin he and his co-Moonlight Investigator ever located were two points on a spur trail, E-2 and E-3. White also testified that he found the metal fragments the Moonlight Investigators claimed were the ignition source adjacent to these two rocks. Reynolds testified similarly. This testimony was false.

During these questions and answers, the Moonlight Prosecutors sat on their hands, doing nothing to prevent the Moonlight Investigators' desperate efforts to exploit the discovery process and our system of justice to prop up their fictional Joint Report. Ironically, it was White's own

---

[33] Specifically, on September 5, 2007, the day White and Reynolds processed the alleged origin scene, Reynolds listed Sierra Pacific Industries as the "Defendant" on an incident report. That same day, Cal Fire retained litigation consultant/metallurgist Lester Hendrickson, and White met with him five days later. By September 5, 2007, the Moonlight Fire had already grown to over 22,000 acres. On September 7, 2007, White interviewed Bill Dietrich of Howell and reported, "Dietrich said the [Safeco] policy was for $3 million liability insurance, as required by SPI. Dietrich said he would fax me a copy of their insurance policy." White testified that his investigation included assessing insurance policies of "potential defendants." White also admitted that he understood that fires of every variety can result in litigation. Each of these facts evidences that White was already contemplating not only the litigation that the Moonlight Fire would result in, but who would be the defendant in that case.

[34] Not only did White violate <u>Brady</u> in destroying his notes, White also violated criminal obstruction of justice laws of the United States. 18 U.S.C. § 1512(c) provides that: "[w]hoever corruptly—(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so," is subject to a fine "or imprisoned not more than 20 years, or both." 18 U.S.C. § 1512(c).

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

photographs of their white flag – which he had omitted from the Joint Report because of what they revealed – that caused his descent into additional perjury. When initially provided with a copy of the first omitted white flag photograph he took on September 5, 2007, at 8:18 a.m., White denied that there was any white flag in its view, an assertion he apparently believed he needed to at least attempt because defense counsel had earlier obtained his testimony that neither he nor Reynolds <u>ever</u> placed a white flag anywhere in origin area for any reason. Thereafter, White nervously testified that he was unable to explain why there was a white flag in the center of five photos he carefully aligned and took from his chosen points of reference.

Reynolds attempted similar acts of deceit. In March of 2011, and despite incontrovertible evidence to the contrary, Reynolds also repeatedly testified that the Moonlight Investigators did not use any white flags. When Defendants confronted him with photographs of the white flag, including the one above, Reynolds denied ever placing any white flags, and claimed that what is obviously a white flag in the photograph above "looks like a chipped rock." Reynolds then compounded his deception. On November 15, 2011, during his deposition in the federal action, defense counsel asked Reynolds about the correlation between the white flag and the distance and bearing measurements Reynolds recorded on his concealed sketch. In response, Reynolds testified that "these have nothing to do with any kind of a white flag." Later, in that same deposition, Reynolds perjured himself again, claiming the distance and bearing measurements in his sketch intersected at E-3, "eight to ten feet away" from the rock marked with the white flag at which the distance and bearing measurements actually intersect. Despite the fact that the Moonlight Prosecutors' own designated surveying expert David Wooley (as well as all defense surveying experts) testified that Reynolds's distance and bearing measurements intersected exactly at that white flag, the Moonlight Prosecutors breached their duty of candor by doing nothing to correct the record or correct Reynold's false testimony.

During the last day of his deposition in the state action, well after the settlement of the federal action, and after it was clear that both Reynolds and White were not credible, Reynolds tried yet another tack, stating that he likely placed the white flag, but that they must have later discounted the significance of the rock it marked and abandoned it that same morning in favor of

53

DOWNEY BRAND LLP

1    the E-2 and E-3 rocks. But Reynolds's last effort to salvage the Moonlight Investigators' and

2    Prosecutors' charade fails for numerous reasons.

3        White and Reynolds had both earlier testified that they <u>never</u> placed a white flag, had no

4    idea how it eventually found its way into their scene, and that they had no interest whatsoever in

5    the spot marked by the white flag. They had plenty of chances to state otherwise in their

6    depositions. Indeed, White testified that he does not know why Reynolds was crouched over the

7    same rock with a GPS unit (despite the fact that he took not one, but three photos of Reynolds

8    performing this act), does not know when the white flag was placed on that rock, when it was

9    removed, or why a series of photographs focused upon it. He denied that the white flag was ever

10   even the focus of the photographs. This testimony was false.

11       White also testified that he took the five photos which depict the same white flag in the

12   center not to photograph a white flag, but to instead photograph the reference rocks themselves,

13   so that others could "go back out to this exact location and have this angle line up and be able to

14   say, okay, that's Reference Point 1." All of this testimony was false.

15       White refused to acknowledge that the photographs were centered on the white flag, as

16   doing so would reveal that he and Reynolds were actually focused on a point of origin far

17   different than the official points of origin he and Welton had already fully committed to in the

18   official Joint Report. He also refused to concede the issue, as doing so would reveal that they

19   released the scene before deciding that they needed to change (and conceal the fact that they were

20   changing) their actual point of origin.[35] All of this testimony was false.

21       Moreover, when White and Reynolds were shown the presence of the white flag in the

22   9:16 a.m. "Overview of Indicators" photo, magnified with the aid of a back-lit computer screen,

23   each of them preposterously testified that they could not explain why it was there, despite the fact

24   that the <u>very purpose</u> of their overview photo was to create a record of the most important

25   indicators of their work, including, of course, just where they identified their point of origin

26

27   _____

[35] In the same section of White's deposition, the following questions and answers were exchanged: "Q: And do you
know why there is a white flag at that rock? A. I believe I have answered it. No, I don't. Q: Okay. And it's true that
28   you guys changed your point of origin at some point in time after that morning of September 5th, correct? A: No."

through the placement of the white flag. All of this testimony was false.

White and Reynolds' "forgetfulness" about their numerous and meaningful acts, and their outright denial of them, are not functions of misplaced memory. Instead, they are the function of a fraud. These acts of perjury were not related to minor issues, but to the very essence of their work and the central issue in the federal action – namely, where the fire started, how it started and who started it. Indeed, this false testimony by law enforcement officers White and Reynolds – provided while in uniform and while wearing a gold badge – is a function of profound investigative corruption regarding key facts, transported into the province of this Court's jurisdiction with ill-intent and without regard for the solemn vow of honesty inherent in all discovery.[36]

The fraudulent nature of law enforcement officers White and Reynolds' testimony was recognized by the joint origin and cause expert for the United States and Cal Fire, Larry Dodds, who after spending more than a thousand hours examining the evidence, finally conceded in May of 2013 (after the conclusion of the federal action) during a state deposition that the white flag raises "a red flag," creates a "shadow of deception" over the investigation, and caused him to conclude "it's more probable than not that there was some act of deception associated with testimony around the white flag." Likewise, Cal Fire Unit Chief Bernie Paul later admitted in the state case that the evidence and testimony surrounding the white flag caused him to disbelieve the Moonlight Investigators.

As Dodds and Paul understand, investigators do not forget about the "very foundation" of their work, and they do not forget about the time expended and the physical tasks associated with performing that work, such as taking measurements with a tape and a GPS device and carefully recording them, or standing behind each reference point and taking five photos of the white flag at that same rock, carefully lining each up so the white flag is centered.

---

[36] Testifying in this manner is akin to two law enforcement officers, while under oath, "forgetting" about the apprehension of a criminal suspect – even though the officers recorded his weight and height, even though they sketched his face, even though they photographed him not once, but numerous times, and even though his presence at the scene was recorded when the crime was committed – and then failing to weigh, sketch, measure, or photograph their new suspect at all.

DOWNEY BRAND LLP

The Moonlight Investigators did not forget about these actions when they intentionally excluded the evidence of each of them from the Joint Report. And they did not forget about these actions when they pretended to remove them from their memories as they violated their oaths. Each act was purposeful, and the Moonlight Investigators' efforts to deny any memory of those acts or deny any understanding of just how a single white flag became the focus of their attention and their photographs is nothing less than a substantial fraud upon this Court.

c. The Moonlight Prosecutors Affirmatively Assisted and Encouraged the Moonlight Investigators' False Testimony.

The Moonlight Prosecutors were not just silent as the Moonlight Investigators testified untruthfully about the primary focus of their work; the Moonlight Prosecutors also affirmatively assisted and encouraged this false testimony, a fact recognized by Judge Nichols.

In particular, in order to prepare for his deposition, law enforcement officer Reynolds attended a January 2011 meeting at the United States Attorney's Office in the Eastern District of California with law enforcement officer White, special agent Welton, and the federal and state prosecutors, Taylor and Winsor. White also confirmed that he and Reynolds, as well as Taylor and Winsor, were present at this January meeting in the morning for three hours, and that co-investigator Welton joined the group for another four hours after lunch.

During this meeting, which occurred after White had already been deposed for six days, and during which the defense had exposed the white flag, the Moonlight Prosecutors used a computer screen to enhance the images of the white flag. They openly discussed the white flag with Reynolds. Instead of demanding answers, the Moonlight Prosecutors encouraged more deceit by telling Reynolds that the white flag was a "non-issue," a fact that Reynolds finally revealed during the last day of his deposition during the state action on November 1, 2012, long after the conclusion of the federal action.[37]

In March 2011, a few weeks after this January 2011 meeting, Defendants deposed

---

[37] During the last day of his state deposition, and after the federal settlement had been reached, Reynolds testified as follows: "And they said it was going to come up and saw it as a nonissue."

Reynolds and asked him about this same topic.[38]  In response, Reynolds feigned ignorance, responding "I don't really see a flag" and testifying it "looks like a chipped rock."  As noted above, Reynolds also falsely denied that his distance and bearing measurements recorded on the concealed scene sketch had any relationship to the rock marked with the white flag, and falsely claimed that the measurements intersected "eight to ten feet" from the white flag.  The Moonlight Prosecutors had actual knowledge that this testimony was in fact false, as they had earlier discussed the white flag with Reynolds.

As Reynolds repeatedly provided false testimony throughout his deposition, the Moonlight Prosecutors did nothing to intervene or to correct the record afterward, as was their responsibility.  The Moonlight Prosecutors apparently believed that Defendants would never discover what had been discussed with Reynolds during their pre-deposition meeting, and remained mute.[39]  In fact, Defendants did not learn about the discussion of the white flag at the pre-deposition meeting until after Defendants prevailed on a motion to compel.  Only then did Reynolds hesitantly reveal to Defendants the facts associated with his pre-deposition meeting and the white flag discussion with the federal and state prosecutors.[40]

Judge Nichols reviewed this series of events relating to the meeting at the United States Attorney's Office.  In his February 4, 2013, Orders, he stated that these events stood out "among

---

[38] Curiously, Reynolds was defended by newly-arrived Assistant United States Attorney Overby, who was not at the meeting to prepare Reynolds for his deposition.  The deposition transcript reflects that lead prosecutor Taylor was in attendance on the first day of the deposition, but skipped the second day when Sierra Pacific's counsel began asking questions about the white flag.  During Reynolds's November 15, 2011, federal deposition, Taylor was once again absent, while Assistant United States Attorney Glen Dorgan defended the deposition.  While the timing of Taylor's absence during Reynolds's depositions is interesting, it does nothing to absolve her of her responsibility to have made sure that Reynolds testified honestly and to have corrected his testimony when she found out that he had not been truthful.  Instead, Taylor did nothing to correct the record regarding this foundational dishonesty.

[39] During the deposition of Reynolds in March of 2011, the federal and state prosecutors instructed him not to answer questions about what was discussed during the meeting at the United States Attorney's office, invoking the attorney-client privilege and their joint prosecution agreement.  Thereafter, Defendants were able to reopen his deposition after prevailing on a motion to compel because both Reynolds and White had been named as experts for the United States.  Indeed, because the United States had named both White and Reynolds as experts, Magistrate Judge Brennan ruled that none of the discussions which took place in their presence were confidential.

[40] After Magistrate Brennan's order, Defendants deposed Reynolds again in November of 2011.  Even then, Reynolds attempted to waffle on what he saw when viewing photographs with the federal and state prosecutors, but he ultimately conceded the existence of a white flag.  A year later, in November of 2012, Defendants deposed Reynolds in the state action.  During that deposition, Reynolds clearly conceded the existence a "white flag" in the photos shown to him by the prosecutors.

so many acts of evasion, misdirection and other wrongful acts . . . ." His Honor stated that the court was "deeply troubled" by two things: First, that Reynolds, one of the primary Moonlight Investigators, "would admit one thing to a table of 'friends' and then refuse to admit the same thing once put under oath," and second, that the prosecutors sat "idly by as Reynolds . . . denied in his deposition what he had conceded in . . . counsel's presence several weeks earlier."

Although most of the false testimony by the Moonlight Investigators concerning the concealed initial point of origin was known to Defendants before the settlement of the federal action, the admissions from the government's retained experts regarding the deception by the Moonlight Investigators, and the effect this had on their opinions, were not disclosed until expert discovery commenced in the state action, well after the federal action settled. Moreover, Reynolds did not reveal until his state deposition in 2013 that he had been advised by the Moonlight Prosecutors that the white flag was a "non-issue." This does not preclude relief under Rule 60(d)(3). See Hazel-Atlas, 322 U.S. at 246 (setting aside a judgment for fraud upon the court notwithstanding the fact that the parties settled, that the defrauded party did not seek relief until seven years after the settlement, and that the defrauded party suspected and was actively investigating the fraud at the time of the settlement).

Analysis

The Ninth Circuit has observed that "most fraud upon the court cases involve a scheme by one party to hide a key fact from the court and the opposing party." Stonehill, 660 F.3d at 444. Here, the fraud upon the Court involved a scheme by the Moonlight Investigators, and later the Moonlight Prosecutors, to hide a key fact – the original origin determination – from Defendants and this Court. Indeed, despite the very purpose of the Joint Report, to report the truth and only the truth, that official law enforcement document advanced a critical falsehood, and covered up the truth about the original origin determination, perhaps the most important issue in this litigation. As noted by former federal prosecutor Wright, "The change in the point of origin and the reasons for the change should have been, but were not, disclosed in the Report." Despite their obligation to do so, the Moonlight Investigators, and later the Moonlight Prosecutors, never disclosed this exculpatory information to Defendants.

58

DOWNEY BRAND LLP

Perhaps worse, the Moonlight Prosecutors allowed both White and Reynolds to testify dishonestly about their scene processing and origin determination. They intentionally sat in silence as the Moonlight Investigators repeatedly testified in ways that were directly contradicted by their own concealed conduct, photographs, and documents. Once confronted with what actually happened, properly focused federal prosecutors would have insisted that the Moonlight Investigators testify honestly regarding their work on the hillside that day, and forced the creation of a truthful Joint Report. Properly focused federal prosecutors would have also certainly abided by their duty of candor to this Court by immediately reporting the Moonlight Investigators' dishonesty and would have quickly dismissed their action against Defendants once they found that the Joint Report was based on lies and engendering numerous additional lies in discovery.

Instead of taking these actions, the Moonlight Prosecutors simply chose not to report what they were ethically required to report, never disclosing to Defendants or to the Court the gross inconsistencies between the photographs and sketches, on the one hand, and the Joint Report and deposition testimony on the other. And even worse, the Moonlight Prosecutors made the investigators perfectly comfortable in their lies, as revealed by the pre-deposition meeting where they assured Reynolds that the white flag was a "non-issue."[41] In the end, the Moonlight Investigators' refusal to admit what they had done reflects a profoundly disturbing arrogance and cynicism towards the very purpose of our discovery rules and our legal system in general, as does the Moonlight Prosecutors' failure to take action when the Moonlight Investigators repeatedly violated their oath.

Critically, the Joint Report was the very foundation of the Moonlight Fire investigation and its subsequent prosecution. There is no more "key fact" in this matter. And the concealment of the white flag origin in that Joint Report is similarly signifcant. Indeed, the white flag cover-up means far more than discovering that the most essential point of the investigation was actually at a spot eight or ten feet from the official points of origin, and it means far more than finding that

---

[41] At that point in time, the Moonlight Prosecutors had already watched White be cross-examined about the white flag, and could see for themselves that this "non-issue" destroyed his credibility.

DOWNEY BRAND LLP

Moonlight Prosecutors were willing to play along.[42] Once an investigation is discovered to have been infused with dishonesty, it is not about distances or a single point of origin or two. It is immediately about everything else in the investigation that can no longer be trusted.

When the Moonlight Prosecutors chose to advance their prosecution by relying upon the fraudulent Joint Report and lies of the Moonlight Investigators, they defiled the Court. In this regard, it is worth noting that "some courts and commentators have suggested that perjury should not usually constitute fraud on the court unless 'an attorney or other officer of the Court was a party to it.'" Stonehill, 660 F.3d at 445 (quoting 11 Wright & Miller, § 2870). Here, the lawyers most certainly were parties to this deception, as they well knew what the Moonlight Investigators were engaged in a deception, yet they continued to advance the Joint Report and its investigative findings in the litigation through discovery, deposition, and motion practice. The core nature of this fraud, and the gross misconduct it involves, is enough, standing alone, to find a fraud upon the court. See Dixon, 316 F.3d at 1046-47 (finding a fraud on the court based on the actions of two IRS attorneys in covering up relevant evidence, including sitting by silently as witnesses presented testimony the attorneys knew to be false).

> **2.** **The Moonlight Prosecutors Misrepresented to the Court Bush's Alleged "Admission" That a Rock Strike Caused the Moonlight Fire, Which They Relied Upon in Procuring a Favorable Summary Judgment Ruling, Thereby Committing a Fraud Upon the Court.**

The Relevant Facts

---

[42] The Moonlight Investigators' deception regarding this central issue is far more meaningful than 10 feet, and it certainly does not mean that the investigators were 10 feet from being correct. Indeed the plume of smoke shown in the air attack video demonstrates that the investigators' secret point of origin and their fabricated but official points of origin all existed in an area too far down the slope, roughly 150 to 200 feet from the center of the smoke plume revealed by an air attack video taken overhead roughly an hour after the fire began. Given their mindset, their error is not surprising. As these investigators quickly processed the scene, the entire point of that exercise was to pin blame on chosen defendants, not to find the truth. Thus, because they were not engaged in a scientific exercise they were way off from where the fire actually started. Once the mindset of these investigators is exposed, it is easy to also imagine that their "initial" and secret point of origin may not have even been their first point of origin. Since this matter clearly and convincingly demonstrates a willingness by these investigators to move their point of origin in a failed effort to "strengthen" their case, it also demonstrates the distinct possibility that the investigators suppressed other points of origin as well, that the white-flagged point of origin is not their only other point, but perhaps their second or third, which they abandoned in favor of a point more "connected" to their target defendants. Perhaps the investigators initially placed a completely different point of origin near the area where the plume is shown in the video, and thought better of it because it implicated the wrong party, a possibility suggested by the testimony of Sierra Pacific employee Mike Mitzel, who saw another flagged area further up on the ridge a few days after the fire started.

60

DOWNEY BRAND LLP

1    Relying solely on the Joint Report and the Declaration of Joshua White, the Moonlight

2    Prosecutors presented the following as an allegedly "undisputed fact" in the United States'

3    opposition to Defendants' motion for summary judgment:

4    171.    In a signed statement that Bush submitted to investigators,
     he admitted that Crismon was operating in the area closest to the
5    fire and that he believes that "Cat tracks scraped rock to cause fire."
     White Decl., ¶ 6, Ex. A, p. 133.
6

7    In making this representation to the Court, the Moonlight Prosecutors failed to disclose

8    that the investigating officers interviewed Bush twice. They also misrepresented what Bush said

9    during those interviews; at no time did Bush state that he believed the bulldozer tracks scraped a

10   rock to cause the fire. In fact, in his interview with lead Moonlight Investigator White, he

11   specifically denied having this belief. The Moonlight Prosecutors were aware of these facts when

12   they presented this allegedly "undisputed fact" to the Court.

13   The first interview was conducted by Moonlight Investigator Reynolds, a law enforcement

14   officer, on September 3, 2007, a little over an hour after the fire was reported from the Red Rock

15   Lookout Tower. That interview was not tape recorded. Consequently, the only record of what

16   Reynolds and Bush purportedly discussed is a federal form titled "Statement," which Reynolds

17   completed for Bush to sign at the end of the interview.

18   The form Reynolds filled out asserts that Bush stated that he "believes CAT tracks

19   scraped rock to cause fire." Reynolds's summary of the first interview was included in the Joint

20   Report and is the Exhibit referenced by the Moonlight Prosecutors in support of their purportedly

21   "undisputed" fact.

22   The form Reynolds used calls for a signature by the officer issuing the report and the

23   signature of a witness. Neither signature box is completed on the version of the form included in

24   the Joint Report and relied upon by the Moonlight Prosecutors.

25   Notwithstanding Reynolds's failure to sign the statement and his failure to have a witness

26   present to sign the statement, Bush signed it on a line marked, "SIGNATURE OF PERSON

27   GIVING STATEMENT." Bush does not dispute that he signed the form. During his deposition,

28   however, he denied making the statement that he believed the CAT tracks scraped a rock and

caused the fire. Plaintiffs challenged Bush on this assertion by pointing out that he had signed the form, which begins with the language, "I have read the foregoing statement." In response, Bush grudgingly admitted he cannot read. He further testified that Reynolds tried to persuade him to say that the CAT tracks scraped a rock to cause the Moonlight Fire, but he never made that statement.

Bush's second interview was conducted one week later by Moonlight Investigator White, also a law enforcement officer, on September 10, 2007. White tape recorded his interview with Bush but did not include the recording as part of the Joint Report. Instead, he, like Reynolds, drafted a document purporting to summarize his conversation with Bush. White included this summary in the Joint Report. The Cal Fire form used by White does not call for a signature by the interviewee, so Bush's signature does not appear on this document. White signed it, though, as the officer completing the summary.

White's written summary of the second interview falsely attributes to Bush an admission of liability regarding the government's rock strike theory. In particular, as confirmed in the tape recording, White asked Bush whether Bush had ever told Reynolds that he believed the bulldozer scraped a rock and started the Moonlight Fire. Bush flatly denied having done so and further explained that he never thought the fire started in that manner, a fact which the recording of the interview confirms.

Nevertheless, White's written summary of the interview, advanced in the Joint Report and presented by the Moonlight Prosecutors as an undisputed fact, states: "Bush reiterated the same information he had provided to I-1 Reynolds."

This statement is of course false, as the most important component of Reynolds's written summary of his interview with Bush is the falsity that Bush believed "a CAT scraped a rock and started the fire," and one of the most important components of White's interview with Bush is Bush's statement that he never told anyone what caused the fire and that he did know what had caused it. In other words, Bush never made the statement to Reynolds that he supposedly "reiterated" to White, and thus the interview reports involve falsities upon falsities.

Defendants obtained the tape recording of White's interview with Bush during discovery.

62

When White was deposed, Defendants confronted him with this contradiction and asked why there was a glaring inconsistency between the tape recording of the interview and the written summary. White could not explain it. Instead, he responded, "No. I don't know why." This deposition occurred more than a year before the Moonlight Prosecutors filed the United States' summary judgment opposition, and was attended by Taylor, the lead Moonlight Prosecutor at the time. The deposition also occurred before the Moonlight Prosecutors relied on these falsified witness summaries in verified discovery responses, signed by Taylor in violation of her duties under Federal Rule of Civil Procedure 26(g)(1)(A).

If White believed Bush was recanting or changing his alleged statements to Reynolds made in the first interview, White would have interrogated Bush on that issue, asking Bush why he no longer believed the CAT tracks scraped a rock to cause the fire, when that was what he had (supposedly) said to Reynolds on September 3. But White did no such thing. Instead, the tape recording reveals that he remained silent when Bush emphatically stated that he had never said to anyone that he knew what started the fire. White thereafter prepared his falsified written summary of this September 10 interview, and could not explain the contradiction when questioned during his deposition, as the Moonlight Prosecutors sat by and watched. These facts demonstrate that White knew the first written "confession" by Bush was fabricated by Reynolds, and that White's interview was simply for the purpose of perpetuating the fraud through a second interview, without any regard for what Bush actually said.

This misrepresentation was directly relevant to one of the central issues in the case – namely, who started the fire, and how.

This Court ruled in favor of the United States and denied Defendants' summary judgment motion. The Moonlight Prosecutors never corrected the record before the Court, never withdrew their reliance on Reynolds's inaccurate statement, never disclosed that White's summary of the second interview intentionally perpetuated the falsity that Reynolds created, and never amended their discovery responses as required by Federal Rule of Civil Procedure 26(e).

Judge Nichols recited these facts in finding by clear and convincing evidence that "Cal Fire's lead investigator falsified Bush's interview statement, and incorporated that falsification

63

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1   into its interrogatory responses."

2       These facts concerning the falsification of the Bush interviews, and the Moonlight

3   Prosecutors' misrepresentations to the Court, were generally known to Defendants before the

4   conclusion of the federal action, but this does not preclude relief under Rule 60(d)(3). See Hazel-

5   Atlas, 322 U.S. at 246 (setting aside a judgment for fraud upon the court notwithstanding the fact

6   that the parties settled, that the defrauded party did not seek relief until seven years after the

7   settlement, and that the defrauded party suspected and was actively investigating the fraud at the

8   time of the settlement).

9                                   Analysis

10      Standing alone, the Moonlight Prosecutors' actions with respect to the falsified Bush

11  interviews, and their presentation of those interviews in connection with their successful summary

12  judgment opposition and verified discovery responses, constitute fraud upon the Court and

13  warrant relief under Rule 60(d)(3). In furtherance of the type of scheme the Ninth Circuit

14  discusses in Stonehill, the Moonlight Investigators here falsified more than just their original

15  white flagged point of origin. In another effort to sell their fraudulent scheme that a bulldozer

16  started the Moonlight Tire, the undisputed evidence establishes that Reynolds and White each

17  produced a written summary of their respective interviews with Bush, falsely attributing to Bush

18  admissions of liability regarding the government's rock strike theory. Even after Defendants

19  uncovered the falsification of Bush's interviews, prominently displayed in the Joint Report, and

20  even after White could not answer why the tape recording of his interview of Bush conflicted

21  with his written summary, the Moonlight Prosecutors still knowingly advanced in motion practice

22  before this Court the so-called "undisputed fact" that Bush had admitted liability, and proffered

23  the so-called fact in verified discovery responses.

24      This behavior constitutes fraud on the court. More specifically, the Moonlight

25  Prosecutors' submission to the Court and use in discovery of the falsified Bush interviews was

26  "an effort by the government to prevent the judicial process from functioning 'in the usual

27  manner.'" Stonehill, 660 F.3d at 445. This was not perjury or nondisclosure relating to a

28  tangential issue; instead, it went to the key issue in the case – causation – and, as such, "was so

                                   64

1    fundamental that it undermined the workings of the adversary process itself." <u>Id</u>.

2        The Ninth Circuit found similar behavior to constitute a fraud on the court in <u>Pumphrey</u>.

3    There, in-house counsel attended trial on the defendant company's behalf, watched an expert

4    witness perjure himself on a key issue, and then watched the same expert perjure himself again in

5    depositions that were taken in subsequent litigation.  62 F.3d at 1132.  He also helped prepare

6    "misleading, inaccurate, and incomplete discovery responses," and "fail[ed] to correct the false

7    impression created by [the expert witness's] testimony."  <u>Id</u>.  This is exactly what the Moonlight

8    Prosecutors have done.  They attended the depositions of Bush and White, heard Bush deny ever

9    having told Reynolds that he believed the CAT tracks scraped a rock to cause the fire, listened to

10   the questions about the discrepancy between White's interview summary and the tape recording,

11   and watched as White had no answer for the falsehood he intentionally created.  The Moonlight

12   Prosecutors did not disclose this falsehood to the Court; instead, they took the lies created by the

13   Moonlight Investigators and relied on them in discovery responses (as the in-house counsel did in

14   <u>Pumphrey</u>), to successfully defeat Defendants' motion for summary judgment (just like in

15   <u>Pumphrey</u>, where the in-house counsel allowed the expert witness to testify falsely at trial).

16       In their portion of the Joint Status Report, the Moonlight Prosecutors  incorrectly state that

17   they "made no misrepresentation" to the Court, and that the instant motion is not about

18   "fabrication of evidence by counsel or anything similar."  (Docket No. 612 at 18:6-7.)  This

19   assertion is clearly incorrect as evidenced by the Moonlight Prosecutors' reliance on the supposed

20   Bush admission within their opposition to Defendants' motion for summary judgment.  Not only

21   did the Moonlight Prosecutors misrepresent the circumstances of the supposed Bush admission,

22   they undoubtedly wrote, or co-wrote, the Declaration of Joshua White, which attaches the

23   falsified Joint Report, including the falsified Bush interview summaries, and presented them to

24   the District Court.  Accordingly, for all the reasons stated above, as well as those stated by the

25   Ninth Circuit in <u>Pumphrey</u>, the Moonlight Prosecutors' behavior in this instance constitutes a

26   fraud upon the Court.

27

28

3. **The Moonlight Prosecutors Proffered False Testimony in Opposition to Defendants' Motion for Summary Judgment and Succeeded in Procuring a Favorable Ruling, Thereby Committing a Fraud Upon the Court.**

<u>The Relevant Facts</u>

The Moonlight Prosecutors proffered to this Court a false and misleading declaration from White and attachments thereto about the investigation of the Moonlight Fire in support of their opposition to Defendants' motion for summary judgment. In doing so, they committed a fraud on this Court.

Defendants Sierra Pacific and Howell filed a Motion for Summary Judgment on February 29, 2012. On March 28, 2012, the United States filed its opposition, the centerpiece of which was a declaration by lead Moonlight Investigator White. (<u>See</u> Docket No. 437.)

In addition to the affirmative misrepresentations and falsehoods by omission in White's Declaration, the Moonlight Prosecutors also attached as an exhibit to the declaration virtually all of the fraudulent Joint Report, thereby presenting it to the Court as evidence in support of their opposition to Defendants' motion.

The United States relied upon that declaration and its exhibits to dispute at least twelve material facts proffered by the defense. (Docket No. 435.) Additionally, the United States relied on that declaration and its exhibits to proffer at least twenty-five additional facts that the government contended were material to the Court's ruling on the motion. (Docket No. 435-1.)

White's declaration discusses in detail various tasks that he and Reynolds supposedly undertook as part of their investigation, including the placement of red, yellow, and blue indicator flags. But critically, White omits any mention of the white flag, and omits any mention of his work marking, measuring, photographing, and diagramming the original, undisclosed point of origin denoted by that white flag. White attests that he and Reynolds found "small metal fragments near two rocks that we identified as having been struck by heavy equipment," i.e. E-2 and E-3. But there can be no question, in view of all the evidence that has been revealed about their actions, that these metal fragments were actually collected at the white flag point of origin the investigators were so desperate to conceal.[43]

---

[43] Defendants are informed and believe that the Moonlight Investigators collected the metal at the white flag rock, not

The equally deceptive Joint Report attached to White's declaration is a study in obstruction of justice. As detailed throughout this supplemental briefing, the Joint Report is replete with a fabrication regarding the investigation. It conceals the existence of the secret abandoned point of origin, and perpetuates the fraud associated with the belatedly manufactured points of origin. The Joint Report, and White's Declaration, also attach and incorporate numerous falsified witnesses statements and witness interview summaries, all manufactured in aide of this "corrupt and tainted" prosecution. All of these documents were attached to and presented to this Court by the Moonlight Prosecutors for its careful consideration in ruling on Defendants' motion for summary judgment.

As discussed, <u>supra</u>, White discusses the alleged Bush "confession" which he also attaches as part of the Joint Report. The Moonlight Prosecutors were present for White's deposition on that subject. There, they saw firsthand White's inability to explain why he wrote in his interview summary the exact opposite of what Bush said, as the recording of the interview reveals.

White's declaration also attaches the fraudulent interview summaries of the USFS personnel staffing the Red Rock Lookout Tower. These falsified official forms were prepared by White's co-investigator Special Agent Welton. As explained in more detail, <u>infra</u>, these false statements are written so as to conceal the most important events that transpired at the Red Rock Lookout Tower in the minutes before the fire was reported. Under 18 U.S.C. section 1519, falsifying any record with the intent to impede, obstruct or influence an investigation constitutes an obstruction of justice. Having attended and defended all pertinent depositions regarding the events that transpired at the Red Rock Lookout Tower, the Moonlight Prosecutors knew or should

at rocks E-2 and E-3 as falsely claimed in their Joint Report. Why else would White have placed metal fragments into a single bag collected from two locations some ten feet apart, in violation of the most basic investigation methods and his own training? Why else would White and Reynolds have lied about the white flag? Why else would the rocks E-2 and E-3 have no indicator flags, no evidence tents, no markings, nothing to suggest White found them relevant in the "overview of indicators" photographs he took to document all that the Moonlight Investigators had accomplished at the scene shortly before he released the scene, and roughly a half hour before Reynolds said they "were done"? Why else would the only scene diagram on September 5 have distance and bearing measurements that perfectly triangulate to the white flag and not E-2 or E-3? Why else would White have waited until September 8, 2007, to collect rocks E-2 and E-3, long after he had released the scene three days before?

have known that these aspects of the Joint Report they elected to present to the Court were works of fiction and that they constituted efforts to obstruct justice.

The Moonlight Prosecutors did nothing to bring these serious issues to the Court's attention or address them in any way, and instead exacerbated them by filing falsified witness interviews with the Court and relying upon them in support of their opposition to the defense motion for summary judgment.

At the time that the Moonlight Prosecutors filed White's declaration with the Court, they knew that the Moonlight Investigators concealed and suppressed their work relating to the white flag from the Joint Report, and that they testified falsely about the white flag in their depositions. Indeed, by that point in time, the Moonlight Prosecutors had already participated directly or indirectly in seventeen days of White's deposition. The Moonlight Prosecutors had already conducted their now infamous meeting with Reynolds to discuss the white flag, where they reviewed enlarged photos of it on a video screen – while brazenly telling him it was a "non-issue" – in preparation for Reynolds's deposition. The Moonlight Prosecutors had already participated directly or indirectly in four days of Reynolds's deposition, during which Reynolds had been examined about his secret scene sketch and claimed to be unable to see the white flag – despite the fact that he had earlier discussed this flag with the Moonlight Prosecutors as being a "non-issue" and viewed pictures of it on a video screen. The Moonlight Prosecutors had also, by that point in time, been present at all of the depositions that were the subject of Judge Nichols' orders, wherein he found by a clear and convincing evidence standard that the Moonlight Investigators had "repeatedly" given false testimony, and specifically found that "Reynolds did not testify honestly."[44]

In addition to the Moonlight Investigators' false testimony, by the time that the Moonlight Prosecutors filed White's declaration with the Court, these government attorneys had also heard testimony from their own surveying expert confirming that the distance and bearing

---

[44] Specifically, Judge Nichols found: "[I]t is this Court's responsibility to review whether Cal Fire abused the legal process through the false testimony of its lead investigator on the Moonlight Fire, White. This Court finds that Cal Fire, through White, repeatedly did so."

measurements on the sketch Reynolds prepared with a single point of origin intersected exactly at the location of the white flag.

White's declaration and the Joint Report attached thereto also contained the falsified reports of three other fires, namely the Greens Fire, the Lyman Fire, and the Sheep Fire. As set forth in greater detail below, these reports were equally specious, and contained equally fraudulent conclusions. The Moonlight Prosecutors attended all of the depositions concerning the reports of these other fires, and thus had no good faith basis to rely upon these reports. Rather, they had every reason to understand exactly what they were: fraudulent materials designed to buttress charges against affluent defendants.

Defendants knew prior to the settlement of the federal action that the Moonlight Prosecutors had proffered a false declaration of a law enforcement officer, but this does not preclude relief under Rule 60(d)(3). See Hazel-Atlas, 322 U.S. at 246 (setting aside a judgment for fraud upon the court notwithstanding the fact that the parties settled, that the defrauded party did not seek relief until seven years after the settlement, and that the defrauded party suspected and was actively investigating the fraud at the time of the settlement). However, that knowledge does not excuse the actions of the Moonlight Prosecutors in submitting White's declaration to the Court, nor excuse their failure to withdraw or correct that pleading.

Analysis

The Moonlight Prosecutors advanced the fraudulent investigation into the judicial proceedings by submitting the false and misleading White declaration and Joint Report as part of summary judgment practice. When these government attorneys chose to advance their prosecution by relying upon the corruption at the heart of the investigative work, they engaged in a scheme to "change the story as presented to the district court." Stonehill, 660 F.3d at 452. Indeed, Judge Nichols, after discussing the white flag and "just how incredible the investigators' testimony was on the most central issues in this case – indeed, on the very basis upon which this action was brought," also discussed a declaration White submitted in the state action, stating: "the Court also finds that White's . . . declarations to this Court, wherein he repeated and advanced the absurdity of his deposition testimony regarding the white flag in effort to avoid the consequences

69

of his actions, are also an affront to this Court, as is Cal Fire's counsel's willingness to allow such a declaration to be filed." Of course, even if the Moonlight Prosecutors had not submitted White's declaration to the Court, but rather had submitted only the Joint Report created by White, that alone would be sufficient to find a fraud on the court, given that the Joint Report was also rife with White's fraud. Cf. Shaffer, 11 F.3d at 460 (finding fraud on the court when EPA administrative record created by witness who lied about credentials was submitted in support of summary judgment motion, even though EPA did not submit declaration of that witness). Their conduct therefore constitutes fraud on this Court.

Hazel-Atlas is instructive because of its parallels to this action. In that case, Hartford attorneys created a bogus trade journal article, which they submitted in support of a patent application. 322 U.S. at 240. Similarly here, the Moonlight Prosecutors created the bogus White declaration and attached to it the fraudulent Joint Report, which they submitted in opposition to the summary judgment motion. In Hazel-Atlas, Hartford attorneys "conceived" of the article "in an effort to persuade a hostile Patent Office to grant their patent application," id. at 247, while here the Moonlight Prosecutors conceived of the White declaration in an effort to persuade this Court to deny the defense motion for summary judgment. And, as in Hazel-Atlas, where the appellate court cited the fraudulent trade journal article in its decision, id. at 240-41, the Court here cited the fraudulent White declaration repeatedly in its order on the summary judgment motion.

Notably, in Hazel-Atlas, the Supreme Court rejected the argument advanced by the Hartford attorneys that their submission did not constitute fraud on the court because the article was not "basic" or "the primary basis" for the appellate decision. Id. at 246-47. The Supreme Court noted that the Hartford attorneys "thought the article material," id. at 247, just as the Moonlight Prosecutors thought the White declaration and attached Joint Report were material, as evidenced by the fact that they relied upon that declaration to dispute at least twelve material facts proffered by the defense, as well as to proffer at least twenty-five additional facts that the government contended were material to the summary judgment motion. In Hazel-Atlas, the Supreme Court found it sufficient that the Hartford attorneys "urged the article upon . . . [the

70

DOWNEY BRAND LLP

DOWNEY BRAND LLP

appellate court] and prevailed." Id. Likewise, the Moonlight Prosecutors urged the White Declaration and the attached Joint Report upon this Court and prevailed. That being the case, the Moonlight Prosecutors "are in no position to now dispute its effectiveness." Id. The Moonlight Prosecutors' conduct, while similar to that of the Hartford attorneys, is all the more egregious in view of their status as government representatives who have a duty to see that justice is done. Berger, 295 U.S. at 88.

As with the alleged Bush admission and associated documents proffered to the Court, the Moonlight Prosecutors' creation of and presentation to the Court of the false White Declaration and the Joint Report belies their assertion in the Joint Status Report that they "made no misrepresentation" to the Court, and that the instant motion is not about "fabrication of evidence by counsel or anything similar." (Docket No. 612 at 18:6-7.) The evidence clearly and convincingly establishes that they did so repeatedly, just as Judge Nichols concluded that their joint prosecution partners had done when proffering the same evidence in the context of the state action.

4. **The Moonlight Prosecutors Failed to Take Remedial Action After Learning of Evidence that Undermined the Government's Origin and Cause Conclusions and Failed to Produce Related Exculpatory Evidence, Thereby Committing a Fraud Upon the Court.**

The Relevant Facts

The Air Attack video is an important piece of evidence undermining the Moonlight Investigators' conclusions about the origin and cause of the Moonlight Fire. Although the Moonlight Prosecutors disclosed this critical video during discovery, they failed to take any remedial action to correct the Joint Report, their discovery responses, or deposition testimony when expert analysis revealed that the video dispelled their origin and cause theory. Additionally, the Moonlight Prosecutors failed to disclose expert evidence associated with the video that would have shed light on a significant problem with their origin determination.

The Air Attack video was taken by a pilot flying over the scene at approximately 3:09 p.m. on September 3, 2007. The aerial video shows the Moonlight Fire, still in its infancy, approximately an hour and a half after the fire had allegedly transitioned from an "incipient" to a "free burning" state.[45] The video shows a large smoke plume on the hillside where the Moonlight Fire began and the fire advancing generally towards the northeast:



Importantly, the Air Attack video shows that the smoke plume from the Moonlight Fire is located up the hill and to the west of the location where the Moonlight Investigators contend the fire started. The video demonstrates that the alleged points of origin are not in the smoke, but located downhill among unburned trees. The importance of this evidence cannot be overstated. The fact that the alleged points of origin are not in the smoke, and that the fire had not yet reached that area despite the fact that the fire had been burning for approximately an hour and a half, demonstrates that the Moonlight Fire did not start where the government contends.

The Air Attack video therefore severely undermines the Moonlight Investigators' origin conclusion. Importantly, the video also undermines their conclusion regarding the cause of the Moonlight Fire. In the field of fire investigation, locating the correct point of origin is critical to

---

[45] The timing of the ignition of the Moonlight Fire is a hotly disputed issue. The government contends that Crismon started the Moonlight Fire at around 12:15 p.m. when his bulldozer ran over a rock. However, no smoke was spotted until more than two hours later, at approximately 2:24 p.m. Defendants contend that this significant lag time suggests that the fire started later and due to a different cause. Faced with the timing discrepancy, the Moonlight Prosecutors advanced the theory that the Moonlight Fire began as a smolder, remained in an "incipient" state for an hour and half, and then allegedly transitioned into a "free burning" state, at which point the fire "actually took off" and produced enough smoke to be spotted. According to the Moonlight Prosecutors, the fire began free burning around 1:45 p.m.

determining the correct cause of the fire. Nat'l Fire Protection Ass'n § 17.1 ("Generally, if the origin of a fire cannot be determined, the cause cannot be determined."). The Moonlight Prosecutors' primary origin and cause expert testified that incorrectly locating the point of origin by even eight feet can make "a world of difference" because, without a correct origin, an investigator cannot identify the correct ignition source and thus cannot identify the correct cause.

The Moonlight Prosecutors were keenly aware of the location of the government's alleged origin in the Air Attack video due to the work of their retained expert, Christopher Curtis ("Curtis"), a civil engineer and land surveyor jointly retained by the federal and state prosecutors under their Joint Prosecution Agreement. Among other things, the Moonlight Prosecutors retained Curtis to identify the precise location of the alleged points of origin within specific frames of the Air Attack video. The Moonlight Prosecutors hoped this identification would show the alleged points of origin near the center of the plume of smoke in the video, and therefore support the Moonlight Investigators' origin and cause conclusions. Curtis performed this assigned task, placing a red dot in certain video frames to denote the government's origin. Critically, Curtis's work revealed that red dot to be at a location on the hillside <u>outside</u> the smoke, underneath the unburned trees standing east and downhill from the smoke plume.



Defendants also asked their own experts to locate the two alleged points of origin in the Air Attack video. The defense work produced similar results to that of Curtis, resulting in the placement of the alleged origin <u>outside</u> the smoke, underneath unburned trees. Defendants

1  disclosed these expert reports and findings to the United States. Therefore, not only were the

2  Moonlight Prosecutors aware of the significant problem with their alleged origin through the

3  work of their own disclosed expert, Curtis, but through defense expert reports too.

4  The Moonlight Prosecutors also knew or should have known of the significance of the Air

5  Attack video and the related expert analysis. The Air Attack video clearly demonstrates that the

6  Moonlight Fire had not yet reached the government's chosen origin despite allegedly having been

7  in a "free burning" state for at least an hour and a half. The only logical conclusion from this

8  evidence is that the fire did not start where the government contends it did. Nevertheless, the

9  Moonlight Prosecutors took no remedial action to correct the Joint Report, discovery responses,

10  or deposition testimony regarding their flawed point of origin. Instead, the Moonlight

11  Prosecutors continued to advance this untenable theory in discovery responses, through

12  deposition testimony, and in expert reports and analysis, all conducted under the purview of this

13  Court's authority.

14  Defendants knew of the Air Attack video and the related expert analysis prior to the

15  federal settlement, but this does not preclude relief under Rule 60(d)(3). See Hazel-Atlas, 322

16  U.S. at 246 (setting aside a judgment for fraud upon the court notwithstanding the fact that the

17  parties settled, that the defrauded party did not seek relief until seven years after the settlement,

18  and that the defrauded party suspected and was actively investigating the fraud at the time of the

19  settlement). However, after the federal settlement, Defendants learned that the Moonlight

20  Prosecutors failed to disclose certain exculpatory evidence associated with the Air Attack video.

21  Specifically, the government attorneys did not provide Defendants with the handwritten notes

22  created by their expert, Larry Dodds, a fire origin and cause expert jointly retained by the federal

23  and state prosecutors under their Joint Prosecution Agreement. Defendants deposed Dodds first

24  in the federal action, and after the federal settlement, again in the state action. In his later state

25  deposition, Dodds produced handwritten notes that he prepared while he was retained as an expert

26  in the federal action, but which the Moonlight Prosecutors had never produced or disclosed to

27  Defendants. The notes reveal that Dodds struggled in consultation with the Moonlight

28  Prosecutors to reconcile the location of the government's alleged origin with the Air Attack

74

video, particularly joint federal/state expert Curtis's placement of the alleged origin in the video frames.

For example, in his handwritten notes, Dodds writes: "Chris Curtis testified to separation between the GAO [government's alleged origin] & the smoke seen in the AA [Air Attack] video." Dodds confirmed during his state deposition that these notes reflect his understanding of Curtis's federal testimony. When questioned in the state action about this note, Dodds admitted that during a meeting with the Moonlight Prosecutors, Curtis discussed his opinion about the "separation" between the smoke and the government's origin.

Also during the state action, and after the federal settlement, Dodds produced for the first time another handwritten note he claimed he created during the pendency of the state action relating to Curtis's testimony. Therein, Dodds wrote that Curtis's opinion was not only that the Moonlight Investigators' alleged origin was not in the smoke, but that this alleged origin had "not burned yet" and that Dodds was trying to "square" Curtis's opinion with the Moonlight Investigators' alleged origin. Dodds conceded during his state deposition that if the government's alleged origin had not yet burned when the Air Attack video was taken, "it would negate the whole government's origin area."

<u>Analysis</u>

The Moonlight Prosecutors' conduct with respect to the Air Attack video provides another unfortunate example of their willingness to ignore their solemn obligation to ensure "that justice shall be done" and instead improperly focus on trying to "win . . . [the] case." <u>See</u> <u>Berger</u>, 295 U.S. at 88. It is another striking example of fraud on the court. In that regard, <u>Pumphrey</u> is informative because of the strong parallels between the conduct of the general counsel in that case and the conduct of the Moonlight Prosecutors in this action.

In <u>Pumphrey</u>, general counsel was aware based on in-house testing that a handgun could fire when dropped, and yet allowed trial counsel to advance the theory that the gun would not do so. 62 F.3d at 1131-32. Similarly here, the Moonlight Prosecutors were aware, based on the Air Attack video, that their alleged origin was not correct, or at the very least, subject to extreme doubt, and yet they actively advanced and advocated their flawed origin and cause theory

75

DOWNEY BRAND LLP

DOWNEY BRAND LLP

throughout the litigation. Additionally, in <u>Pumphrey</u>, general counsel proffered discovery responses that mischaracterized the gun testing and denied any record of the test in which the gun fired, <u>id.</u> at 1131-32, just as the Moonlight Prosecutors proffered discovery responses and declarations in motion practice that advanced the government's flawed origin analysis. Moreover, in <u>Pumphrey</u>, general counsel allowed a company employee to create a false impression during his deposition about the gun testing, <u>id.</u> at 1132, just as the Moonlight Prosecutors allowed its investigators and experts to create a false impression in their depositions about the location of the origin and false impression about the accuracy of the initial investigation. And, in <u>Pumphrey</u>, general counsel did not facilitate the production of a video of the testing in which the gun fired, <u>id.</u> at 1131, while similarly the Moonlight Prosecutors did not facilitate the production of notes taken by their expert that highlighted the flaws in the government's origin location. Standing alone, this conduct constitutes fraud upon the Court and warrants relief under Rule 60(d)(3).

**5. The Moonlight Prosecutors Created a False Diagram to Further Their Case, Thereby Committing a Fraud Upon the Court.**

<u>The Relevant Facts</u>

After learning that the location of the government's origin in the Air Attack video was outside the smoke, the Moonlight Prosecutors did not attempt to correct the record, but instead conceived a plan to create new evidence to salvage their flawed origin. As part of that effort, the Moonlight Prosecutors knowingly and deliberately proffered a false diagram of the directional spread of the fire from the alleged origin. This diagram squarely contradicted the official sketch in the Joint Report, the sworn deposition testimony of Moonlight Investigator Reynolds, and the Air Attack video.

The Joint Report includes an official sketch depicting the Moonlight Investigators' alleged points of origin and diagraming the spread of the fire from those points. As this sketch reflects, the Moonlight Investigators hypothesized that the fire advanced downhill and to the northeast of their chosen origins. During his deposition, Reynolds confirmed this theory, testifying that he and White were in agreement that the fire moved "downhill, northeast" from the alleged origin.

76

DOWNEY BRAND LLP

Long after the publication of the Joint Report and its official sketch, the experts analyzed the Air Attack video and pinpointed the alleged origin. The Air Attack video does indicate that the Moonlight Fire advanced to the northeast as Reynolds testified; however, the video also reveals that the fire could not have started at the alleged origin and then spread northeast, because the smoke plume (and thus the fire) is located to the north<u>west</u> of the alleged origin, while to the north<u>east</u> of the alleged origin are green, unburned trees. <u>See</u> picture, <u>supra</u>.

Rather than admit that the Moonlight Investigators had wrongly identified the origin, the Moonlight Prosecutors embarked on a mission to manufacture new evidence, attempting to explain the discrepancy between the location of their origin and the smoke in the Air Attack video. The Moonlight Prosecutors directed Curtis to create a brand new scene diagram, one that re-plotted the location of the alleged points of origin and re-diagramed the spread of the fire.[46] At their behest, Curtis created a new diagram that dramatically altered the direction of the advancing fire. The new diagram showed the fire spreading up the hill to the northwest. This new diagram, and its uphill, northwest advancement, are contrary to the official sketch in the Joint Report, the sworn testimony of Reynolds, and the Air Attack video, all of which indicate a downhill, northeast spread. Thus, the Moonlight Prosecutors changed the direction of the advancing fire by a full ninety degrees.

After the creation of this new diagram, White unveiled it mid-deposition and testified about it extensively. Deposition testimony establishes that this directional change was not done to correct a careless drafting error on the official sketch in the Joint Report. In fact, during her deposition, Welton testified that co-Moonlight Investigator White took a particular interest in the precise placement of the north compass on the official sketch, and that White even instructed her to revise and to slightly cant their north arrow to the left so as to improve its accuracy before finalizing the official sketch and to make clear the fire advanced to the northeast. Notwithstanding the care that went into the original placement of the northeast advancing indicators, the Moonlight Prosecutors facilitated the creation of the new diagram since the old one

---

[46] Curtis testified that "counsel from the state and from the federal government," along with consultant Carlson, came to his office "before Christmas" in 2010 and "asked me if I could do this [diagram]."

could not withstand critical scrutiny and could not be reconciled with the Air Attack video.

Analysis

The conduct of the Moonlight Prosecutors with respect to the false fire spread diagram was not only a violation of their heightened ethics as representatives of our government, but it was also similar to the conduct at issue in Derzack, 173 F.R.D. 400. In that case, the plaintiffs produced falsified documents to the opposing party during discovery and then proffered deposition testimony about those documents and related facts, thereby committing a fraud upon the court. Id. at 404; see also Hazel-Atlas, 322 U.S. at 245 (finding a fraud upon the court based on manufactured evidence). Similarly here, the Moonlight Prosecutors directed the creation of a scene diagram that was conceived years after the origin and cause investigation concluded, and that completely departed from the official scene sketch prepared during the investigation, as well as the sworn deposition testimony of Reynolds and the indisputable Air Attack video. In so doing, the Moonlight Prosecutors manufactured evidence in an effort to salvage the Moonlight Investigators' faulty origin determination, and purposefully injected that evidence into the discovery process in an effort to win at all costs. This conduct is a clear scheme to "change the story as presented to the district court." Stonehill, 660 F.3d at 452. Standing alone, this conduct also constitutes fraud upon the Court and warrants relief under Rule 60(d)(3).

**6.** **The Moonlight Prosecutors Failed to Disclose and Correct Admittedly False Expert Reports Thereby Committing a Fraud Upon the Court.**

<u>The Relevant Facts</u>

The Moonlight Prosecutors failed to disclose to the defense a serious error in a report prepared by their expert Kelly Close ("Close") regarding the directional spread of the fire. When confronted with this error, Close testified that he made the Moonlight Prosecutors aware of this mistake, leaving no doubt that they were aware of the problem and that they purposefully chose not to take corrective action. Had the Moonlight Prosecutors corrected this mistake, Close's report would have undermined the government's origin theory and provided additional proof that the fire did not start where the Moonlight Investigators and Prosecutors contended it did.

As relevant to this issue, the Moonlight Prosecutors retained Close, a fire spread behavior

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

specialist who, among other things, purported to model the fire spread using software known as FARSITE. To perform this modeling, Close entered certain data into FARSITE, including the surrounding terrain, wind, and fuel loads. When Close eventually produced his FARSITE modeling to Defendants, it showed the fire initially advancing from the alleged origin to the west, directly towards the smoke plume seen in the Air Attack video. From this FARSITE modeling, the Moonlight Prosecutors were able to suggest that their alleged points of origin were correct, notwithstanding the Air Attack video, and that the fire burned uphill to the west, rather than downhill to the northeast, as depicted on the official sketch and as testified to by Reynolds.

Through tremendous cost and effort, Defendants discovered that Close made an egregious error in his FARSITE modeling, one that had a significant effect on the direction of the fire spread in his model. Specifically, instead of correctly inputting the actual nine degrees of slope of the hillside in the area of the fire, Close inputted thirty-three degrees.[47] The magnitude of this error is apparent from the following demonstrative, which compares the actual slope (in blue) to Close's slope (in red).



Defendants did not learn of this error through a disclosure by the Moonlight Prosecutors, or through a corrected expert report from Close. Instead, Defendants' fire modeling expert Dr. Christopher Lautenberger ("Lautenberger") discovered the error only after carefully sifting through the data that Close produced. Lautenberger re-ran the FARSITE modeling using a corrected data set, including the correct nine degree slope. The results of Lautenberger's

[47] As fire behaviorists and investigators recognize, slope has a tremendous impact on the rate and direction of fire spread. Fires will burn faster uphill than downhill because of the preheating of the uphill fuels and the influence of upslope and up-canyon winds.

DOWNEY BRAND LLP

modeling revealed a fire spread generally to the northeast – not to the west – consistent with the Air Attack video. These facts tended to prove that the fire did not start where the Moonlight Investigators and Prosecutors claimed, and that it actually started farther up the hill.

In light of Lautenberger's work and his discoveries, Defendants were eager to take Close's deposition, which occurred on March 5, 2012. While Lautenberger's supplemental report revealed that Defendants were aware of Close's incorrect slope input before the deposition began, Close nevertheless began by testifying that he had no changes to make to his report.

In light of the severity of his slope input error, defense counsel pressed the issue, asking him, "Do you understand that if in fact you think you found a mistake, that you are obligated to make changes to your report?"[48] Assistant United States Attorney Richard Elias objected to this line of questioning, accusing defense counsel of "misstating the law" and instructing the witness not to "speculate."

After a lengthy back-and-forth, and in a moment of understatement, expert witness Close finally admitted that "there was an error in specifically a slope map error that I used for inputs in the FARSITE . . . that caused some of the slope values to be somewhat exaggerated in some parts of the terrain that I was examining."

When defense counsel asked Close if he had taken any steps to correct his report, Close testified that he brought the error to the attention of the Moonlight Prosecutors. The Moonlight Prosecutors were therefore aware that Close's report contained significant errors and yet they did nothing to correct the record.[49]

Close also testified that he had considered making changes but ultimately did nothing to correct his report. Close did testify, however, that after realizing his mistake he went back into

---

[48] Under Rule 26(a)(2)(E), as expressly informed by Rule 26(e)(1), "A party who has made a disclosure under Rule 26(a) – or who has responded to an interrogatory, request for production, or request for admission – **must supplement or correct its disclosure or response**: (A) in a timely manner **if the party learns that in some material respect the disclosure or response is incomplete or incorrect**, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. Fed. R. Civ. P. 26(e)(1)(A) (emphasis added).

[49] Of course, a properly focused prosecutor would have quickly discussed the error with the expert, discussed the need to be careful with such important data sets, and immediately instructed the expert to comply with Rule 26 and correct the report as soon as possible. Not here.

DOWNEY BRAND LLP

his models, fixed the slope error, and allegedly "for his own edification" re-ran the model. Close claimed that his modeling results with the corrected slope "were very similar." This assertion, however, is completely unsubstantiated. The Moonlight Prosecutors allowed him to keep the results of his corrected work private and never provided those results or the underlying data to Defendants. And, contrary to Close's assertion, Lautenberger's work proved that modeling with the correct slope and with Close's incorrect slope produced dramatically different results in the fire spread direction.[50]

The Moonlight Prosecutors repeatedly demonstrated their willingness to prepare and submit false discovery responses on other fronts; to actively facilitate false testimony regarding the most important aspects of the investigation; to misrepresent to the court the state of critical evidence; and to willfully and intentionally conceal the state of that critical evidence. In light of these facts, Defendants are informed and believe that if required to testify truthfully, Close would concede that the Moonlight Prosecutors instructed him not to correct his erroneous expert report, and further instructed him not to create any permanent record of his corrected fire modeling, because to have done so would have created evidence that, while truthful, would have been extremely favorable to Defendants.[51]

Analysis

Before the deposition of government expert Close, the Moonlight Prosecutors were acutely aware that he had used the egregiously invalid 33 degree slope input (more than triple the actual slope) and yet they did nothing to disclose his mistake or correct his report as required under Rule 26(e). Thereafter, one of the lead Moonlight Prosecutors sat on his hands while Close testified at his deposition that he had nothing to correct in his original expert report. That the Moonlight Prosecutors knowingly allowed Close to conduct additional fire modeling

---

[50] It appears Taylor wanted to attack Lautenberger's work through her expert Curtis. Curtis testified that he was asked to do some filming from a helicopter and was asked to give opinions on certain experts, one of which was Lautenberger. He testified that "Ms. Taylor asked if I could rebut Lautenberger and I wouldn't do it." (Ex. 54 at 16-17.)

[51] Close's error was so harmful to the government's case that Cal Fire elected not to disclose Close as one of its retained experts in the state action, even though it used no less than eleven other experts whom the United States had also used.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

experimentation using the correct slope input data for his "edification," while discarding, or allowing Close to discard, the output of those experiments makes this abuse that much worse. Addressing a similar issue, the Ninth Circuit in <u>Pumphrey</u> found that the purposeful concealment of experimental results that controvert or call into question the reliability of produced results was sufficient to support a finding of fraud upon the court. <u>See</u> 62 F.3d at 1130-31. Accordingly, the Moonlight Prosecutors' malfeasance with respect to the use of false slope inputs by Close separately constitutes fraud upon the Court and warrants setting aside the judgment under Rule 60(d)(3).

> **7.** **The Moonlight Prosecutors Misrepresented Evidence to the Court to Wrongfully Claim that Howell Started Other Wildland Fires to Procure Another Favorable Ruling on Summary Judgment, Thereby Committing a Fraud Upon the Court.**

<u>The Relevant Facts</u>

The Moonlight Fire litigation was not about only one fire. It was, in fact, a lawsuit premised on four fires because the Moonlight Prosecutors' Complaint alleged that Howell was responsible for negligently causing three other fires in 2007, two before and one shortly after the Moonlight Fire occurred. The Moonlight Prosecutors relied on these three other fires as support for their negligent hiring and negligent supervision/retention claims.

One of the other fires was investigated solely by the USFS, and two of the other fires were investigated solely by Cal Fire. The investigations of all three of these other fires were completed in a rush to shore up White and Reynolds' work on Moonlight, and like the Moonlight investigation, they were fraudulent and lack scientific integrity.

The Moonlight Prosecutors made misrepresentations to the Court in their trial brief and their summary judgment opposition regarding these fires. The Moonlight Prosecutors represented to the Court in their trial brief:

> All the defendants should have foreseen the [Moonlight] fire, because Howell's had already started two other fires earlier that summer while performing similar work for Sierra Pacific with bulldozers, and W.M. Beaty, Howell's, and Sierra Pacific all learned of those fires weeks before the Moonlight Fire.

DOWNEY BRAND LLP

DOWNEY BRAND LLP

At the time they submitted this statement to the Court, the Moonlight Prosecutors were aware that the investigations into these three other fires were fraudulent.

The Greens Fire

The Greens Fire broke out on June 21, 2007, about a mile west of where the Moonlight Fire eventually started, on property owned by the Landowner Defendants, managed by W.M. Beaty, and harvested by Sierra Pacific through its contractor, Howell. The fire burned approximately one quarter of an acre and generated $4,500 in suppression costs – a relatively nominal amount which the United States never attempted to collect.

The USFS sent forestry technician Brigitte Foster ("Foster") to conduct an origin and cause investigation. Although Foster conducted a perfunctory investigation on June 21, 2007, Foster did not submit an origin and cause report until September 8, 2007, five days after the Moonlight Fire began and only then at the specific request of Investigator Reynolds. Foster's delayed report blames Howell for causing the Greens Fire. It concludes that, like Moonlight, the fire began as a result of one of Howell's bulldozers striking a rock.

Notably, the Greens Fire report surfaced just after the Moonlight Fire ignited, despite Foster's confirmation during her deposition that the USFS requires investigators to complete origin and cause reports within two weeks of a fire. When defense counsel asked Foster why she failed to comply with the two-week deadline, she had no answer.

Curiously, Foster claimed to have submitted a single-page excerpt of the report in July 2007 under her married name, "Foster," and then, in the section designated for her supervisor's signature (signifying the supervisor's approval of the report), Foster filled in her maiden name, "Boysen." This gave the appearance that Foster had properly submitted her report and that it had been approved by a supervisor, when in fact neither of these things occurred. In her deposition, Foster could give no explanation for this apparent act of deception, simply stating, "I don't know why I . . . put 'Approved by Boysen.'"

During her deposition, which Taylor defended as the lead Moonlight Prosecutor, Foster testified that she never located a point of origin or even a specific area of origin. Foster also admitted in her deposition that she did not find an ignition source for the Greens Fire.

DOWNEY BRAND LLP

1    Under the fire investigation standards, Foster's failure to find the point of origin should

2    have resulted in a finding that the fire's cause was "undetermined." Joint federal and state origin

3    and cause expert Larry Dodds confirmed under oath that it is almost always the case that an

4    investigator must find a point of origin before he or she can make a conclusion about a fire's

5    cause. Dodds also confirmed that to identify the origin and cause of a fire, the investigator must

6    locate a competent ignition source and find where that competent ignition source came into

7    contact and ignited a fuel. With respect to the Greens Fire origin and cause report, not only did

8    Foster fail to find a point of origin, she failed to locate the far broader specific area of origin as

9    well as any ignition source. Thus, according to the United States' own expert, she should have

10   listed the cause of the Greens Fire as "undetermined."

11   Foster's deposition testimony presented additional problems with the Greens Fire origin

12   and cause report. She testified that she saw rock strikes but took no photographs of them and

13   could not explain why she failed to do so. Foster was unable to say whether there were 100 rock

14   strikes or only two. Foster also testified, strangely, that although she had a magnet with her, she

15   made no effort to search for metal as a potential ignition source because "the area was disturbed

16   and I didn't feel the need to pull out the magnet." When asked whether she thought the fire was

17   caused by a "fragment that came off a Caterpillar," Foster paused and could only say "possibly."

18   Finally, while accepted scientific methodology required her to test her claimed hypothesis, Foster

19   admitted that she failed to do so. In the face of these investigative failures, Foster's report

20   concludes, inexplicably, that Howell caused the Greens Fire.

21   As a consequence of hearing Foster testify to these facts, Taylor had actual knowledge

22   that there was no basis whatsoever to conclude that Howell caused the Greens Fire.

23   There are additional irregularities with regard to the Greens Fire investigation and the

24   origin and cause report of which the Moonlight Prosecutors were well aware. While Foster

25   testified that Damon Baker was the Howell employee responsible for starting the Greens Fire, a

26   year later the Moonlight Prosecutors prepared and filed a sworn declaration from White stating

27   that Howell's employee Bush admitted to starting the Greens Fire.

28   Additionally, when the Moonlight Prosecutors produced the Greens Fire origin and cause

84

report during litigation, Foster created an entirely new version of the report, which differed significantly from the original. Foster conceded that she manufactured a new report from memory and submitted it as the actual report for purposes of producing the document in discovery. Among other things, Foster manufactured a new scene sketch, photo descriptions, and incident report, all of which differed substantively from the original report. By falsifying a police report, Foster arguably committed a felony.

After Foster's deposition occurred and the Moonlight Prosecutors were on notice that the Greens Fire origin and cause report was falsified, fraudulent, and unsupportable according to their own expert's testimony, they still violated their duty of candor and elected to rely on this document in support of various claims they made to the Court. In their trial brief, the Moonlight Prosecutors specifically relied on Foster's theory that Howell caused the Greens Fire as support for their negligent supervision claim. They also successfully opposed Defendants' motion for summary judgment and argued, in part, that Howell was responsible for starting the Greens Fire. And, as with so many other instances of discovery abuse, the Moonlight Prosecutors relied on Foster's fraudulent report in support of numerous discovery responses they provided to Defendants.

The Lyman Fire

Like the Greens Fire, the August 17, 2007, Lyman Fire broke out before the Moonlight Fire. It burned approximately three acres of Sierra Pacific's property in Tehama County. As was the case with the Greens Fire, there was no origin and cause report on Lyman until after the Moonlight Investigators blamed Howell for the Moonlight Fire. As explained below, the belatedly issued Lyman Fire report was fraudulent in ways similar to the Greens Fire report.

The Moonlight Prosecutors made misrepresentations to the Court in their trial brief and their summary judgment opposition regarding the Lyman Fire. The Moonlight Prosecutors represented to the Court in their trial brief:

> The Lyman Fire ignited later that same season, on August 17, 2007, once again in close proximity to Howell's operations. Howell's learned the next day that the cause of the fire was an equipment-to-rock strike by a Howell's employee conducting operations on Sierra Pacific land.

DOWNEY BRAND LLP

DOWNEY BRAND LLP

The Moonlight Prosecutors also relied on the fraudulent Lyman Fire report in their discovery responses.

On September 24, 2007, more than a month after the Lyman Fire broke out, Cal Fire finally issued its report. Purportedly written by Cal Fire employee Les Anderson ("Anderson"), the origin and cause report on the Lyman Fire concluded that one of Howell's bulldozers was the cause.

Defendants took Anderson's deposition on July 14, 2011, and took the deposition of another Lyman Fire investigator and expert witness for the United States, Greg Gutierrez ("Gutierrez"), on October 19, 2011. Both Anderson and Gutierrez testified they had <u>not</u> concluded that Howell caused the Lyman Fire. Anderson testified that he was not an investigator, did no real investigation, and relied upon Gutierrez to do the origin and cause investigation. Gutierrez then testified that, as occurred with Foster on the Greens Fire, he had been unable to locate a point of origin or ignition source, thus making it impossible to reach a conclusion about the cause. Gutierrez confirmed he had reached no formal conclusions at all regarding the Lyman Fire, and that he was unable to rule out arson or other possible causes.

Evidence of other possible causes was readily available. Howell employee Robert Brown, who was operating a bulldozer in the area where the Lyman Fire broke out, testified during his deposition that there were known marijuana farms near where he was working, and that he had seen people associated with these farms nearby.

Despite these facts, Cal Fire issued the Lyman Fire report shortly after the Moonlight Fire broke out, stating that the Lyman Fire was caused by one of Howell's bulldozers striking a rock. Neither Anderson nor Gutierrez investigated the possibility that an individual working on the nearby marijuana farm was responsible for starting the fire.

The same day that the Lyman Fire report issued, Cal Fire Battalion Chief David Harp ("Harp") sent Eunice Howell a demand letter, stating that "[t]he [Lyman] fire . . . was caused by one of your bulldozers striking a rock with a timber harvest clear cut area." Among other things, Harp alluded to the potential for criminal charges and demanded that Eunice Howell immediately send Cal Fire a check in the amount of $46,206.26. Harp then sent Eunice Howell another

demand letter on December 10, 2007, and then another letter on January 6, 2008, confirming receipt of $26,206.26 and Ms. Howell's agreement to make monthly installment payments until the balance was paid off. Eunice Howell closed her business shortly thereafter.

Despite Anderson and Gutierrez's testimony confirming that they never concluded the Lyman Fire was caused by Howell's bulldozer striking a rock, Cal Fire never returned Howell's money.

Similarly, the Moonlight Prosecutors never amended or withdrew their reliance on the false origin and cause report in their pleadings and discovery responses. Instead, the Moonlight Prosecutors continued to rely on this report in response to various interrogatories, requests for admission, the operative pleadings, and even in its pretrial brief to this Court, all in an effort to support their allegations against Defendants in this action.

Discussing similar conduct by Cal Fire, Judge Nichols summarized the issues as follows:

> With respect to the Lyman Fire, Cal Fire does not even attempt to deny that the conclusion of the Origin and Cause Report for that fire prepared by Lester Anderson was false. There is no dispute that his conclusion, that a Howell's bulldozer ignited the Lyman Fire, was flatly contracted by the lead investigator of the Lyman Fire, Officer Greg Gutierrez, who testified that the cause was properly classified as undetermined.

The Sheep Fire

The Sheep Fire occurred on either September 17 or September 18, 2007, in close proximity to where the Lyman Fire occurred a month prior. It burned less than an acre.

Cal Fire purportedly investigated the Sheep Fire and, as was the case with Greens and Lyman, failed to locate a point of origin and failed to identify a source of ignition. Again, this fact should have led to the conclusion that the Sheep Fire's cause was undetermined. Once again ignoring the scientific method, the Sheep Fire origin and cause report stated that the fire was caused by "the bulldozer tracks or rippers contacting the rocks" in an outcropping.

As with the Greens and Lyman Fires, the Moonlight Prosecutors made misrepresentations to the Court in their trial brief and their summary judgment opposition regarding the Sheep Fire, as well as in discovery responses they served. The Moonlight Prosecutors knew, in making these misrepresentations and in serving these responses, that the origin and cause conclusions for these

DOWNEY BRAND LLP

other fires were baseless.  In fact, the Moonlight Prosecutors' primary origin and cause investigator Larry Dodds testified that Greens, Lyman, and Sheep were not investigated by "first string investigators," that those investigators drew conclusions which did not appear to be sufficiently supported, and, based on the limited material he read, the three fires appeared better classified as "undetermined."  The Moonlight Prosecutors nevertheless represented to the Court in their summary judgment briefing that these fires placed Sierra Pacific on notice that Howell was allegedly a dangerous operator.  All three fraudulent reports were included as part of the Joint Report, which was attached as the first exhibit to White's Declaration in opposition to Defendants' motion for summary judgment.  In its Order denying Defendants' motion, the Court relied extensively upon these false reports and upon Howell's supposed connection to the Greens and Lyman fires.

Defendants were generally aware of the facts and circumstances concerning the Greens, Lyman and Sheep fires before the conclusion of the federal action, but this does not preclude relief under Rule 60(d)(3).  <u>See</u> <u>Hazel Atlas</u>, 322 U.S. at 246 (setting aside a judgment for fraud upon the court notwithstanding the fact that the parties settled, that the defrauded party did not seek relief until seven years after the settlement, and that the defrauded party suspected and was actively investigating the fraud at the time of the settlement).

<u>Analysis</u>

The investigations and origin and cause reports for the Greens, Lyman, and Sheep Fires were nothing more than opportunities seized upon to manufacture evidence to buttress the allegations that Howell was a dangerous and rogue operator that started the Moonlight Fire. Standing alone, the Moonlight Prosecutors' manufacturing of this evidence constitutes another fraud upon the court.

The Moonlight Prosecutors were not limited in the material they reviewed, like their expert, Larry Dodds.  Instead, the Moonlight Prosecutors had access to all the evidence, including the depositions of Foster, Anderson, Gutierrez (whom they disclosed as an expert witness for the United States), and Brown, which they attended and in some cases defended.  Specifically, the lead Moonlight Prosecutor defended Foster's deposition and understood that the Greens Fire

88

DOWNEY BRAND LLP

1   report was a sham. Yet Taylor continued to rely on this report and, in doing so, disregarded her

2   duties of disclosure and candor to the Court. See Shaffer, 11 F.3d at 458-59. Of course, the

3   Moonlight Prosecutors had a "continuing duty to inform the Court of any development which

4   may conceivably affect the outcome' of the litigation." Id. at 458 (citing Tiverton Bd. of License

5   Comm'rs v. Pastore, 469 U.S. 238, 240 (1985)). Their failure to do so upon learning of facts

6   evidencing that the investigations and reports relating to the Greens, Lyman and Sheep Fires were

7   all falsified, clearly violates this duty and worked a fraud on the Court.

8        The Moonlight Prosecutors also continued to represent to the Court that these other fires

9   constituted compelling evidence that Howell, which actually had an exemplary safety record over

10  decades of operation, was instead a dangerous operator, that it started the Moonlight Fire, and that

11  the other Defendants were on notice that Howell presented a danger. These representations to the

12  Court were made without evidentiary support and in violation of the Moonlight Prosecutors' duty

13  of candor, which they owed to the Court as officers of the court. See Shaffer, 11 F.3d at 458-59.

14       Of course, the most egregious facet of this fraud is the willingness to fabricate an origin

15  and cause report against Eunice Howell to collect more than $46,000 from her in order to support

16  its claims against Sierra Pacific and the Landowners. This fraud was only unveiled when

17  Defendants deposed the Moonlight Prosecutors' expert witness Gutierrez, who confirmed he

18  never reached any conclusions about the cause of the Lyman Fire. The heartless quality of Cal

19  Fire's act in extorting almost $50,000 from Eunice Howell reveals much of what this Court needs

20  to know about the government actors behind the Moonlight Fire action, as does the Moonlight

21  Prosecutors' willingness to rely upon these fires in their filings with this Court. Separate from the

22  harm this caused Defendants, most specifically Eunice Howell, these acts rise to the level of a

23  fraud upon the Court because the Moonlight Prosecutors relied on this information in opposing

24  Defendants' motion for summary judgment, and the Court, in turn, relied heavily on this

25  information when it ruled in favor of the United States. This constitutes a fraud upon the Court,

26  insofar as it prevented the Court from "perform[ing] in the usual manner its impartial task of

27  adjudging cases that are present for adjudication." Intermagnetics, 926 F.2d at 916. Indeed, the

28  investigators conceived of this fraud, and intended these reports to have this effect; the Moonlight

Prosecutors knowingly carried it out without regard for their duties as officers of the court. "The integrity of the judicial process" was necessarily harmed as a consequence of the Moonlight Prosecutors' scheme "to improperly influence the court in its decisions . . . ." <u>Dixon</u>, 316 F.3d at 1046. These fires, and their fraudulent investigation and cause reports – consistently relied on and advanced by the Moonlight Investigators – serve as yet another example of conduct warranting action by the Court under Rule 60(d)(3).

> **8. The Moonlight Prosecutors Actively Covered Up Misconduct at the Red Rock Lookout Tower in Verified Discovery Responses and Misrepresented the State of the Evidence to the Court, Thereby Committing A Fraud Upon the Court.**

<u>The Relevant Facts</u>

The USFS staffs a number of fire lookout towers throughout the Sierra Nevada mountain range. These towers exist for one purpose: to facilitate spotting fires as soon as possible in order to dispatch fire suppression resources before a fire gets out of control. The closest tower to the Moonlight Fire, known as the Red Rock Lookout Tower, sits on Red Rock Mountain, approximately ten miles away from where the Moonlight Fire began.

The Red Rock Lookout Tower is a two story building with a square footprint. The lower floor is largely vacant. The second floor (approximately 120 square feet) comprises the single room living quarters (sometimes referred to as a "cab" or "cabin") for housing the USFS lookout stationed at the tower, sometimes for days on end. The perimeter of the second floor is framed with windows, and the second floor exterior is surrounded on all sides with a balcony/catwalk. An exterior stairway affixed to the outside of the tower provides access from the ground level to the second floor exterior balcony.

Given the tower's remote location, the tower can only be accessed via miles of dirt roads. Vehicles approaching the tower on these roads create large dust plumes easily seen from the tower for miles, especially during the late summer and fall, when the roads are at their driest. The Red Rock Lookout Tower has an unobstructed direct line of sight to the general area where the Moonlight Fire began.

According to the Joint Report, the fire was spotted and reported via radio transmission from the Red Rock Lookout Tower at 2:24 p.m. But the events that transpired at Red Rock, and the timeliness of the report from Red Rock (i.e. whether the fire could have been spotted and reported sooner), as set forth more fully below, are the subject of a concerted plan to conceal them from Defendants and the Court, conceived within the ranks of the United States Forest Service, and transported into the realm of litigation by both the Moonlight Investigators and the Moonlight Prosecutors.

The Joint Report concludes as follows:

> Based on the time lag from S-2 CRISMON'S departure to the time or [sic] report by Red Rock Lookout, I believe the fire maintained in the incipient stage, smoldering in the dry fuel bed for approximately 1 1/2 hours until it entered into the free-burning stage and produced enough smoke to be identified by Red Rock Lookout.

The timing of the report from Red Rock was a critical component of the Joint Report and the conclusions therein regarding the circumstances surrounding the alleged ignition and early spread of the Moonlight Fire. Moreover, from the outset of the action, Sierra Pacific asserted with its first appearance a number of affirmative defenses, including comparative fault (a species of contributory negligence under California law) on the part of the United States. Accordingly, whether the USFS employee stationed at the Red Rock Lookout Tower on September 3, 2007, exercised due care in the performance of his duties was necessarily a central issue in the case for numerous reasons. The District Court so held in its pre-trial rulings.

Because of the importance of whether the Moonlight Fire was timely reported, Defendants' discovery efforts in the federal and state actions focused upon the events that transpired in the hours and minutes leading up to 2:24 p.m. Only through persistent, expensive and time consuming discovery efforts, did Defendants eventually uncover a carefully executed cover-up of what really occurred at the Red Rock Lookout Tower on the afternoon of the fire.

The cover-up was conceived by the USFS and its lead investigator Welton; it was quickly joined by Cal Fire's lead investigator White; and it was then advanced through the litigation by

Welton and the Moonlight Prosecutors through misdirection and deception. What follows is a summary of the documents and witness testimony concerning what actually happened on that Labor Day afternoon when the Moonlight Fire erupted, followed by an explication of the false narrative through which the Moonlight Investigators and arguably the Moonlight Prosecutors obstructed justice in violation of at least 18 U.S.C. §§ 1503 and 1519.

a.   What actually happened in the Red Rock Lookout Tower.

On September 3, 2007, a USFS employee named Caleb Lief was stationed in the Red Rock Lookout Tower, charged with spotting smoke and fire as soon as possible in order to alert suppression resources in time to prevent catastrophic burning. Visibility from the tower to the surrounding landscape was excellent. In fact, Lief testified that during the morning hours of September 3, 2007, he was able to see dust kicked up by the Howell bulldozers operating some ten miles away.

Later that day, sometime shortly before 2:00 p.m., Karen Juska ("Juska"), a USFS fire prevention technician who intended to repair a broken radio in the tower, began making her way up to Red Rock Lookout Tower on a winding dirt road in her USFS pickup truck. She had called in her plans via radio earlier that day. The road and the dust plume created by her USFS pickup could easily be seen from the tower.

When Juska arrived, she parked her truck at the base of the tower roughly 20 feet away. Juska opened and closed the door of her pickup and walked to the tower. She then ascended its single flight of stairs, reached the top of the stairs, stepped onto the catwalk, and turned right towards the door on the elevated cabin. All of this escaped the attention of federal lookout Lief.

After reaching the catwalk at the top of the stairs and turning right, Juska caught Lief by surprise. He was facing her direction, looking down, urinating on his bare feet. Shocked by her sudden appearance before him, Lief spun away from her to zip up his pants, saying over his shoulder, "Don't think I am weird or gorse [sic], it's an old Hot-shot trick to cure athlete's foot."

After Lief collected himself, Juska and Lief entered the second floor of the tower. Once inside, Juska spotted what she described as a blue-green glass marijuana pipe on the counter

DOWNEY BRAND LLP

adjacent to the tower sink.  Lief quickly grabbed the pipe, put it behind his back or in his back

pocket and said, "My bad, you weren't supposed to see that."

Shortly thereafter, Lief handed Juska the radio that she had come to the tower to repair.

As he handed it to her, Juska smelled the "heavy odor" of marijuana on Lief's hand and on the

radio.[52]

A short while later, Lief and Juska took a bag of trash outside the tower to Juska's vehicle

and placed it in the bed of the truck.  While standing behind the bed of Juska's pickup truck,

Juska spotted the plume from the fire over Lief's shoulder.  Lief testified that, by this time, the

smoke plume was "huge."

Juska and Lief dispute which one of them first spotted the fire, but Juska reported the fire

to the dispatch center via radio from her truck as Lief ran back into the tower.  The dispatch

center then contacted Lief in the tower, who was in the best position to provide the precise

coordinates of the smoke plume by using the spotting equipment designed for that specific

purpose, including what is known as an Osborne Firefinder.  Consistent with Lief's bizarre

behavior (potentially indicative of the influence of marijuana), the fire coordinates he provided

were off by approximately one mile.  The events set forth above were memorialized in a memo

drafted by Juska:

DOWNEY BRAND LLP

---

[52] Although Juska testified that she looked for smoke plumes on the landscape upon entering the tower and saw nothing, she was upset by what she had witnessed with Lief and was not a trained fire-spotter.  Moreover, her statement is contradicted by Lief, who testified that the fire's plume was "huge" when they eventually did see it from below the tower.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT



During the week after the ignition of the fire, the events that transpired at Red Rock, as witnessed by Juska, were reported and discussed both verbally and through email exchanges involving the management team for the Plumas National Forest, and the matter was referred to USFS law enforcement for investigation. The investigation never took place.

      b.    <u>The Cover-Up: What the Investigators and the Moonlight Prosecutors said about what happened at the Red Rock Lookout Tower</u>.

On September 12, 2007, United States law enforcement officer Welton conducted interviews of both Lief and Juska in furtherance of her work on the origin and cause investigation. By then, Welton was well-aware of the misconduct at Red Rock Lookout Tower on the day of the fire.

According to Juska's sworn testimony and her own contemporaneous notes, just before the interview began, Welton instructed Juska to stay silent about Lief's misconduct on the day of the fire. Essentially, Juska was to omit those particular facts as Welton purported to record from Juska what she had witnessed on that day. In this regard, Welton expressly told Juska, "I can't know about that."

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

DOWNEY BRAND LLP

After providing those instructions, Welton prepared and signed a report of her interview of Juska, which differed greatly from the internal memorandum Juska has previously prepared regarding what actually transpired. The witness statement that Welton prepared for Juska included a body of arguably inconsequential details, including when and where Juska ate lunch on that day as she made her way up to the Red Rock Lookout Tower.[53] Welton included these details to create the appearance that her report was complete and thorough, even though it concealed the most important events that had transpired at the Red Rock Lookout Tower.

Welton's summary of her interview with Juska omitted any reference to Lief's misconduct, which occurred during the critical moments while the fire was in its initial stages. The official form completed by Investigator Welton fails to reference in any way the fact that Juska was able to catch the "lookout" (whose sole purpose was to notice all that occurred around him) by surprise. It fails to mention the fact that Juska found Lief on the side of the tower opposite the fire, looking down while urinating on his bare feet. It fails to record the fact that Juska found what she believed was a blue-green glass marijuana pipe in the tower. It omits the fact that Juska smelled the "heavy odor" of marijuana emanating from Lief's hand and the radio when he handed it to her.

Welton engaged in a similar deception as it pertains to Lief. Her official witness statement from Lief contains no mention of anything Juska caught him doing, no mention of any fact showing that Lief was not properly performing his lookout duties at the very time the Moonlight Fire began to burn, and no mention that he was in violation of various federal policies and the law. Indeed, Welton's official summary of her interview with Lief reflects no indication that Welton made any effort to conduct a real interview of Lief regarding these critical facts.

Nevertheless, Welton prepared and signed both witness statements, affirming that each was "true, accurate, and complete" and Welton then included both of her falsified witness interview statements in the Joint Report.

---

[53] Including a reference to where Juska had lunch that afternoon while omitting all the material facts she witnessed at Red Rock is akin to describing what President Lincoln wore to the theater while omitting the fact that he was assassinated as he watched the show.

1      Defendants would not have discovered the true facts but for their ultimately successful

2  motion to open what the federal prosecutors attempted to shield within "confidential"

3  employment records, and what the Moonlight Prosecutors attempted to conceal through patently

4  false written discovery responses on the topic of what actually happened at Red Rock.

5      Welton and the Moonlight Prosecutors did not engage in this effort alone.  Ron

6  Heinbockel, the Assistant District Fire Management Officer in the Plumas National Forest who

7  supervised Juska and Lief, confirmed in an email he sent to the acting U.S. District Ranger, Dave

8  Loomis, that Loomis instructed Heinbockel to give Lief a "fully satisfactory" performance review

9  for 2007, notwithstanding Lief's misconduct that day, and that he was not to mention any of

10  Lief's misconduct in his performance evaluation.  Heinbockel told Loomis that he was "very

11  uncomfortable" giving Lief this satisfactory designation, that it was a "safety issue," and that he

12  did not want to hire Lief back for the next fire season.[54]  A copy of Heinbockel's email is set forth

13  below:



24      The fact that Heinbockel was ordered to participate in conduct designed to cover up what

25  actually happened at the Red Rock Lookout Tower is also revealed through his deposition

26  testimony and other documents.  Under oath, Heinbockel testified that it was his understanding

[54] Heinbockel testified during his deposition that he had wanted Lief terminated immediately in 2007.

DOWNEY BRAND LLP

certain members of the USFS did not want to make Lief angry as they did not want him to "shoot his mouth off." He testified that they wanted to keep him "on our side."

Under oath, Heinbockel gave the following testimony, wherein he confirmed the intent on the part of USFS management to engage in a cover-up of the events that transpired at the Red Rock Lookout Tower:

> Q. BY MR. WARNE: I don't want –
> A. Part of it.
> Q. Go ahead, sir. What?
> A. Part, yes.
> Q. You were concerned at least in part that he could shoot his mouth off about what really took place on the fire if in fact he was fired?
> MS. TAYLOR: Same objections.
> THE WITNESS: Or –
> Q. BY MR. WARNE: Go ahead, sir.
> A. Or just of our – just some of the things that bugged him about the Forest Service.
> Q. One of the things you were concerned about him talking about was what actually happened on the day of the fire, correct?
> MS. TAYLOR: Argumentative.
> Q. BY MR. WARNE: If he was fired?
> MS. TAYLOR: Misstates. Assumes facts not in evidence. Calls for speculation.
> THE WITNESS: Yes.
> Q. BY MR. WARNE: Okay. And the other things that you understood there were concerns about were that if in fact he was fired and he wasn't on your side he could do what?
> A. Just be slanderous.

Consistent with the plan to keep Lief "on our side," the USFS hired him back for the 2008 and 2009 fire seasons. Neither the USFS's lead Moonlight Investigator nor any other USFS employee ever investigated the allegations of Lief's drug use.

When law enforcement officer Welton was eventually deposed, she was defended by the lead Moonlight Prosecutor, Taylor. As Welton testified, the lead Moonlight Prosecutor failed to abide by her duties of candor, and instead allowed Welton to testify that she did not report what Juska witnessed that day because it "wasn't pertinent." In this regard, Welton lied under oath through most of the first day of her deposition. Remaining perfectly sanguine in allowing her to

do so, Taylor assisted Welton throughout the questioning by interposing as many objections as possible while Welton's fraud was slowly exposed.

Of course Lief's inattentiveness and conduct was highly "pertinent." In addition to the Court's ruling that the timing of the report of the fire was relevant to Defendants' affirmative defenses, Heinbockel conceded in his deposition that Lief's conduct was relevant and that the facts might have some bearing on whether Lief failed to spot the fire when he should have. In fact, Heinbockel's concerns were also documented in an internal USFS document which Defendants obtained only after filing a motion:



c.  <u>The lead Moonlight Prosecutor Taylor joined in the effort to cover up what actually occurred at the Red Rock Lookout Tower</u>.

As set forth below, most of the above-referenced facts concerning Lief's misconduct and the fallout within the USFS were revealed only after Defendants filed a motion to require the Moonlight Prosecutors to produce materials they had been wrongfully withholding concerning Lief's malfeasance at Red Rock Lookout Tower. Without those documents, Defendants would not have been able to identify critical witnesses and would not have known to pursue certain lines of cross-examination.

Early in the case, before obtaining the documents or subsequent testimony that disclosed the above-referenced misconduct on the part of Lief, Sierra Pacific had heard rumors that the USFS was covering up something that occurred at the Red Rock Lookout Tower on the first day of the fire and that it may have had some impact on whether the fire was timely spotted. Accordingly, given that the USFS's diligence in spotting and reporting the fire was a central issue in the case, Sierra Pacific sought to expose the issue by propounding the following unambiguous interrogatory:

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

Describe in detail all activity at Red Rock Lookout on September 3, 2007, including (without limitation) the IDENTITY of all PERSONS involved and all conduct and action taken by those PERSONS.

This was the first interrogatory Sierra Pacific propounded in the federal Moonlight Fire action. In the Moonlight Prosecutors' verified response, signed by Taylor and verified under penalty of perjury by USFS Plumas Division Chief Larry Craggs, the United States responded on July 9, 2010, as follows:

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

**INTERROGATORY NO. 1:**

Describe in detail all activity at *RED ROCK LOOKOUT* on September 3, 2007, including *(without limitation)* the *IDENTITY* of all *PERSONS* involved and all conduct and action taken by those *PERSONS*.

**RESPONSE TO INTERROGATORY NO. 1:**

The United States objects to the extent this interrogatory requires disclosure of information covered by the attorney-client privilege, the work product doctrine or Privacy Act. The United States further objects that the term "all activity" is vague and ambiguous and potentially calls for information that is not relevant to any party's claims or defenses, and thus is not subject to discovery under Rule 26 of the Federal Rules of Civil Procedure. Subject to the foregoing specific and general objections, the United States responds as follows.

Caleb Lief conducted lookout activities throughout the day on September 3, 2007. This included performing a 360° observation of the surrounding forests from the lookout looking for signs of fire, including smoke. At approximately 2:05-2:10 p.m., Fire Prevention Technician Karen Juska arrived at the Red Rock lookout to deliver supplies and remove garbage. Ms. Juska proceeded into the lookout, spoke with Mr. Lief and performed a 360° scan of the horizon from the lookout. No signs of fire were seen by Ms. Juska or Mr. Lief at this time. Mr. Lief and Ms. Juska went to Ms. Juska's truck, which was parked at the drive leading up to the lookout. While standing on the drive near Ms. Juska's truck, Ms. Juska and Mr. Lief spotted smoke in the distance over the trees in the direction of Moonlight Peak. This occurred approximately ten minutes after Ms. Juska entered the lookout. Mr. Lief returned to the lookout to determine the location of the fire using the "fire finder." While Mr. Lief was in the process of determining the location using the "fire finder," Ms. Juska got into her vehicle to go to the fire and she called dispatch to report the fire. Ms. Juska placed her call approximately two minutes after they first spotted the smoke. Thereafter, Mr. Lief called dispatch to give the location of the fire based on coordinates determined using the "fire finder." Ms. Juska left the lookout and proceeded to the fire. Mr. Lief remained at the lookout and continued to perform his lookout activities. During this time, there were no other persons at the lookout. The United States' investigation is on-going, including the extent to which other individuals were present at the Red Rock lookout on September 3, 2007. The United States will supplement this response as appropriate.



BENJAMIN B. WAGNER
United States Attorney

Date: July 9, 2010

By:    KELLY L. TAYLOR
TODD A. PICKLES,
Assistant United States Attorneys

Thus, the Moonlight Prosecutors drafted and signed demonstrably false interrogatory responses regarding Red Rock, which to this day, they have never amended, modified, or updated in any way. The Moonlight Prosecutors have failed to do so, even though Craggs, who verified the response, admitted during his deposition that the response was not truthful. When asked why

he had verified the response under penalty of perjury when he knew it was untrue, he said he was handed the document, that it was written by someone else, and that "I didn't know I was supposed to add more to the document."

The Moonlight Prosecutors then continued this fraud on Defendants and the Court with additional false discovery responses. For instance, in response to Sierra Pacific's effort to obtain admissions on whether there was any "misconduct" at the Red Rock Lookout Tower on September 3, 2007, the Moonlight Prosecutors signed responses for the United States that expressly, and falsely, denied each request. Specifically, without objection, the Moonlight Prosecutors signed responses for the United States that expressly, and falsely, denied the following:

> Admit that on September 3, 2007, Caleb Lief engaged in conduct prohibited by the USFS, while he was on duty at RED ROCK LOOKOUT.

> Admit that on September 3, 2007, Caleb Lief engaged in conduct prohibited by the USFS.

> Admit that on September 3, 2007, Karen Juska witnessed Caleb Lief engaged in conduct prohibited by the USFS.

Sierra Pacific also propounded further written discovery requests on the United States, attempting to resolve any dispute regarding the facts associated with the misconduct at the Red Rock Lookout Tower.

**REDACTED**

In doing so, Taylor, an officer of the Court, was also speaking for the United States. *Demjanjuk v. Petrovsky* 10 F.3d 338; 353 (holding that "When the party is the United States, acting through the Department of Justice, the distinction between client and attorney actions becomes meaningless.")

The possession by a federal employee of illegal drug paraphernalia while on duty constitutes misconduct. The use of illegal drugs while on duty as a federal employee on federal land also constitutes misconduct. The fact that the USFS understood that Lief had engaged in

misconduct was confirmed by Maria Garcia, the USFS deputy forest supervisor for the Plumas National Forest, when she testified that Juska's allegations were referred to law enforcement.

**REDACTED**

The Red Rock Lookout Tower cover-up was also furthered through the Moonlight Prosecutors' response to Sierra Pacific's request that the government admit that one or more USFS employees superior to Caleb Lief wanted to terminate Lief immediately following the Moonlight Fire. Again, the U.S. Attorneys denied the request, despite the fact that, as described above, Ron Heinbockel – Lief and Juska's direct supervisor – attempted to give Lief an "unsatisfactory" rating and believed he should be fired, but was forced to give him a fully satisfactory review instead. The lead Moonlight Prosecutor attended and defended this deposition, and yet never corrected these false written discovery responses, which flatly contradicted both Heinbockel's internal writings, and his sworn deposition testimony.

The Moonlight Prosecutors also chose to deny other requests for admission that they knew to be true. For instance, in its ninth request for admission, Sierra Pacific asked the government to admit that "at some point from 2:00 to 2:30 p.m. on September 3, 2007, no USFS employees at RED ROCK LOOKOUT, including (without limitation) Caleb Lief, were watching for fire." The U.S. denied this request. However, the Moonlight Prosecutors knew that Karen Juska had revealed that when she arrived at Red Rock on September 3, 2007, between 2:05 and 2:10, she found Caleb Lief outside of the lookout, on the opposite side of the cabin from where the fire was burning, looking down while urinating on his bare feet. These are but a few examples of numerous occasions where the Moonlight Prosecutors chose to lie in response to discovery requests.[55]

---

[55] In light of the Moonlight Prosecutors' false interrogatory responses, which were verified by USFS Fire Management Officer Larry Craggs, Sierra Pacific sought, among other things, sanctions by filing a motion with Magistrate Judge Edwin Brennan on January 14, 2011. To its surprise, Sierra Pacific did not prevail on that motion. Perhaps the magistrate, in light of his own experience as a long-time Assistant United States Attorney in the U.S. Attorney's Office for the Eastern District of California and as the USFS's lead counsel in numerous actions for years before he became a magistrate, was justified – based on his own experiences – in assuming that such charges simply could not be true. Clearly, judges have a right to expect the best from federal prosecutors, and the federal prosecutors on the Moonlight Fire case took advantage of their credibility with Judge Brennan while committing a fraud upon the Court with respect to their actual conduct.

Defendants took other depositions that confirmed the Moonlight Investigators' and Prosecutors' plan to cover up the damaging Red Rock facts and obstruct justice.[56] The depositions of Juska, Welton, Craggs, and Heinbockel all confirmed this, as did the depositions of Loomis, Maria Garcia, and the head of the Plumas National Forest in 2007, Alice Carlton. In fact, it was Carlton who cautioned USFS management that they needed to be careful that their treatment of the Red Rock incident would not be seen as a cover-up. Had Defendants relied on the Moonlight Prosecutors and their false discovery responses, the truth may never have been revealed.

To this day, and even after Craggs admitted that the Moonlight Prosecutors' interrogatory responses were false, and even after discovery showed other responses on Red Rock were also false, the Moonlight Prosecutors have never amended or retracted any of the false discovery responses served on behalf of the United States, and never informed the Magistrate Judge of these additional facts to correct the record and his Order.

The Moonlight Prosecutors also never amended any of the discovery responses wherein the United States incorporated by reference the Joint Report, even though it was clear – based on the testimony and documents – that the Joint Report's depiction of what happened at Red Rock was a complete fabrication. Instead of correcting the record, the Moonlight Prosecutors deepened the corruption by attaching the Joint Report, including Welton's falsified Red Rock witness statement summaries, to the Declaration of Joshua White filed with the district court in opposition to Defendants' motion for summary judgment.

The Moonlight Prosecutors' fraud on the court continued on other fronts as well. Near the close of discovery, after it was clear that the Moonlight Prosecutors' written interrogatory and RFA responses concerning Red Rock were fraudulent, the Landowner Defendants served a request for admission on the USFS, asking it to admit that the United States' previous response to

---

[56] If, before the hearing, Magistrate Judge Brennan had known of the facts regarding the Red Rock cover-up that Defendants were able to develop after his Honor denied their motion on January 25, 2011, including the facts revealed during the numerous depositions that were not taken until after the motion was heard, Defendants believe that Judge Brennan would not only have granted the motion but would likely have issued findings and recommendations dismissing the action for gross prosecutorial misconduct.

1    Interrogatory No. 1 about what transpired at Red Rock Lookout Tower was false, and that the

2    United States knew it to be false before serving the verified response.

3          Answering the Landowners' RFA, the Moonlight Prosecutors objected, and then brazenly

4    asserted, "[T]he USFS denies this request in full.  The USFS denies that any portion of the

5    response was false."  The Moonlight Prosecutors signed and served this response even though

6    Craggs, who verified the prior interrogatory response, had at this point already admitted under

7    oath at his deposition that the interrogatory response was not complete and truthful.

8          The Landowner Defendants also served over 250 additional requests for admissions

9    seeking the truth from the Moonlight Prosecutors regarding what had finally been discovered

10   about the plan amongst a group of federal employees to conceal from these Defendants and the

11   Court the events that transpired at the Red Rock Lookout Tower, and the effort by the USFS to

12   continue to employ Caleb Lief to "keep him on [their] side" even though they believed he

13   presented a public safety hazard.  These requests also covered the landscape of investigatory and

14   prosecutorial abuses in connection with other aspect of the litigation.  In response to the vast

15   majority of these interrogatories, the lead Moonlight Prosecutor either falsely entered an

16   unequivocal denial, or refused to provide an answer without justification.  Through dozens of

17   written responses to these requests for admission, the lead Moonlight Prosecutor falsely denied

18   the existence of virtually every fact harmful to the prosecution that had been established by either

19   internal USFS documents, or through sworn testimony of USFS witnesses during their

20   depositions.

21         As trial approached, the Moonlight Prosecutors made submissions to the District Court

22   which continued their false narrative regarding the events that occurred at the Red Rock Lookout

23   Tower, and their culpability in attempting to cover up those events.  The Moonlight Prosecutors'

24   trial brief states:

25              Further, the unclean hands defense fails because the United States
                has purged itself of any alleged cover up.  The defense of unclean
26              hands is inappropriate where a party purges itself of the inequitable
                conduct giving rise to the defense. . . .  Here, the only basis for an
27              unclean hands defense that any defendant has arguably pled is
                Sierra Pacific's vague allegation that the Forest Service
28              "suppressed" evidence of conduct at the Red Rock Lookout. . . .

DOWNEY BRAND LLP

Thus, even if the defendants could prove that evidence of Lief's conduct was "suppressed," such suppression was purged by the United States' subsequent full disclosure of the information.

The Moonlight Prosecutors' representation that they had made a "full disclosure" was itself a gross misrepresentation to this Court. The Moonlight Prosecutors in no way purged themselves of the inequitable conduct regarding what truly occurred at the Red Rock Lookout Tower, as the Moonlight Prosecutors never made any attempt to correct the record before the Court and continued to proffer false discovery responses about the attempted cover-up of these facts.

Defendants discovered the Moonlight Investigators' and the Moonlight Prosecutors' false witness statements, false reports, and false verified discovery responses concerning the events that transpired at the Red Rock Lookout Tower during the pendency of the federal action, but this does not preclude relief under Rule 60(d)(3). See Hazel-Atlas, 322 U.S. at 246 (setting aside a judgment for fraud upon the court notwithstanding the fact that the parties settled, that the defrauded party did not seek relief until seven years after the settlement, and that the defrauded party suspected and was actively investigating the fraud at the time of the settlement).

Analysis

Standing alone, the Moonlight Investigators' and Moonlight Prosecutors' continued and unabated efforts to cover up the events that transpired at the Red Rock Lookout Tower, and their misrepresentations to the Court that they had "purged" themselves of malfeasance, separately constitute fraud upon the Court and warrant relief under Rule 60(d)(3), setting aside the judgment.

In covering up these key events that are material to the issues at the heart of this case, the Moonlight Investigators and Prosecutors harmed "the integrity of the judicial process" Dixon, 316 F.3d at 1046, and they prevented the "judicial machinery [from] perform[ing] in the usual manner . . . ." Intermagnetics, 926 F.2d at 916. From the Moonlight Investigator's preparation of a false summary of her interview of Juska, to the Moonlight Investigators' incorporation of Juska and Lief's fraudulent interview reports into the Joint Report, to the USFS's retention of Lief to secure

his cooperation as a witness, to the Moonlight Prosecutors' repeated false discovery responses regarding these events and their subsequent misrepresentations to the Court regarding their conduct, the Moonlight Prosecutors and Investigators, together and separately, conceived of and executed "an unconscionable plan or scheme which is designed to improperly influence the court in its decisions," which amounts to a fraud on the court. <u>Dixon</u>, 316 F.3d at 1046.

Notwithstanding the Moonlight Prosecutors' positions within the Department of Justice – lawyers entrusted with the honor of representing the United States – they actively concealed the very "conduct" which transpired at the Red Rock Lookout Tower that would be most relevant to Defendants in this case and concealed the information that would be most damaging to the Moonlight Fire prosecution team. In this regard, the Moonlight Prosecutors' false discovery responses are orders of magnitude more pervasive and egregious than the prosecutorial misconduct the federal court in <u>Shaffer</u> so forcefully admonished, and which easily constituted a fraud upon the court. <u>See</u> <u>Shaffer</u>, 11 F.3d at 456.

Moreover, there is no room for argument that the Moonlight Prosecutors' falsification of evidence somehow only amounted to "immaterial or technical inaccuracies." <u>See</u> <u>Pumphrey</u>, 62 F.3d at 1133. The events that occurred at the Red Rock Lookout Tower are central to affirmative defenses at issue in the case, as the Court confirmed when it denied the Moonlight Prosecutors' motion in limine to exclude evidence related to Red Rock. Accordingly, the false narrative regarding those events proffered to both Defendants and to this Court serve to establish fraud upon the court.

Even had the Moonlight Prosecutors not presented the false Red Rock interviews to the Court, and had they not falsely represented to the Court that they had "purged" themselves of their malfeasance, their discovery abuses and perjured discovery responses, perpetrated by officers of the Court, would alone have constituted a fraud upon the Court because "[t]he discovery process is an integral part of the judicial process." <u>Derzack</u>, 173 F.R.D. at 416. As in <u>Derzack</u>, the "parties were engaging in court-ordered discovery under the authority and jurisdiction of the [court] and its rules and procedures." <u>Id.</u> The Moonlight Prosecutors, in submitting discovery responses that fraudulently excluded any reference to these important facts,

DOWNEY BRAND LLP

in subsequently refusing to admit in discovery responses that the initial response was false, and finally in representing to the Court that this abuse had been purged, "engaged in a pattern and practice of 'stonewalling, bad faith and lack of candor.'" Id. In Derzack, fraud on the court was found where the plaintiffs manipulated financial data relevant to their business loss claim, and turned over falsified, fraudulent documents to the opposing party. Id. at 404. Here, the Moonlight Prosecutors manipulated the facts, and the language of an interrogatory, to mislead Defendants and the Court. Similarly, the Ninth Circuit in Pumphrey found that the defendant's failure to supplement discovery responses with evidence once it was discovered, as well as the defendant's false discovery responses which mischaracterized material evidence, contributed to the defendant's commission of a fraud on the court. 62 F.3d at 1131-32. The true facts associated with what transpired at the Red Rock Lookout Tower were central to this litigation, and the Moonlight Prosecutors' active and ongoing effort to cover them up is even more egregious than the behavior that the Derzack and Pumphrey courts agreed warranted relief under Rule 60(d).

In their portion of the Joint Status Report, the Moonlight Prosecutors attempted to recast and mischaracterize Defendants' motion by wrongly claiming, "The motion to set aside [sic] judgment is not about bribery of a judge or jury, or fabrication of evidence by counsel, or anything similar." (Docket No. 612 at 18:7-8.) This assertion is clearly incorrect. As so thoroughly explicated here, the Moonlight Prosecutors did in fact affirmatively fabricate evidence by personally authoring and signing false interrogatory responses, and securing the perjured verification of them by a USFS employee who knew them to be incomplete and untrue, all in an effort to perpetuate the concealment of evidence not supportive of their claims. Once the true facts were discovered, the Moonlight Prosecutors authored scores of additional false discovery responses, all designed to avoid any concession with respect to their original efforts to hide the truth and then justify their efforts to do so.

Finally, the facts associated with the Red Rock Lookout Tower establish that the USFS, with the assistance of Moonlight Investigator Welton, engaged in yet a further distinct species of fraud upon this Court by improperly attempting to influence a material witness, in violation of

1   federal law.  Specifically, USFS employee Heinbockel conceded that the USFS continued to

2   employ Lief as a fire lookout, even though keeping him employed was a known safety issue.  As

3   revealed by Heinbockel in his deposition, the USFS made this election for the purpose of

4   "keeping him on our side" in the context of the Moonlight litigation for fear that he would

5   otherwise go "shooting his mouth off."  That the USFS personnel involved in this matter would

6   put their own cover-up and the promise of a financial recovery above the safety of others says

7   volumes about how misguided the Moonlight Fire matter had become.  In short, the story could

8   hardly be any uglier:  certain members of the USFS were willing to bribe Lief with a position so

9   as to buy his silence, regardless of the risk he posed to others.  But such conduct constitutes far

10  more than a breach of public trust.  The USFS's conduct on this front, and Welton's instructions

11  to Juska and Lief before their "interviews," constituted the obstruction of justice under 18 U.S.C.

12  § 1512(c), which establishes felony liability for whoever "corruptly persuades another person" or

13  "attempts to do so" with the intent to influence the testimony of any person in an official

14  proceeding.  This fraudulent and illegal conduct is directly related to this Court's determination as

15  tampering with witnesses is itself an act that constitutes a separate fraud upon this Court.  See Ty

16  Inc. v. Softbelly's, Inc., 517 F.3d 494, 498 (7th Cir. 2008) (holding that "[t]rying improperly to

17  influence a witness is fraud on the court").

18      **9.      The Moonlight Prosecutors Made Reckless Misrepresentations About Cal
                 Fire's Civil Cost Recovery Program to Procure Another Favorable Pretrial**
19               **Ruling on a Material Issue, Thereby Committing a Fraud Upon the Court.**

20                          The Relevant Facts

21          Long after this Court entered its dismissal order premised on the federal settlement,

22  Defendants discovered facts which revealed that the Moonlight Prosecutors made reckless

23  misrepresentations to this Court about the legitimacy of Cal Fire's civil cost recovery program,

24  which were directly relevant to the Court's pretrial rulings.  The true facts flatly contradict

25  positions taken by the Moonlight Prosecutors in their pretrial motions.

26          As part of their pretrial Omnibus Motion in Limine, the Moonlight Prosecutors included a

27  motion styled, "Motion to Exclude Argument of Government Conspiracy and Cover Up."  In

28  support of that Motion, the Moonlight Prosecutors first attacked a straw man, arguing that

108

Defendants' so-called conspiracy allegations were premised in part on the fact "that Cal Fire has a fire cost recovery program . . . ." But the mere existence of a cost recovery program was never Defendants' stated concern. Instead, Defendants were troubled by the possibility that, under its program, Cal Fire might be diverting a portion of the money it was recovering from those it accused of starting wildland fires into accounts controlled by wildland fire investigators. Any such practice would naturally instill a financial bias in investigators, whether consciously or unconsciously, to target and collect from affluent defendants.

The Moonlight Prosecutors nevertheless claimed in their motion in limine that "defendants' allegations of a conspiracy are unsupported" and falsely described for the Court Cal Fire's cost recovery system as a benign public program established for altruistic purposes, as follows:

> The other evidence Defendants rely upon is equally flimsy. That Cal Fire has a fire cost recovery program does not support an inference that investigators concealed evidence. Under the program, a portion of assets recovered from Cal Fire's civil recoveries can be allocated to a separate public trust fund to support investigator training and to purchase equipment for investigators (e.g., investigation kits and cameras). A public program established to train and equip fire investigators is hardly evidence of a multi-agency conspiracy.

Despite the Moonlight Prosecutors' representations to the Court, Defendants were concerned that any civil cost recovery dollars earmarked for accounts controlled by Cal Fire investigators created beneficiaries out of those responsible for reaching causation decisions. As such, an unacceptable bias would be created which favored blaming affluent parties to the exclusion of other possible causes. To perpetuate such a fund and the benefits flowing from it, investigators might name affluent individuals and entities as defendants, rather than name penurious culprits, such as arsonists, who generally provide little or no prospect of financial recovery. At the time of the motions in limine briefing, however, Defendants' discovery efforts had uncovered remarkably little information to support this common sense conclusion.

In the state action, Defendants propounded discovery on Cal Fire in October 2010, seeking "All DOCUMENTS evidencing the use of any money recovered from any wildfire

litigation to which YOU were a party in the last ten years." Notwithstanding the fact that both Cal Fire and the Moonlight Prosecutors benefitted from the assertion of a "joint prosecution privilege" under a joint prosecution agreement when convenient for their mutual purposes, Cal Fire was not a party to the federal action and thus Defendants propounded discovery requests for Cal Fire documents only in the state action. In response to Defendants' requests, Cal Fire and its attorneys produced only two responsive documents concerning an outside fund: a single cryptic accounting spreadsheet, and what Cal Fire described as a "CDAA Audit Report." The CDAA Audit Report pertained to a November 2009 Cal Fire internal audit of a program labeled the "Wildland Fire Investigation Training and Equipment Fund" (WiFITER) administered by the California District Attorneys' Association (CDAA) on behalf of Cal Fire.[57]

This audit report generally found WIFITER to be of "considerable value" and stated that the audit "did not reveal any significant internal control problems or weaknesses." Thus, the proffered material made it appear as if WiFITER was a legitimate program controlled not by Cal Fire, but by the CDAA. As explicated below, Defendants learned after the resolution of the federal action that this audit report provided to Defendants was falsified.

Defendants encountered similar road blocks in the federal action. During the federal deposition of United States expert Chris Parker (a recently retired Cal Fire Deputy Chief of Law Enforcement), Parker reluctantly admitted that he had conceived of and founded the WiFITER account in 2005. But Parker testified that the account was created only for altruistic purposes to benefit Californians and rejected any suggestion that the fund might bias investigators. At no time did Parker ever suggest that the account was established to circumvent state fiscal controls. Thus, at the time of the federal pretrial conference, Defendants had only limited evidence to prove their theory of a cover-up or conspiracy associated with WiFITER, or to prove their theory that

---

[57] Under California law, Cal Fire is the state agency charged with pursuing wildland fire cost recovery actions under Health and Safety Code section 13009, the proceeds of which are required by law to be returned to the state's general fund. Moreover, section 8002 of the State Administrative Manual makes it illegal for any agency to set up a separate account without express authority from the Department of Finance. Given this Request for Production, and given the state prosecutors' duties of disclosure, Defendants expected that, as officers of the court, the government attorneys would disclose any facts which called into question the credibility of investigators flowing from the WiFITER account. As discussed infra, during the pendency of the federal action, Cal Fire, its in-house general counsel, and its litigation counsel from the Office of the California Attorney General, concealed virtually all evidence favorable to the defense concerning WiFITER.

DOWNEY BRAND LLP

the WiFITER account (ostensibly controlled by the CDAA) instilled any bias in those individuals controlling the Moonlight Fire investigation, including law enforcement officer White and his supervisor and mentor, officer Carlson.

Given the state of the evidence then available to this Court and Defendants, the Court granted the Moonlight Prosecutors' motion in limine with respect to conspiracy arguments as it pertained to the impact of Cal Fire's cost recovery program. Thus, as a result of the Moonlight Prosecutors' motion in limine and representations to the Court concerning WiFITER, the Court entered an order foreclosing Defendants from arguing that the Moonlight Investigators were part of any conspiracy concerning the handling, retention, or expenditure of wildland fire monies collected. The Court's ruling on this issue contributed to the increased risks of trial and Defendants' settlement assessment, and it was a substantial factor in causing Defendants to settle the federal action. Although Defendants disagreed with the Court's ruling, it was not necessarily a surprise given the limited evidence then available to the Court.

Circumstances, however, changed rather dramatically after October 15, 2013, when the California State Auditor issued a Formal Audit Report concerning "Accounts Outside the State's Centralized Treasury System." California State Auditor, Accounts Outside the State's Centralized Treasury System, http://www.bsa.ca.gov/pdfs/reports/2013-107.pdf (last visited January 13, 2015). The final portion of the State Auditor's report contains findings regarding WiFITER, which the State Auditor summarized as follows:

> Cal Fire had $3.7 million in settlement payments for the cost of fire suppression and investigation (cost recovery revenues) deposited into an outside account, the Wildland Fire and Investigation Training and Equipment Fund (Wildland Fire Fund), that was neither authorized by statute nor approved by Finance.[58] Further, it did not subject the money in this outside account to its own internal controls, nor did it track or monitor the account's revenues adequately. Specifically, the management of Cal Fire's law enforcement unit bypassed Cal Fire's accounting and budgeting processes by failing to submit a request to its accounting office to establish the account and by diverting and spending cost recovery

---

[58] Elsewhere, the State Auditor confirmed that State Administrative Manual section 8002 requires all accounts established outside the State Treasury to be approved and authorized by the California Department of Finance.

DOWNEY BRAND LLP

revenues without submitting the appropriate request to increase its budget appropriations. As a result, this portion of Cal Fire's cost recovery revenue was not subject to Cal Fire's normal internal controls or to oversight by the control agencies or the Legislature, leaving Cal Fire open to possible misuse of these revenues.

Id. at 26-39. The State Auditor's findings were based in part on a critical January 8, 2005, internal Cal Fire email by Chris Parker to other high ranking Cal Fire managers regarding the formation of WiFITER. The State Auditor described and analyzed this email as follows:

An e-mail dated January 2005 from the former deputy chief to a former cost recovery case manager [Parker] suggests that cost recovery program management designed [WiFITER], at least in part, to avoid state fiscal controls. Specifically, the former deputy chief discussed using the attorneys association or another third party to set up and manage a fund with the purpose of training and equipping Cal Fire's fire investigators. He said he would like to see an outside organization receive the money so it could be used in a more effective manner. He went on to say that if the State received the money, there would be a lot of limiting factors on how, when, and where it could be used, such as budgeting, purchasing, and contracting limitations, and spending freezes.

Id. at 32. The discussion of Parker's email concludes that "[b]y directing and spending portions of cost recovery revenues through [WiFITER] instead of following normal state processes, cost recovery program management prevented Finance and the Legislature from performing their role in deciding how state money should be spent, including whether some of it should be spent on non-state entities." Id. at 33. Parker's email, which had never been produced by Cal Fire or the United States, conflicts with his sworn testimony in the federal action regarding the purpose of the fund, as Parker never disclosed it was designed "to avoid state fiscal controls," and evidences Cal Fire's scienter in forming WIFITER.

Despite eventual orders by the state court in 2013 requiring Cal Fire and its counsel to produce all WiFITER documents, Cal Fire withheld this critical document and thousands of other documents until well after the settlement of the federal action. In fact, but for the issuance of the State Auditor's report, Defendants would never have learned of these documents; the United States certainly never produced them.

DOWNEY BRAND LLP

Once the State Auditor's report and the existence of this unproduced document became public, Defendants immediately notified Cal Fire of its failure to produce this email and demanded production of all responsive documents. That demand precipitated an admission by Cal Fire and its attorneys that the Office of the Attorney General had failed to produce the critical email identified by the State Auditor, and thousands of pages of additional critical WiFITER documents. After Defendants secured a <u>third</u> order requiring production of all WiFITER documents, Cal Fire's attorneys belatedly produced two tranches of documents: first, approximately 5,000 pages, and then (despite previously assuring Judge Nichols in a telephonic hearing that there was "nothing" else) Cal Fire belatedly produced more than 2,000 additional pages, many of which were directly responsive to Defendants' 2010 request for production and to Defendants' subsequent requests in October 2012.[59]

Through this belated process Defendants finally obtained critical documents revealing the true reason Cal Fire created WiFITER and confirming Defendants' suspicions that this free money, unencumbered by any State oversight or control, motivated the Moonlight investigators – the lead investigator himself a WiFITER beneficiary – to seek out monied defendants. More specifically, documents eventually produced by Cal Fire's counsel, none of which were provided to Defendants by the time this Court issued its pretrial rulings on motions in limine, revealed, among other things, the following:

- Cal Fire law enforcement and wildland fire investigators created WiFITER without obtaining approval from the California Department of Finance (DOF) as required by state law.

- Cal Fire established WiFITER for the purpose of facilitating Cal Fire investigators' circumvention of strict limitations in expenditure of State general fund dollars.

---

[59] It was not until after the October 15, 2013, State Auditor's report, which revealed that Cal Fire and its lawyers had withheld the most important documents, that the Office of the Attorney General finally began to provide the most damaging documents (those most favorable to Defendants). These documents, largely in the form of internal emails, prove the existence of a conspiracy to actively conceal WiFITER. It was this last batch of documents that also revealed most clearly the moral hazard WiFITER created, namely the motivational bias that WiFITER instilled in fire investigators to target affluent defendants, partially explaining the effort here to pin blame on Defendants, regardless of evidence pointing to other parties and the damage it would cause to our system of justice.

- Cal Fire senior management, including those overseeing the Moonlight investigation, strategized on how to conceal WiFITER from regulators.

- While Cal Fire Northern Region Chief Carlson, who eventually assisted the United States in this action, was reviewing and revising his mentee White's draft Moonlight Fire Joint Report in February 2008, Carlson also expressed concerned that WiFITER was "running in the red" and emphasized that the fund would remain so, "unless someone is going to make a high % recovery." In another email that same day, Carlson denied a request to use WiFITER funds to enhance Cal Fire's ability to investigate arsonists because, he said, "it is hard to see where our arson convictions are bringing in additional cost recovery."

- In March 2008, while concerned that the WiFITER account was "running in the red," Carlson urged other Cal Fire law enforcement personnel to divert an even greater percentage of wildland fire settlement dollars from the state's general fund into the WiFITER account. In response, Cal Fire's then lead in-house general counsel, an officer of the Court, advised against it – not because the fund was illegal, but to prevent discovery of the fund by state regulators. Specifically, Cal Fire's general counsel stated: "the point is to keep a low profile. If we take a cut off the top of a recovery where assets are say $100K but costs are $1 Million, that will look fishy." This advice was repeated in an email from Cal Fire's highest ranking law enforcement official in a March 2008 email to Carlson, again not because the fund was illegal, but to ensure regulators did not discover the fund.

- Three months prior to the Moonlight Fire, lead investigator White admitted in an email to circumventing the chain of command ("CoC") so as to check on whether WiFITER funds would allow him to get his hands on additional WiFITER-funded equipment – in this instance, an expensive computer voice stress analyzer ("CVSA"). He tells the person he is writing to that he "figured [she] wouldn't rat him out for circumventing the CoC" on this question because "as Alan [Carlson's] boy, I can do no wrong . . . ."[60]

- Cal Fire's counsels' failure to produce WiFITER documents enabled United States expert witness Chris Parker, a former Cal Fire investigator and the creator of WiFITER, to provide misleading testimony in this case about WiFITER and its purpose and benefits, which was inconsistent with his own wrongfully withheld January 8, 2005, internal email, which showed that WiFITER was created to circumvent rules restricting expenditure of state money.

---

[60] In other instances, Carlson and White (the lead Moonlight Investigator) strategized together about how much money they should initially demand for the WiFITER account from their chosen defendants to perpetuate their illegal off-books account. In one instance involving another fire only a few short months before he sent the Moonlight Fire demand letters, White wanted to divert 20% of what Cal Fire was demanding from Defendants on that fire to WiFITER. But Carlson, apparently heeding the advice of Cal Fire's general counsel Giny Chandler to "keep a low profile," directed White to divert only 5%. White reluctantly complied, but not before pleading to Carlson: "Giving up money for the CDAA fund? Can't we wait until we get the CVSA?"

114

- The November 2009 internal WiFITER audit report produced by Cal Fire (one of only two WiFITER documents provided to Defendants as of the federal trial date) was a fraudulent document that supplanted earlier versions of the audit report. Those earlier versions contained a finding that the account was not formed in compliance with law and had never been approved.

- The finding of illegality in the first final audit report was deleted and suppressed at the urging of law enforcement officer Carlson, shortly after the state and federal Moonlight Fire complaints were filed in 2009.

- Cal Fire ultimately and <u>illegally</u> siphoned approximately $3.66 million dollars of state money into the WiFITER account between 2005 and 2012, and spent some $2.9 million of those funds for the benefit of its wildland fire investigators—the very people who, with exclusive and private access to fire scenes, assign blame for those fires. These benefits included numerous "training" events at locations including beachfront resorts in Pismo Beach and San Diego, and expensive equipment, such as $1800 camera packages.

- Many of the training events and WiFITER purchases were coordinated and overseen, or requested by, Moonlight Fire lead investigator White, who also attended numerous WiFITER funded events.

- The CDAA merely processed the expenditure of WiFITER money as directed by Cal Fire civil cost recovery staff and investigators, including Carlson. Thus, the same investigators and case managers responsible for assigning blame and recovering money for wildland fires controlled the unlawful expenditure of millions of dollars in recovered funds.

- Carlson, Cal Fire's initial case manager on the Moonlight Fire prosecution, was one of only a handful of Cal Fire staff members on a committee that made all decisions on how to spend WiFITER money, and he suggested and received approval for multiple expenditures of WiFITER money.

- Carlson apparently received personal payments from the WiFITER account for his participation as an instructor at WiFITER training events, while also receiving his salary as a state employee.

- Lead investigator White's Moonlight Fire demand letter of August 4, 2007, which demanded the payment of $8.1 million in two separate checks, one short-changing the State of California and the other requiring an illegal payment to CDAA in the amount of $400,000, would have effectuated one of the largest WiFITER cash infusions in the history of the illegal off-book account.

- In late January, 2013, after Defendants exposed WiFITER, the Wall Street Journal, the Los Angeles Times, and the Sacramento Bee ran stories on Cal Fire's malfeasance. Thereafter, in March 2013, Cal Fire's lead in-house general counsel, who provided the above-quoted advice, was terminated.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

The California Department of Finance also issued its own review of WiFITER, and similarly concluded that Cal Fire had failed to obtain the legally required authorization for the outside bank account, and that Cal Fire had not complied with state mandated restrictions on the expenditure of state money.

Shortly after publication of that report, retired Cal Fire Law Enforcement Chief Tom Hoffman came forward as yet another "whistle blower," offering his own revealing criticism of WiFITER and Cal Fire's civil cost recovery unit responsible for the state action, stating:

> I feel vindicated. I tried so hard to get centralized management of cost recovery monies. I was stymied at every turn by the North Region and the South Region. It became the wild west with everyone doing their own thing. The system was doomed. Lack of support from my management to do the right thing is what led to my early retirement. I also recommend [sic] CALFIRE go to Department of Finance for approval of the Wildland Investigation and Training Fund. This was in the original draft report, but someone wiped it out, (shortly after I retired) thereby covering up what was the right thing to do.

In stark contrast to these facts, the Moonlight Prosecutors recklessly disregarded the truth in representing to this Court through their motions in limine that WiFITER was essentially a noble cause, arguing that "[a] public program established to train and equip fire investigators is hardly evidence of a multi-agency conspiracy;" and that "Defendants' allegations of a conspiracy are unsupported."

The Moonlight Prosecutors also recklessly misrepresented WiFITER to the Court as a "separate public trust fund." In fact, it was secret, not public. It was an off-books illegal account, not a trust. It was filled with money skimmed from wildland fire settlements legally required to be delivered to the state's general fund. And it was controlled and spent by wildland fire investigators on themselves. Thus, it was anything but "separate."

The eventual disclosure of the true facts precipitated much-needed corrective action by California's Legislature. Specifically, Governor Brown signed into law two new pieces of legislation (SB 1074 and SB 1075) which focus on addressing Cal Fire's malfeasance in creating

and operating WiFITER.[61]  In an effort to ensure that other agencies would not engage in similar behavior, the State Controller's Office also sent notices to all state agencies calling out Cal Fire's malfeasance.

This Court's ruling on the Moonlight Prosecutors' motion in limine was therefore the product of a fraud on the court.  Indeed, Judge Nichols reached this very conclusion after finally having in his possession a full accounting of what actually occurred with this illegal slush fund, including documents showing the motivational bias it instilled in those involved with the Moonlight Fire investigation, including Carlson and White.

Armed with that information in the state action, Judge Nichols reversed his ruling wherein he had granted Cal Fire's motion in limine to exclude reference to WiFITER during trial.  In one of his February 4, 2014, orders, he found that "many of the belatedly produced documents are supportive of Defendants' argument that WiFITER is relevant to the question of whether Moonlight Fire case manager Carlson and Moonlight Investigator (and subsequent case manager) White were biased towards affixing blame on affluent defendants who could pay for Cal Fire's suppression costs (and who therefore could, by extension, help fund WiFITER) in order to perpetuate an illegal account for which Carlson, White and others were beneficiaries."

The belatedly produced documents establish that these Cal Fire managers and their counsel followed an agreed-upon strategy, coordinated their activities, and acted in concert to minimize the possibility that the illegal account would be discovered by state regulators at the Department of Finance or by opposing parties.

At bottom, a small cadre of Cal Fire managers and their counsel created a money-skimming operation which instilled in wildland fire investigators an undisclosed personal, direct, illegal and contingent beneficial interest in the outcome of their own investigations.  The Moonlight Prosecutors then proffered one of these law enforcement officers, White, as both a

---

[61] This legislative action was largely symbolic, because diversion of money by state employees, as was done in Cal Fire by numerous individuals acting in coordination, including Carlson and the Moonlight Fire's lead investigator White, was and is already a felony under California law.  See Cal. Penal Code § 424.  But despite a request by California State Senator Ted Gaines and others in open letters to Attorney General Kamala Harris urging her to undertake a criminal investigation, Attorney General Harris claimed she could not take any such action because her office represented Cal Fire.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

1   percipient witness and as an expert witness in the federal Moonlight Fire action, and submitted an

2   extensive expert declaration from him to this Court, all without ever disclosing to the Court or

3   Defendants his contingent financial interest.

4   <u>Analysis</u>

5   Here, the existence of WiFITER and the moral hazard it represents, the Moonlight

6   Prosecutors' reckless misrepresentations to the District Court concerning its true nature, and the

7   joint prosecution's concealment of it from Defendants collectively establish three distinct frauds

8   upon this Court.

9       a.    <u>The Moonlight Prosecutors' Misrepresentations to the Court Concerning WiFITER Constituted a Fraud Upon the Court</u>.

10

11   The Moonlight Prosecutors' intentional misconduct with regard to WiFITER was not just

12   a failure to disclose the WiFITER account to Defendants.  The Moonlight Prosecutors also made

13   recklessly false representations about WiFITER to the Court in support of their motion in limine

14   to preclude Defendants from arguing that there was any government conspiracy.  This Court

15   relied upon the Moonlight Prosecutors' recklessly false representations in granting that motion.

16   Given that they asked the Court to engage in a careful balancing of interests and evidence, the

17   Moonlight Prosecutors' duty of candor to the Court required them to ensure that the Court had a

18   full and complete record upon which to base its rulings.  <u>Cf.</u> <u>Shaffer</u>, 11 F.3d 457-58 (discussing

19   duty of candor to court).  Instead, the Moonlight Prosecutors defrauded the Court by grossly

20   misrepresenting the true nature of WiFITER, thereby inducing the Court to make erroneous

21   rulings in reliance thereon.  <u>Demjanjuk</u>, 10 F.3d at 353-54 (holding that government attorneys'

22   "reckless disregard" for the truth is sufficient to establish a fraud on the court).

23   In view of White's contingent interest in the case, a fraud upon the Court was committed

24   when the Moonlight Prosecutors filed the expert declaration of White in opposition to

25   Defendants' motion for summary judgment.  White's declaration is replete with, among other

26   things, purported expert opinions regarding the ignition and supposed early spread of the

27   Moonlight Fire from an alleged "incipient stage" to the free burning stage, all in an effort by the

28   Moonlight Investigators to reverse engineer, or "back into," a time of ignition that coincides with

118

DOWNEY BRAND LLP

a time when a Howell bulldozer was in that general vicinity. As addressed in detail elsewhere, White's perjured testimony and false declaration constitute fraud going to the central issue in the action. But given the belated disclosures of WiFITER documents to Defendants, it is now clear that the Moonlight Prosecutors' submission of White's expert declaration to the Court was also in direct contravention of California Rule of Rule of Professional Conduct Rule 7-107(C), which prohibits testifying experts from having a contingent interest in the outcome of the action in which they are testifying. By concealing from the Court White's undisclosed contingent interest in the action through WiFITER, White himself, through the Moonlight Prosecutors, defrauded this Court.

In their portion of the Joint Status Report, the Moonlight Prosecutors state, counterfactually, that they "made no misrepresentation" to the Court. (Docket No. 612 at 19:2-3.) This assertion is clearly incorrect. As demonstrated here, the Moonlight Prosecutors in fact misrepresented the nature of WiFITER to the Court, aided and abetted by their joint prosecution partners, who were simultaneously withholding the very documents and evidence that belied the Moonlight Prosecutors' false representations.

          b.    Concealment of the Motivational Bias Created by WiFITER Constituted a Fraud Upon the Court.

Even if there was no joint prosecution agreement binding the federal and state prosecutors, and even assuming, arguendo, that the Moonlight Prosecutors made no misrepresentations about WiFITER to this Court, the judgment should nonetheless be vacated and the case dismissed as a result of the fraud upon this Court committed by Cal Fire's general counsel and litigation counsel who were also officers of this Court under Ninth Circuit precedent. See Pumphrey, 62 F.3d at 1130-31 (holding that in-house counsel, even though not counsel of record and not admitted pro hac vice, was officer of the Court for purposes of Rule 60 analysis).

Fraud perpetrated so thoroughly and on such a broad scale is not confined to one tribunal when it is based on a joint investigation and joint prosecution. Cal Fire's investigators and attorneys plainly knew that their actions and decisions to disclose or not disclose evidence

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

favorable to the defense had a direct and material effect on the concurrent federal Moonlight proceedings, and their fraud necessarily extended to this Court.[62]

As the investigating agency upon which the federal prosecution relied, Cal Fire and its counsel (who are undoubtedly officers of the Court) had a constitutional obligation under <u>Brady</u> to disclose material evidence. Both the Ninth Circuit and the Supreme Court have recognized that "exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does." <u>Tennison</u>, 570 F.3d at 1087 (quoting <u>Blanco</u>, 392 F.3d at 388). Such a rule "would undermine <u>Brady</u> by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them." <u>Id</u>. (quoting <u>Blanco</u>, 392 F.3d at 388). The Supreme Court has also made clear that "<u>Brady</u> suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" <u>Youngblood</u>, 547 U.S. at 869-70 (quoting <u>Kyles</u>, 514 U.S. at 438).

Accordingly, regardless of whether the federal prosecutors even possessed WiFITER evidence material to the defense, Cal Fire – as the investigating agency and the federal prosecution team's joint prosecution partner – clearly possessed such evidence and had a duty to disclose that evidence to the Court and Defendants, at least in connection with a motion to compel all documents germane to the investigators' opinions, which this Court granted. (Docket No.

---

[62] The Moonlight Prosecutors listed White and Reynolds as expert witnesses. The Moonlight Prosecutors then asserted that, in view of its Joint Prosecution Agreement with Cal Fire, it had no obligation to produce what it claimed were privileged communications with these experts germane to their opinions. On May 26, 2011, Magistrate Judge Brennan entered an order granting Defendants' Motion to Compel production by the United States, despite finding that "[t]he USAO and the AGO have entered into a joint prosecution agreement." Defendants also served a Rule 45 document subpoena on Cal Fire, seeking documents pertaining to White and Reynolds' expert opinions for the United States. Cal Fire similarly refused to produce documents, and on November 8, 2011, Magistrate Judge Brennan entered an order on Cal Fire's motion for protective order. In ordering Cal Fire to comply with much of the subpoena, Judge Brennan again found that Cal Fire and the United States had "voluntarily entered into a joint prosecution agreement" and that Cal Fire was "reaping the benefits of that arrangement." Judge Brennan also ruled that discoverability of the expert files turned on whether the documents are "germane to the subject matter on which the expert has offered an opinion." Certainly, counsel for Cal Fire and the United States were obligated to disclose to the Court the WiFITER program and White's role within it. It is difficult to imagine material more "germane" to an expert opinion than a contingent financial/beneficial interest in the investigation/outcome. Yet the Moonlight Prosecutors failed to disclose any of it, and instead defended the WiFITER program.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

210.)[63]  Cal Fire's general counsel and litigation counsel, officers of the Court, also had a duty to ensure this jointly prosecuted action did not work a fraud upon <u>any</u> court.  <u>See</u> <u>Pumphrey</u>, 62 F.3d at 1130-31.  Nevertheless, Cal Fire's in-house counsel, with the cooperation of Cal Fire's litigation counsel, actively suppressed evidence of WiFITER's illegality and its impact on wildland fire investigations, thereby defrauding this Court.  <u>See</u> <u>Derzack</u>, 173 F.R.D. at 416 (finding fraud upon the Court arising from discovery abuses and lack of candor, even where fraudulent documents had not been submitted to the court).

> c.  <u>The Existence of WiFITER Constitutes a Fraud Upon the Court</u>.

First, the "imperative of judicial integrity" as articulated by the Supreme Court in <u>Mapp v. Ohio</u>, 367 U.S. at 659, cannot possibly tolerate circumstances where law enforcement officers have any undisclosed contingent beneficial interest in an investigation which is the basis for governmental prosecution.[64]  The judicial process, particularly government prosecutions that depend entirely on law enforcement officers to provide both percipient and expert opinions, necessarily places tremendous trust in these law enforcement officers.  Such was certainly the case here.  The Court necessarily presumes these officers are serving the public trust and fulfilling their law enforcement oaths to defend the constitution and protect the innocent.  When law enforcement officers instead have a concealed financial bias driven by an undisclosed contingent interest in the outcome of their investigation and a lawsuit derived from it, "the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are present for adjudication."  <u>Intermagnetics</u>, 926 F.2d at 916 (quoting 7 *James Wm. Moore & J.*

---

[63] Any question of whether the federal prosecution team considered Cal Fire to be the lead investigating agency was answered when the United States served its trial witness list.  The United States witness list had two sections.  The first section was a listing of those witnesses the United States absolutely intended to call.  The United States included lead Moonlight Investigator White of Cal Fire in that section.  He is the only Moonlight Investigator listed.  The United States' provisional witness list/section included witnesses that may be called "if the need arises."  USFS fire investigator Welton can be found only in this section.

[64] In this regard, on February 7, 2013, former Eastern District of California Assistant United States Attorney and Civil Chief Matthew Jacobs, now General Counsel for CalPers, published an article in the Sacramento Bee and elsewhere deriding the practice of creating financial incentives for investigators and prosecutors, indicating how the practice is "widely condemned" and raising the very concerns expressed herein by Defendants relating to the motivational biases created by such practices.  The article may now be found at http://www.mercedsunstar.com/news/state/article3274403.html.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

*Lucas, Moore's Federal Practice* ¶ 60.33 (2d ed. 1978)).

California Rule of Professional Conduct 7-107(C) absolutely prohibits proffering expert witnesses in litigation on a contingency basis where the amount of their compensation depends on the outcome of the action. This prohibition is founded upon nearly a century of case authority.

> It is the contingency on the one hand and the agreement to furnish a given set of facts essential to a successful litigation on the other, and both of which in their nature are calculated to induce false charges and the production of perjured testimony, to subvert the truth and pervert justice through fraud, trickery, and chicanery at the hands of unscrupulous private detectives or other conscienceless persons, which has impelled the law, with wisdom, to declare such contracts illegal.

Von Kesler v. Baker, 131 Cal. App. 654, 657 (1933) (quoting Hare v. McGue 178 Cal. 740 (1918)). This prohibition applies with full force even if the existence of an expert's contingent interest is disclosed in the course of the action. See Cal. R. Prof. Conduct 7-107(C).

Here, the lead investigating agency Cal Fire and lead investigator White clearly had a contingent interest in the outcome of their investigation by virtue of WiFITER, as evidenced by White's letter to Defendants demanding a $400,000 cash infusion for the off-books account of which he was a beneficiary. That the contingent interest in this case was concealed makes it all the worse.

To the extent the Moonlight Prosecutors attempt to argue that the motivations and biases of Cal Fire investigators are irrelevant to the federal action, this argument is incorrect. A single joint investigation served as the foundation for both the federal and state actions. The Moonlight Investigators gave testimony that would be used in trials of both actions. Accordingly, the lead investigator's contingent interest in the outcome of the state action created a financially driven bias that necessarily infected both actions to an equal degree. Moreover, the Moonlight Prosecutors voluntarily elected to undertake a joint investigation and prosecution of the Moonlight Fire with Cal Fire and its attorneys. At every point along the path of the concurrent state and federal actions, the Moonlight Prosecutors availed themselves of the benefits of a joint prosecution and the evidentiary privileges associated with it. Given that the state and federal

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

prosecutors aided and abetted one another in the prosecution of both actions, any failure to disclose critical facts associated with the WiFITER account are failures of the entire joint prosecution team. The Moonlight Prosecutors cannot seize the benefits of their "common interest" at every turn with Cal Fire and now distance themselves from the acts of their joint prosecution partners. As in any joint venture, both parties become responsible for the acts of the other.

**10. The Moonlight Prosecutors Concealed from the Court and Defendants Percipient Witness Edwin Bauer's False Report of a Two Million Dollar Bribe, Which Enabled Them to Obtain a Favorable Pretrial Ruling on a Material Issue, Thereby Committing a Fraud on the Court.**

The Relevant Facts

The Moonlight Fire began on Labor Day, September 3, 2007, deep in the woods about ten miles from Westwood, California, which is the nearest town. Almost immediately after this action was filed, Defendants discovered evidence that the Moonlight Investigators ignored and suppressed evidence tending to prove that a Westwood local, Ryan Bauer, was a potential cause of the Moonlight Fire.[65] Thus, Defendants focused much of their discovery efforts on uncovering the facts regarding Bauer and his whereabouts and activities on the day of the fire.

Bauer woke up on the morning of September 3 and called his parents Edwin and Jennifer to tell them that he was planning on going out to cut firewood that day. As a knot bumper for Howell (a low-level position working at landings of logging sites), Bauer had Labor Day off.

Bauer ran his own side business cutting and selling firewood cords, which helped support his expensive drug habit. In fact, he testified in his deposition that he was high on four different narcotics on the day of the fire. He also testified that his favorite place to scout for and cut firewood was in the Cooks Creek area, a forested area located south of Westwood where Howell conducted logging operations in the weeks before the Moonlight Fire erupted.

Bauer had a personal "hot-rodded" chain saw, which is a modified machine with greater

---

[65] That the government did not investigate Ryan Bauer, an individual unable to pay any damages, was consistent with lead Moonlight Investigator White's status as a recipient of various benefits associated with Cal Fire's illegal WiFITER slush fund. The same can be said about the investigators' failure to investigate Michael McNeil.

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DOWNEY BRAND LLP

horsepower and a lack of key fire safety components such as spark arrestors. Because these chainsaws are not fire-safe, Bauer was forbidden from using his when working for Howell, which had an exemplary safety record. But Howell had no control over Bauer's use of dangerous chainsaws on his days off.

During his deposition, Bauer circled an area around Cooks Creek as his chosen location to scout firewood for his side business. This is the same area where the Moonlight Fire began.

Shortly after the first report of the fire at 2:24 p.m., a private patrolman found Bauer's parents driving alone deep in the woods, approximately one-half mile from where the fire began, searching for their son and expressing concern for his safety. They claimed they spotted the smoke plume from a nearby meadow several miles away and began searching for their son, whom they understood was cutting wood in the area, corroborating what he had told them that morning.

At about the same time, a Lassen County deputy sheriff encountered and stopped Ryan Bauer in a nearby meadow as he sped away ("like a bat out of hell," according to the deputy) from the area of the fire shortly after it started, as he headed back toward the town of Westwood. Bauer was highly agitated and had a chainsaw in the back of his pickup. Bauer told the deputy sheriff that he was in the area where the fire was burning to retrieve his chainsaw.

Four days later, on September 7, 2007, Cal Fire employees assisting with the investigation interviewed Ryan Bauer at the Cal Fire station in Westwood. During his interview with Cal Fire, Ryan Bauer offered an unsolicited alibi – blurting out, "I was with my girlfriend all day. She can verify that if I'm being blamed for the fire." This statement was false.

The Moonlight Investigators intentionally failed to interview Ryan Bauer's girlfriend, Andrea Terry ("Terry"). During the litigation, Defendants tracked her down and took her deposition. She testified that Bauer was not with her all day, but instead showed up mid-day, dirty and with sawdust on his clothing, with a chainsaw in his pickup. At the time of the fire, Terry lived in Westwood only a few hundred feet from the fire station where Cal Fire interviewed Bauer, some ten miles from the fire's origin.

Terry testified that Bauer, shortly after he arrived at her home and in her presence, suddenly claimed to have spotted the smoke plume of the fire in its early stages from ten miles

away. Terry found it odd that Bauer saw a plume of smoke she could hardly see, and that he inexplicably "just knew right off the bat" that "[t]hat's where we [Howell's crew] are working." Ms. Terry's parents also confirmed during their depositions that Bauer was at their home only for a short while, and that he had not been at their home "all day."

Bauer lied to the investigators during his interview about other issues as well, including that, on the day of the fire, an officer in a red fire engine helped to retrieve a chain saw that Bauer had stashed behind a tree in the area where the fire began. Later, during his deposition, when asked about whether he stashed a chainsaw in the area of the fire, Bauer contradicted himself, saying he had not stashed any chainsaws on the mountainside that day. This also contradicted the story he told to the deputy sheriff as he sped away from the fire.

During his September 7th interview, Bauer suddenly insisted that the investigators turn off their recorder, so that he could reveal certain information in confidence. At that point in time, according to the investigators, Bauer told them that he had overheard two of Howell's bulldozer operators in a nearby meadow several hours after the fire had been reported, blaming one another for having caused the fire. Curiously, Bauer is the only person to have overheard this alleged conversation. This statement by Bauer was also false, as both bulldozer operators denied having had such a conversation.

Eventually, during his deposition, Bauer asserted the Fifth Amendment in response to questions concerning his potential involvement in the start of the fire.

The investigators also interviewed Ryan Bauer's father, Edwin Bauer, on September 7, 2007. During his interview, Edwin Bauer also attempted to blame one of Howell's bulldozer operators for the fire. In this regard, he claimed that as he and his wife were driving out of the woods after searching for their son, they encountered one of the dozer operators driving a silver pickup. Edwin Bauer claimed that he stopped and asked the operator how the fire started. According to Bauer, the bulldozer operator replied that a "bulldozer hit a rock." Mr. Bauer is the only witness to this alleged admission. This statement by Edwin Bauer was false, and Bauer was never asked to explain how the Howell bulldozer operator could have reached such a conclusion two days before even the Moonlight Investigators had processed the scene of the alleged origin.

125

DOWNEY BRAND LLP

At no time following the interview of either Ryan or Edwin Bauer did the investigators ever follow up with Howell's bulldozer operators to inquire about whether either of them had made any such statements to either of the Bauers. The Moonlight Investigators apparently never scrutinized the illogical Bauer allegations. For instance, assuming the bulldozer operators had made such statements, they were never asked how they could have known that the fire started as a result of a bulldozer striking a rock unless they had witnessed the ignition. Assuming they witnessed the ignition, they were never asked why it was that they were unable to suppress the fire immediately in its infancy, just as one would extinguish a cigarette.[66] Howell's bulldozer operators deny having made any such implausible statements to either of the Bauers, and deny ever believing that the fire started when a bulldozer hit a rock.

The Moonlight Investigators intentionally prepared misleading witness interview summaries for both Ryan Bauer and Edwin Bauer. Each interview summary included the alleged admissions by the bulldozer operators. But curiously, the summary of the interview of Ryan Bauer omitted altogether his unsolicited false alibi, and contains no discussion or analysis of his many other false statements. The summary of the interview with Edwin Bauer confirms that he and his wife encountered a patrolman while searching for their son, but the summary fails to describe just how deep into the woods (some ten miles from the town of Westwood) and how close to the origin of the fire (only a half mile) Edwin Bauer and his wife were at that time of the encounter.

DOWNEY BRAND LLP

[66] The Joint Report claims that the fire ignited at 12:15 p.m., but remained in an "incipient" state until it burst into flames sometime around 2:00 p.m.

The image below illustrates the location where the Bauers were spotted in close proximity to the fire, less than a half-mile from the origin, some ten miles from civilization.



Armed with the foregoing facts, all of which were known to Defendants before the settlement of the federal action, Defendants approached the federal trial with the intent of presenting these facts, among others, to demonstrate an alternative potential cause of the fire. In this regard, Defendants never limited their alternative theory regarding the Bauers to arson, and always intended to argue that one or more of the Bauers may have caused the fire either intentionally or unintentionally, whether via arson, with a chainsaw, spilled gasoline, or through careless smoking.

On May 31, 2012, the Moonlight Prosecutors filed various motions in limine in a calculated effort to keep much of the evidence relating to the Bauers away from the jury. In making this motion, the Moonlight Prosecutors misrepresented to the Court that there was not a "shred" of evidence tending to show the Bauers may have caused the fire, and asked the court to exclude such argument after engaging in a careful balancing of the evidence under Federal Rule of Evidence 403 ("A court may exclude evidence, even if relevant, whose probative value is substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury,

undue delay, and wasting time.").

Defendants opposed the motion as being contrary to law and evidence. With respect to the Bauers, Defendants presented the Court with the facts known to them at that time, and argued that they were entitled to present them to the jury and that it was within the province of the jury to consider alternative potential causes of the fire.

Having received the parties' briefing, the Court engaged in a careful balancing of the evidence under Federal Rule of Evidence 403 and, in doing so, relied upon the United States' representations that there was not a "shred" of evidence tending to show that one or more of the Bauers may have been responsible for the fire. As a consequence, during the June 26, 2012, Final Pretrial Conference and motion hearing, the Court granted the United States' motion regarding other potential causes, and reiterated its rulings in its Final Pretrial Order. Specifically, the Court ordered that Defendants may not "elicit evidence to argue that someone else started the fire."

The Court's ruling prohibiting Defendants from "eliciting evidence to argue that someone else started the fire" was a critical ruling that was a substantial factor in forcing Defendants to settle the federal action.

Long after the settlement and dismissal of the federal action, Defendants learned that before the Moonlight Prosecutors filed their motions in limine in the federal action, they were in possession of, and had intentionally failed to disclose to the Court and Defendants, critical evidence regarding an illegal scheme on the part of Edwin Bauer and/or his son Ryan Bauer, which tended to demonstrate the Bauers' potential involvement in the ignition of the fire, and which was directly relevant to the Court's careful balancing under Rule 403, and which directly contradicted their misrepresentation to the Court that there was not a "shred" of evidence.

Specifically, in November of 2013, while Defendants were working on various motions that led to the termination of Cal Fire's state court action, counsel for Sierra Pacific received a telephone call from Edwin Bauer. Edwin Bauer ostensibly called to request the return of documents Defendants had copied from his hard drive pursuant to a court order issued in the state action. During that telephone call, Edwin Bauer made a surprise comment about a $2 million bribe. When Sierra Pacific's counsel immediately sought more information, Edwin Bauer

claimed that Eugene Chittock, the lawyer he had retained to represent his son Ryan during Ryan's deposition, had told him that Downey Brand or Sierra Pacific had offered his son a $2 million bribe if Ryan would state that he had started the Moonlight Fire. Edwin Bauer also revealed that he had told lead Moonlight Prosecutors Taylor and Richard Elias that his son had been bribed when those two prosecutors personally delivered a trial subpoena to him in advance of the federal trial. Edwin Bauer said he filed a police report, and that the FBI had interviewed him and Mr. Chittock.

The next day, Sierra Pacific's counsel contacted Mr. Chittock to ask him about Mr. Bauer's story. Mr. Chittock said that he had "absolutely not" conveyed any bribe offer, but that one of the Bauers had apparently made that claim to federal employees working on this case. Mr. Chittock stated that he had been contacted by two federal investigators or lawyers. Mr. Chittock stated that these two individuals, a man and a woman, came to his office in the spring of 2012, telling him that Ryan Bauer's parents had stated that Mr. Chittock conveyed the offer of a bribe to their son Ryan in the amount of $2 million and that the money would be coming from Downey Brand or Sierra Pacific.

Mr. Chittock told the investigators that the charge was "absolutely false," and he readily agreed to allow them to search his phone records and files. Mr. Chittock informed the federal employees that all they would find was a record of a single phone call he had received from Sierra Pacific's counsel Warne, who was in the process of scheduling the continued deposition of Ryan Bauer within Susanville's adult detention facility, as Bauer was there serving a term for assaulting a police officer. Mr. Chittock described this single call as a predictable and normal event before the federal agents began their search. After finding nothing beyond a record of that single call, the federal employees left.

Defendants are informed and believe that, because neither they nor Sierra Pacific were ever interviewed or investigated about the alleged bribe, the federal investigators and the Moonlight Prosecutors concluded that Bauer's claim was false, which of course it was. As a result, Defendants are informed and believe that Edwin Bauer violated, at a bare minimum, 18 U.S.C. § 1001 by making a false report to a federal agent, which is a felony.

DOWNEY BRAND LLP

The Moonlight Prosecutors knowingly and willfully failed to reveal to the Court and Defendants the fact that Edwin Bauer had made the false claim that Mr. Chittock had communicated a $2 million bribe to his son Ryan Bauer, nor did the Moonlight Prosecutors reveal the fact that Mr. Chittock denied the allegation and that they were unable to obtain any evidence supporting Bauer's claim. The Moonlight Prosecutors knowingly and willfully failed to reveal the existence of a federal investigation into the matter concerning the Bauers, even after the investigation revealed the falsity of the charges.

Revealing such information to Defendants or to the Court would have been damaging to the government's case, as it would have tended to prove that Edwin Bauer made a false assertion to strengthen the government's claims against Sierra Pacific while diverting attention from his son. Obviously, had it been true, it would have been more serious than the charges set forth in the federal action. Since it is not true, the false report of such a crime is also serious, demonstrating, among other things, a willingness on the part of the Bauers to manufacture evidence harmful to an innocent party and an effort to deflect attention away from someone who may have actually started the fire. Bauer's false claim raised numerous questions, including whether the Bauers had engaged in similar conduct when Edwin Bauer told investigators that a man in a silver pickup had told him that "a bulldozer hit a rock," and when Ryan Bauer claimed that he too had overheard a different statement by one of Howell's bulldozer operators supposedly admitting to having started the fire by striking a rock with his dozer.

Edwin Bauer's false allegation of a multi-million dollar bribe by Downey Brand or Sierra Pacific can only have been made in an effort to falsely inculpate Sierra Pacific, and thus it actually has the opposite effect, tending instead to incriminate Mr. Bauer and his son Ryan as a failed attempt to deflect focused attention from themselves and whatever role they had in starting the Moonlight Fire. But instead of receiving this information, which is harmful to the government's case, the Court and Defendants heard and received nothing in just one of many instances of the government purposefully withholding harmful evidence.[67]

---

[67] Defendants had earlier in the case requested, under Rule 34, production of all interview statements and documents concerning the Moonlight Fire investigation, and all communications with the Bauers. To date, none of the

DOWNEY BRAND LLP

DOWNEY BRAND LLP

Defendants are informed and believe that had the Court been apprised of all the relevant information concerning the Bauers, the Court would not have granted the Moonlight Prosecutors' motion in limine, and would not have foreclosed argument or evidence from Defendants during trial regarding other potential causes of the fire. The Moonlight Prosecutors' successful efforts to purposefully mislead the Court in this manner were also an important component of their broader stratagem to defraud the Court by abusing the Court's processes on numerous fronts to coerce a settlement from Defendants.

The Bauer evidence concealed by the Moonlight Prosecutors goes to the central issue in the Moonlight Fire federal action – namely, who ignited the fire. All of the foregoing actions by the Moonlight Prosecutors were undertaken intentionally and with malice, with actual knowledge that their actions violated the due process rights of Defendants, and violated their duty of candor to the Court.

Only through a chance telephone call during which Edwin Bauer made an off-the- cuff comment in November of 2013, more than a year after the conclusion of the federal action, did Defendants begin to learn of this particular aspect of the Moonlight Prosecutors' fraud on the Court.

<u>Analysis</u>

Standing alone, the Moonlight Prosecutors' successful motion in limine precluding Defendants' argument regarding other potential causes of the fire, made while the Moonlight Prosecutors were intentionally concealing evidence material to the Court's ruling, separately constitutes fraud upon the Court and warrants relief under Rule 60(d)(3), setting aside the judgment. In this regard, the Moonlight Prosecutors persuaded the Court to engage in a careful balancing of the evidence under Federal Rule of Evidence 403, knowing that they had intentionally deprived the Court of critical pieces of evidence that necessarily would have been an important component of the Court's assessment.

By engaging in the foregoing conduct, the Moonlight Prosecutors engaged in an "an

government's investigatory files concerning its investigation of the alleged bribe have ever been produced.

1 unconscionable plan or scheme" "designed to improperly influence the court in its decisions,"

2 and engaged in a scheme "perpetrated by officers of the court so that the judicial machinery

3 cannot perform in the usual manner its impartial task of adjudging cases that are present for

4 adjudication." Although under controlling Ninth Circuit authority mere "attempts" to defraud the

5 Court is sufficient to establish fraud on the Court under Rule 60(d)(3), Pumphrey, 62 F.3d at

6 1131, the Moonlight Prosecutors succeeded in their attempt by actually misleading the Court, and

7 through their misconduct procured a favorable and erroneous legal ruling that was a substantial

8 factor in forcing Defendants to settle the action.

9 The failure by the federal prosecutors to comply with these obligations and rules

10 constitutes a fraud on the Court for another reason: this conduct was a knowing and potentially

11 criminal attempt to hinder the judicial process, the subsequent suppression of which further

12 tainted the Moonlight Fire prosecution while prejudicing Defendants. Stonehill, 660 F.3d at 445

13 (stating that fraud on the court exists where the fraudulent conduct "harm[ed] the integrity of the

14 judicial process"); see also Chambers, 501 U.S. at 44 (stating that "tampering with the

15 administration of justice . . . [is] a wrong against the institutions set up to protect and safeguard

16 the public"). By intentionally concealing from the Court information concerning the Bauers'

17 false claim of a $2 million bribe, which itself was a felony, while simultaneously representing to

18 the Court in the context of their critical motion in limine that there was not a "shred" of evidence

19 supporting a claim against the Bauers, the Moonlight Prosecutors clearly defrauded the Court. Id.

20 Moreover, by concealing the evidence that Edwin Bauer had made false statements to

21 federal investigators regarding an alleged bribe, the Moonlight Prosecutors not only knowingly

22 violated their duty of candor to the Court, they knowingly violated their duties under Brady to

23 disclose evidence that may be favorable to Defendants, and they violated their ongoing duty to

24 supplement discovery responses under Rule 26 during the pendency of the case. That duty to

25 update discovery responses persists even after the close of formal discovery under Rule 26.

26 In view of these circumstances, the Moonlight Prosecutor's statement in their portion of

27 the Joint Status Report to this Court that "the United States made no misrepresentations and

28 presented no false evidence" is itself yet another misrepresentation. Certainly the Moonlight

132

1   Prosecutors' representation to the Court that there was not a "shred" of evidence was a

2   misrepresentation. Moreover, just as in Pumphrey, Schaffer, Levander, Hazel-Atlas, and

3   Demjanjuk, they obviously violated their duty of candor to the Court (and their obligations under

4   Rule 26 to Defendants) by making that representation while concealing contrary facts critical to

5   the Court's balancing of interests under Federal Rule of Evidence 403. Here, the facts are that

6   much more egregious because there is no question that this fraud was intentional inasmuch as

7   Edwin Bauer first reported the alleged bribe to the lead Moonlight Prosecutors personally.

8   **IV. THE MOONLIGHT PROSECUTORS' MULTIPLE INSTANCES OF MISCONDUCT
        COLLECTIVELY CONSTITUTE FRAUD ON THE COURT.**

9

10      Defendants' brief describes in detail certain types of misconduct by the Moonlight

11   Prosecutors. Various courts have found that each of these types of misconduct can independently

12   constitute fraud on the court under Rule 60(d)(3). But even if the Court were to conclude that no

13   discrete sequence of events was sufficient to constitute on its own a fraud on the Court, the

14   analysis most certainly would not end there. Fraud on the court may also be found by assessing

15   various acts of misconduct that, when taken together over the entire course of litigation, rise to

16   the level of a fraud on the court. See Stonehill, 660 F.3d at 446-52 (analyzing seven separate

17   instances of litigation malfeasance in isolation to determine whether each of those instances

18   constituted a fraud upon the court, and after answering that inquiry in the negative, analyzing

19   whether the "allegations as a whole" amounted to fraud on the court); see also Pumphrey, 62 F.3d

20   at 1133 (listing a series of steps undertaken by general counsel which, taken together, constituted

21   fraud on the court). As the Ninth Circuit recognized in Stonehill, a fraud on the court occurs

22   when the alleged conduct, considered in its totality, "changes the story . . . presented to the

23   district court," or alternatively, when that conduct "substantially undermine[s] the judicial process

24   by preventing the [court] from analyzing the case." 660 F.3d at 452, 454.

25      Considered as a whole, the Moonlight Prosecutors' conduct not only meets the applicable

26   standards, but far exceeds any evidentiary threshold associated with showing grave damage to the

27   integrity of our judicial system. Indeed, beyond committing a single act of fraud on the court,

28   such as was the case in Hazel-Atlas, the prosecutors here conceived of and engaged in a series of

DOWNEY BRAND LLP

DOWNEY BRAND LLP

interconnected acts – all driven by a perverted desire to win at any cost – that dramatically "changed the story" heard by this Court and substantially undermined the judicial process. This long-running deception started well before the case was filed, as the Moonlight Prosecutors' conduct extended into the realm of this Court a fraud that began before the litigation was filed. Shortly after the lawsuit was filed, and certainly after Shelledy removed Wright from the action, the Moonlight Prosecutors advanced the fraudulent report into this Court's purview and then sat on their hands as their star witnesses lied repeatedly under oath regarding the centerpiece of their case against Defendants. When the Moonlight Investigators' deception was exposed, instead of demanding answers, the federal stewards of justice told the investigators that it was a non-issue.

Unfortunately, the fraudulent conduct does not end there. Among the numerous acts of fraud and deception, the Moonlight Prosecutors: advanced a false "confession" by Bush; prepared and presented a false declaration to the Court in law and motion practice; participated in the creation of a new fire spread diagram in an effort to obfuscate the truth about the location of the origin; instructed an expert not to produce a corrected report when they discovered using the correct data would be harmful to the United States; failed to produce to the defense exculpatory expert notes and expert work product; advocated the existence of three other fraudulent fire investigations in order to help pin the blame on Defendants; attempted to conceal and cover up information harmful to the government regarding egregious conduct at the Red Rock Lookout Tower; allowed various Red Rock witnesses to lie under oath; falsified verified responses to interrogatories and requests for admissions; made reckless misrepresentations to the Court regarding evidence of White's bias and financial motivation; failed to disclose an alleged bribe that destroyed the credibility of a key witnesses; and presented to the Court through a false declaration the Joint Report, and all of its misrepresentations and material omissions after the corruption inherent in each of these documents had been exposed through discovery. This fraud was pervasive and directed to every important issue in the case, including issues such as whether the fire started where the government contended or in the manner the government contended, and more fundamentally, whether Defendants were legally responsible for the Moonlight Fire or whether certain affirmative defenses barred relief by the United States.

1    Moreover, although finding fraud upon the court most certainly does not require a

2    showing of "knowing and intentional participation by counsel," and can be satisfied by a reckless

3    disregard for the truth, there can be no doubt that the Moonlight Prosecutors engaged in this

4    misconduct intentionally.  While the government could perhaps try to chalk up a single, isolated

5    incident to an unintentional mistake, the broad tapestry of misconduct in this case defies such

6    description.[68]  The transgressions and instances of prosecutorial misconduct here are simply too

7    numerous, relate to too many critical issues, and are so pervasive throughout the litigation to have

8    been the product of incompetence.  There is only one inescapable conclusion:  the Moonlight

9    Prosecutors knowingly and willfully engaged in each of the acts described herein as part of an

10   unconscionable plan or scheme to improperly influence the Court and affect the outcome of the

11   litigation.

12       Indeed, the Moonlight Prosecutors engaged in what can only be described as a pattern and

13   practice of fraud in the Moonlight litigation.  While the facts of malfeasance certainly support the

14   conclusion that these acts were willful, additional corroborating evidence is abundant, including

15   what has been revealed by Wright and Overby, two former prosecutors assigned to the case.

16   Despite receiving accolades for his work, Shelledy removed Wright from the Moonlight Fire after

17   Wright refused, in other fire cases, to succumb to pressure to withhold information harmful to the

18   United States.  It can be no coincidence that after the government removed Wright from the

19   Moonlight Fire litigation that the Moonlight Prosecutors did, in fact, withhold information

20   harmful to the United States.[69]  But Wright was not the only government prosecutor who felt

---

[68] Judge Nichols also viewed the fraud as a whole.  In his twenty-six page Order, His Honor found, "In making this order and in addressing the issues as set forth, it is always possible that a party that sees itself as aggrieved might point to some individual point or points, and argue at length that the Court's determination is wrong. Because this Court's painstaking review considered the entire record of the proceedings, the Court views this exercise as pulling at a thread or threads in a huge tapestry or looking at a scuff or misplaced stroke in a mural. The big picture still stands out clearly."

[69] Of course, describing information which might help the defense as "harmful to the United States," reveals a fundamentally flawed mindset, something that animated this case throughout.  As Overby told certain prosecutors when he left them in disgust, "we win if justice wins."  If information is truthful, disclosing it to Defendants is most decidedly <u>not</u> harmful to the United States, regardless of whether it aids Defendants.  Since the Supreme Court confirms that federal prosecutors are not in the business of winning but of furthering justice, disclosing the truth in the context of litigation is always beneficial to the United States, even when doing so is helpful to the defense. Moreover, while Wright's own discussion of the truth regarding what happened to him might be on some level disloyal to his supervisor, Wright does not owe a duty of loyalty to his supervisor.  He owes it to his client the United States, and telling the truth about corruption is an act of loyalty towards his client.  Indeed, in light of what is taught

DOWNEY BRAND LLP

"pressured to engage in unethical conduct as a lawyer." Overby left the case in disgust, exasperated at his inability to work within the ranks of the Moonlight Prosecutors to steer the case toward the pursuit of justice. His experience also serves to confirm that the conduct of the Moonlight Prosecutors was not a mere mistake, but intentionally effectuated.

In sum, the Moonlight Prosecutors did not stay "well within the rules" in the Moonlight Fire litigation. See United States v. Maloney, 755 F.3d 1044, 1046 (9th Cir. 2014) ("The prosecutor's job isn't just to win, but to win fairly, staying well within the rules.") (quotation marks and citations omitted). Instead, they did whatever necessary, from allowing perjurous testimony, to concealing critical facts, in an all-out effort to win. By engaging in this conduct, the Moonlight Prosecutors forgot not only their obligations as attorneys, but also their obligation as representatives of a sovereignty whose "interest in a . . . prosecution is not that it shall win a case, but that justice shall be done." Berger, 295 U.S. at 88. The Moonlight Prosecutors – shielded by the high level of trust our system of justice naturally places in them as representatives of the United States – pursued their goal at the expense of justice. Instead of serving as stewards of justice, they brought dishonor to their office by aiding and abetting the very type of conduct they were charged with preventing, an approach which ultimately led to a fraud upon two courts.

Thus, the pervasive and coordinated misconduct of the Moonlight Fire Prosecutors, whether viewed in isolated parts or as a whole, clearly and convincingly reflects "an effort by the government to prevent the judicial process from functioning 'in the usual manner,'" and that "involved perjury or nondisclosure [ ] so fundamental that it undermined the workings of the adversary process itself." Stonehill, 660 F.3d at 445. "The total effect of all this fraud . . . calls for nothing less than a complete denial of relief." Hazel-Atlas, 322 U.S. at 250.

## V. CONCLUSION

Those courts that have assessed whether litigation conduct has harmed the integrity of the judicial system in a manner that warrants a finding of fraud on the court are frequently reviewing facts associated with conduct by privately employed officers of the court who are dealing with

---

through a variety of Supreme Court decisions, telling the truth as a prosecutor defines loyalty.

1    disputes between private entities. In those situations, where the conduct amounts to a scheme

2    which has done damage to our system of justice, the courts are not shy about following the

3    Supreme Court's direction in <u>Hazel-Atlas</u> and moving forcefully to protect and restore the

4    integrity of our legal system. The Moonlight Fire matter, however, presents a far more significant

5    attack on the integrity of our judicial system. Not only was the misconduct shockingly egregious

6    and pervasive, it was carried about by individuals sworn to protect the public and to preserve

7    justice – by the law enforcement officers who conducted a sham investigation and by certain

8    Assistant United States Attorneys and Deputy Attorneys General who co-prosecuted this action in

9    a way that ultimately worked a colossal fraud on two courts. Those courts that have addressed

10    fraud on the court involving government actors, <u>Shaffer</u>, <u>Demjanjuk</u>, and <u>Dixon</u>, for instance,

11    have acknowledged a heightened level of sensitivity and concern when such conduct is carried

12    out by those who are sworn to protect justice. Judge Nichols did as well with respect to the

13    related state cases. If there was ever a case deserving of the full measure of this Court's powers

14    to protect the integrity of our legal system, it is the Moonlight Fire matter. Defendants

15    respectfully request that this Court restore justice by terminating this action and setting aside its

16    earlier settlement.

17    DATED: January 15, 2015        DOWNEY BRAND LLP

18

19                                 By:          */s/ William R. Warne*

20                                       WILLIAM R. WARNE
                                  Attorney for Defendant/Cross-Defendant

21                                   SIERRA PACIFIC INDUSTRIES

22    DATED: January 15, 2015        BRACEWELL & GIULIANI LLP

23

24                                 By:          */s/ Richard W. Beckler*

25                                      RICHARD W. BECKLER
                                  Attorney for Defendant/Cross-Defendant

26                                   SIERRA PACIFIC INDUSTRIES

27

28

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

DATED: January 15, 2015          MATHENY SEARS LINKERT & JAIME

By: _/s/ Richard Linkert as auth'd on 1/15/15)_
RICHARD LINKERT
Attorneys For Defendants W.M. BEATY &
ASSOCIATES, INC. AND ANN MCKEEVER
HATCH, as Trustee of the Hatch 1987 Revocable
Trust, et al.

DATED:  January 15, 2015          RUSHFORD & BONOTTO, LLP

By: _/s/ Phillip Bonotto (as authorized on 1/15/15)_
PHILLIP BONOTTO
Attorneys for Defendant, EUNICE E. HOWELL,
INDIVIDUALLY and d/b/a HOWELL'S
FOREST HARVESTING

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' SUPPLEMENTAL BRIEFING REGARDING FRAUD ON THE COURT