UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>    v.<br><br>SIERRA PACIFIC INDUSTRIES, et al.,<br><br>            Defendants, | CIV. NO. 2:09-02445 WBS AC<br><br><br>MEMORANDUM AND ORDER |
| AND ALL RELATED CROSS-ACTIONS. | |

----oo0oo----

After reaching a settlement with the government and requesting the court to enter judgment pursuant to that settlement almost two years ago, defendants Sierra Pacific Industries, Howell's Forest Harvesting Company, and fifteen individuals and/or trusts who own land in the Sierra Nevada mountains (referred to collectively as "defendants") now move to set aside that judgment based upon "fraud on the court."

1

1  I.  <u>Brief Factual and Procedural Background</u>

2          On September 3, 2007, a fire ignited on private

3  property near the Plumas National Forest.  The fire, which became

4  known as the Moonlight Fire, burned for over two weeks and

5  ultimately spread to 46,000 acres of the Plumas and Lassen

6  National Forests.  The day after the fire started, California

7  Department of Forestry and Fire Protection ("Cal Fire")

8  investigator Joshua White and United States Forest Service

9  ("USFS") investigator David Reynolds sought to determine the

10  cause of the fire.  As a result of the joint investigation, Cal

11  Fire and the USFS ultimately issued the "Origin and Cause

12  Investigation Report, Moonlight Fire" ("Joint Report").  The

13  Joint Report concluded that the Moonlight Fire was caused by a

14  rock striking the grouser or front blade of a bulldozer operated

15  by an employee of defendant Howell's Forest Harvesting Company.

16  After winning a bid to harvest timber on the private property,

17  Sierra Pacific Industries had hired that company to conduct

18  logging operations in the area.

19          On August 9, 2009, the Office of the California

20  Attorney General filed an action in state court on behalf of Cal

21  Fire to recover its damages caused by the Moonlight Fire (the

22  "state action").  That same month, on August 31, 2009, the United

23  States Attorney filed this action on behalf of the United States

24  to recover its damages caused by the Moonlight Fire (the "federal

25  action").  The two cases proceeded independently, but the

26

27

28

government[1] and Cal Fire operated pursuant to a joint prosecution agreement.

        To say that this case was litigated aggressively and exhaustively by all parties would be an understatement. When the court entered judgment almost two years ago, the docket had almost six hundred entries, which included contentious discovery motions and voluminous dispositive motions. Almost three years after the federal action commenced, it was set to proceed to jury trial on July 9, 2012 before Judge Mueller and was expected to last no more than thirty court days. Three days before trial, the parties voluntarily participated in a settlement conference and reached a settlement agreement.

        Under the terms of the settlement agreement, Sierra Pacific Industries agreed to pay the government $47 million, Howell's Forest Harvesting Company agreed to pay the government $1 million, and other defendants agreed to pay the government $7 million. (Settlement Agreement & Stipulation ¶ 25 (Docket No. 592).) Sierra Pacific Industries also agreed to convey 22,500 acres of land to the government. (Id.) At the request of the parties and pursuant to the settlement agreement, the court dismissed the case with prejudice on July 18, 2012 and directed the clerk to enter final judgment in the case. (Id.)

        More than two years later, on October 9, 2014, defendants filed the pending motion to set aside that judgment.

_____

[1]    All references to the "government" in this Order refer to the United States government and, where appropriate, the Assistant United States Attorneys who represented the government in this case.

After Judge Mueller recused herself, the case was reassigned to the undersigned judge. After conferring with the parties, the court required limited briefing addressing the threshold issue of whether the alleged conduct giving rise to defendants' motion constitutes "fraud on the court." The court now addresses that limited issue.

## II. Legal Standards

### A. Federal Rule of Civil Procedure 60

To preserve the finality of judgments, the Federal Rules of Civil Procedure limit a party's ability to seek relief from a final judgment. Rule 60(b) enumerates six grounds under which a court may relieve a party from a final judgment:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). A motion seeking relief from a final judgment under Rule 60(b) must be made "within a reasonable time" and any motion under one of the first three grounds for relief must be made "no more than a year after the entry of the judgment." Id. R. 60(c)(1). Defendants concede that any motion under Rule 60(b) in this case would be barred as untimely because

4

it would rely on one or more of the first three grounds for relief but was not filed within a year of the entry of final judgment.

Despite the limitations in Rule 60(b), "[c]ourts have inherent equity power to vacate judgments obtained by fraud." United States v. Estate of Stonehill, 660 F.3d 415, 443 (9th Cir. 2011) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Rule 60(d)(3) preserves this inherent power and recognizes that Rule 60 does not "limit a court's power to . . . set aside a judgment for fraud on the court." Fed. R. Civ. P. 60(d)(3); accord Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir. 2003) ("Federal Rule of Civil Procedure 60(b) preserves the district court's right to hear an independent action to set aside a judgment for fraud on the court."); Estate of Stonehill, 660 F.3d at 443 ("Rule 60(b), which governs relief from a judgment or order, provides no time limit on courts' power to set aside judgments based on a finding of fraud on the court.").[2] Because defendants failed to file a timely Rule 60(b) motion, they are forced to argue that the judgment in this case

---

[2] Prior to the amendments to the Federal Rules of Civil Procedure in 2007, the savings clause for fraud on the court was contained in Rule 60(b), thus courts referred to Rule 60(b) as preserving a court's inherent power to set aside a final judgment for fraud on the court. As part of the stylistic amendments in 2007, the savings clause language was moved from subsection (b) to subsection (d)(3). Compare Fed. R. Civ. P. 60(b) (2006) ("This rule does not limit the power of a court to entertain an independent action . . . to set aside a judgment for fraud on the court."), with Fed. R. Civ. P. 60(d)(3) (amended 2007) ("This rule does not limit a court's power to: . . . (3) set aside a judgment for fraud on the court."); see also Fed. R. Civ. P. 60 (2007 amendments cmt.) ("The language of Rule 60 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.").

should be set aside for fraud on the court, and the court must assess defendants' allegations under this narrowly defined term.

B. Definition of "Fraud on the Court"

The Supreme Court has "justified the 'historic power of equity to set aside fraudulently begotten judgments' on the basis that 'tampering with the administration of justice . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public.'" In re Levander, 180 F.3d 1114, 1118 (9th Cir. 1999) (quoting Chambers, 501 U.S. at 44). Still, "[a] court must exercise its inherent powers with restraint and discretion in light of their potency." Id. at 1119.

Relief for fraud on the court must be "reserved for those cases of 'injustices which, in certain instances, are deemed sufficiently gross to demand a departure' from rigid adherence to the doctrine of res judicata." United States v. Beggerly, 524 U.S. 38, 46 (1998) (quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244 (1944), overruled on other grounds by Standard Oil Co. v. United States, 429 U.S. 17 (1976)). The Ninth Circuit has repeatedly emphasized that "[e]xceptions which would allow final decisions to be reconsidered must be construed narrowly in order to preserve the finality of judgments." Abatti v. Comm'r of the I.R.S., 859 F.2d 115, 119 (9th Cir. 1988); see also Appling, 340 F.3d at 780; Dixon v. C.I.R., 316 F.3d 1041, 1046 (9th Cir. 2003).

Fraud on the court "'embrace[s] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial

6

machinery can not perform in the usual manner its impartial task
of adjudging cases that are presented for adjudication.'"
Appling, 340 F.3d at 780 (quoting In re Levander, 180 F.3d at
119) (alteration in original).  A finding of fraud on the court
"must involve an unconscionable plan or scheme which is designed
to improperly influence the court in its decision." Pumphrey v.
K.W. Thompson Tool Co., 62 F.3d 1128, 1131 (9th Cir. 1995)
(internal quotations marks omitted); see also Appling, 340 F.3d
at 780 ("Fraud on the court requires a 'grave miscarriage of
justice,' and a fraud that is aimed at the court." (quoting
Beggerly, 524 U.S. at 47)).

　　　　　"In determining whether fraud constitutes fraud on the
court, the relevant inquiry is not whether fraudulent conduct
'prejudiced the opposing party,' but whether it '"harm[ed]" the
integrity of the judicial process.'"  Estate of Stonehill, 660
F.3d at 444 (quoting Alexander v. Robertson, 882 F.2d 421, 424
(9th Cir. 1989)); see also Estate of Stonehill, 660 F.3d at 444
("Fraud on the court involves 'far more than an injury to a
single litigant . . . .'" (quoting Hazel-Atlas Glass Co., 322
U.S. at 246)).  Although "one of the concerns underlying the
'fraud on the court' exception is that such fraud prevents the
opposing party from fully and fairly presenting his case," this
showing alone is not sufficient.  Abatti, 859 F.2d at 119; see
also Abatti, 859 F.2d at 118 ("[W]e have said that it may occur
when the acts of a party prevent his adversary from fully and
fairly presenting his case or defense. . . . Fraud on the court
must involve 'an unconscionable plan or scheme which is designed
to improperly influence the court in its decision.'" (quoting

_Toscano v. Comm'r of the I.R.S._, 441 F.2d 930, 934 (9th Cir.
1971) (internal citation omitted) (emphasis added)).  At the same
time, a showing of prejudice to the party seeking relief is not
required.  _Dixon_, 316 F.3d at 1046.

"Non-disclosure, or perjury by a party or witness, does
not, by itself, amount to fraud on the court." _Appling_, 340 F.3d
at 780; _accord_ _In re Levander_, 180 F.3d at 1119 ("Generally, non-
disclosure by itself does not constitute fraud on the court. . .
. Similarly, perjury by a party or witness, by itself, is not
normally fraud on the court."); _see also_ _Hazel-Atlas Glass Co._,
322 U.S. at 245 ("This is not simply a case of a judgment
obtained with the aid of a witness who, on the basis of after-
discovered evidence, is believed possibly to have been guilty of
perjury.").

The Supreme Court has held that a party's failure to
"thoroughly search its records and make full disclosure to the
Court" does not amount to fraud on the court. _Beggerly_, 524 U.S.
at 47 (internal quotation marks omitted); _see also_ _Valerio v.
Boise Cascade Corp._, 80 F.R.D. 626, 641 (C.D. Cal. 1978), _adopted_
_as the opinion of the Ninth Circuit in_ 645 F.2d 699, 700 (9th
Cir. 1981) ("[N]ondisclosure to the court of facts allegedly
pertinent to the matter before it, will not ordinarily rise to
the level of fraud on the court.").

Non-disclosure by an officer of the court or perjury by
or suborned by an officer of the court may amount to fraud on the
court only if it was "so fundamental that it undermined the
workings of the adversary process itself." _Estate of Stonehill_,
660 F.3d at 445; _see also_ 11 Charles Alan Wright, Arthur R.

8

Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman,

_Federal Practice and Procedure_ § 2870 (3d ed. 2014) ("[T]here is a powerful distinction between perjury to which an attorney is a party and that with which no attorney is involved. . . . [W]hether perjury constitutes a fraud on the court should depend on whether an attorney or other officer of the court was a party to it."). Non-disclosure by an officer of the court, however, does not rise to this level if it had a "limited effect on the district court's decision" and the withheld information would not have "significantly changed the information available to the district court." _Estate of Stonehill_, 660 F.3d at 446.

As the Ninth Circuit has recognized, "the term 'fraud on the court' remains a 'nebulous concept.'" _In re Levander_, 180 F.3d at 1119 (quoting _Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp._, 12 F.3d 1080, 1085 (Fed. Cir. 1993)). Nonetheless, it "places a high burden on [the party] seeking relief from a judgment," _Latshaw v. Trainer Wortham & Co., Inc._, 452 F.3d 1097, 1104 (9th Cir. 2006), and the party seeking relief must prove fraud on the court by clear and convincing evidence, _Estate of Stonehill_, 660 F.3d at 443-44.

C.    _Inapplicability of Brady v. Maryland_

Relying on _Brady v. Maryland_, 373 U.S. 83 (1963), defendants argue that the government is held to a higher standard than non-government parties not just in criminal cases but in civil cases as well.[3] In _Brady_, the Supreme Court held that "the

_____

[3] Some of defendants' arguments come within _Giglio v. United States_, 405 U.S. 150 (1972), as the non-disclosures may have contained impeachment, not exculpatory, evidence. The court's discussion of _Brady_ in this Order extends equally to

9

suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Its holding relied on the rights of a criminal defendant under the Due Process Clause of the Fourteenth Amendment and the "avoidance of an unfair trial to the accused." Id.; see also Lisenba v. California, 314 U.S. 219, 236 (1941) ("As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice.").

"'Due process is a flexible concept, and its procedural protections will vary depending on the particular deprivation involved.'" Goichman v. Rheuban Motors, Inc., 682 F.2d 1320, 1324 (9th Cir. 1982) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)); see also Mathews v. Eldridge, 424 U.S. 319, 335 (1976) (identifying the first consideration in the procedural due process inquiry as "the private interest that will be affected by the official action").[4] In a criminal case, the government is

consideration of the government's heightened disclosure obligations in a criminal case under Giglio.

    [4] The Supreme Court has not yet indicated whether Brady derives from a criminal defendant's procedural or substantive due process rights. See Castellano v. Fragozo, 352 F.3d 939, 968 (5th Cir. 2003) (discussing the differing views expressed in Albright v. Oliver, 510 U.S. 266 (1994)); see also Martin A. Schwartz, The Supreme Court's Unfortunate Narrowing of the Section 1983 Remedy for Brady Violations, 37-MAY Champion 58, 59 (May 2013) ("The Supreme Court has never definitively held whether Brady is based on substantive or procedural due process."). The court need not resolve this issue because the differences between criminal and civil cases would render Brady inapplicable to civil cases regardless of whether its protections

10

seeking to deprive a defendant, who is presumed to be innocent, of his liberty. The "'requirement of due process . . . in safeguarding the liberty of the citizen against deprivation through the action of the State, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions.'" <u>Mooney v. Holohan</u>, 294 U.S. 103, 112 (1935). In contrast to a criminal case where there is a potential loss of liberty, a civil action such as this is strictly about money. Except that the government happens to be the plaintiff, this case is no different from any other civil case in which one party pursues recovery of damages allegedly caused by the other party. The government did not seek to deprive any defendant in this case of liberty or impose any other consequences akin to a criminal conviction.[5] It therefore stands

_____

derive from the procedural or substantive components of the Due Process Clause. Here, defendants rely exclusively on the protections of procedural due process in arguing that <u>Brady</u> applies to this civil case. (<u>See</u> Defs.' Reply at 56:1-17 (applying the procedural due process balancing test from <u>Mathews</u>, 424 U.S. 319).)

[5] Defendants suggest that this case had criminal implications because the government's Second Amended Complaint relied on 36 C.F.R. § 261.5(c) and California Public Resources Code section 4435.

Section 4435 provides:

If any fire originates from the operation or use of any engine, machine, barbecue, incinerator, railroad rolling stock, chimney, or any other device which may kindle a fire, the occurrence of the fire is prima facie evidence of negligence in the maintenance, operation, or use of such engine, machine, barbecue, incinerator, railroad rolling stock, chimney, or other device. If such fire escapes from the place where it originated and it can be determined which person's negligence caused such fire, such person is guilty of

11

to reason that <u>Brady</u> has no application in civil cases such as this.

The differences between discovery in criminal and civil cases also underscore the need for <u>Brady</u> only in criminal cases. In a criminal case, a defendant is "entitled to rather limited discovery, with no general right to obtain the statements of the Government's witnesses before they have testified." <u>Degen v. United States</u>, 517 U.S. 820, 825 (1996). A defendant in a civil

---

a misdemeanor.

Cal. Pub. Res. Code § 4435. In their Second Amended Complaint, the government did not assert a claim under section 4435, but relied on that section to generally allege that the ignition of the fire was prima facie evidence of defendants' negligence. (<u>See</u> Second Am. Compl. ¶¶ 26-27.) Similarly, in denying defendants' motion for summary judgment as to prima facie negligence, Judge Mueller regarded section 4435 as relevant to the burdens at trial, not as an independent claim. (<u>See</u> May 31, 2012 Order at 17:4-18:12 (Docket No. 485) (discussing section 4435 and concluding that defendants will have the "burden at trial to present sufficient evidence that the bulldozer was not negligently maintained, operated, or used").) The government did not seek to hold any of the individual defendants liable for a violation of section 4435 and could not have pursued a state law misdemeanor charge in federal court.

Section 261.5(c) prohibits "[c]ausing timber, trees, slash, brush or grass to burn except as authorized by permit." 36 C.F.R. § 261.5(c). Under § 261.1b, "[a]ny violation of the prohibitions of this part (261) shall be punished by a fine of not more than $500 or imprisonment for not more than six months or both pursuant to title 16 U.S.C., section 551, unless otherwise provided." <u>Id.</u> § 261.1b. The government relied on § 261.5(c) in its Second Amended Complaint only to allege that "[c]ausing timber, trees, brush, or grass to burn except as authorized by permit is prohibited by law." (Second Am. Compl. ¶ 29.) The government did not, and could not, pursue the criminal fine or imprisonment contemplated by § 261.5(c) in this civil case. Judge Mueller also found that § 261.5(c) was inapplicable to this case because the fire did not start on federally-owned land and entered judgment in favor of defendants on the government's state law claims "insofar as plaintiff relies on 36 C.F.R. § 261.5(c) for the underlying violation of law." (May 31, 2012 Order at 19:1-20:2.)

case, on the other hand, is "entitled as a general matter to discovery of any information sought if it appears 'reasonably calculated to lead to the discovery of admissible evidence.'" Id. at 825-26. The Supreme Court has explained that "[t]he Federal Rules of Civil Procedure are designed to further the due process of law that the Constitution guarantees." Nelson v. Adams USA, Inc., 529 U.S. 460, 465 (2000). The expansive right to discovery in civil cases and the Federal Rules of Civil Procedure thus provided defendants with constitutionally adequate process to mount an effective and meaningful defense to this civil action.

Defendants have not cited and this court is not aware of a single case from the Supreme Court or Ninth Circuit applying Brady to a civil case.[6] In fact, all of the Supreme Court and Ninth Circuit cases defendants rely on for this proposition are cases assessing the conduct of prosecutors[7] in criminal cases. (See Defs.' Revised Supplemental Briefing at 3, 19-20 (Docket No. 625-1) ("Defs.' Br.") (relying on Youngblood v. West Virginia,

---

[6]    In Pavlik v. United States, the Ninth Circuit "assume[d], without deciding, that the principle enunciated in Brady v. Maryland applies in the context of [National Oceanic and Atmospheric Administration] civil penalty proceedings." 951 F.2d 220, 225 n.5 (9th Cir. 1991).

[7]    In what cannot have been an inadvertent choice, defendants exclusively refer to the government attorneys in this case as "prosecutors." Referring to the plaintiff's attorneys in a civil case as prosecutors may be technically correct, particularly where, as here, the government entered into a "joint prosecution agreement." In practice, however, the term "prosecutors" is generally used to describe government attorneys in criminal cases. More importantly, referring to the government attorneys in this case as prosecutors does not convert them into criminal prosecutors within the meaning of Brady.

547 U.S. 867, 869-70 (2006) (criminal case addressing Brady);
Kyles v. Whitley, 514 U.S. 419, 438 (1995) (habeas petition based
on Brady violation); United States v. Young, 470 U.S. 1, 25-26
(1985) (Brennan, J., concurring) (criminal case addressing
prosecutorial misconduct); Imbler v. Pachtman, 424 U.S. 409, 424
(1976) (discussing prosecutorial immunity in suits under 42
U.S.C. § 1983); Berger v. United States, 295 U.S. 78, 88 (1935)
("The United States Attorney is the representative not of an
ordinary party to a controversy, but of a sovereignty whose
obligation to govern impartially is as compelling as its
obligation to govern at all; and whose interest, therefore, in a
criminal prosecution is not that it shall win a case, but that
justice shall be done." (emphasis added)); Tennison v. City &
County of San Francisco, 570 F.3d 1078, 1087 (9th Cir. 2009) (42
U.S.C. § 1983 claim based on Brady violations in underlying
criminal case); Morris v. Ylst, 447 F.3d 735, 744 (9th Cir. 2006)
(criminal case addressing Brady and prosecutor's duty to
investigate suspected perjury); United States v. Chu, 5 F.3d
1244, 1249 (9th Cir. 1993) (criminal case addressing
prosecutorial misconduct in questioning of witness); Benn v.
Lambert, 283 F.3d 1040, 1062 (9th Cir. 2002) (habeas petition
based on Brady violation)).)

Outside of the Ninth Circuit, "courts have only in rare
instances found Brady applicable in civil proceedings, mainly in
those unusual cases where the potential consequences 'equal or
exceed those of most criminal convictions.'" Fox ex rel. Fox v.
Elk Run Coal Co., Inc., 739 F.3d 131, 138-39 (4th Cir. 2014)
(quoting Demjanjuk v. Petrovsky, 10 F.3d 338, 354 (6th Cir.

1   1993)); see also Brodie v. Dep't of Health & Human Servs., 951 F.

2   Supp. 2d 108, 118 (D.D.C. 2013) ("Brady does not apply in civil

3   cases except in rare situations, such as when a person's liberty

4   is at stake. . . . With only three exceptions, . . . courts

5   uniformly have declined to apply Brady in civil cases.").

6        In arguing that Brady should be extended to this civil

7   case, defendants rely heavily on the Sixth Circuit's decision in

8   Demjanjuk.  In that case, the government sought denaturalization

9   and extradition to Israel on capital murder charges based on its

10  belief that Demjanjuk was "the notorious Ukrainian guard at the

11  Nazi extermination camp near Treblinka, Poland called by Jewish

12  inmates 'Ivan the Terrible.'"  Demjanjuk, 10 F.3d at 339.  During

13  the proceedings, the government did not disclose documents and

14  statements in its possession that "should have raised doubts

15  about Demjanjuk's identity as Ivan the Terrible."  Id. at 342.

16       The Sixth Circuit recognized that even though Brady did

17  not apply in civil cases, "it should be extended to cover

18  denaturalization and extradition cases where the government seeks

19  denaturalization or extradition based on proof of alleged

20  criminal activities of the party proceeded against."  Id. at 353

21  (emphasis added); see also id. (indicating that Brady would not

22  apply if "the government had sought to denaturalize Demjanjuk

23  only on the basis of his misrepresentations at the time he sought

24  admission to the United States and subsequently when he applied

25  for citizenship").

26       In extending Brady to the proceedings in Demjanjuk, the

27  Sixth Circuit explained that the "consequences of

28  denaturalization and extradition equal or exceed those of most

criminal convictions," "that Demjanjuk was extradited for trial
on a charge that carried the death penalty," that the government
attorneys were from the Office of Special Investigations ("OSI"),
which is a unit within the Criminal Division of the Department of
Justice, that the government attorneys were frequently referred
to as prosecutors during the proceedings, and that the Director
of OSI believed _Brady_ applied to the proceedings.  _Id._ at 353-54.
Unlike in _Demjanjuk_, this case was brought by the Civil Division
of the United States Attorney's Office, the government did not
seek to prove that defendants engaged in serious criminal conduct
potentially subject to capital punishment, and a judgment in
favor of the government would not have subjected defendants to
consequences akin to those following a criminal conviction.

Because _Brady_ is understandably inapplicable to this
civil case, defendants' reliance on criminal cases discussing a
prosecutor's heightened duties in light of _Brady_ and other
distinctly criminal rights is misguided.  Lawyers representing
the United States, like lawyers representing any party, must of
course comport with the applicable rules governing attorney
conduct.  As defendants appear to concede, those ethical
standards, or any self-imposed standard by the executive branch,
do not affect the showing necessary to prove fraud on the court,
and the court should not, as defendants argue, assess the conduct
of the government through the lens of any heightened obligation.

The Supreme Court and Ninth Circuit have repeatedly
analyzed claims of fraud on the court by government attorneys
without suggesting that their conduct is to be evaluated in light
of any heightened obligations.  In _Beggerly_, the government had

16

brought a quiet title action.  524 U.S. at 40.  Defendants sought

proof of their title to the land during discovery and, after

searching public land records, the government informed defendants

that it had not found any evidence showing that the land in

dispute had been granted to a private landowner.  Id. at  40-41.

After judgment was entered pursuant to a settlement the parties

reached on the eve of trial, defendants discovered a land grant

in the National Archives that supported their claim.  Id. at 41.

Defendants sought to vacate the judgment for fraud on the court

because "the United States failed to 'thoroughly search its

records and make full disclosure to the Court'" regarding the

land grant.  Id. at 47.  Without suggesting that a heightened

standard governed the government's conduct during discovery or

litigation, the Supreme Court held that defendants were not

entitled to relief from the judgment.  The Court concluded that

"it surely would work no 'grave miscarriage of justice,' and

perhaps no miscarriage of justice at all, to allow the judgment

to stand."  Id.

          In Appling, the Ninth Circuit discussed Beggerly

without mentioning that the alleged misconduct was committed by

the government and referred to the government only as the

prevailing party.  See Appling, 340 F.3d at 780 (describing

Beggerly as "holding that allegations that the prevailing parting

[sic] failed during discovery in the underlying case to

'thoroughly search its records and make full disclosure to the

Court' were not fraud on the court").

          Similarly, in Estate of Stonehill, the Ninth Circuit

engaged in a detailed examination of alleged instances of

misconduct by the government without suggesting that a heightened standard applied because it was the government that engaged in the conduct at issue. 660 F.3d at 445-52. Instead, the standards the Ninth Circuit articulated and applied were the same as those which govern the ability to seek relief for fraud on the court by non-government parties.[8] See, e.g., id. at 444-45 (discussing Levander and Pumphrey, which assessed allegations of fraud on the court by non-government attorneys); see also id. at 445 ("In order to show fraud on the court, Taxpayers must demonstrate, by clear and convincing evidence, an effort by the government to prevent the judicial process from functioning 'in the usual manner.'"); accord Dixon, 316 F.3d at 1046-47 (finding fraud on the court perpetrated by government tax attorneys under the same standards governing fraud on the court by non-government attorneys).

The court therefore finds that Brady is inapplicable to this civil case and that the conduct of the government is to be assessed under the same standards as a non-government party when analyzing whether that conduct amounts to fraud on the court.

III. Analysis

Initially, it does not appear that any of the alleged acts of fraud tainted the court's decision to enter the stipulated judgment. The government argues quite persuasively that none of those acts therefore may form the basis for setting

_____

[8] In their brief, defendants mis-cite Estate of Stonehill as mentioning a "higher standard of behavior" for government attorneys. (See Defs.' Br. at 23:18-19.) That quoted language, however, is not in Estate of Stonehill. The language comes from the criminal case of Young, 470 U.S. 1.

18

aside the settlement agreement and stipulated judgment.  The

argument certainly has logical appeal and finds support in a

plethora of lower court decisions.[9]  The Supreme Court,

---

[9]    See Superior Seafoods, Inc. v. Tyson Foods, Inc., 620
F.3d 873, 880 (8th Cir. 2010) (affirming the denial of relief for
fraud on the court when "[t]he court entered its consent judgment
based on the written document provided by the parties after
extensive negotiation" and explaining that "the court was not
required to look behind or interpret that written document to
ensure that the meeting of minds reflected therein was not, in
fact, against the wishes of Mr. Kemp and his attorney"); Pfotzer
v. Amercoat Corp., 548 F.2d 51, 52 (2d Cir. 1977) (affirming
denial of relief for fraud on the court and noting that "'it
sufficed for the court to know the parties had decided to settle,
without inquiring why'" (quoting Martina Theatre Corp. v. Schine
Chain Theatres, Inc., 278 F.2d 798, 801 (2d Cir. 1960))); Roe v.
White, No. Civ. 03-04035 CRB, 2009 WL 4899211, at *3 (N.D. Cal.
Dec. 11, 2009) ("The alleged fraud 'did not improperly influence
the court' because the judgment was based on the parties'
voluntary settlement and not an adjudication on the merits. . . .
The purported falsity of Plaintiffs' allegations is irrelevant to
the settlement agreement, and to the resulting judgment.
Accordingly, any fraud in no way affected the proper functioning
of the judicial system."); In re Leisure Corp., No. Civ. 03-03012
RMW, 2007 WL 607696, at *7 (N.D. Cal. Feb. 23, 2007) (explaining
that an alleged lack of disclosure did not amount to fraud on the
court because it "was not material to the bankruptcy court's
assessment of the Settlement Agreement"); Petersville Sleigh Ltd.
v. Schmidt, 124 F.R.D. 67, 72 (S.D.N.Y. 1989) (finding that
alleged fraud surrounding the source of settlement funds did not
amount to fraud on the court because the court "never inquired,
nor was it told, the source of those funds"); United States v.
Int'l Tel. & Tel. Corp., 349 F. Supp. 22, 36 (D. Conn. 1972)
(concluding that a failure to disclose a motivating factor of the
government's decision to enter settlement negotiations could not
amount to fraud on the court when the court "had a limited role
in approving" the consent decree and the government's "decision
to negotiate a settlement of the [] case w[as] simply not
relevant to such an inquiry"); In re Mucci, 488 B.R. 186, 194
(Bankr. D. N.M. 2013) ("[I]f the Court did not rely on fraudulent
conduct in entering the judgment from which the party seeks
relief, the judgment should not be set aside. . . . The Court
entered the Stipulated Judgment setting forth terms of the
settlement between the Plaintiffs and Defendant and approving the
settlement based on the stipulation of the parties, not based on

19

nevertheless, appears to have rejected that argument. <u>See</u>

<u>Beggerly</u>, 524 U.S. at 39, 40-41, 47 (addressing the sufficiency

of allegations of fraud on the court despite the fact that the

judgment in that case was entered pursuant to a settlement

agreement and the alleged fraud was not relevant to the court's

decision to enter the judgment pursuant to the settlement

agreement).  The court accordingly proceeds to consider

defendants' claims, individually and collectively, in light of

the government's alternative arguments.

    A.    <u>Allegations of fraud on the court that defendants knew</u>

              <u>about prior to settlement and entry of judgment</u>

With the exception of any allegations subsequently

addressed in this Order, defendants concede they knew of the

following alleged instances of fraud on the court prior to

settling the federal action: (1) that the government advanced an

allegedly fraudulent origin and cause investigation and allegedly

allowed investigators to testify falsely about their work,

(Defs.' Br. at 58:2-9); (2) that the government allegedly

misrepresented J.W. Bush's admission that a bulldozer rock strike

caused the Moonlight Fire, (<u>id.</u> at 63:26-28); (3) that the

government proffered allegedly false testimony in opposition to

---

any affidavits or testimony from the Plaintiffs or Mr. Ely.  The
Court did not look behind the parties' stipulation."); <u>In re</u>
<u>NWFX, Inc.</u>, 384 B.R. 214, 220 (Bankr. W.D. Ark. 2008) ("To prove
fraud on the court, the movant must establish that the officer of
the court's misrepresentation or nondisclosure was <u>material</u> to
the court's judgment. . . . [T]he aforementioned cases indicate
that a relevant inquiry in the present case is whether the court
would have approved the settlement had it known the undisclosed
facts, i.e., whether the trustee's misrepresentations were
'material' to the court's approval of the settlement.").

20

defendants' motion for summary judgment, (id. at 69:3-4); (4)
that the government failed to take remedial action after learning
that the air attack video allegedly undermined its origin and
cause theory, (id. at 74:3-4); (5) that the government created an
allegedly false diagram, (id. at 77:8-9); (6) that the government
failed to correct an allegedly false expert report, (id. at
79:20-80:11); (7) that the government allegedly misrepresented
evidence regarding other wildland fires, (id. at 88:5-6); and (8)
that the government allegedly covered up misconduct at the Red
Rock Lookout Tower, (id. at 104:9-11).

Despite knowing of and having the opportunity to
persuade the jury that the government engaged in the
aforementioned alleged misconduct, defendants chose to settle the
case and forgo the jury trial.  Relying exclusively on Hazel-
Atlas Glass Co., defendants now argue that the calculated
decision to settle the case with full knowledge of the alleged
fraud does not bar their ability to seek relief for fraud on the
court.

In Hazel-Atlas Glass Co., however, the Supreme Court
indicated that it was addressing relief from a judgment gained by
fraud on the court because of "after-discovered fraud."  See
Hazel-Atlas Glass Co., 322 U.S. at 244 ("From the beginning there
has existed along side the term rule a rule of equity to the
effect that under certain circumstances, one of which is after-
discovered fraud, relief will be granted against judgments
regardless of the term of their entry."); Hazel-Atlas Glass Co.,
322 U.S. at 245 ("This is not simply a case of a judgment
obtained with the aid of a witness who, on the basis of after-

discovered evidence, is believed possibly to have been guilty of perjury."); accord O.F. Nelson & Co. v. United States, 169 F.2d 833, 835 (9th Cir. 1948) ("Nor is it a case of after discovered fraud, where an appellate court, after the expiration of the term, has an equitable right, in a proceeding in the nature of a bill of review, to set aside its judgment on proof of fraud in its procurement as in . . . Hazel-Atlas Glass Co.") (internal citation omitted); Demjanjuk, 10 F.3d at 356 ("The Supreme Court has recognized a court's inherent power to grant relief, for 'after-discovered fraud,' from an earlier judgment 'regardless of the term of [its] entry.'" (quoting Hazel-Atlas Glass Co., 322 U.S. at 244)).

While the Court in Hazel-Atlas Glass Co. contemplated relief only for "after-discovered fraud," it recognized that Hazel-Atlas Glass Co. ("Hazel") had "received information" about the fraud prior to entry of judgment and, when the significance of the suspected fraud became clear, had "hired investigators for the purpose of verifying the hearsay by admissible evidence." 322 U.S. at 241-42. Hazel was unable to confirm the fraud because the witness who could have revealed it lied to Hazel's investigators at the behest of defendants. Id. at 242. In rejecting the appellate court's finding that Hazel was not entitled to relief because it "had not exercised proper diligence in uncovering the fraud," the Court concluded, "We cannot easily understand how, under the admitted facts, Hazel should have been expected to do more than it did to uncover the fraud." Id. at 246 (emphasis added). The Court went on to explain that, "even if Hazel did not exercise the highest degree of diligence [in

uncovering the fraud,] Hartford's fraud cannot be condoned for that reason alone." Id.

The Court was therefore working under the factual premise that Hazel suspected and was investigating the fraud prior to settlement, but had not yet uncovered it, possibly due to its own lack of diligence. The Court's understanding of the facts was consistent with Hazel's allegations in seeking relief. See id. at 263-68 (Roberts, J., dissenting) (indicating that Hazel alleged that it "'did not know'" of the fraud and "'could not have ascertained [it] by the use of proper and reasonable diligence'" prior to entry of judgment).

Justice Roberts' dissenting opinion underscores the factual assumptions the majority relied on because his primary disagreement with the majority was that an evidentiary hearing was necessary to determine whether Hazel in fact knew of the fraud before entry of judgment. In his dissent, Justice Roberts belabors facts that are entirely absent from the majority opinion and from which he believes a trier of fact could find that Hazel knew of the fraud prior to entry of judgment. See id. (Roberts, J., dissenting). He concludes,

> [I]t is highly possible that, upon a full trial, it will be found that Hazel held back what it knew and, if so, is not entitled now to attack the original decree. . . . And certainly an issue of such importance affecting the validity of a judgment, should never be tried on affidavits.

Id. at 270 (Roberts, J., dissenting).

In sum, all of the justices in Hazel-Atlas Glass Co. agreed that Hazel would have been barred from seeking relief if it knew of the fraud prior to settlement and entry of judgment.

They disagreed only as to whether the limited evidence before the Court was sufficient to find--as the majority did--that Hazel had suspicions, but had not yet uncovered the fraud and could therefore seek relief based on "after-discovered fraud."

At the opposite end of the spectrum, defendants here concede they knew of the eight instances of alleged fraud prior to reaching a settlement and the stipulated entry of judgment pursuant to that settlement.  In fact, at the time they settled the case, defendants possessed and understood the purported significance of the very documents and testimony they now rely on in support of their motion before the court.  According to defendants, these documents prove the alleged fraud and, unlike in Hazel-Atlas Glass Co., would have presumably been admissible at trial.  See id. at 241-43.  Other than Hazel-Atlas Glass Co., which does not support defendants' position, defendants have not cited and this court is not aware of a single decision in which a court set aside a final judgment because of fraud on the court when the party seeking relief knew of and had the evidence to prove the fraud prior to entry of judgment.

That defendants cannot cite such a case comes as no surprise to this court.  "The concept of fraud upon the court challenges the very principle upon which our judicial system is based: the finality of a judgment." Herring v. United States, 424 F.3d 384, 386 (3d Cir. 2005).  Moreover, this is not just a case in which a party seeks the extreme relief of setting aside a final judgment.  Defendants here seek to set aside a final judgment entered only because of their own strategic choice to settle the case with full knowledge of the alleged fraud.

24

The significance of defendants' decision to settle with the government cannot be overstated. A settlement, by its very nature, is a calculated assessment that the benefit of settling outweighs the potential exposure, risks, and expense of litigation. Here, the parties acknowledged these competing considerations in their settlement agreement: "This settlement is entered into to compromise disputed claims and avoid the delay, uncertainty, inconvenience, and expense of further litigation." (Settlement Agreement & Stipulation ¶ 12.) In any lawsuit, it is not uncommon for the parties to disagree not only on the ultimate issues in the case, but also about whether witnesses are telling the truth or the opposing party complied with its discovery obligations. Any settlement agreement would become just a meaningless formality if a settling party could set aside that agreement at any later time based upon alleged fraud the party knew of when entering into the agreement.

In explaining why perjury by a witness and non-disclosure alone generally cannot amount to fraud on the court, the Ninth Circuit has also emphasized that such fraud "could and should be exposed at trial." In re Levander, 180 F.3d at 1120; accord George P. Reintjes Co., Inc. v. Riley Stoker Corp., 71 F.3d 44, 49 (1st Cir. 1995) ("The possibility of perjury, even concerted, is a common hazard of the adversary process with which litigants are equipped to deal through discovery and cross-examination . . . . Were mere perjury sufficient to override the considerable value of finality after the statutory time period for motions on account of fraud has expired, it would upend the Rule's careful balance." (internal

citation omitted)); <u>Great Coastal Exp., Inc. v. Int'l Bhd. of</u>
<u>Teamsters, Chauffeurs</u>, 675 F.2d 1349, 1357 (4th Cir. 1982)
("Perjury and fabricated evidence are evils that can and should
be exposed at trial, and the legal system encourages and expects
litigants to root them out as early as possible.  In addition,
the legal system contains other sanctions against perjury.").

        For the eight allegations of fraud that
defendants knew of at the time of settlement, there can be no
question that they had the opportunity to expose the alleged
fraud at trial.  During depositions, defendants' counsel
repeatedly cross-examined witnesses on the very issues defendants
now claim constitute fraud on the court.  (<u>See, e.g.</u>, Defs.' Br.
at 45:3-15, 52:9-12, 52:20-53:17, 61:23-28, 62:24-28, 67:20-23,
78:20-80:7, 83:18-20, 84:3-11, 103:3-7.)  In their trial brief,
defendants expressed their intent to expose the fraud at trial
and had every opportunity to do so.  (<u>See, e.g.</u>, Defs.' Trial Br.
at 1:11-13 (Docket No. 563) ("But, as the facts of this case
show, their investigation was more than just unscientific and
biased.  When the investigators realized that their initial
assumptions were flawed, they resorted to outright deception.");
July 2, 2012 Final Pretrial Order at 17:21-22 (Docket No. 573)
(denying the government's motion in limine in part and allowing
defendants "to introduce evidence that there was an attempt to
conceal information from the public or the defense").)

        To the extent defendants argue that any tentative in
limine ruling would have limited their ability to prove the
alleged fraud, their argument must fail.  Defendants had the
opportunity to challenge any in limine ruling during trial and on

appeal. Instead, defendants elected to forgo the normal procedures of litigating a dispute. Allowing defendants to knowingly bypass an appeal and seek relief now would erroneously allow "fraud on the court" to "become an open sesame to collateral attacks." Oxxford Clothes XX, Inc. v. Expeditors Intern. of Wash., Inc., 127 F.3d 574, 578 (7th Cir. 1997); see also Oxxford Clothes XX, Inc., 127 F.3d at 578 ("A lie uttered in court is not a fraud on the liar's opponent if the opponent knows it's a lie yet fails to point this out to the court. If the court through irremediable obtuseness refuses to disregard the lie, the party has--to repeat what is becoming the refrain of this opinion--a remedy by way of appeal. Otherwise 'fraud on the court' would become an open sesame to collateral attacks, unlimited as to the time within which they can be made by virtue of the express provision in Rule 60(b) on this matter, on civil judgments."); Abatti, 859 F.2d at 119 ("Appellants might have been successful had they argued their version of the agreement on a direct and timely appeal from the decisions against them, but their argument does not change the finality of the decisions now.").

The litigation process not only uncovered the alleged fraud, it equipped defendants with the opportunity to prove it. Instead, defendants made the calculated decision on the eve of trial to settle the case knowing everything that they now claim amounts to fraud on the court. Cf. Latshaw, 452 F.3d at 1099 ("Generally speaking, Rule 60(b) is not intended to remedy the effects of a deliberate and independent litigation decision that a party later comes to regret through second thoughts . . . .").

A party's voluntary settlement with full knowledge of and the opportunity to prove alleged fraudulent conduct cannot amount to a "grave miscarriage of justice," Beggerly, 524 U.S. at 47. To argue otherwise is absurd.

B. Allegations of fraud on the court that defendants discovered after settlement and entry of judgment

As to the six overarching allegations of fraud that defendants allegedly discovered after settlement and entry of judgment, the government contends that the allegations must fail because of defendants' lack of diligence and the settlement agreement in this case.

When fraud is aimed at the court, the injured party's lack of diligence in uncovering the fraud does not necessarily bar relief. In Hazel-Atlas Glass Co., the Supreme Court held that relief in that case was not precluded even if Hazel "did not exercise the highest degree of diligence" in uncovering the fraud. 322 U.S. at 246. The Court explained that it could not "condone[]" the fraud based on a party's lack of diligence because the fraud was perpetrated against the court:

> This matter does not concern only private parties. There are issues of great moment to the public in a patent suit. Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

28

Id. (internal citations omitted). More recently, in Pumphrey, the Ninth Circuit cited Hazel-Atlas Glass Co. and explained that, "even assuming that [the plaintiff] was not diligent in uncovering the fraud, the district court was still empowered to set aside the verdict, as the court itself was a victim of the fraud." Pumphrey, 62 F.3d at 1133 (emphasis added).

On the other hand, the Ninth Circuit has held that fraud "perpetrated by officers of the court" did not amount to fraud on the court when it was "aimed only at the [party seeking relief] and did not disrupt the judicial process because [that party] through due diligence could have discovered the non-disclosure." Appling, 340 F.3d at 780 (emphasis added). In Appling, plaintiffs had served a subpoena on Henry Keller, who was a former executive of the defendant. Id. at 774. Defendant's counsel responded to the subpoena on behalf of Keller and orally assured plaintiffs' counsel that Keller did not have any documents or knowledge relevant to the litigation. Id.

After the district court granted summary judgment in favor of defendant, plaintiffs discovered that "Keller had not authorized State Farm to respond on his behalf, [] was never shown a copy of the objections or consulted with respect to their contents," and in fact had a document and video and had made a statement that were relevant and favorable to plaintiffs. Id. The Ninth Circuit concluded that, although a non-disclosure by counsel that was aimed only at the opposing party and could have been discovered through due diligence might have "worked an injustice, it did not work a 'grave miscarriage of justice.'" Id. at 780; see Appling, 340 F.3d at 780 ("Fraud on the court

29

requires a 'grave miscarriage of justice,' and a fraud that is aimed at the court." (quoting Beggerly, 524 U.S. at 47)).

Similarly, in Gleason v. Jandrucko, the plaintiff sought to set aside a judgment entered pursuant to the parties' settlement for fraud on the court.  860 F.2d 556 (2d Cir. 1988).  After the case had settled and judgment was entered, the plaintiff uncovered alleged fraud by the defendant police officers.  Id. at 558.  The Second Circuit nonetheless concluded that the plaintiff was not entitled to relief because he "had the opportunity in the prior proceeding to challenge the police officers' account of his arrest."  Id. at 559.  Instead of pursuing the relevant discovery to uncover the fraud and challenging the police officers' account of his arrest through litigation, the plaintiff "voluntarily chose to settle the action."  Id.  The Ninth Circuit relied on Gleason when explaining that perjury or non-disclosure cannot amount to fraud on the court when the party seeking relief had "the opportunity to challenge" the alleged fraud through discovery that could have been performed and evidence that could have been introduced at trial.  In re Levander, 180 F.3d at 1120.

With the exception of evidence that simply did not exist at the time of settlement and entry of judgment, defendants uncovered most of the evidence underlying their allegations of fraud through discovery in the state action that occurred after the federal action concluded.  Since defendants were able to successfully obtain the evidence to show the alleged fraud through discovery in the state action, the court can discern no reason why they could not have obtained that same evidence

30

through diligent discovery in the federal action.  As the Ninth

Circuit has explained, a grave miscarriage of justice simply

cannot result from any fraud that was directed only at defendants

and could have been discovered with the exercise of due

diligence.

Even as to allegations of fraud on the court that

defendants could not have discovered through diligence before

settlement and entry of judgment, the terms of the settlement

agreement in this case bar relief, at least as to alleged fraud

aimed only at defendants.  In their settlement agreement,

defendants not only willingly settled the case in light of the

facts they knew, but expressly acknowledged and accepted that the

facts may be different from what they believed:

> The Parties understand and acknowledge that the facts
> and/or potential claims with respect to liability or
> damages regarding the above-captioned actions may be
> different from facts now believed to be true or claims
> now believed to be available. . . . Each Party accepts
> and assumes the risks of such possible differences in
> facts and potential claims and agrees that this
> Settlement Agreement shall remain effective
> notwithstanding any such differences.

(See Settlement Agreement & Stipulation ¶ 25.)  Defendants were

not obligated to include this language in the settlement

agreement and, when defendants believed at the time of settlement

that the case was based on "outright deception," (Defs.' Trial

Br. at 1:13), it might have seemed more appropriate to exclude

any fraudulent government conduct or fraud on the court from this

waiver.  But they did not.  Defendants have been represented by

numerous high-priced attorneys throughout this litigation and the

court has no doubt that defense counsel expended many hours

31

reviewing and revising each term in the settlement agreement.  A grave miscarriage of justice cannot result from enforcing the clear and deliberate terms of a settlement agreement.  If the court were to simply ignore the express language of a settlement agreement, parties to such an agreement could never obtain a reasonable assurance that a settlement was indeed final.

For alleged fraud on the court aimed only at defendants, any lack of diligence and the express terms of their settlement agreement preclude a finding that the alleged misconduct resulted in a grave miscarriage of justice. Nonetheless, the court will go on to examine whether any of the allegations defendants discovered after settlement and entry of judgment are sufficient to sustain defendants' motion notwithstanding the preclusive effect of the settlement agreement.

### 1.   Allegations Surrounding the White Flag

Defendants contend that the government advanced a fraudulent origin and cause investigation and allowed the investigators to lie during their depositions about the foundation of their investigation.  The central aspect of these allegations is the existence of a white flag, which allegedly denotes an investigator's determined point of origin.  (Defs.' Br. at 44:26-27.)  As revealed by photographs taken during their investigation, a white flag had been placed at the location that matches with the investigators' only recorded GPS measurement but is about ten feet away from the two points of origin identified in the Joint Report.  (Id. at 45:21-25.)  Of the conduct giving rise to the overarching allegation of fraudulent conduct

surrounding the white flag, defendants discovered only three

discrete alleged acts of misconduct after settlement and entry of

judgment.

a.   <u>Reynolds' Deposition Testimony</u>

First, defendants allege that in January 2011, the

government had a pre-deposition meeting with Reynolds at which

they discussed the white flag.  Defense counsel obviously knew

about that meeting before settlement because they questioned

Reynolds at length about it at his earlier deposition on November

15, 2011.  (<u>See, e.g.</u>, Reynolds Nov. 15, 2011 Dep. at 1053:16-21

("Q: And do you recall your testimony, sir, is that someone in

the January--roughly January 2011 meeting at the D.O.J.'s office

or the U.S. Attorney's Office asking questions about the white

flag, correct?  A: Yes."); <u>see also</u> Reynolds Nov. 15, 2011 Dep.

at 1062:21-2063:8, 1064:7-14, 1065:13-24, 1101:7-14.)  At that

deposition, Reynolds testified that he did not "recall for sure"

what the government counsel "contribute[d] to the discussion"

about the white flag.  (Reynolds Nov. 15, 2011 Dep. at 1068:7-

22.)

During his later deposition in the state action and

after the federal action settled, Reynolds allegedly testified

for the first time that the government attorneys told him that

the white flag was a "non-issue" at the January 2011 meeting:

> Q: And in this conversation did they ask you questions
> as to whether or not you placed that white flag?
>
> A: Yes.
>
> Q: And what was your answer in response to those
> questions?

33

A: I have no recollection of placing the flag. And
         that's--we saw it as a nonissue. And they said it was
         going to come up and saw it as a nonissue.

(Reynolds Nov. 1, 2012 Dep. at 1499:3-11 (Docket No. 597-18); see
also Defs.' Br. at 56:15-21; Defs.' Reply in Support of
Supplemental Briefing at 83:24-26 (Docket No. 637) ("Defs.'
Reply").)

         According to defendants, the government attorneys'
indication that they saw the white flag as a "non-issue" gave
Reynolds "permission to provide false testimony," and the
government did not correct Reynolds' testimony when he denied the
existence of a white flag in his subsequent deposition. (Defs.'
Reply at 84:11-13; see also Defs.' Br. at 56:22-57:6 (quoting
from the March 2011 deposition).) At oral argument, defendants
recognized that Eric Overby represented the government at
Reynolds' three-day deposition in March 2011. Probably because
defendants rely on statements Overby made about this case to
advance their motion, they do not argue that Overby suborned
perjury. Instead, they suggest that the lead government attorney
had a duty to correct Reynolds' allegedly perjured testimony
after his deposition.

         When the record is examined there is no substance
whatsoever to defendants' contention. Specifically, the court is
at a loss to decipher how Reynolds' testimony at his deposition
following the January 2011 meeting could possibly be construed as
falsely testifying that a white flag did not exist. When defense
counsel originally showed Reynolds a picture with the white flag,
he testified that he could not see the flag:

1   Q: I have blown it up for you on a laptop here, Mr.
    Reynolds.
2
3   And if I could have you look at the very center of
    that photograph and tell me if you recognize a white
4   flag with a post on it? . . .

5   THE WITNESS: I see what looks like a chipped rock
    there.
6
7   Q. BY MR. WARNE: And do you see the flag?

8   A. No.

9   Q. You don't see any white flag?

10  A. It looks like a chipped rock right there
    (indicating).
11

12  (Reynolds Mar. 23, 2011 Dep. at 534:11-24.)

13      Had Reynolds' testimony about the white flag ended

14  there, defendants' allegations might make sense.  However,

15  defense counsel continued his questioning and Reynolds ultimately

16  agreed that the image counsel identified was indeed a white flag,

17  albeit hard to make out:

18
    Q. There is a white flag right there (indicating).
19
20  A. Okay.

21  Q. Do you see it?

22  A. Well, I don't really see a flag.  It almost looks
    like a wire here.
23
24  Q. That's right.  And do you see the flag on top of
    it, sir?
25
26  A. I guess if that's what that is.

27  Q. And you don't recall where that came from?

28  A. No.

. . .

Q. You don't recognize a white flag there?

A. Hard to say that that's a white flag but I do see a stem--

Q. But you don't recall--

A. --that looks like it's one.

Q. It looks like it's a white flag, correct?

A. It looks like a white flag.

(Id. at 531:25-10, 536:1-7.)

That Reynolds struggled to see the white flag should not come as a surprise. Defense counsel admit that they initially "missed the white flag as they carefully reviewed the Joint Report as well as all of the native photographs" and only discovered it "while reviewing the native photographic files on a computer screen with back-lit magnification." (Defs.' Br. at 49 n.29.) Defendants included a "magnified and cropped" photograph of the white flag in their brief. (Id. at 46.) Similar to Reynolds, only after examining the image for a considerable amount of time, could the court locate what appears to possibly be a thin metal pole. Near the top of the pole is a whitish colored object that the court presumes must be the white flag. Without having located the metal pole, the court itself would have firmly believed that the whitish object was a rock or other ground debris.

Even if Reynolds' reluctance in acknowledging the flag was not so easily understood, he ultimately testified that the white flag was in the picture. Assuming that an attorney's

encouraging and then suborning perjury during a deposition could amount to fraud on the court even though it is not "aimed at the court," <u>Appling</u>, 340 F.3d at 780 (quoting <u>Beggerly</u>, 524 U.S. at 47), the government never encouraged nor suborned perjury with respect to Reynolds' deposition testimony.  Accordingly, the January 2011 pre-deposition meeting and Reynolds' subsequent deposition testimony about the white flag fail to amount to any type of fraud, let alone fraud on the court.

b.   <u>Dodds' and Paul's Deposition Testimony</u>

The second instance of alleged fraudulent misconduct by the government about the white flag involves deposition testimony during the state action by one of the government's origin and cause experts, Larry Dodds, and Cal Fire Unit Chief Bernie Paul. At his deposition for the state action about ten months after the federal settlement, Dodds allegedly recognized that "the white flag raises 'a red flag,' creates a 'shadow of deception' over the investigation, and caused him to conclude 'it's more probable than not that there was some act of deception associated with testimony around the white flag.'"  (Defs.' Br. at 55:11-14.) Similarly, defendants allege that during his deposition for the state action about six months after the federal settlement, Paul testified that "the evidence and testimony surrounding the white flag caused him to disbelieve the Moonlight Investigators," (<u>id.</u> at 55:14-16), and was "'alone enough to cause [him] to want to toss the whole report out.'"  (Defs.' Reply at 88:2-3.)[10]

---

[10]   Defendants may be playing loose with their characterization of the deposition testimony as the questions often relied on the witness making faulty assumptions, such as Reynolds having denied the existence of the white flag during his

37

Defendants do not allege that either witness testified differently and thus falsely during any deposition in the federal action. As to Dodds, defendants allege only that he "did not make these concessions during his federal deposition." (Id. at 87:19.) So what? There is no allegation that Dodds committed perjury, let alone that the government was a party to any perjury.

The most that can be inferred from Dodds' testimony is that he either failed to volunteer his personal opinions during the federal deposition or did not form those opinions until after the settlement. As the Ninth Circuit has repeatedly recognized, "[n]on-disclosure. . . does not, by itself, amount to fraud on the court." Appling, 340 F.3d at 780. Moreover, there is no allegation that the government attorneys knew of these alleged opinions; thus it cannot even be suggested that any alleged out-of-court non-disclosure was "a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Id.

If Dodds simply did not form these opinions until after the federal settlement, any allegation of fraud must fail. See Pumphrey, 62 F.3d at 1131 (explaining that a finding of fraud on the court "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." (internal quotations marks omitted)). If a post-judgment change

---

deposition. (See, e.g., Paul Dec. 18, 2012 Dep. at 202:9-23; Paul Jan. 15, 2013 Dep. at 806:2-8 (Docket No. 597-26).)

in opinion by an expert witness could somehow be elevated to
fraud on the court, the finality of every judgment relying on
expert testimony could always be called into question.

Paul was neither disclosed as an expert nor deposed in
the federal action. (Defs.' Reply 87:21-22.) That an expert in
a separate case forms an opinion allegedly advantageous to a
party after entry of judgment does not even come close to the
outer limits of fraud on the court. Stretching defendants'
allegations to their limit, defendants might argue that Paul
formed his opinions before the settlement and that the government
knew of and failed to disclose those opinions. Again, so what?
Even if defendants had alleged that the government knew of Paul's
opinions before settlement, the government was under no
obligation to disclose the opinions of a potential expert witness
whom it did not intend to call. See Fed. R. Civ. P. 26(a)(2)(A).
Such a non-disclosure surely could not be considered a "grave
miscarriage of justice." Beggerly, 524 U.S. at 47.

For these reasons, the allegations regarding Dodds' and
Paul's subsequent testimony during their depositions for the
state action cannot constitute fraud on the court.

c.    Welton's Deposition Testimony

According to defendants, United States Forest Service
law enforcement officer Marion Matthews and United States Forest
Service investigator Diane Welton visited the fire scene on
September 8, 2007. During that meeting, "Matthews told Welton
that she had reservations about the size of the alleged origin
area as established by White." (Defs.' Br. at 30:9-11.) At the
time of settlement, defendants were aware of Matthews'

39

reservations about the size of the alleged origin area and that she had communicated those concerns to Welton. (*See, e.g.*, Matthews Apr. 26, 2011 Dep. at 174:22-176:8, 177:17:178:3.)

About thirteen months later, former Assistant United States Attorney ("AUSA") Robert Wright visited the fire site with several expert consultants, White, and Welton. (*Id.* at 32:3-6.) After viewing the site, Wright allegedly drove back to town with White and Welton. (*Id.* at 32:8-9.) During the drive, Welton allegedly told Wright "that investigator Matthews, who had visited the alleged origin five days after it began, had wanted the investigators to declare a larger alleged origin area for the fire." (*Id.* at 32:10-12.)

At her deposition on August 15, 2012 prior to the settlement and entry of judgment, Welton testified that she did not recall having any discussions with Matthews about expanding the origin area:

> Q: Was there any discussion that you recall at the scene about the general area of origin being potentially larger than the area that was bounded by the pink flagging?
>
> A: I don't recall having that discussion.
>
> Q: Did Marion Matthews at any point in time ever express to you the thought that she believed the general area of origin should have been bigger, both uphill and downhill?
> A: Not that I can recall.

(Welton Aug. 15, 2011 Dep. at 579:23-580:7.)

According to defendants, Welton "lied" during her deposition when she testified that she did not recall the conversation with Matthews about the area of origin. She did

not, however, deny that the conversation occurred. Welton
testified only that she did not recall an alleged conversation
that occurred almost four years prior to her deposition. Even
assuming that Welton's testimony could be considered perjury,
perjury by a witness alone cannot amount to fraud on the court.
See, e.g., Appling, 340 F.3d at 780 ("Non-disclosure, or perjury
by a party or witness, does not, by itself, amount to fraud on
the court."); Hazel-Atlas Glass Co., 322 U.S. at 245 ("This is
not simply a case of a judgment obtained with the aid of a
witness who, on the basis of after-discovered evidence, is
believed possibly to have been guilty of perjury."). Having
already deposed Matthews at length about her conversation with
Welton about the area of origin, (see, e.g., Matthews Apr. 26,
2011 Dep. at 174:22-176:8, 177:17-178:3), defendants could not
have been deceived by Welton's inability to remember.

        Alleging that Welton told AUSA Wright about the
conversation, defendants apparently seek to make the government a
party to Welton's allegedly perjured testimony. According to
defendants, however, Welton told Wright about the conversation on
October 2, 2008, and Wright was then forbidden from working on
the case in January 2010. Wright was therefore neither present
for nor privy to the substance of Welton's August 15, 2011
deposition. While it would ordinarily be reasonable to infer
that one attorney's knowledge is shared by all of the attorneys
working on a case, the allegations in this case preclude such an
inference. Not only was AUSA Wright removed from this case, he
has since left the United States Attorney's Office and

essentially joined forces with defense counsel in the very case

he originally pursued on behalf of the government.

In the detailed declarations from Wright that defendants submitted in support of the pending motion, Wright never suggests that he told any of the other AUSAs assigned to this case about his pre-litigation conversation with Welton. (See June 12, 2014 Wright Decl. (Docket No. 593-4), Mar. 6, 2015 Wright Decl. (Docket No. 637-2).) Because Wright is now cooperating with and advocating on behalf of defendants, and has not hesitated to accuse his former colleagues of misconduct, the court has no doubt he would have disclosed that he told his former colleagues about the conversation if he had done so. Any argument of fraud on the court must fail in the absence of an allegation or reasonable inference that the government had unique knowledge beyond Matthews' testimony about the area of origin conversation when Welton testified she did not recall it.[11]

2.   Dodds' Handwritten Notes

Defendants' next allegation of fraud on the court relates to the air attack video, which was taken by a pilot flying over the Moonlight Fire about one-and-a-half hours after it ignited.  While the federal action was pending, both parties had their experts identify the alleged points of origin on the video and, according to defendants, both experts marked locations

---

[11]   Defendants of course do not argue that Wright, whom they obviously believe to be their star witness, should have voluntarily disclosed his conversation with Welton about the area of origin prior to his removal from the case.  Had this mere non-disclosure been by any other AUSA, the court has no doubt that defendants would acuse that AUSA of egregious misconduct.

that are in unburnt areas outside of the smoke plume. Defendants knew of and litigated the issues surrounding the air attack video and the related expert analysis prior to settlement and entry of judgment. (See Defs.' Br. at 74:3-4.)

The only evidence surrounding the air attack video that defendants were unaware of prior to settling were handwritten notes by Dodds.[12] Dodds provided these notes to defendants for the first time during his deposition in the state action. Defendants allege that the undisclosed handwritten notes "reveal that Dodds struggled in consultation with the [government] to reconcile the location of the government's alleged origin with the Air Attack video, particularly joint federal/state expert Curtis's placement of the alleged origin in the video frames." (Id. at 74:16-19.)

That defendants even suggest the alleged fraud regarding the air attack video is remotely analogous to the fraud in Pumphrey underscores the looseness with which defendants want the court to view conduct required to allege fraud on the court. The similarities between defendants' allegations in this case and Pumphrey end at the fact that both include a video. Unlike in Pumphrey, there is no allegation in this case that the air attack video was recorded for a fraudulent purpose or concealed from defendants. See Pumphrey, 62 F.3d at 1130-32. Defendants and the government simply, albeit strongly, disagree about what

_____

[12]    Defendants initially argued that two sets of notes were not produced. Dodds did not transcribe the second set of notes until after the federal action settled. As defendants appear to concede in their reply brief, failing to disclosure handwritten notes that did not yet exist cannot amount to fraud on the court.

43

inferences can reasonably be drawn from the smoke plume and the experts' placement of the alleged points of origin in the air attack video.[13]

Defendants' allegation of fraud on the court based on the non-disclosure of Dodds' handwritten notes fails for several reasons. First, defendants' entire argument appears to rely on the government's purported duty to disclose under <u>Brady</u>, which does not apply in this civil case. Second, defendants do not allege that the government even knew about the handwritten notes. Third, defendants identify the notes as only recounting Curtis's deposition testimony about placement of the points of origin outside of the smoke plume in the video. (<u>See</u> <u>id.</u> at 74:20-23; Defs.' Reply at 90:4-7.) Defendants were aware of Curtis's deposition testimony and did not need Dodds' notes about Curtis's testimony to effectively question Dodds or any other witness about the alleged inconsistency between the smoke plume and alleged points of origin.

Nonetheless, even if the government should have known

---

[13] Although defendants quote <u>Pumphrey</u> as having focused on the defendant's "failure to disclose," (Defs.' Br. at 13 n.12), that language appears only in the editorial description of the case and is absent from the opinion. <u>Pumphrey</u> did not involve mere non-disclosure. Although a significant video was not disclosed, defendant's general counsel "engaged in a scheme to defraud the jury, the court, and [plaintiff], through the use of misleading, inaccurate, and incomplete responses to discovery requests [about the undisclosed video], the presentation of fraudulent evidence, and the failure to correct the false impression created by [expert] testimony" at trial. <u>Pumphrey</u>, 62 F.3d at 1132. While non-disclosure discovery violations may be relevant in determining whether a scheme to defraud the court exists, <u>Pumphrey</u> does not suggest that discovery violations alone can amount to fraud on the court.

about Dodds' handwritten notes and the notes would have aided

defendants, non-disclosure generally "does not constitute fraud

on the court." See, e.g., In re Levander, 180 F.3d at 1119.  The

allegations regarding Dodds' undisclosed notes do not even rise

to the level of the previously discussed affirmative

misrepresentations made by counsel in Appling, which the Ninth

Circuit held did not constitute fraud on the court.  See Appling,

340 F.3d at 774.

       For any and all of the reasons discussed above, the

non-disclosure of Dodds' handwritten notes cannot amount to fraud

on the court.

            3.  The State Wildfire Fund

       Defendants' next allegation of fraud on the court is

based on Cal Fire's "Wildland Fire Investigation Training and

Equipment Fund" (the "State Wildfire Fund" or "fund").  Portions

of wildfire recoveries collected by Cal Fire were deposited in

the State Wildfire Fund and available for use by Cal Fire.

Defendants allege that the existence of the State Wildfire Fund

motivated Cal Fire employees, such as White, to falsely attribute

blame for fires to wealthy individuals or corporations in an

effort to gain personal benefits through the State Wildfire Fund.

Defendants knew of the State Wildfire Fund prior to settlement

and entry of judgment but allege that they discovered the true

nature and inherent conflicts created by the fund after

settlement and entry of judgment.

       For example, after settlement of the federal action,

the California State Auditor issued a formal report on October

15, 2013 that criticized the State Wildfire Fund.  (Defs.' Br. at

110:12-16.)  Among the findings, the State Auditor found that the State Wildfire Fund "'was neither authorized by statute nor approved'" and "'was not subject to Cal Fire's normal internal controls or oversight by the control agencies or the Legislature.'"  (Id. at 110:18-27 (citing the California State Auditor's report titled, "Accounts Outside the State's Centralized Treasury System").)  After repeated motions to compel in the state action, Cal Fire also produced numerous documents allegedly raising concerns about the impartiality of its investigators in light of the State Wildfire Fund.  (Id. at 111:21-25, 112:3-8.)  For example, an email from Cal Fire Northern Region Chief Alan Carlson allegedly "denied a request to use [the State Wildfire Fund] to enhance Cal Fire's ability to investigate arsonists because, he said, 'it is hard to see where our arson convictions are bringing in additional cost recovery.'"  (Id. at 113:2-4.)  Documents also allegedly showed that Cal Fire management sought to conceal the fund from state regulators, knew the fund was illegal, and used the fund to pay for destination training retreats.  (Id. at 112:21-22, 113:5-20.)

Defendants contend that their post-judgment discoveries revealing the true nature and inherent conflicts created by the State Wildfire Fund support their claim of fraud on the court based on four distinct theories: (a) the federal government made reckless misrepresentations[14] to the court to obtain a favorable

_____

[14]  Although defendants make a passing reference to the government's "intentional misconduct" of "fail[ing] to disclose" the State Wildfire Fund to defendants, (Defs.' Br. at 117:8-9), they do not advance this theory and rely only on alleged reckless misrepresentations.  Moreover, absent application of Brady and a finding that Cal Fire's knowledge can somehow be attributed to

46

in limine ruling pertaining to the State Wildfire Fund; (b) Cal

Fire's general counsel and litigation counsel should be treated

as officers of the federal court and thereby committed fraud on

the court when they failed to disclose the true nature of the

State Wildfire Fund; (c) Chris Parker testified falsely about the

State Wildfire Fund during his deposition; and (d) the very

existence of the State Wildfire Fund constitutes a fraud on the

court.

### a. Alleged Reckless Misrepresentations by the Government

In one of its in limine motions, the government sought

to exclude argument of a government conspiracy and cover-up.

(U.S.'s Omnibus Mot. in Limine at 2:1 (Docket No. 487).)  While

the motion focused on the alleged misconduct surrounding the

events at the Red Rock Lookout Tower, the government also argued

that defendants sought to prove a conspiracy based, in part, on

the State Wildfire Fund.  The government explained that "a

portion of assets recovered from Cal Fire's civil recoveries can

be allocated to a separate public trust fund to support

investigator training and to purchase equipment for investigators

(e.g., investigation kits and cameras)."  (Id. at 3:28-4:3.)  It

argued that the existence of the State Wildfire Fund "does not

support an inference that investigators concealed evidence" and

that "[a] public program established to train and equip fire

investigators is hardly evidence of a multi-agency conspiracy."

(Id. at 3:27-4:4.)

the government, this theory has no legs to stand on.

Judge Mueller granted the government's in limine motion "as to conspiracy." (July 2, 2012 Final Pretrial Order at 17:21.) In their instant motion, defendants recognize that Judge Mueller's ruling "was not necessarily a surprise given the limited evidence then available to the Court," but nonetheless argue that, in light of what was subsequently discovered about the State Wildfire Fund, the government was reckless in its representations to the court about the legitimacy of the fund. (Defs.' Br. at 110:10-11, 115:17-10.)

To suggest that the limited evidence before the court was the only reason defendants were not surprised by Judge Mueller's ruling is misleading. In fact, in their opposition to the government's motion, defendants disavowed any intent to argue the existence of a government conspiracy:

> The U.S. mischaracterizes Defendants' arguments in order to knock down a straw man. Defendants have not argued--and do not intend to argue--a "conspiracy" among the USFS, CDF, and their respective counsel, based on . . . (2) the facilitation of a program that encourages agents to blame fires on companies who are most likely able to pay for them . . . .

(Defs.' Opp'n to U.S.'s Mot. in Limine at 3:4-8 (Docket No. 531).) Defendants do not explain how any reckless misrepresentations by the government persuaded Judge Mueller to tentatively preclude defendants from arguing a theory defendants expressly disavowed.

Notwithstanding the questionable footing of defendants' position, allegations of reckless conduct cannot give rise to fraud on the court. The Ninth Circuit has indicated that fraud

on the court requires proof of "an intentional, material misrepresentation directly 'aimed at the court.'" In re Napster, Inc. Copyright Litig., 479 F.3d 1078, 1097 (9th Cir. 2007), abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 105 n.1, 114 (2009);[15] see also In re Napster, Inc. Copyright Litig., 479 F.3d at 1097-98 (emphasizing that the evidence does not suggest that defendants selected the contract terms "with the intent to defraud the courts"). The Ninth Circuit has also explained that it has "vacated for fraud on the court when the litigants intentionally misrepresented facts that were critical to the outcome of the case, showing the appropriate 'deference to the deep rooted policy in favor of the repose of judgments.'" Estate of Stonehill, 660 F.3d at 452 (quoting Hazel-Atlas Glass Co., 322 U.S. at 244-45) (emphasis added). Allowing reckless conduct to amount to fraud on the court would also be inconsistent with the Ninth Circuit's explanation that a finding of fraud on the court "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." Pumphrey, 62 F.3d at 1131 (internal quotations marks omitted).

    Although defendants appear to concede that reckless

---

[15]    In Napster, the Ninth Circuit was assessing whether defendants had committed fraud on the court thereby vitiating the attorney-client privilege under the crime-fraud exception to the privilege.  479 F.3d at 1096-98.  Although the Ninth Circuit does not discuss the fraud on the court doctrine in detail, it concluded that even if it considered the evidence as argued, it "would not conclude that this evidence establishes an intentional, material misrepresentation directly 'aimed at the court.'"  Id. at 1097 (quoting Appling, 340 F.3d at 780).

conduct by a non-government party could not amount to fraud on the court, (Defs.' Br. at 24:14-18), they argue that because it was on the part of the government, recklessness can amount to fraud on the court.  Defendants have not cited and the court is not aware of a single case in which the Supreme Court or Ninth Circuit suggested that reckless conduct by the government could come within the narrow confines of fraud on the court.

In arguing that a reckless disregard for the truth by government attorneys can amount to fraud on the court, defendants rely exclusively on Demjanjuk.  In Demjanjuk, the Sixth Circuit held that an objectively reckless disregard for the truth can satisfy the requisite intent to show a fraud on the court.  10 F.3d at 348-49.  Its holding was not, however, dependent on the fact that the misconduct was committed by government attorneys. See id.  In the Sixth Circuit, a reckless state of mind by non-government parties can also suffice to show fraud on the court. See Gen. Med., P.C. v. Horizon/CMS Health Care Corp., 475 Fed. App'x 65, 71-72 (6th Cir. 2012).

Defendants have not cited and this court is not aware of a single circuit that has joined the Sixth Circuit in allowing something less than intentional conduct to arise to fraud on the court.  See, e.g., Herring v. United States, 424 F.3d 384, 386 & n.1 (3d Cir. 2005) (recognizing Demjanjuk's holding, but requiring proof of "an intentional fraud"); United States v. MacDonald, 161 F.3d 4, 1998 WL 637184, at *3 (4th Cir. 1998) (rejecting Demjanjuk's holding and describing that position as the "minority view"); Robinson v. Audi Aktiengesellschaft, 56 F.3d 1259, 1266-67 (10th Cir. 1995) (rejecting Demjanjuk's

holding and requiring "a showing that one has acted with an intent to deceive or defraud the court"). In disagreeing with the Sixth Circuit, the Tenth Circuit explained, "A proper balance between the interests underlying finality on the one hand and allowing relief due to inequitable conduct on the other makes it essential that there be a showing of conscious wrongdoing--what can properly be characterized as a deliberate scheme to defraud-- before relief from a final judgment is appropriate under the Hazel-Atlas standard." Robinson, 56 F.3d at 1267.

Even if this court was at liberty to depart from Ninth Circuit precedent and was inclined to examine the government's conduct under the reckless disregard for the truth standard, the reasons the Sixth Circuit concluded that the government acted with a reckless disregard in Demjanjuk are not present in this case. As previously discussed, Demjanjuk did not examine the government's reckless failure to disclose through the lens of its obligations in a civil case. The Sixth Circuit concluded that the denaturalization and extradition proceedings in that case were one of the rare instances in which Brady extended to a civil case and thus the OSI prosecutors had a "constitutional duty" to produce the exculpatory evidence. The Sixth Circuit's application of Brady was inextricably entwined with its finding of fraud of the court: "This was fraud on the court in the circumstances of this case where, by recklessly assuming Demjanjuk's guilt, they failed to observe their obligation to produce exculpatory materials requested by Demjanjuk." Demjanjuk, 10 F.3d at 354.

Thus, even if the Ninth Circuit adopted the minority position in <u>Demjanjuk</u> of allowing reckless conduct to rise to the level of fraud on the court, <u>Demjanjuk</u> does not aid defendants because <u>Brady</u> does not apply to this case.  Moreover, in <u>Demjanjuk</u>, the documents the government failed to disclose were "in their possession." <u>Id.</u> at 339, 350.  Here, defendants do not even allege that the government had the documents exposing the alleged conflicts created by the State Wildfire Fund, and the critical audit report allegedly revealing the true nature of the fund did not even exist before judgment was entered in this case.

In sum, allegations of reckless conduct regarding the State Wildfire Fund cannot amount to fraud on the court and, even if the Ninth Circuit adopted the minority position from <u>Demjanjuk</u>, defendants' allegations are still insufficient because <u>Brady</u> does not apply and the government did not possess the documents at issue.

b. <u>Treating Cal Fire's General Counsel and Litigation Counsel as Officers of This Court</u>

Relying on <u>Pumphrey</u>, defendants argue that Cal Fire's general counsel and litigation counsel were "officers of the court" as the term is used when examining allegations of fraud on the court.  In <u>Pumphrey</u>, plaintiff filed suit and proceeded to trial in Idaho and local counsel represented defendants throughout the litigation.  62 F.3d at 1131.  Defendant's general counsel was not admitted to practice in Idaho or admitted <u>pro hac vice</u> and never made an appearance or signed a document filed with the court.  <u>Id.</u> at 1130-31.  The Ninth Circuit nonetheless found that he was an "officer of the court" for purposes of assessing

fraud on the court because he "participated significantly" by
attending trial on defendant's behalf, gathering information
during discovery, participating in creating the fraudulent video,
and maintaining possession of the fraudulent and undisclosed
video.  Id. at 1131.

The court doubts whether the rationale in Pumphrey can
be extended to Cal Fire because, although it operated under a
joint investigation and prosecution agreement with the
government, Cal Fire was not a party to this case as was the
defendant in Pumphrey.  Cf. Latshaw, 452 F.3d at 1104 ("We find
it significant that vacating the judgment would in fact '"punish"
parties who are in no way responsible for the "fraud."'" (quoting
Alexander, 882 F.2d at 425)).  Nor did Cal Fire's general counsel
or litigation counsel ever act or purport to act as an attorney
for the United States.

Nonetheless, the court need not resolve this issue
because defendants' theory attributing fraud on the court to Cal
Fire's general counsel and litigation counsel relies on their
failure to comply with their alleged obligation to disclose
evidence about the State Wildfire Fund under Brady.  (See Defs.'
Br. at 119:1-17.)  As this court has already explained, Brady
does not apply in this civil action.  Absent some duty to
disclose imported from Brady, non-disclosures to defendants alone
cannot amount to fraud on the court.  See, e.g., Appling, 340
F.3d at 780; In re Levander, 180 F.3d at 1119; Valerio, 80 F.R.D.
at 641, adopted as the opinion of the Ninth Circuit in 645 F.2d
at 700.  Any allegations based on Cal Fire's counsel's failure to

disclose information about the State Wildfire Fund therefore cannot amount to fraud on the court.

### c. Chris Parker's Deposition Testimony

Chris Parker, a former Cal Fire investigator, was an expert witness for the government and the creator of the State Wildfire Fund. During his deposition in this action, Parker allegedly testified that the State Wildfire Fund was "created only for altruistic purposes" and did not "suggest that the account was established to circumvent state fiscal controls." (Defs.' Br. at 109:17-19.) This testimony was allegedly false or concealed the true nature of the State Wildfire Fund because the 2013 audit report revealed that Parker "had written an email which stated the purpose of the account was to give Cal Fire control over money that was unencumbered by restrictions on expenditure of state funds." (Id. at 87:2-4.)

Assuming Parker testified falsely at his deposition, the Supreme Court and Ninth Circuit have unequivocally held that perjury by a witness alone cannot amount to fraud on the court. See, e.g., Hazel-Atlas Glass Co., 322 U.S. at 245 ("This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury."); Appling, 340 F.3d at 780 ("[P]erjury by a party or witness[] does not, by itself, amount to fraud on the court."). Defendants do not allege that the government had any knowledge of this alleged perjured testimony. Even assuming Cal Fire's counsel knew of the false testimony, defendants' theory of fraud on the court tied to Cal Fire's counsel relies on a questionable extension of Pumphrey and

1  an impermissible extension of <u>Brady</u>.  Parker's deposition

2  testimony simply does not rise to fraud on the court.

3                    d. <u>Mere Existence of the State Wildfire Fund</u>

4         As their Hail Mary attempt to show fraud on the court

5  based on the State Wildfire Fund, defendants contend that the

6  existence of the fund alone is a fraud on the court.  Although

7  the State Wildfire Fund did not and could not receive any

8  proceeds obtained in the federal action, defendants nonetheless

9  allege that it created a conflict of interest for Cal Fire

10  employees and that the investigation and opinions of those

11  employees were central to the federal action.  Even assuming

12  those alleged conflicts permeated this action, defendants do not

13  explain how the existence of conflicts of interest by witnesses

14  translates into a fraud on the court. Suffice to say, the mere

15  existence of the State Wildfire Fund does not "'defile the court

16  itself'" and is not a fraud "'perpetrated by officers of the

17  court so that the judicial machinery can not perform in the usual

18  manner its impartial task of adjudging cases that are presented

19  for adjudication.'"  <u>Appling</u>, 340 F.3d at 780 (quoting <u>In re</u>

20  <u>Levander</u>, 180 F.3d at 119).

21              4.   <u>Alleged Bribe by Downey Brand LLP or Sierra</u>

22                   <u>Pacific Industries</u>

23         To introduce the allegation of fraud on the court based

24  on the government's failure to inform the court and defendants of

25  an alleged bribe by Downey Brand LLP or Sierra Pacific

26  Industries, defendants spend four pages detailing the facts and

27  circumstances allegedly showing that Ryan Bauer may have started

28  the Moonlight Fire.  (<u>See</u> Defs.' Br. at 122:6-126:6.)  Ryan lived

in Westwood, California and was allegedly near the area of origin with a chainsaw when the Moonlight Fire ignited. At the time of settlement and entry of judgment, defendants knew all of the information detailed in their brief that allegedly shows Ryan may have started the fire.

After the settlement, defendants learned that Ryan's father, Edwin Bauer, had told the government that Downey Brand LLP or Sierra Pacific Industries had offered Ryan two million dollars if he would state that he had started the Moonlight Fire. (Id. at 127:10-19.) Edwin allegedly filed a police report of the bribe attempt and the FBI interviewed him and Ryan's lawyer about it. (Id. at 127:19-20.) According to defendants, revealing the alleged bribe to the court or defendants "would have been damaging to the government's case, as it would have tended to prove that Edwin Bauer made a false assertion to strengthen the government's claims against Sierra Pacific while diverting attention from his son." (Id. at 128:21-24.) Defendants further contend that the false bribe allegation shows "a willingness on the part of the Bauers to manufacture evidence harmful to an innocent party and an effort to deflect attention away from someone who may have actually started the fire." (Id. at 128:26-28.)

As one of their eighteen motions in limine, the government sought to exclude any evidence seeking to show that the Moonlight Fire was caused by a potential arsonist, including Ryan. (U.S.'s Omnibus Mot. in Limine at 5:1-7.) Defendants opposed the motion, putting forth the allegations recited in its current motion. Judge Mueller tentatively denied the motion

"insofar as defendants may use evidence indicating arson was not considered to show weaknesses in the investigation following the fire," but excluded defendants from "elicit[ing] evidence to argue that someone else started the fire." (July 2, 2012 Final Pretrial Order at 18:1-6.) Based on this tentative in limine ruling, defendants claim the court was defrauded by the government's failure to disclose the alleged bribe to the court and defendants while arguing that there was "no evidence" of arson.

"[I]n limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial." Ohler v. United States, 529 U.S. 753, 758, n.3 (2000); (see also July 2, 2012 Final Pretrial Order at 17:2-5 ("The following motions have been decided based upon the record presently before the court. Each ruling is made without prejudice and is subject to proper renewal, in whole or in part, during trial.").) Defendants in fact filed written objections to the tentative ruling, but the parties reached a settlement agreement before Judge Mueller had the opportunity to address those objections. That Judge Mueller's ruling was only tentative minimizes its significance in the fraud on the court inquiry.

Moreover, that defendants would now claim that even though the ruling was only tentative it somehow prevented them from "elicit[ing] evidence to argue that someone else started the fire" boggles the judicial mind. It may seem plausible based on their statement in their current brief that they "always intended to argue that one or more of the Bauers may have caused the fire either intentionally or unintentionally, whether via arson, with

a chainsaw, spilled gasoline, or through careless smoking."

(Defs.' Br. at 126:4-6.)  It is concerning to this court,

however, that defendants would so flippantly make this

representation now when defendants' lead counsel made the

opposite representation to Judge Mueller during the hearing on

the motions in limine:

> MR. WARNE: The other issue that I don't -- again,
> another burning need question here, you indicated a
> ruling as it relates to Bauer . . . .  We appreciated
> that.  We're not here to prove that Mr. Bauer started
> the fire, nor can anybody do that right now in light
> of the way the investigation was done.

(June 26, 2012 Tr. at 94:11-14 (Docket No. 572) (emphasis

added).)  As Warne's colloquy with the court continued, he

repeatedly emphasized that defendants' intent was to show the

flaws in the investigation, not prove that Ryan started the fire:

> MR. WARNE:  But the evidence pertaining to those two
> individuals goes directly to the quality of the
> investigation . . . .
>
> THE COURT:  There is no evidence that -- there is no
> evidence suggesting that arson was the cause of this
> fire, is there?  Your point is that the investigation
> didn't consider that fully.
>
> MR. WARNE: Actually, there is as much evidence -- and
> we don't intend to play it this way to the jury, but
> there is as much evidence suggesting that there was
> another perpetrator of this fire, be it arson or a
> chain saw or something else, as there is the
> circumstantial evidence that the government is relying
> upon to say that the bulldozer started the fire. . . .
> The government's case is fully and completely based on
> circumstantial evidence and opinion evidence, as is
> the arguments we're making with respect to the
> investigation and what it left behind without looking
> into various other possibilities.

THE COURT: Why can't you make that point generally without referencing Mr. Bauer or Mr. McNeil?

MR. WARNE: Because it is the essence of our case there, as I indicated in footnote 3, with respect to what I understood this Court's ruling was as it relates to <u>an effort by the government to really, apologize, mischaracterize our motion or our case as trying to prove that Mr. Bauer is an arsonist. Our case is focused on the investigation.</u>

(<u>Id.</u> at 94:14-95:20 (emphasis added).)

When asked at oral argument on this motion about his representations to Judge Mueller, Mr. Warne suggested he was simply feigning agreement with Judge Mueller's tentative ruling to avoid any suggestion that the ruling could weaken defendants' case. As Judge Mueller explained at the hearing on the motions in limine, however, her tentative ruling was based on the suggestion of one of defendants' counsel. (<u>See</u> June 26, 2012 Tr. at 67:19-24 ("The exclusion of arson defenses generally. My current plan is to deny, but consider some kind of limiting instruction; that is, the defense represents it will not attempt to show that someone else started the fire, but wished to introduce evidence showing the investigation was biased. Mr. Schaps referenced this approach earlier."); <u>see also</u> June 26, 2012 Tr. at 45:2-18).

At the very least, it remains a mystery how a tentative in limine ruling based on defendants' own suggestion can transform into a "substantial factor in forcing Defendants to settle the federal action," (Defs.' Br. at 126:27-28). Even setting aside the inconsistencies surrounding defendants' alleged intent, their argument that the government's non-disclosure of

the bribe allegation amounts to fraud on the court relies heavily on _Brady_, which does not extend to this civil case.  Absent application of _Brady_, the government was under no obligation to disclose the alleged bribe.  In fact, if the government attorneys had disclosed the alleged bribe, they could have just as easily been criticized for spreading a scandalous rumor in attempt to intimidate defendants.

In the civil context, the Ninth Circuit has repeatedly held that non-disclosures alone generally cannot amount to fraud on the court.  _See, e.g._, _Appling_, 340 F.3d at 780.  To meet the high threshold for fraud on the court, a non-disclosure by counsel must be "so fundamental that it undermined the workings of the adversary process itself."  _Estate of Stonehill_, 660 F.3d at 445.  The Ninth Circuit has found that non-disclosures did not rise to this level when they "had limited effect on the district court's decision" and the withheld information would not have "significantly changed the information available to the district court."  _Id._ at 446.

That defendants even argue that the government's non-disclosure of the bribe was "so fundamental that it undermined the workings of the adversary process itself" is disturbing.  The court ruled consistent with the very trial strategy defendants represented they wanted to take, and it is far from plausible that evidence of the alleged bribe would even have remotely changed the information available to the district court, let alone have been admissible.  _Cf._ _id._

5.  Removal of AUSA Wright from the Case

Former AUSA Wright was originally assigned to lead the

Moonlight Fire case, but was allegedly "forbidden from working on the case in January 2010, shortly after raising ethical concerns regarding disclosures in another wildland fire action he was handling." (Defs.' Reply at 90:24-91:1.) Defendants do not articulate how removal of Wright from the Moonlight Fire case could amount to fraud on the court. It is the exclusive prerogative of the United States Attorney to determine how to staff any case in his office. Defendants argue only that the removal of Wright "tend[s] to show" the government's fraudulent intent and that its alleged misconduct was purposeful. (<u>Id.</u> at 90:22-91:8.) It neither shows nor suggests any such thing.

6. <u>Judge Nichols' Terminating Order and Sanctions in the State Action</u>

In the state action, Judge Nichols issued two decisions[16] condemning misconduct by Cal Fire and its attorneys and ultimately dismissed the state action with prejudice and ordered sanctions in favor of defendants because of Cal Fire's misconduct. Defendants acknowledge that Judge Nichols' findings in the state action have no preclusive or binding effect in this

---

[16] The government criticizes Judge Nichols for having adopted the detailed proposed findings submitted by Downey Brand LLP with only two minor edits. As a companion to that order, however, Judge Nichols first issued an order that "speaks in the Court's own voice." <u>See</u> <u>Cal. Dep't of Forestry v. Howell</u>, No. GN CV09-00205, 2014 WL 7972096, at *7 (Cal. Super. Ct. Feb. 4, 2014). Judge Nichols repeatedly emphasized that he had belabored to review all of the evidence and did not simply sign the proposed order. <u>See</u> <u>id.</u> at *7, *12 ("The fact that the Court has signed Defendants' proposed orders with few changes reflects only the reality that those orders are supportable in all respects. . . . The Court does not wish on any appellate tribunal the task undertaken by the undersigned: the personal review of every document and video deposition submitted in the case. This task required countless hours of study and consideration.").

61

case.  Not only was the government not a party in the state action, it did not have the opportunity to argue or brief any of the issues before Judge Nichols.  More importantly, Judge Nichols' findings and criticisms were levied against Cal Fire and its counsel.  See Cal. Dep't of Forestry v. Howell, No. GN CV09-00205, 2014 WL 7972096 (Cal. Super. Ct. Feb. 4, 2014); Cal. Dep't of Forestry v. Howell, No. GN CV09-00205, 2014 WL 7972097 (Cal. Super. Ct. Feb. 4, 2014).

The only references Judge Nichols makes in either order regarding any involvement of the federal government were about the pre-deposition meeting with Reynolds.  Cal. Dep't of Forestry, 2014 WL 7972096, at *10; Cal. Dep't of Forestry v. Howell, 2014 WL 7972097, at *n.13.  This court has already determined that the allegations regarding the pre-deposition meeting with Reynolds cannot amount to fraud on the court.

Judge Nichols, moreover, based his decision to impose terminating sanctions on Cal Fire's discovery abuses and his determination that Cal Fire "prejudiced [defendants'] ability to go to trial."  Cal. Dep't of Forestry, 2014 WL 7972096, at *4.  Findings in that context and under that legal standard are not relevant to the determination of whether alleged misconduct by the federal government constituted fraud on the court.  As the Ninth Circuit has explained, prejudice to the opposing party may be considered when assessing fraud on the court, but fraud on the court exists only if there is "'an unconscionable plan or scheme which is designed to improperly influence the court in its decision.'"  Abatti, 859 F.2d at 118 (quoting Toscano, 441 F.2d at 934).  Judge Nichols' findings that Cal Fire prejudiced

defendants' ability to go to trial in the state action thus do not aid this court in determining whether defendants' allegations about the federal government amount to a "'grave miscarriage of justice,'" <u>Appling</u>, 340 F.3d at 780 (quoting <u>Beggerly</u>, 524 U.S. at 47).

IV. <u>Conclusion</u>

      Defendants made a calculated decision to settle this case almost two years ago, and a final judgment was entered pursuant to their agreement.  To set that judgment aside, the law requires a showing of fraud on the court, not an imperfect investigation.  Defendants have failed to identity even a single instance of fraud on the court, certainly none on the part of any attorney for the government.  They repeatedly argue that fraud on the court can be found by considering the totality of the allegations.  Here, the whole can be no greater than the sum of its parts.  Stripped of all its bluster, defendants' motion is wholly devoid of any substance.

      IT IS THEREFORE ORDERED that defendants' motion to set aside the judgment (Docket No. 593) and defendants' motion for a temporary stay of the settlement agreement (Docket No. 615) be, and the same hereby are, DENIED.

Dated:  April 17, 2015

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE