UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIV. NO. 2:09-02445 WBS AC |
| Plaintiff, | |
| v. | MEMORANDUM AND ORDER |
| SIERRA PACIFIC INDUSTRIES, et al., | |
| Defendants, | |
| AND ALL RELATED CROSS-ACTIONS. | |

----oo0oo----

       After reaching a settlement with the government and
requesting the court to enter judgment pursuant to that
settlement almost two years ago, defendants Sierra Pacific
Industries, Howell's Forest Harvesting Company, and fifteen
individuals and/or trusts who own land in the Sierra Nevada
mountains (referred to collectively as "defendants") now move to
set aside that judgment based upon "fraud on the court."

1

1    I.    Brief Factual and Procedural Background

2              On September 3, 2007, a fire ignited on private

3    property near the Plumas National Forest.  The fire, which became

4    known as the Moonlight Fire, burned for over two weeks and

5    ultimately spread to 46,000 acres of the Plumas and Lassen

6    National Forests.  The day after the fire started, California

7    Department of Forestry and Fire Protection ("Cal Fire")

8    investigator Joshua White and United States Forest Service

9    ("USFS") investigator David Reynolds sought to determine the

10   cause of the fire.  As a result of the joint investigation, Cal

11   Fire and the USFS ultimately issued the "Origin and Cause

12   Investigation Report, Moonlight Fire" ("Joint Report").  The

13   Joint Report concluded that the Moonlight Fire was caused by a

14   rock striking the grouser or front blade of a bulldozer operated

15   by an employee of defendant Howell's Forest Harvesting Company.

16   After winning a bid to harvest timber on the private property,

17   Sierra Pacific Industries had hired that company to conduct

18   logging operations in the area.

19             On August 9, 2009, the Office of the California

20   Attorney General filed an action in state court on behalf of Cal

21   Fire to recover its damages caused by the Moonlight Fire (the

22   "state action").  That same month, on August 31, 2009, the United

23   States Attorney filed this action on behalf of the United States

24   to recover its damages caused by the Moonlight Fire (the "federal

25   action").  The two cases proceeded independently, but the

26

27

28

2

1  government[1] and Cal Fire operated pursuant to a joint prosecution

2  agreement.

3          To say that this case was litigated aggressively and

4  exhaustively by all parties would be an understatement.  When the

5  court entered judgment almost two years ago, the docket had

6  almost six hundred entries, which included contentious discovery

7  motions and voluminous dispositive motions.  Almost three years

8  after the federal action commenced, it was set to proceed to jury

9  trial on July 9, 2012 before Judge Mueller and was expected to

10 last no more than thirty court days.  Three days before trial,

11 the parties voluntarily participated in a settlement conference

12 and reached a settlement agreement.

13         Under the terms of the settlement agreement, Sierra

14 Pacific Industries agreed to pay the government $47 million,

15 Howell's Forest Harvesting Company agreed to pay the government

16 $1 million, and other defendants agreed to pay the government $7

17 million.  (Settlement Agreement & Stipulation ¶ 25 (Docket No.

18 592).)  Sierra Pacific Industries also agreed to convey 22,500

19 acres of land to the government.  (Id.)  At the request of the

20 parties and pursuant to the settlement agreement, the court

21 dismissed the case with prejudice on July 18, 2012 and directed

22 the clerk to enter final judgment in the case.  (Id.)

23         More than two years later, on October 9, 2014,

24 defendants filed the pending motion to set aside that judgment.

25 _____

26     [1]   All references to the "government" in this Order refer
   to the United States government and, where appropriate, the
27 Assistant United States Attorneys who represented the government
   in this case.
28

1   After Judge Mueller recused herself, the case was reassigned to

2   the undersigned judge.  After conferring with the parties, the

3   court required limited briefing addressing the threshold issue of

4   whether the alleged conduct giving rise to defendants' motion

5   constitutes "fraud on the court."  The court now addresses that

6   limited issue.

7   II.  Legal Standards

8        A.   Federal Rule of Civil Procedure 60

9             To preserve the finality of judgments, the Federal

10  Rules of Civil Procedure limit a party's ability to seek relief

11  from a final judgment.  Rule 60(b) enumerates six grounds under

12  which a court may relieve a party from a final judgment:

13       (1)  mistake, inadvertence, surprise, or excusable
          neglect;
14

15       (2)  newly discovered evidence that, with reasonable
          diligence, could not have been discovered in time
16       to move for a new trial under Rule 59(b);

17       (3)  fraud (whether previously called intrinsic or
          extrinsic), misrepresentation, or misconduct by
18       an opposing party;

19       (4)  the judgment is void;

20       (5)  the judgment has been satisfied, released or
          discharged; it is based on an earlier judgment
21       that has been reversed or vacated; or applying it
          prospectively is no longer equitable; or

22       (6)  any other reason that justifies relief.

23  Fed. R. Civ. P. 60(b).  A motion seeking relief from a final

24  judgment under Rule 60(b) must be made "within a reasonable time"

25  and any motion under one of the first three grounds for relief

26  must be made "no more than a year after the entry of the

27  judgment."  Id. R. 60(c)(1).  Defendants concede that any motion

28  under Rule 60(b) in this case would be barred as untimely because

4

1    it would rely on one or more of the first three grounds for

2    relief but was not filed within a year of the entry of final

3    judgment.

4            Despite the limitations in Rule 60(b), "[c]ourts have

5    inherent equity power to vacate judgments obtained by fraud."

6    United States v. Estate of Stonehill, 660 F.3d 415, 443 (9th Cir.

7    2011) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)).

8    Rule 60(d)(3) preserves this inherent power and recognizes that

9    Rule 60 does not "limit a court's power to . . . set aside a

10   judgment for fraud on the court." Fed. R. Civ. P. 60(d)(3);

11   accord Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769,

12   780 (9th Cir. 2003) ("Federal Rule of Civil Procedure 60(b)

13   preserves the district court's right to hear an independent

14   action to set aside a judgment for fraud on the court."); Estate

15   of Stonehill, 660 F.3d at 443 ("Rule 60(b), which governs relief

16   from a judgment or order, provides no time limit on courts' power

17   to set aside judgments based on a finding of fraud on the

18   court.").[2] Because defendants failed to file a timely Rule 60(b)

19   motion, they are forced to argue that the judgment in this case

---

20           [2]  Prior to the amendments to the Federal Rules of Civil
21   Procedure in 2007, the savings clause for fraud on the court was
     contained in Rule 60(b), thus courts referred to Rule 60(b) as
22   preserving a court's inherent power to set aside a final judgment
     for fraud on the court.  As part of the stylistic amendments in
23   2007, the savings clause language was moved from subsection (b)
     to subsection (d)(3).  Compare Fed. R. Civ. P. 60(b) (2006)
24   ("This rule does not limit the power of a court to entertain an
     independent action . . . to set aside a judgment for fraud on the
25   court."), with Fed. R. Civ. P. 60(d)(3) (amended 2007) ("This
     rule does not limit a court's power to: . . . (3) set aside a
26   judgment for fraud on the court."); see also Fed. R. Civ. P. 60
     (2007 amendments cmt.) ("The language of Rule 60 has been amended
27   as part of the general restyling of the Civil Rules to make them
     more easily understood and to make style and terminology
28   consistent throughout the rules.  These changes are intended to
     be stylistic only.").

1   should be set aside for fraud on the court, and the court must

2   assess defendants' allegations under this narrowly defined term.

3        B.   Definition of "Fraud on the Court"

4        The Supreme Court has "justified the 'historic power of

5   equity to set aside fraudulently begotten judgments' on the basis

6   that 'tampering with the administration of justice . . . involves

7   far more than an injury to a single litigant.  It is a wrong

8   against the institutions set up to protect and safeguard the

9   public.'"  In re Levander, 180 F.3d 1114, 1118 (9th Cir. 1999)

10  (quoting Chambers, 501 U.S. at 44).  Still, "[a] court must

11  exercise its inherent powers with restraint and discretion in

12  light of their potency."  Id. at 1119.

13       Relief for fraud on the court must be "reserved for

14  those cases of 'injustices which, in certain instances, are

15  deemed sufficiently gross to demand a departure' from rigid

16  adherence to the doctrine of res judicata."  United States v.

17  Beggerly, 524 U.S. 38, 46 (1998) (quoting Hazel-Atlas Glass Co.

18  v. Hartford-Empire Co., 322 U.S. 238, 244 (1944), overruled on

19  other grounds by Standard Oil Co. v. United States, 429 U.S. 17

20  (1976)).  The Ninth Circuit has repeatedly emphasized that

21  "[e]xceptions which would allow final decisions to be

22  reconsidered must be construed narrowly in order to preserve the

23  finality of judgments."  Abatti v. Comm'r of the I.R.S., 859 F.2d

24  115, 119 (9th Cir. 1988); see also Appling, 340 F.3d at 780;

25  Dixon v. C.I.R., 316 F.3d 1041, 1046 (9th Cir. 2003).

26       Fraud on the court "'embrace[s] only that species of

27  fraud which does or attempts to, defile the court itself, or is a

28  fraud perpetrated by officers of the court so that the judicial

6

machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.'" Appling, 340 F.3d at 780 (quoting In re Levander, 180 F.3d at 119) (alteration in original).  A finding of fraud on the court "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision." Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128, 1131 (9th Cir. 1995) (internal quotations marks omitted); see also Appling, 340 F.3d at 780 ("Fraud on the court requires a 'grave miscarriage of justice,' and a fraud that is aimed at the court." (quoting Beggerly, 524 U.S. at 47)).

        "In determining whether fraud constitutes fraud on the court, the relevant inquiry is not whether fraudulent conduct 'prejudiced the opposing party,' but whether it '"harm[ed]" the integrity of the judicial process.'" Estate of Stonehill, 660 F.3d at 444 (quoting Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989)); see also Estate of Stonehill, 660 F.3d at 444 ("Fraud on the court involves 'far more than an injury to a single litigant . . . .'" (quoting Hazel-Atlas Glass Co., 322 U.S. at 246)).  Although "one of the concerns underlying the 'fraud on the court' exception is that such fraud prevents the opposing party from fully and fairly presenting his case," this showing alone is not sufficient.  Abatti, 859 F.2d at 119; see also Abatti, 859 F.2d at 118 ("[W]e have said that it may occur when the acts of a party prevent his adversary from fully and fairly presenting his case or defense. . . . Fraud on the court must involve 'an unconscionable plan or scheme which is designed to improperly influence the court in its decision.'" (quoting

7

1  Toscano v. Comm'r of the I.R.S., 441 F.2d 930, 934 (9th Cir.

2  1971) (internal citation omitted) (emphasis added)).  At the same

3  time, a showing of prejudice to the party seeking relief is not

4  required.  Dixon, 316 F.3d at 1046.

5          "Non-disclosure, or perjury by a party or witness, does

6  not, by itself, amount to fraud on the court."  Appling, 340 F.3d

7  at 780; accord In re Levander, 180 F.3d at 1119 ("Generally, non-

8  disclosure by itself does not constitute fraud on the court. . .

9  . Similarly, perjury by a party or witness, by itself, is not

10 normally fraud on the court."); see also Hazel-Atlas Glass Co.,

11 322 U.S. at 245 ("This is not simply a case of a judgment

12 obtained with the aid of a witness who, on the basis of after-

13 discovered evidence, is believed possibly to have been guilty of

14 perjury.").

15         The Supreme Court has held that a party's failure to

16 "thoroughly search its records and make full disclosure to the

17 Court" does not amount to fraud on the court.  Beggerly, 524 U.S.

18 at 47 (internal quotation marks omitted); see also Valerio v.

19 Boise Cascade Corp., 80 F.R.D. 626, 641 (C.D. Cal. 1978), adopted

20 as the opinion of the Ninth Circuit in 645 F.2d 699, 700 (9th

21 Cir. 1981) ("[N]ondisclosure to the court of facts allegedly

22 pertinent to the matter before it, will not ordinarily rise to

23 the level of fraud on the court.").

24         Non-disclosure by an officer of the court or perjury by

25 or suborned by an officer of the court may amount to fraud on the

26 court only if it was "so fundamental that it undermined the

27 workings of the adversary process itself."  Estate of Stonehill,

28 660 F.3d at 445; see also 11 Charles Alan Wright, Arthur R.

1  Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman,

2  Federal Practice and Procedure § 2870 (3d ed. 2014) ("[T]here is

3  a powerful distinction between perjury to which an attorney is a

4  party and that with which no attorney is involved. . . .

5  [W]hether perjury constitutes a fraud on the court should depend

6  on whether an attorney or other officer of the court was a party

7  to it."). Non-disclosure by an officer of the court, however,

8  does not rise to this level if it had a "limited effect on the

9  district court's decision" and the withheld information would not

10  have "significantly changed the information available to the

11  district court." Estate of Stonehill, 660 F.3d at 446.

12      As the Ninth Circuit has recognized, "the term 'fraud

13  on the court' remains a 'nebulous concept.'" In re Levander, 180

14  F.3d at 1119 (quoting Broyhill Furniture Indus., Inc. v.

15  Craftmaster Furniture Corp., 12 F.3d 1080, 1085 (Fed. Cir.

16  1993)). Nonetheless, it "places a high burden on [the party]

17  seeking relief from a judgment," Latshaw v. Trainer Wortham &

18  Co., Inc., 452 F.3d 1097, 1104 (9th Cir. 2006), and the party

19  seeking relief must prove fraud on the court by clear and

20  convincing evidence, Estate of Stonehill, 660 F.3d at 443-44.

21      C.   Inapplicability of Brady v. Maryland

22      Relying on Brady v. Maryland, 373 U.S. 83 (1963),

23  defendants argue that the government is held to a higher standard

24  than non-government parties not just in criminal cases but in

25  civil cases as well.[3] In Brady, the Supreme Court held that "the

26  _____

27      [3]   Some of defendants' arguments come within Giglio v.
   United States, 405 U.S. 150 (1972), as the non-disclosures may
   have contained impeachment, not exculpatory, evidence. The

28  court's discussion of Brady in this Order extends equally to

9

1   suppression by the prosecution of evidence favorable to an

2   accused upon request violates due process where the evidence is

3   material either to guilt or to punishment, irrespective of the

4   good faith or bad faith of the prosecution."  373 U.S. at 87.

5   Its holding relied on the rights of a criminal defendant under

6   the Due Process Clause of the Fourteenth Amendment and the

7   "avoidance of an unfair trial to the accused."  Id.; see also

8   Lisenba v. California, 314 U.S. 219, 236 (1941) ("As applied to a

9   criminal trial, denial of due process is the failure to observe

10  that fundamental fairness essential to the very concept of

11  justice.").

12         "'Due process is a flexible concept, and its procedural

13  protections will vary depending on the particular deprivation

14  involved.'"  Goichman v. Rheuban Motors, Inc., 682 F.2d 1320,

15  1324 (9th Cir. 1982) (quoting Morrissey v. Brewer, 408 U.S. 471,

16  481 (1972)); see also Mathews v. Eldridge, 424 U.S. 319, 335

17  (1976) (identifying the first consideration in the procedural due

18  process inquiry as "the private interest that will be affected by

19  the official action").[4]  In a criminal case, the government is

20
    consideration of the government's heightened disclosure
21  obligations in a criminal case under Giglio.

22         [4]   The Supreme Court has not yet indicated whether Brady
    derives from a criminal defendant's procedural or substantive due
23  process rights.  See Castellano v. Fragozo, 352 F.3d 939, 968
    (5th Cir. 2003) (discussing the differing views expressed in
24  Albright v. Oliver, 510 U.S. 266 (1994)); see also Martin A.
    Schwartz, The Supreme Court's Unfortunate Narrowing of the
25  Section 1983 Remedy for Brady Violations, 37-MAY Champion 58, 59
    (May 2013) ("The Supreme Court has never definitively held
26  whether Brady is based on substantive or procedural due
    process.").  The court need not resolve this issue because the
27  differences between criminal and civil cases would render Brady
    inapplicable to civil cases regardless of whether its protections
28

1  seeking to deprive a defendant, who is presumed to be innocent,

2  of his liberty.  The "'requirement of due process . . . in

3  safeguarding the liberty of the citizen against deprivation

4  through the action of the State, embodies the fundamental

5  conceptions of justice which lie at the base of our civil and

6  political institutions.'"  <u>Mooney v. Holohan</u>, 294 U.S. 103, 112

7  (1935).  In contrast to a criminal case where there is a

8  potential loss of liberty, a civil action such as this is

9  strictly about money.  Except that the government happens to be

10  the plaintiff, this case is no different from any other civil

11  case in which one party pursues recovery of damages allegedly

12  caused by the other party.  The government did not seek to

13  deprive any defendant in this case of liberty or impose any other

14  consequences akin to a criminal conviction.[5]  It therefore stands

15  _____

16  derive from the procedural or substantive components of the Due
    Process Clause.  Here, defendants rely exclusively on the

17  protections of procedural due process in arguing that <u>Brady</u>
    applies to this civil case.  (<u>See</u> Defs.' Reply at 56:1-17

18  (applying the procedural due process balancing test from <u>Mathews</u>,
    424 U.S. 319).)

19

20      [5]   Defendants suggest that this case had criminal
    implications because the government's Second Amended Complaint

21  relied on 36 C.F.R. § 261.5(c) and California Public Resources
    Code section 4435.

22      Section 4435 provides:

23      If any fire originates from the operation or use of
        any engine, machine, barbecue, incinerator, railroad

24      rolling stock, chimney, or any other device which may
        kindle a fire, the occurrence of the fire is prima

25      facie evidence of negligence in the maintenance,
        operation, or use of such engine, machine, barbecue,

26      incinerator, railroad rolling stock, chimney, or other
        device. If such fire escapes from the place where it

27      originated and it can be determined which person's
        negligence caused such fire, such person is guilty of

28

1    to reason that <u>Brady</u> has no application in civil cases such as

2    this.

3          The differences between discovery in criminal and civil

4    cases also underscore the need for <u>Brady</u> only in criminal cases.

5    In a criminal case, a defendant is "entitled to rather limited

6    discovery, with no general right to obtain the statements of the

7    Government's witnesses before they have testified." <u>Degen v.</u>

8    <u>United States</u>, 517 U.S. 820, 825 (1996).  A defendant in a civil

9

10        a misdemeanor.

11   Cal. Pub. Res. Code § 4435.  In their Second Amended Complaint,
     the government did not assert a claim under section 4435, but
12   relied on that section to generally allege that the ignition of
     the fire was prima facie evidence of defendants' negligence.
13   (<u>See</u> Second Am. Compl. ¶¶ 26-27.)  Similarly, in denying
     defendants' motion for summary judgment as to prima facie
14   negligence, Judge Mueller regarded section 4435 as relevant to
     the burdens at trial, not as an independent claim.  (<u>See</u> May 31,
15   2012 Order at 17:4-18:12 (Docket No. 485) (discussing section
     4435 and concluding that defendants will have the "burden at
16   trial to present sufficient evidence that the bulldozer was not
     negligently maintained, operated, or used").)  The government did
17   not seek to hold any of the individual defendants liable for a
     violation of section 4435 and could not have pursued a state law
18   misdemeanor charge in federal court.
           Section 261.5(c) prohibits "[c]ausing timber, trees,
19   slash, brush or grass to burn except as authorized by permit."
     36 C.F.R. § 261.5(c).  Under § 261.1b, "[a]ny violation of the
20   prohibitions of this part (261) shall be punished by a fine of
     not more than $500 or imprisonment for not more than six months
21   or both pursuant to title 16 U.S.C., section 551, unless
     otherwise provided."  <u>Id.</u> § 261.1b.  The government relied on §
22   261.5(c) in its Second Amended Complaint only to allege that
     "[c]ausing timber, trees, brush, or grass to burn except as
23   authorized by permit is prohibited by law."  (Second Am. Compl. ¶
     29.)  The government did not, and could not, pursue the criminal
24   fine or imprisonment contemplated by § 261.5(c) in this civil
     case.  Judge Mueller also found that § 261.5(c) was inapplicable
25   to this case because the fire did not start on federally-owned
     land and entered judgment in favor of defendants on the
26   government's state law claims "insofar as plaintiff relies on 36
     C.F.R. § 261.5(c) for the underlying violation of law."  (May 31,
27   2012 Order at 19:1-20:2.)

28

1   case, on the other hand, is "entitled as a general matter to

2   discovery of any information sought if it appears 'reasonably

3   calculated to lead to the discovery of admissible evidence.'"

4   Id. at 825-26.  The Supreme Court has explained that "[t]he

5   Federal Rules of Civil Procedure are designed to further the due

6   process of law that the Constitution guarantees."  Nelson v.

7   Adams USA, Inc., 529 U.S. 460, 465 (2000).  The expansive right

8   to discovery in civil cases and the Federal Rules of Civil

9   Procedure thus provided defendants with constitutionally adequate

10  process to mount an effective and meaningful defense to this

11  civil action.

12          Defendants have not cited and this court is not aware

13  of a single case from the Supreme Court or Ninth Circuit applying

14  Brady to a civil case.[6]  In fact, all of the Supreme Court and

15  Ninth Circuit cases defendants rely on for this proposition are

16  cases assessing the conduct of prosecutors[7] in criminal cases.

17  (See Defs.' Revised Supplemental Briefing at 3, 19-20 (Docket No.

18  625-1) ("Defs.' Br.") (relying on Youngblood v. West Virginia,

19  _____

20          [6]    In Pavlik v. United States, the Ninth Circuit
    "assume[d], without deciding, that the principle enunciated in
21  Brady v. Maryland applies in the context of [National Oceanic and
    Atmospheric Administration] civil penalty proceedings."  951 F.2d
22  220, 225 n.5 (9th Cir. 1991).

23          [7]    In what cannot have been an inadvertent choice,
    defendants exclusively refer to the government attorneys in this
24  case as "prosecutors."  Referring to the plaintiff's attorneys in
    a civil case as prosecutors may be technically correct,
25  particularly where, as here, the government entered into a "joint
    prosecution agreement."  In practice, however, the term
26  "prosecutors" is generally used to describe government attorneys
    in criminal cases.  More importantly, referring to the government
27  attorneys in this case as prosecutors does not convert them into
    criminal prosecutors within the meaning of Brady.

28

547 U.S. 867, 869-70 (2006) (criminal case addressing Brady); Kyles v. Whitley, 514 U.S. 419, 438 (1995) (habeas petition based on Brady violation); United States v. Young, 470 U.S. 1, 25-26 (1985) (Brennan, J., concurring) (criminal case addressing prosecutorial misconduct); Imbler v. Pachtman, 424 U.S. 409, 424 (1976) (discussing prosecutorial immunity in suits under 42 U.S.C. § 1983); Berger v. United States, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." (emphasis added)); Tennison v. City & County of San Francisco, 570 F.3d 1078, 1087 (9th Cir. 2009) (42 U.S.C. § 1983 claim based on Brady violations in underlying criminal case); Morris v. Ylst, 447 F.3d 735, 744 (9th Cir. 2006) (criminal case addressing Brady and prosecutor's duty to investigate suspected perjury); United States v. Chu, 5 F.3d 1244, 1249 (9th Cir. 1993) (criminal case addressing prosecutorial misconduct in questioning of witness); Benn v. Lambert, 283 F.3d 1040, 1062 (9th Cir. 2002) (habeas petition based on Brady violation)).)

Outside of the Ninth Circuit, "courts have only in rare instances found Brady applicable in civil proceedings, mainly in those unusual cases where the potential consequences 'equal or exceed those of most criminal convictions.'"  Fox ex rel. Fox v. Elk Run Coal Co., Inc., 739 F.3d 131, 138-39 (4th Cir. 2014) (quoting Demjanjuk v. Petrovsky, 10 F.3d 338, 354 (6th Cir.

1   1993)); see also Brodie v. Dep't of Health & Human Servs., 951 F.

2   Supp. 2d 108, 118 (D.D.C. 2013) ("Brady does not apply in civil

3   cases except in rare situations, such as when a person's liberty

4   is at stake. . . . With only three exceptions, . . . courts

5   uniformly have declined to apply Brady in civil cases.").

6        In arguing that Brady should be extended to this civil

7   case, defendants rely heavily on the Sixth Circuit's decision in

8   Demjanjuk.  In that case, the government sought denaturalization

9   and extradition to Israel on capital murder charges based on its

10  belief that Demjanjuk was "the notorious Ukrainian guard at the

11  Nazi extermination camp near Treblinka, Poland called by Jewish

12  inmates 'Ivan the Terrible.'"  Demjanjuk, 10 F.3d at 339.  During

13  the proceedings, the government did not disclose documents and

14  statements in its possession that "should have raised doubts

15  about Demjanjuk's identity as Ivan the Terrible."  Id. at 342.

16       The Sixth Circuit recognized that even though Brady did

17  not apply in civil cases, "it should be extended to cover

18  denaturalization and extradition cases where the government seeks

19  denaturalization or extradition based on proof of alleged

20  criminal activities of the party proceeded against."  Id. at 353

21  (emphasis added); see also id. (indicating that Brady would not

22  apply if "the government had sought to denaturalize Demjanjuk

23  only on the basis of his misrepresentations at the time he sought

24  admission to the United States and subsequently when he applied

25  for citizenship").

26       In extending Brady to the proceedings in Demjanjuk, the

27  Sixth Circuit explained that the "consequences of

28  denaturalization and extradition equal or exceed those of most

15

criminal convictions," "that Demjanjuk was extradited for trial on a charge that carried the death penalty," that the government attorneys were from the Office of Special Investigations ("OSI"), which is a unit within the Criminal Division of the Department of Justice, that the government attorneys were frequently referred to as prosecutors during the proceedings, and that the Director of OSI believed _Brady_ applied to the proceedings.  _Id._ at 353-54. Unlike in _Demjanjuk_, this case was brought by the Civil Division of the United States Attorney's Office, the government did not seek to prove that defendants engaged in serious criminal conduct potentially subject to capital punishment, and a judgment in favor of the government would not have subjected defendants to consequences akin to those following a criminal conviction.

Because _Brady_ is understandably inapplicable to this civil case, defendants' reliance on criminal cases discussing a prosecutor's heightened duties in light of _Brady_ and other distinctly criminal rights is misguided.  Lawyers representing the United States, like lawyers representing any party, must of course comport with the applicable rules governing attorney conduct.  As defendants appear to concede, those ethical standards, or any self-imposed standard by the executive branch, do not affect the showing necessary to prove fraud on the court, and the court should not, as defendants argue, assess the conduct of the government through the lens of any heightened obligation.

The Supreme Court and Ninth Circuit have repeatedly analyzed claims of fraud on the court by government attorneys without suggesting that their conduct is to be evaluated in light of any heightened obligations.  In _Beggerly_, the government had

16

brought a quiet title action.  524 U.S. at 40.  Defendants sought

proof of their title to the land during discovery and, after

searching public land records, the government informed defendants

that it had not found any evidence showing that the land in

dispute had been granted to a private landowner.  Id. at  40-41.

After judgment was entered pursuant to a settlement the parties

reached on the eve of trial, defendants discovered a land grant

in the National Archives that supported their claim.  Id. at 41.

Defendants sought to vacate the judgment for fraud on the court

because "the United States failed to 'thoroughly search its

records and make full disclosure to the Court'" regarding the

land grant.  Id. at 47.  Without suggesting that a heightened

standard governed the government's conduct during discovery or

litigation, the Supreme Court held that defendants were not

entitled to relief from the judgment.  The Court concluded that

"it surely would work no 'grave miscarriage of justice,' and

perhaps no miscarriage of justice at all, to allow the judgment

to stand."  Id.

          In Appling, the Ninth Circuit discussed Beggerly

without mentioning that the alleged misconduct was committed by

the government and referred to the government only as the

prevailing party.  See Appling, 340 F.3d at 780 (describing

Beggerly as "holding that allegations that the prevailing parting

[sic] failed during discovery in the underlying case to

'thoroughly search its records and make full disclosure to the

Court' were not fraud on the court").

          Similarly, in Estate of Stonehill, the Ninth Circuit

engaged in a detailed examination of alleged instances of

1  misconduct by the government without suggesting that a heightened

2  standard applied because it was the government that engaged in

3  the conduct at issue.  660 F.3d at 445-52.  Instead, the

4  standards the Ninth Circuit articulated and applied were the same

5  as those which govern the ability to seek relief for fraud on the

6  court by non-government parties.[8]  See, e.g., id. at 444-45

7  (discussing Levander and Pumphrey, which assessed allegations of

8  fraud on the court by non-government attorneys); see also id. at

9  445 ("In order to show fraud on the court, Taxpayers must

10  demonstrate, by clear and convincing evidence, an effort by the

11  government to prevent the judicial process from functioning 'in

12  the usual manner.'"); accord Dixon, 316 F.3d at 1046-47 (finding

13  fraud on the court perpetrated by government tax attorneys under

14  the same standards governing fraud on the court by non-government

15  attorneys).

16      The court therefore finds that Brady is inapplicable to

17  this civil case and that the conduct of the government is to be

18  assessed under the same standards as a non-government party when

19  analyzing whether that conduct amounts to fraud on the court.

20  III.  Analysis

21      Initially, it does not appear that any of the alleged

22  acts of fraud tainted the court's decision to enter the

23  stipulated judgment.  The government argues quite persuasively

24  that none of those acts therefore may form the basis for setting

25  

26      [8]   In their brief, defendants mis-cite Estate of Stonehill
   as mentioning a "higher standard of behavior" for government
27  attorneys.  (See Defs.' Br. at 23:18-19.)  That quoted language,
   however, is not in Estate of Stonehill.  The language comes from
28  the criminal case of Young, 470 U.S. 1.

aside the settlement agreement and stipulated judgment.  The

argument certainly has logical appeal and finds support in a

plethora of lower court decisions.[9]  The Supreme Court,

_____

[9]    See Superior Seafoods, Inc. v. Tyson Foods, Inc., 620
F.3d 873, 880 (8th Cir. 2010) (affirming the denial of relief for
fraud on the court when "[t]he court entered its consent judgment
based on the written document provided by the parties after
extensive negotiation" and explaining that "the court was not
required to look behind or interpret that written document to
ensure that the meeting of minds reflected therein was not, in
fact, against the wishes of Mr. Kemp and his attorney"); Pfotzer
v. Amercoat Corp., 548 F.2d 51, 52 (2d Cir. 1977) (affirming
denial of relief for fraud on the court and noting that "'it
sufficed for the court to know the parties had decided to settle,
without inquiring why'" (quoting Martina Theatre Corp. v. Schine
Chain Theatres, Inc., 278 F.2d 798, 801 (2d Cir. 1960))); Roe v.
White, No. Civ. 03-04035 CRB, 2009 WL 4899211, at *3 (N.D. Cal.
Dec. 11, 2009) ("The alleged fraud 'did not improperly influence
the court' because the judgment was based on the parties'
voluntary settlement and not an adjudication on the merits. . . .
The purported falsity of Plaintiffs' allegations is irrelevant to
the settlement agreement, and to the resulting judgment.
Accordingly, any fraud in no way affected the proper functioning
of the judicial system."); In re Leisure Corp., No. Civ. 03-03012
RMW, 2007 WL 607696, at *7 (N.D. Cal. Feb. 23, 2007) (explaining
that an alleged lack of disclosure did not amount to fraud on the
court because it "was not material to the bankruptcy court's
assessment of the Settlement Agreement"); Petersville Sleigh Ltd.
v. Schmidt, 124 F.R.D. 67, 72 (S.D.N.Y. 1989) (finding that
alleged fraud surrounding the source of settlement funds did not
amount to fraud on the court because the court "never inquired,
nor was it told, the source of those funds"); United States v.
Int'l Tel. & Tel. Corp., 349 F. Supp. 22, 36 (D. Conn. 1972)
(concluding that a failure to disclose a motivating factor of the
government's decision to enter settlement negotiations could not
amount to fraud on the court when the court "had a limited role
in approving" the consent decree and the government's "decision
to negotiate a settlement of the [] case w[as] simply not
relevant to such an inquiry"); In re Mucci, 488 B.R. 186, 194
(Bankr. D. N.M. 2013) ("[I]f the Court did not rely on fraudulent
conduct in entering the judgment from which the party seeks
relief, the judgment should not be set aside. . . . The Court
entered the Stipulated Judgment setting forth terms of the
settlement between the Plaintiffs and Defendant and approving the
settlement based on the stipulation of the parties, not based on

1  nevertheless, appears to have rejected that argument.  See

2  Beggerly, 524 U.S. at 39, 40-41, 47 (addressing the sufficiency

3  of allegations of fraud on the court despite the fact that the

4  judgment in that case was entered pursuant to a settlement

5  agreement and the alleged fraud was not relevant to the court's

6  decision to enter the judgment pursuant to the settlement

7  agreement).  The court accordingly proceeds to consider

8  defendants' claims, individually and collectively, in light of

9  the government's alternative arguments.

10      A.   Allegations of fraud on the court that defendants knew

11           about prior to settlement and entry of judgment

12           With the exception of any allegations subsequently

13  addressed in this Order, defendants concede they knew of the

14  following alleged instances of fraud on the court prior to

15  settling the federal action: (1) that the government advanced an

16  allegedly fraudulent origin and cause investigation and allegedly

17  allowed investigators to testify falsely about their work,

18  (Defs.' Br. at 58:2-9); (2) that the government allegedly

19  misrepresented J.W. Bush's admission that a bulldozer rock strike

20  caused the Moonlight Fire, (id. at 63:26-28); (3) that the

21  government proffered allegedly false testimony in opposition to

22

23  any affidavits or testimony from the Plaintiffs or Mr. Ely.  The
    Court did not look behind the parties' stipulation."); In re

24  NWFX, Inc., 384 B.R. 214, 220 (Bankr. W.D. Ark. 2008) ("To prove
    fraud on the court, the movant must establish that the officer of

25  the court's misrepresentation or nondisclosure was material to
    the court's judgment. . . . [T]he aforementioned cases indicate

26  that a relevant inquiry in the present case is whether the court
    would have approved the settlement had it known the undisclosed

27  facts, i.e., whether the trustee's misrepresentations were

28  'material' to the court's approval of the settlement.").

1   defendants' motion for summary judgment, (id. at 69:3-4); (4)

2   that the government failed to take remedial action after learning

3   that the air attack video allegedly undermined its origin and

4   cause theory, (id. at 74:3-4); (5) that the government created an

5   allegedly false diagram, (id. at 77:8-9); (6) that the government

6   failed to correct an allegedly false expert report, (id. at

7   79:20-80:11); (7) that the government allegedly misrepresented

8   evidence regarding other wildland fires, (id. at 88:5-6); and (8)

9   that the government allegedly covered up misconduct at the Red

10  Rock Lookout Tower, (id. at 104:9-11).

11          Despite knowing of and having the opportunity to

12  persuade the jury that the government engaged in the

13  aforementioned alleged misconduct, defendants chose to settle the

14  case and forgo the jury trial.  Relying exclusively on Hazel-

15  Atlas Glass Co., defendants now argue that the calculated

16  decision to settle the case with full knowledge of the alleged

17  fraud does not bar their ability to seek relief for fraud on the

18  court.

19          In Hazel-Atlas Glass Co., however, the Supreme Court

20  indicated that it was addressing relief from a judgment gained by

21  fraud on the court because of "after-discovered fraud."  See

22  Hazel-Atlas Glass Co., 322 U.S. at 244 ("From the beginning there

23  has existed along side the term rule a rule of equity to the

24  effect that under certain circumstances, one of which is after-

25  discovered fraud, relief will be granted against judgments

26  regardless of the term of their entry."); Hazel-Atlas Glass Co.,

27  322 U.S. at 245 ("This is not simply a case of a judgment

28  obtained with the aid of a witness who, on the basis of after-

discovered evidence, is believed possibly to have been guilty of
perjury."); accord O.F. Nelson & Co. v. United States, 169 F.2d
833, 835 (9th Cir. 1948) ("Nor is it a case of after discovered
fraud, where an appellate court, after the expiration of the
term, has an equitable right, in a proceeding in the nature of a
bill of review, to set aside its judgment on proof of fraud in
its procurement as in . . . Hazel-Atlas Glass Co.") (internal
citation omitted); Demjanjuk, 10 F.3d at 356 ("The Supreme Court
has recognized a court's inherent power to grant relief, for
'after-discovered fraud,' from an earlier judgment 'regardless of
the term of [its] entry.'" (quoting Hazel-Atlas Glass Co., 322
U.S. at 244)).

While the Court in Hazel-Atlas Glass Co. contemplated
relief only for "after-discovered fraud," it recognized that
Hazel-Atlas Glass Co. ("Hazel") had "received information" about
the fraud prior to entry of judgment and, when the significance
of the suspected fraud became clear, had "hired investigators for
the purpose of verifying the hearsay by admissible evidence."
322 U.S. at 241-42.  Hazel was unable to confirm the fraud
because the witness who could have revealed it lied to Hazel's
investigators at the behest of defendants.  Id. at 242.  In
rejecting the appellate court's finding that Hazel was not
entitled to relief because it "had not exercised proper diligence
in uncovering the fraud," the Court concluded, "We cannot easily
understand how, under the admitted facts, Hazel should have been
expected to do more than it did to uncover the fraud."  Id. at
246 (emphasis added).  The Court went on to explain that, "even
if Hazel did not exercise the highest degree of diligence [in

22

1   uncovering the fraud,] Hartford's fraud cannot be condoned for

2   that reason alone."  Id.

3        The Court was therefore working under the factual

4   premise that Hazel suspected and was investigating the fraud

5   prior to settlement, but had not yet uncovered it, possibly due

6   to its own lack of diligence.  The Court's understanding of the

7   facts was consistent with Hazel's allegations in seeking relief.

8   See id. at 263-68 (Roberts, J., dissenting) (indicating that

9   Hazel alleged that it "'did not know'" of the fraud and "'could

10  not have ascertained [it] by the use of proper and reasonable

11  diligence'" prior to entry of judgment).

12       Justice Roberts' dissenting opinion underscores the

13  factual assumptions the majority relied on because his primary

14  disagreement with the majority was that an evidentiary hearing

15  was necessary to determine whether Hazel in fact knew of the

16  fraud before entry of judgment.  In his dissent, Justice Roberts

17  belabors facts that are entirely absent from the majority opinion

18  and from which he believes a trier of fact could find that Hazel

19  knew of the fraud prior to entry of judgment.  See id. (Roberts,

20  J., dissenting).  He concludes,

21        [I]t is highly possible that, upon a full trial, it
          will be found that Hazel held back what it knew and,
22        if so, is not entitled now to attack the original
          decree. . . . And certainly an issue of such
23        importance affecting the validity of a judgment,
          should never be tried on affidavits.
24

25  Id. at 270 (Roberts, J., dissenting).

26       In sum, all of the justices in Hazel-Atlas Glass Co.

27  agreed that Hazel would have been barred from seeking relief if

28  it knew of the fraud prior to settlement and entry of judgment.

23

1    They disagreed only as to whether the limited evidence before the

2    Court was sufficient to find--as the majority did--that Hazel had

3    suspicions, but had not yet uncovered the fraud and could

4    therefore seek relief based on "after-discovered fraud."

5         At the opposite end of the spectrum, defendants here

6    concede they knew of the eight instances of alleged fraud prior

7    to reaching a settlement and the stipulated entry of judgment

8    pursuant to that settlement.  In fact, at the time they settled

9    the case, defendants possessed and understood the purported

10   significance of the very documents and testimony they now rely on

11   in support of their motion before the court.  According to

12   defendants, these documents prove the alleged fraud and, unlike

13   in Hazel-Atlas Glass Co., would have presumably been admissible

14   at trial.  See id. at 241-43.  Other than Hazel-Atlas Glass Co.,

15   which does not support defendants' position, defendants have not

16   cited and this court is not aware of a single decision in which a

17   court set aside a final judgment because of fraud on the court

18   when the party seeking relief knew of and had the evidence to

19   prove the fraud prior to entry of judgment.

20        That defendants cannot cite such a case comes as no

21   surprise to this court.  "The concept of fraud upon the court

22   challenges the very principle upon which our judicial system is

23   based: the finality of a judgment."  Herring v. United States,

24   424 F.3d 384, 386 (3d Cir. 2005).  Moreover, this is not just a

25   case in which a party seeks the extreme relief of setting aside a

26   final judgment.  Defendants here seek to set aside a final

27   judgment entered only because of their own strategic choice to

28   settle the case with full knowledge of the alleged fraud.

24

The significance of defendants' decision to settle with the government cannot be overstated.  A settlement, by its very nature, is a calculated assessment that the benefit of settling outweighs the potential exposure, risks, and expense of litigation.  Here, the parties acknowledged these competing considerations in their settlement agreement: "This settlement is entered into to compromise disputed claims and avoid the delay, uncertainty, inconvenience, and expense of further litigation." (Settlement Agreement & Stipulation ¶ 12.)  In any lawsuit, it is not uncommon for the parties to disagree not only on the ultimate issues in the case, but also about whether witnesses are telling the truth or the opposing party complied with its discovery obligations.  Any settlement agreement would become just a meaningless formality if a settling party could set aside that agreement at any later time based upon alleged fraud the party knew of when entering into the agreement.

In explaining why perjury by a witness and non-disclosure alone generally cannot amount to fraud on the court, the Ninth Circuit has also emphasized that such fraud "could and should be exposed at trial."  In re Levander, 180 F.3d at 1120; accord George P. Reintjes Co., Inc. v. Riley Stoker Corp., 71 F.3d 44, 49 (1st Cir. 1995) ("The possibility of perjury, even concerted, is a common hazard of the adversary process with which litigants are equipped to deal through discovery and cross-examination . . . . Were mere perjury sufficient to override the considerable value of finality after the statutory time period for motions on account of fraud has expired, it would upend the Rule's careful balance." (internal

1   citation omitted)); <u>Great Coastal Exp., Inc. v. Int'l Bhd. of</u>

2   <u>Teamsters, Chauffeurs</u>, 675 F.2d 1349, 1357 (4th Cir. 1982)

3   ("Perjury and fabricated evidence are evils that can and should

4   be exposed at trial, and the legal system encourages and expects

5   litigants to root them out as early as possible.  In addition,

6   the legal system contains other sanctions against perjury.").

7           For the eight allegations of fraud that

8   defendants knew of at the time of settlement, there can be no

9   question that they had the opportunity to expose the alleged

10  fraud at trial.  During depositions, defendants' counsel

11  repeatedly cross-examined witnesses on the very issues defendants

12  now claim constitute fraud on the court.  (<u>See, e.g.</u>, Defs.' Br.

13  at 45:3-15, 52:9-12, 52:20-53:17, 61:23-28, 62:24-28, 67:20-23,

14  78:20-80:7, 83:18-20, 84:3-11, 103:3-7.)  In their trial brief,

15  defendants expressed their intent to expose the fraud at trial

16  and had every opportunity to do so.  (<u>See, e.g.</u>, Defs.' Trial Br.

17  at 1:11-13 (Docket No. 563) ("But, as the facts of this case

18  show, their investigation was more than just unscientific and

19  biased.  When the investigators realized that their initial

20  assumptions were flawed, they resorted to outright deception.");

21  July 2, 2012 Final Pretrial Order at 17:21-22 (Docket No. 573)

22  (denying the government's motion in limine in part and allowing

23  defendants "to introduce evidence that there was an attempt to

24  conceal information from the public or the defense").)

25          To the extent defendants argue that any tentative in

26  limine ruling would have limited their ability to prove the

27  alleged fraud, their argument must fail.  Defendants had the

28  opportunity to challenge any in limine ruling during trial and on

1   appeal.  Instead, defendants elected to forgo the normal

2   procedures of litigating a dispute.  Allowing defendants to

3   knowingly bypass an appeal and seek relief now would erroneously

4   allow "fraud on the court" to "become an open sesame to

5   collateral attacks."  Oxxford Clothes XX, Inc. v. Expeditors

6   Intern. of Wash., Inc., 127 F.3d 574, 578 (7th Cir. 1997); see

7   also Oxxford Clothes XX, Inc., 127 F.3d at 578  ("A lie uttered

8   in court is not a fraud on the liar's opponent if the opponent

9   knows it's a lie yet fails to point this out to the court.  If

10   the court through irremediable obtuseness refuses to disregard

11   the lie, the party has--to repeat what is becoming the refrain of

12   this opinion--a remedy by way of appeal.  Otherwise 'fraud on the

13   court' would become an open sesame to collateral attacks,

14   unlimited as to the time within which they can be made by virtue

15   of the express provision in Rule 60(b) on this matter, on civil

16   judgments."); Abatti, 859 F.2d at 119 ("Appellants might have

17   been successful had they argued their version of the agreement on

18   a direct and timely appeal from the decisions against them, but

19   their argument does not change the finality of the decisions

20   now.").

21          The litigation process not only uncovered the alleged

22   fraud, it equipped defendants with the opportunity to prove it.

23   Instead, defendants made the calculated decision on the eve of

24   trial to settle the case knowing everything that they now claim

25   amounts to fraud on the court.  Cf. Latshaw, 452 F.3d at 1099

26   ("Generally speaking, Rule 60(b) is not intended to remedy the

27   effects of a deliberate and independent litigation decision that

28   a party later comes to regret through second thoughts . . . .").

1  A party's voluntary settlement with full knowledge of and the

2  opportunity to prove alleged fraudulent conduct cannot amount to

3  a "grave miscarriage of justice," Beggerly, 524 U.S. at 47.  To

4  argue otherwise is absurd.

5       B.    Allegations of fraud on the court that defendants

6             discovered after settlement and entry of judgment

7            As to the six overarching allegations of fraud that

8  defendants allegedly discovered after settlement and entry of

9  judgment, the government contends that the allegations must fail

10 because of defendants' lack of diligence and the settlement

11 agreement in this case.

12          When fraud is aimed at the court, the injured party's

13 lack of diligence in uncovering the fraud does not necessarily

14 bar relief.  In Hazel-Atlas Glass Co., the Supreme Court held

15 that relief in that case was not precluded even if Hazel "did not

16 exercise the highest degree of diligence" in uncovering the

17 fraud.  322 U.S. at 246.  The Court explained that it could not

18 "condone[]" the fraud based on a party's lack of diligence

19 because the fraud was perpetrated against the court:

20

21          This matter does not concern only private parties.
           There are issues of great moment to the public in a
22          patent suit.  Furthermore, tampering with the
           administration of justice in the manner indisputably
23          shown here involves far more than an injury to a
           single litigant.  It is a wrong against the
24          institutions set up to protect and safeguard the
           public, institutions in which fraud cannot
25          complacently be tolerated consistently with the good
           order of society.  Surely it cannot be that
26          preservation of the integrity of the judicial process
           must always wait upon the diligence of litigants.  The
27          public welfare demands that the agencies of public
           justice be not so impotent that they must always be
28          mute and helpless victims of deception and fraud.

1    Id. (internal citations omitted).  More recently, in Pumphrey,

2    the Ninth Circuit cited Hazel-Atlas Glass Co. and explained that,

3    "even assuming that [the plaintiff] was not diligent in

4    uncovering the fraud, the district court was still empowered to

5    set aside the verdict, as the court itself was a victim of the

6    fraud."  Pumphrey, 62 F.3d at 1133 (emphasis added).

7         On the other hand, the Ninth Circuit has held that

8    fraud "perpetrated by officers of the court" did not amount to

9    fraud on the court when it was "aimed only at the [party seeking

10   relief] and did not disrupt the judicial process because [that

11   party] through due diligence could have discovered the non-

12   disclosure."  Appling, 340 F.3d at 780 (emphasis added).  In

13   Appling, plaintiffs had served a subpoena on Henry Keller, who

14   was a former executive of the defendant.  Id. at 774.

15   Defendant's counsel responded to the subpoena on behalf of Keller

16   and orally assured plaintiffs' counsel that Keller did not have

17   any documents or knowledge relevant to the litigation.  Id.

18        After the district court granted summary judgment in

19   favor of defendant, plaintiffs discovered that "Keller had not

20   authorized State Farm to respond on his behalf, [] was never

21   shown a copy of the objections or consulted with respect to their

22   contents," and in fact had a document and video and had made a

23   statement that were relevant and favorable to plaintiffs.  Id.

24   The Ninth Circuit concluded that, although a non-disclosure by

25   counsel that was aimed only at the opposing party and could have

26   been discovered through due diligence might have "worked an

27   injustice, it did not work a 'grave miscarriage of justice.'"

28   Id. at 780; see Appling, 340 F.3d at 780 ("Fraud on the court

29

1    requires a 'grave miscarriage of justice,' and a fraud that is

2    aimed at the court." (quoting Beggerly, 524 U.S. at 47)).

3          Similarly, in Gleason v. Jandrucko, the plaintiff

4    sought to set aside a judgment entered pursuant to the parties'

5    settlement for fraud on the court.  860 F.2d 556 (2d Cir. 1988).

6    After the case had settled and judgment was entered, the

7    plaintiff uncovered alleged fraud by the defendant police

8    officers.  Id. at 558.  The Second Circuit nonetheless concluded

9    that the plaintiff was not entitled to relief because he "had the

10   opportunity in the prior proceeding to challenge the police

11   officers' account of his arrest."  Id. at 559.  Instead of

12   pursuing the relevant discovery to uncover the fraud and

13   challenging the police officers' account of his arrest through

14   litigation, the plaintiff "voluntarily chose to settle the

15   action."  Id.  The Ninth Circuit relied on Gleason when

16   explaining that perjury or non-disclosure cannot amount to fraud

17   on the court when the party seeking relief had "the opportunity

18   to challenge" the alleged fraud through discovery that could have

19   been performed and evidence that could have been introduced at

20   trial.  In re Levander, 180 F.3d at 1120.

21         With the exception of evidence that simply did not

22   exist at the time of settlement and entry of judgment, defendants

23   uncovered most of the evidence underlying their allegations of

24   fraud through discovery in the state action that occurred after

25   the federal action concluded.  Since defendants were able to

26   successfully obtain the evidence to show the alleged fraud

27   through discovery in the state action, the court can discern no

28   reason why they could not have obtained that same evidence

1   through diligent discovery in the federal action.   As the Ninth

2   Circuit has explained, a grave miscarriage of justice simply

3   cannot result from any fraud that was directed only at defendants

4   and could have been discovered with the exercise of due

5   diligence.

6          Even as to allegations of fraud on the court that

7   defendants could not have discovered through diligence before

8   settlement and entry of judgment, the terms of the settlement

9   agreement in this case bar relief, at least as to alleged fraud

10  aimed only at defendants.   In their settlement agreement,

11  defendants not only willingly settled the case in light of the

12  facts they knew, but expressly acknowledged and accepted that the

13  facts may be different from what they believed:

14          The Parties understand and acknowledge that the facts
            and/or potential claims with respect to liability or
15          damages regarding the above-captioned actions may be
            different from facts now believed to be true or claims
16          now believed to be available. . . . Each Party accepts
            and assumes the risks of such possible differences in
17          facts and potential claims and agrees that this
            Settlement Agreement shall remain effective
18          notwithstanding any such differences.
19
20  (See Settlement Agreement & Stipulation ¶ 25.)   Defendants were

21  not obligated to include this language in the settlement

22  agreement and, when defendants believed at the time of settlement

23  that the case was based on "outright deception," (Defs.' Trial

24  Br. at 1:13), it might have seemed more appropriate to exclude

25  any fraudulent government conduct or fraud on the court from this

26  waiver.   But they did not.   Defendants have been represented by

27  numerous high-priced attorneys throughout this litigation and the

28  court has no doubt that defense counsel expended many hours

1    reviewing and revising each term in the settlement agreement.  A

2    grave miscarriage of justice cannot result from enforcing the

3    clear and deliberate terms of a settlement agreement.  If the

4    court were to simply ignore the express language of a settlement

5    agreement, parties to such an agreement could never obtain a

6    reasonable assurance that a settlement was indeed final.

7          For alleged fraud on the court aimed only at

8    defendants, any lack of diligence and the express terms of their

9    settlement agreement preclude a finding that the alleged

10   misconduct resulted in a grave miscarriage of justice.

11   Nonetheless, the court will go on to examine whether any of the

12   allegations defendants discovered after settlement and entry of

13   judgment are sufficient to sustain defendants' motion

14   notwithstanding the preclusive effect of the settlement

15   agreement.

16          1.   Allegations Surrounding the White Flag

17          Defendants contend that the government advanced a

18   fraudulent origin and cause investigation and allowed the

19   investigators to lie during their depositions about the

20   foundation of their investigation.  The central aspect of these

21   allegations is the existence of a white flag, which allegedly

22   denotes an investigator's determined point of origin.  (Defs.'

23   Br. at 44:26-27.)  As revealed by photographs taken during their

24   investigation, a white flag had been placed at the location that

25   matches with the investigators' only recorded GPS measurement but

26   is about ten feet away from the two points of origin identified

27   in the Joint Report.  (Id. at 45:21-25.)  Of the conduct giving

28   rise to the overarching allegation of fraudulent conduct

surrounding the white flag, defendants discovered only three

discrete alleged acts of misconduct after settlement and entry of

judgment.

a.    Reynolds' Deposition Testimony

First, defendants allege that in January 2011, the

government had a pre-deposition meeting with Reynolds at which

they discussed the white flag.  Defense counsel obviously knew

about that meeting before settlement because they questioned

Reynolds at length about it at his earlier deposition on November

15, 2011.  (See, e.g., Reynolds Nov. 15, 2011 Dep. at 1053:16-21

("Q: And do you recall your testimony, sir, is that someone in

the January--roughly January 2011 meeting at the D.O.J.'s office

or the U.S. Attorney's Office asking questions about the white

flag, correct?  A: Yes."); see also Reynolds Nov. 15, 2011 Dep.

at 1062:21-2063:8, 1064:7-14, 1065:13-24, 1101:7-14.)  At that

deposition, Reynolds testified that he did not "recall for sure"

what the government counsel "contribute[d] to the discussion"

about the white flag.  (Reynolds Nov. 15, 2011 Dep. at 1068:7-

22.)

During his later deposition in the state action and

after the federal action settled, Reynolds allegedly testified

for the first time that the government attorneys told him that

the white flag was a "non-issue" at the January 2011 meeting:

> Q: And in this conversation did they ask you questions
> as to whether or not you placed that white flag?
>
> A: Yes.
>
> Q: And what was your answer in response to those
> questions?

A:  I  have  no  recollection  of  placing  the  flag.  And
that's--we  saw  it  as  a  nonissue.   And  they  said  it  was
going  to  come  up  and  saw  it  as  a  nonissue.

(Reynolds Nov. 1, 2012 Dep. at 1499:3-11 (Docket No. 597-18); see

also Defs.' Br. at 56:15-21; Defs.' Reply in Support of

Supplemental Briefing at 83:24-26 (Docket No. 637) ("Defs.'

Reply").)

       According to defendants, the government attorneys'

indication that they saw the white flag as a "non-issue" gave

Reynolds "permission to provide false testimony," and the

government did not correct Reynolds' testimony when he denied the

existence of a white flag in his subsequent deposition.  (Defs.'

Reply at 84:11-13; see also Defs.' Br. at 56:22-57:6 (quoting

from the March 2011 deposition).)  At oral argument, defendants

recognized that Eric Overby represented the government at

Reynolds' three-day deposition in March 2011.  Probably because

defendants rely on statements Overby made about this case to

advance their motion, they do not argue that Overby suborned

perjury.  Instead, they suggest that the lead government attorney

had a duty to correct Reynolds' allegedly perjured testimony

after his deposition.

       When the record is examined there is no substance

whatsoever to defendants' contention.  Specifically, the court is

at a loss to decipher how Reynolds' testimony at his deposition

following the January 2011 meeting could possibly be construed as

falsely testifying that a white flag did not exist.  When defense

counsel originally showed Reynolds a picture with the white flag,

he testified that he could not see the flag:

1   Q: I have blown it up for you on a laptop here, Mr.
2   Reynolds.

3   And if I could have you look at the very center of
    that photograph and tell me if you recognize a white
4   flag with a post on it? . . .

5   THE WITNESS: I see what looks like a chipped rock
6   there.

7   Q. BY MR. WARNE: And do you see the flag?

8   A. No.

9   Q. You don't see any white flag?

10  A. It looks like a chipped rock right there
11  (indicating).

12  (Reynolds Mar. 23, 2011 Dep. at 534:11-24.)

13       Had Reynolds' testimony about the white flag ended

14  there, defendants' allegations might make sense.  However,

15  defense counsel continued his questioning and Reynolds ultimately

16  agreed that the image counsel identified was indeed a white flag,

17  albeit hard to make out:

18
    Q. There is a white flag right there (indicating).
19
20  A. Okay.

21  Q. Do you see it?

22  A. Well, I don't really see a flag.  It almost looks
23  like a wire here.

24  Q. That's right.  And do you see the flag on top of
    it, sir?
25
26  A. I guess if that's what that is.

27  Q. And you don't recall where that came from?

28  A. No.

35

1          . . .

2          Q. You don't recognize a white flag there?

3          A. Hard to say that that's a white flag but I do see a
4          stem--

5          Q. But you don't recall--

6          A. --that looks like it's one.

7          Q. It looks like it's a white flag, correct?

8          A. It looks like a white flag.

9

10     (Id. at 531:25-10, 536:1-7.)

11          That Reynolds struggled to see the white flag should

12     not come as a surprise.  Defense counsel admit that they

13     initially "missed the white flag as they carefully reviewed the

14     Joint Report as well as all of the native photographs" and only

15     discovered it "while reviewing the native photographic files on a

16     computer screen with back-lit magnification."  (Defs.' Br. at 49

17     n.29.)  Defendants included a "magnified and cropped" photograph

18     of the white flag in their brief.  (Id. at 46.)  Similar to

19     Reynolds, only after examining the image for a considerable

20     amount of time, could the court locate what appears to possibly

21     be a thin metal pole.  Near the top of the pole is a whitish

22     colored object that the court presumes must be the white flag.

23     Without having located the metal pole, the court itself would

24     have firmly believed that the whitish object was a rock or other

25     ground debris.

26          Even if Reynolds' reluctance in acknowledging the flag

27     was not so easily understood, he ultimately testified that the

28     white flag was in the picture.  Assuming that an attorney's

1   encouraging and then suborning perjury during a deposition could

2   amount to fraud on the court even though it is not "aimed at the

3   court," Appling, 340 F.3d at 780 (quoting Beggerly, 524 U.S. at

4   47), the government never encouraged nor suborned perjury with

5   respect to Reynolds' deposition testimony.  Accordingly, the

6   January 2011 pre-deposition meeting and Reynolds' subsequent

7   deposition testimony about the white flag fail to amount to any

8   type of fraud, let alone fraud on the court.

9                 b.   Dodds' and Paul's Deposition Testimony

10              The second instance of alleged fraudulent misconduct by

11  the government about the white flag involves deposition testimony

12  during the state action by one of the government's origin and

13  cause experts, Larry Dodds, and Cal Fire Unit Chief Bernie Paul.

14  At his deposition for the state action about ten months after the

15  federal settlement, Dodds allegedly recognized that "the white

16  flag raises 'a red flag,' creates a 'shadow of deception' over

17  the investigation, and caused him to conclude 'it's more probable

18  than not that there was some act of deception associated with

19  testimony around the white flag.'"  (Defs.' Br. at 55:11-14.)

20  Similarly, defendants allege that during his deposition for the

21  state action about six months after the federal settlement, Paul

22  testified that "the evidence and testimony surrounding the white

23  flag caused him to disbelieve the Moonlight Investigators," (id.

24  at 55:14-16), and was "'alone enough to cause [him] to want to

25  toss the whole report out.'"  (Defs.' Reply at 88:2-3.)[10]

26  ────────────────────────────
            [10]   Defendants may be playing loose with their
27  characterization of the deposition testimony as the questions
    often relied on the witness making faulty assumptions, such as
28  Reynolds having denied the existence of the white flag during his

1      Defendants do not allege that either witness testified

2  differently and thus falsely during any deposition in the federal

3  action.  As to Dodds, defendants allege only that he "did not

4  make these concessions during his federal deposition." (Id. at

5  87:19.)  So what?  There is no allegation that Dodds committed

6  perjury, let alone that the government was a party to any

7  perjury.

8      The most that can be inferred from Dodds' testimony is

9  that he either failed to volunteer his personal opinions during

10  the federal deposition or did not form those opinions until after

11  the settlement.  As the Ninth Circuit has repeatedly recognized,

12  "[n]on-disclosure. . . does not, by itself, amount to fraud on

13  the court." Appling, 340 F.3d at 780.  Moreover, there is no

14  allegation that the government attorneys knew of these alleged

15  opinions; thus it cannot even be suggested that any alleged out-

16  of-court non-disclosure was "a fraud perpetrated by officers of

17  the court so that the judicial machinery can not perform in the

18  usual manner its impartial task of adjudging cases that are

19  presented for adjudication." Id.

20      If Dodds simply did not form these opinions until after

21  the federal settlement, any allegation of fraud must fail.  See

22  Pumphrey, 62 F.3d at 1131 (explaining that a finding of fraud on

23  the court "must involve an unconscionable plan or scheme which is

24  designed to improperly influence the court in its decision."

25  (internal quotations marks omitted)).  If a post-judgment change

26  

27  deposition.  (See, e.g., Paul Dec. 18, 2012 Dep. at 202:9-23;
   Paul Jan. 15, 2013 Dep. at 806:2-8 (Docket No. 597-26).)

28

1  in opinion by an expert witness could somehow be elevated to

2  fraud on the court, the finality of every judgment relying on

3  expert testimony could always be called into question.

4       Paul was neither disclosed as an expert nor deposed in

5  the federal action.  (Defs.' Reply 87:21-22.)  That an expert in

6  a separate case forms an opinion allegedly advantageous to a

7  party after entry of judgment does not even come close to the

8  outer limits of fraud on the court.  Stretching defendants'

9  allegations to their limit, defendants might argue that Paul

10 formed his opinions before the settlement and that the government

11 knew of and failed to disclose those opinions.  Again, so what?

12 Even if defendants had alleged that the government knew of Paul's

13 opinions before settlement, the government was under no

14 obligation to disclose the opinions of a potential expert witness

15 whom it did not intend to call.  See Fed. R. Civ. P. 26(a)(2)(A).

16 Such a non-disclosure surely could not be considered a "grave

17 miscarriage of justice."  Beggerly, 524 U.S. at 47.

18      For these reasons, the allegations regarding Dodds' and

19 Paul's subsequent testimony during their depositions for the

20 state action cannot constitute fraud on the court.

21            c.   Welton's Deposition Testimony

22      According to defendants, United States Forest Service

23 law enforcement officer Marion Matthews and United States Forest

24 Service investigator Diane Welton visited the fire scene on

25 September 8, 2007.  During that meeting, "Matthews told Welton

26 that she had reservations about the size of the alleged origin

27 area as established by White."  (Defs.' Br. at 30:9-11.)  At the

28 time of settlement, defendants were aware of Matthews'

1   reservations about the size of the alleged origin area and that

2   she had communicated those concerns to Welton. (See, e.g.,

3   Matthews Apr. 26, 2011 Dep. at 174:22-176:8, 177:17:178:3.)

4         About thirteen months later, former Assistant United

5   States Attorney ("AUSA") Robert Wright visited the fire site with

6   several expert consultants, White, and Welton. (Id. at 32:3-6.)

7   After viewing the site, Wright allegedly drove back to town with

8   White and Welton. (Id. at 32:8-9.) During the drive, Welton

9   allegedly told Wright "that investigator Matthews, who had

10   visited the alleged origin five days after it began, had wanted

11   the investigators to declare a larger alleged origin area for the

12   fire." (Id. at 32:10-12.)

13         At her deposition on August 15, 2012 prior to the

14   settlement and entry of judgment, Welton testified that she did

15   not recall having any discussions with Matthews about expanding

16   the origin area:

17        Q:  Was there any discussion that you recall at the
           scene about the general area of origin being
18        potentially larger than the area that was bounded by
           the pink flagging?
19

20        A:  I don't recall having that discussion.

21        Q: Did Marion Matthews at any point in time ever
           express to you the thought that she believed the
22        general area of origin should have been bigger, both
           uphill and downhill?
23        A:  Not that I can recall.

24

25   (Welton Aug. 15, 2011 Dep. at 579:23-580:7.)

26         According to defendants, Welton "lied" during her

27   deposition when she testified that she did not recall the

28   conversation with Matthews about the area of origin.  She did

1   not, however, deny that the conversation occurred.  Welton

2   testified only that she did not recall an alleged conversation

3   that occurred almost four years prior to her deposition.  Even

4   assuming that Welton's testimony could be considered perjury,

5   perjury by a witness alone cannot amount to fraud on the court.

6   See, e.g., Appling, 340 F.3d at 780 ("Non-disclosure, or perjury

7   by a party or witness, does not, by itself, amount to fraud on

8   the court."); Hazel-Atlas Glass Co., 322 U.S. at 245 ("This is

9   not simply a case of a judgment obtained with the aid of a

10  witness who, on the basis of after-discovered evidence, is

11  believed possibly to have been guilty of perjury.").  Having

12  already deposed Matthews at length about her conversation with

13  Welton about the area of origin, (see, e.g., Matthews Apr. 26,

14  2011 Dep. at 174:22-176:8, 177:17-178:3), defendants could not

15  have been deceived by Welton's inability to remember.

16          Alleging that Welton told AUSA Wright about the

17  conversation, defendants apparently seek to make the government a

18  party to Welton's allegedly perjured testimony.  According to

19  defendants, however, Welton told Wright about the conversation on

20  October 2, 2008, and Wright was then forbidden from working on

21  the case in January 2010.  Wright was therefore neither present

22  for nor privy to the substance of Welton's August 15, 2011

23  deposition.  While it would ordinarily be reasonable to infer

24  that one attorney's knowledge is shared by all of the attorneys

25  working on a case, the allegations in this case preclude such an

26  inference.  Not only was AUSA Wright removed from this case, he

27  has since left the United States Attorney's Office and

28

41

1   essentially joined forces with defense counsel in the very case

2   he originally pursued on behalf of the government.

3          In the detailed declarations from Wright that

4   defendants submitted in support of the pending motion, Wright

5   never suggests that he told any of the other AUSAs assigned to

6   this case about his pre-litigation conversation with Welton.

7   (See June 12, 2014 Wright Decl. (Docket No. 593-4), Mar. 6, 2015

8   Wright Decl. (Docket No. 637-2).)  Because Wright is now

9   cooperating with and advocating on behalf of defendants, and has

10  not hesitated to accuse his former colleagues of misconduct, the

11  court has no doubt he would have disclosed that he told his

12  former colleagues about the conversation if he had done so.  Any

13  argument of fraud on the court must fail in the absence of an

14  allegation or reasonable inference that the government had unique

15  knowledge beyond Matthews' testimony about the area of origin

16  conversation when Welton testified she did not recall it.[11]

17          2.   Dodds' Handwritten Notes

18          Defendants' next allegation of fraud on the court

19  relates to the air attack video, which was taken by a pilot

20  flying over the Moonlight Fire about one-and-a-half hours after

21  it ignited.  While the federal action was pending, both parties

22  had their experts identify the alleged points of origin on the

23  video and, according to defendants, both experts marked locations

24  _____

25          [11]   Defendants of course do not argue that Wright, whom
    they obviously believe to be their star witness, should have
26  voluntarily disclosed his conversation with Welton about the area
    of origin prior to his removal from the case.  Had this mere non-
27  disclosure been by any other AUSA, the court has no doubt that
    defendants would acuse that AUSA of egregious misconduct.

28
                              42

1  that are in unburnt areas outside of the smoke plume.  Defendants

2  knew of and litigated the issues surrounding the air attack video

3  and the related expert analysis prior to settlement and entry of

4  judgment.  (See Defs.' Br. at 74:3-4.)

5       The only evidence surrounding the air attack video that

6  defendants were unaware of prior to settling were handwritten

7  notes by Dodds.[12]  Dodds provided these notes to defendants for

8  the first time during his deposition in the state action.

9  Defendants allege that the undisclosed handwritten notes "reveal

10  that Dodds struggled in consultation with the [government] to

11  reconcile the location of the government's alleged origin with

12  the Air Attack video, particularly joint federal/state expert

13  Curtis's placement of the alleged origin in the video frames."

14  (Id. at 74:16-19.)

15       That defendants even suggest the alleged fraud

16  regarding the air attack video is remotely analogous to the fraud

17  in Pumphrey underscores the looseness with which defendants want

18  the court to view conduct required to allege fraud on the court.

19  The similarities between defendants' allegations in this case and

20  Pumphrey end at the fact that both include a video.  Unlike in

21  Pumphrey, there is no allegation in this case that the air attack

22  video was recorded for a fraudulent purpose or concealed from

23  defendants.  See Pumphrey, 62 F.3d at 1130-32.  Defendants and

24  the government simply, albeit strongly, disagree about what

25

26       [12]   Defendants initially argued that two sets of notes were
   not produced.  Dodds did not transcribe the second set of notes
27  until after the federal action settled.  As defendants appear to
   concede in their reply brief, failing to disclosure handwritten
28  notes that did not yet exist cannot amount to fraud on the court.

inferences can reasonably be drawn from the smoke plume and the experts' placement of the alleged points of origin in the air attack video.[13]

Defendants' allegation of fraud on the court based on the non-disclosure of Dodds' handwritten notes fails for several reasons.  First, defendants' entire argument appears to rely on the government's purported duty to disclose under <u>Brady</u>, which does not apply in this civil case.  Second, defendants do not allege that the government even knew about the handwritten notes.  Third, defendants identify the notes as only recounting Curtis's deposition testimony about placement of the points of origin outside of the smoke plume in the video.  (<u>See</u> <u>id.</u> at 74:20-23; Defs.' Reply at 90:4-7.)  Defendants were aware of Curtis's deposition testimony and did not need Dodds' notes about Curtis's testimony to effectively question Dodds or any other witness about the alleged inconsistency between the smoke plume and alleged points of origin.

Nonetheless, even if the government should have known

_____

[13]  Although defendants quote <u>Pumphrey</u> as having focused on the defendant's "failure to disclose," (Defs.' Br. at 13 n.12), that language appears only in the editorial description of the case and is absent from the opinion.  <u>Pumphrey</u> did not involve mere non-disclosure.  Although a significant video was not disclosed, defendant's general counsel "engaged in a scheme to defraud the jury, the court, and [plaintiff], through the use of misleading, inaccurate, and incomplete responses to discovery requests [about the undisclosed video], the presentation of fraudulent evidence, and the failure to correct the false impression created by [expert] testimony" at trial.  <u>Pumphrey</u>, 62 F.3d at 1132.  While non-disclosure discovery violations may be relevant in determining whether a scheme to defraud the court exists, <u>Pumphrey</u> does not suggest that discovery violations alone can amount to fraud on the court.

1   about Dodds' handwritten notes and the notes would have aided

2   defendants, non-disclosure generally "does not constitute fraud

3   on the court." See, e.g., In re Levander, 180 F.3d at 1119.   The

4   allegations regarding Dodds' undisclosed notes do not even rise

5   to the level of the previously discussed affirmative

6   misrepresentations made by counsel in Appling, which the Ninth

7   Circuit held did not constitute fraud on the court.  See Appling,

8   340 F.3d at 774.

9        For any and all of the reasons discussed above, the

10  non-disclosure of Dodds' handwritten notes cannot amount to fraud

11  on the court.

12          3.  The State Wildfire Fund

13       Defendants' next allegation of fraud on the court is

14  based on Cal Fire's "Wildland Fire Investigation Training and

15  Equipment Fund" (the "State Wildfire Fund" or "fund").  Portions

16  of wildfire recoveries collected by Cal Fire were deposited in

17  the State Wildfire Fund and available for use by Cal Fire.

18  Defendants allege that the existence of the State Wildfire Fund

19  motivated Cal Fire employees, such as White, to falsely attribute

20  blame for fires to wealthy individuals or corporations in an

21  effort to gain personal benefits through the State Wildfire Fund.

22  Defendants knew of the State Wildfire Fund prior to settlement

23  and entry of judgment but allege that they discovered the true

24  nature and inherent conflicts created by the fund after

25  settlement and entry of judgment.

26       For example, after settlement of the federal action,

27  the California State Auditor issued a formal report on October

28  15, 2013 that criticized the State Wildfire Fund.  (Defs.' Br. at

45

110:12-16.)  Among the findings, the State Auditor found that the State Wildfire Fund "'was neither authorized by statute nor approved'" and "'was not subject to Cal Fire's normal internal controls or oversight by the control agencies or the Legislature.'"  (Id. at 110:18-27 (citing the California State Auditor's report titled, "Accounts Outside the State's Centralized Treasury System").)  After repeated motions to compel in the state action, Cal Fire also produced numerous documents allegedly raising concerns about the impartiality of its investigators in light of the State Wildfire Fund.  (Id. at 111:21-25, 112:3-8.)  For example, an email from Cal Fire Northern Region Chief Alan Carlson allegedly "denied a request to use [the State Wildfire Fund] to enhance Cal Fire's ability to investigate arsonists because, he said, 'it is hard to see where our arson convictions are bringing in additional cost recovery.'"  (Id. at 113:2-4.)  Documents also allegedly showed that Cal Fire management sought to conceal the fund from state regulators, knew the fund was illegal, and used the fund to pay for destination training retreats.  (Id. at 112:21-22, 113:5-20.)

Defendants contend that their post-judgment discoveries revealing the true nature and inherent conflicts created by the State Wildfire Fund support their claim of fraud on the court based on four distinct theories: (a) the federal government made reckless misrepresentations[14] to the court to obtain a favorable

_____

[14]  Although defendants make a passing reference to the government's "intentional misconduct" of "fail[ing] to disclose" the State Wildfire Fund to defendants, (Defs.' Br. at 117:8-9), they do not advance this theory and rely only on alleged reckless misrepresentations.  Moreover, absent application of Brady and a finding that Cal Fire's knowledge can somehow be attributed to

46

in limine ruling pertaining to the State Wildfire Fund; (b) Cal Fire's general counsel and litigation counsel should be treated as officers of the federal court and thereby committed fraud on the court when they failed to disclose the true nature of the State Wildfire Fund; (c) Chris Parker testified falsely about the State Wildfire Fund during his deposition; and (d) the very existence of the State Wildfire Fund constitutes a fraud on the court.

### a. Alleged Reckless Misrepresentations by the Government

In one of its in limine motions, the government sought to exclude argument of a government conspiracy and cover-up. (U.S.'s Omnibus Mot. in Limine at 2:1 (Docket No. 487).)  While the motion focused on the alleged misconduct surrounding the events at the Red Rock Lookout Tower, the government also argued that defendants sought to prove a conspiracy based, in part, on the State Wildfire Fund.  The government explained that "a portion of assets recovered from Cal Fire's civil recoveries can be allocated to a separate public trust fund to support investigator training and to purchase equipment for investigators (e.g., investigation kits and cameras)."  (Id. at 3:28-4:3.)  It argued that the existence of the State Wildfire Fund "does not support an inference that investigators concealed evidence" and that "[a] public program established to train and equip fire investigators is hardly evidence of a multi-agency conspiracy." (Id. at 3:27-4:4.)

---

the government, this theory has no legs to stand on.

47

1          Judge Mueller granted the government's in limine motion

2    "as to conspiracy."  (July 2, 2012 Final Pretrial Order at

3    17:21.)  In their instant motion, defendants recognize that Judge

4    Mueller's ruling "was not necessarily a surprise given the

5    limited evidence then available to the Court," but nonetheless

6    argue that, in light of what was subsequently discovered about

7    the State Wildfire Fund, the government was reckless in its

8    representations to the court about the legitimacy of the fund.

9    (Defs.' Br. at 110:10-11, 115:17-10.)

10          To suggest that the limited evidence before the court

11   was the only reason defendants were not surprised by Judge

12   Mueller's ruling is misleading.  In fact, in their opposition to

13   the government's motion, defendants disavowed any intent to argue

14   the existence of a government conspiracy:

15         The U.S. mischaracterizes Defendants' arguments in
           order to knock down a straw man.  Defendants have not
16         argued--and do not intend to argue--a "conspiracy"
           among the USFS, CDF, and their respective counsel,
17         based on . . . (2) the facilitation of a program that
           encourages agents to blame fires on companies who are
18         most likely able to pay for them . . . .

19

20   (Defs.' Opp'n to U.S.'s Mot. in Limine at 3:4-8 (Docket No.

21   531).)  Defendants do not explain how any reckless

22   misrepresentations by the government persuaded Judge Mueller to

23   tentatively preclude defendants from arguing a theory defendants

24   expressly disavowed.

25          Notwithstanding the questionable footing of defendants'

26   position, allegations of reckless conduct cannot give rise to

27   fraud on the court.  The Ninth Circuit has indicated that fraud

28

                                   48

1    on the court requires proof of "an intentional, material

2    misrepresentation directly 'aimed at the court.'"   In re Napster,

3    Inc. Copyright Litig., 479 F.3d 1078, 1097 (9th Cir. 2007),

4    abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter,

5    558 U.S. 100, 105 n.1, 114 (2009);[15] see also In re Napster, Inc.

6    Copyright Litig., 479 F.3d at 1097-98 (emphasizing that the

7    evidence does not suggest that defendants selected the contract

8    terms "with the intent to defraud the courts").   The Ninth

9    Circuit has also explained that it has "vacated for fraud on the

10   court when the litigants intentionally misrepresented facts that

11   were critical to the outcome of the case, showing the appropriate

12   'deference to the deep rooted policy in favor of the repose of

13   judgments.'"   Estate of Stonehill, 660 F.3d at 452 (quoting

14   Hazel-Atlas Glass Co., 322 U.S. at 244-45) (emphasis added).

15   Allowing reckless conduct to amount to fraud on the court would

16   also be inconsistent with the Ninth Circuit's explanation that a

17   finding of fraud on the court "must involve an unconscionable

18   plan or scheme which is designed to improperly influence the

19   court in its decision."   Pumphrey, 62 F.3d at 1131 (internal

20   quotations marks omitted).

21        Although defendants appear to concede that reckless

22

23

24        [15]   In Napster, the Ninth Circuit was assessing whether
     defendants had committed fraud on the court thereby vitiating the
25   attorney-client privilege under the crime-fraud exception to the
     privilege.   479 F.3d at 1096-98.   Although the Ninth Circuit does
26   not discuss the fraud on the court doctrine in detail, it
     concluded that even if it considered the evidence as argued, it
27   "would not conclude that this evidence establishes an
     intentional, material misrepresentation directly 'aimed at the
28   court.'"   Id. at 1097 (quoting Appling, 340 F.3d at 780).

                                  49

1   conduct by a non-government party could not amount to fraud on

2   the court, (Defs.' Br. at 24:14-18), they argue that because it

3   was on the part of the government, recklessness can amount to

4   fraud on the court.  Defendants have not cited and the court is

5   not aware of a single case in which the Supreme Court or Ninth

6   Circuit suggested that reckless conduct by the government could

7   come within the narrow confines of fraud on the court.

8         In arguing that a reckless disregard for the truth by

9   government attorneys can amount to fraud on the court, defendants

10  rely exclusively on Demjanjuk.  In Demjanjuk, the Sixth Circuit

11  held that an objectively reckless disregard for the truth can

12  satisfy the requisite intent to show a fraud on the court.  10

13  F.3d at 348-49.  Its holding was not, however, dependent on the

14  fact that the misconduct was committed by government attorneys.

15  See id.  In the Sixth Circuit, a reckless state of mind by non-

16  government parties can also suffice to show fraud on the court.

17  See Gen. Med., P.C. v. Horizon/CMS Health Care Corp., 475 Fed.

18  App'x 65, 71-72 (6th Cir. 2012).

19        Defendants have not cited and this court is not aware

20  of a single circuit that has joined the Sixth Circuit in allowing

21  something less than intentional conduct to arise to fraud on the

22  court.  See, e.g., Herring v. United States, 424 F.3d 384, 386 &

23  n.1 (3d Cir. 2005) (recognizing Demjanjuk's holding, but

24  requiring proof of "an intentional fraud"); United States v.

25  MacDonald, 161 F.3d 4, 1998 WL 637184, at *3 (4th Cir. 1998)

26  (rejecting Demjanjuk's holding and describing that position as

27  the "minority view"); Robinson v. Audi Aktiengesellschaft, 56

28  F.3d 1259, 1266-67 (10th Cir. 1995) (rejecting Demjanjuk's

1   holding and requiring "a showing that one has acted with an

2   intent to deceive or defraud the court").   In disagreeing with

3   the Sixth Circuit, the Tenth Circuit explained, "A proper balance

4   between the interests underlying finality on the one hand and

5   allowing relief due to inequitable conduct on the other makes it

6   essential that there be a showing of conscious wrongdoing--what

7   can properly be characterized as a deliberate scheme to defraud--

8   before relief from a final judgment is appropriate under the

9   Hazel-Atlas standard."   Robinson, 56 F.3d at 1267.

10          Even if this court was at liberty to depart from Ninth

11   Circuit precedent and was inclined to examine the government's

12   conduct under the reckless disregard for the truth standard, the

13   reasons the Sixth Circuit concluded that the government acted

14   with a reckless disregard in Demjanjuk are not present in this

15   case.   As previously discussed, Demjanjuk did not examine the

16   government's reckless failure to disclose through the lens of its

17   obligations in a civil case.   The Sixth Circuit concluded that

18   the denaturalization and extradition proceedings in that case

19   were one of the rare instances in which Brady extended to a civil

20   case and thus the OSI prosecutors had a "constitutional duty" to

21   produce the exculpatory evidence.   The Sixth Circuit's

22   application of Brady was inextricably entwined with its finding

23   of fraud of the court: "This was fraud on the court in the

24   circumstances of this case where, by recklessly assuming

25   Demjanjuk's guilt, they failed to observe their obligation to

26   produce exculpatory materials requested by Demjanjuk."

27   Demjanjuk, 10 F.3d at 354.

28

1          Thus, even if the Ninth Circuit adopted the minority

2   position in Demjanjuk of allowing reckless conduct to rise to the

3   level of fraud on the court, Demjanjuk does not aid defendants

4   because Brady does not apply to this case.  Moreover, in

5   Demjanjuk, the documents the government failed to disclose were

6   "in their possession." Id. at 339, 350.  Here, defendants do not

7   even allege that the government had the documents exposing the

8   alleged conflicts created by the State Wildfire Fund, and the

9   critical audit report allegedly revealing the true nature of the

10  fund did not even exist before judgment was entered in this case.

11         In sum, allegations of reckless conduct regarding the

12  State Wildfire Fund cannot amount to fraud on the court and, even

13  if the Ninth Circuit adopted the minority position from

14  Demjanjuk, defendants' allegations are still insufficient because

15  Brady does not apply and the government did not possess the

16  documents at issue.

17                    b. Treating Cal Fire's General Counsel and

18                    Litigation Counsel as Officers of This Court

19         Relying on Pumphrey, defendants argue that Cal Fire's

20  general counsel and litigation counsel were "officers of the

21  court" as the term is used when examining allegations of fraud on

22  the court.  In Pumphrey, plaintiff filed suit and proceeded to

23  trial in Idaho and local counsel represented defendants

24  throughout the litigation.  62 F.3d at 1131.  Defendant's general

25  counsel was not admitted to practice in Idaho or admitted pro hac

26  vice and never made an appearance or signed a document filed with

27  the court.  Id. at 1130-31.  The Ninth Circuit nonetheless found

28  that he was an "officer of the court" for purposes of assessing

1  fraud on the court because he "participated significantly" by

2  attending trial on defendant's behalf, gathering information

3  during discovery, participating in creating the fraudulent video,

4  and maintaining possession of the fraudulent and undisclosed

5  video.  Id. at 1131.

6          The court doubts whether the rationale in Pumphrey can

7  be extended to Cal Fire because, although it operated under a

8  joint investigation and prosecution agreement with the

9  government, Cal Fire was not a party to this case as was the

10  defendant in Pumphrey.  Cf. Latshaw, 452 F.3d at 1104 ("We find

11  it significant that vacating the judgment would in fact '"punish"

12  parties who are in no way responsible for the "fraud."'" (quoting

13  Alexander, 882 F.2d at 425)).  Nor did Cal Fire's general counsel

14  or litigation counsel ever act or purport to act as an attorney

15  for the United States.

16          Nonetheless, the court need not resolve this issue

17  because defendants' theory attributing fraud on the court to Cal

18  Fire's general counsel and litigation counsel relies on their

19  failure to comply with their alleged obligation to disclose

20  evidence about the State Wildfire Fund under Brady.  (See Defs.'

21  Br. at 119:1-17.)  As this court has already explained, Brady

22  does not apply in this civil action.  Absent some duty to

23  disclose imported from Brady, non-disclosures to defendants alone

24  cannot amount to fraud on the court.  See, e.g., Appling, 340

25  F.3d at 780; In re Levander, 180 F.3d at 1119; Valerio, 80 F.R.D.

26  at 641, adopted as the opinion of the Ninth Circuit in 645 F.2d

27  at 700.  Any allegations based on Cal Fire's counsel's failure to

28

1   disclose information about the State Wildfire Fund therefore

2   cannot amount to fraud on the court.

3                    c. Chris Parker's Deposition Testimony

4            Chris Parker, a former Cal Fire investigator, was an

5   expert witness for the government and the creator of the State

6   Wildfire Fund.  During his deposition in this action, Parker

7   allegedly testified that the State Wildfire Fund was "created

8   only for altruistic purposes" and did not "suggest that the

9   account was established to circumvent state fiscal controls."

10  (Defs.' Br. at 109:17-19.)  This testimony was allegedly false or

11  concealed the true nature of the State Wildfire Fund because the

12  2013 audit report revealed that Parker "had written an email

13  which stated the purpose of the account was to give Cal Fire

14  control over money that was unencumbered by restrictions on

15  expenditure of state funds."  (Id. at 87:2-4.)

16           Assuming Parker testified falsely at his deposition,

17  the Supreme Court and Ninth Circuit have unequivocally held that

18  perjury by a witness alone cannot amount to fraud on the court.

19  See, e.g., Hazel-Atlas Glass Co., 322 U.S. at 245 ("This is not

20  simply a case of a judgment obtained with the aid of a witness

21  who, on the basis of after-discovered evidence, is believed

22  possibly to have been guilty of perjury."); Appling, 340 F.3d at

23  780 ("[P]erjury by a party or witness[] does not, by itself,

24  amount to fraud on the court.").  Defendants do not allege that

25  the government had any knowledge of this alleged perjured

26  testimony.  Even assuming Cal Fire's counsel knew of the false

27  testimony, defendants' theory of fraud on the court tied to Cal

28  Fire's counsel relies on a questionable extension of Pumphrey and

                                   54

1    an impermissible extension of <u>Brady</u>.   Parker's deposition

2    testimony simply does not rise to fraud on the court.

3              d. <u>Mere Existence of the State Wildfire Fund</u>

4              As their Hail Mary attempt to show fraud on the court

5    based on the State Wildfire Fund, defendants contend that the

6    existence of the fund alone is a fraud on the court.   Although

7    the State Wildfire Fund did not and could not receive any

8    proceeds obtained in the federal action, defendants nonetheless

9    allege that it created a conflict of interest for Cal Fire

10   employees and that the investigation and opinions of those

11   employees were central to the federal action.   Even assuming

12   those alleged conflicts permeated this action, defendants do not

13   explain how the existence of conflicts of interest by witnesses

14   translates into a fraud on the court. Suffice to say, the mere

15   existence of the State Wildfire Fund does not "'defile the court

16   itself'" and is not a fraud "'perpetrated by officers of the

17   court so that the judicial machinery can not perform in the usual

18   manner its impartial task of adjudging cases that are presented

19   for adjudication.'"   <u>Appling</u>, 340 F.3d at 780 (quoting <u>In re</u>

20   <u>Levander</u>, 180 F.3d at 119).

21              4.   <u>Alleged Bribe by Downey Brand LLP or Sierra</u>

22                   <u>Pacific Industries</u>

23              To introduce the allegation of fraud on the court based

24   on the government's failure to inform the court and defendants of

25   an alleged bribe by Downey Brand LLP or Sierra Pacific

26   Industries, defendants spend four pages detailing the facts and

27   circumstances allegedly showing that Ryan Bauer may have started

28   the Moonlight Fire.   (<u>See</u> Defs.' Br. at 122:6-126:6.)   Ryan lived

in Westwood, California and was allegedly near the area of origin with a chainsaw when the Moonlight Fire ignited.  At the time of settlement and entry of judgment, defendants knew all of the information detailed in their brief that allegedly shows Ryan may have started the fire.

After the settlement, defendants learned that Ryan's father, Edwin Bauer, had told the government that Downey Brand LLP or Sierra Pacific Industries had offered Ryan two million dollars if he would state that he had started the Moonlight Fire. (Id. at 127:10-19.)  Edwin allegedly filed a police report of the bribe attempt and the FBI interviewed him and Ryan's lawyer about it.  (Id. at 127:19-20.)  According to defendants, revealing the alleged bribe to the court or defendants "would have been damaging to the government's case, as it would have tended to prove that Edwin Bauer made a false assertion to strengthen the government's claims against Sierra Pacific while diverting attention from his son."  (Id. at 128:21-24.)  Defendants further contend that the false bribe allegation shows "a willingness on the part of the Bauers to manufacture evidence harmful to an innocent party and an effort to deflect attention away from someone who may have actually started the fire." (Id. at 128:26-28.)

As one of their eighteen motions in limine, the government sought to exclude any evidence seeking to show that the Moonlight Fire was caused by a potential arsonist, including Ryan. (U.S.'s Omnibus Mot. in Limine at 5:1-7.)  Defendants opposed the motion, putting forth the allegations recited in its current motion.  Judge Mueller tentatively denied the motion

1   "insofar as defendants may use evidence indicating arson was not

2   considered to show weaknesses in the investigation following the

3   fire," but excluded defendants from "elicit[ing] evidence to

4   argue that someone else started the fire."  (July 2, 2012 Final

5   Pretrial Order at 18:1-6.)  Based on this tentative in limine

6   ruling, defendants claim the court was defrauded by the

7   government's failure to disclose the alleged bribe to the court

8   and defendants while arguing that there was "no evidence" of

9   arson.

10          "[I]n limine rulings are not binding on the trial

11   judge, and the judge may always change his mind during the course

12   of a trial."  Ohler v. United States, 529 U.S. 753, 758, n.3

13   (2000); (see also July 2, 2012 Final Pretrial Order at 17:2-5

14   ("The following motions have been decided based upon the record

15   presently before the court.  Each ruling is made without

16   prejudice and is subject to proper renewal, in whole or in part,

17   during trial.").)  Defendants in fact filed written objections to

18   the tentative ruling, but the parties reached a settlement

19   agreement before Judge Mueller had the opportunity to address

20   those objections.  That Judge Mueller's ruling was only tentative

21   minimizes its significance in the fraud on the court inquiry.

22          Moreover, that defendants would now claim that even

23   though the ruling was only tentative it somehow prevented them

24   from "elicit[ing] evidence to argue that someone else started the

25   fire" boggles the judicial mind.  It may seem plausible based on

26   their statement in their current brief that they "always intended

27   to argue that one or more of the Bauers may have caused the fire

28   either intentionally or unintentionally, whether via arson, with

a chainsaw, spilled gasoline, or through careless smoking."

(Defs.' Br. at 126:4-6.)  It is concerning to this court,

however, that defendants would so flippantly make this

representation now when defendants' lead counsel made the

opposite representation to Judge Mueller during the hearing on

the motions in limine:

> MR. WARNE:  The other issue that I don't -- again,
> another burning need question here, you indicated a
> ruling as it relates to Bauer . . . .  We appreciated
> that.  We're not here to prove that Mr. Bauer started
> the fire, nor can anybody do that right now in light
> of the way the investigation was done.

(June 26, 2012 Tr. at 94:11-14 (Docket No. 572) (emphasis

added).)  As Warne's colloquy with the court continued, he

repeatedly emphasized that defendants' intent was to show the

flaws in the investigation, not prove that Ryan started the fire:

> MR. WARNE:  But the evidence pertaining to those two
> individuals goes directly to the quality of the
> investigation . . . .
>
> THE COURT:  There is no evidence that -- there is no
> evidence suggesting that arson was the cause of this
> fire, is there?  Your point is that the investigation
> didn't consider that fully.
>
> MR. WARNE: Actually, there is as much evidence -- and
> we don't intend to play it this way to the jury, but
> there is as much evidence suggesting that there was
> another perpetrator of this fire, be it arson or a
> chain saw or something else, as there is the
> circumstantial evidence that the government is relying
> upon to say that the bulldozer started the fire. . . .
> The government's case is fully and completely based on
> circumstantial evidence and opinion evidence, as is
> the arguments we're making with respect to the
> investigation and what it left behind without looking
> into various other possibilities.

58

1     THE COURT: Why can't you make that point generally
2     without referencing Mr. Bauer or Mr. McNeil?

3     MR. WARNE: Because it is the essence of our case
      there, as I indicated in footnote 3, with respect to
4     what I understood this Court's ruling was as it
      relates to <u>an effort by the government to really,</u>
5     <u>apologize, mischaracterize our motion or our case as</u>
      <u>trying to prove that Mr. Bauer is an arsonist.</u> <u>Our</u>
6     <u>case is focused on the investigation.</u>

7

8   (<u>Id.</u> at 94:14-95:20 (emphasis added).)

9          When asked at oral argument on this motion about his

10  representations to Judge Mueller, Mr. Warne suggested he was

11  simply feigning agreement with Judge Mueller's tentative ruling

12  to avoid any suggestion that the ruling could weaken defendants'

13  case.  As Judge Mueller explained at the hearing on the motions

14  in limine, however, her tentative ruling was based on the

15  suggestion of one of defendants' counsel.  (<u>See</u> June 26, 2012 Tr.

16  at 67:19-24 ("The exclusion of arson defenses generally.  My

17  current plan is to deny, but consider some kind of limiting

18  instruction; that is, the defense represents it will not attempt

19  to show that someone else started the fire, but wished to

20  introduce evidence showing the investigation was biased.  Mr.

21  Schaps referenced this approach earlier."); <u>see also</u> June 26,

22  2012 Tr. at 45:2-18).

23         At the very least, it remains a mystery how a tentative

24  in limine ruling based on defendants' own suggestion can

25  transform into a "substantial factor in forcing Defendants to

26  settle the federal action," (Defs.' Br. at 126:27-28).  Even

27  setting aside the inconsistencies surrounding defendants' alleged

28  intent, their argument that the government's non-disclosure of

1  the bribe allegation amounts to fraud on the court relies heavily

2  on Brady, which does not extend to this civil case.  Absent

3  application of Brady, the government was under no obligation to

4  disclose the alleged bribe.  In fact, if the government attorneys

5  had disclosed the alleged bribe, they could have just as easily

6  been criticized for spreading a scandalous rumor in attempt to

7  intimidate defendants.

8          In the civil context, the Ninth Circuit has repeatedly

9  held that non-disclosures alone generally cannot amount to fraud

10 on the court.  See, e.g., Appling, 340 F.3d at 780.  To meet the

11 high threshold for fraud on the court, a non-disclosure by

12 counsel must be "so fundamental that it undermined the workings

13 of the adversary process itself."  Estate of Stonehill, 660 F.3d

14 at 445.  The Ninth Circuit has found that non-disclosures did not

15 rise to this level when they "had limited effect on the district

16 court's decision" and the withheld information would not have

17 "significantly changed the information available to the district

18 court."  Id. at 446.

19         That defendants even argue that the government's non-

20 disclosure of the bribe was "so fundamental that it undermined

21 the workings of the adversary process itself" is disturbing.  The

22 court ruled consistent with the very trial strategy defendants

23 represented they wanted to take, and it is far from plausible

24 that evidence of the alleged bribe would even have remotely

25 changed the information available to the district court, let

26 alone have been admissible.  Cf. id.

27              5.  Removal of AUSA Wright from the Case

28         Former AUSA Wright was originally assigned to lead the

1  Moonlight Fire case, but was allegedly "forbidden from working on

2  the case in January 2010, shortly after raising ethical concerns

3  regarding disclosures in another wildland fire action he was

4  handling." (Defs.' Reply at 90:24-91:1.)  Defendants do not

5  articulate how removal of Wright from the Moonlight Fire case

6  could amount to fraud on the court.  It is the exclusive

7  prerogative of the United States Attorney to determine how to

8  staff any case in his office.  Defendants argue only that the

9  removal of Wright "tend[s] to show" the government's fraudulent

10  intent and that its alleged misconduct was purposeful.  (Id. at

11  90:22-91:8.)  It neither shows nor suggests any such thing.

12          6.   Judge Nichols' Terminating Order and Sanctions in

13               the State Action

14          In the state action, Judge Nichols issued two

15  decisions[16] condemning misconduct by Cal Fire and its attorneys

16  and ultimately dismissed the state action with prejudice and

17  ordered sanctions in favor of defendants because of Cal Fire's

18  misconduct.  Defendants acknowledge that Judge Nichols' findings

19  in the state action have no preclusive or binding effect in this

20          [16]   The government criticizes Judge Nichols for having
adopted the detailed proposed findings submitted by Downey Brand
21  LLP with only two minor edits.  As a companion to that order,
however, Judge Nichols first issued an order that "speaks in the
22  Court's own voice."  See Cal. Dep't of Forestry v. Howell, No. GN
CV09-00205, 2014 WL 7972096, at *7 (Cal. Super. Ct. Feb. 4,
23  2014).  Judge Nichols repeatedly emphasized that he had belabored
to review all of the evidence and did not simply sign the
24  proposed order.  See id. at *7, *12 ("The fact that the Court has
signed Defendants' proposed orders with few changes reflects only
25  the reality that those orders are supportable in all respects. .
. . The Court does not wish on any appellate tribunal the task
26  undertaken by the undersigned: the personal review of every
document and video deposition submitted in the case.  This task
27  required countless hours of study and consideration.").

28

1   case.  Not only was the government not a party in the state

2   action, it did not have the opportunity to argue or brief any of

3   the issues before Judge Nichols.  More importantly, Judge

4   Nichols' findings and criticisms were levied against Cal Fire and

5   its counsel.  See Cal. Dep't of Forestry v. Howell, No. GN CV09-

6   00205, 2014 WL 7972096 (Cal. Super. Ct. Feb. 4, 2014); Cal. Dep't

7   of Forestry v. Howell, No. GN CV09-00205, 2014 WL 7972097 (Cal.

8   Super. Ct. Feb. 4, 2014).

9        The only references Judge Nichols makes in either order

10  regarding any involvement of the federal government were about

11  the pre-deposition meeting with Reynolds.  Cal. Dep't of

12  Forestry, 2014 WL 7972096, at *10; Cal. Dep't of Forestry v.

13  Howell, 2014 WL 7972097, at *n.13.  This court has already

14  determined that the allegations regarding the pre-deposition

15  meeting with Reynolds cannot amount to fraud on the court.

16       Judge Nichols, moreover, based his decision to impose

17  terminating sanctions on Cal Fire's discovery abuses and his

18  determination that Cal Fire "prejudiced [defendants'] ability to

19  go to trial."  Cal. Dep't of Forestry, 2014 WL 7972096, at *4.

20  Findings in that context and under that legal standard are not

21  relevant to the determination of whether alleged misconduct by

22  the federal government constituted fraud on the court.  As the

23  Ninth Circuit has explained, prejudice to the opposing party may

24  be considered when assessing fraud on the court, but fraud on the

25  court exists only if there is "'an unconscionable plan or scheme

26  which is designed to improperly influence the court in its

27  decision.'"  Abatti, 859 F.2d at 118 (quoting Toscano, 441 F.2d

28  at 934).  Judge Nichols' findings that Cal Fire prejudiced

62

1  defendants' ability to go to trial in the state action thus do

2  not aid this court in determining whether defendants' allegations

3  about the federal government amount to a "'grave miscarriage of

4  justice,'" <u>Appling</u>, 340 F.3d at 780 (quoting <u>Beggerly</u>, 524 U.S.

5  at 47).

6  IV. <u>Conclusion</u>

7           Defendants made a calculated decision to settle this

8  case almost two years ago, and a final judgment was entered

9  pursuant to their agreement.  To set that judgment aside, the law

10 requires a showing of fraud on the court, not an imperfect

11 investigation.  Defendants have failed to identity even a single

12 instance of fraud on the court, certainly none on the part of any

13 attorney for the government.  They repeatedly argue that fraud on

14 the court can be found by considering the totality of the

15 allegations.  Here, the whole can be no greater than the sum of

16 its parts.  Stripped of all its bluster, defendants' motion is

17 wholly devoid of any substance.

18          IT IS THEREFORE ORDERED that defendants' motion to set

19 aside the judgment (Docket No. 593) and defendants' motion for a

20 temporary stay of the settlement agreement (Docket No. 615) be,

21 and the same hereby are, DENIED.

22 Dated:  April 17, 2015

23

24 _____

   WILLIAM B. SHUBB

25 UNITED STATES DISTRICT JUDGE

26

27

28

63